## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,
U.S. Department of Justice,
Antitrust Division,
450 Fifth Street NW, Suite 4000,
Washington, DC 20530,

                     *Plaintiff*,

     v.

AB ELECTROLUX,
S:t Goransgatan 143,
Stockholm, Sweden 10545,

ELECTROLUX NORTH AMERICA, INC.,
10200 David Taylor Drive,
Charlotte, NC 28262,

and

GENERAL ELECTRIC COMPANY,
3135 Easton Turnpike,
Fairfield, CT 06828,

                     *Defendants*.

## <u>COMPLAINT</u>

The United States of America, acting under the direction of the Attorney General of the United States, brings this civil action to enjoin the proposed acquisition by Defendants AB Electrolux and Electrolux North America, Inc. (collectively "Electrolux") of Defendant General Electric Company's assets relating to its appliance business unit.  The United States alleges as follows:

# I. <u>INTRODUCTION</u>

1.      General Electric and Electrolux, which owns the "Frigidaire" brand, have long competed to sell major cooking appliances (ranges, cooktops, and wall ovens), which are an essential part of the American household and among consumers' most significant purchases. Electrolux, through the proposed acquisition, would stop that competition and take out an important rival in General Electric.  If not enjoined, the proposed acquisition would combine two of the leading suppliers of major cooking appliances sold in the United States.  The result likely would be less competition, higher prices, and fewer options for millions of Americans who buy major cooking appliances each year.

2.      The proposed acquisition would create a duopoly in the supply of major cooking appliances to American home builders, property managers, and other contract-channel appliance purchasers.  To fully serve the contract channel, appliance suppliers at least must have a full line of kitchen appliances, a variety of choices and models for each appliance, and a large and sophisticated distribution network that can meet the specific delivery, scheduling, and service needs of contract-channel purchasers.  Few appliance suppliers can meet these demands and, as a result, General Electric, Electrolux, and Whirlpool (the "Big Three") today possess a combined share of more than 90 percent of sales of each major cooking appliance sold in the contract channel.  The proposed acquisition would leave Electrolux and Whirlpool as the only meaningful competitors.

3.      The competition between Electrolux and General Electric is important.  Over the last decade, Electrolux intensified its efforts in the contract channel and made significant investments to serve those purchasers.  General Electric noticed.  As one senior executive observed, Electrolux is "very hungry and they are going after our huge piece of the pie in a big

way."  But rather than continuing to compete for contract channel sales, Electrolux now seeks to obtain General Electric's huge piece of the pie by buying it.

4.     While the proposed acquisition's harmful effects likely would be particularly acute in sales to contract-channel purchasers, those effects also likely would be felt across all purchases of major cooking appliances.  Purchasers in the United States spent over $4 billion on major cooking appliances in 2014.  General Electric describes itself as the "clear leader" for cooking products sold in the United States.  Electrolux likewise touts itself as "the leader in cooking products."  Top Electrolux executives have recognized that by merging these two leaders in major cooking appliances, "the combined entity would have a dominant position as market leader."

5.     The proposed acquisition violates Section 7 of the Clayton Act, 15 U.S.C. § 18, and should be enjoined.

## II. JURISDICTION, VENUE, AND COMMERCE

6.     This action is filed by the United States under Section 15 of the Clayton Act, 15 U.S.C. § 25, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.  This Court has subject-matter jurisdiction over this action under Section 15 of the Clayton Act, 15 U.S.C. § 25.

7.     Electrolux and General Electric are engaged in interstate commerce and in activities substantially affecting interstate commerce.  Electrolux and General Electric sell major cooking appliances throughout the United States.  They are engaged in a regular, continuous, and substantial flow of interstate commerce, and their major cooking appliance businesses have had a substantial effect upon interstate commerce.

8.     This Court has personal jurisdiction over each Defendant.  Both Electrolux North America, Inc. and General Electric Company are corporations that transact business and are found within the District of Columbia through, among other things, selling major cooking appliances to consumers in the District of Columbia.  AB Electrolux's acquisition of General Electric's appliance business will have effects throughout the United States, including in this district.

9.     Venue is proper in this district under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391(b) and (c), concerning corporate Defendants Electrolux North America, Inc. and General Electric Company.  And venue is proper in this district for Defendant AB Electrolux, a Swedish corporation, under 28 U.S.C. § 1391(c)(3).

### III. DEFENDANTS AND THE PROPOSED ACQUISITION

10.     Defendant Electrolux North America, Inc. is an Ohio corporation headquartered in Charlotte, North Carolina.  In the United States, Electrolux North America, Inc. makes and sells major cooking appliances, including those under the brand names "Frigidaire," "Frigidaire Gallery," "Frigidaire Professional," "Tappan," "Electrolux," and "Electrolux Icon."  Electrolux North America, Inc.'s annual major-cooking-appliance sales in the United States total about $770 million.  Electrolux North America, Inc. is a wholly owned subsidiary of Defendant AB Electrolux.

11.     Defendant General Electric Company is a New York corporation headquartered in Fairfield, Connecticut.  It is one of the largest and most diversified corporations in the world.  General Electric's appliance business is based in Louisville, Kentucky.  It makes and sells major cooking appliances, including those under the brand names "GE Monogram," "GE Café," "GE

Profile," "GE," "GE Artistry," and "Hotpoint."  In the United States, General Electric's annual major-cooking-appliance sales total about $1.1 billion.

12.     On September 7, 2014, Defendant AB Electrolux agreed to acquire from Defendant General Electric Company and its subsidiaries assets relating to General Electric's appliance business.  Electrolux agreed to pay General Electric $3.3 billion for these assets, subject to certain adjustments.

### IV. INDUSTRY BACKGROUND

13.     There are three types of major cooking appliances:  cooktops, wall ovens, and ranges.  A cooktop is a cooking unit with burners or hot plates that is installed into the top of a kitchen counter or cabinet.  A wall oven is a cooking unit containing an enclosed heating compartment that is built or slid into a kitchen cabinet or wall opening.  A range, which is the most common major cooking appliance, is a cooking unit that combines the functions of a cooktop and oven.  While ranges, cooktops, and wall ovens are all major cooking appliances, they typically are not good substitutes for each other.  Other cooking appliances, such as grills and microwaves, are even poorer substitutes for ranges, cooktops, and wall ovens.  All of these appliances are priced differently and a consumer typically must spend more to buy both a cooktop and a wall oven than to buy a range.

14.     As Electrolux explained in its 2013 Annual Report, the sale of appliances "is dominated by three manufacturers:  Electrolux, Whirlpool and General Electric."  These manufacturers sell major cooking appliances through two principal sales channels:  retail and contract.  In both channels, Electrolux and General Electric compete with each other.

15.     In the retail channel, manufacturers sell major cooking appliances to retailers and retail distributors at wholesale prices.  Retailers then add their own mark-up and resell the

appliances to their customers.  When manufacturers increase wholesale prices for major cooking appliances, retailers have the incentive and ability to pass the wholesale price increases on to their customers by increasing the retail prices of those appliances.

16.     Many retail-channel customers make their major cooking appliance purchase decisions based largely on brand, price, and features.  Because brand preferences and brand loyalty are important drivers of sales, cooking-appliance suppliers invest heavily in advertising and promotion to build and maintain their brand equity.

17.     In the contract channel, cooking-appliance suppliers sell to single-family homebuilders, multi-family homebuilders (builders of new apartment and condominium buildings), property managers of apartment and condominium buildings, hotels/motels, and governmental entities.  Cooking-appliance suppliers sell both directly to builders and indirectly through builder distributors.  Whether sales in the contract channel are direct or indirect, prices paid by contract-channel purchasers frequently are negotiated individually between the purchaser and the supplier.  When cooking-appliance suppliers increase the prices charged to contract-channel appliance purchasers, those purchasers often have the incentive and ability to pass the price increases on to home buyers or renters.

18.     Many contract-channel purchasers make their buying decisions based on brand, price, features, and the ability of the appliance supplier to meet the purchaser's specific needs, which generally include availability of a wide array of products as well as exacting service and delivery capabilities.  Certain homebuilders and property managers often demand delivery directly from the appliance supplier, in significant quantities, and on a specific schedule dictated by the contract-channel purchaser.  Some contract-channel purchasers prefer to contract with a single supplier for their major-cooking-appliance needs in order to simplify the procurement

process.  Moreover, to effectively serve contract-channel purchasers, suppliers need to offer major cooking, refrigeration, and dishwashing appliances, with multiple models across various price points.  Weaknesses of other suppliers in major cooking appliances or in the lower pricing tiers makes it difficult for them to break into sales in the contract channel, even if they have had some success selling refrigerators, dishwashers, or premium appliances outside of the contract channel, because contract-channel purchasers often will not mix and match kitchen appliances by purchasing them from different suppliers.  These weaknesses have resulted in only a few appliance suppliers controlling almost all of the sales to contract-channel purchasers of major cooking appliances, refrigerators, and dishwashers.

19.     Industry participants recognize that major-cooking-appliance sales to contract-channel purchasers are different from sales to customers in the retail channel because purchasers in the contract channel have needs that are distinct from retail channel purchasers.  Both General Electric and Electrolux have dedicated contract-channel and retail-channel sales teams and distinct pricing processes for sales into each channel.

## V. RELEVANT MARKETS

### A.    Ranges, Cooktops, and Wall Ovens

20.     Ranges constitute a relevant antitrust market and line of commerce under Section 7 of the Clayton Act.  This market includes all residential ranges, whether powered by gas or electricity and whether free standing, slide-in, or built-in.  The next-best substitute for buying a range is to buy both a cooktop and a wall oven, but buying both a cooktop and a wall oven typically is not a good substitute for a range.  A hypothetical monopolist supplier of ranges likely would increase its prices by at least a small but significant and non-transitory amount.

21.     Cooktops constitute a relevant antitrust market and line of commerce under Section 7 of the Clayton Act.  This market includes all residential cooktops, regardless of whether they are powered by gas or electricity.  The next-best substitute for buying a cooktop is to buy a range, but a range typically is not a good substitute for a cooktop.  A hypothetical monopolist supplier of cooktops likely would increase its prices by at least a small but significant and non-transitory amount.

22.     Wall ovens constitute a relevant antitrust market and line of commerce under Section 7 of the Clayton Act.  This market includes all residential wall ovens, regardless of whether they are powered by gas or electricity, or whether they have a microwave function.  The next-best substitute for buying a wall oven is to buy a range, but a range typically is not a good substitute for a wall oven.  A hypothetical monopolist supplier of wall ovens likely would increase its prices by at least a small but significant and non-transitory amount.

**B.     Ranges, Cooktops, and Wall Ovens Sold to Contract-Channel Purchasers**

23.     The different buying practices of contract-channel and retail-channel customers mean that contract-channel purchasers can be harmed by the proposed acquisition independent of any harm to retail-channel customers.  Because they often purchase major cooking appliances under individually negotiated contracts, and can therefore be made subject to targeted price increases, sales in the contract channel can constitute a relevant antitrust market.

24.     These contract-channel customers could not reasonably avoid such targeted price increases.  Home buyers almost always buy their homes with major cooking appliances already purchased and installed.  Similarly, property managers generally furnish an apartment with major cooking appliances installed, and renters generally do not rent an apartment and then purchase and install a range, cooktop, or wall oven.  Consequently, contract-channel purchasers cannot

rely on major-cooking-appliance purchases by home buyers or renters to prevent targeted price increases.

25.     Additionally, most large builders and other contract-channel purchasers could not reasonably avoid targeted post-acquisition price increases by purchasing major cooking appliances from retailers because of the service issues described above.  These contract-channel purchasers also typically receive lower prices in the contract channel than they would receive from a retailer.

26.     There are three relevant contract-channel markets.  First, ranges sold to contract-channel purchasers constitute a relevant antitrust market and line of commerce under Section 7 of the Clayton Act.  A hypothetical monopolist supplier of ranges to contract-channel purchasers likely would increase prices to those purchasers by at least a small but significant and non-transitory amount.  Second, cooktops sold to contract-channel purchasers constitute a relevant antitrust market and line of commerce under Section 7 of the Clayton Act.  A hypothetical monopolist supplier of cooktops to contract-channel purchasers likely would increase prices to those purchasers by at least a small but significant and non-transitory amount.  Third, wall ovens sold to contract-channel purchasers constitute a relevant antitrust market and line of commerce under Section 7 of the Clayton Act.  A hypothetical monopolist supplier of wall ovens to contract-channel purchasers likely would increase prices to those purchasers by at least a small but significant and non-transitory amount.

C.      **Relevant Geographic Markets**

27.      The relevant geographic markets are no larger than the United States.  A

hypothetical monopolist supplier of each of the relevant products in the United States likely

would increase prices by a small but significant and non-transitory amount.  Defendants have

agreed that they will not argue that the relevant geographic markets are broader than the United

States.

## VI. ANTICOMPETITIVE EFFECTS

28.      The proposed acquisition would eliminate competition between Electrolux and

General Electric and significantly increase concentration in already concentrated markets.  The

proposed acquisition likely would lead Electrolux to profit by, among other things, raising the

prices of major cooking appliances above pre-acquisition levels.  It would reduce from three to

two the number of meaningful suppliers to contract-channel purchasers and prevent those

purchasers from playing Electrolux and General Electric off against each other in negotiations,

raising contract-channel purchasers' costs of buying and installing major cooking appliances in

homes throughout the United States.  Similarly, retail-channel customers likely would be harmed

by the elimination of competition.  The proposed acquisition also likely would further enable or

encourage accommodating and coordinated interactions among firms in the relevant markets,

which likely would lead to higher major-cooking-appliance prices.

A.      **The Proposed Acquisition Would Significantly Increase the Concentration of
         Already Concentrated Markets and Harm Consumers**

29.      The Herfindahl-Hirschman Index ("HHI") is a measure of market concentration

widely accepted by economists and the courts in evaluating the level of competitive vigor in a

market and the likely competitive effects of an acquisition.  The more concentrated a market, and

the more an acquisition would increase concentration in that market, the more likely the

acquisition would result in market power that harms consumers.  Under the Horizontal Merger

Guidelines of the United States Department of Justice and the Federal Trade Commission,

markets in which the HHI values exceed 2,500 points are considered "highly concentrated."

Acquisitions that increase the HHI values by more than 200 points in highly concentrated

markets are presumed likely to create or enhance market power.

30.     Using this measure, the proposed acquisition is presumed likely to create or

enhance market power in each of the relevant markets.  As shown by the tables below, the

approximate post-acquisition HHI values are above 2,500 points and concentration would

increase by considerably more than 200 points, whether measured by the amount of money each

appliance supplier received from those sales (revenues) or the quantity of each appliance sold

(units).

| U.S. Sales in Contract Channel | | | | |
|---|---|---|---|---|
| | Revenues | | Units | |
| | Post-Acquisition HHI | Increase | Post-Acquisition HHI | Increase |
| Ranges | 5,100 | 1,750 | 5,400 | 2,000 |
| Cooktops | 4,500 | 600 | 4,700 | 950 |
| Wall Ovens | 4,600 | 650 | 4,700 | 950 |

| U.S. Sales in All Channels | | | | |
|---|---|---|---|---|
| | Revenues | | Units | |
| | Post-Acquisition HHI | Increase | Post-Acquisition HHI | Increase |
| Ranges | 2,700 | 900 | 3,200 | 1,150 |
| Cooktops | 2,800 | 350 | 2,600 | 450 |
| Wall Ovens | 3,000 | 400 | 2,700 | 500 |

**B.      The Proposed Acquisition Would Eliminate Competition Between Electrolux and General Electric and Harm Consumers**

31.      Electrolux and General Electric are close competitors in the sale of major cooking appliances.  The proposed acquisition would end that competition, and consumers would lose the benefits of that competition.

**1.      Contract-Channel Purchasers of Ranges, Cooktops, and Wall Ovens Likely Would Face Higher Prices**

32.      The Big Three collectively account for more than 90 percent of sales of each major cooking appliance to purchasers in the contract channel.  If the proposed acquisition is not enjoined, these contract-channel purchasers would be left with only two meaningful options: Electrolux and Whirlpool.

33.      In recent years, Electrolux has competed aggressively with General Electric to win the business of home builders and other contract-channel purchasers and Electrolux has succeeded in increasing its share of sales in the contract channel.  It has won business with some of the largest home builders in the country, with most of those wins coming at the expense of General Electric.  In recent years, some builders were able to obtain lower prices and better service by switching their business from General Electric to Electrolux.  Other builders were able to obtain better prices and service from General Electric by threatening to move to Electrolux. As a General Electric executive recognized, an aggressive Electrolux competing with General

Electric gave a home builder "leverage" and "negotiating options" in seeking the best terms from its major-cooking-appliance suppliers.  The proposed acquisition would end the vigorous and growing head-to-head competition between Electrolux and General Electric that has produced significant benefits for contract-channel purchasers.

> **2.   Purchasers of Ranges, Cooktops, and Wall Ovens Likely Would Face Higher Prices**

34.   Electrolux and General Electric are two of the leading suppliers of major cooking appliances in the United States.  They each have multiple popular brands that they use to sell ranges, cooktops, and wall ovens across a wide variety of price points.  If the proposed acquisition is not enjoined, Electrolux likely would find it profitable to increase the prices of many of the combined firm's cooking appliance models, knowing that enough purchasers deterred by the price increase from buying those products would instead purchase other products that it makes or sells.  Electrolux would profit post-acquisition not only from a price increase on Electrolux and General Electric major cooking appliances, but also from an increase in the price it charges Sears to manufacture the major cooking appliances that Sears then sells under the "Kenmore" brand name.

35.   The HHI values reported above reflect all sales in the relevant markets, regardless of whether the appliance sold was the least expensive appliance brand or the most expensive. But purchasers of low and mid-priced major cooking appliances likely would be particularly harmed by the proposed acquisition.  A large share of major cooking appliances is sold in these "value" and "mass market" pricing segments.  If the proposed acquisition is not enjoined, consumers purchasing major cooking appliances in these segments would be left with only three meaningful rivals:  Electrolux, Whirlpool, and Kenmore.  And, again, Electrolux manufactures the major cooking appliances for Kenmore.

## VII. LACK OF COUNTERVAILING FACTORS

36.     Barriers to economically meaningful entry or expansion associated with manufacturing and selling in these markets are high, and thus new entry or expansion by existing competitors is unlikely to prevent or remedy the proposed acquisition's anticompetitive effects. The barriers to timely and sufficient entry and expansion include the following:  time and cost of developing a brand recognized for major cooking appliances, particularly a brand for the "value" and "mass market" pricing segments; building effective manufacturing capabilities; solving the "chicken and egg problem" of needing large volume to drive costs down but needing lower costs to generate large volume; and, for the markets of major cooking appliances sold to contract-channel purchasers, developing full lines of kitchen appliances, including major cooking appliances, refrigerators, and dishwashers, providing the specialized services those purchasers demand, and developing distribution networks to meet the exacting needs of those purchasers.

37.     Although Electrolux asserts that the proposed acquisition might produce efficiencies, it cannot demonstrate acquisition-specific and cognizable efficiencies that would offset the proposed acquisition's anticompetitive effects in the major-cooking-appliance markets.

## VIII. VIOLATION ALLEGED

38.     The effect of the proposed acquisition, if approved, likely would be to lessen competition substantially in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## REQUEST FOR RELIEF

39.     The United States requests:

(a)     that the proposed acquisition be adjudged to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

(b)     that the Defendants be permanently enjoined and restrained from carrying out the Agreement dated September 7, 2014, or from entering into or carrying out any agreement, understanding, or plan by which Electrolux would acquire General Electric's appliances business or any of its relevant assets;

(c)     that the United States be awarded costs of this action; and

(d)     that the United States be awarded such other relief as the Court may deem just and proper.

Dated this 1st day of July 2015.

Respectfully submitted,

FOR PLAINTIFF UNITED STATES:

Leslie C. Overton (D.C. Bar #454493)
Acting Assistant Attorney General
Antitrust Division

David I. Gelfand (D.C. Bar #416596)
Deputy Assistant Attorney General
Antitrust Division

Patricia A. Brink
Director of Civil Enforcement
Antitrust Division

David C. Kully (D.C. Bar #448763)
Chief, Litigation III Section
Antitrust Division

Ethan C. Glass (D.D.C. Bar #MI0018)
    Assistant Chief, Litigation III Section
    Antitrust Division
Bryson L. Bachman (D.C. Bar #988125)
Thomas E. Carter
Mona S. Haar (D.C. Bar #986789)
Nina B. Hale
Ihan Kim
Steven Kramer
Lisa A. Scanlon
Kelsey W. Shannon (D.C. Bar #990386)
Adam C. Speegle
Paul J. Torzilli (D.C. Bar #986767)
Jeffrey G. Vernon (D.C. Bar #1009690)
Rachel L. Zwolinski
    Trial Attorneys

U.S. Department of Justice
Antitrust Division, Litigation III Section
450 Fifth Street, NW #4000
Washington, D.C. 20530
Telephone:   (202) 305-1489
Facsimile:   (202) 514-7308
ethan.glass@usdoj.gov