UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,           )
                                    )
          Plaintiff,                )   Civil Action
                                    )   No. 15-1039
     v.                             )
                                    )   November 20, 2015
AB ELECTROLUX, et al.,              )   9:06 a.m.
                                    )
          Defendants.               )   Washington, D.C.
                                    )
                                    )

VOLUME 9 - MORNING SESSION
*TRANSCRIPT OF BENCH TRIAL PROCEEDINGS*
*(EXCLUDING CLOSED SESSION)*
*BEFORE THE HONORABLE EMMET G. SULLIVAN,*
*UNITED STATES DISTRICT COURT JUDGE*

APPEARANCES:

    For the Plaintiff:        **Ethan Glass, Trial Attorney**
                              U.S. DEPARTMENT OF JUSTICE
                              450 Fifth Street, NW
                              Room 4000
                              Washington, DC 20001
                              (202) 305-1489
                              Email: Ethan.glass@usdoj.gov

                              **Kelsey Walter Shannon, Trial
                              Attorney**
                              UNITED STATES DEPARTMENT OF JUSTICE
                              450 Fifth Street, NW, Ste. 4000
                              Washington, DC 20530
                              (202) 598-2854
                              Fax: (202) 514-7308
                              Email: Kelsey.shannon@usdoj.gov

                              **Mark Harris Hamer, Trial Attorney**
                              UNITED STATES DEPARTMENT OF JUSTICE
                              Antitrust Division
                              450 Fifth Street, NW
                              Suite 4000
                              Washington, DC 20530
                              (202) 532-4562
                              Fax: (202) 514-7308

**APPEARANCES:   Cont.**
                                    Email: Mark.hamer@usdoj.gov


**For the Plaintiff:**              **David L. Gelfand, Trial Attorney**
                                    UNITED STATES DEPARTMENT OF JUSTICE
                                    450 Fifth Street, NW
                                    Ste. 4000
                                    Washington, DC 20530
                                    202-514-0731
                                    Email:david.gelfand@doj.gov

                                    **Bryson Bachman, Trial Attorney**
                                    UNITED STATES DEPARTMENT OF JUSTICE
                                    450 Fifth Street, NW
                                    Ste. 4000
                                    Washington, DC 20530
                                    Email: Bryson.bachman@doj.gov


**For Defendant:**                  **John M. Majoras, Esq.**
**(AB Electrolux)**                 JONES DAY
                                    51 Louisiana Avenue, NW
                                    Washington, DC 20001-2113
                                    (614) 281-3835
                                    Fax: (202) 626-1700
                                    Email: Jmmajoras@jonesday.com

                                    **Paula W. Render, Esq.**
                                    JONES DAY
                                    77 West Wacker Drive
                                    Chicago, IL 60601
                                    (312) 269-1555
                                    Email: Prender@jonesday.com

                                    **Kristen A. Lejnieks, Esq.**
                                    JONES DAY
                                    51 Louisiana Avenue, NW
                                    Washington, DC 20001-2113
                                    (202) 879-3939
                                    Fax: (202) 626-1700
                                    Email: Kalejnieks@jonesday.com

                                    **Peter J. Love, Esq.**
                                    JONES DAY
                                    51 Louisiana Avenue, NW
                                    Washington, DC 20001-2113
                                    (202) 879-3816
                                    Fax: (202) 626-1700
                                    Email: Pjlove@jonesday.com

**APPEARANCES: Cont.**

| | |
|---|---|
| **For Defendant:**<br>**(AB Electrolux)** | **Thomas Demitrack, Esq.**<br>JONES, DAY, REAVIS & POGUE<br>North Point<br>901 Lakeside Avenue<br>Cleveland, OH 44114<br>(216) 586-3939 |
| | **Debra R. Belott, Esq.**<br>JONES DAY<br>51 Louisiana Avenue, N.W.<br>Washington, DC 20001-2113<br>(202)879-3689 |
| **For Defendant:**<br>**(General Electric**<br>**Company)** | **Paul H. Friedman, Esq.**<br>DECHERT LLP<br>1900 K Street, NW<br>Suite 1200<br>Washington, DC 20006<br>(202) 261-3398<br>Email: Paul.friedman@dechert.com |
| | **Paul T. Denis, Esq.**<br>DECHERT, LLP<br>1900 K Street NW<br>Suite 1200<br>Washington, DC 20006<br>(202) 261-3430<br>Email: Paul.denis@dechert.com |
| | **Craig Gerald Falls, Esq.**<br>DECHERT LLP<br>1900 K Street, NW<br>Washington, DC 20006<br>(202) 261-3373<br>Fax: (202) 261-3034<br>Email: Craig.falls@dechert.com |
| | **Michael G. Cowie, Esq.**<br>DECHERT, LLP<br>1900 K Street NW<br>Suite 1200<br>Washington, DC 20006<br>(202) 261-3339 |
| **Court Reporter:** | **Scott L. Wallace, RDR, CRR** |

Proceedings reported by machine shorthand, transcript produced

by computer-aided transcription.

## C O N T E N T S

**EXAMINATIONS**

**Page**

DIRECT EXAMINATION OF ROBERT POSTHAUER    2232
BY MR. FRIEDMAN:

## EXHIBITS

**DESCRIPTION**

1             <u>**MORNING SESSION, NOVEMBER 20, 2015**</u>

2 (9:06 a.m.)

3     THE COURTROOM CLERK:  Good morning, Your Honor.

4     THE COURT:  Good morning.

5     THE COURTROOM CLERK:  Your Honor, this is Civil Action

6 15-1039, *United States of America versus AB Electrolux, et al.*

7 Will parties please come forward to the podium and introduce

8 yourselves for the record, please.

9     MR. GLASS:  Good morning, Your Honor.  Ethan Glass for the

10 United States.

11     THE COURT:  Good morning, Counsel.

12     MR. GLASS:  With me at counsel table today is Ms. Rose

13 Haag, Mr. Benjamin Adler, Mr. Kelsey Shannon, Mr. Bryson Bachman

14 and Mr. Mark Hamer.

15     THE COURT:  All right.  Good morning.

16     MR. FRIEDMAN:  Good morning, Your Honor.  Paul Friedman

17 from Dechert for General Electric, and with me at counsel table

18 are my colleagues Craig Falls, Paul Denis and Mike Cowie.

19     THE COURT:  All right.  Good morning.

20     MR. MAJORAS:  Good morning, Your Honor.

21     THE COURT:  Good morning, Counsel.

22     MR. MAJORAS:  John Majoras from Jones Day on behalf of the

23 Electrolux defendants.  With me at counsel table today are Tom

24 Demitrack, Paula Render, Peter Love, Debra Belott and Kristen

25 Lejnieks.

1      THE COURT:  All right.  Good morning.  I understand

2  there's a preliminary matter that you wish to bring to the

3  Court's attention?

4      MR. MAJORAS:  I think there are a couple.  I'll begin with

5  the one I raised, I mention to Mr. Coates.

6      Your Honor, yesterday, as you'll recall, Mr. McLoughlin

7  from Electrolux was here testifying all day.

8      THE COURT:  Yes.

9      MR. MAJORAS:  And last evening, as he thought back on his

10  testimony, there was one part of it in particular that he was

11  concerned about whether he had correctly stated, and that was the

12  testimony about the $399 and $499 prices of LG or Samsung.

13      THE COURT:  Right.

14      MR. MAJORAS:  Mr. McLoughlin went to look at the

15  information he had that he had based that testimony on, and

16  realized that he had misspoken.  And he has looked at the

17  information.  In particular, the 399 was a Whirlpool range.

18      What we plan to do today, and I've mentioned this to

19  Mr. Glass earlier, we plan to file a declaration from

20  Mr. McLoughlin stating exactly that, also stating -- and his

21  apologies to the Court, Your Honor, for any confusion from that,

22  and having misspoken.  And also, he will, of course, make himself

23  available, if necessary, whether by phone or in person, to come

24  and correct any testimony that might be needed.

25      THE COURT:  All right.

1          MR. MAJORAS:  Thank you, Your Honor.

2          THE COURT:  Any objection to that declaration, or do you

3     wish to examine him further about the declaration?

4          MR. GLASS:  Well, Your Honor, I'd like to see the

5     declaration --

6          THE COURT:  Right.

7          MR. GLASS:  -- before we make that determination, if it's

8     okay.

9          THE COURT:  Sure.

10          MR. GLASS:  So, Your Honor, we were concerned about some

11     of the things that Mr. McLoughlin said.  One of them was the 399,

12     499.

13          THE COURT:  Well, I asked some follow-up questions also

14     about that, too.

15          MR. GLASS:  You did, Your Honor.

16          Another was, I believe -- and we haven't yet had the

17     opportunity to review the transcript.  We will as soon as it

18     comes.  He emphatically stated that if this merger doesn't go

19     through he expected GE Appliances would go out of business or

20     Electrolux would go out of business.  And we think those are two

21     key issues to this case that have never been disclosed to the

22     government, and candidly, Your Honor, are inconsistent with the

23     evidence that has already been produced in this case.

24          I just want to flag for Your Honor that we do appreciate

25     the candor of counsel and bringing this to our attention, but,

1   you know, Mr. McLoughlin was here under oath to testify in this

2   court about facts to his personal knowledge, and to the extent

3   that those facts within his personal knowledge are inconsistent,

4   we would like to know which of the facts that he testified about

5   yesterday aren't accurate or he was mistaken about, so that then

6   we can examine our options and maybe come to Your Honor, and if

7   we need to recall him, recall him.

8        THE COURT:  Sure.  I see nothing wrong with that.

9        Was he deposed?

10       MR. GLASS:  Yes, he was, Your Honor.

11       THE COURT:  Is his testimony -- was his testimony

12   yesterday inconsistent with his deposition testimony?

13       MR. GLASS:  Your Honor, at no point did Mr. McLoughlin in

14   his deposition testimony testify about an LG or Samsung range at

15   499 or 399.

16       THE COURT:  Right.

17       MR. GLASS:  So it was not consistent with his deposition

18   testimony.  And, in fact, Your Honor, LG has been deposed and has

19   testified in this court.  Samsung was deposed.  GE was deposed.

20   Mr. Blankenship testified in this Court that he understood, based

21   on his experience running the GE Appliances business, that under

22   599, it's Whirlpool, Electrolux, GE and Kenmore for 98 percent of

23   the sales, and the other 2 percent, he mentioned these small

24   companies, Premier and Summit.

25       So, Your Honor, I think we were surprised to hear that

1    Mr. McLoughlin testify that there were these 399 and 499 ranges

2    by LG and Samsung.

3         We also went and looked.  We did as much as we could

4    overnight.  None of the big four retailers, Lowe's, Sears, Home

5    Depot, Best Buy, are selling today during the Black Friday event,

6    the lowest prices of the year, an event that there's been quite a

7    bit of testimony about already, none of them are selling a 399

8    Samsung range or a 399 LG range or a 499 Samsung range or a 499

9    LG range.  And so I think that's important for us to see exactly

10   what Mr. McLoughlin's correction to his testimony is before we

11   know how to proceed.

12        We're also are interested in whether or not he was also

13   accurate about the impending doom if this merger doesn't go

14   through.  I mean, Mr. Blankenship testimony.  And, in fact, the

15   press release when this merger was announced, Mr. Immelt,

16   GE Company's chairman and CEO, said, "GE Appliances is a great

17   business."  There's no mention that if this deal doesn't go

18   through they're going to close it and it's going to go out of

19   business.  In fact, Mr. Blankenship was here.  He could have

20   answered questions.

21        Mr. McLoughlin doesn't work at LG, doesn't work at

22   Samsung, doesn't work at GE, so his testimony about those other

23   companies, when there are percipient witnesses here, about things

24   that are potentially inconsistent with the other evidence, raises

25   some concerns for us.  And we appreciate corrections, and we'd

1    like to see them, and then we'd like to see what those

2    corrections are before we proceed forward.

3         THE COURT:  The concern -- the one concern I have -- and I

4    haven't ruled out the declaration, but this is a trial, and it

5    would be highly unusual for a witness who's given in-court

6    testimony under oath to thereafter -- and been excused -- to

7    thereafter file a declaration correcting testimony.  I'm trying

8    to think of -- I'm sure it's probably happened before, but why

9    should the Court allow that?  I mean, his testimony is what his

10   testimony is.  It's under oath.  He was excused.  There was a

11   full opportunity to cross-examine or redirect.

12        Why should I give him another bite at the apple?

13        MR. MAJORAS:  Your Honor, certainly you are correct.  His

14   testimony was under oath, and Mr. McLoughlin would tell the Court

15   that when he testified he testified to the best of his ability.

16   That was his recollection.  It was a misstatement.

17        In a bench trial, especially in antitrust cases, there

18   certainly have been a number of occasions where the Court has

19   considered declarations on substantive testimony.  I was faced

20   with a situation, Your Honor, where I know that there was

21   something on the record yesterday that was incorrect,

22   Mr. McLoughlin raised that, and we wanted to be the first to tell

23   the Court that we're aware of that and we'll do what we can to

24   correct it.

25        His testimony certainly is still out there.  I think we're

1    going to hear testimony, perhaps even today, from other witnesses

2    who are closer to pricing and know what pricing is, and the Court

3    can consider that.

4          We are here this morning to say that that particular --

5    and just that part of his testimony was incorrect.  It was a

6    mistake, and we --

7          THE COURT:  Well, it's fairly significant testimony, too,

8    I think.  It was significant enough for the Court to ask some

9    follow-up questions.

10         MR. MAJORAS:  I understand that, Your Honor.

11         THE COURT:  Because it was fairly new testimony that the

12   Court had not heard about.

13         MR. MAJORAS:  I agree, Your Honor, and I had not heard

14   about that, which is the whole point of the misstatement.  It was

15   misstatement.  He has a basis that he had seen the 399 and was

16   wrong.  We --

17         THE COURT:  I think that -- I'm not going to rule it out.

18   And, again, it's nonjury, and the Court has a lot of discretion

19   and leeway, more so than it would presiding over jury trial.

20         I think there should be a motion filed, though, with some

21   supporting points and authorities that would persuade the Court

22   that the Court should allow this.

23         And I'm curious as to what his declaration will say, but I

24   think that, you know, I mean -- you know, this trial is being

25   conducted pursuant to the federal rules, and it would be -- I was

1    just sitting here trying think of instances in which a witness

2    has been recalled in a jury trial to essentially correct

3    testimony, and I can't -- I have not had any personal experience

4    with that.  That's not to say it hasn't happened.  But I think

5    just so there's a clear record here, because there could be

6    appellate review, I think there probably should be a motion filed

7    with supporting points and authorities, and give the government a

8    brief period of time to file a response to that.

9         And it would seem to me that it would be appropriate that

10   along with your motion you attach your declaration, but I want to

11   hear from the government about that.  I mean, if this were a

12   motion to amend the complaint filed in the normal course,

13   normally there'd be a -- the amended complaint would be filed so

14   the Court could have an opportunity to determine whether or not

15   Rule 15 allows the amendment.  I'm just trying to think of an

16   analogous situation, but it seems to me the declaration should

17   be -- should accompany the points and authorities of law that

18   might persuade the Court that the Court should do this.

19        And I recognize I have a great deal of discretion to do

20   this, and it's probably appropriate to allow the declaration, and

21   also to allow further testimony, but since we do have -- since

22   we're only half way through the trial and we have some time, I

23   think it'd be appropriate to get a motion with -- it doesn't have

24   to be lengthy, in fact, you could limit it.  The more you can

25   limit it the better, but I want your best arguments also, but --

 1    and I'm always reluctant to put page limitations, but fewer is

 2    better.  Okay?

 3         MR. MAJORAS:  Yes, sir.  We will file that motion, and we

 4    will attach it.  It will be a very brief declaration.

 5         THE COURT:  All right.  Let me hear from government

 6    counsel about that approach.  What about that approach?  The

 7    motion, along with the declaration, give the government a short

 8    period of time to file a response?

 9         And if this is testimony that -- this is an issue that the

10    Court would want to resolve before the experts testify?

11         MR. GLASS:  Well --

12         THE COURT:  And it gets a little complicated there.

13         MR. GLASS:  It does, Your Honor.  So I -- your approach, I

14    think it's fair, that defendants can file their motion, attach

15    the declaration, we can look at it, we can make whatever filing

16    we need, and then to the extent Your Honor is going to rule about

17    whether he's going to consider or not and how much he's going to

18    consider it and what he wants to do with the testimony, that

19    sounds like a very fair approach.

20         THE COURT:  Yeah.  I mean, your office's expert in

21    prosecuting these types of cases, and defense counsel have had a

22    great deal of experience in defending these types of

23    prosecutions.

24         Does this issue come up often in the context of a merger

25    trial?

```
 1          MR. GLASS:  So I have to admit I've never seen it, but

 2    that's not to say it hasn't.  But it -- it could come up in any

 3    trial where a witness gives testimony and then later realizes

 4    that testimony was incorrect.  I haven't done a comprehensive

 5    search, though, Your Honor, so that would be something that,

 6    perhaps with the opportunity of the night to review the case law,

 7    we might be able to --

 8          THE COURT:  Yeah.  There may be -- I can understand why it

 9    would come up.  I could understand why in good faith somebody

10    would go back and say, "You know what, I was wrong on that," and

11    I'd want an opportunity to correct that testimony before the fact

12    finder.  I can -- I can certainly understand that.

13          The question is:  What are the -- what are the rules about

14    that?

15          MR. GLASS:  Yes, Your Honor.

16          THE COURT:  That's the question.  I mean, because he's

17    already left.  He's had a chance to -- I mean, he's had a chance

18    to arguably discuss it with counsel, and I think I probably told

19    him, you know, please do not discuss your testimony with anyone

20    either, so -- and I'm not suggesting anything inappropriate,

21    either, but, I mean, that's -- you know, we want people not to

22    testify -- not to talk to anyone about their testimony, so that's

23    an issue that might --

24          MR. GLASS:  It is --

25          THE COURT:  I might have to resolve that.
```

1      MR. GLASS:  It's hard to imagine how the declaration would

2 be crafted without working with counsel, so I don't know how

3 that's going to be bridged, but Your Honor --

4      THE COURT:  Maybe, then, before we even get to the

5 declaration, what's your -- let me think through this.  Maybe

6 it's appropriate just to get the motion from counsel, because,

7 you know, this touches on issues that are fairly sensitive, but

8 it also -- it also touches issues that surround the

9 attorney-client relationship, because, I mean, you know, he's --

10 I query whether under these circumstances a witness, who is

11 represented by counsel opposing the government's action, can talk

12 to his attorney after having testified under oath about his

13 testimony and say, "You know what, I've screwed up, I need to

14 correct the testimony."  I -- that -- and that's an issue.  So

15 maybe -- I'm saying fewer than more, but that's an issue also

16 that's going to have to be addressed.

17      And, you know, we talked early on about the *Michele*

18 *Roberts* case -- and actually I found that case, and I'll give you

19 the citation for it -- but that was a criminal case in this

20 Court, not before me, but I recall it, wherein I think the Court

21 told the witness that the witness couldn't talk to his attorney,

22 I think, over a weekend or something like that.  And it's a

23 little bit different because the testimony was still ongoing.

24 That's only one opinion from the circuit that comes to mind.

25 We'll get the caption.  I probably have it around here somewhere,

1    I'm sure.

2         But that concerns the Court as well, so I don't know

3    whether the declaration should be attached because that would

4    mean further consultation with counsel.  These are kind of thorny

5    issues right now; and the other one is whether or not it should

6    be resolved before the experts testify, so --

7         MR. GLASS:  Yes, Your Honor.  So these low-priced ranges,

8    in the millions of ranges that are sold below where Samsung and

9    LG are selling, is a core issue in this case, as the United

10   States has presented to Your Honor.

11        THE COURT:  Absolutely, right.

12        MR. GLASS:  And so the experts have looked at this issue,

13   and no nowhere -- I went back and read all the expert reports --

14        THE COURT:  How long did it take to you read them?

15        MR. GLASS:  It took me six hours, Your Honor.

16        THE COURT:  Really?  So it'll take me 12 this weekend,

17   then, right?  Yeah.

18        FROM THE FLOOR:  (Laughter.)

19        THE COURT:  That's fun we were just talking about the

20   amount of time to spend reading them.  If it took an expert to

21   read an expert six hours, it's going to take me 12, then, but I

22   have to read them, though.

23        MR. GLASS:  They are slow reads.

24        THE COURT:  Thanks.  Thanks for the encouragement.

25        FROM THE FLOOR:  (Laughter.)

 1          THE COURT:  But no, it's important.  I want to read them.

 2     Yeah, yeah, so...

 3          MR. GLASS:  And so the experts looked at these issues, and

 4     the experts have data of sales, they have data of manufacturing

 5     invoices, they have data from the retailers, and they've looked

 6     at these issues.  And testimony about ranges existing in this

 7     lower price point -- which is a significant part of the market,

 8     right, around millions; almost half of all the ranges sold are in

 9     this price point.  That's an important part of this case, and so

10     I think Your Honor's approach is fair.  I don't want to get in

11     the middle of the attorney-client communications.

12          THE COURT:  That's a thorny issue.  I don't know -- I

13     mean, I -- you know, we do tell people.  We tell them that's

14     consistent with the rule on witnesses and not to discuss

15     testimony, but that's an issue that counsel will have to address

16     in his motion.

17          And, again, I'm not suggesting anything sinister at all on

18     part of counsel at all, no, but I did give that instruction to

19     him.  I'm sure I did.  I tell all the witnesses not to do that.

20          MR. GLASS:  Yes, Your Honor.

21          THE COURT:  But he's a party.

22          MR. GLASS:  Yes, Your Honor.

23          THE COURT:  He is a party.

24          MR. GLASS:  He's the president of the company that is

25     trying to acquire GE Appliances.

1          THE COURT:  Right, right.  And as Mr. Denis reminded me a

2     few weeks ago, he's a party, right?

3          MR. GLASS:  Yes, sir.

4          THE COURT:  So it may -- at the end of the day it may be

5     appropriate to hear all this.  I don't know.  But it should be

6     addressed anyway so there's a clear record to enable some other

7     court to have meaningful review of whatever the Court decides to

8     do.

9          MR. GLASS:  Thank you, Your Honor.

10          THE COURT:  But what about the timing, though?  I mean,

11     it's -- today's Friday.  Your witness -- your expert's scheduled

12     to testify.

13          Do you have one expert or two?

14          MR. GLASS:  Your Honor, we have two.

15          THE COURT:  Right.

16          MR. GLASS:  We have one economist, Professor Michael

17     Whinston, who will be coming in our case-in-chief.  He will be

18     here Monday morning.  We will begin his examination.  He is our

19     final witness in our case-in-chief.

20          We also have Mr. Ronald Quintero.  He is a forensic

21     accounting expert.  He is going to come, and he's going to

22     testify about the types of things that Mr. McLoughlin testified

23     about yesterday, these efficiencies that defendants have relied

24     upon in defense of this merger.  Because Mr. Quintero's testimony

25     is in response to the defense, it's going to come in our rebuttal

```
 1   case.

 2           THE COURT:  Fright.

 3           MR. GLASS:  So we expect that our economic expert will

 4   testify on Monday, and then if needed, testify in our rebuttal

 5   case in response to defendants' economic expert.  And our

 6   forensic accounting expert will only testify in a rebuttal case

 7   if necessary.

 8           THE COURT:  All right.  Let me ask you this:  So it would

 9   seem to me that if I were you, I would want this issue resolved

10   about whether the witness should be allowed to testify again

11   before your expert testifies, Mr. Whinston.

12           MR. GLASS:  Yes, Your Honor.

13           THE COURT:  Right, Professor Whinston.  All right.

14           So what's the hardship if he's delayed until Tuesday or

15   later Monday?

16           MR. GLASS:  None.

17           THE COURT:  None?  All right.

18           MR. GLASS:  None -- let me -- not to the United States.

19   I'll speak for myself.

20           THE COURT:  All right.  All right.  So let me just -- just

21   help me think through this, then.  So if the government -- I

22   mean, if the defendants file their motion -- I don't know, what's

23   fair, Counsel?  Tomorrow at noon or so?  I mean, I don't know.

24           MR. MAJORAS:  Certainly by noon tomorrow we can do that,

25   Your Honor.
```

1        THE COURT:  By noon tomorrow.  Then the government files a

2   response by noon on Sunday or so.  I mean, I have to -- it's -- I

3   mean, I don't know what else I can do.  I mean, we have -- we're

4   not sitting Wednesday, and I'm sure you folks have planned to

5   leave early Tuesday.  I'm sure, right.

6        Are we planning to sit on -- I think we're sitting on

7   Tuesday, correct?

8        MR. GLASS:  We are, Your Honor.

9        So noon on Sunday is good for us, but we could even file

10   it on Saturday if it helps Your Honor.

11        THE COURT:  Oh, can you?

12        MR. GLASS:  Yeah.

13        THE COURT:  All right.  Well, fine.  If you can, do it,

14   yeah.

15        MR. GLASS:  Yeah.

16        THE COURT:  What's reasonable?

17        MR. GLASS:  Can we say 5 p.m. on Saturday?

18        THE COURT:  Yeah, absolutely.  Right.  5:00 is fine.

19        Are you sure you can do that?

20        MR. GLASS:  Yes.

21        THE COURT:  Okay that's fine.

22        MR. GLASS:  Your Honor, I expect that the defendants'

23   brief will be short.  Our response, whatever it will say, I

24   assume will just be a couple of pages.

25        MR. MAJORAS:  And I anticipate we will try to get on file

1    evenly earlier than noon tomorrow, Your Honor.

2            THE COURT:  You know what, that'd be perfect.  Let me just

3    say, how about this:  How about 10:00 tomorrow, then?

4            MR. MAJORAS:  Yes, sir.  That'd be fine.

5            THE COURT:  10:00, and then -- because I want to give you

6    a chance to file a reply.  This is a big issue.

7            MR. MAJORAS:  Thank you.

8            THE COURT:  So what's reasonable, 5:00 still?

9            MR. GLASS:  Yeah, or 3:00.

10           THE COURT:  3:00.  All right.

11           MR. GLASS:  I mean, if we have a couple extra hours we

12   could --

13           THE COURT:  All right.  10:00, 3:00 and a reply by 6.  All

14   right?

15           MR. MAJORAS:  Yes, Your Honor.

16           THE COURT:  All right.

17           MR. MAJORAS:  And just so it's clear on why I'm here this

18   morning and raising this issue, I think, in part --

19           THE COURT:  Well, first of all, I appreciate you raising

20   it now, you know.

21           MR. MAJORAS:  It was something I had to think about coming

22   in this morning because it's exactly what you're saying.  We

23   don't want anyone going off and trying to see, well, where is

24   this?  How does this affect the analysis?

25           I think the upshot of all of this is that the information

1    from the individuals who are close to pricing and know what the

2    pricing are, none of that has changed.  To the extent that

3    Mr. McLoughlin said something yesterday and misspoke about that

4    issue, I want to make sure everyone knows he misspoke.

5         THE COURT:  Right.

6         MR. MAJORAS:  It doesn't need additional expert analysis

7    to say, "Well, what does it mean if there is this additional

8    range out there?"

9         THE COURT:  Right.

10         MR. MAJORAS:  There's not.  He wants to correct that

11    record, Your Honor.  We'll see what that is.  It will be a very

12    simple statement, Your Honor.

13         THE COURT:  My guess is there are probably points and

14    authorities of law that will allow the Court to accept that

15    correction.  That's my guess, but, you know, I haven't researched

16    that issue recently, so...

17         MR. MAJORAS:  Thank you, sir.

18         THE COURT:  All right.  Mr. Glass?

19         MR. GLASS:  Your Honor, thank you very much for the time

20    this morning.  If I may just make sure I understand.

21         Mr. McLoughlin testified that there was an LG range at 499

22    and an LG range at 399, a Samsung range at 499 and a Samsung

23    range at 399.  I think those are issues that should be addressed.

24         Mr. McLoughlin also testified that if the deal didn't go

25    through, GE Appliances was going to go out of business and

```
 1    potentially Electrolux, an $18 billion company, was going to go

 2    out of business.

 3         Those are also things -- because, Your Honor, there's

 4    something called the failing firm.

 5         THE COURT:  Right.

 6         MR. GLASS:  The Supreme Court has recognized that there's

 7    a different analysis when you have a merger involving a failing

 8    firm, and that needs to be raised so it can be discovered, there

 9    can be expert analysis, and that's where I'm pausing on the

10    experts.  I agree with Mr. Majoras.  If there is no 499 range and

11    there is no 399 range by either LG and Samsung, that's exactly

12    what the experts found, so that shouldn't change the expert

13    testimony at all.

14         However, if there's analysis about this merger being

15    stopped will result in one or both of these companies going out

16    of business, that is squarely something the experts should be --

17         THE COURT:  That's something that should have been alleged

18    before --

19         MR. GLASS:  Yes, Your Honor.

20         THE COURT:  -- as a defense to the government's position

21    that the merger should not go forward.

22         MR. GLASS:  Yes, Your Honor, it's an affirmative defense.

23         THE COURT:  Right.

24         MR. MAJORAS:  Your Honor, in terms of the failing

25    defense [sic] -- I'm sorry, the failing firm defense, the
```

1    party -- the defendants have not raised that as affirmative

2    defense.  We've not briefed that.  We were not making an argument

3    on that specific defense.

4         THE COURT:  Well, then what's the weight to be given to

5    his testimony?  Because that's what he said.

6         MR. MAJORAS:  I actually don't think he said specifically

7    that.  I think the question that the Court raised with him, and

8    to some extent, came up during his testimony when the government

9    was questioning him is:  What do you see going forward?  What

10   happens?

11        He gave his assessment, his opinion, as Your Honor

12   requested, of what he thought GE was facing.  I believe, if you

13   look at that and you compare that to what Mr. Blankenship from GE

14   said about what it would mean if they could not combine and how

15   they would have to deal with the business going forward -- over

16   the longer term, not the day after -- I think it's very

17   consistent with that.

18        And as you may recall, in his testimony when I asked

19   Mr. McLoughlin the question, "To make clear, are you saying that

20   Electrolux is going to close up shop if this deal doesn't go

21   through," I think he was very clear in saying, "No, that's not

22   what he's saying at all."

23        The record is what it is.  His testimony, there is no

24   intention nor thought nor discussion about Mr. McLoughlin

25   changing or withdrawing his opinion in that regard.  The

1   government had that opportunity to the cross-examine him on that

2   yesterday to testify what he had to say, and the record is what

3   it is on that.

4       THE COURT:  All right.  Mr. Glass?

5       MR. GLASS:  Your Honor, maybe we're coming full circle to

6   the first day of trial.  This is -- cross-examination is a

7   powerful tool, powerful, but when a witness says something that

8   is new, hasn't been discovered, cross-examination is limited.

9       And if the argument that defendants are making is that

10  this merger is good, because without this merger one or both of

11  these companies are going to go out of business, that's new.

12  That's something that would require expert analysis; would

13  require discovery; and candidly, Your Honor, would require a

14  different legal framework.

15      So I -- I appreciate that he was giving his opinion, but

16  to the extent that his opinion, if this merger should be allowed

17  to go through because if it doesn't --

18      THE COURT:  But if that testimony is inconsistent with an

19  affirmative defense, though, that's not been raised, I mean, the

20  Court should not give it any weight at all.

21      And I'm not hearing the defendants asking the Court to

22  give that testimony any weight, are you?  You can't have it both

23  ways, I don't think.

24      MR. MAJORAS:  No, sir.  I think there's an issue of --

25  there is case law on the failing firm defense.  It's a technical

1    issue, which is essentially without the merger a company

2    disappears very quickly.

3         The questioning and the answers that Mr. McLoughlin gave

4    on that, as you may recall, came during his direct examination,

5    some of them directly from the Court's questioning.  This is not

6    something that we came into court and said, "You know, talk about

7    this."

8         THE COURT:  Right.

9         MR. MAJORAS:  Now, in terms of what's a surprise or not a

10   surprise, the government spent seven hours on deposition with

11   Mr. McLoughlin.  They also spent, I assume, something near that,

12   if not exactly that, during the investigation phase.  And whether

13   they covered that or not in his deposition, it's not consistent

14   with his deposition.  If the question's aren't asked at his

15   deposition, much like the question came from you yesterday, that

16   he can't respond to it.  So to somehow say because we didn't ask

17   the question, we didn't ask what his view was going forward, that

18   we shouldn't have to hear that now or respond to

19   cross-examination, that's classic trial --

20        THE COURT:  Well, let me ask you this:  You're not --

21   you're not -- you're not attempting to assert an affirmative

22   defense that was previously not pled, are you?

23        MR. MAJORAS:  No, sir.  What we --

24        THE COURT:  Then what weight -- what's the relevance,

25   then, of his testimony that -- oh, I think there was some

1    testimony about dire circumstances, words to that effect?

2         But he did -- he did -- he did give some testimony about

3    what he thought might happen to GE Appliance and Electrolux, so

4    what weight should the Court give that testimony if it's

5    inconsistent with an affirmative defense that's not been

6    asserted, assuming that he said there's going to be failures of

7    one firm or the other or both?

8         MR. MAJORAS:  Well, I think, again, looking back at his

9    testimony in terms of what he envisioned going forward if the

10   deal were not to conclude and the circumstances it would put both

11   companies in, is on the record.  And, obviously, Your Honor will

12   look at that in consideration of your decisions here.

13        The weight, however, that should have been given to it

14   really goes to the point you raised in asking it, where you said,

15   "I have to try to predict what's going to happen."

16        THE COURT:  Right.

17        MR. MAJORAS:  And the comparison in looking at a merger

18   and whether it's going to substantially lessen competition, there

19   has to be some comparison of what does the world look like with

20   the merger?  Which, obviously, we've put a lot of evidence in.

21   We've got a full -- our case is really coming in starting today

22   and then into that final week.  We're going to put in the

23   evidence showing the competition we think that will be there if

24   the merger were allowed to continue.

25        But the Court has to make a comparison of if the merger

1   doesn't go through, what does competition look like, then?

2   Because it's going to be:  Is it better?  Is it worse?  And more

3   importantly, has the government proven that competition is

4   substantially lessoned by it?

5        So the looking forward part, which Your Honor mentioned,

6   is kind of an unusual thing for courts to have to deal with, is

7   important in terms of --

8        THE COURT:  But that's what the Court has to do --

9        MR. MAJORAS:  Yes, sir.

10       THE COURT:  -- in the context of a merger action.  That's

11  exactly what the Court has to do.

12       MR. MAJORAS:  And it has to --

13       THE COURT:  And the job of the Court is not to predict

14  with any reasonable degree of certainty what will happen but what

15  may happen, is what Congress intended, right?

16       MR. MAJORAS:  That's correct, Your Honor.

17       And so in that comparison, what does the world look like

18  with the merger and what does it look like without, what does it

19  look like pre-merger, all of those blend into it.

20       I think Mr. McLoughlin's testimony on that, his opinion,

21  his view, of what will happen, I think, is relevant to that,

22  should be given whatever weight Your Honor wants to attach to

23  that in the context of that discussion of what will the future

24  look like.

25       We are not -- I will say again:  We are not making the

1   technical defense of a failing firm defense.  That was not --

2   that was not -- has never been part of our case or briefing or

3   our answer here.  But the question of what the future looks like

4   is highly relevant.  It's up to Your Honor to put whatever weight

5   you want on that.

6       As I said, I think it's very consistent with what

7   Mr. Blankenship testified about.  I think it will be consistent

8   with what you will hear throughout this trial.

9       THE COURT:  Okay.  Let me ask.  Maybe there's another way

10  to approach this.  Let me ask Mr. Glass.  Let me ask government

11  counsel whether or not in your case-in-chief you want to recall

12  this witness for further examination, because if you do, maybe

13  under all the circumstances, I'll allow that, and then allow

14  appropriate cross-examination about whatever -- within the scope

15  of that examination.  And that will address the, quote-unquote,

16  mistaken testimony, whatever.

17      Do you want an opportunity to examine him further?

18      MR. GLASS:  Your Honor, only if his testimony's changing.

19      So this is my concern --

20      THE COURT:  Well, we know.  I mean, there's been a proffer

21  that he wants to correct certain testimony.

22      MR. GLASS:  Yeah.

23      THE COURT:  All right.  But the other part of that is,

24  well, you said, "Well, wait a minute, this comes as a surprise

25  about this failing firm defense."

1          Do you want an opportunity to explore that more?

2          MR. GLASS:  Well, certainly, Your Honor.

3          So this is the thing, is that there is a concept adopted

4     by the United States Supreme Court to address when a merger is to

5     be analyzed because one or both of the firms are going to go out

6     of business without a merger.

7          THE COURT:  Right, yeah.

8          MR. GLASS:  So I believe what defendants are trying to do

9     is they're trying to say, "We're not going through that process,

10    but we still want to say that, because this is a future

11    predicting exercise, our witnesses can come and they can say that

12    without this merger the firms are going to go out of business."

13         And, Your Honor, I think it can't go both ways.  It --

14    either we do some discovery, we do some expert work on whether or

15    not there really is a failing firm defense to this merger, or

16    that should be given no weight, because that's the process.  The

17    process can't be a end-around where, instead of asserting

18    affirmative defense, providing support for that affirmative

19    defense, allowing the United States to conduct discovery and

20    expert work on that affirmative defense, they can come to trial

21    and they can say, "We're not asserting an affirmative defense,

22    but we still want Your Honor to consider that in the future one

23    alternative is that if this merger is blocked, one or both of

24    these firms will go out of business."

25         THE COURT:  Well, isn't that what the Court has to do

1   anyway?  The Court has to predict what will life be after -- what

2   could it be like after a merger or not?

3        MR. GLASS:  Absolutely, Your Honor.

4        THE COURT:  Right.

5        MR. GLASS:  But the question is only whether or not Your

6   Honor should consider failure of one or both of these firms to be

7   a realistic --

8        THE COURT:  Right.

9        MR. GLASS:  -- to be a part of the "may" that the --

10       THE COURT:  So you're saying then that that's inconsistent

11  with a defense that must have been raised, should have been

12  raised, before trial, then it's irrelevant?

13       MR. GLASS:  Yes, Your Honor.

14       THE COURT:  But nevertheless, it's part of -- it's part of

15  an argument about predictability.  I mean, how do you separate

16  out the two?

17       MR. GLASS:  Well, the United States Supreme Court has

18  helped us by adopting a standard and a process --

19       THE COURT:  Right.

20       MR. GLASS:  -- for how we look at whether or not a merger

21  should be allowed because one or both of the firms are going to

22  go out of business.

23       THE COURT:  Right.  Which case are you relying on, by the

24  way?

25       MR. GLASS:  It's the Supreme Court case in the *Arizona*

1    *Daily Star Citizen* case.  Unfortunately, Your Honor, I wasn't

2    prepared with the cite, but I will submit it to Your Honor this

3    afternoon.

4         THE COURT:  We can get it.

5         MR. GLASS:  Right.

6         THE COURT:  The *Arizona Daily Citizen* case?

7         MR. GLASS:  It's the Arizona Daily Star was merging with

8    Tucson Citizen.

9         THE COURT:  Right.

10        MR. GLASS:  And in that case the Supreme Court looked at

11   this exact question.  One of the newspapers -- it was a newspaper

12   merger, in Tucson, Arizona.  One of the newspapers, maybe even

13   both, were claiming that without this merger they would go out of

14   business, and therefore the --

15        THE COURT:  And that was pled as a defense, correct?

16        MR. GLASS:  It was pled as a defense, Your Honor.  And

17   looking forward competition wouldn't be harmed by the merger

18   because whether the merger went through or the merger was

19   blocked, there would only be one newspaper in Tucson.  The

20   Supreme Court said that's an affirmative defense and laid out all

21   of the requirements for defendants to show that it is an

22   affirmative defense, right on point.

23        Here, Your Honor, defendants have not made that

24   allegation, nor provided that evidence.  Instead, they want to

25   make the same argument, which is that if this merger is not

1   allowed, either GE or Electrolux will go out of business and

2   therefore competition will be hurt by stopping this merger, and

3   that's irrelevant outside of the context of the failing firm

4   defense that the Supreme Court has set forth.

5          THE COURT:  All right.  All right.

6          Mr. Denis?

7          MR. DENIS:  Thank you, Your Honor.  If I could address

8   this on behalf of GE.  GE does not contend that the Appliance

9   Division is a failing company or a failing division in any sense.

10         THE COURT:  And you're not -- and it's not your argument

11  that absent the merger the appliance section will go out of

12  business?

13         MR. DENIS:  That is correct, Your Honor.  We are not

14  arguing that absent the merger it's going out of business.

15         THE COURT:  What about that witness's testimony that is in

16  response to the Court's questions?

17         MR. DENIS:  Two things.  I think we've conflated two

18  issues here, right?  One issue brought up by Mr. Majoras was the

19  testimony about the 499 and 399 ranges.

20         THE COURT:  Right.  Yeah, that's separate and apart.

21         MR. DENIS:  That will be dealt with.

22         What the government has done is try to drag into that

23  issue other parts of the testimony from -- that they didn't like,

24  for whatever reason.

25         THE COURT:  Well, they didn't like it because they say

1  it's inconsistent with the defendants' theory that's advanced in

2  this case because this affirmative defense has never been

3  asserted.  So they're asking the Court to disregard it.

4       MR. DENIS:  Yeah.  It is not inconsistent.  We have never

5  asserted a failing company defense.  We all know how to do that,

6  and you can look at our answer.  It's not there.

7       The Court asked the witness a question, as the Court has

8  with several of the witness, about, "What do you think's going to

9  happen?"  The witnesses are entitled to answer these questions,

10  because the issue that you're raising --

11       THE COURT:  And then the Court's entitled to give it

12  whatever weight it wants.  And if the Court --

13       MR. DENIS:  And you're entitled to give it any weight.

14       THE COURT:  At the end of the day, if the Court determines

15  that the Court asked this question because it was curious, and

16  this case is about curiosity also and predictions, but

17  nevertheless, the answer given is inconsistent with an

18  affirmative defense that was never pled, then the Court's not

19  going to give it any weight.  I mean, that's probably one option

20  available.

21       What's another option, though?

22       MR. DENIS:  Well, the other option is to recognize that a

23  witness's testimony doesn't create a discovery issue.  If a

24  witness is asked his opinion or her opinion, they should be

25  entitled to answer the question in an honest manner, as we heard

1    yesterday.

2         THE COURT:  But it could -- it could create a discovery

3    issue, just as the 399 and 499 issue's creating a discovery issue

4    because it's inconsistent with any discovery that's been taken

5    inconsistent, arguably, with any information that any expert is

6    relying on.

7         MR. DENIS:  What is consistent here, Your Honor, is you've

8    heard repeatedly through the course of the testimony about the

9    growth of LG and Samsung at the expense of the firms that were

10   much better established, more highly regarded, when LG and

11   Samsung entered the U.S.  The trend lines we've shown you.

12   You've seen the data on this.  There's a very clear trend in

13   terms of what's happening in the marketplace.  What the witnesses

14   are telling you is that's not stopping.

15        What the government wants you to believe in deciding this

16   case is that will stop.  So the witnesses keep testifying to the

17   fact this is happening and it's not stopping.  You've heard that

18   again from Mr. McLoughlin yesterday.

19        The issue of the failing firm defense only comes into this

20   case if we plead it as an affirmative defense, which we have not,

21   and the deadline to do so has long since past.  We are not

22   seeking to amend our answer, but we are -- I think the Court is

23   right to focus on what is happening in the future, because that

24   is the inquiry under Section 7.  I mean, it's a substantial

25   lessoning of competition, relative to what you would see

1   otherwise.

2       So what do we think is going to happen absent this merger?

3   And what you're hearing from the witnesses -- you heard from

4   Mr. Blankenship, you heard from Mr. McLoughlin -- is that LG and

5   Samsung will continue to do what they're doing.  They are not

6   accepting the pour mouth thing of these rather substantial and

7   successful firms.  The trends that they witnessed in laundry,

8   refrigeration, dishwashers and they're experiencing now in

9   cooking, are continuing.

10      THE COURT:  Mr. McLoughlin's opinion about GE Appliance,

11  though, was pretty dire, though.  I mean, I -- you know, I'm not

12  going -- I can't repeat verbatim what he said, but it wasn't a

13  rosy picture that he painted.

14      MR. DENIS:  No, it was not.  That is his opinion.  He's

15  entitled to that opinion.  The Court is entitled to put whatever

16  weight on it.

17      But I think the question that you asked, and that you've

18  asked to multiple witnesses, goes to the core issue in this case

19  in terms of what is happening with this competitive dynamic.  Is

20  it something that is going continue, or is it going stop?  All

21  right.

22      We are contending, and the witnesses have been telling

23  you, that the marketplace is functioning in a certain way that

24  will not be affected by the merger.  The government would like

25  you to believe that that's going to change, right?  This is a

1    reversal from what we usually have in these merger cases.  Quite

2    often the defendants are coming in and saying, "Oh, things are

3    going to change.  There's going to be a dramatic difference in

4    the market."

5         What we've been telling you consistently and you've been

6    hearing from witnesses who are not employed by the companies, is

7    that there's something very important happening in this

8    marketplace that has been changing it, and it's expected to

9    continue, absent the merger or with the merger.  The merger is

10   about how will these firms more effectively compete in that

11   dynamic and contribute to it.

12        THE COURT:  All right.

13        MR. DENIS:  Thank you.

14        THE COURT:  Sure.  Mr. Majoras -- Mr. Glass first again,

15   and then counsel.

16        Yes, sir.

17        MR. GLASS:  Thank you, Your Honor.  So I'm not going to

18   recount all the witness's testimony, but you heard from the

19   director of strategy at LG.  We brought LG.  We wanted Your Honor

20   to hear what LG is doing and wants to do in the future.

21        We brought Haier, because we wanted Your Honor to hear

22   what Haier is doing now and is doing in the future.

23        Today Your Honor is going to hear from Bosch, because we

24   want Your Honor to hear what Bosch is doing now and will do in

25   the future.

1          Your Honor, I just want to make sure that we're very clear

2     here.  We recognize LG and Samsung sell appliances.  They sell

3     ranges.  There's no debate about that.  That is not the issue.

4     The issue is whether or not they are going to fix the problem

5     created by the merger of these two dominant firms:  GE and

6     Electrolux.  That's the whole issue.

7          And I think an important piece of all this, an important

8     piece, is that you've heard and you've seen the documents, and

9     the United States -- and you'll hear from Professor Whinston next

10    week -- has recognized that LG and Samsung are out there, that LG

11    and Samsung have grown in other appliances and taken that into

12    account.

13         This is not a case of us ignoring LG and Samsung.  It's

14    not a case of us claiming that LG and Samsung are going to do

15    anything different.  What we're saying is that even with what LG

16    and Samsung are doing today, even continuing that out, this

17    merger is going to hurt consumers.  And, Your Honor, that's all

18    separate, all of that, is the analysis and that's what we're

19    trying in this case.  That's all separate from whether or not GE

20    and Electrolux are --

21         THE COURT:  I understand.  I understand.  And, again, it's

22    nonjury, and that's -- you know what, I have a lot of options

23    available, and the circuit courts have said time and time again,

24    you know, the Court's going to hear a lot of evidence, and we'll

25    leave it up to the Court to determine what's relevant, what's

1   irrelevant, what's competent, what's not competent, and give

2   reviewing courts reasons why court's relying on something or not

3   relying on something.  So, and that's a powerful tool to have for

4   a judge, to listen to lots of testimony, some incompetent, some

5   arguably inadmissible, let some hearsay in, but, you know, it's

6   probably fairly reliable hearsay.

7        So it's a powerful tool.  At the end of the day I'm going

8   to have to sort through everything and make decisions consistent

9   with the theories that have been pled in this case and consistent

10  with the competent evidence that the Court's rely upon to make,

11  hopefully, a correct decision as a matter of law.

12       MR. GLASS:  Absolutely, Your Honor.  And one thing where

13  we can help, all the lawyers, is that when a witness is

14  testifying, we either show contemporaneous business documents

15  that support the witness's testimony, or we impeach them, and

16  that's the problem.

17       THE COURT:  Well, that's -- that's -- I mean, that's your

18  job, and, you know, you do it as you see fit.

19       MR. GLASS:  Yeah.

20       THE COURT:  And, you know, impeach with inconsistencies,

21  impeach with other substantive evidence.  I mean, there's a full

22  panoply of tools available.  So, you know, I leave it to counsel

23  to develop their theories and strategies, you know, the way they

24  deem appropriate.

25       MR. GLASS:  Thank you, Your Honor.  And that's why we

1   brought this issue today.  We brought it to Mr. Majoras.  We had

2   no ability to impeach Mr. McLoughlin yesterday about these 399

3   and 499 LG and Samsung ranges.

4       We had not ability to impeach Mr. McLoughlin about his

5   testimony about what would happen with GE -- a company he doesn't

6   worked for -- if this merger doesn't go through.  And we have to

7   ability to impeach Mr. McLoughlin without his testimony about

8   what would happen to Electrolux.  So that's an important piece of

9   all this, is that we appreciate people misspeak, but these were

10  questions in open court.

11      THE COURT:  When did the 399 testimony -- when were the

12  answers given?  During the defendants' offering of the witness

13  and direct?  I mean, I just don't recall -- or whether it's part

14  of the government's examination.  I don't recall.

15      MR. GLASS:  So, Your Honor, as I recall -- and I will do

16  this to the best of my recollection -- it was during the

17  examination by defendants --

18      THE COURT:  Right.

19      MR. GLASS:  -- that Mr. McLoughlin first mentioned 399 and

20  499 ranges.

21      THE COURT:  Right.

22      MR. GLASS:  And then when Your Honor asked those

23  questions, "Who is selling those," Mr. McLoughlin said, "LG and

24  Samsung."  On our redirect we gave Mr. McLoughlin an opportunity

25  by asking him, "Those were wholesale prices which are, of course,

1     different from retail prices?"

2            THE COURT:  Right, right.

3            MR. GLASS:  And he said, "No, those were retail prices."

4            THE COURT:  Right.

5            MR. GLASS:  That's my recollection, Your Honor.

6            THE COURT:  Right.  I think that's probably correct.

7            But, you now, the government has a rebuttal phase of this

8     case as well.  So, you know, it's -- and so you have an

9     opportunity to introduce substantive evidence or to proceed as

10    appropriate in your rebuttal phase.  Because he was called.  He

11    did answer during the defendants' direct portion of defendants'

12    case.

13           Yes, Counsel.

14           MR. MAJORAS:  I agree with, I think, the sequencing of

15    that.  It came out during a question -- I don't think there was a

16    direct question on what's the pricing.

17           THE COURT:  Right, right.  It was after lunch, I recall

18    that, though.

19           MR. MAJORAS:  Your Honor, as I started this morning, we

20    don't in any way question what is on the record about the 399,

21    the 499.  We know that that was a misstatement.  We will offer to

22    you the correction on that, and you can do what you want with

23    that.

24           THE COURT:  Yeah.  But my guess is there's probably case

25    law that allows that to come in, subject to appropriate

1    examination by, impeachment by, or whatever other tool that

2    opposing counsel wants to avail themselves of.

3         MR. MAJORAS:  I just wanted you to understand that when --

4    if you're wondering, "Well, why isn't Majoras up here talking

5    about the 399 LG or Samsung range?"  There's a reason for it.  It

6    was a misstatement.

7         But I think maybe I can conclude on the part where

8    everyone's in agreement with the Court, which is that at the end

9    of the process here, in your consideration of the process, you're

10   going to have to take all of the evidence that's offered by the

11   multiple parties that have testified here, and I think -- and I

12   would encourage you, when you do that, when you look at

13   Mr. McLoughlin's testimony and his responses to your questions

14   about what would happen in the future, he gave a range of

15   possibilities.  It wasn't, "They'll be out of business tomorrow"

16   type of an answer.  It wasn't that at all.  There were a range of

17   possibilities.  Were some of them dire?  Absolutely.  That was

18   his opinion.  That was his view.

19        Your Honor will be able to assess that in light of what

20   other witnesses have said, what the experts have said, but to

21   somehow say that after 14 hours of depositions for the government

22   it never occurred to them to ask what might happen in the future,

23   and they made a decision to take depositions on whatever their

24   subjects were.  I think that's certainly a stretch to somehow say

25   that they didn't have the ability to do that.

1          And then there are surprises certainly that come up --

2     that come up throughout trials.  There were surprises to me in

3     trial.  We deal with that.  That's why we're here.  We're here to

4     assist the Court in that.

5          I think Mr. McLoughlin's testimony stands on its own, and

6     stands well in conjunction with the other witnesses by the time

7     you look at the full record in this case.

8          THE COURT:  All right.  All right.  Thank you.

9          But this is an issue, though, especially the correction of

10    the testimony, that's an issue that's going to have to be

11    resolved before your expert testifies.  So I'm just saying this

12    because I don't want him to have to sit in a windowless room all

13    day, but I can't resolve it, I don't think, before -- prior to

14    Monday morning.  I'll probably want to hear some argument, or

15    maybe I won't want to hear some argument.  Maybe the attorneys

16    will agree that this process -- that the declaration should come

17    in, that he be -- I think he's going to have to be here, though.

18    I think at the very least, if I allow him to correct his

19    testimony, I think it's only fair that -- for the scope of that

20    testimony, that he be cross-examined by government counsel, so

21    that may take an hour or two.  I'm just saying that to let you

22    know so we can probably try and accommodate your expert so he's

23    not just sitting around in the hallway somewhere.

24         So we've spent the last hour not hearing any testimony.

25    Let me do this before we hear some testimony.

```
 1          Anything else from anyone about these issues, the 399, the

 2    499 issue or the other issue?  I think the other issue's going to

 3    resolve itself during closing argument, but by the same token,

 4    you know, the government does -- is entitled to offer rebuttal

 5    witnesses, so it may well be that you want to proceed with

 6    offering some evidence in the appropriate rebuttal phase of the

 7    trial.

 8          But anything else that I need to hear from counsel?  I

 9    think we should take a short recess until 10:00, and then we'll

10    start with the testimony of the next witness.

11          Anything further, Counsel?

12          MR. GLASS:  Your Honor, nothing further for the United

13    States.

14          THE COURT:  Mr. Majoras?

15          MR. MAJORAS:  Nor for the defendants, Your Honor.

16          THE COURT:  Okay.  All right.  Let's do this.  We'll take

17    a recess until 10:00.

18          Who's your next witness?

19          MR. FRIEDMAN:  Your Honor, actually, to work the schedule

20    right because of Professor Whinston's schedule, defendants are

21    going to call Rob Posthauer.

22          THE COURT:  All right.

23          MR. FRIEDMAN:  So he'll be the first witness in the

24    defense case.

25          THE COURT:  That's fine.  All right.  Okay.
```

1          And give me a proffer.  What's he going to testify to?

2          MR. FRIEDMAN:  So Mr. Posthauer is going to testify to the

3     competitive, dynamic and landscape that he's witnessed, first as

4     an employee at Maytag back 20 years ago, traveling through his

5     journey at GE, after the Whirlpool/Maytag merger, working as the

6     national account manager at GE responsible for the Home Depot

7     account.

8          So he's going to give the Court a sense of the impact of

9     Samsung and LG.  He's going to talk about the effect that he

10    observed in the marketplace of the merger of Whirlpool and

11    Maytag.  And he'll bring the Court up to the state of competition

12    as he experiences it today.  He's the general manager of sales at

13    GE today.

14         THE COURT:  All right.  That's fine.  All right.

15         And that's another powerful tool the Court has available:

16    The ability to allow a party to call a witness out of turn, and

17    indeed, while an opposing counsel's case is still in direct

18    examination, so --

19         MR. GLASS:  Yes, Your Honor.

20         THE COURT:  So there are lot of tools available to the

21    Court.

22         MR. GLASS:  Yes, Your Honor.  Your Honor, if I may, may I

23    just introduce Mr. Mark Hamer will be examining Mr. Posthauer.

24         THE COURT:  Good morning, Counsel.

25         MR. HAMER:  Good morning.

1          THE COURT:  All right.

2          MR. GLASS:  I wanted to introduce him.

3          THE COURT:  All right.  Let's do this.  It's 10 minutes to

4    10.  Let's break until 10:00, and we'll start the witness at

5    10:00.  Okay?  12:30 I have a criminal matter.  This afternoon

6    we'll be in Courtroom 5 on the second floor, I think, right,

7    Mark?  All right.  At what time?

8          THE COURTROOM CLERK:  2:00.

9          THE COURT:  At 2:00.  All right.  Thank you.

10          (Thereupon, a break was had from 9:57 a.m. until

11    10:11 a.m.)

12          THE COURT:  Let me just -- I'm sorry, go ahead.

13          MR. GLASS:  Oh no, Your Honor, I was only going to provide

14    you with the citation to the case that I --

15          THE COURT:  Oh, yes, right.

16          MR. GLASS:  So the case I referenced was *Citizen*

17    *Publishing Company versus United States*.

18          THE COURT:  All right.

19          MR. GLASS:  At 394 U.S. 131.

20          THE COURT:  All right.

21          MR. GLASS:  And what's interesting about that case is

22    that's where the Supreme Court discusses failing firm.  And what

23    happened after that case is actually neither of those two

24    companies failed, in fact, they both independently operated for

25    decades after the Supreme Court decision.  Thank you, Your Honor.

```
 1          THE COURT:  All right.  Let me ask you, Mr. Glass, let's

 2     assume -- let's assume that the Court's going to allow the

 3     declaration to be filed.  What would be your preference?  To

 4     examine the witness again or not or -- I'm just trying to figure

 5     out what's best because, you know, if you want him here, we

 6     probably should tell him a time to be here anyway.  So what's

 7     fair to the government, if I allow the witness to correct his

 8     testimony?

 9          MR. GLASS:  Your Honor, if you allow the declaration to

10     come in, we would like an opportunity to examine the witness.

11          THE COURT:  You want him present in Court?

12          MR. GLASS:  Yes, Your Honor, because, one, I think it

13     would be helpful for us to be able to use our cross-examination

14     tools.  And there are several issues, the 399 and 499 LG and

15     Samsung ranges.

16          THE COURT:  Well, that's one issue.

17          MR. GLASS:  That's one issue.  The basis for his claim

18     that either company will go out of business is another issue.

19     And there may be others, just depending on what the declaration

20     says and our review of the final transcript, that it would be

21     helpful to have him here for a short period of time.

22          THE COURT:  All right.  I don't have any problems with

23     that.  I just -- just for planning purposes, I just wanted your

24     input there.

25          What about that, Counsel?  Is he around?  Is he available?
```

1        MR. MAJORAS:  We'll check on that, Your Honor.  As part of

2   the process, he has made it clear if he needs to testify again --

3        THE COURT:  I think he should.  I think he should plan on

4   being here, right.

5        MR. MAJORAS:  The other thing I would say, though, in

6   response to Mr. Glass, there is -- and you'll see it when it

7   arrives.  The declaration's going to be a very simple, "I

8   misspoke on the 399, 499.  I'm not aware of any pricing of

9   Samsung or LG on those prices."  Pretty simple.

10       But to reopen his entire testimony on this issue that is

11  not at all part of anything the witness is saying in his

12  declaration that he was on the stand already for the tools that

13  are available, cross-examination, I don't -- I don't think that

14  that part is appropriate in terms of reopening.  His testimony

15  was out there yesterday.  It could have been examined yesterday

16  at the time it was first raised.  Certainly we would agree that

17  anything in the declaration, if the government wants to recall on

18  that basis, that's fair game, we understand that issue.

19       THE COURT:  All right.  What about that?  They're asking

20  to reopen it essentially for one reason.  He was available for

21  cross-examination.  So why should I allow the government to

22  inquire with respect to issues that weren't raised during the

23  examination, Counsel?

24       MR. GLASS:  Well, so, Your Honor, the most acute

25  misstatement was on 399 and 499 Samsung and LG ranges.

1              THE COURT:  Right.

2              MR. GLASS:  We believe that there were others that we

3    weren't prepared to impeach on because they were new.  One of

4    them is this idea that these companies are going to go out of

5    business.  There may be others, and I would just ask, Your Honor,

6    that we not be limited to what defendants choose that we can

7    examine Mr. McLoughlin on.  We should be allowed, now that we

8    know he at least misspoke about the Samsung and LG ranges, to

9    examine him on other places where we believe he might have

10   misspoke.

11             THE COURT:  So essentially, in other words, if I allow

12   direct to be reopened for a limited purpose, what the government

13   is essentially asking is that I'll also allow cross to be

14   reopened for a more extensive purpose, though.

15             What's wrong with that?

16             MR. MAJORAS:  Essentially, Your Honor, it's the general

17   rules on examination in terms of, even if you look at the cross

18   as the scope of the direct, this is the only issue that is a new

19   issue.  Trial lawyers every day go home at the end of court and

20   say, "Oh, I wish I'd have asked that."

21             THE COURT:  Or, "I'm glad I didn't ask that."

22             FROM THE FLOOR:  (Laughter.)

23             MR. MAJORAS:  There's that, too, Your Honor.  I've had

24   that quite often.

25             That is no different.  It would -- the argument being made

1    by the government right now would be:  If I were to go back to

2    one of their witnesses they called earlier and say, "I wish I

3    would have asked this.  Your Honor, could I reopen their

4    testimony because I would have liked to have asked that, that was

5    a surprise to me."

6           THE COURT:  Well, let me ask you this:  The government

7    gets another opportunity to rebut, right?

8           MR. MAJORAS:  Yes.

9           THE COURT:  All right.  Arguably the government could call

10   that witness again in its rebuttal phase, and for purposes of

11   rebutting testimony that he, in fact, testified to during direct,

12   right?

13          MR. MAJORAS:  I would suggest that having him re-testify

14   about the same thing he testified is not rebuttal, but if the

15   government were to ask to bring any witness in on rebuttal, we

16   would be making our assessment as to whether that's appropriate

17   rebuttal and would raise it with the Court.

18          THE COURT:  Right.

19          MR. MAJORAS:  If the government wants to bring in

20   Mr. McLoughlin to say again what he said and offer his opinion

21   again on rebuttal -- it doesn't sound like rebuttal to me -- but

22   it also doesn't sound like tactic that makes much sense either.

23          THE COURT:  Yeah, yeah.

24          MR. MAJORAS:  But calling him to recross him on issues, or

25   calling any witness to recross on issues, that is not rebuttal,

1    Your Honor.

2         THE COURT:  Right.  Counsel?

3         MR. GLASS:  Fundamentally what defense are asking is that

4    they get to reopen Mr. McLoughlin's testimony.

5         THE COURT:  Right.

6         MR. GLASS:  They want to --

7         THE COURT:  For a limited purpose different than what

8    you're asking the Court to do.

9         MR. GLASS:  It is -- in addition to, I would say, Your

10   Honor.  We raised this morning, after hearing Mr. McLoughlin's

11   testimony, this concern about his misstatement, and that's being

12   resolved.

13        THE COURT:  Well, it may be resolved -- I mean, it will be

14   resolved.  And, again, I'm -- if I had to predict what I'm going

15   to do, since we're talking about predictions, my prediction is

16   that I probably will allow it.

17        I mean, and also let me just say one other thing, too.  Am

18   I really concerned that a witness who thought he made a mistake

19   during his testimony said something to his attorney afterwards?

20   You know, "Gee, I made a mistake."  Probably not.  I mean, what's

21   he supposed to do, call me?  You know, that's not going to

22   happen.  I'm not going to talk to him.

23        FROM THE FLOOR:  (Laughter.)

24        THE COURT:  But, I mean, I could see where someone would

25   be sweating and wondering, "Well, what can I do now?  The judge

1    said don't discuss it."

2         I mean, there has to be -- you know, there are exceptions

3    to all the rules, and it strikes me as an appropriate exception

4    to the rule where an attorney [sic] says, "I made a mistake," and

5    tells his attorney, and the attorney says, "Let me tell the

6    Court, and let's see what we can do."

7         So at the end of the day, will I allow it?  I probably

8    will.  Will I be, you know, upset that he talked to his attorney?

9    Probably not.  But this is another issue.  Should -- I mean, you

10   know, he was offered as direct, he was examined, his testimony's

11   over.  If we were at closing argument -- I could give you one

12   scenario.  At closing argument, and, you know, I'd have to focus

13   back on what the GE witness said.  He didn't say it.  The GE

14   witness, who's in a better position to know about the future of

15   GE than the president of Electrolux, didn't say anything about

16   GE Appliance going out of business.  He said, "Well, you know,

17   we'd have to do something else, maybe even merge with another

18   business.  We'd have to re-examine it."  I'd probably give his

19   testimony more weight than someone who has an interest in the

20   outcome of this case who says, "Oh, gee, they're going to go

21   out -- they're going to go out of business."

22        So, you know, at the end of the day, what's the harm,

23   what's the foul?

24        MR. GLASS:  Your Honor, I appreciate all that.

25        THE COURT:  Well, I can understand why you want to reopen

1   it, but would that really be appropriate, though, to reopen

2   cross-examination?

3           MR. GLASS:  Well, they --

4           THE COURT:  And could you call him again in your rebuttal

5   case?

6           MR. GLASS:  We -- we certainly could.

7           THE COURT:  I think you probably could, so why go through

8   that, right?

9           MR. GLASS:  Yeah.

10          THE COURT:  If he's going to be here, right?

11          MR. GLASS:  Exactly, Your Honor.  And so there's the

12  practical point Your Honor's addressed, which is if he's going to

13  be here sitting on the stand, we should be able to ask him the

14  questions we have.

15          THE COURT:  And I think you'd probably be able to recall

16  him in your rebuttal case, or do some other evidence to impeach

17  his testimony that they're not going to go out of business.

18          MR. GLASS:  Yes, Your Honor.

19          THE COURT:  You could call the GE representative.  He's

20  not going to say they're going out of business.  If so, he can be

21  impeached with his testimony.  You know, he didn't say anything

22  about that did he, Blankenship?  He didn't say anything about

23  going out of business?

24          MR. GLASS:  That's right, Your Honor.

25          THE COURT:  All right.  So I'm probably going to allow

1    that as well.

2         MR. GLASS:  Yeah.  And it's highly unlikely that we're

3    going to object to any submission by defendants.  I mean, we --

4         THE COURT:  Yeah.  And in all likelihood I'm going to

5    allow it.

6         MR. GLASS:  Yeah, yeah.

7         THE COURT:  I mean, what's a witness supposed to do?  Not

8    say anything?

9         MR. GLASS:  Yeah, exactly.

10        THE COURT:  That's not right, and -- or call me?  I mean,

11   people have done that.  They've called courts before because they

12   don't know what to do.  I don't want to walk to them and I

13   wouldn't talk on them.

14        FROM THE FLOOR:  (Laughter.)

15        THE COURT:  So at the end of the day I'm probably going to

16   allow it.  So if you want to save yourselves all some time, you

17   know, we can agree that he'll be called at 9:00 on Monday, or if

18   you want to go ahead and file your motion, that's fine as well.

19        I mean, what do you want to do?  Do you want the

20   opportunity to respond?  Do you want to see the declaration

21   first?

22        MR. GLASS:  Your Honor, we would like to see the

23   declaration.  We would like to see what the amendment or

24   modification to his testimony is.  But I can represent to you,

25   it's highly unlikely we're going to oppose.

1          THE COURT:  Okay.

2          MR. GLASS:  We're almost certainly going to stipulate.

3          THE COURT:  Absolutely.

4          MR. GLASS:  But I do want to make sure that I'm clear,

5     they're reopening his direct.

6          THE COURT:  Right.

7          MR. GLASS:  They're reopening his examination to correct

8     some testimony.  They had an opportunity yesterday to say, "Now,

9     Mr. McLoughlin, you just testified there are these ranges.  They

10    don't exist."

11         They had the opportunity.

12         THE COURT:  Well, they were surprised, too, I guess.

13         MR. GLASS:  Right.  So that's -- that's my point about

14    reopening cross.

15         THE COURT:  I'm going to let you do it.  I'm going to let

16    you do it, because I think you can probably present some evidence

17    in your rebuttal phase.  Indeed, you could probably recall this

18    witness again, probably, in rebuttal phase, and, you know, for

19    purposes of saying, "You know, when you testified on direct

20    during your -- the defendants' case-in-chief, you said the

21    following, and that's not true, is it?"

22         MR. GLASS:  That's right.

23         THE COURT:  So I'm going to allow it over objection.  I'm

24    going to allow it.

25         MR. GLASS:  Thank you, Your Honor.

```
1          THE COURT:  All right.  Okay.  Let's proceed with whomever
2     we have today to testify.
3          MR. FRIEDMAN:  Your Honor, the defendants call Rob
4     Posthauer.
5          THE COURT:  All right.
6          Good morning, sir.
7          THE WITNESS:  Good morning.
8      (ROBERT POSTHAUER, DEFENDANT'S WITNESS IN THE CASE, SWORN)
9               DIRECT EXAMINATION OF ROBERT POSTHAUER
10    BY MR. FRIEDMAN:
11    Q.    Good morning, Mr. Posthauer.  How are you today?
12    A.    I'm doing great.  Thank you.
13    Q.    Good.  Mr. Posthauer, by whom are you employed?
14    A.    GE Appliances.
15    Q.    And what's your current position at GE?
16    A.    I am the general manager for sales for GE Appliances.
17    Q.    And how long have you worked in the appliance industry?
18    A.    22 years total.
19    Q.    Where were you born?
20    A.    Born in Evansville, Indiana.
21    Q.    And where did you go to school?
22    A.    Um, I went to, of course, elementary school in
23    Evansville, Indiana, and I went to Purdue University for
24    college.
25    Q.    What's your degree in?
```

1    **A.**    Business management, with an option in finance.

2    **Q.**    And after you graduated from college, where did you go to

3    work?

4    **A.**    Right after college I took a job with St. Vincent

5    Hospital in Indianapolis for a short period of time, and then I

6    went to Maytag Appliances.

7    **Q.**    And when did you start working with Maytag?

8    **A.**    1994.

9    **Q.**    And how long did you stay at Maytag?

10   **A.**    About 11 total years.

11   **Q.**    So until 2005?

12   **A.**    Two thousand -- late 2004, really.

13   **Q.**    Okay.  And just briefly walk the Court through your

14   different positions at Maytag.

15   **A.**    Yeah.  With Maytag, I started early as a detailer or a

16   merchandiser.  So what that is, is I made sure at the national

17   accounts the floors were well represented with merchandising,

18   and I also trained the employees on the advantage of Maytag

19   appliances, so --

20   **Q.**    During your time at Maytag, was it particularly known for

21   any particular kind of appliance?

22   **A.**    Maytag was known for, of course, laundry products.

23   **Q.**    That's the loneliest man, the Maytag man?

24   **A.**    Loneliest man, that's right, yeah.

25   **Q.**    And did there come a time when you had any sales

1    experience or responsibility at Maytag?

2    **A.**    Yes.  So after an area of merchandising specialists

3    role -- I think they called it a district representative role --

4    I moved into various sales roles -- field sales roles at Maytag.

5    **Q.**    And could you describe briefly what your responsibilities

6    were in your field sales capacities?

7    **A.**    Sure, sure.  I -- so the primary responsibility, the way

8    that Maytag started the training program, really, for field

9    sales was that I was responsible for smaller independent

10   dealers.  So my first selling responsibility is really in

11   Traverse City, Michigan.  And I would, you know, sell all

12   product lines to the customers that I was responsible for, as

13   well as train them, work private sales and do the merchandising

14   as well.  And then there's a component of advertising as well

15   that I was responsible for.

16        So from there I moved into a larger market.  They moved

17   me down to the Detroit area.  I had similar responsibilities

18   with some larger accounts, some of which aren't in business

19   anymore.

20   **Q.**    What were some of those?

21   **A.**    Silo, Fretter, that I had in the Detroit area.  And I

22   also was responsible for ABC Appliance.  Of course, they're

23   still a customer, a good customer, of ours.  And so I had both

24   national account responsibilities and independent dealer

25   responsibilities in the Detroit area.

1        From Detroit I moved to Northern California where I spent

2    most of my career.

3    Q.    And what were your responsibilities at Maytag while you

4    were in Northern California?

5    A.    Similar roles.  So I moved into yet a larger market in

6    the Bay Area, so I had Northern California, Napa, and Sonoma,

7    part of my territory.  Then I moved -- I was promoted at some

8    point and had, what we've referred to still on the GE side, as

9    key account responsibility.  So I had, in Northern California,

10   Fry's Electronics, and Western Appliance, so just larger

11   regional accounts with centralized buying, but, you know, 10 to

12   12 locations.  Fry's has more than that.

13   Q.    So can you describe briefly your experience as a key

14   account manager or a national account manager, the interaction

15   with the customer in terms of getting product on the floor of

16   the customer?

17   A.    Sure.  That process hasn't changed a lot, but we would --

18   I was responsible for, you know, as I said, a couple of the

19   larger accounts, so I would have standing appointments on a

20   Tuesday or a Wednesday.  I would go in, and we'd have certain

21   goals that I would want to accomplish in that sales meeting.

22   Generally I'd pick one product line and focus on that product

23   line, but sometimes we were planning for a sale or an event, so

24   there are promotional things and merchandising things that I

25   needed to accomplish.  And we would just, you know, compete.  I

1    would compete for spots on the floor, so representation on the

2    sales floor.

3    **Q.**     Does having representation on the floor matter in your

4    business?

5    **A.**     Oh, yes.

6    **Q.**     Could you explain why?

7    **A.**     Um, still to this day, you know, with -- even with the

8    Internet, although a lot of consumers shop before going into the

9    store, 84 percent look at their phone or their computer prior to

10   walking into a store.  Generally they like to open the doors and

11   touch the knobs, and so the product on the floor is really

12   important for sell-through or productivity, which I refer to as

13   the weekly sales rate.

14   **Q.**     So could you explain to the Court what you mean by

15   sell-through or productivity?

16   **A.**     So in our business you have sell-to, so for -- I'll take

17   an independent dealer as this example.  But part of the area

18   sales managers' field sales responsibility is to sell product to

19   the customer, and part of that may be cubing a truck for more

20   efficient transportation.  And in some cases we give truckload

21   discounts, as an example.  So that was part of my

22   responsibility.

23   **Q.**     Okay.  And is there a forecasting element that's involved

24   when you meet with your customer to talk about what the volume

25   or productivity or sell-through of a particular SKU will be?

1   **A.**      Yeah.  For the larger accounts, both regional accounts

2   and national accounts, we have a forecasting rhythm.  Generally

3   it's -- for national accounts it's 90 days out.  So we'll meet

4   on a regular basis once a month, generally, and try to forecast

5   90 days out.  Now we have to forecast for, what I'm sure we'll

6   talk about is, mega events and promotions a little bit

7   differently.  So we'll forecast out a little bit further than

8   that.

9   **Q.**      So what is a mega event or a promotion?

10  **A.**      From my perspective and from an industry perspective, the

11  two mega events are July 4th, which is a four-week promotion,

12  so -- and Black Friday, which is really Black November, as it's

13  commonly referred to now since it's a four-week holiday as well,

14  or promotional holiday.

15  **Q.**      So we're in Black Friday now; is that right?

16  **A.**      Yes.

17  **Q.**      And when did you start working with your customers, or

18  when did your teams start working with their customers to start

19  planning for Black Friday 2015?

20  **A.**      February, March time frame.  Excuse me, February, March

21  time frame is when we start the conversations for Black Friday.

22  I think the first meeting that we'll have for July 4th is

23  January, so we have an opportunity to talk that far in advance.

24  **Q.**      And this is jumping a little bit out of order, but can

25  you give us an overview, a sense of what it is that is going on

1    in the discussion with the buyer, with your customer, when

2    you're talking about either the Black Friday promotion or the

3    July 4th promotion?

4    **A.**     Sure.  The dealer or the customers really have a

5    tremendous amount of influence on all mega events, of course.

6    And so I'll just take Home Depot as an example.  Home Depot's

7    generally the first to encourage Black Friday and July 4th

8    planning that far in advance.  And so they would call us or

9    e-mail us and provide dates where we could show up and go to

10   either Atlanta if it's Home Depot, or Charlotte if it's Lowe's,

11   and present a model list of products in the promotional MAP or

12   the value to the consumer that we're considering offering.  And

13   generally that's the first pass.  It's generally not good

14   enough, I guess, for the customer.

15        In Home Depot's case, Bob Baird, who is the head -- he's

16   the MVP, merchandising vice president for appliances.  He would

17   generally call us or e-mail us several times and ask for better

18   pricing and better values for the July 4th and Black Friday

19   promotion, so that negotiation and process goes on for quite

20   some time, couple -- two or three months.

21   **Q.**     And is there competition generated or instigated by the

22   merchant between GE, in this case, and other appliance suppliers

23   to get position during these promotions?

24   **A.**     Yes.

25   **Q.**     Can you describe that for the Court?

**A.**      Sure.  So, you know, there's eight promotions, as I see

them.  I can run through them, or -- and there's two mega events

which I talked about.  The two mega events -- maybe I'll focus

on because it's easier to understand -- drives about a third of

the overall volume for the national accounts for a Lowe's or a

Home Depot or a Best Buy.  And so generally the merchant, the

buyer, has an interest to improve their comps, their

year-over-year performance in that particular product line,

laundry, cooking, dishwashers or what have you.

        So oftentimes there will either be phone calls, phone

conversations or e-mails encouraging lower wholesale prices and

lower promotional MAPs to encourage the competition.  So there

might be, as an example, Bob or Natedra Banks who's the laundry

merchant for Home Depot, would send an e-mail to our national

account manager that's responsible for laundry and would

indicate that competitively we're in a tough position against

some other brand because their promotional value exceeds ours.

And then there's a negotiation on what we're going to do about

it:  Are we going to lower the price and the promotional MAP to

better compete with it?

**Q.**      So let me see if I understand.

        Before the mega event occurs, is there a negotiation back

and forth between you and the merchant, the result of which is

you end up either offering lower prices or you don't to the

merchant for that event?

1   **A.**      That's right, yes.  And I'm -- as GM of sales, I'm

2   generally -- I would talk to the merchandising vice presidents

3   who were responsible for the Appliance Department.  And there's,

4   of course, our national account manager and our -- what would

5   have the same conversations with the buyers or merchants.

6   **Q.**      So I'll come back to this a little bit later.  I got

7   myself out of sequence.  I was interested in that.

8         Let me go back to your time when you were with Maytag.

9   **A.**      Sure.

10  **Q.**      So this was back up through 2004?

11  **A.**      Right.

12  **Q.**      Who were the appliance brands that you were competing

13  with when you were at Maytag?

14  **A.**      In 2004 and before that, appliance brands were, of

15  course, Maytag, Whirlpool, GE, Electrolux and Kenmore were the

16  primary brands, and there were some other, you know, Thermador

17  and Viking and Bosch and some of the Premium brands as well.

18  **Q.**      And at the time of the Maytag merger with Whirlpool, were

19  you still with Maytag or had you already moved over to GE?

20  **A.**      Merger closed in early 2006, so I was with GE.

21  **Q.**      Right.  And were you paying attention to what was

22  happening with respect to that merger?

23  **A.**      Yes, yeah.  I have a lot of friends, of course, still in

24  the industry with Maytag.  And, you know, one of the -- I have a

25  lot of great -- had great experiences, a lot of great memories

1    with Maytag.  I met my -- my wife and I both worked for Maytag,

2    actually, and she left to go with GE shortly before I did.  So,

3    yeah, I have obviously even to this day, a special interest, I

4    guess, in Maytag Appliances.  But I watched the merger and what

5    happened before and what happened after pretty closely.

6    Q.    And focussing specifically on laundry, do you have a

7    recollection of what Maytag's share of laundry was at the time

8    of the merger?

9    A.    Yes.  Maytag's laundry share is around 20 percent.

10   Whirlpool was 25, I think.

11   Q.    And do you know whether Whirlpool at the time of the

12   merger was manufacturing laundry appliances for Kenmore brand?

13   A.    They were, yes.

14   Q.    And do you know what the Kenmore brand share of laundry

15   was at that time?

16   A.    Around 25 percent.

17   Q.    So was it your impression that after the merger the

18   manufacturing share of laundry controlled by Whirlpool was about

19   70 percent?

20   A.    Yes.

21   Q.    And what's Maytag's share of laundry today?

22   A.    I believe Maytag's share is around 12 percent, so they

23   went from 20 to 12.  Their brand commitment, so consumers'

24   commitment to buy laundry when shopping, was somewhere around --

25   when I was with Maytag, around 48 percent.  I recall the goal

1    was always to increase our market share to meet our brand

2    commitment in laundry.  That never happened, of course, but

3    their -- the brand commitment for Maytag is also decreased.  I

4    think it's around 25 percent.

5    **Q.**    What is brand commitment?  I think that's a new term for

6    us.

7    **A.**    Yeah.  Brand commitment is a consumer's commitment to buy

8    a particular product brand in that product line.

9    **Q.**    And why is it important?

10   **A.**    I think it's important because it drives traffic to that

11   particular brand when a consumer is shopping for, in this case,

12   laundry.  So before they go to the store, consumers are

13   committed to buy that particular brand, and then they might see

14   other values which might steer them in a different direction.

15   **Q.**    So -- so Maytag's share before it was acquired in laundry

16   was 20 percent, and today it's fallen to 12 percent?

17   **A.**    Yes, somewhere around that.

18   **Q.**    And Whirlpool's share before the merger, just Whirlpool

19   brand, was 25 percent in laundry?

20   **A.**    My recollection is around 25.  It's probably 20 percent

21   now.

22   **Q.**    So it's fallen 5 percent?

23   **A.**    Yes.  Roughly, yes.

24   **Q.**    And do you know whether Whirlpool is still manufacturing

25   laundry for Kenmore?

1   **A.**      They do.

2   **Q.**      Do they have all of the laundry?

3   **A.**      They have some of the laundry.  I think LG has a portion

4   of their laundry as well.  There's an SSI for Sears' Kenmore

5   brand.  I believe it's every three years, so it does change from

6   year to year.

7   **Q.**      You need to tell the Judge what an SSI is.

8   **A.**      Oh, strategic sourcing initiative, I believe, is what

9   that refers to.

10  **Q.**      Is that a competitive bid, do you know?

11  **A.**      Competitive bid for the Kenmore product in any particular

12  product line.  I think that's every two to three years.

13  **Q.**      So who's grown share in laundry if Whirlpool and Maytag

14  have lost?

15  **A.**      Kenmore has lost -- has lost share as well.  I think

16  their share, as I said, in, you know, around 2004 was around 25

17  in laundry, and I believe they're close to 15.  So LG and

18  Samsung clearly are the winners in laundry.

19  **Q.**      And do you know, based on your experience in the

20  appliance business with Maytag, up through 2004, what LG's share

21  of laundry was at the time of the merger between Whirlpool and

22  Maytag?

23  **A.**      Up to 2004?

24  **Q.**      Yes, sir.

25  **A.**      Relatively small.  I'm not sure what it was.  They didn't

1    have broad distribution until 2005.

2    Q.    All right.  And what about Samsung?  Do you know what

3    their share of laundry was?

4    A.    The same.  I don't know exactly what it was, but it

5    was -- it was low single digits.

6    Q.    And do you know what LG's share of laundry is today?

7    A.    LG's share of laundry is someplace north of 15.

8    Q.    And what is Samsung's share of laundry today?

9    A.    About the same.

10   Q.    So each of them has about a 15 percent share of laundry?

11   A.    Yes.

12   Q.    So they've grown from low single digits to 15 percent

13   each in the ten years?

14   A.    Yes, that's correct.

15   Q.    How have they done that?

16   A.    Number one, broader distribution.  So what I mean by that

17   is they've partnered with national accounts.  So in 2005 LG

18   partnered with Home Depot, and that provided an opportunity for

19   roughly 2,000 stores, so -- and then Samsung partnered with

20   Lowe's in 2006 for the same effect.

21   Q.    Now, in 2005, you were working at General Electric,

22   correct?

23   A.    That's correct.

24   Q.    What was your job in 2005 at General Electric?

25   A.    I was a area sales manager in the Northern California

1    market, so in the San Francisco Bay Area market.

2    Q.    And did there become a time when you became the national

3    account manager for Home Depot working at General Electric?

4    A.    Yes.

5    Q.    When was that?

6    A.    Around 2006, 2007.

7    Q.    All right.

8    A.    I was the national account manager for the Home Depot

9    account.

10   Q.    And in that position as national account manager for the

11   Home Depot account, did you have an opportunity to observe

12   firsthand LG's growth and expansion at Home Depot?

13   A.    Oh, yes.  Yes.

14   Q.    Could you -- could you share with us a little bit about

15   what you observed concerning LG's growth and expansion at Home

16   Depot?

17   A.    So they really -- LG really built their infrastructure --

18   by that, I mean, their distribution centers around the

19   country -- to better serve all customers; but in this case, for

20   me, I was on the Home Depot account, as you mentioned.

21         So it was a difficult time, I guess, as a GE employee in

22   laundry, as LG launched, you know, their new product line and

23   their improved, more mature infrastructure that they have.  And

24   they -- they launched a new front-load, and it was a new color

25   for the industry called wild cherry, so just a fire engine red

1  color, and had, you know, incredible consumer acceptance, and it

2  was a big success for them.  So that product really was

3  fantastic for them from a success standpoint in around that

4  time, 2006, 2007.

5  Q.    And did you see LG do anything in terms of expanding its

6  product line or the range of offerings?

7  A.    Yes.  They continued to offer laundry products, really,

8  up and down the line.  So they migrated features, whether it's

9  capacity or steam or they also had a unique front-load product

10  that had a -- that had rear controls around that time, so it was

11  unique innovation for laundry, of course, did well with that.

12        So yes, they expanded their line, both above the wild

13  cherry price point, which my recollection was that was around

14  999, and below that as well.

15  Q.    So you observed LG both moving up the price ladder and

16  down the price ladder?

17  A.    Yes.

18  Q.    And how did they do that in terms of the features that

19  they offered to consumers?

20  A.    Again, they would migrate the most important CTQs for a

21  consumer.  Critical to quality, is what CTQ is.

22  Q.    Thank you.

23  A.    But the most important features a consumer would consider

24  when purchasing a product, so whether it was capacity and they

25  would launch it at a certain -- this still occurs with all of

1    us, quite frankly, in the industry today -- but launch

2    innovation and features at a particular price point and migrate

3    those features down to improve the value at low price points for

4    the consumer.

5    **Q.**    Did you observe anything in that time period, 2006, 2007,

6    2008 regarding LG's promotion strategy?

7    **A.**    Yeah.  Yes.

8    **Q.**    Tell us what you saw, please.

9    **A.**    Really, both from LG and Samsung, Samsung was not at the

10   Home Depot at that point when I was a national account manager.

11   But, you know, one of the differences in the industry change in

12   the last ten years, certainly in the last eight or so years, is

13   the increased activity around promotions.  So promotions became

14   longer and more often, basically, and the values to the consumer

15   became much greater.

16   **Q.**    Are you familiar with the term "promotion cadence" or

17   "promotional cadence"?

18   **A.**    Promotional cadence, yes.

19   **Q.**    Can you tell us what that is?

20   **A.**    Just the rhythm that -- and the values offered to the

21   consumer for a promotional period.  So our promotional cadence

22   for a year is on a particular product.  That would be something

23   that, when we are introducing a product to the retailer or our

24   customer, we would also -- we would not only go over the

25   features and benefits of that particular product, but we would

1    also discuss our promotional cadence, how long and how often and

2    how deep we were going to promote that product.  So it's really

3    become a feature of the product as well that you -- that we

4    really have to talk about at the time of introducing a product.

5    **Q.**    So back before the Whirlpool/Maytag merger, what was the

6    promotional cadence in your experience?

7    **A.**    Yeah, my recollection is it was much less often, the

8    promotional cadence.  I don't recall there being a July 4thth

9    promotion.  Certainly it wasn't a month long.  It was maybe a

10   weekend-long event, just like Black Friday may have been a

11   weekend or a long -- or a week.  But it's expanded, both in

12   frequency and the duration of the event is much longer as well.

13   So, you know, the promotions are -- it goes from MLK to

14   President's Day to Memorial Day, July 4th into Labor Day,

15   Columbus Day, and Black November, and to the year NX13, which is

16   just a two-week period at the end of the year to drive --

17   generally to drive closeouts, but that's just another

18   promotional period that the industry's kind of developed.

19   **Q.**    So last I checked there were 52 weeks in a year.

20        How many weeks in a year do you typically find that

21   you're on promotion?

22   **A.**    Just -- how many times -- just in the highlighted holiday

23   periods, there's generally 26 to 28 weeks of promotional

24   activity, but it exceeds that, of course, during the year.  So

25   even in what we refer to as -- or what I maybe refer to as white

1  space.  So it's tough to find a period of time where there's not

2  a holiday or a promotional period.

3       But, for example, in-between President's Day in February

4  and Memorial Day in May, that's what would be referred to as,

5  from my perspective, as white space, and so we find an

6  opportunity, I guess you would call it, to provide additional

7  promo discounts during this time.  So this year we had a kitchen

8  event in April which had -- where we had promotional MAPs

9  through the month of April.

10       So back to the original question.  The holiday periods

11  that we're all familiar with in the industry are 26 to 28 weeks

12  probably, but it far exceeds that because we find opportunities

13  to promote.

14       Another example is May is Maytag month.  Maytag has --

15  promotes during that period of time.  LG, they sponsor the NCAA

16  championship, so March Madness.  So there's all sorts of

17  promotional activity outside of those holiday periods.

18  Q.   And in terms of the size of the value that's offered, has

19  that stayed constant in the last ten years, the size of the

20  discounts or promotions, or have the promotional values

21  increased?

22  A.   The promotional values have definitely increased over

23  time.

24  Q.   Can you give us a sense of what you typically see today

25  as promotional offers or promotional values?

1   **A.**      Typically, you know, French-door refrigeration is maybe

2   an example I'll use.  LG and Samsung will generally have --

3   excuse me -- discounts for Black Friday that are 1,000 to 1,200

4   to $1,400 off the normal MAP, so tremendous values.  Samsung

5   currently has a front-load pair that's $1,400 off.

6   **Q.**      A front-load pair?  What is that?

7   **A.**      Front-load laundry pair.

8   **Q.**      Thank you.

9   **A.**      Yeah.  So those are a couple of examples.

10          MR. MAJORAS:  Your Honor, we'd like to object to the

11  extent counsel intends to ask the witness about any current

12  pricing post-discovery.

13          THE COURT:  All right.  And that would be consistent with

14  the Court's order.  Right.

15          MR. FRIEDMAN:  So, Your Honor, just -- I do have some

16  demonstratives that I plan to use with the witness.

17          THE COURT:  Yeah, but I'm not -- I don't want realtime

18  testimony about current pricing.

19          MR. FRIEDMAN:  It's not realtime testimony, but it

20  compares 2013, 2014 and 2015 circulars that are published in the

21  newspaper, Your Honor.

22          THE COURT:  Counsel?  As longer as it's not inconsistent

23  with the Court's order.  I'm not interested in realtime pricing

24  from the floors of any of these retailers.

25          MR. FRIEDMAN:  My understanding, Your Honor, this is

1    consistent with the order, which was we're not going to have

2    realtime sales results coming in from these events.  And this is

3    not realtime sales results.

4         THE COURT:  That's fine, as long as it's not -- as long as

5    it's consistent with the Court's order.

6         MR. FRIEDMAN:  All right.  Thank you, Your Honor.

7    BY MR. FRIEDMAN:

8    Q.   So as somebody who was on the ground competing in the

9    marketplace, did you observe any change in prices in the

10   marketplace for appliances following the merger of Whirlpool and

11   Maytag?

12   A.   The industry became more competitive, as I mentioned,

13   with LG and Samsung having broader distribution and increasing

14   their customer base.

15   Q.   And the broader distribution --

16        THE COURT:  Do you have an opinion as to whether that

17   would have happened notwithstanding the merger?

18        THE WITNESS:  I think it would have happened either way.

19        THE COURT:  Yeah.

20        THE WITNESS:  Yeah.

21   BY MR. FRIEDMAN:

22   Q.   And what do you think caused the price -- pricing to

23   become more competitive?

24   A.   LG and Samsung have been intensely competitive with

25   stated goals to have, you know, a 50 percent market share in the

1    U.S.

2    **Q.**    And have you seen LG and Samsung taking actions in the

3    marketplace to further their efforts to achieve those goals?

4    **A.**    Yes, every day, as we sit here during black November.  So

5    they are -- obviously, I respect all my competitors.  So they

6    have good product.  They've built a great brand with the success

7    of both cell phones and what I refer to as brown goods or

8    electronics, TVs, and DVDs and that kind of thing.  So consumers

9    are comfortable with the brands, both LG and Samsung, and

10   they've really leveraged that brand strength and brand awareness

11   to -- in appliances as well.

12   **Q.**    So you've talked a little bit about LG expanding at Home

13   Depot beginning in 2005.

14         Have they broadened out the line of appliances that they

15   offer since 2005?

16   **A.**    Sure.

17   **Q.**    Could you walk us through that, please?

18   **A.**    Yeah.  In laundry, they've talked a little bit about the

19   front-load product they have, but they also have high-efficiency

20   laundry, which is top-load laundry without an agitator.  They've

21   launched front-control, top-load laundry, which is an

22   innovation, and they've migrated that product down as well.

23   That's been very successful for them.

24         Dishwashers, I believe they have five or six different

25   dishwashers now, so they've migrated third rack to lower price

1  points, as an example.

2  Same thing in refrigeration.  They've launched new

3  side-by-sides, new innovation in French doors, door-in-a-door,

4  and in ranges as well.  And then for LG they have built-in

5  products.  So they've really rounded out their product portfolio

6  in most of those product lines.

7  And similar to Samsung.  Starting in -- both starting in

8  laundry and refrigeration, it seems like they're strategy -- I

9  guess from my perspective, not knowing their exact strategy, but

10  watching it unfold over the years -- laundry is 40 percent of

11  the appliance industry, so --

12  **Q.**  That's 40 percent for everybody?

13  **A.**  Yes, of the appliance -- of the, you know, 44 million

14  units, that's -- laundry represents about 40 percent of that, is

15  what the traditional number is.  Refrigeration is someplace

16  around 20 to 25 percent.

17  So they start in those very important product lines and

18  migrate up and down, and they've done that after their success

19  in and kind of during their success in laundry and

20  refrigeration, and the other products lines as well, dishwasher

21  and cooking.

22  **Q.**  And what percentage of total appliance sales does cooking

23  represent?

24  **A.**  I think it's 17 percent, I think.

25  **Q.**  And dishwashers, what percent is that?

1   **A.**     I -- I don't know the answer to that.

2   **Q.**     Okay.

3   **A.**     Something less than that.

4   **Q.**     Okay.  So -- and have you seen -- have you seen LG

5   following the same strategy in cooking as it executed in laundry

6   and refrigeration?

7   **A.**     Yes, similar strategy.

8   **Q.**     And can you explain for the Court what that strategy is

9   in cooking that you've observed?

10  **A.**     Launch great, you know, innovative product, whether it's

11  a double oven, freestanding range, so a range, obviously, with

12  two ovens, and migrating that particular product line, so

13  offering more products in the double oven space, and offering

14  compelling features, including griddles on a freestanding range,

15  five burners, whether it's a round burner or an oval burner for

16  griddle, cooking convection has been pushed down to lower price

17  points as well.  So they've migrated a lot of important

18  features.  Capacity is one area that both Samsung and LG are

19  super competitive and successful with, the capacity of a range.

20  **Q.**     And when you use the term migrating the features, can you

21  explain for us what you mean by that?

22  **A.**     Launching features at a particular price point.  Over the

23  years, price points -- from my experience in 22 years, price

24  points have remained kind of static, so the price points that

25  existed when I started in '93, '94 are similar to where they are

1   now, but the migration of features down to lower price points

2   provides a better value for the consumers.  And so that's what,

3   again, as I mentioned, all manufacturers try to do to provide a

4   better value, features, benefits, styling, those kind of things

5   for that.

6   **Q.**    Are you familiar with the term "line logic"?

7   **A.**    I am.

8   **Q.**    Can you explain to us what that means?

9   **A.**    Line logic is the strategy or logic around a particular

10  product line.  So laundry is a product line, but -- or product

11  category.  So a product category within laundry might be

12  front-loads versus top-loads.  And it's developing feature steps

13  at particular price points, is what line logic means to me.

14  **Q.**    So let's focus on ranges just a little bit.

15  **A.**    Sure.

16  **Q.**    How would you describe the line logic for ranges?

17  **A.**    For me, for GE, it's -- you can take a freestanding

18  electric range.  We start with a standard clean range, a very

19  simple range; coil cooktop, so the Calrod elements; up the line

20  into a standard clean freestanding Saran top, so another feature

21  step; and then into maybe five elements versus four elements on

22  the cooktop; self clean versus standard clean, would be a

23  feature step; convection would be another feature step.

24       And then there's different -- other different styling and

25  features, maybe larger capacity oven, as you step up the line

1    into, as I mentioned before, double ovens, so the opportunity to

2    have an upper oven and a lower oven and a freestanding range.

3    **Q.**    And as you work through the line logic, are there sort of

4    traditional retail price points for each step in the line?

5    **A.**    Yes.  As I mentioned, I think the price points have

6    remained kind of static over the years.  You know, I go back to

7    laundry just for a second.  I recall having a 299 and a 399

8    top-load washer when I started Maytag.  And, you know,

9    there's -- the market has, actually, a 274 washer right now from

10   Kenmore, as one example, but the market's right at the -- kind

11   of the same price point.  It's just the value and the features

12   have improved for the consumer over the years.

13   **Q.**    So in the 20-plus years that you've been in the industry,

14   there's still a $274 washing machine, but what you can buy for

15   that $274 today is a whole lot better than what you could buy 20

16   years ago?

17   **A.**    Yes.  Generally a larger capacity, maybe the washer tub

18   went from plastic to porcelain, still -- you know, still pretty

19   minimal in terms of features, but certainly improved features

20   over the years and more efficient, too, obviously.  It uses less

21   water, generally not ENERGY STAR at that price point, but more

22   efficient.

23   **Q.**    And would that same fact be true with respect to cooking,

24   that you can buy a much better freestanding electric range today

25   for the same dollars that it would have cost you 20 years ago?

1    **A.**     Yes.  Price points kind of, as I said, remained

2    unchanged, but the value for the consumer in all product lines

3    and categories generally is better.

4    **Q.**     So we've talked about LG's entry at the Home Depot in

5    2005, but where was Samsung in 2005?

6    **A.**     2005, I believe Samsung may be -- my recollection is that

7    they were potentially at Best Buy, not all stores, maybe some

8    smaller regional accounts.  But really in 2006 when they

9    partnered with Lowe's, that provided the distribution -- the

10   broader distribution, national distribution that helped them.

11   **Q.**     And you talked at some length about LG's expansion up and

12   down the price ladder in expanding into the different appliance

13   categories.

14        Could you describe briefly Samsung's journey as you

15   witnessed it?

16   **A.**     Really the same type of strategy with a focus on where

17   most of the volume is, is laundry; and French-door

18   refrigeration; frankly, fantastic innovation from Samsung in

19   front-load laundry, high-efficiency top-load laundry;

20   French-door refrigeration with four doors or door-in-door

21   product, as well as side-by-sides as well.

22   **Q.**     And did there come a time when Samsung was added to the

23   floor at Home Depot?

24   **A.**     Yes.

25   **Q.**     And when did that happen?

1    **A.**    Negotiations started around April of 2012.  I think they

2    had a broad, I'll call it, .com distribution and awareness in

3    December.  So I think they waited -- my recollection is they

4    waited until after Black Friday.

5         But to answer your question, late 2012 is when Samsung

6    appeared at -- the partnership with Home Depot.

7    **Q.**    And what was your job at GE at the time that Samsung

8    arrived at Home Depot?

9    **A.**    I was fortunate enough to be the general manager of the

10   Home Depot account during that period.

11   **Q.**    And from your perspective as general manager of the Home

12   Depot account, how did the arrival of Samsung at the Home Depot

13   affect General Electric?

14   **A.**    Um, again, tough position.  They are super competitive,

15   have, you know, great brand awareness, as I mentioned before,

16   from cell phones and brown goods.  And the associate acceptance

17   was far faster than I had anticipated.  By that I mean we had

18   a -- at that point, a relationship with Home Depot since 1999.

19   We were the first appliance brand to partner with the Home

20   Depot.  So for some Home Depot associates in appliances that

21   have been there a long time, you know, we have a strong

22   relationship.  But Samsung took off really quick, I guess, is

23   the best way that -- as did LG in 2013.

24   **Q.**    Did Samsung displace GE from some floor spaces at Home

25   Depot?

1    **A.**    Certainly.

2    **Q.**    Did LG displace GE from some floor spaces at Home Depot?

3    **A.**    Yes.

4    **Q.**    At the time that Home Depot added Samsung, did it add any

5    other brands?

6    **A.**    Yes, Electrolux and Frigidaire, of course, and Whirlpool

7    brand.  So they had always had Maytag brand under the Whirlpool

8    Corporation, but they also added the Whirlpool brand at that

9    time.

10   **Q.**    Did GE lose floor spots to Electrolux or Frigidaire at

11   Home Depot?

12   **A.**    Most of the floor spots went to Samsung.  Whirlpool

13   brand, in most cases, replaced the Maytag brand, so kind of a

14   one-for-one swap.  I think we lost a couple, maybe, to

15   Whirlpool, and maybe a couple to Electrolux.  But the catalyst,

16   I guess, for that big change at the Home Depot was a project

17   which you're speaking of called "Jumbo," so it might be

18   appropriate for me to just talk about --

19   **Q.**    Sure.

20   **A.**    -- why or how this all unfolded.

21          So Home Depot at that time, an average -- what we refer

22   to as a planogram.  So the average floor space dedicated to

23   appliances was around 1,400 square feet on average.  For

24   prospective in comparison, Lowe's is at least twice that; Sears

25   is three times that.

1        So in order to -- from Home Depot's perspective, in order

2   to serve that customer better and grow the appliance awareness

3   and department sales, they had to invest in larger planograms,

4   or larger square feet dedicated to appliances.  So that's where

5   the term "Jumbo" comes in.  So Jumbo represented about twice the

6   square feet, 24- to 2,600 square feet, if memory serves me

7   right.  So in a lot of cases they were additions to the floors

8   versus replacing GE or another brand.

9   **Q.**    Why don't I ask you to take a look at Exhibit DX184.

10  It'll show up on the screen, but it's also in your binder.

11  **A.**    One you had asked me about, sell-to and sell-through, so

12  it's been on my mind.

13  **Q.**    Yes, sir.

14  **A.**    So sell-to is the, as an ASM, one of the main

15  responsibilities for my SM's was the cubing of trucks, I talked

16  about, putting refrigerators with dishwashers and cooking

17  products for more efficient selling and buying, really, and

18  distribution.

19      Sell-through, which we'll probably refer to today at some

20  point, is the consumer actually buying a product.  So sell-to is

21  any brand selling the product to the dealer or the customer; and

22  sell-through really just reflects the customer or dealer selling

23  it to the consumer.  So I just wanted to mention that.

24  **Q.**    Okay.  And sell-through is really talking about the

25  productivity of the SKU on the floor; is that right?

1   **A.**     Absolutely.  What we usually refer to as their -- I

2   normally refer to as the weekly run rate or productivity of each

3   individual model or SKU.

4   **Q.**     All right.  We'll come back to that in a minute.

5   **A.**     Okay.

6   **Q.**     So take a look at what's up on your screen, DX184.  And

7   this is a series of e-mails.  If we can go to the bottom half of

8   the page, there's an e-mail from Ed Martin on November 28th on

9   the very bottom of the page.  Can you pull that out and

10  highlight the section that says, "The hounds of hell have

11  arrived at our doorstep."

12          Do you see that?

13  **A.**     I do.

14  **Q.**     And who was Ed Martin at this time?

15  **A.**     Ed Martin is our -- was our chief marketing officer for

16  GE appliances.

17  **Q.**     And who is Michael McDermott?

18  **A.**     Mike had my position, so he's the general manager of

19  sales at the time.

20  **Q.**     And this e-mail that Mr. Martin sent, "The hounds of hell

21  have arrived at our doorstep," was in response to your e-mail

22  that's on the next page of the exhibit announcing that Home

23  Depot would be announcing the addition of Samsung to its

24  portfolio of appliances in December, correct?

25  **A.**     That's right.

1    **Q.**     And in your -- that somewhat colorful language, what did

2    you understand it to mean?

3    **A.**     Again, Samsung is a super aggressive competitor, and so

4    he was referring to Samsung being just that:  Aggressive in the

5    marketplace.

6    **Q.**     And Mr. McDermott responded to that e-mail by saying,

7    "The only way to win is with great product."

8          Do you see that?

9    **A.**     That's right, yes.

10   **Q.**     And Mr. Martin added to that, "And sales team and

11   advertising and thoughtful promo schedule."

12         Do you see that?

13   **A.**     I do.

14   **Q.**     And do you agree that all of those elements are needed to

15   win in competition with Samsung or LG or any of your other

16   competitors?

17   **A.**     Yes.

18   **Q.**     And could you tell us:  Since Samsung has been added to

19   the floor at Home Depot, do you learn from time to time how

20   you're doing and how other brands are doing in terms of total

21   revenue at Home Depot?

22   **A.**     Yeah.  We have -- at Home Depot we have Bob Baird, the

23   merchandising vice president, often shares, not only weekly run

24   rate or productivity information, but also revenue information.

25   So, yeah, we're on an ongoing basis, really, at any account, we

1    have some sort of understanding of how well or poorly our

2    competition is doing.

3    Q.    And do you understand why your customer, the merchant, is

4    sharing that information with you?

5    A.    I've been doing this -- yes.  Yeah, to encourage

6    competition really.  It's just to encourage us to just be aware

7    that Samsung's, in this case, winning, so you might want to

8    reduce some of your promotional values or what have you to

9    improve productivity in a certain product or product line.

10   Q.    When you say "reduce some of your promotional values,"

11   does that mean increase the promotional dollars and reduce the

12   price?

13   A.    Yeah, reduce the retail price, potentially, the

14   promotional MAP, to increase the productivity, that's right.

15   Q.    And do you have an understanding generally about what the

16   progression of Samsung's revenues have been at Home Depot from

17   2013 to forecast for next year?

18   A.    I do, and --

19   Q.    Could you share that with us.

20   A.    Yeah.  The --

21   Q.    Are you okay with that in open court, or do we need that

22   to be in private session?

23   A.    It probably is best in private session.

24   Q.    All right.  We'll save that.  Remind me not to forget it.

25   A.    Okay.  Well, what I can say is my understanding, in terms

1    of revenue from 2013 to 2016, is they have at least tripled

2    their revenue in --

3            THE COURT:  You say "they."  You mean, Samsung, right?

4            THE WITNESS:  Samsung, yes.  Sorry about that, yes.

5    BY MR. FRIEDMAN:

6    Q.    And what about LG in that same time frame?

7    A.    Growth.  Certainly growth may be as much as 50 percent

8    growth in that same time period, is my understanding.

9    Q.    And what about GE?

10   A.    2012 to 2013, for prospective, we lost -- we went from

11   930 million to 880ish in 2013, and our operating plan from 2015

12   to 2016 is flat, so our goal is to maintain our current revenue

13   with the Home Depot account.

14   Q.    Now, I want to understand discussions that you, as an

15   appliance seller, have with your customer, the merchandiser,

16   about productivity and weekly performance.

17           Can you explain to us what the nature of those

18   conversations is?

19   A.    Yeah.  On a -- on at least a weekly basis, as I

20   mentioned, for all customers we will get productivity

21   sell-through information, and the basis for that is, if it is

22   not productive in their eyes, meaning the customer, then there

23   would be potentially an opportunity for others to displace us

24   with that product line or that product.

25   Q.    Let's be a little bit more direct and explicit.

1   **A.**      Okay.

2   **Q.**      So what is -- what does the merchant say if you have a

3   product that is not performing at the forecast rate?

4   **A.**      You're going to lose your product.  The 4250 model number

5   as an example, not performing to expectations.  Samsung, LG,

6   Whirlpool, whomever, has a product that they want on the floor,

7   and so we have to do something to improve that productivity.  So

8   that could be a new product, and if a new product's not coming,

9   that generally is some sort of reduction in either pricing, MAP

10  pricing or promotional, increasing the values and the frequency

11  of which we promote that particular product.

12  **Q.**      So you've talked a little bit about MAP pricing.  Can you

13  just tell the Court what that means?

14  **A.**      MAP refers to as minimum advertised pricing, and it's

15  a -- it's a policy that all manufacturers, I believe, have.  And

16  it's, you know, guidelines and requirements around logo

17  placement, features, the types of image you use in an

18  advertisement, as well as minimum advertised price.

19  **Q.**      And so is the retailer obligated to sell at the MAP

20  price?

21  **A.**      No.  The dealer -- the customers determine their own

22  retail price, so MAP is -- if they want to participate in our

23  co-op advertising program, then they have to meet certain

24  requirements, as I mentioned for MAP pricing.  So, but the --

25  obviously the dealer always determines the retail price.

1    **Q.**    And what's the -- what's the business rationale, from

2    your perspective, the manufacturers' perspective, for having a

3    MAP program or policy?

4    **A.**    Again, it -- it's the integrity of the ad, from my

5    perspective.  It's making sure that the important CTQs that I've

6    talked about are listed on -- it's called a newspaper ad, so the

7    capacity and things of that nature for a range or laundry.  And

8    the logo is included so they know what brand of product -- the

9    consumer understands what brand of product it is.  And then the

10   image, we want to make sure that there's some sort of

11   requirement around -- a minimum requirement around the quality

12   of the image --

13   **Q.**    So --

14   **A.**    -- that's representative of what the product actually is.

15   **Q.**    -- is the idea if a seller, a retailer, is going to

16   advertise one of GE's branded appliances in GE's going to

17   provide money to support that advertising, that the advertising

18   is going to be consistent with the image that GE has worked hard

19   to create and maintain for the brand?

20   **A.**    That's right, just protecting the integrity of that model

21   and the brand itself.

22   **Q.**    And are retailers free to decide not to participate in

23   MAP pricing?

24   **A.**    Yes.

25   **Q.**    And is there any consequence to them if they do that?

1    **A.**    No.

2    **Q.**    And are retailers who do participate in MAP pricing

3    free -- or a MAP program, are they limited in the price they can

4    actually sell the product at?

5    **A.**    No.  They can sell it at whatever they choose to sell it

6    at.

7    **Q.**    And do you know whether they do?

8    **A.**    Every day.

9    **Q.**    Do they sell below the minimum advertised price even

10   though they participate in a MAP program?

11   **A.**    Yeah.  The market is generally 10 percent below MAP every

12   day, at least 10 percent.  I can't think of a day that there's

13   not either a 10 percent off offer in the marketplace by any

14   national account, regional account, et cetera, or some sort of,

15   what we refer to as, "buy more, save more," what generally is

16   equal to or about 10 percent, so that's normal industry.

17   **Q.**    And is there something called a "house promotion," or am

18   I getting that right?

19   **A.**    Yeah.  The house promotions, that's what I was referring

20   to, 10 percent offer outside of those promotional periods where

21   there's generally a promotional MAP, and in some cases another

22   10 percent off of that promotional MAP.  The house offer is

23   generally 10 percent or off -- or, you know, buy more, save more

24   type of promotion.

25          And then there's always, by the way, free delivery.  And

1   there's delivery thresholds now, too, in the industry.  So

2   there's 399, as an example, is a common threshold.  So you have

3   to buy product above 399 to get free delivery.  So there's that.

4        And then there's financing promotions and things like

5   that all adds up to pretty good value for the consumer.

6   Q.   So you mentioned promotional MAP.  How is that different

7   from MAP?

8   A.   Promotional MAP is exactly that, it's a -- it's a value

9   to the consumer of something less than MAP.  So promotional MAP

10  might be a promotional -- if a product is MAP'd at 499, for

11  Memorial Day we might provide a promotional MAP for 899 or 799.

12  Q.   So if you have a product that is every day MAP is 999,

13  and on the holiday its promotional MAP is 799, does that mean

14  that the product is advertised by a retailer who's participating

15  in this program at 799 is the exact same product that when it's

16  not on promotion is advertised at 999?

17  A.   I would hate to ask you to repeat that question, but --

18  Q.   Yeah, that was a -- that was a long question even for me.

19       THE COURT:  You beat me to it.

20       FROM THE FLOOR:  (Laughter.)

21  BY MR. FRIEDMAN:

22  Q.   So let's say we've got freestanding electric range that

23  has a MAP advertised price of 999.

24  A.   Okay.

25  Q.   And you say there's a promotional MAP of 799.  Is it the

1   same range that --

2   **A.**     Same product, absolutely, yeah.

3   **Q.**     So that's a $200 discount?

4   **A.**     $200 discount.  And then there's generally house offers

5   that would apply on top of that, as I mentioned.  And the house

6   offer would be 10 -- generally speaking, 10 percent off the 799

7   and free delivery, of course, in that example, if the threshold

8   is 799 and -- or 399 rather.  And then there's -- you know,

9   sometimes there's free financing or something like that as well,

10  but yes.

11  **Q.**     Now, the net price that you charge to your customer is

12  different from the MAP price, right?

13  **A.**     Yes.  Yes.

14  **Q.**     So what are the components of your selling price, your

15  net selling price, to your customer?

16  **A.**     Of the net price.  So what we would refer to as gross

17  price or wholesale, best way to explain that, maybe is just

18  invoice pricing.

19  **Q.**     Sure.

20         THE COURT:  Invoice pricing is the same as the wholesale

21  price to the customer, right?

22         THE WITNESS:  Yes, that's right.  Yeah.

23         THE COURT:  And the customers are Home Depot or some

24  other --

25         THE WITNESS:  Yeah.

1          THE COURT:  All right.

2          THE WITNESS:  That's right.  So maybe a -- an example in

3     making these margin -- the margin opportunity rates up for 999

4     range that you just spoke of, we might offer a wholesale price

5     that reflects a 30 percent margin opportunity for the customer.

6     So 30 points, too, so -- and then on top of that -- so that would

7     be the invoice or wholesale price.

8          And then there's generally what I refer to as in the

9     industry first to as "backside."  GE refers to it as fire power,

10    but backside is volume rebates.  I won't go through the details

11    of any one particular customer, but it might be a 3 to 5 percent

12    volume rebate offered.  And generally that's paid quarterly, some

13    are paid at the end of the year.  But that all applies to the net

14    wholesale -- to the net cost to the customer.

15         There's co-op in some cases, in a lot of cases, that could

16    be 2 to 5 percent, just depending.  And then there's growth funds

17    we have.  MDF funds, which is just merchandising funds.

18         So all of that would be considered in the net price to the

19    customer.  So you have the front side, or invoice price, minus

20    the backside, as we refer to it.

21    BY MR. FRIEDMAN:

22    Q.   And does the amount that you, GE, offer to your customers

23    on the backside, does it vary from customer to customer?

24    A.   Every customer is different, front and back, really.

25    Q.   All right.  So your invoice price varies from customer to

1  customer?

2  **A.**     Yes.

3  **Q.**     Your backside price varies from customer to customer?

4  **A.**     Yes.

5  **Q.**     So you might have the same MAP price for a bunch of

6  similarly situated customers, but they would potentially have

7  different net prices from you?

8  **A.**     Almost every one of them would be different.  I can't

9  think of one that's the same, but yes, to answer your question,

10  it would be different.

11  **Q.**     And do you have a few people who help you out on pricing?

12  **A.**     I do.  Currently I'm responsible for the marketing side,

13  so I have a lot of discussions with the pricing team, and then

14  that's the responsibility, really, of our national account

15  manager for every particular customer, as well as the general

16  manager for that customer as well.

17  **Q.**     Is there a whole department called the Pricing

18  Department?

19  **A.**     And as I mentioned, the pricing team gets involved and

20  the finance team gets involved, so --

21  **Q.**     Is it -- is the whole pricing process pretty translucent,

22  transparent or opaque?

23  **A.**     Opaque, I would say.

24  **Q.**     And even though you might get from reading the newspaper

25  or e-mails from your customers what your MAP prices are and what

1  competitors' MAP prices are, does that tell you what their net

2  prices are, the competitors are?

3  **A.**     No.  No, it's just retail pricing.

4  **Q.**     Okay.  Thank you.

5         So let me ask you whether the expansion of Samsung and LG

6  has affected GE in terms of GE's new product introduction pace?

7  **A.**     Um-hmm.  Yeah, I think, you know, I would characterize

8  it -- I've talked a little bit about the innovation that Samsung

9  and LG have brought to the appliance industry, and that's

10 certainly clear that they've brought great innovation.  But I

11 look back to when I was with Maytag in, you know, the '90s, and,

12 you know, there was great innovation, in my opinion, from all

13 the manufacturers at that time.  But I think the product

14 development cycle was longer previous to LG and Samsung.

15        So you'll hear a lot of people talk about the great

16 innovation, which is certainly those -- LG and Samsung have

17 helped the industry in terms of innovation, but I believe that

18 the innovation was always there as well.  It's just the speed to

19 develop the new product has increased since LG and Samsung.

20        So in other words, as an example, I recall the product

21 development cycle being -- let's call it 36 months, 3 years or

22 something like that, and now you really have to turn product and

23 offer new product for the -- to the consumers much quicker than

24 that.  So the turnaround is -- the speed-to-market on new

25 product has increased, I guess.

1    Q.    So what is the new product introduction cycle now, in

2    your experience?

3    A.    You know, 18 months to 2 years is not uncommon for --

4    there's got to be the latest and greatest product, so it's --

5    it's fast and it's tough.

6    Q.    And -- and so who are the leaders in that innovation, in

7    your experience?

8    A.    Um, LG and Samsung.

9    Q.    And have you seen innovation introductions from them in

10   cooking as well as other products?

11   A.    Sure.

12   Q.    Could you give us some examples, please?

13   A.    I talked about the double oven ranges.  LG, in

14   particular, has done really well with double oven ranges.

15   There's a Flex Duo, so it's Samsung's version of a double oven

16   range as well.  Migration of most of consumers' use of a range

17   is on the cooking surface, so the cooking surfaces is important.

18   So things like higher BTUs and large oval burners for the

19   griddle, to me those are very important features and they've

20   done a really good job there as well.

21         Capacity, I mentioned.  It's a really important CTQ, so

22   they have some of the largest capacity ovens in the industry.

23   Most recently, slide-in ranges.  Samsung giving us a fit with

24   slide-in ranges, so they've done really, really well with new

25   slide-in ranges.  So the slide-in range would be without the

1    back guard on the back, more of a built-in look.

2    **Q.**    And have you seen -- along with the innovation, have you

3    seen that Samsung and LG are making products with newer features

4    available at lower price points?

5    **A.**    Yeah.  They -- we've talked about they migrated features

6    down to lower price points.

7    **Q.**    All right.  Why don't we look at DXDEM24, which is in

8    your book, I think, at the very beginning, and it's also going

9    to come up on the screen.  And this is, I think, a 2013 Home

10   Depot Black Friday circular.  It's in newspapers.

11       And if you turn to the third page, and if we can pull

12   that up on the screen, "Don't wait.  Get Special Buy."

13       There's a kitchen suite there.  Do you see that?

14   **A.**    I do.

15   **Q.**    And who's the manufacturer on that?

16   **A.**    Samsung's the manufacturer.

17   **Q.**    And what are the products that are included in this

18   suite?

19   **A.**    So it's a common kitchen suite, so it's a French-door

20   refrigerator, in this case, with dispenser; stainless -- all

21   stainless, of course -- stainless range; and over-the-range

22   microwave, OTR.

23       MR. FRIEDMAN:  Do you have that binder, Your Honor?

24       THE COURT:  No, I don't have 24.

25       MR. FRIEDMAN:  It's in this book (indicating).  It's a

1    skinny little book.

2            THE COURT:  Oh, I'm not sure I have that one.

3            MR. GLASS:  Your Honor, may I approach?  You can have

4    mine.

5            THE COURT:  No, no.  I have it on the screen here.  That's

6    all right.  Okay.

7            (Brief pause in proceedings.)

8            MR. FRIEDMAN:  You found it, Your Honor?

9            THE COURT:  Yes.

10           MR. FRIEDMAN:  Thanks.

11   BY MR. FRIEDMAN:

12   **Q.**    So, Mr. Posthauer, we're looking at the 2013 Black Friday

13   circular from Home Depot.  On the third page they've got a

14   Samsung kitchen suite.  You were describing it?

15   **A.**    Yes, yep.

16   **Q.**    And so what can you tell us about this suite, in terms of

17   the features and value that's offered?

18   **A.**    Great value, as you can see.  I mean, what stands out is

19   $1,000.  $1,001 off the French-door refrigerator.  Oftentimes

20   the refrigerator -- generally speaking, I guess, the

21   refrigerator is the anchor to a kitchen package.  So Samsung and

22   LG have really done a good job of offering tremendous values to

23   try to attach the other product lines to that purchase.  So in

24   this case $1,000 off is great value, of course.  A couple -- you

25   know, $200 off the stainless steel dishwasher, and $300 off of a

1   convection range down to 698.

2   **Q.**    So how did -- if you know, how did Samsung get this

3   position in the 2013 Home Depot Black Friday circular?

4   **A.**    Because of the value that they're offering, $1,624 off of

5   this package.  So the buyer --

6        THE COURT:  That's off of the retail price?

7        THE WITNESS:  That's right.

8        THE COURT:  Is that right?

9        THE WITNESS:  Yes.

10       THE COURT:  All right.  So just walk me through this.

11       So Samsung has sold at a wholesale or inventory price this

12   product.  And what would you estimate the wholesale price or

13   inventory price of this product --

14       THE WITNESS:  Um --

15       THE COURT:  -- was?

16       THE WITNESS:  -- I don't know, you know, the -- their

17   back -- I wouldn't know either the wholesale price or the --

18   their backside, but generally speaking, it's probably --

19       THE COURT:  It's pretty low, then, isn't it?

20       THE WITNESS:  Yeah, yeah.

21       THE COURT:  Very low, right?

22       THE WITNESS:  Yeah.  Absolutely, yeah.

23       THE COURT:  And that's the incentive for the customer to

24   buy this product, then?

25       THE WITNESS:  Yeah, absolutely.  I mean, it's just a --

1    represents a tremendous value.  And, you know, what we fight for

2    as manufacturers is this coveted insert space, and generally the

3    front cover is the spot that we want the most.

4         THE COURT:  What's the name -- what's the trade name for

5    this type of ad that we all see?

6         THE WITNESS:  This is -- this is what I would refer to as

7    a insert or a print -- you know, obviously a print circular type

8    of advertisement.

9    BY MR. FRIEDMAN:

10   **Q.**    And was there -- was there --

11        MR. FRIEDMAN:  I'm sorry, Your Honor, I didn't want to --

12        THE COURT:  No, no.  Go ahead.

13   BY MR. FRIEDMAN:

14   **Q.**    Is there sort of an auction process that the merchant

15   holds with you and Samsung and LG and Whirlpool and Electrolux

16   to get this coveted spot or another coveted spot in the

17   circular?

18   **A.**    For every holiday period, yes.  And it is -- generally we

19   would know from the customer in advance what their promotional

20   offer would be.  So, obviously, I wouldn't know the wholesale

21   price, but we would know the -- that Samsung is going to have a

22   suite for $1,624, and they would tell us that because --

23        THE COURT:  Is Samsung contributing to the cost of this

24   publication?

25        THE WITNESS:  No.  Generally speaking, no.

1           THE COURT:  Yeah.

2           THE WITNESS:  That's Home Depot's cost.  And Home Depot

3    wants to provide the best value to create the draw and the foot

4    traffic that they need.  So that's why Samsung, and LG generally,

5    will have more print impressions than we will.  I say print, but

6    also television.  Television's even more important in our world,

7    I guess, more expensive, and so they would have similar offers on

8    television.

9    BY MR. FRIEDMAN:

10   Q.    Now, there's an extra discount over and above the $1,624

11   over on the left; isn't that right?

12   A.    That's right.

13   Q.    So I don't know if you remember.  We did the math, but

14   this whole package with that extra discount is just under

15   $2,800.  Does that sound about right to you?

16   A.    Yes.

17   Q.    And as you look at those -- those appliances, would you

18   have a little bit of difficulty competing, offering something

19   like that at that value point?

20   A.    Yes.  Really difficult to get to $1,000 off of a range,

21   as an example, or even $300 off of a range.  So, yeah, this

22   suite offering is aggressive.

23   Q.    All right.  And then if we look at the next year,

24   DXDEM25, that's the 2014 Black Friday circular, do you want to

25   turn to the next tab in your binder, Mr. Posthauer?

1   **A.**     Okay.

2   **Q.**     It's also on the screen.

3   **A.**     Oh, the next tab?  Okay.

4   **Q.**     Now, this year, 2014, it looks like Samsung got the front

5   cover.  Do you see that?

6   **A.**     They did, yes.  Yes.

7   **Q.**     And they helped us -- they helped us out here because

8   they put the total price for this package there as well as the

9   savings.  Do you see that?

10  **A.**     Yes.

11  **Q.**     So what's the total price for this package?

12  **A.**     3,292 saving $2,154.

13  **Q.**     And is there another $200 off because the package is four

14  appliances?

15  **A.**     And then you would apply the buy more, save more.  In

16  this case it would be $200 off, so 3,092 would be the net price

17  to the consumer.

18  **Q.**     Okay.  And have you compared the appliances that are in

19  this package in 2014 for $3,092 to the products that were

20  offered in the Samsung package in 2013 for $300 less?

21  **A.**     Yeah.  I think I'll start with the refrigerator, since I

22  mentioned that's kind of the anchor of the kitchen.  And

23  door-in-door is a new innovation for Samsung at this time,

24  newer, and a little higher-end, I guess, so improved features

25  certainly for the consumer.

 1          The range, of course, it's an electric range on the '13

 2     ad, but this gas range is a convection range with five burners

 3     as well.  That's a coveted, you know, type of product, so it's a

 4     well-featured gas range.  You can see the -- I believe, the

 5     style on the range has changed a little bit.  The oven window is

 6     larger, so that's yet another feature that all of us -- you

 7     know, that's important to consumers.  So those are a few things.

 8     **Q.**     So would you -- would you agree that the package in 2014

 9     that Samsung offered was a more highly-featured package of

10     appliances?

11     **A.**     Yes.

12     **Q.**     And is it your experience that sales of kitchen suites

13     like this are pretty common?

14     **A.**     Yes.

15     **Q.**     And you said, I believe, that the refrigerator often

16     drives the purchase of the kitchen suite.  Could you explain

17     what you mean by that?

18     **A.**     So we want attachment in the industry.  You want to sell

19     as many pieces of product on each invoice as possible.  And so

20     oftentimes if a consumer is -- or sometimes, I should say, if

21     the consumer is shopping for a refrigerator, if the value for

22     the kitchen package is great enough, they might consider the

23     entire suite of products versus the refrigerator that they had

24     intended to purchase in and of itself.

25     **Q.**     So if somebody comes in thinking, "I might buy a GE

1   refrigerator," and they see this package deal with this Samsung

2   door-in-door refrigerator, $1,400 savings, what do you think --

3   what are you worried about happening?

4   A.     They would buy the whole suite of products from them.

5   Q.     From whom?

6   A.     From Samsung, and that would take them out of the market

7   place for us, at least, for the other product lines.

8          And maybe a good way to explain it is, an average invoice

9   is -- includes 1.3 units per invoice.  And during these mega

10  events when there's package, such values on the kitchen package,

11  the units per invoice or units per delivery increases to about

12  1.4, 1.5.  So that might sound small, but in our world it's a

13  big deal.  So -- and Samsung and LG generally have the highest

14  units per invoice, 1.6 to 1.7, so the numbers I gave you

15  previous, 1.3 to 1.4 to 1.5, that's an industry average, but LG

16  and Samsung do well during these big events.

17         And that includes laundry, too, so that's the washer and

18  dryer set, too.

19  Q.     And has it been your experience that in promoting on

20  these major events, the mega events, Samsung, in particular,

21  promotes more than anybody else?

22  A.     They have deeper values, larger values -- in this case

23  $1,401 -- than I can say any other brand.  We all try to

24  compete.  LG has great offers as well.  Whirlpool has some

25  pretty good offers right now.  But, generally speaking,

1    Samsung's the most aggressive in that -- in that area.

2    **Q.**    And if you flip in this exhibit to the page ending in

3    005, there's an Amana kitchen suite that's offered.  Do you see

4    that?

5    **A.**    I do.

6    **Q.**    And the savings there is $764.  That's a pretty good

7    deal, right?

8    **A.**    Yeah, absolutely.  It's not a French-door refrigerator,

9    so the products themselves are a little bit different.  Black

10   escutcheon or control panel on the dishwasher versus all

11   stainless, front control versus top control, so -- but yes,

12   that's a good value.

13   **Q.**    But the Samsung guy who got the front cover's a $2,154

14   savings, right?

15   **A.**    That grabs their attention first, generally, yes.

16   **Q.**    And do you know from working with these big-box retailers

17   for so many years, do they have an interest in having sales like

18   this to draw people into their stores to buy appliances and

19   other things?

20   **A.**    Um, it's one of the most important tools that they have

21   to draw consumers into the store, and certainly into the

22   appliance department, is the value that they offer the consumer.

23   **Q.**    And they have communicated to you that appliance value is

24   a tool that they use to get customers in to buy all kind of

25   other things --

1    **A.**    That's right.

2    **Q.**    -- as well; is that right?

3    **A.**    That's right.

4    **Q.**    So let's just round it out, looking at the 2015 circular

5    for Black Friday, which is DXDEM026.

6    **A.**    026, okay.

7          MR. HAMER:  Your Honor.

8          THE COURT:  Yes.

9          MR. HAMER:  We object to this.  This is the current Black

10   Friday going on right now.  It was not produced in discovery.  It

11   was delivered to us for the first time yesterday.  We object to

12   it.

13         THE COURT:  All right.  Counsel?

14         MR. FRIEDMAN:  Your Honor, your minute order said that we

15   were not permitted to provide updates on actual sales figures

16   during the sale.

17         THE COURT:  Right.

18         MR. FRIEDMAN:  This is not an actual sales figure.  This

19   is just what is the advertising, what's the product offering.  I

20   don't think it's at all circular --

21         THE COURT:  Well, it's essentially -- if you had someone

22   on the floor, that person would be testifying about these same

23   figures, right?

24         MR. FRIEDMAN:  Well, my understanding, Your Honor, of the

25   order was:  What are the units that are being sold?  Because we

1  had offered, and what led to the objection was there was a score

2  card.  Who's got how many sales of what units?

3       This is not anything about sales, it's just an

4  advertisement that shows what the price is for the items that are

5  on sale the month of November at Home Depot.

6       THE COURT:  What about that, in terms of not absolutes but

7  predictions, what the projected sales are?  Not the sales are,

8  but what the -- what the pricing is for units being sold now?

9  What's the objection?

10      MR. HAMER:  It's the same objection, Your Honor.  This

11 shows the MAP pricing going on right now.  It's something that

12 we've not had the opportunity to do discovery on.  It's something

13 that is after the close of discovery.

14      THE COURT:  All right.  I'll sustain the objection.

15      MR. FRIEDMAN:  Your Honor, if I could just note --

16      THE COURT:  Sure.

17      MR. FRIEDMAN:  -- that Mr. Baird will be a witness.  He'll

18 be able to testify whether this is the accurate ad.  The

19 government gets newspapers.  There really is no discovery here.

20 It's not anything, other than showing the Court what's happening

21 in the marketplace in terms of what the competitive offers are.

22      THE COURT:  Let me just throw this out.  If the Court

23 could take judicial notice of the news -- of this news item,

24 what's the prejudice there?

25      MR. HAMER:  We object to the evidence reflected in that

1    document.

2         THE COURT:  Okay.  How's the government prejudiced?

3         MR. HAMER:  Again, Your Honor, the opportunity to do

4    discovery into this is not possible because this is new

5    information that was not available to us during the discovery

6    period.

7         THE COURT: All right.  All right.  I'll maintain the

8    objection.

9    BY MR. FRIEDMAN:

10   **Q.**    Mr. Posthauer, do you -- do you have any observation

11   whether Samsung has continued to bring package prices available

12   to consumers at ever lower prices?

13   **A.**    Yes.  And they --

14   **Q.**    Okay.  What have you observed?

15   **A.**    They continue similar, if not greater, values on kitchen

16   packages that they -- that we looked at in two thousand --

17        THE COURT:  So in other words, this Black market is not

18   going to be anything different conceptually than the Black market

19   last year or Red, White & Blue sales?  You expect dramatic sales

20   offers from competitors, I assume, right?

21        THE WITNESS:  Yeah.

22        THE COURT:  It's not going to be anything atypical about

23   this Black market season than last year or the year before?

24        THE WITNESS:  The values offered for Black Friday

25   promotional period, which is really Black November, you're right,

1    are similar to what we've seen in --

2         THE COURT:  Right, there'll be tremendous sales for

3    manufacturers, including General Electric and Electrolux?

4         THE WITNESS:  We try to compete in those areas, but

5    Samsung really has a great deal of influences, you can tell, over

6    the promotions themselves because they can -- and LG.  They can

7    really -- apparently, part of their strategy is to promote a

8    little bit deeper during this to drive --

9         THE COURT:  And why do you think they're able to do that?

10        THE WITNESS:  I -- my -- my only guess is their product

11   cost is better than ours because of their global scale.

12        THE COURT:  You mean?  Global scale meaning?

13        THE WITNESS:  Meaning their success in other industries,

14   as we've talked about, and the production of the product around

15   the world at lower prices.  That's the only thing that -- and

16   they --

17        THE COURT:  Their products are made outside of the United

18   States?

19        THE WITNESS:  That's part of it, too.

20        THE COURT:  Right.

21        THE WITNESS:  And they have market share globally as well.

22        THE COURT:  All right.

23        THE WITNESS:  And in Korea, as an example.

24        THE COURT:  So this is as usual -- this Black November, as

25   it has been last year and the year before, there'll be tremendous

1    sales for everyone, but it's your opinion that Samsung and LG

2    will outpace the market?

3              THE WITNESS:  That's fair, yes.

4              THE COURT:  All right.

5    BY MR. FRIEDMAN:

6    Q.    Do you have a prediction about this year's Black Friday,

7    who will be the leading seller of ranges at Home Depot?  Just

8    your prediction, not the actual results.

9    A.    Yes, Samsung will lead range sales for Black November.

10   Their comp sales, in my prediction, would be that they would --

11   they would lead all other brands in year-over-year sales.

12             THE COURT:  Range sales, but not only just the ranges, but

13   the package sales, right?

14             THE WITNESS:  Yes.

15             THE COURT:  The refrigerators, the ranges, the dishwasher,

16   right?

17             THE WITNESS:  Yes, certainly in cooking.  In

18   refrigeration, LG and Whirlpool are doing -- my prediction would

19   be, I guess, that they're doing pretty well, too.  So I would say

20   Samsung would be the leader in at least three of the four

21   categories, if not four.

22             THE COURT:  All right.  But especially ranges, though?

23             THE WITNESS:  Yes.  My prediction would be, yeah.

24             THE COURT:  And that's based upon what's happened in the

25   past two or three years or so?

1          THE WITNESS:  Yeah, just their growth.  Just in general, I

2    talked a little bit about the holiday period, so we were able to

3    get a taste for their performance in Labor Day and Columbus Day

4    and those time frames.  And I would think that it would be

5    consistent in Black Friday, Black November.

6    BY MR. FRIEDMAN:

7    **Q.**    And over Labor Day, did you observe any pricing from

8    Samsung on its ranges?

9    **A.**    We did.

10   **Q.**    And what pricing did you observe?

11   **A.**    Aggressive pricing.  I -- you know, they have a 598 range

12   currently, $598 promotional MAP, with convection electric range.

13   And my recollection was that they were similar in pricing for

14   Labor Day and Columbus Day.

15   **Q.**    And how did they do on Labor Day and Columbus Day with

16   that item?

17   **A.**    Again, very, very well in cooking.

18   **Q.**    All right.

19   **A.**    Really across the board in all product lines, they do

20   well in all the holiday periods.

21   **Q.**    Let me -- let me switch a little bit, just a little shift

22   and talk about how retailers talk to you about lowering price

23   when your product is not as productive.

24          Are you familiar with something called "a line review"?

25   **A.**    Sure.

1    **Q.**    Could you tell the Court what a line review is?

2    **A.**    So a line review, there's -- I guess in appliances

3    there's what I would refer to as product review and a line

4    review.  And a product review would be if we are launching a new

5    product in a particular category -- stay on ranges -- or

6    potentially launching what we call edge-to-edge glass.  So we

7    would do a product review to show our customers what the

8    differences are with their -- our current product and our new

9    product.  So that's a product review.

10        A line review, which is I think what you're asking, is

11   maybe a little bit different, so there's a point of

12   clarification between the two if there's documents that have a

13   product review and line review.

14        But a line review would be, to your point, if I would

15   suspect, after Black Friday if there's models on our customers'

16   floors that were not as productive as other brands and models,

17   that would provide a line review opportunity, meaning if our

18   range or refrigerator wasn't as successful as other brands, they

19   would say, "Our weekly run rate, given our forecast, was

20   supposed to be 125, we're running at 70, we need to put your

21   floor spot in line review," meaning everybody has the

22   opportunity to bid on that particular spot.

23   **Q.**    So there's a couple of concepts in there.

24        You said, if the weekly run rate was at 125 and it was

25   supposed to be at 170 --

**A.**     Something like -- if it's not meeting our forecast, if it's not meeting the buyer at the customer and the national account manager's forecast, then there will quickly become a conversation around that to displace that product with another -- potentially another brand.

**Q.**     Why does the retailer care whether you're being as productive on their floor as forecast?

**A.**     Um, I think we started today talking about how important floor space was at any retail location, and it's -- it has to be productive in order to remain on the floor.  It has to earn their spot or earn its spot.  You'll hear that often:  It's not earning its spot.

**Q.**     What does that mean to you?

**A.**     You've got to improve the weekly run rate.  So you've got to promote it more or do something to improve the positioning right now, because otherwise it's going to be replaced by another product and brand.

**Q.**     So has the merchant said to you, explained to you, why earning your spot, hitting the forecast targets, why does it matter to them?  Aren't they just selling somebody else's if yours isn't moving?

**A.**     They are -- especially some of the regional accounts, and really any account, but maybe the easiest to understand are the regional accounts and national accounts -- driven by comp sales, so they have a responsibility to the shareholders to provide

1    comp sales, higher comp sales.  And so that's why that space and

2    that productivity is so important.

3    **Q.**    What's a comp sale?

4    **A.**    Year-over-year sales in any given time period, month,

5    quarterly, in the appliance department.  And for the merchant

6    they drive that by the individual products on the floor.

7         THE COURT:  Excuse me.

8         THE WITNESS:  Yeah.

9         (Discussion had off the record.)

10        THE COURT:  Go right ahead.

11   BY MR. FRIEDMAN:

12   **Q.**    So let's pull up DX91, and I believe this document has

13   some redactions that will appear on the monitors, but you should

14   have an unredacted version in your book.  And when I ask you

15   questions, I'd just ask you not to mention the name of -- oh,

16   it's not going to be on the screen, okay -- the name of the

17   customer.  All right?

18   **A.**    Okay.

19   **Q.**    So are you familiar with DX91?

20   **A.**    I do recall this exchange, yes.

21   **Q.**    And could you briefly summarize for the Court what was

22   going on between GE and this particular customer in the spring

23   of 2014?

24   **A.**    Maybe a little background for this particular customer.

25   This particular customer does really well with LG and Samsung.

1    Their primary vendors of choice, really, are LG and Samsung.

2    And in 2012, Mike McDermott, who I replaced, had some meetings.

3    We had leadership meetings with this particular customer.  And

4    we determined that because of their lack of support for GE

5    appliances, we felt that they were drawing in consumers and

6    selling off of our brand to sell primarily LG and Samsung.  So

7    we made a decision to change their programming -- which

8    basically means increase pricing and decrease their backside --

9    so their overall net price became worse because of their lack of

10   support for GE.

11        So I think in 2012, we -- with this particular customer,

12   we did somewhere around 120 million, and this year we'll do

13   around 65 or 70 million.  So a reduction.  It resulted in a

14   reduction, and quickly a reduction in revenue for us.

15   Q.    So you raised the price, and they stopped selling your

16   products?

17   A.    They said, "Fine," and -- that's right.  So our

18   partnership with this particular customer had become strained.

19   I took this job, as I mentioned, in October of '13.  This

20   particular customer is growing fairly rapidly, I would say, and

21   from our industry point of view.  So I went in around this time

22   frame to try to rekindle the relationship with this particular

23   customer, and that's what the basis, I guess, for this e-mail

24   is.

25   Q.    All right.  So one of your colleagues made a proposal to

1    the customer in early March to recapture some floor space; is

2    that right?

3    **A.**    We will -- yes.  And Mike Starmer is our general manager

4    for this particular account.

5    **Q.**    All right.  And the account -- the customer replied back

6    saying, "We have a GE assortment that is underperforming

7    significantly to floor space allocation.  Each merchant has

8    provided GE with SKU productivity goals, and we are nowhere near

9    the volume we need to make these floor positions productive."

10        Let me just stop there.  Can you explain what you

11   understood that to mean?

12   **A.**    The e-mail is -- from GE is indicating that we would

13   provide better programming, so we're going to reduce their

14   overall cost, in exchange for potentially some additional

15   product on the floor.  This particular merchant or buyer is

16   saying, "You're not there yet."  Our product is simply not

17   earning its spot.

18   **Q.**    And so then the customer went on to say, "As you know, we

19   can't guarantee floor positions.  Each model must earn its

20   keep."

21        Do you see that?

22   **A.**    Exactly.  That's kind of what is typical of what we hear.

23   **Q.**    And what do you understand that to mean, "You must earn

24   its keep"?

25   **A.**    It has to be productive every single day.

1    **Q.**    All right.  And then the e-mail goes on to say -- they

2    made a proposal to you, "Allocating space in 350 of our best

3    stores with dedicated labor to support a four-piece GE kitchen

4    suite is also attempting to give GE a shot at earning the

5    kitchen business back at that customer."

6          Do you see that?

7    **A.**    I do.

8    **Q.**    And what did you understand that to mean?

9    **A.**    My experience, what that means is, "I'll tell what you

10   we'll do, we have more than 350 stores, almost three times that

11   many, but we'll give you some floor spots at some of our stores

12   in the vignette area."

13         And sometimes we refer to the vignette as being the place

14   where appliances go to die; so in other words, it's oftentimes

15   the most unproductive space at a retailer.  If you're going in

16   to buy an appliance, generally you want to be in the power

17   aisles and the race track, as we call it.  And in the linear

18   lineup, vignettes are just not that.  So if somebody is looking

19   for a refrigerator, generally they do not go to the vignette.

20   So not the ideal location, I guess, is what my understanding

21   was.

22   **Q.**    So would you interpret -- did you interpret this letter,

23   e-mail from the customer, to be saying, "Your offer isn't good

24   enough yet"?

25   **A.**    That's precisely what this particular merchant was

1    saying --

2    Q.    All right.  And then --

3    A.    -- "Thanks but no thanks."

4    Q.    They go on to say, "We will participate in line reviews,

5    and review assortment suggestions accordingly."

6          What did you understand that to mean?

7    A.    You'll have an opportunity, just like everybody else, but

8    your product has to be productive; so in other words, we can

9    compete with LG and Samsung and Electrolux and Whirlpool when

10   the line reviews happen, occur.

11   Q.    And the line review is a open competition with --

12   A.    Open competition where you talk about the great features

13   and benefits of your product, any advertising opportunities that

14   you might have, promotional cadence on that particular product

15   that we've talked about a lot, those types of things.

16   Q.    Is a line review similar to a reverse auction?

17   A.    A what?

18   Q.    Reverse auction?

19   A.    Yeah, I think so.  Never -- never thought about it that

20   way, but yes.

21   Q.    All right.  And is it a welcome experience for you, as a

22   supplier, to go through a line review if you're -- if you're the

23   incumbent?

24   A.    If you're the incumbent on the floor, no.  No.

25   Q.    All right.

1  **A.**     We'd rather there not be line reviews, of course, but...

2  **Q.**     Let's look at DX171.  Again, I think this is one that

3  we're going to talk around a little bit, so we're not going to

4  mention customer names.

5  **A.**     Okay.

6  **Q.**     This is an e-mail that was sent to you; is that right?

7  **A.**     Yes.

8  **Q.**     From you.  I'm sorry.

9  **A.**     It's an older e-mail, but -- let me see the original.

10  Yes, I sent it to the merchant team at this particular account.

11  **Q.**     Okay.  I'm sorry.  I was looking at the wrong thing.

12  **A.**     Oh, okay.

13  **Q.**     Excuse me.

14          So this concerns a price increase announcement that GE

15  provided to a customer in 2013; is that right?

16  **A.**     Yes, a proposed price increase.  That's right.

17  **Q.**     And what was the customer's reaction to the proposed

18  price increase?

19  **A.**     They didn't like it, in a nutshell.  That's generally

20  what happens.

21  **Q.**     So there was a letter from you, if we look at page 003,

22  an e-mail from you, that says, "With the attached letter, we are

23  announcing a price increase of approximately 5 to 6 percent on

24  select models effective April 1, 2013."

25          Do you see that?

1    **A.**      I do.

2    **Q.**      And there's an e-mail back from the customer on 002 that

3    says, "What floor models are impacted in refrigeration?"

4            Do you see that?

5    **A.**      Yes.

6    **Q.**      And you responded, "They have a presentation for you

7    tomorrow."

8            Do you see that?

9    **A.**      Yes.

10   **Q.**      And then the customer writes back, and I guess he's kind

11   of not happy, "Please provide a summary of the proposed

12   increases to me before you arrive tomorrow."

13           Do you see that?

14   **A.**      Right, and they wanted a chance to review them.

15   **Q.**      But did I interpret that correctly that he was not

16   terribly happy?

17   **A.**      They generally are not, and that is accurate.

18   **Q.**      And then he also writes another e-mail, "Would have been

19   nice to get a heads-up today when you called."

20           Do you see that?

21   **A.**      Yes.

22   **Q.**      And then finally, the first e-mail -- the last e-mail in

23   the chain is from the customer to one of your colleagues, and he

24   writes, "Makes a lot of decisions easier for me now.  Can

25   consolidate both top-mounts and side-by-sides and don't need the

1  GNE 26 or the GFE 27 in the mix at higher retails."

2       Do you see that?

3  **A.**  I do.

4  **Q.**  And do you understand that to mean that he's going to

5  stop flooring some of your models?

6  **A.**  That's exactly what it means, yes.

7  **Q.**  And stop flooring means they're gone from the floor?

8  **A.**  Yes.

9  **Q.**  All right.  And then he goes on to write, "Not sure how

10  much longer the PFE 29 will last."

11       Do you see that?

12  **A.**  Yes.

13  **Q.**  Does that mean that that particular model is also in

14  jeopardy of being taken off the floor?

15  **A.**  Yes.  That was our -- was our Profile French-door

16  refrigerator, and that's what he's indicating here.

17  **Q.**  "Will definitely hurt your volume across the board on

18  pieces that remain on the floor, considering Samsung and LG

19  aren't making any changes I'm aware of."

20       Do you see that?

21  **A.**  Yes.

22  **Q.**  And what did you understand that to mean?

23  **A.**  He means that our productivity will suffer because of the

24  price increases that we were proposing because LG and Samsung

25  were likely not going to raise prices.

1    **Q.**     Okay.  And these were refrigerator; is that right?

2    **A.**     Yes.

3    **Q.**     Okay.

4    **A.**     Yeah.  He was the refrigerator merchant, that's correct.

5    **Q.**     And sales of refrigerators often lead the purchase of

6    other appliances, is that --

7    **A.**     Yes.  Yeah, generally that's the anchor for the kitchen.

8    **Q.**     So let's talk generally about what the process is at your

9    customers if, for example, GE experiences raw material cost

10   increases or labor cost increases and needs to increase prices.

11   What do you need to do?

12   **A.**     Um, generally the retail customer, the customers in

13   general, will require some justification for price increases.

14   So, you know, I guess I can't talk about this particular -- but

15   it's oftentimes a justification worksheet or a cost change

16   worksheet, and what that is, is just an opportunity, I guess, or

17   requirement for us to provide sometimes raw material prices.

18   Why are we increasing prices?  Did steel prices go up?  Did oil,

19   et cetera?  And so we have to justify oftentimes why we would

20   have a price increase.

21   **Q.**     Is there a team at GE that compiles data and information

22   and provides it to the customers to support or substantiate cost

23   increases in connection with the request for a price increase?

24   **A.**     Yeah.  Generally the sales team, my team, will obviously

25   hear the request.  And we're prepared for this, if and when we

1    have price increases, of course, because it's normal course of

2    business, but -- so the sales team will go to the finance and

3    pricing and sourcing teams, three separate teams, and try to

4    develop some sort of information for the customers without

5    providing our exact cost of that -- any particular given

6    product.  So in other words, we might provide a percent increase

7    on steel or plastic or something like that -- to justify our

8    price increases.

9    **Q.**    And is it your experience that as long as GE

10   substantiates or justifies the cost increase the customer says,

11   "Okay, we'll accept all that"?

12   **A.**    No, it's never -- never that easy.  Retailers just do not

13   like price increases, generally speaking.

14   **Q.**    Okay.  Let's look at DX551, which is another confidential

15   exhibit, so we'll avoid the customer name in talking about it.

16   **A.**    Can you repeat the exhibit?

17   **Q.**    551.  It's next to the last one, I believe.

18         Do you have that?

19   **A.**    I do.

20   **Q.**    And this is an e-mail originally from GE to a customer on

21   October 23, 2013 saying, "Attached is the price letter and

22   schedule of price changes that will go into effect January 1,

23   2014."

24         Do you see that?

25   **A.**    I do.

1   Q.      And then going back to the first page, the customer says,

2   "Customer will not accept the January 1, 2014 cost increase

3   without supporting data substantiating the need for a cost

4   increase.  As a result, we are requiring GE to complete the

5   attached file, as well as provide supporting data for any key

6   factor influencing the increase.  The attached file must be

7   completed and returned, along with all supporting data, before

8   we even review the proposed cost increase.  Customer cannot and

9   will not absorb any unsubstantiated cost increase."

10          Do you see that?

11  A.      I do.

12  Q.      Is that fairly typical, in your experience?

13  A.      Really typical.  They try to make it as difficult as

14  possible.  We're generally required, as part of our Ts&Cs, terms

15  and conditions, Ts&Cs, to provide some sort of minimum time

16  period that we would announce a price increase, so 60- or 90-day

17  notice as an example.  And so we generally try to start that

18  process at that time.

19          And I guess it's my opinion that part of the reason why

20  they require Excel sheets and other documentation is to slow the

21  process down and push out the price increase as long as possible

22  or try to -- try to prevent us from going up in price, just by

23  the nature of the material increases.

24  Q.      In your 22 years in the appliance industry, has any

25  customer ever asked you to raise prices?

1   **A.**      No, not at all.

2         MR. FRIEDMAN:  Your Honor, I believe I'm about to go into

3   my confidential part of my examination.

4         THE COURT:  How long will that take?

5         MR. FRIEDMAN:  Probably about 40 minutes, 45 minutes.

6         THE COURT:  All right.  We'll do that until 12:30.  We'll

7   break at 12:30.

8         And I see Ms. Clark here.  We'll take your case at 12:30.

9   All right?  All right.

10        So who can remain in the courtroom?  Give me a -- I need

11  to hear from the gatekeepers here.

12        MR. FRIEDMAN:  So counsel for the parties, employees of

13  the parties can remain in here, the consultants can remain, but

14  anybody else --

15        THE COURT:  And when you return, we'll return to Courtroom

16  5 on the second floor.  All right.

17                          * * * * *

18        (Thereupon, the following proceedings were closed by order

19  of the court and are not included as part of the transcript

20  production in this case.)

21                          * * * * *

22

23        (Thereupon, a luncheon recess was had beginning at

24  12:29 p.m.)

25

2303

# C E R T I F I C A T E

                    I, Scott L. Wallace, RDR-CRR, certify that
the foregoing is a correct transcript from the record of
proceedings in the above-entitled matter.


    /s/ Scott L. Wallace                    11/20/15

    ---------------------------        ----------------
    **Scott L. Wallace, RDR, CRR**              **Date**
       **Official Court Reporter**

## $

**$1,000** [3] - 2275:19, 24; 2278:20
**$1,001** [1] - 2275:19
**$1,400** [3] - 2250:4; 2281:2
**$1,401** [1] - 2281:23
**$1,624** [3] - 2276:4; 2277:22; 2278:10
**$18** [1] - 2199:1
**$2,154** [2] - 2279:12; 2282:13
**$2,800** [1] - 2278:15
**$200** [5] - 2269:3; 2275:25; 2279:13, 16
**$274** [2] - 2256:14
**$3,092** [1] - 2279:19
**$300** [3] - 2275:25; 2278:21; 2279:20
**$399** [1] - 2182:12
**$499** [1] - 2182:12
**$598** [1] - 2288:12
**$764** [1] - 2282:6

## '

**'13** [2] - 2280:1; 2292:19
**'90s** [1] - 2272:11
**'93** [1] - 2254:25
**'94** [1] - 2254:25

## /

**/s** [1] - 2303:5

## 0

**002** [1] - 2297:2
**003** [1] - 2296:21
**005** [1] - 2282:3
**026** [1] - 2283:6

## 1

**1** [3] - 2296:24; 2300:22; 2301:2
**1,000** [1] - 2250:3
**1,200** [1] - 2250:3
**1,400** [1] - 2259:23
**1.3** [2] - 2281:9, 15
**1.4** [2] - 2281:12, 15
**1.5** [2] - 2281:12, 15
**1.6** [1] - 2281:14
**1.7** [1] - 2281:14
**10** [12] - 2222:3; 2235:11; 2267:11-13, 16, 20, 22-23; 2269:6
**10:00** [7] - 2197:3, 5, 13; 2220:9, 17; 2222:4
**10:11** [1] - 2222:11
**11** [1] - 2233:10
**11/20/15** [1] - 2303:5

**12** [6] - 2192:16, 21; 2235:12; 2241:22; 2242:16
**120** [1] - 2292:12
**1200** [3] - 2179:10, 14, 22
**125** [2] - 2289:20, 24
**12:29** [1] - 2302:24
**12:30** [4] - 2222:5; 2302:6
**131** [1] - 2222:19
**14** [1] - 2218:21
**15** [5] - 2188:15; 2243:17; 2244:7, 10, 12
**15-1039** [2] - 2177:4; 2181:6
**17** [1] - 2253:24
**170** [1] - 2289:25
**18** [1] - 2273:3
**1900** [4] - 2179:9, 13, 17, 21
**1994** [1] - 2233:8
**1999** [1] - 2258:18

## 2

**2** [3] - 2184:23; 2270:16; 2273:3
**2,000** [1] - 2244:19
**2,600** [1] - 2260:6
**20** [10] - 2177:5; 2181:1; 2221:4; 2241:9, 23; 2242:16, 20; 2253:16; 2256:15, 25
**20-plus** [1] - 2256:13
**20001** [1] - 2177:15
**20001-2113** [4] - 2178:12, 19, 23; 2179:7
**20006** [4] - 2179:10, 14, 18, 22
**2004** [6] - 2233:12; 2240:10, 14; 2243:16, 20, 23
**2005** [10] - 2233:11; 2244:1, 17, 21, 24; 2252:13, 15; 2257:5
**2006** [6] - 2240:20; 2244:20; 2245:6; 2246:4; 2247:5; 2257:8
**2007** [3] - 2245:6; 2246:4; 2247:5
**2008** [1] - 2247:6
**2012** [5] - 2258:1, 5; 2264:10; 2292:2, 11
**2013** [13] - 2250:20; 2258:23; 2263:17; 2264:1, 10-11; 2274:9; 2275:12; 2276:3; 2279:20; 2296:15, 24; 2300:21
**2014** [8] - 2250:20; 2278:24; 2279:4, 19; 2280:8; 2291:23; 2300:23; 2301:2
**2015** [5] - 2177:5; 2181:1; 2237:19; 2250:20; 2264:11; 2283:4
**2016** [2] - 2264:1, 12
**202** [15] - 2177:15, 19-20, 24-25; 2178:13, 20, 24; 2179:11, 15, 18-19, 23
**202]879-3689** [1] - 2179:7
**202-514-0731** [1] - 2178:5
**20530** [4] - 2177:19, 24; 2178:4, 8
**216** [1] - 2179:4
**22** [3] - 2232:18; 2254:23; 2301:24
**2232** [1] - 2180:5
**23** [1] - 2300:21

**24** [2] - 2260:6; 2274:24
**25** [7] - 2241:10, 16; 2242:4, 19-20; 2243:16; 2253:16
**26** [3] - 2248:23; 2249:11; 2298:1
**261-3034** [1] - 2179:19
**261-3339** [1] - 2179:23
**261-3373** [1] - 2179:18
**261-3398** [1] - 2179:11
**261-3430** [1] - 2179:15
**269-1555** [1] - 2178:16
**27** [1] - 2298:1
**274** [1] - 2256:9
**28** [2] - 2248:23; 2249:11
**281-3835** [1] - 2178:12
**28th** [1] - 2261:8
**29** [1] - 2298:10
**299** [1] - 2256:7
**2:00** [2] - 2222:8

## 3

**3** [2] - 2270:11; 2272:21
**3,092** [1] - 2279:16
**3,292** [1] - 2279:12
**30** [2] - 2270:5
**305-1489** [1] - 2177:15
**312** [1] - 2178:16
**350** [2] - 2294:2, 10
**36** [1] - 2272:21
**394** [1] - 2222:19
**399** [25] - 2182:17; 2183:11; 2184:15; 2185:1, 7-8; 2187:15; 2198:22; 2199:11; 2209:19; 2211:3; 2216:2, 11, 19; 2217:20; 2218:5; 2220:1; 2223:14; 2224:8, 25; 2256:7; 2268:2; 2269:8
**3:00** [3] - 2197:9, 13

## 4

**40** [4] - 2253:10, 12, 14; 2302:5
**4000** [5] - 2177:14, 18, 23; 2178:4, 8
**4250** [1] - 2265:4
**44** [1] - 2253:13
**44114** [1] - 2179:4
**45** [1] - 2302:5
**450** [5] - 2177:14, 18, 23; 2178:3, 7
**48** [1] - 2241:25
**499** [18] - 2183:12; 2184:15; 2185:1, 8; 2198:21; 2199:10; 2209:19; 2211:3; 2216:3, 20; 2217:21; 2220:2; 2223:14; 2224:8, 25; 2268:10
**4th** [6] - 2237:11, 22; 2238:3, 7, 18; 2248:14
**4thth** [1] - 2248:8

## 5

**5** [7] - 2196:17; 2222:6; 2242:22; 2270:11, 16; 2296:23; 2302:16
**50** [2] - 2251:25; 2264:7
**51** [4] - 2178:11, 19, 23; 2179:6
**514-7308** [2] - 2177:20, 25
**52** [1] - 2248:19
**532-4562** [1] - 2177:24
**551** [1] - 2300:17
**586-3939** [1] - 2179:4
**598** [1] - 2288:11
**598-2854** [1] - 2177:19
**599** [1] - 2184:22
**5:00** [2] - 2196:18; 2197:8

## 6

**6** [2] - 2197:13; 2296:23
**60** [1] - 2301:16
**60601** [1] - 2178:16
**614** [1] - 2178:12
**626-1700** [3] - 2178:13, 20, 24
**65** [1] - 2292:13
**698** [1] - 2276:1

## 7

**7** [1] - 2211:24
**70** [3] - 2241:19; 2289:20; 2292:13
**77** [1] - 2178:15
**799** [6] - 2268:11, 13, 15, 25; 2269:6, 8

## 8

**84** [1] - 2236:9
**879-3816** [1] - 2178:24
**879-3939** [1] - 2178:20
**880ish** [1] - 2264:11
**899** [1] - 2268:11

## 9

**9** [1] - 2177:9
**90** [2] - 2237:3, 5
**90-day** [1] - 2301:16
**901** [1] - 2179:3
**930** [1] - 2264:11
**98** [1] - 2184:22
**999** [5] - 2246:14; 2268:12, 16, 23; 2270:3
**9:00** [1] - 2230:17
**9:06** [2] - 2177:6; 2181:2
**9:57** [1] - 2222:10

## A

**a.m** [4] - 2177:6; 2181:2; 2222:10
**AB** [4] - 2177:6; 2178:11; 2179:2; 2181:6
**ABC** [1] - 2234:22
**ability** [6] - 2186:15; 2216:2, 4, 7; 2218:25; 2221:16
**able** [8] - 2190:7; 2218:19; 2223:13; 2229:13, 15; 2284:18; 2286:9; 2288:2
**above-entitled** [1] - 2303:3
**absent** [3] - 2209:11, 14; 2212:2; 2213:9
**absolutely** [11] - 2192:11; 2196:18; 2207:3; 2215:12; 2218:17; 2231:3; 2261:1; 2269:2; 2276:22, 25; 2282:8
**absolutes** [1] - 2284:6
**absorb** [1] - 2301:9
**accept** [3] - 2198:14; 2300:11; 2301:2
**acceptance** [2] - 2246:1; 2258:16
**accepting** [1] - 2212:6
**accommodate** [1] - 2219:22
**accompany** [1] - 2188:17
**accomplish** [2] - 2235:21, 25
**accordingly** [1] - 2295:5
**account** [28] - 2214:12; 2221:6; 2234:24; 2235:9, 14; 2239:15; 2240:4; 2245:3, 8-11, 20; 2247:10; 2258:10, 12; 2262:25; 2264:13; 2267:14; 2271:14; 2290:3, 23; 2293:4; 2296:10
**accounting** [2] - 2194:21; 2195:6
**accounts** [14] - 2233:17; 2234:18; 2235:11, 19; 2237:1-3; 2239:5; 2244:17; 2257:8; 2290:22, 24
**accurate** [4] - 2184:5; 2185:13; 2284:18; 2297:17
**achieve** [1] - 2252:3
**acquire** [1] - 2193:25
**acquired** [1] - 2242:15
**action** [2] - 2191:11; 2204:10
**Action** [2] - 2177:4; 2181:5
**actions** [1] - 2252:2
**activity** [3] - 2247:13; 2248:24; 2249:17
**actual** [3] - 2283:15, 18; 2287:8
**acute** [1] - 2224:24
**ad** [5] - 2266:4, 6; 2277:5; 2280:2; 2284:18
**add** [1] - 2259:4
**added** [5] - 2257:22; 2259:4, 8; 2262:10, 18
**addition** [2] - 2227:9; 2261:23
**additional** [4] - 2198:6; 2249:6; 2293:14
**additions** [1] - 2260:7
**address** [4] - 2193:15; 2205:15; 2206:4; 2209:7
**addressed** [4] - 2191:16; 2194:6; 2198:23; 2229:12

**adds** [1] - 2268:5
**Adler** [1] - 2181:13
**admit** [1] - 2190:1
**adopted** [1] - 2206:3
**adopting** [1] - 2207:18
**advance** [2] - 2237:23; 2238:8; 2277:19
**advanced** [1] - 2210:1
**advantage** [1] - 2233:18
**advertise** [1] - 2266:16
**advertised** [3] - 2265:14, 18; 2267:9; 2268:14, 16, 23
**advertisement** [3] - 2265:18; 2277:8; 2284:4
**advertising** [7] - 2234:14; 2262:11; 2265:23; 2266:17; 2283:19; 2295:13
**affect** [2] - 2197:24; 2258:13
**affected** [2] - 2212:24; 2272:6
**afternoon** [2] - 2208:3; 2222:5
**afterwards** [1] - 2227:19
**aggressive** [5] - 2262:3; 2278:22; 2282:1; 2288:11
**agitator** [1] - 2252:20
**ago** [4] - 2194:2; 2221:4; 2256:16, 25
**agree** [8] - 2187:13; 2199:10; 2217:14; 2219:16; 2224:16; 2230:17; 2262:14; 2280:8
**agreement** [1] - 2218:8
**ahead** [4] - 2222:12; 2230:18; 2277:12; 2291:10
**aided** [1] - 2179:25
**aisles** [1] - 2294:17
**al** [2] - 2177:6; 2181:6
**allegation** [1] - 2208:24
**alleged** [1] - 2199:17
**Allocating** [1] - 2294:2
**allocation** [1] - 2293:7
**allow** [22] - 2186:9; 2187:22; 2188:20; 2198:14; 2205:13; 2219:18; 2221:16; 2223:2, 7, 9; 2224:21; 2225:11, 13; 2227:16; 2228:7; 2229:25; 2230:5, 16; 2231:23
**allowed** [6] - 2195:10; 2201:16; 2203:24; 2207:21; 2209:1; 2225:7
**allowing** [1] - 2206:19
**allows** [2] - 2188:15; 2217:25
**almost** [4] - 2193:8; 2231:2; 2271:8; 2294:10
**alternative** [1] - 2206:23
**Amana** [1] - 2282:3
**amend** [2] - 2188:12; 2211:22
**amended** [1] - 2188:13
**amendment** [2] - 2188:15; 2230:23
**AMERICA** [1] - 2177:3
**America** [1] - 2181:6
**amount** [3] - 2192:20; 2238:5; 2270:22
**analogous** [1] - 2188:16
**analysis** [7] - 2197:24; 2198:6; 2199:7, 9, 14; 2201:12; 2214:18

**analyzed** [1] - 2206:5
**anchor** [3] - 2275:21; 2279:22; 2299:7
**announce** [1] - 2301:16
**announced** [1] - 2185:15
**announcement** [1] - 2296:14
**announcing** [3] - 2261:22; 2296:23
**answer** [11] - 2205:3; 2210:6, 9, 17, 25; 2211:22; 2217:11; 2218:16; 2254:1; 2258:5; 2271:9
**answered** [1] - 2185:20
**answers** [2] - 2202:3; 2216:12
**anticipate** [1] - 2196:25
**anticipated** [1] - 2258:17
**Antitrust** [1] - 2177:22
**antitrust** [1] - 2186:17
**anyway** [3] - 2194:6; 2207:1; 2223:6
**apart** [1] - 2209:20
**apologies** [1] - 2182:21
**appear** [1] - 2291:13
**APPEARANCES** [3] - 2177:12; 2178:1; 2179:1
**appeared** [1] - 2258:6
**appellate** [1] - 2188:6
**apple** [1] - 2186:12
**Appliance** [7] - 2203:3; 2209:8; 2212:10; 2228:16; 2234:22; 2235:10; 2240:3
**appliance** [20] - 2209:11; 2232:17; 2233:21; 2238:22; 2240:12, 14; 2243:20; 2253:11, 13, 22; 2257:12; 2258:19; 2260:2; 2264:15; 2272:9; 2282:22; 2291:5; 2294:16; 2301:24
**appliances** [23] - 2214:2, 11; 2233:19; 2238:16; 2241:12; 2251:10; 2252:11, 14; 2258:20; 2259:23; 2260:4; 2261:16, 24; 2266:16; 2278:17; 2279:14, 18; 2280:10; 2282:18; 2289:2; 2292:5; 2294:14; 2299:6
**Appliances** [9] - 2183:19; 2184:21; 2185:16; 2193:25; 2198:25; 2232:14, 16; 2233:6; 2241:4
**applies** [1] - 2270:13
**apply** [2] - 2269:5; 2279:15
**appointments** [1] - 2235:19
**appreciate** [6] - 2183:24; 2185:25; 2197:19; 2201:15; 2216:9; 2228:24
**approach** [7] - 2189:6, 13, 19; 2193:10; 2205:10; 2275:3
**appropriate** [15] - 2188:9, 20, 23; 2191:6; 2194:5; 2205:14; 2215:24; 2217:10, 25; 2220:6; 2224:14; 2226:16; 2228:3; 2229:1; 2259:18
**April** [4] - 2249:8; 2258:1; 2296:24
**area** [9] - 2234:2, 17, 21, 25; 2236:17; 2244:25; 2254:18; 2282:1; 2294:12
**Area** [2] - 2235:6; 2245:1
**areas** [1] - 2286:4
**arguably** [4] - 2190:18; 2211:5; 2215:5; 2226:9
**arguing** [1] - 2209:14

**argument** [11] - 2200:2; 2201:9; 2207:15; 2208:25; 2209:10; 2219:14; 2220:3; 2225:25; 2228:11
**arguments** [1] - 2188:25
**Arizona** [4] - 2207:25; 2208:6, 12
**arrival** [1] - 2258:12
**arrive** [1] - 2297:12
**arrived** [3] - 2258:8; 2261:11, 21
**arrives** [1] - 2224:7
**ASM** [1] - 2260:14
**assert** [1] - 2202:21
**asserted** [2] - 2203:6; 2210:3, 5
**asserting** [2] - 2206:17, 21
**assess** [1] - 2218:19
**assessment** [2] - 2200:11; 2226:16
**assist** [1] - 2219:4
**associate** [1] - 2258:16
**associates** [1] - 2258:20
**assortment** [2] - 2293:6; 2295:5
**assume** [5] - 2196:24; 2202:11; 2223:2; 2285:20
**assuming** [1] - 2203:6
**Atlanta** [1] - 2238:10
**attach** [5] - 2188:10; 2189:4, 14; 2204:22; 2275:23
**attached** [4] - 2192:3; 2296:22; 2301:5
**Attached** [1] - 2300:21
**attachment** [1] - 2280:18
**attempting** [2] - 2202:21; 2294:4
**attention** [4] - 2182:3; 2183:25; 2240:21; 2282:15
**Attorney** [5] - 2177:13, 17, 21; 2178:2, 6
**attorney** [9] - 2191:9, 12, 21; 2193:11; 2227:19; 2228:4, 8
**attorney-client** [2] - 2191:9; 2193:11
**attorneys** [1] - 2219:15
**atypical** [1] - 2285:22
**auction** [3] - 2277:14; 2295:16, 18
**authorities** [4] - 2187:21; 2188:7, 17; 2198:14
**avail** [1] - 2218:2
**available** [12] - 2182:23; 2210:20; 2214:23; 2215:22; 2221:15, 20; 2223:25; 2224:13, 20; 2274:4; 2285:5, 11
**Avenue** [5] - 2178:4, 11, 19, 23; 2179:3, 6
**average** [5] - 2259:21-23; 2281:8, 15
**avoid** [1] - 2300:15
**aware** [4] - 2186:23; 2224:8; 2263:6; 2298:19
**awareness** [4] - 2252:10; 2258:2, 15; 2260:2

**B**

**Bachman** [2] - 2178:6; 2181:13
**background** [1] - 2291:24

**backside** [7] - 2270:9, 20, 23; 2271:3; 2276:18; 2292:8
**Baird** [3] - 2238:15; 2262:22; 2284:17
**Banks** [1] - 2239:13
**base** [1] - 2251:14
**based** [4] - 2182:15; 2184:20; 2243:19; 2287:24
**basis** [8] - 2187:15; 2223:17; 2224:18; 2237:4; 2262:25; 2264:19, 21; 2292:23
**Bay** [2] - 2235:6; 2245:1
**beat** [1] - 2268:19
**became** [5] - 2245:2; 2247:13, 15; 2251:12; 2292:9
**become** [5] - 2245:2; 2248:3; 2251:23; 2290:3; 2292:18
**BEFORE** [1] - 2177:10
**begin** [2] - 2182:4; 2194:18
**beginning** [3] - 2252:13; 2274:8; 2302:23
**behalf** [2] - 2181:22; 2209:8
**Belott** [2] - 2179:5; 2181:24
**below** [4] - 2192:8; 2246:14; 2267:9, 11
**BENCH** [1] - 2177:9
**bench** [1] - 2186:17
**benefits** [3] - 2247:25; 2255:4; 2295:13
**Benjamin** [1] - 2181:13
**Best** [3] - 2185:5; 2239:6; 2257:7
**best** [9] - 2186:15; 2188:25; 2216:16; 2223:5; 2258:23; 2263:23; 2269:17; 2278:3; 2294:2
**better** [17] - 2188:25; 2189:2; 2204:2; 2211:10; 2228:14; 2238:17; 2239:20; 2245:19; 2255:2, 4; 2256:15, 24; 2257:3; 2260:2; 2286:11; 2293:13
**between** [6] - 2238:22; 2239:23; 2243:21; 2249:3; 2289:12; 2291:22
**bid** [3] - 2243:10; 2289:22
**big** [7] - 2185:4; 2197:6; 2246:2; 2259:16; 2281:13, 16; 2282:16
**big-box** [1] - 2282:16
**billion** [1] - 2199:1
**binder** [3] - 2260:10; 2274:23; 2278:25
**bit** [21] - 2185:7; 2191:23; 2237:6, 24; 2240:6; 2245:14; 2252:12, 18; 2255:14; 2264:25; 2265:12; 2272:8; 2278:18; 2280:5; 2282:9; 2286:8; 2288:2, 21; 2289:11; 2296:3
**bite** [1] - 2186:12
**black** [2] - 2252:4; 2282:9
**Black** [30] - 2185:5; 2237:12, 15, 19, 21; 2238:2, 7, 18; 2248:10, 15; 2250:3; 2258:4; 2274:10; 2275:12; 2276:3; 2278:24; 2283:5, 9; 2285:17, 23-25; 2286:24; 2287:6, 9; 2288:5; 2289:15
**Blankenship** [7] - 2184:20; 2185:14, 19; 2200:13; 2205:7; 2212:4; 2229:22
**blend** [1] - 2204:19
**blocked** [2] - 2206:23; 2208:19

**Blue** [1] - 2285:19
**board** [2] - 2288:19; 2298:17
**Bob** [3] - 2238:15; 2239:13; 2262:22
**book** [4] - 2274:8, 25; 2275:1; 2291:14
**born** [2] - 2232:19
**Bosch** [3] - 2213:23; 2240:17
**bottom** [2] - 2261:7, 9
**box** [1] - 2282:16
**brand** [33] - 2239:17; 2241:12, 14, 23; 2242:1, 3, 5, 7-8, 11, 13, 19; 2243:5; 2252:6, 10; 2258:15, 19; 2259:7, 13; 2260:8, 21; 2266:8, 19, 21; 2281:23; 2290:5, 17; 2292:6
**branded** [1] - 2266:16
**brands** [10] - 2240:12, 14, 16-17; 2252:9; 2259:5; 2262:20; 2287:11; 2289:16, 18
**break** [3] - 2222:4, 10; 2302:7
**bridged** [1] - 2191:3
**brief** [3] - 2188:8; 2189:4; 2196:23
**Brief** [1] - 2275:7
**briefed** [1] - 2200:2
**briefing** [1] - 2205:2
**briefly** [5] - 2233:13; 2234:5; 2235:13; 2257:14; 2291:21
**bring** [5] - 2182:2; 2221:11; 2226:15, 19; 2285:11
**bringing** [1] - 2183:25
**broad** [2] - 2244:1; 2258:2
**broadened** [1] - 2252:14
**broader** [4] - 2244:16; 2251:13, 15; 2257:10
**brought** [7] - 2209:18; 2213:19, 21; 2216:1; 2272:9
**brown** [2] - 2252:7; 2258:16
**Bryson** [2] - 2178:6; 2181:13
**bryson.bachman@doj.gov** [1] - 2178:9
**BTUs** [1] - 2273:18
**built** [4] - 2245:17; 2252:6; 2253:4; 2274:1
**built-in** [2] - 2253:4; 2274:1
**bunch** [1] - 2271:5
**burner** [2] - 2254:15
**burners** [3] - 2254:15; 2273:18; 2280:2
**business** [36] - 2183:19; 2184:21; 2185:17, 19; 2198:25; 2199:2, 16; 2200:15; 2201:11; 2206:6, 12, 24; 2207:22; 2208:14; 2209:1, 12, 14; 2215:14; 2218:15; 2223:18; 2225:5; 2228:16, 18, 21; 2229:17, 20, 23; 2233:1; 2234:18; 2236:4, 16; 2243:20; 2266:1; 2294:5; 2300:2
**but..** [1] - 2296:1
**Buy** [4] - 2185:5; 2239:6; 2257:7; 2274:12
**buy** [16] - 2241:24; 2242:7, 13; 2256:14, 24; 2267:15, 23; 2268:3; 2276:24; 2279:15; 2280:25; 2281:4;

2282:18, 24; 2294:16
**buyer** [5] - 2238:1; 2239:7; 2276:5; 2290:2; 2293:15
**buyers** [1] - 2240:5
**buying** [3] - 2235:11; 2260:17, 20
**BY** [15] - 2180:5; 2232:10; 2251:7, 21; 2264:5; 2268:21; 2270:21; 2275:11; 2277:9, 13; 2278:9; 2285:9; 2287:5; 2288:6; 2291:11

---

# C

**cadence** [8] - 2247:16-18, 21; 2248:1, 6, 8; 2295:14
**California** [5] - 2235:1, 4, 6, 9; 2244:25
**Calrod** [1] - 2255:19
**candidly** [2] - 2183:22; 2201:13
**candor** [1] - 2183:25
**cannot** [1] - 2301:8
**capacities** [1] - 2234:6
**capacity** [9] - 2246:9, 24; 2254:18; 2255:25; 2256:17; 2266:7; 2273:21
**caption** [1] - 2191:25
**card** [1] - 2284:2
**care** [1] - 2290:6
**career** [1] - 2235:2
**CASE** [1] - 2232:8
**case** [56] - 2183:21, 23; 2190:6; 2191:18; 2192:9; 2193:9; 2194:17, 19; 2195:1, 5-6; 2201:25; 2203:21; 2205:2, 11; 2207:23, 25; 2208:1, 6, 10; 2210:2, 16; 2211:16, 20; 2212:18; 2214:13, 19; 2215:9; 2217:8, 12, 24; 2219:7; 2220:24; 2221:17; 2222:14, 16, 21, 23; 2228:20; 2229:5, 16; 2231:20; 2238:15, 22; 2242:11; 2245:19; 2263:7; 2270:2; 2275:24; 2279:16; 2281:22; 2302:8, 20
**case-in-chief** [4] - 2194:17, 19; 2205:11; 2231:20
**cases** [9] - 2186:17; 2189:21; 2213:1; 2236:20; 2259:13; 2260:7; 2267:21; 2270:15
**catalyst** [1] - 2259:15
**categories** [3] - 2257:3, 13; 2287:21
**category** [3] - 2255:11; 2289:5
**caused** [1] - 2251:22
**cell** [2] - 2252:7; 2258:16
**centers** [1] - 2245:18
**centralized** [1] - 2235:11
**CEO** [1] - 2185:16
**certain** [6] - 2205:21; 2212:23; 2235:20; 2246:25; 2263:9; 2265:23
**certainly** [21] - 2186:13, 18, 25; 2190:12; 2195:24; 2206:2; 2218:24; 2219:1; 2224:16; 2229:6; 2231:2; 2247:12; 2248:9; 2256:19; 2259:1; 2264:7; 2272:10, 16; 2279:25; 2282:21; 2287:17

**certainty** [1] - 2204:14
**certify** [1] - 2303:2
**cetera** [2] - 2267:14; 2299:19
**chain** [1] - 2297:23
**chairman** [2] - 2185:16
**championship** [1] - 2249:16
**chance** [4] - 2190:17; 2197:6; 2297:14
**change** [9] - 2199:12; 2212:25; 2213:3; 2243:5; 2247:11; 2251:9; 2259:16; 2292:7; 2299:15
**changed** [3] - 2198:2; 2235:17; 2280:5
**changes** [1] - 2298:19; 2300:22
**changing** [3] - 2200:25; 2205:18; 2213:8
**characterize** [1] - 2272:7
**charge** [1] - 2269:11
**Charlotte** [1] - 2238:10
**check** [1] - 2224:1
**checked** [1] - 2248:19
**cherry** [2] - 2245:25; 2246:13
**Chicago** [1] - 2178:16
**chief** [5] - 2194:17, 19; 2205:11; 2231:20; 2261:15
**choice** [1] - 2292:1
**choose** [2] - 2225:6; 2267:5
**circle** [1] - 2201:5
**circuit** [2] - 2191:24; 2214:23
**circular** [8] - 2274:10; 2275:13; 2276:3; 2277:7, 17; 2278:24; 2283:4, 20
**circulars** [1] - 2250:20
**circumstances** [4] - 2191:10; 2203:1, 10; 2205:13
**citation** [2] - 2191:19; 2222:14
**cite** [1] - 2208:2
**Citizen** [2] - 2208:1, 6, 8; 2222:16
**City** [1] - 2234:11
**Civil** [2] - 2177:4; 2181:5
**claim** [1] - 2223:17
**claiming** [2] - 2208:13; 2214:14
**clarification** [1] - 2289:12
**Clark** [1] - 2302:8
**classic** [1] - 2202:19
**clean** [4] - 2255:18, 20, 22
**clear** [10] - 2188:5; 2194:6; 2197:17; 2200:19, 21; 2211:12; 2214:1; 2224:2; 2231:4; 2272:10
**clearly** [1] - 2243:18
**CLERK** [3] - 2181:3, 5; 2222:8
**Cleveland** [1] - 2179:4
**client** [2] - 2191:9; 2193:11
**close** [5] - 2185:18; 2198:1; 2200:20; 2243:17; 2284:13
**closed** [2] - 2240:20; 2302:18
**closely** [1] - 2241:5
**closeouts** [1] - 2248:17
**closer** [1] - 2187:2
**closing** [3] - 2220:3; 2228:11
**co** [2] - 2265:23; 2270:15

---

**co-op** [2] - 2265:23; 2270:15
**Coates** [1] - 2182:5
**coil** [1] - 2255:19
**colleagues** [3] - 2181:18; 2292:25; 2297:23
**college** [3] - 2232:24; 2233:2, 4
**color** [2] - 2245:24; 2246:1
**colorful** [1] - 2262:1
**COLUMBIA** [1] - 2177:1
**Columbus** [4] - 2248:15; 2288:3, 14
**com** [1] - 2258:2
**combine** [1] - 2200:14
**comfortable** [1] - 2252:9
**coming** [7] - 2194:17; 2197:21; 2201:5; 2203:21; 2213:2; 2251:2; 2265:8
**commitment** [7] - 2241:23; 2242:2, 5, 7
**committed** [1] - 2242:13
**common** [3] - 2268:2; 2274:19; 2280:13
**commonly** [1] - 2237:13
**communicated** [1] - 2282:23
**communications** [1] - 2193:11
**comp** [5] - 2287:10; 2290:24; 2291:1, 3
**companies** [8] - 2184:24; 2185:23; 2199:15; 2201:11; 2203:11; 2213:6; 2222:24; 2225:4
**Company** [2] - 2179:9; 2222:17
**company** [7] - 2193:24; 2199:1; 2202:1; 2209:9; 2210:5; 2216:5; 2223:18
**Company's** [1] - 2185:16
**compare** [1] - 2200:13
**compared** [1] - 2279:18
**compares** [1] - 2250:20
**comparison** [5] - 2203:17, 19, 25; 2204:17; 2259:24
**compelling** [1] - 2254:14
**compete** [7] - 2213:10; 2235:25; 2236:1; 2239:20; 2281:24; 2286:4; 2295:9
**competent** [3] - 2215:1, 10
**competing** [2] - 2240:12; 2251:8; 2278:18
**competition** [15] - 2203:18, 23; 2204:1, 3; 2208:17; 2209:2; 2211:25; 2221:11; 2238:21; 2239:12; 2262:15; 2263:2, 6; 2295:11
**competitive** [10] - 2212:19; 2221:3; 2243:10; 2251:12, 23-24; 2254:19; 2258:14; 2284:21
**competitively** [1] - 2239:16
**competitor** [1] - 2262:3
**competitors** [4] - 2252:5; 2262:16; 2272:2; 2285:20
**competitors'** [1] - 2272:1
**compiles** [1] - 2299:21
**complaint** [2] - 2188:12

**complete** [1] - 2301:4
**completed** [1] - 2301:7
**complicated** [1] - 2189:12
**component** [1] - 2234:14
**components** [1] - 2269:14
**comprehensive** [1] - 2190:4
**comps** [1] - 2239:7
**computer** [2] - 2179:25; 2236:9
**computer-aided** [1] - 2179:25
**concept** [1] - 2206:3
**concepts** [1] - 2289:23
**conceptually** [1] - 2285:18
**concern** [4] - 2186:3; 2205:19; 2227:11
**concerned** [3] - 2182:11; 2183:10; 2227:18
**concerning** [1] - 2245:15
**concerns** [3] - 2185:25; 2192:2; 2296:14
**conclude** [2] - 2203:10; 2218:7
**conditions** [1] - 2301:15
**conduct** [1] - 2206:19
**conducted** [1] - 2187:25
**confidential** [2] - 2300:14; 2302:3
**conflated** [1] - 2209:17
**confusion** [1] - 2182:21
**Congress** [1] - 2204:15
**conjunction** [1] - 2219:6
**connection** [1] - 2299:23
**consequence** [1] - 2266:25
**consider** [5] - 2187:3; 2189:17; 2206:22; 2207:6; 2246:23; 2280:22
**consideration** [2] - 2203:12; 2218:9
**considered** [2] - 2186:19; 2270:18
**considering** [2] - 2238:12; 2298:18
**consistent** [14] - 2184:17; 2193:14; 2200:17; 2202:13; 2205:6; 2211:7; 2215:8; 2250:13; 2251:1, 5; 2266:18; 2288:5
**consistently** [1] - 2213:5
**consolidate** [1] - 2297:25
**constant** [1] - 2249:19
**consultants** [1] - 2302:13
**consultation** [1] - 2192:4
**consumer** [20] - 2238:12; 2242:11; 2246:1, 21, 23; 2247:4, 14, 21; 2256:12; 2257:2; 2260:20, 23; 2266:9; 2268:5, 9; 2279:17, 25; 2280:20; 2282:22
**consumer's** [1] - 2242:7
**consumers** [11] - 2214:17; 2236:8; 2242:12; 2246:19; 2252:8; 2255:2; 2272:23; 2280:7; 2282:21; 2285:12; 2292:5
**consumers'** [2] - 2241:23; 2273:16
**Cont** [2] - 2178:1; 2179:1
**contemporaneous** [1] - 2215:14
**contend** [1] - 2209:8
**contending** [1] - 2212:22

**context** [4] - 2189:24; 2204:10, 23; 2209:3
**continue** [5] - 2203:24; 2212:5, 20; 2213:9; 2285:15
**continued** [2] - 2246:7; 2285:11
**continuing** [2] - 2212:9; 2214:16
**contribute** [1] - 2213:11
**contributing** [1] - 2277:23
**control** [4] - 2252:21; 2282:10
**controlled** [1] - 2241:18
**controls** [1] - 2246:10
**convection** [5] - 2254:16; 2255:23; 2276:1; 2280:2; 2288:12
**conversation** [1] - 2290:4
**conversations** [4] - 2237:21; 2239:11; 2240:5; 2264:18
**cooking** [14] - 2212:9; 2239:9; 2253:21; 2254:5, 9, 16; 2256:23; 2260:16; 2273:10, 17; 2287:17; 2288:17
**cooktop** [2] - 2255:19, 22
**core** [2] - 2192:9; 2212:18
**Corporation** [1] - 2259:8
**correct** [23] - 2182:24; 2186:13, 24; 2188:2; 2190:11; 2191:14; 2196:7; 2198:10; 2204:16; 2205:21; 2208:15; 2209:13; 2215:11; 2217:6; 2219:18; 2223:7; 2231:7; 2244:14, 22-23; 2261:24; 2299:4; 2303:3
**correcting** [1] - 2186:7
**correction** [4] - 2185:10; 2198:15; 2217:22; 2219:9
**corrections** [2] - 2185:25; 2186:2
**correctly** [2] - 2182:11; 2297:15
**cost** [16] - 2256:25; 2270:14; 2277:23; 2278:2; 2286:11; 2293:14; 2299:9, 15, 22; 2300:5, 10; 2301:2, 8
**Counsel** [8] - 2181:11, 21; 2195:23; 2217:13; 2220:11; 2221:24; 2223:25; 2224:23
**counsel** [24] - 2181:12, 17, 23; 2183:25; 2189:6, 21; 2190:18; 2191:2, 6, 11; 2192:4; 2193:15, 18; 2205:11; 2213:15; 2215:22; 2218:2; 2219:20; 2220:8; 2227:2; 2250:11, 22; 2283:13; 2302:12
**counsel's** [1] - 2221:17
**country** [1] - 2245:19
**couple** [10] - 2182:4; 2196:24; 2197:11; 2235:18; 2238:20; 2250:9; 2259:14; 2275:24; 2289:23
**course** [22] - 2182:22; 2188:12; 2211:8; 2216:25; 2232:22; 2233:22; 2234:22; 2238:5; 2240:4, 15, 23; 2242:2; 2246:11; 2248:24; 2259:6; 2269:7; 2274:21; 2275:24; 2280:1; 2296:1; 2300:1
**Court** [70] - 2179:24; 2182:21; 2184:20; 2186:9, 14, 18, 23; 2187:2, 8, 12, 18, 21-22; 2188:14, 18; 2189:10;

2191:20; 2192:2; 2194:7; 2198:14;
2199:6; 2200:7; 2201:20; 2203:4, 25;
2204:8, 11, 13; 2206:4, 25; 2207:1, 17,
25; 2208:10, 20; 2209:4; 2210:3, 7, 12,
14-15; 2211:22; 2212:15; 2214:25;
2218:8; 2219:4; 2221:8, 11, 15, 21;
2222:22, 25; 2223:11; 2226:17; 2227:8;
2228:6; 2233:13; 2236:14; 2238:25;
2254:8; 2265:13; 2284:20, 22; 2289:1;
2291:21; 2303:7

court [9] - 2184:2, 19; 2186:5; 2194:7;
2202:6; 2216:10; 2225:19; 2263:21;
2302:19

court's [1] - 2215:2

Court's [11] - 2182:3; 2202:5; 2209:16;
2210:11, 18; 2214:24; 2215:10; 2223:2;
2250:14, 23; 2251:5

Courtroom [2] - 2222:6; 2302:15

courtroom [1] - 2302:10

COURTROOM [3] - 2181:3, 5; 2222:8

courts [4] - 2204:6; 2214:23; 2215:2;
2230:11

cover [2] - 2277:3; 2279:5

cover's [1] - 2282:13

covered [1] - 2202:13

coveted [4] - 2277:2, 16; 2280:3

Cowie [2] - 2179:20; 2181:18

crafted [1] - 2191:2

Craig [2] - 2179:16; 2181:18

craig.falls@dechert.com [1] -
2179:19

create [4] - 2210:23; 2211:2; 2266:19;
2278:3

created [1] - 2214:5

creating [1] - 2211:3

criminal [2] - 2191:19; 2222:5

critical [1] - 2246:21

cross [14] - 2186:11; 2201:1, 6, 8;
2202:19; 2205:14; 2219:20; 2223:13;
2224:13, 21; 2225:13, 17; 2229:2;
2231:14

cross-examination [8] - 2201:6, 8;
2202:19; 2205:14; 2223:13; 2224:13,
21; 2229:2

cross-examine [2] - 2186:11; 2201:1

cross-examined [1] - 2219:20

CRR [3] - 2179:24; 2303:2, 6

CTQ [2] - 2246:21; 2273:21

CTQs [2] - 2246:20; 2266:5

cubing [2] - 2236:19; 2260:15

curiosity [1] - 2210:16

curious [2] - 2187:23; 2210:15

current [6] - 2232:15; 2250:11, 18;
2264:12; 2283:9; 2289:8

customer [61] - 2234:23; 2235:15;
2236:19, 24; 2238:1, 14; 2247:24;
2251:14; 2260:2, 21-22; 2263:3;
2264:15, 22; 2269:11, 15, 21; 2270:5,
11, 14, 19, 23-25; 2271:1, 3, 15-16;
2276:23; 2277:19; 2290:2; 2291:17, 22,

24-25; 2292:3, 11, 18, 20, 23; 2293:1,
5, 18; 2294:5, 23; 2296:4, 15; 2297:2,
10, 23; 2299:12; 2300:10, 15, 20;
2301:1, 8, 25

Customer [1] - 2301:2

customer's [1] - 2296:17

customers [17] - 2234:12; 2237:17;
2238:4; 2245:19; 2264:20; 2265:21;
2269:23; 2270:22; 2271:6, 25; 2282:24;
2289:7; 2299:9, 12, 22; 2300:4

customers' [1] - 2289:15

cycle [3] - 2272:14, 21; 2273:1

# D

D.C [1] - 2177:7

Daily [1] - 2208:1, 6

data [8] - 2193:4; 2211:12; 2299:21;
2301:3, 5, 7

Date [1] - 2303:6

dates [1] - 2238:9

David [1] - 2178:2

DAY [6] - 2178:11, 15, 18, 22; 2179:2,
6

days [2] - 2237:3, 5

DC [13] - 2177:15, 19, 24; 2178:4, 8,
12, 19, 23; 2179:7, 10, 14, 18, 22

deadline [1] - 2211:21

deal [13] - 2185:17; 2188:19; 2189:22;
2198:24; 2200:15, 20; 2203:10; 2204:6;
2219:3; 2281:1, 13; 2282:7; 2286:5

dealer [7] - 2234:24; 2236:17; 2238:4;
2260:21; 2265:21, 25

dealers [1] - 2234:10

dealt [1] - 2209:21

debate [1] - 2214:3

Debra [2] - 2179:5; 2181:24

decades [1] - 2222:25

December [2] - 2258:3; 2261:24

Dechert [1] - 2181:17

DECHERT [4] - 2179:9, 13, 17, 21

decide [1] - 2266:22

decides [1] - 2194:7

deciding [1] - 2211:15

decision [4] - 2215:11; 2218:23;
2222:25; 2292:7

decisions [3] - 2203:12; 2215:8;
2297:24

declaration [24] - 2182:19; 2183:2, 5;
2186:4, 7; 2187:23; 2188:10, 16, 20;
2189:4, 7, 15; 2191:1, 5; 2192:3;
2219:16; 2223:3, 9, 19; 2224:12, 17;
2230:20, 23

declaration's [1] - 2224:7

declarations [1] - 2186:19

decrease [1] - 2292:8

decreased [1] - 2242:3

dedicated [3] - 2259:22; 2260:4;
2294:3

deem [1] - 2215:24

deep [1] - 2248:2

deeper [2] - 2281:22; 2286:8

Defendant [3] - 2178:10; 2179:2, 8

DEFENDANT'S [1] - 2232:8

defendants [11] - 2181:23; 2189:14;
2194:23; 2195:22; 2200:1; 2201:9, 21;
2206:8; 2208:21, 23; 2213:2; 2216:17;
2220:15, 20; 2225:6; 2230:3; 2232:3

Defendants [1] - 2177:7

defendants' [7] - 2195:5; 2196:22;
2210:1; 2216:12; 2217:11; 2231:20

defending [1] - 2189:22

defense [34] - 2189:21; 2194:24;
2199:20, 22, 25; 2200:2; 2201:19, 25;
2202:22; 2203:5; 2205:1, 25; 2206:15,
18-21; 2207:11; 2208:15, 20, 22;
2209:4; 2210:2, 5, 18; 2211:19;
2220:24; 2227:3

definitely [2] - 2249:22; 2298:17

degree [2] - 2204:14; 2232:25

delayed [1] - 2195:14

delivered [1] - 2283:11

delivery [3] - 2267:25; 2268:1, 3;
2269:7; 2281:11

Demitrack [2] - 2179:2; 2181:24

demonstratives [1] - 2250:16

Denis [4] - 2179:12; 2181:18; 2194:1;
2209:6

DENIS [10] - 2209:7, 13, 17, 21;
2210:4, 13, 22; 2211:7; 2212:14;
2213:13

department [4] - 2260:3; 2271:17;
2282:22; 2291:5

Department [2] - 2240:3; 2271:18

DEPARTMENT [5] - 2177:13, 18, 22;
2178:3, 7

deposed [2] - 2184:9, 18

deposition [2] - 2184:12, 14, 17;
2202:10, 13

depositions [2] - 2218:21, 23

Depot [44] - 2185:5; 2221:6; 2238:6,
10; 2239:6, 14; 2244:18; 2245:3, 8,
11-12, 16, 20; 2247:10; 2252:13;
2257:4, 23; 2258:6, 8, 10, 12, 18, 20,
25; 2259:2, 4, 11, 16, 21; 2261:23;
2262:19, 21-22; 2263:16; 2264:13;
2269:23; 2274:10; 2275:13; 2276:3;
2278:2; 2284:5; 2287:7

Depot's [4] - 2238:6, 15; 2260:1;
2278:2

describe [5] - 2234:5; 2235:13;
2238:25; 2255:16; 2257:14

describing [1] - 2275:14

DESCRIPTION [1] - 2180:7

detailer [1] - 2233:15

details [1] - 2270:10

determination [1] - 2183:7

determine [3] - 2188:14; 2214:25;
2265:21

**determined** [1] - 2292:4
**determines** [2] - 2210:14; 2265:25
**Detroit** [4] - 2234:17, 21, 25; 2235:1
**develop** [3] - 2215:23; 2272:19; 2300:4
**developed** [1] - 2248:18
**developing** [1] - 2255:12
**development** [2] - 2272:14, 21
**die** [1] - 2294:14
**difference** [1] - 2213:3
**differences** [2] - 2247:11; 2289:8
**different** [22] - 2191:23; 2199:7; 2201:14; 2214:15; 2217:1; 2225:25; 2227:7; 2233:14; 2242:14; 2252:24; 2255:24; 2257:12; 2268:6; 2269:12; 2270:24; 2271:7, 10; 2282:9; 2285:18; 2289:11
**differently** [1] - 2237:7
**difficult** [3] - 2245:21; 2278:20; 2301:13
**difficulty** [1] - 2278:18
**digits** [2] - 2244:5, 12
**dire** [3] - 2203:1; 2212:11; 2218:17
**DIRECT** [2] - 2180:5; 2232:9
**direct** [12] - 2202:4; 2216:13; 2217:11, 16; 2221:17; 2225:12, 18; 2226:11; 2228:10; 2231:5, 19; 2264:25
**direction** [1] - 2242:14
**directly** [1] - 2202:5
**director** [1] - 2213:19
**disappears** [1] - 2202:2
**disclosed** [1] - 2183:21
**discount** [4] - 2269:3; 2278:10, 14
**discounts** [4] - 2236:21; 2249:7, 20; 2250:3
**discovered** [2] - 2199:8; 2201:8
**discovery** [14] - 2201:13; 2206:14, 19; 2210:23; 2211:2-4; 2250:12; 2283:10; 2284:12, 19; 2285:4
**discretion** [2] - 2187:18; 2188:19
**discuss** [5] - 2190:18; 2193:14; 2228:1; 2248:1
**discusses** [1] - 2222:22
**discussion** [3] - 2200:24; 2204:23; 2238:1
**Discussion** [1] - 2291:9
**discussions** [2] - 2264:14; 2271:13
**dishwasher** [4] - 2253:20; 2275:25; 2282:10; 2287:15
**dishwashers** [6] - 2212:8; 2239:9; 2252:24; 2253:25; 2260:16
**dispenser** [1] - 2274:20
**displace** [4] - 2258:24; 2259:2; 2264:23; 2290:4
**disregard** [1] - 2210:3
**distribution** [10] - 2244:1, 16; 2245:18; 2251:13, 15; 2257:9; 2258:2; 2260:18
**DISTRICT** [3] - 2177:1, 10
**district** [1] - 2234:3

**Division** [2] - 2177:22; 2209:9
**division** [1] - 2209:9
**document** [2] - 2285:1; 2291:12
**documentation** [1] - 2301:20
**documents** [3] - 2214:8; 2215:14; 2289:12
**dollars** [2] - 2256:25; 2263:11
**dominant** [1] - 2214:5
**done** [9] - 2190:4; 2209:22; 2230:11; 2244:15; 2253:18; 2273:14, 20, 24; 2275:22
**doom** [1] - 2185:13
**door** [15] - 2250:1; 2253:3; 2257:17, 20; 2274:19; 2275:19; 2279:23; 2281:2; 2282:8; 2298:15
**door-in-a-door** [1] - 2253:3
**door-in-door** [3] - 2257:20; 2279:23; 2281:2
**doors** [3] - 2236:10; 2253:3; 2257:20
**doorstep** [2] - 2261:11, 21
**double** [6] - 2254:11, 13; 2256:1; 2273:13
**down** [12] - 2234:17; 2246:8, 16; 2247:3; 2252:22; 2253:18; 2254:16; 2255:1; 2257:12; 2274:6; 2276:1; 2301:21
**drag** [1] - 2209:22
**dramatic** [2] - 2213:3; 2285:19
**draw** [3] - 2278:3; 2282:18, 21
**drawing** [1] - 2292:5
**Drive** [1] - 2178:15
**drive** [4] - 2248:16; 2286:8; 2291:6
**driven** [1] - 2290:24
**drives** [3] - 2239:4; 2242:10; 2280:16
**dryer** [1] - 2281:18
**Duo** [1] - 2273:15
**duration** [1] - 2248:12
**during** [26] - 2185:5; 2200:8; 2202:4, 12; 2216:12, 16; 2217:11, 15; 2220:3; 2224:22; 2226:11; 2227:19; 2231:20; 2233:20; 2238:23; 2248:24; 2249:7, 15; 2252:4; 2253:19; 2258:10; 2283:16; 2285:5; 2286:8
**DVDs** [1] - 2252:8
**DX171** [1] - 2296:2
**DX184** [2] - 2260:9; 2261:6
**DX551** [1] - 2300:14
**DX91** [2] - 2291:12, 19
**DXDEM026** [1] - 2283:5
**DXDEM24** [1] - 2274:7
**DXDEM25** [1] - 2274:8
**dynamic** [3] - 2212:19; 2213:11; 2221:3

# E

**e-mail** [19] - 2238:9, 17; 2239:14; 2261:8, 20-21; 2262:6; 2292:23; 2293:12; 2294:1, 23; 2296:6, 9, 22;

2297:2, 18, 22; 2300:20
**e-mails** [3] - 2239:11; 2261:7; 2271:25
**early** [5] - 2191:17; 2196:5; 2233:15; 2240:20; 2293:1
**earn** [4] - 2290:10; 2293:19, 23
**earning** [4] - 2290:12, 19; 2293:17; 2294:4
**easier** [2] - 2239:4; 2297:24
**easiest** [1] - 2290:23
**easy** [1] - 2300:12
**economic** [2] - 2195:3, 5
**economist** [1] - 2194:16
**Ed** [3] - 2261:8, 14
**edge** [2] - 2289:6
**edge-to-edge** [1] - 2289:6
**effect** [4] - 2203:1; 2221:9; 2244:20; 2300:22
**effective** [1] - 2296:24
**effectively** [1] - 2213:10
**efficiencies** [1] - 2194:23
**efficiency** [3] - 2252:19; 2257:19
**efficient** [4] - 2236:20; 2256:20, 22; 2260:17
**efforts** [1] - 2252:3
**eight** [4] - 2239:1; 2247:12
**either** [16] - 2190:20; 2199:11; 2206:14; 2209:1; 2215:14; 2223:18; 2226:22; 2238:2, 10; 2239:10, 24; 2251:18; 2265:9; 2267:13; 2276:17
**electric** [5] - 2255:18; 2256:24; 2268:22; 2287:4; 2288:1; 2288:12
**Electric** [7] - 2179:9; 2181:17; 2244:21, 24; 2245:3; 2258:13; 2286:3
**ELECTROLUX** [1] - 2177:6
**Electrolux** [22] - 2178:11; 2179:2; 2181:6, 23; 2182:7; 2183:20; 2184:22; 2199:1; 2200:20; 2203:3; 2209:1; 2214:6, 20; 2216:8; 2228:15; 2240:15; 2259:6, 10, 15; 2277:15; 2286:3; 2295:9
**Electronics** [1] - 2235:10
**electronics** [1] - 2252:8
**element** [1] - 2236:23
**elementary** [1] - 2232:22
**elements** [4] - 2255:19, 21; 2262:14
**Email** [7] - 2177:16, 20, 25; 2178:9, 13, 17, 21, 25; 2179:11, 15, 19
**Email:david.gelfand@doj.gov** [1] - 2178:5
**EMMET** [1] - 2177:10
**emphatically** [1] - 2183:18
**employed** [2] - 2213:6; 2232:13
**employee** [2] - 2221:4; 2245:21
**employees** [2] - 2233:18; 2302:12
**enable** [1] - 2194:6
**encourage** [5] - 2218:12; 2238:7; 2239:12; 2263:5
**encouragement** [1] - 2192:24
**encouraging** [1] - 2239:11

**end** [13] - 2194:4; 2206:17; 2210:14; 2215:7; 2218:8; 2225:19; 2228:7, 22; 2230:15; 2239:24; 2248:16; 2270:13; 2279:24
**end-around** [1] - 2206:17
**ending** [1] - 2282:2
**ENERGY** [1] - 2256:21
**engine** [1] - 2245:25
**entered** [1] - 2211:11
**entire** [2] - 2224:10; 2280:23
**entitled** [8] - 2210:9, 11, 13, 25; 2212:15; 2220:4; 2303:3
**entry** [1] - 2257:4
**envisioned** [1] - 2203:9
**equal** [1] - 2267:16
**escutcheon** [1] - 2282:10
**especially** [4] - 2186:17; 2219:9; 2287:22; 2290:22
**Esq** [10] - 2178:10, 14, 18, 22; 2179:2, 5, 8, 12, 16, 20
**essentially** [7] - 2188:2; 2202:1; 2224:20; 2225:11, 13, 16; 2283:21
**established** [1] - 2211:10
**estimate** [1] - 2276:12
**et** [4] - 2177:6; 2181:6; 2267:14; 2299:19
**Ethan** [2] - 2177:13; 2181:9
**ethan.glass@usdoj.gov** [1] - 2177:16
**Evansville** [2] - 2232:20, 23
**evening** [1] - 2182:9
**evenly** [1] - 2197:1
**event** [5] - 2185:5; 2235:23; 2237:9; 2239:22, 25; 2248:10, 12; 2249:8
**events** [10] - 2237:6, 11; 2238:5; 2239:2; 2251:2; 2281:10, 16, 20
**evidence** [14] - 2183:23; 2185:24; 2203:20, 23; 2208:24; 2214:24; 2215:10, 21; 2217:9; 2218:10; 2220:6; 2229:16; 2231:16; 2284:25
**exact** [4] - 2208:11; 2253:9; 2268:15; 2300:5
**exactly** [12] - 2182:20; 2185:9; 2197:22; 2199:11; 2202:12; 2204:11; 2229:11; 2230:9; 2244:4; 2268:8; 2293:22; 2298:6
**examination** [20] - 2194:18; 2201:6, 8; 2202:4, 19; 2205:12, 14-15; 2216:14, 17; 2218:1; 2221:18; 2223:13; 2224:13, 21, 23; 2225:17; 2229:2; 2231:7; 2302:3
**EXAMINATION** [2] - 2180:5; 2232:9
**EXAMINATIONS** [1] - 2180:3
**examine** [10] - 2183:3; 2184:6; 2186:11; 2201:1; 2205:17; 2223:4, 10; 2225:7, 9; 2228:18
**examined** [3] - 2219:20; 2224:15; 2228:10
**examining** [1] - 2221:23
**example** [18] - 2236:17, 21; 2238:6; 2239:13; 2249:3, 14; 2250:2; 2253:1;

2256:10; 2265:5; 2268:2; 2269:7; 2270:2; 2272:20; 2278:21; 2286:23; 2299:9; 2301:17
**examples** [2] - 2250:9; 2273:12
**exceeds** [3] - 2239:17; 2248:24; 2249:12
**Excel** [1] - 2301:20
**exception** [1] - 2228:3
**exceptions** [1] - 2228:2
**exchange** [2] - 2291:20; 2293:14
**excuse** [4] - 2237:20; 2250:3; 2291:7; 2296:13
**excused** [2] - 2186:6, 10
**executed** [1] - 2254:5
**exercise** [1] - 2206:11
**exhibit** [4] - 2261:22; 2282:2; 2300:15
**Exhibit** [1] - 2260:9
**EXHIBITS** [1] - 2180:6
**exist** [1] - 2231:10
**existed** [1] - 2254:25
**existing** [1] - 2193:6
**expanded** [2] - 2246:12; 2248:11
**expanding** [3] - 2246:5; 2252:12; 2257:12
**expansion** [4] - 2245:12, 15; 2257:11; 2272:5
**expect** [3] - 2195:3; 2196:22; 2285:19
**expectations** [1] - 2265:5
**expected** [2] - 2183:19; 2213:8
**expense** [1] - 2211:9
**expensive** [1] - 2278:7
**experience** [16] - 2184:21; 2188:3; 2189:22; 2234:1; 2235:13; 2243:19; 2248:6; 2254:23; 2273:2, 7; 2280:12; 2281:19; 2294:9; 2295:21; 2300:9; 2301:12
**experiences** [3] - 2221:12; 2240:25; 2299:9
**experiencing** [1] - 2212:8
**expert** [19] - 2189:20; 2192:13, 20-21; 2194:13, 21; 2195:3, 5-6, 11; 2198:6; 2199:9, 12; 2201:12; 2206:14, 20; 2211:5; 2219:11, 22
**expert's** [1] - 2194:11
**experts** [9] - 2189:10; 2192:6, 12; 2193:3; 2199:10, 12, 16; 2218:20
**explain** [10] - 2236:6, 14; 2254:8, 21; 2255:8; 2264:17; 2269:17; 2280:16; 2281:8; 2293:10
**explained** [1] - 2290:18
**explicit** [1] - 2264:25
**explore** [1] - 2206:1
**extensive** [1] - 2225:14
**extent** [6] - 2184:2; 2189:16; 2198:2; 2200:8; 2201:16; 2250:11
**extra** [3] - 2197:11; 2278:10, 14
**eyes** [1] - 2264:22

# F

**faced** [1] - 2186:19
**facing** [1] - 2200:12
**fact** [9] - 2184:18; 2185:14, 19; 2188:24; 2190:11; 2211:17; 2222:24; 2226:11; 2256:23
**factor** [1] - 2301:6
**facts** [3] - 2184:2
**failed** [1] - 2222:24
**failing** [14] - 2199:4, 7, 24-25; 2201:25; 2205:1, 25; 2206:15; 2209:3, 9; 2210:5; 2211:19; 2222:22
**failure** [1] - 2207:6
**failures** [1] - 2203:6
**fair** [8] - 2189:14, 19; 2193:10; 2195:23; 2219:19; 2223:7; 2224:18; 2287:3
**fairly** [6] - 2187:7, 11; 2191:7; 2215:6; 2292:20; 2301:12
**faith** [1] - 2190:9
**fallen** [2] - 2242:16, 22
**Falls** [2] - 2179:16; 2181:18
**familiar** [5] - 2247:16; 2249:11; 2255:6; 2288:24; 2291:19
**fantastic** [2] - 2246:3; 2257:18
**far** [4] - 2237:23; 2238:8; 2249:12; 2258:17
**fast** [1] - 2273:5
**faster** [1] - 2258:17
**Fax** [6] - 2177:20, 25; 2178:13, 20, 24; 2179:19
**feature** [6] - 2248:3; 2255:12, 20, 23; 2280:6
**featured** [2] - 2280:4, 9
**features** [23] - 2246:8, 18, 23; 2247:2, 25; 2254:14, 18, 20, 22; 2255:1, 4, 25; 2256:11, 19; 2265:17; 2273:19; 2274:3, 5; 2275:17; 2279:24; 2295:12
**February** [3] - 2237:20; 2249:3
**federal** [1] - 2187:25
**feet** [4] - 2259:23; 2260:4, 6
**felt** [1] - 2292:5
**few** [3] - 2194:2; 2271:11; 2280:7
**fewer** [2] - 2189:1; 2191:15
**field** [4] - 2234:4, 6, 8; 2236:18
**Fifth** [5] - 2177:14, 18, 23; 2178:3, 7
**fight** [1] - 2277:1
**figure** [2] - 2223:4; 2283:18
**figures** [2] - 2283:15, 23
**file** [13] - 2182:19; 2186:7; 2188:8; 2189:3, 8, 14; 2195:22; 2196:9, 25; 2197:6; 2230:18; 2301:5
**filed** [5] - 2187:20; 2188:6, 12-13; 2223:3
**files** [1] - 2196:1
**filing** [1] - 2189:15
**final** [3] - 2194:19; 2203:22; 2223:20
**finally** [1] - 2297:22

**finance** [3] - 2233:1; 2271:20; 2300:2
**financing** [2] - 2268:4; 2269:9
**finder** [1] - 2190:12
**Fine** [1] - 2292:17
**fine** [8] - 2196:13, 18, 21; 2197:4; 2220:25; 2221:14; 2230:18; 2251:4
**fire** [2] - 2245:25; 2270:9
**firm** [11] - 2199:4, 8, 25; 2201:25; 2203:7; 2205:1, 25; 2206:15; 2209:3; 2211:19; 2222:22
**firms** [9] - 2206:5, 12, 24; 2207:6, 21; 2211:9; 2212:7; 2213:10; 2214:5
**first** [19] - 2186:22; 2197:19; 2201:6; 2213:14; 2216:19; 2220:23; 2221:3; 2224:16; 2230:21; 2234:10; 2237:22; 2238:7, 13; 2258:19; 2270:9; 2282:15; 2283:11; 2297:22; 2301:1
**firsthand** [1] - 2245:12
**fit** [2] - 2215:18; 2273:23
**five** [4] - 2252:24; 2254:15; 2255:21; 2280:2
**fix** [1] - 2214:4
**flag** [1] - 2183:24
**flat** [1] - 2264:12
**Flex** [1] - 2273:15
**flip** [1] - 2282:2
**floor** [33] - 2222:6; 2235:15; 2236:1-3, 11; 2257:23; 2258:24; 2259:2, 10, 12, 22; 2260:25; 2262:19; 2265:6; 2283:22; 2289:21; 2290:7, 9-10; 2291:6; 2293:1, 7, 9, 15, 19; 2294:11; 2295:24; 2297:3; 2298:7, 14, 18; 2302:16
**FLOOR** [6] - 2192:18, 25; 2225:22; 2227:23; 2230:14; 2268:20
**flooring** [2] - 2298:5, 7
**floors** [4] - 2233:17; 2250:24; 2260:7; 2289:16
**focus** [6] - 2211:23; 2228:12; 2235:22; 2239:3; 2255:14; 2257:16
**focussing** [1] - 2241:6
**folks** [1] - 2196:4
**follow** [2] - 2183:13; 2187:9
**follow-up** [2] - 2183:13; 2187:9
**following** [4] - 2231:21; 2251:10; 2254:5; 2302:18
**foot** [1] - 2278:3
**FOR** [1] - 2177:1
**forecast** [10] - 2237:4, 7; 2263:17; 2265:3; 2289:19; 2290:1, 3, 7, 19
**forecasting** [2] - 2236:23; 2237:2
**foregoing** [1] - 2303:3
**forensic** [2] - 2194:20; 2195:6
**forget** [1] - 2263:24
**forth** [2] - 2209:4; 2239:23
**fortunate** [1] - 2258:9
**forward** [9] - 2181:7; 2186:2; 2199:21; 2200:9, 15; 2202:17; 2203:9; 2204:5; 2208:17
**foul** [1] - 2228:23
**four** [9] - 2185:4; 2237:11, 13;

2255:21; 2257:20; 2279:13; 2287:20; 2294:3
**four-piece** [1] - 2294:3
**four-week** [2] - 2237:11, 13
**frame** [4] - 2237:20; 2264:6; 2292:22
**frames** [1] - 2288:4
**framework** [1] - 2201:14
**Francisco** [1] - 2245:1
**frankly** [2] - 2247:1; 2257:18
**free** [6] - 2266:22; 2267:3, 25; 2268:3; 2269:7, 9
**freestanding** [7] - 2254:11, 14; 2255:17, 20; 2256:2, 24; 2268:22
**French** [8] - 2250:1; 2253:3; 2257:17, 20; 2274:19; 2275:19; 2282:8; 2298:15
**French-door** [7] - 2250:1; 2257:17, 20; 2274:19; 2275:19; 2282:8; 2298:15
**frequency** [2] - 2248:12; 2265:10
**Fretter** [1] - 2234:21
**Friday** [22] - 2185:5; 2194:11; 2237:12, 15, 19, 21; 2238:2, 7, 18; 2248:10; 2250:3; 2258:4; 2274:10; 2275:12; 2276:3; 2278:24; 2283:5, 10; 2285:24; 2287:6; 2288:5; 2289:15
**Friedman** [2] - 2179:8; 2181:16
**FRIEDMAN** [37] - 2180:5; 2181:16; 2220:19, 23; 2221:2; 2232:3, 10; 2250:15, 19, 25; 2251:6, 21; 2264:5; 2268:21; 2270:21; 2274:23, 25; 2275:8, 10-11; 2277:9, 11, 13; 2278:9; 2283:14, 18, 24; 2284:15, 17; 2285:9; 2287:5; 2288:6; 2291:11; 2302:2, 5, 12
**friends** [1] - 2240:23
**fright** [1] - 2195:2
**Frigidaire** [2] - 2259:6, 10
**FROM** [6] - 2192:18, 25; 2225:22; 2227:23; 2230:14; 2268:20
**front** [15] - 2245:24; 2246:9; 2250:5-7; 2252:19, 21; 2255:12; 2257:19; 2270:19, 24; 2277:3; 2279:4; 2282:11, 13
**front-control** [1] - 2252:21
**front-load** [7] - 2245:24; 2246:9; 2250:5-7; 2252:19; 2257:19
**front-loads** [1] - 2255:12
**Fry's** [2] - 2235:10, 12
**full** [5] - 2186:11; 2201:5; 2203:21; 2215:21; 2219:7
**fun** [1] - 2192:19
**functioning** [1] - 2212:23
**fundamentally** [1] - 2227:3
**funds** [3] - 2270:16
**future** [11] - 2204:23; 2205:3; 2206:10, 22; 2211:23; 2213:20, 22, 25; 2218:14, 22; 2228:14

## G

**game** [1] - 2224:18

**gas** [2] - 2280:2, 4
**gatekeepers** [1] - 2302:11
**GE** [64] - 2183:19; 2184:19, 21-22; 2185:16, 22; 2193:25; 2198:25; 2200:12; 2203:3; 2209:1, 8; 2212:10; 2214:5, 19; 2216:5; 2221:5, 13; 2228:13, 15-16; 2229:19; 2232:14-16; 2235:8; 2238:22; 2240:15, 19-20; 2241:2; 2245:21; 2255:17; 2258:7, 24; 2259:2, 10; 2260:8; 2261:16; 2264:9; 2266:18; 2270:9, 22; 2272:6; 2280:25; 2291:22; 2292:4, 10; 2293:6, 8, 12; 2294:3; 2296:14; 2299:9, 21; 2300:9, 20; 2301:4
**GE's** [3] - 2266:16; 2272:6
**Gee** [1] - 2227:20
**gee** [1] - 2228:20
**Gelfand** [1] - 2178:2
**general** [10] - 2221:12; 2225:16; 2232:16; 2258:9, 11; 2261:18; 2271:15; 2288:1; 2293:3; 2299:13
**General** [7] - 2179:9; 2181:17; 2244:21, 24; 2245:3; 2258:13; 2286:3
**generally** [46] - 2235:22; 2236:10; 2237:2, 4; 2238:7, 13, 17; 2239:6; 2240:2; 2248:17, 23; 2250:2; 2256:17, 21; 2257:3; 2263:15; 2265:9; 2267:11, 15, 21, 23; 2269:4, 6; 2270:8, 12; 2275:20; 2276:18; 2277:2, 18, 25; 2278:4; 2281:13, 25; 2282:15; 2294:16, 19; 2296:19; 2297:17; 2299:7, 12, 24; 2300:13; 2301:14, 17
**generated** [1] - 2238:21
**Gerald** [1] - 2179:16
**GFE** [1] - 2298:1
**given** [10] - 2186:5; 2200:4; 2203:13; 2204:22; 2206:16; 2210:17; 2216:12; 2289:19; 2291:4; 2300:5
**glad** [1] - 2225:21
**glass** [8] - 2182:19; 2198:18; 2201:4; 2205:10; 2213:14; 2223:1; 2224:6; 2289:6
**GLASS** [102] - 2181:9, 12; 2183:4, 7, 10, 15; 2184:10, 13, 17; 2189:11, 13; 2190:1, 15, 24; 2191:1; 2192:7, 12, 15, 23; 2193:3, 20, 22, 24; 2194:3, 9, 14, 16; 2195:3, 12, 16, 18; 2196:8, 12, 15, 17, 20, 22; 2197:9, 11; 2198:19; 2199:6, 19, 22; 2201:5; 2205:18, 22; 2206:2, 8; 2207:3, 5, 9, 13, 17, 20, 25; 2208:5, 7, 10, 16; 2213:17; 2215:12, 19, 25; 2216:15, 19, 22; 2217:3, 5; 2220:12; 2221:19, 22; 2222:2, 13, 16, 19, 21; 2223:9, 12, 17; 2224:24; 2225:2; 2227:3, 6, 9; 2228:24; 2229:3, 6, 9, 11, 18, 24; 2230:2, 6, 9, 22; 2231:2, 4, 7, 13, 22, 25; 2275:3
**Glass** [2] - 2177:13; 2181:9
**global** [2] - 2286:11
**globally** [1] - 2286:21

**GM** [1] - 2240:1
**GNE** [1] - 2298:1
**goal** [2] - 2241:25; 2264:12
**goals** [4] - 2235:21; 2251:25; 2252:3; 2293:8
**goods** [2] - 2252:7; 2258:16
**government** [30] - 2183:22; 2188:7, 11; 2189:5, 7; 2195:21; 2196:1; 2200:8; 2201:1; 2202:10; 2204:3; 2205:10; 2209:22; 2211:15; 2212:24; 2217:7; 2218:21; 2219:20; 2220:4; 2223:7; 2224:17, 21; 2225:12; 2226:1, 6, 9, 15, 19; 2284:19; 2285:2
**government's** [3] - 2191:11; 2199:20; 2216:14
**grabs** [1] - 2282:15
**graduated** [1] - 2233:2
**great** [20] - 2185:16; 2188:19; 2189:22; 2232:12; 2240:25; 2252:6; 2254:10; 2258:15; 2262:7; 2272:10, 12, 15; 2275:18, 24; 2280:22; 2281:24; 2286:5; 2295:12
**greater** [2] - 2247:15; 2285:15
**greatest** [1] - 2273:4
**griddle** [2] - 2254:16; 2273:19
**griddles** [1] - 2254:14
**gross** [1] - 2269:16
**ground** [1] - 2251:8
**grow** [1] - 2260:2
**growing** [1] - 2292:20
**grown** [3] - 2214:11; 2243:13; 2244:12
**growth** [8] - 2211:9; 2245:12, 15; 2264:7; 2270:16; 2288:1
**guarantee** [1] - 2293:19
**guard** [1] - 2274:1
**guess** [24] - 2198:13, 15; 2217:24; 2231:12; 2238:14; 2241:4; 2245:21; 2249:6; 2253:9; 2258:22; 2259:16; 2272:25; 2275:20; 2278:7; 2279:24; 2286:10; 2287:19; 2289:2; 2292:23; 2294:20; 2297:10; 2299:14, 16; 2301:19
**guidelines** [1] - 2265:16
**guy** [1] - 2282:13

## H

**Haag** [1] - 2181:13
**Haier** [2] - 2213:21
**half** [3] - 2188:22; 2193:8; 2261:7
**hallway** [1] - 2219:23
**Hamer** [3] - 2177:21; 2181:14; 2221:23
**HAMER** [6] - 2221:25; 2283:7, 9; 2284:10, 25; 2285:3
**happy** [2] - 2297:11, 16
**hard** [2] - 2191:1; 2266:18
**hardship** [1] - 2195:14
**harm** [1] - 2228:22
**harmed** [1] - 2208:17

**Harris** [1] - 2177:21
**hate** [1] - 2268:17
**head** [1] - 2238:15
**heads** [1] - 2297:19
**heads-up** [1] - 2297:19
**hear** [22] - 2184:25; 2187:1; 2188:11; 2189:5; 2194:5; 2202:18; 2205:8; 2213:20, 23-24; 2214:9, 24; 2219:14, 25; 2220:8; 2272:15; 2290:11; 2293:22; 2299:25; 2302:11
**heard** [9] - 2187:12; 2210:25; 2211:8, 17; 2212:3; 2213:18; 2214:8
**hearing** [5] - 2201:21; 2212:3; 2213:6; 2219:24; 2227:10
**hearsay** [2] - 2215:5
**hell** [2] - 2261:10, 20
**help** [3] - 2195:21; 2215:13; 2271:11
**helped** [3] - 2207:18; 2257:10; 2272:17; 2279:7
**helpful** [2] - 2223:13, 21
**helps** [1] - 2196:10
**high** [2] - 2252:19; 2257:19
**high-efficiency** [2] - 2252:19; 2257:19
**higher** [4] - 2273:18; 2279:24; 2291:1; 2298:1
**higher-end** [1] - 2279:24
**highest** [1] - 2281:13
**highlight** [1] - 2261:10
**highlighted** [1] - 2248:22
**highly** [6] - 2186:5; 2205:4; 2211:10; 2230:2, 25; 2280:9
**highly-featured** [1] - 2280:9
**himself** [1] - 2182:22
**hitting** [1] - 2290:19
**hmm** [1] - 2272:7
**holds** [1] - 2277:15
**holiday** [10] - 2237:13; 2248:22; 2249:2, 10, 17; 2268:13; 2277:18; 2288:2, 20
**home** [1] - 2225:19
**Home** [48] - 2185:4; 2221:6; 2238:6, 10, 15; 2239:6, 14; 2244:18; 2245:3, 8, 11-12, 15, 20; 2247:10; 2252:12; 2257:4, 23; 2258:6, 8, 10-12, 18-20, 24; 2259:2, 4, 11, 16, 21; 2260:1; 2261:22; 2262:19, 21-22; 2263:16; 2264:13; 2269:23; 2274:9; 2275:13; 2276:3; 2278:2; 2284:5; 2287:7
**honest** [1] - 2210:25
**Honor** [125] - 2181:3, 5, 9, 16, 20; 2182:6, 21; 2183:1, 4, 10, 15, 22, 24; 2184:6, 10, 13, 18, 25; 2186:13, 20; 2187:10, 13; 2189:13, 16; 2190:5, 15; 2191:3; 2192:7, 10, 15; 2193:20, 22; 2194:9, 14; 2195:12, 25; 2196:8, 10, 22; 2197:1, 15; 2198:11, 19; 2199:3, 19, 22, 24; 2200:11; 2201:5, 13; 2203:11; 2204:5, 16, 22; 2205:4, 18; 2206:2, 13, 22; 2207:3, 6, 13; 2208:1, 16, 23; 2209:7, 13; 2211:7; 2213:17,

19, 21, 23-24; 2214:1, 17; 2215:12, 25; 2216:15, 22; 2217:5, 19; 2218:19; 2220:12, 15, 19; 2221:19, 22; 2222:13, 25; 2223:9, 12; 2224:1, 24; 2225:5, 16, 23; 2226:3; 2227:1, 10; 2228:24; 2229:11, 18, 24; 2230:22; 2231:25; 2232:3; 2250:10, 15, 21, 25; 2251:6; 2274:23; 2275:3, 8; 2277:11; 2283:7, 14, 24; 2284:10, 15; 2285:3; 2302:2
**Honor's** [2] - 2193:10; 2229:12
**HONORABLE** [1] - 2177:10
**hopefully** [1] - 2215:11
**Hospital** [1] - 2233:5
**hounds** [2] - 2261:10, 20
**hour** [2] - 2219:21, 24
**hours** [5] - 2192:15, 21; 2197:11; 2202:10; 2218:21
**house** [5] - 2267:17, 19, 22; 2269:4
**hurt** [3] - 2209:2; 2214:17; 2298:17

## I

**idea** [2] - 2225:4; 2266:15
**ideal** [1] - 2294:20
**ignoring** [1] - 2214:13
**IL** [1] - 2178:16
**image** [4] - 2265:17; 2266:10, 12, 18
**imagine** [1] - 2191:1
**Immelt** [1] - 2185:15
**impact** [1] - 2221:8
**impacted** [1] - 2297:3
**impeach** [8] - 2215:15, 20-21; 2216:2, 4, 7; 2225:3; 2229:16
**impeached** [1] - 2229:21
**impeachment** [1] - 2218:1
**impending** [1] - 2185:13
**important** [24] - 2185:9; 2193:1, 9; 2204:7; 2213:7; 2214:7; 2216:8; 2236:12; 2242:9; 2246:20, 23; 2253:17; 2254:17; 2266:5; 2273:17, 19, 21; 2278:6; 2280:7; 2282:20; 2290:8; 2291:2
**importantly** [1] - 2204:3
**impression** [1] - 2241:17
**impressions** [1] - 2278:5
**improve** [6] - 2239:7; 2247:3; 2263:9; 2265:7; 2290:14
**improved** [4] - 2245:23; 2256:12, 19; 2279:24
**IN** [1] - 2232:8
**in-between** [1] - 2249:3
**in-court** [1] - 2186:5
**inadmissible** [1] - 2215:5
**inappropriate** [1] - 2190:20
**incentive** [1] - 2276:23
**included** [3] - 2266:8; 2274:17; 2302:19
**includes** [2] - 2281:9, 17
**including** [2] - 2254:14; 2286:3

**incompetent** [1] - 2215:4
**inconsistencies** [1] - 2215:20
**inconsistent** [13] - 2183:22; 2184:3, 12; 2185:24; 2201:18; 2203:5; 2207:10; 2210:1, 4, 17; 2211:4; 2250:22
**incorrect** [3] - 2186:21; 2187:5; 2190:4
**increase** [20] - 2242:1; 2263:11, 14; 2292:8; 2296:14, 16, 18, 23; 2299:10, 20, 23; 2300:6, 10; 2301:2, 4, 6, 8-9, 16, 21
**increased** [5] - 2247:13; 2249:21; 2272:19, 25
**increases** [11] - 2281:11; 2297:12; 2298:24; 2299:10, 13, 23; 2300:1, 8, 13; 2301:23
**increasing** [3] - 2251:13; 2265:10; 2299:18
**incredible** [1] - 2246:1
**incumbent** [2] - 2295:23
**indeed** [2] - 2221:17; 2231:17
**independent** [3] - 2234:9, 24; 2236:17
**independently** [1] - 2222:24
**Indiana** [2] - 2232:20, 23
**Indianapolis** [1] - 2233:5
**indicate** [1] - 2239:16
**indicating** [2] - 2293:12; 2298:16
**indicating)** [1] - 2274:25
**individual** [2] - 2261:3; 2291:6
**individuals** [1] - 2198:1
**industries** [1] - 2286:13
**industry** [20] - 2232:17; 2237:10; 2240:24; 2245:25; 2247:1, 11; 2249:11; 2251:12; 2253:11; 2256:13; 2267:16; 2268:1; 2270:9; 2272:9, 17; 2273:22; 2280:18; 2281:15; 2292:21; 2301:24
**industry's** [1] - 2248:18
**influence** [1] - 2238:5
**influences** [1] - 2286:5
**influencing** [1] - 2301:6
**information** [11] - 2182:15, 17; 2197:25; 2211:5; 2262:24; 2263:4; 2264:21; 2285:5; 2299:21; 2300:4
**infrastructure** [1] - 2245:17, 23
**initiative** [1] - 2243:8
**innovation** [15] - 2246:11; 2247:2; 2252:22; 2253:3; 2257:18; 2272:8, 10, 12, 16-18; 2273:6, 9; 2274:2; 2279:23
**innovative** [1] - 2254:10
**input** [1] - 2223:24
**inquire** [1] - 2224:22
**inquiry** [1] - 2211:24
**insert** [2] - 2277:2, 7
**instances** [1] - 2188:1
**instead** [2] - 2206:17; 2208:24
**instigated** [1] - 2238:21
**instruction** [1] - 2193:18
**integrity** [2] - 2266:4, 20
**intended** [2] - 2204:15; 2280:24

**intends** [1] - 2250:11
**intensely** [1] - 2251:24
**intention** [1] - 2200:24
**interaction** [1] - 2235:14
**interest** [4] - 2228:19; 2239:7; 2241:3; 2282:17
**interested** [3] - 2185:12; 2240:7; 2250:23
**interesting** [1] - 2222:21
**Internet** [1] - 2236:8
**interpret** [1] - 2294:22; 2297:15
**introduce** [4] - 2181:7; 2217:9; 2221:23; 2222:2
**introducing** [2] - 2247:23; 2248:4
**introduction** [2] - 2272:6; 2273:1
**introductions** [1] - 2273:9
**inventory** [2] - 2276:11, 13
**invest** [1] - 2260:3
**investigation** [1] - 2202:12
**invoice** [10] - 2269:18, 20; 2270:7, 19, 25; 2280:19; 2281:8, 11, 14
**invoices** [1] - 2193:5
**involved** [2] - 2236:23; 2271:19
**involving** [1] - 2199:7
**irrelevant** [3] - 2207:12; 2209:3; 2215:1
**issue** [40] - 2189:9, 24; 2190:23; 2191:14; 2192:9, 12; 2193:12, 15; 2195:9; 2197:6, 18; 2198:4, 16; 2201:24; 2202:1; 2209:18, 23; 2210:10, 23; 2211:3, 19; 2212:18; 2214:3, 6; 2216:1; 2219:9; 2220:2; 2223:16-18; 2224:10, 18; 2225:18; 2228:9
**issue's** [1] - 2211:3; 2220:2
**issues** [13] - 2183:21; 2191:7; 2192:5; 2193:3, 6; 2198:23; 2209:18; 2220:1; 2223:14; 2224:22; 2226:24
**it'd** [1] - 2188:23
**it'll** [2] - 2192:16; 2260:10
**item** [2] - 2284:23; 2288:16
**items** [1] - 2284:4
**itself** [3] - 2220:3; 2266:21; 2280:24

## J

**January** [3] - 2237:23; 2300:22; 2301:2
**jeopardy** [1] - 2298:14
**jmmajoras@jonesday.com** [1] - 2178:13
**job** [8] - 2204:13; 2215:18; 2233:4; 2244:24; 2258:7; 2273:20; 2275:22; 2292:19
**John** [2] - 2178:10; 2181:22
**Jones** [1] - 2181:22
**JONES** [6] - 2178:11, 15, 18, 22; 2179:2, 6
**journey** [2] - 2221:5; 2257:14
**judge** [2] - 2215:4; 2227:25

**Judge** [1] - 2243:7
**JUDGE** [1] - 2177:10
**judicial** [1] - 2284:23
**July** [7] - 2237:11, 22; 2238:3, 7, 18; 2248:8, 14
**Jumbo** [3] - 2259:17; 2260:5
**jumping** [1] - 2237:24
**jury** [2] - 2187:19; 2188:2
**JUSTICE** [5] - 2177:13, 18, 22; 2178:3, 7
**justification** [2] - 2299:13, 15
**justifies** [1] - 2300:10
**justify** [2] - 2299:19; 2300:7

## K

**kalejnieks@jonesday.com** [1] - 2178:21
**keep** [3] - 2211:16; 2293:20, 24
**Kelsey** [2] - 2177:17; 2181:13
**kelsey.shannon@usdoj.gov** [1] - 2177:20
**Kenmore** [9] - 2184:22; 2240:15; 2241:12, 14; 2242:25; 2243:4, 11, 15; 2256:10
**key** [4] - 2183:21; 2235:9, 13; 2301:5
**kind** [16] - 2192:4; 2204:6; 2233:21; 2248:18; 2252:8; 2253:19; 2254:24; 2255:4; 2256:6, 10; 2257:1; 2259:13; 2279:22; 2282:24; 2293:22; 2297:10
**kitchen** [15] - 2249:7; 2274:13, 19; 2275:14, 21; 2279:22; 2280:12, 16, 22; 2281:10; 2282:3; 2285:15; 2294:3, 5; 2299:7
**knobs** [1] - 2236:11
**knowing** [1] - 2253:9
**knowledge** [2] - 2184:2
**known** [2] - 2233:20, 22
**knows** [1] - 2198:4
**Korea** [2] - 2286:23
**Kristen** [2] - 2178:18; 2181:24

## L

**labor** [2] - 2294:3; 2299:10
**Labor** [5] - 2248:14; 2288:3, 7, 14
**lack** [2] - 2292:4, 9
**ladder** [3] - 2246:15; 2257:12
**laid** [1] - 2208:20
**Lakeside** [1] - 2179:3
**landscape** [1] - 2221:3
**language** [1] - 2262:1
**large** [1] - 2273:18
**larger** [12] - 2234:16, 18; 2235:5, 10, 19; 2237:1; 2255:25; 2256:17; 2260:3; 2280:6; 2281:22
**largest** [1] - 2273:22
**last** [12] - 2182:9; 2219:24; 2247:12;

2248:19; 2249:19; 2285:19, 23;
2286:25; 2297:22; 2298:10; 2300:17
**late** [2] - 2233:12; 2258:5
**latest** [1] - 2273:4
**Laughter** [6] - 2192:18, 25; 2225:22;
2227:23; 2230:14; 2268:20
**launch** [3] - 2246:25; 2247:1; 2254:10
**launched** [4] - 2245:22, 24; 2252:21;
2253:2
**launching** [3] - 2254:22; 2289:4, 6
**laundry** [51] - 2212:7; 2233:22;
2239:9, 13, 15; 2241:6, 9, 12, 14, 18,
21, 24; 2242:2, 12, 15, 19, 25;
2243:2-4, 13, 17-18, 21; 2244:3, 6-8,
10; 2245:22; 2246:7, 11; 2250:7;
2252:18, 20-21; 2253:8, 10, 14, 19;
2254:5; 2255:10; 2256:7; 2257:17, 19;
2266:7; 2281:17
**law** [6] - 2188:17; 2190:6; 2198:14;
2201:25; 2215:11; 2217:25
**lawyers** [2] - 2215:13; 2225:19
**lead** [3] - 2287:9, 11; 2299:5
**leader** [1] - 2287:20
**leaders** [1] - 2273:6
**leadership** [1] - 2292:3
**leading** [1] - 2287:7
**learn** [1] - 2262:19
**least** [8] - 2219:18; 2225:8; 2259:24;
2264:1, 19; 2267:12; 2281:7; 2287:20
**leave** [3] - 2196:5; 2214:25; 2215:22
**led** [1] - 2284:1
**leeway** [1] - 2187:19
**left** [3] - 2190:17; 2241:2; 2278:11
**legal** [1] - 2201:14
**Lejnieks** [2] - 2178:18; 2181:25
**length** [1] - 2257:11
**lengthy** [1] - 2188:24
**less** [5] - 2248:7; 2254:3; 2256:20;
2268:9; 2279:20
**lessen** [1] - 2203:18
**lessoned** [1] - 2204:4
**lessoning** [1] - 2211:25
**letter** [4] - 2294:22; 2296:21; 2300:21
**leveraged** [1] - 2252:10
**LG** [77] - 2182:12; 2184:14, 18;
2185:2, 8-9, 21; 2192:9; 2198:21;
2199:11; 2211:9; 2212:4; 2213:19;
2214:2, 10, 13-15; 2216:3, 23; 2218:5;
2221:9; 2223:14; 2224:9, 25; 2225:8;
2243:3, 17; 2244:17; 2245:17, 22;
2246:5, 15; 2247:9; 2249:15; 2250:2;
2251:13, 24; 2252:2, 9, 12; 2253:4;
2254:4, 18; 2258:23; 2259:2; 2262:15;
2264:6; 2265:5; 2272:5, 9, 14, 16, 19;
2273:8, 13; 2274:3; 2275:22; 2277:15;
2278:4; 2281:13, 15, 24; 2286:6;
2287:1, 18; 2291:25; 2292:1, 6; 2295:9;
2298:18, 24
**LG's** [8] - 2243:20; 2244:6; 2245:12,
15; 2247:6; 2257:4, 11

**life** [1] - 2207:1
**light** [1] - 2218:19
**likelihood** [1] - 2230:4
**likely** [1] - 2298:25
**limit** [2] - 2188:24
**limitations** [1] - 2189:1
**limited** [5] - 2201:8; 2225:6, 12;
2227:7; 2267:3
**line** [38] - 2235:22; 2239:8; 2242:8;
2243:12; 2245:22; 2246:6, 8, 12;
2252:14; 2254:12; 2255:6, 9-10, 13, 16,
19, 25; 2256:3; 2263:9; 2264:24;
2288:24; 2289:1-3, 10, 13-14, 17, 21;
2295:4, 10-11, 16, 22; 2296:1
**linear** [1] - 2294:17
**lines** [9] - 2211:11; 2234:12; 2253:6,
17, 20; 2257:2; 2275:23; 2281:7;
2288:19
**lineup** [1] - 2294:18
**list** [2] - 2238:11
**listed** [1] - 2266:6
**listen** [1] - 2215:4
**LLP** [4] - 2179:9, 13, 17, 21
**load** [11] - 2245:24; 2246:9; 2250:5-7;
2252:19-21; 2256:8; 2257:19
**loads** [2] - 2255:12
**location** [2] - 2290:9; 2294:20
**locations** [1] - 2235:12
**logic** [6] - 2255:6, 9, 13, 16; 2256:3
**logo** [2] - 2265:16; 2266:8
**loneliest** [2] - 2233:23
**look** [26] - 2182:14; 2189:15; 2200:13;
2203:12, 19; 2204:1, 17-19, 24;
2207:20; 2210:6; 2218:12; 2219:7;
2225:17; 2236:9; 2260:9; 2261:6;
2272:11; 2274:1, 7; 2278:17, 23;
2296:2, 21; 2300:14
**looked** [7] - 2182:16; 2185:3; 2192:12;
2193:3, 5; 2208:10; 2285:16
**looking** [8] - 2203:8, 17; 2204:5;
2208:17; 2275:12; 2283:4; 2294:18;
2296:11
**looks** [2] - 2205:3; 2279:4
**lose** [2] - 2259:10; 2265:4
**lost** [5] - 2243:14; 2259:14; 2264:10
**Louisiana** [4] - 2178:11, 19, 23;
2179:6
**Love** [2] - 2178:22; 2181:24
**low** [6] - 2192:7; 2244:5, 12; 2247:3;
2276:19, 21
**low-priced** [1] - 2192:7
**Lowe's** [6] - 2185:4; 2238:10; 2239:5;
2244:20; 2257:9; 2259:24
**lower** [13] - 2193:7; 2239:11, 19, 24;
2252:25; 2254:16; 2255:1; 2256:2;
2274:4, 6; 2285:12; 2286:15
**lowering** [1] - 2288:22
**lowest** [1] - 2185:6
**lunch** [1] - 2217:17
**luncheon** [1] - 2302:23

# M

**machine** [2] - 2179:25; 2256:14
**Madness** [1] - 2249:16
**mail** [19] - 2238:9, 17; 2239:14;
2261:8, 20-21; 2262:6; 2292:23;
2293:12; 2294:1, 23; 2296:6, 9, 22;
2297:2, 18, 22; 2300:20
**mails** [3] - 2239:11; 2261:7; 2271:25
**main** [1] - 2260:14
**maintain** [3] - 2264:12; 2266:19;
2285:7
**major** [1] - 2281:20
**MAJORAS** [43] - 2181:20, 22; 2182:4,
9, 14; 2183:1; 2186:13; 2187:10, 13;
2189:3; 2195:24; 2196:25; 2197:4, 7,
15, 17, 21; 2198:6, 10, 17; 2199:24;
2200:6; 2201:24; 2202:9, 23; 2203:8,
17; 2204:9, 12, 16; 2217:14, 19;
2218:3; 2220:15; 2224:1, 5; 2225:16,
23; 2226:8, 13, 19, 24; 2250:10
**Majoras** [7] - 2178:10; 2181:22;
2199:10; 2209:18; 2216:1; 2218:4;
2220:14
**majoras** [1] - 2213:14
**man** [3] - 2233:23
**management** [1] - 2233:1
**manager** [18] - 2221:6, 12; 2232:16;
2235:14; 2239:15; 2240:4; 2244:25;
2245:3, 8, 10; 2247:10; 2258:9, 11;
2261:18; 2271:15; 2293:3
**manager's** [1] - 2290:3
**managers** [1] - 2236:18
**manner** [1] - 2210:25
**manufacturer** [2] - 2274:15
**manufacturers** [5] - 2255:3; 2265:15;
2272:13; 2277:2; 2286:3
**manufacturers'** [1] - 2266:2
**manufacturing** [4] - 2193:4; 2241:12,
18; 2242:24
**MAP** [34] - 2238:11; 2239:19; 2250:4;
2263:14; 2265:9, 12, 14, 19, 22, 24;
2266:3, 23; 2267:2, 10-11, 21-22;
2268:6-9, 11-13, 23, 25; 2269:12;
2271:5, 25; 2272:1; 2284:11; 2288:12
**MAP'd** [1] - 2268:10
**MAPs** [2] - 2239:12; 2249:8
**March** [4] - 2237:20; 2249:16; 2293:1
**margin** [3] - 2270:3, 5
**mark** [1] - 2181:14
**Mark** [3] - 2177:21; 2221:23; 2222:7
**mark.hamer@usdoj.gov** [1] - 2177:25
**market** [12] - 2193:7; 2213:4; 2234:16;
2235:5; 2242:1; 2245:1; 2251:25;
2256:9; 2267:11; 2272:24; 2281:6;
2285:17, 23; 2286:21; 2287:2
**market's** [1] - 2256:10
**marketing** [2] - 2261:15; 2271:12
**marketplace** [10] - 2211:13; 2212:23;

2213:8; 2221:10; 2251:9; 2252:3;
2262:5; 2267:13; 2284:21
  **Martin** [5] - 2261:8, 14-15, 20; 2262:10
  **material** [3] - 2299:9, 17; 2301:23
  **math** [1] - 2278:13
  **matter** [6] - 2182:2; 2215:11; 2222:5;
2236:3; 2290:20; 2303:3
  **mature** [1] - 2245:23
  **Maytag** [36] - 2221:4, 11; 2233:6, 9,
14-15, 18, 20, 22-23; 2234:1, 4, 8;
2235:3; 2240:8, 13, 15, 18-19, 24;
2241:1, 4, 25; 2242:3; 2243:13, 20, 22;
2249:14; 2251:11; 2256:8; 2259:7, 13;
2272:11
  **Maytag's** [5] - 2241:7, 9, 21-22;
2242:15
  **McDermott** [3] - 2261:17; 2262:6;
2292:2
  **McLoughlin** [29] - 2182:6, 14, 20;
2183:11; 2184:1, 13; 2185:1, 21;
2186:14, 22; 2194:22; 2198:3, 21, 24;
2200:19, 24; 2202:3, 11; 2211:18;
2212:4; 2216:2, 4, 7, 19, 23-24; 2225:7;
2226:20; 2231:9
  **McLoughlin's** [7] - 2185:10; 2204:20;
2212:10; 2218:13; 2219:5; 2227:4, 10
  **MDF** [1] - 2270:17
  **mean** [60] - 2185:14; 2186:9; 2187:24;
2188:11; 2189:20; 2190:16, 21; 2191:9;
2192:4; 2193:13; 2194:10; 2195:22;
2196:2; 2197:11; 2198:7; 2200:14;
2201:19; 2205:20; 2207:15; 2210:19;
2211:24; 2212:11; 2215:17, 21;
2216:13; 2227:13, 17, 20, 24; 2228:2,
9; 2230:3, 7, 10, 19; 2236:14; 2244:16;
2245:18; 2254:21; 2258:17; 2262:2;
2263:11; 2264:3; 2268:13; 2275:18;
2276:25; 2280:17; 2286:12; 2290:13;
2293:11, 23; 2294:8; 2295:6; 2298:4,
13, 22
  **meaning** [5] - 2264:22; 2286:12;
2289:17, 21
  **meaningful** [1] - 2194:7
  **means** [8] - 2255:8, 13; 2265:13;
2292:8; 2294:9; 2298:6, 23
  **meet** [4] - 2236:24; 2237:3; 2242:1;
2265:23
  **meeting** [4] - 2235:21; 2237:22;
2290:1
  **meetings** [2] - 2292:2
  **mega** [9] - 2237:6, 9, 11; 2238:5;
2239:2, 22; 2281:9, 20
  **Memorial** [3] - 2248:14; 2249:4;
2268:11
  **memories** [1] - 2240:25
  **memory** [1] - 2260:6
  **mention** [5] - 2182:5; 2185:17;
2260:23; 2291:15; 2296:4
  **mentioned** [18] - 2182:18; 2184:23;
2204:5; 2216:19; 2245:20; 2251:12;

2255:3; 2256:1, 5; 2258:15; 2264:20;
2265:24; 2268:6; 2269:5; 2271:19;
2273:21; 2279:22; 2292:19
  **merchandiser** [2] - 2233:16; 2264:15
  **merchandising** [8] - 2233:17; 2234:2,
13; 2235:24; 2238:16; 2240:2; 2262:23;
2270:17
  **merchant** [15] - 2238:22; 2239:6, 14,
23, 25; 2263:3; 2265:2; 2277:14;
2290:18; 2291:5; 2293:7, 15; 2294:25;
2296:10; 2299:4
  **merchants** [1] - 2240:5
  **merge** [1] - 2228:17
  **merger** [58] - 2183:18; 2185:13, 15;
2189:24; 2194:24; 2199:7, 14, 21;
2201:10, 16; 2202:1; 2203:17, 20,
24-25; 2204:10, 18-19; 2206:4, 6, 12,
15, 23; 2207:2, 20; 2208:12, 17-18, 25;
2209:2, 11, 14; 2212:2, 24; 2213:1, 9;
2214:5, 17; 2216:6; 2221:5, 10;
2240:18, 20, 22; 2241:8, 12, 17;
2242:18; 2243:21; 2248:5; 2251:10, 17
  **merging** [1] - 2208:7
  **met** [1] - 2241:1
  **Michael** [3] - 2179:20; 2194:16;
2261:17
  **Michele** [1] - 2191:17
  **Michigan** [1] - 2234:11
  **microwave** [1] - 2274:22
  **middle** [1] - 2193:11
  **might** [25] - 2182:24; 2188:18; 2190:7,
23, 25; 2203:3; 2218:22; 2225:9;
2239:13; 2242:13; 2255:11; 2259:17;
2263:7; 2268:10; 2270:4, 11; 2271:5,
24; 2280:22, 25; 2281:12; 2295:14;
2300:6
  **migrate** [3] - 2246:20; 2247:2; 2253:18
  **migrated** [5] - 2246:8; 2252:22, 25;
2254:17; 2274:5
  **migrating** [2] - 2254:12, 20
  **migration** [2] - 2255:1; 2273:16
  **Mike** [4] - 2181:18; 2261:18; 2292:2;
2293:3
  **million** [4] - 2253:13; 2264:11;
2292:12
  **millions** [2] - 2192:8; 2193:8
  **mind** [2] - 2191:24; 2260:12
  **mine** [1] - 2275:4
  **minimal** [1] - 2256:19
  **minimum** [5] - 2265:14, 18; 2266:11;
2267:9; 2301:15
  **minus** [1] - 2270:19
  **minute** [3] - 2205:24; 2261:4; 2283:14
  **minutes** [3] - 2222:3; 2302:5
  **misspeak** [1] - 2216:9
  **misspoke** [5] - 2198:3; 2224:8;
2225:8, 10
  **misspoken** [2] - 2182:16, 22
  **misstatement** [7] - 2186:16; 2187:14;
2217:21; 2218:6; 2224:25; 2227:11

  **mistake** [4] - 2187:6; 2227:18, 20;
2228:4
  **mistaken** [2] - 2184:5; 2205:16
  **mix** [1] - 2298:1
  **MLK** [1] - 2248:13
  **model** [6] - 2238:11; 2261:3; 2265:4;
2266:20; 2293:19; 2298:13
  **models** [5] - 2289:15; 2296:24;
2297:3; 2298:5
  **modification** [1] - 2230:24
  **Monday** [5] - 2194:18; 2195:4, 15;
2219:14; 2230:17
  **money** [1] - 2266:17
  **monitors** [1] - 2291:13
  **month** [6] - 2237:4; 2248:9; 2249:9,
14; 2284:5; 2291:4
  **months** [3] - 2238:20; 2272:21; 2273:3
  **MORNING** [2] - 2177:9; 2181:1
  **morning** [23] - 2181:3, 9, 11, 15-16,
19-21; 2182:1; 2187:4; 2194:18;
2197:18, 22; 2198:20; 2217:19;
2219:14; 2221:24; 2227:10; 2232:6, 11
  **most** [14] - 2224:24; 2235:2; 2246:20,
23; 2253:6; 2257:17; 2259:12; 2273:16,
23; 2277:3; 2282:1, 20; 2294:15
  **motion** [12] - 2187:20; 2188:6, 10, 12,
23; 2189:3, 7, 14; 2191:6; 2193:16;
2195:22; 2230:18
  **mounts** [1] - 2297:25
  **mouth** [1] - 2212:6
  **moved** [7] - 2234:4, 16; 2235:1, 5, 7;
2240:19
  **moving** [2] - 2246:15; 2290:21
  **MR** [198] - 2180:5; 2181:9, 12, 16, 20,
22; 2182:4, 9, 14; 2183:1, 4, 7, 10, 15;
2184:10, 13, 17; 2186:13; 2187:10, 13;
2189:3, 11, 13; 2190:1, 15, 24; 2191:1;
2192:7, 12, 15, 23; 2193:3, 20, 22, 24;
2194:3, 9, 14, 16; 2195:3, 12, 16, 18,
24; 2196:8, 12, 15, 17, 20, 22, 25;
2197:4, 7, 9, 11, 15, 17, 21; 2198:6, 10,
17, 19; 2199:6, 19, 22, 24; 2200:6;
2201:5, 24; 2202:9, 23; 2203:8, 17;
2204:9, 12, 16; 2205:18, 22; 2206:2, 8;
2207:3, 5, 9, 13, 17, 20, 25; 2208:5, 7,
10, 16; 2209:7, 13, 17, 21; 2210:4, 13,
22; 2211:7; 2212:14; 2213:13, 17;
2215:12, 19, 25; 2216:15, 19, 22;
2217:3, 5, 14, 19; 2218:3; 2220:12, 15,
19, 23; 2221:2, 19, 22, 25; 2222:2, 13,
16, 19, 21; 2223:9, 12, 17; 2224:1, 5,
24; 2225:2, 16, 23; 2226:8, 13, 19, 24;
2227:3, 6, 9; 2228:24; 2229:3, 6, 9, 11,
18, 24; 2230:2, 6, 9, 22; 2231:2, 4, 7,
13, 22, 25; 2232:3, 10; 2250:10, 15, 19,
25; 2251:6, 21; 2264:5; 2268:21;
2270:21; 2274:23, 25; 2275:3, 8, 10-11;
2279:11, 13; 2278:9; 2283:7, 9, 14,
18, 24; 2284:10, 15, 17, 25; 2285:3, 9;
2287:5; 2288:6; 2291:11; 2302:2, 5, 12

**multiple** [2] - 2212:18; 2218:11
**must** [4] - 2207:11; 2293:19, 23; 2301:6
**MVP** [1] - 2238:16

# N

**N.W** [1] - 2179:6
**name** [5] - 2277:4; 2291:15; 2300:15
**names** [1] - 2296:4
**Napa** [1] - 2235:6
**Natedra** [1] - 2239:13
**national** [19] - 2221:6; 2233:16; 2234:24; 2235:14; 2237:2; 2239:5, 14; 2240:4; 2244:17; 2245:2, 8, 10; 2247:10; 2257:10; 2267:14; 2271:14; 2290:2, 24
**nature** [3] - 2264:17; 2266:7; 2301:23
**NCAA** [1] - 2249:15
**near** [2] - 2202:11; 2293:8
**necessary** [2] - 2182:23; 2195:7
**need** [14] - 2184:7; 2189:16; 2191:13; 2198:6; 2220:8; 2243:7; 2263:21; 2278:4; 2289:20; 2293:9; 2297:25; 2299:11; 2301:3; 2302:10
**needed** [4] - 2182:24; 2195:4; 2235:25; 2262:14
**needs** [3] - 2199:8; 2224:2; 2299:10
**negotiation** [3] - 2238:19; 2239:18, 22
**negotiations** [1] - 2258:1
**net** [10] - 2269:11, 15-16; 2270:13, 18; 2271:7; 2272:1; 2279:16; 2292:9
**never** [12] - 2183:21; 2190:1; 2205:2; 2210:2, 4, 18; 2218:22; 2242:2; 2295:19; 2300:12
**nevertheless** [2] - 2207:14; 2210:17
**new** [23] - 2187:11; 2201:8, 11; 2225:3, 18; 2242:5; 2245:22, 24; 2253:2; 2265:8; 2272:6, 19, 23-24; 2273:1, 24; 2279:23; 2285:4; 2289:4, 8
**newer** [2] - 2274:3; 2279:24
**news** [1] - 2284:23
**newspaper** [5] - 2208:11, 19; 2250:21; 2266:6; 2271:24
**newspapers** [4] - 2208:11; 2274:10; 2284:19
**next** [9] - 2214:9; 2220:10, 18; 2261:22; 2263:17; 2278:23, 25; 2279:3; 2300:17
**nice** [1] - 2297:19
**night** [1] - 2190:6
**none** [6] - 2185:4, 7; 2195:16-18; 2198:2
**nonjury** [2] - 2187:18; 2214:22
**noon** [6] - 2195:23; 2196:1, 9; 2197:1
**normal** [4] - 2188:12; 2250:4; 2267:16; 2300:1
**normally** [2] - 2188:13; 2261:2
**North** [1] - 2179:3

**north** [1] - 2244:7
**Northern** [5] - 2235:1, 4, 6, 9; 2244:25
**note** [1] - 2284:15
**nothing** [2] - 2184:8; 2220:12
**notice** [2] - 2284:23; 2301:17
**notwithstanding** [1] - 2251:17
**NOVEMBER** [1] - 2181:1
**November** [10] - 2177:5; 2237:12; 2248:15; 2252:4; 2261:8; 2284:5; 2285:25; 2286:24; 2287:9; 2288:5
**nowhere** [2] - 2192:13; 2293:8
**number** [4] - 2186:18; 2244:16; 2253:15; 2265:4
**numbers** [1] - 2281:14
**nutshell** [1] - 2296:19
**NW** [12] - 2177:14, 18, 23; 2178:3, 7, 11, 19, 23; 2179:9, 13, 17, 21
**NX13** [1] - 2248:15

# O

**oath** [5] - 2184:1; 2186:6, 10, 14; 2191:12
**object** [5] - 2230:3; 2250:10; 2283:9, 11; 2284:25
**objection** [7] - 2183:2; 2231:23; 2284:1, 9-10, 14; 2285:8
**obligated** [1] - 2265:19
**observation** [1] - 2285:10
**observe** [5] - 2221:10; 2245:15; 2246:15; 2254:9; 2285:14
**observed** [10] - 2203:11, 20; 2241:3; 2252:5; 2254:11; 2256:20; 2265:25; 2277:7, 20; 2299:24
**occasions** [1] - 2186:18
**occur** [1] - 2295:10
**occurred** [1] - 2218:22
**occurs** [2] - 2239:22; 2246:25
**October** [2] - 2292:19; 2300:21
**OF** [10] - 2177:1, 3, 9, 13, 18, 22; 2178:3, 7; 2180:5; 2232:9
**offer** [15] - 2217:21; 2220:4; 2226:20; 2246:7; 2252:15; 2267:13, 20, 22; 2269:6; 2270:4, 22; 2272:23; 2277:20; 2282:22; 2294:23
**offered** [12] - 2218:10; 2228:10; 2246:19; 2247:20; 2249:18; 2270:12; 2275:17; 2279:20; 2280:9; 2282:3; 2284:1; 2285:24
**offering** [6] - 2216:12; 2220:6; 2238:12; 2239:24; 2254:13; 2275:22; 2276:4; 2278:18, 22; 2283:19
**offerings** [1] - 2246:6
**offers** [7] - 2249:25; 2269:4; 2278:7; 2281:24; 2284:21; 2285:20
**office's** [1] - 2189:20
**officer** [1] - 2261:15

**Official** [1] - 2303:7
**often** [10] - 2189:24; 2213:2; 2225:24; 2247:14; 2248:1, 7; 2262:23; 2280:15; 2290:11; 2299:5
**oftentimes** [2] - 2239:10; 2275:19; 2280:20; 2294:14; 2299:15, 19
**OH** [1] - 2179:4
**oil** [1] - 2299:18
**older** [1] - 2296:9
**once** [1] - 2237:4
**one** [50] - 2182:5, 10; 2183:11; 2186:3; 2191:24; 2192:5; 2194:13, 16; 2199:15; 2201:10; 2203:7; 2206:5, 22-23; 2207:6, 21; 2208:11, 19; 2209:18; 2210:19; 2215:12; 2223:12, 16-17; 2224:20; 2225:3; 2226:2; 2227:17; 2228:11; 2235:22; 2240:24; 2244:16; 2247:1; 2254:18; 2256:10; 2259:14; 2260:11, 14; 2266:16; 2270:11; 2271:8; 2275:2; 2282:20; 2292:25; 2296:2; 2297:23; 2300:17
**one-for-one** [1] - 2259:14
**ongoing** [2] - 2191:23; 2262:25
**op** [2] - 2265:23; 2270:15
**opaque** [2] - 2271:22
**open** [5] - 2216:10; 2236:10; 2263:21; 2295:11
**operated** [1] - 2222:24
**operating** [1] - 2264:11
**opinion** [17] - 2191:24; 2200:11, 25; 2201:15; 2204:20; 2210:24; 2212:10, 14-15; 2218:18; 2226:20; 2251:16; 2272:12; 2287:1; 2301:19
**opportunities** [2] - 2249:12; 2295:13
**opportunity** [29] - 2183:17; 2186:11; 2188:14; 2190:6, 11; 2201:1; 2205:17; 2206:1; 2216:24; 2217:9; 2223:10; 2226:7; 2230:20; 2231:8, 11; 2237:23; 2244:18; 2245:11; 2249:6; 2256:1; 2264:23; 2270:3, 5; 2284:12; 2285:3; 2289:17, 22; 2295:7; 2299:16
**oppose** [1] - 2230:25
**opposing** [3] - 2191:11; 2218:2; 2221:17
**option** [4] - 2210:19, 21-22; 2233:1
**options** [2] - 2184:6; 2214:22
**order** [11] - 2237:24; 2250:14, 23; 2251:1, 5; 2260:1; 2283:14, 25; 2290:10; 2302:18
**original** [2] - 2249:10; 2296:9
**originally** [1] - 2300:20
**otherwise** [2] - 2212:1; 2290:16
**OTR** [1] - 2274:22
**outcome** [1] - 2228:20
**outpace** [1] - 2287:2
**outside** [4] - 2209:3; 2249:17; 2267:20; 2286:17
**oval** [2] - 2274:15; 2273:18
**oven** [9] - 2254:11, 13; 2255:25; 2256:2; 2273:13-15; 2280:5

**ovens** [3] - 2254:12; 2256:1; 2273:22
**over-the-range** [1] - 2274:21
**overall** [3] - 2239:5; 2292:9; 2293:14
**overnight** [1] - 2185:4
**overview** [1] - 2237:25
**own** [2] - 2219:5; 2265:21

# P

**p.m** [2] - 2196:17; 2302:24
**pace** [1] - 2272:6
**package** [16] - 2275:21; 2276:5; 2278:14; 2279:8, 11, 13, 19-20; 2280:8, 22; 2281:1, 10; 2285:11; 2287:13
**packages** [1] - 2285:16
**Page** [1] - 2180:4
**page** [9] - 2189:1; 2261:8, 22; 2274:11; 2275:13; 2282:2; 2296:21; 2301:1
**pages** [1] - 2196:24
**paid** [2] - 2270:12
**painted** [1] - 2212:19
**pair** [3] - 2250:5
**panel** [1] - 2282:10
**panoply** [1] - 2215:22
**part** [27] - 2182:10; 2187:5; 2193:7, 9, 18; 2197:18; 2204:5; 2205:2, 23; 2207:9, 14; 2216:13; 2218:7; 2224:1, 11, 14; 2235:7; 2236:17, 19, 21; 2286:7, 19; 2301:14, 19; 2302:3, 19
**participate** [5] - 2265:22; 2266:22; 2267:2, 10; 2295:4
**participating** [1] - 2268:14
**particular** [40] - 2182:10, 17; 2187:4; 2233:21; 2236:25; 2239:8; 2242:8, 11, 13; 2243:11; 2247:2, 22, 25; 2254:12, 22; 2255:9, 13; 2265:11; 2270:11; 2271:15; 2273:14; 2281:20; 2289:5, 22; 2291:22, 24-25; 2292:3, 11, 18, 20, 22; 2293:4, 15; 2294:25; 2295:14; 2296:10; 2298:13; 2299:14; 2300:5
**particularly** [1] - 2233:20
**parties** [4] - 2181:7; 2218:11; 2302:12
**partner** [1] - 2258:19
**partnered** [4] - 2244:17-19; 2257:9
**partnership** [2] - 2258:6; 2292:18
**parts** [1] - 2209:23
**party** [5] - 2193:21, 23; 2194:2; 2200:1; 2221:16
**pass** [1] - 2238:13
**past** [2] - 2211:21; 2287:25
**Paul** [4] - 2179:8, 12; 2181:16, 18
**paul.denis@dechert.com** [1] - 2179:15
**paul.friedman@dechert.com** [1] - 2179:11
**Paula** [2] - 2178:14; 2181:24
**pause** [1] - 2275:7
**pausing** [1] - 2199:9

**paying** [1] - 2240:21
**people** [7] - 2190:21; 2193:13; 2216:9; 2230:11; 2271:11; 2272:15; 2282:18
**per** [4] - 2281:9, 11, 14
**percent** [37] - 2184:22; 2236:9; 2241:9, 16, 19, 22, 25; 2242:4, 16, 19-20, 22; 2244:10, 12; 2251:25; 2253:10, 12, 14, 16, 24-25; 2264:7; 2267:11-13, 16, 20, 22-23; 2269:6; 2270:5, 11, 16; 2296:23; 2300:6
**percentage** [1] - 2253:22
**percipient** [1] - 2185:23
**perfect** [1] - 2197:2
**performance** [3] - 2239:8; 2264:16; 2288:3
**performing** [1] - 2265:3, 5
**perhaps** [2] - 2187:1; 2190:6
**period** [19] - 2188:8; 2189:8; 2223:21; 2233:5; 2247:5, 21; 2248:16, 18; 2249:1, 15; 2258:10; 2264:8; 2277:18; 2285:6, 25; 2288:2; 2291:4; 2301:16
**periods** [5] - 2248:23; 2249:10, 17; 2267:20; 2288:20
**permitted** [1] - 2283:15
**person** [2] - 2182:23; 2283:22
**personal** [2] - 2184:2; 2188:3
**perspective** [9] - 2237:10; 2249:5; 2253:9; 2258:11; 2260:1; 2266:2, 5
**persuade** [2] - 2187:21; 2188:18
**Peter** [2] - 2178:22; 2181:24
**PFE** [1] - 2298:10
**phase** [7] - 2202:12; 2217:7, 10; 2220:6; 2226:10; 2231:17
**phone** [4] - 2182:23; 2236:9; 2239:10
**phones** [1] - 2252:7; 2258:16
**pick** [1] - 2235:22
**picture** [1] - 2212:13
**piece** [4] - 2214:7; 2216:8; 2294:3
**pieces** [2] - 2280:19; 2298:18
**pjlove@jonesday.com** [1] - 2178:25
**place** [2] - 2281:7; 2294:13
**placement** [1] - 2265:17
**places** [1] - 2225:9
**Plaintiff** [3] - 2177:4, 13; 2178:2
**plan** [5] - 2182:18; 2224:3; 2250:16; 2264:11
**planned** [1] - 2196:4
**planning** [5] - 2196:6; 2223:23; 2235:23; 2237:19; 2238:8
**planogram** [1] - 2259:22
**planograms** [1] - 2260:3
**plastic** [2] - 2256:18; 2300:7
**plead** [1] - 2211:20
**pled** [5] - 2202:22; 2208:15; 2210:18; 2215:9
**podium** [1] - 2181:7
**POGUE** [1] - 2179:2
**point** [21] - 2184:13; 2187:14; 2193:7, 9; 2203:14; 2208:22; 2229:12; 2231:13;

2235:8; 2246:13; 2247:2, 10; 2254:22; 2256:11, 21; 2258:18; 2260:20; 2278:19; 2289:11, 14; 2292:21
**Point** [1] - 2179:3
**points** [18] - 2187:21; 2188:7, 17; 2198:13; 2247:3; 2253:1; 2254:17, 23-24; 2255:1, 13; 2256:4; 2257:1; 2270:6; 2274:4, 6
**policy** [2] - 2265:15; 2266:3
**poorly** [1] - 2263:1
**porcelain** [1] - 2256:18
**portfolio** [2] - 2253:5; 2261:24
**portion** [2] - 2217:11; 2243:3
**position** [9] - 2199:20; 2228:14; 2232:15; 2238:23; 2239:16; 2245:10; 2258:14; 2261:18; 2276:3
**positioning** [1] - 2290:15
**positions** [3] - 2233:14; 2293:9, 19
**possibilities** [2] - 2218:15, 17
**possible** [4] - 2280:19; 2285:4; 2301:14, 21
**post** [1] - 2250:12
**post-discovery** [1] - 2250:12
**Posthauer** [8] - 2220:21; 2221:2, 23; 2232:4, 11, 13; 2275:12; 2278:25
**POSTHAUER** [3] - 2180:5; 2232:8
**posthauer** [1] - 2285:10
**potentially** [6] - 2185:24; 2199:1; 2257:7; 2263:13; 2264:23; 2271:6; 2289:6; 2290:5; 2293:14
**pour** [1] - 2212:6
**power** [2] - 2270:9; 2294:16
**powerful** [5] - 2201:7; 2215:3, 7; 2221:15
**practical** [1] - 2229:12
**pre** [1] - 2204:19
**pre-merger** [1] - 2204:19
**precisely** [1] - 2294:25
**predict** [4] - 2203:15; 2204:13; 2207:1; 2227:14
**predictability** [1] - 2207:15
**predicting** [1] - 2206:11
**prediction** [6] - 2227:15; 2287:6, 8, 10, 18, 23
**predictions** [3] - 2210:16; 2227:15; 2284:7
**preference** [1] - 2223:3
**prejudice** [1] - 2284:24
**prejudiced** [1] - 2285:2
**preliminary** [1] - 2182:2
**Premier** [1] - 2184:24
**Premium** [1] - 2240:17
**prender@jonesday.com** [1] - 2178:17
**prepared** [3] - 2208:2; 2225:3; 2299:25
**present** [3] - 2223:11; 2231:16; 2238:11
**presentation** [1] - 2297:6
**presented** [1] - 2192:10

**president** [4] - 2193:24; 2228:15; 2238:16; 2262:23
**President's** [2] - 2248:14; 2249:3
**presidents** [1] - 2240:2
**presiding** [1] - 2187:19
**press** [1] - 2185:15
**pretty** [11] - 2212:11; 2224:9; 2241:5; 2256:18; 2268:5; 2271:21; 2276:19; 2280:13; 2281:25; 2282:6; 2287:19
**prevent** [1] - 2301:22
**previous** [2] - 2272:14; 2281:15
**previously** [1] - 2202:22
**price** [77] - 2193:7, 9; 2239:19; 2246:13, 15-16; 2247:2; 2251:22; 2252:25; 2254:16, 22-24; 2255:1, 13; 2256:4, 11, 21; 2257:1, 12; 2263:12; 2265:18, 20, 22, 25; 2267:3, 9; 2268:23; 2269:11, 14-17, 21; 2270:4, 7, 18-19, 25; 2271:3, 5; 2274:4, 6; 2276:6, 11-13, 17; 2277:21; 2279:8, 11, 16; 2284:4; 2288:22; 2292:9, 15; 2296:14, 16, 18, 23; 2298:24; 2299:13, 20, 23; 2300:1, 8, 13, 21-22; 2301:16, 21
**priced** [1] - 2192:7
**prices** [22] - 2182:12; 2185:6; 2216:25; 2217:1, 3; 2224:9; 2239:11, 24; 2251:9; 2271:7, 25; 2272:1; 2285:11; 2286:15; 2298:25; 2299:10, 17-18; 2301:25
**Pricing** [1] - 2271:17
**pricing** [33] - 2187:2; 2198:1; 2217:16; 2224:8; 2238:18; 2250:12, 18, 23; 2251:22; 2265:9, 12, 14, 24; 2266:23; 2267:2; 2269:18, 20; 2271:11, 13, 19, 21; 2272:3; 2284:8, 11; 2288:7, 10-11, 13; 2292:8; 2300:3
**primarily** [1] - 2292:6
**primary** [3] - 2234:7; 2240:16; 2292:1
**print** [4] - 2277:7; 2278:5
**private** [3] - 2234:13; 2263:22
**problem** [2] - 2214:4; 2215:16
**problems** [1] - 2223:22
**proceed** [5] - 2185:11; 2186:2; 2217:9; 2220:5; 2232:1
**proceedings** [3] - 2275:7; 2302:18; 2303:3
**PROCEEDINGS** [1] - 2177:9
**Proceedings** [1] - 2179:25
**process** [15] - 2206:9, 16-17; 2207:18; 2218:9; 2219:16; 2224:2; 2235:17; 2238:19; 2271:21; 2277:14; 2299:8; 2301:18, 21
**produced** [3] - 2179:25; 2183:23; 2283:10
**product** [95] - 2234:12; 2235:15, 22; 2236:11, 18; 2239:8; 2242:8; 2243:11; 2245:22; 2246:2, 6, 9, 24; 2247:22, 25; 2248:2-4; 2252:6, 19, 22; 2253:5, 17; 2254:10, 12; 2255:10; 2257:2, 21; 2260:20; 2262:7; 2263:9; 2264:24; 2265:3, 6, 8, 11; 2266:8, 14; 2267:4;

2268:3, 10, 12, 14-15; 2269:2; 2272:6, 13, 19-20, 22-23, 25; 2273:1, 4; 2275:23; 2276:12, 24; 2280:3, 19; 2281:7; 2283:19; 2286:10, 14; 2288:19, 23; 2289:3-5, 7-9, 13; 2290:4, 17; 2293:15; 2295:8, 13-14; 2300:6
**product's** [1] - 2265:8
**production** [2] - 2286:14; 2302:20
**productive** [2] - 2264:22; 2288:23; 2289:16; 2290:7, 10; 2293:9, 25; 2295:8
**productivity** [14] - 2236:12, 15, 25; 2260:25; 2261:2; 2262:24; 2263:9, 14; 2264:16, 20; 2265:7; 2291:2; 2293:8; 2298:23
**products** [17] - 2233:22; 2238:11; 2246:7; 2253:5, 20; 2254:13; 2260:17; 2273:10; 2274:3, 17; 2279:19; 2280:23; 2281:4; 2282:9; 2286:17; 2291:6; 2292:16
**Professor** [4] - 2194:16; 2195:13; 2214:9; 2220:20
**proffer** [2] - 2205:20; 2221:1
**Profile** [1] - 2298:15
**program** [6] - 2234:8; 2265:23; 2266:3; 2267:3, 10; 2268:15
**programming** [2] - 2292:7; 2293:13
**progression** [1] - 2263:16
**project** [1] - 2259:16
**projected** [1] - 2284:7
**promo** [2] - 2249:7; 2262:11
**promote** [5] - 2248:2; 2249:13; 2265:11; 2286:7; 2290:15
**promoted** [1] - 2235:7
**promotes** [2] - 2249:15; 2281:21
**promoting** [1] - 2281:19
**promotion** [12] - 2237:9, 11; 2238:2, 19; 2247:6, 16; 2248:9, 21; 2267:17, 24; 2268:16
**promotional** [41] - 2235:24; 2237:14; 2238:11; 2239:12, 17, 19; 2247:17, 21; 2248:1, 6, 8, 18, 23; 2249:2, 8, 17, 20, 22, 25; 2263:8, 10-11, 14; 2265:10; 2267:20-22; 2268:6, 8-11, 13, 25; 2277:19; 2285:25; 2288:12; 2295:14
**promotions** [10] - 2237:6; 2238:23; 2239:1; 2247:13; 2248:13; 2249:20; 2267:19; 2268:4; 2286:6
**proposal** [2] - 2292:25; 2294:2
**proposed** [4] - 2296:16; 2297:11; 2301:8
**proposing** [1] - 2298:24
**prosecuting** [1] - 2189:21
**prosecutions** [1] - 2189:23
**prospective** [2] - 2259:24; 2264:10
**protecting** [1] - 2266:20
**proven** [1] - 2204:3
**provide** [16] - 2222:13; 2238:9; 2249:6; 2255:3; 2266:17; 2268:11; 2278:3; 2283:15; 2289:17; 2290:25;

2293:13; 2297:11; 2299:17; 2300:6; 2301:5, 15
**provided** [5] - 2208:24; 2244:18; 2257:9; 2293:8; 2296:15
**provides** [2] - 2255:2; 2299:22
**providing** [2] - 2206:18; 2300:5
**publication** [1] - 2277:24
**published** [1] - 2250:20
**Publishing** [1] - 2222:17
**pull** [3] - 2261:9; 2274:11; 2291:12
**purchase** [4] - 2275:23; 2280:16, 24; 2299:5
**purchasing** [1] - 2246:24
**Purdue** [1] - 2232:23
**purpose** [3] - 2225:12, 14; 2227:7
**purposes** [3] - 2223:23; 2226:10; 2231:19
**pursuant** [1] - 2187:25
**push** [1] - 2301:21
**pushed** [1] - 2254:16
**put** [8] - 2191:1; 2203:10, 20, 22; 2205:4; 2212:15; 2279:8; 2289:20
**putting** [1] - 2260:16

## Q

**quality** [2] - 2246:21; 2266:11
**quarterly** [2] - 2270:12; 2291:5
**query** [1] - 2191:10
**question's** [1] - 2202:14
**questioning** [3] - 2200:9; 2202:3, 5
**questions** [13] - 2183:13; 2185:20; 2187:9; 2209:16; 2210:9; 2216:10, 23; 2218:13; 2229:14; 2291:15
**quick** [1] - 2258:22
**quicker** [1] - 2272:23
**quickly** [3] - 2202:2; 2290:3; 2292:14
**Quintero** [1] - 2194:20
**Quintero's** [1] - 2194:24
**quite** [5] - 2185:6; 2213:1; 2225:24; 2238:19; 2247:1
**quote** [1] - 2205:15
**quote-unquote** [1] - 2205:15

## R

**race** [1] - 2294:17
**rack** [1] - 2252:25
**raise** [3] - 2226:17; 2298:25; 2301:25
**raised** [13] - 2182:5; 2186:22; 2199:8; 2200:1, 7; 2201:19; 2203:14; 2207:11; 2224:16, 22; 2227:10; 2292:15
**raises** [1] - 2185:24
**raising** [3] - 2197:18; 2210:10
**range** [49] - 2182:17; 2184:14; 2185:8; 2198:8, 21-23; 2199:10; 2218:5, 14, 16; 2246:6; 2254:11, 14, 19; 2255:18; 2256:2, 24; 2266:7; 2268:22; 2269:1;

2270:4; 2273:16, 25; 2274:21; 2276:1;
2278:20; 2280:1, 4-5; 2287:9, 12;
2288:11; 2289:18
    **ranges** [27] - 2185:1; 2192:7; 2193:6,
8; 2209:19; 2214:3; 2216:3, 20;
2223:15; 2224:25; 2225:8; 2231:9;
2253:4; 2255:14, 16; 2273:13, 23-25;
2287:7, 12, 15, 22; 2288:8; 2289:5
    **rapidly** [1] - 2292:20
    **rate** [7] - 2236:13; 2261:2; 2262:24;
2265:3; 2289:19, 24; 2290:14
    **rates** [1] - 2270:3
    **rather** [3] - 2212:6; 2269:8; 2296:1
    **rationale** [1] - 2266:1
    **raw** [2] - 2299:9, 17
    **RDR** [3] - 2179:24; 2303:2, 6
    **RDR-CRR** [1] - 2303:2
    **re** [2] - 2226:13; 2228:18
    **re-examine** [1] - 2228:18
    **re-testify** [1] - 2226:13
    **reaction** [1] - 2296:17
    **read** [5] - 2192:13, 21-22; 2193:1
    **reading** [2] - 2192:20; 2271:24
    **reads** [1] - 2192:23
    **realistic** [1] - 2207:7
    **realized** [1] - 2182:16
    **realizes** [1] - 2190:3
    **really** [48] - 2192:16; 2203:14, 21;
2206:15; 2227:18; 2229:1; 2233:12;
2234:8, 10; 2236:11; 2237:12; 2238:4;
2245:17; 2246:2, 7; 2247:9; 2248:2, 4;
2252:10; 2253:5; 2257:8, 16; 2258:22;
2260:17, 22, 24; 2262:25; 2263:6;
2270:24; 2271:14; 2272:22; 2273:14,
20-21, 24; 2275:22; 2278:20; 2284:19;
2285:25; 2286:5, 7; 2288:19; 2290:23;
2291:25; 2292:1; 2301:13
    **realtime** [5] - 2250:17, 19, 23; 2251:2
    **rear** [1] - 2246:10
    **reason** [4] - 2209:24; 2218:5; 2224:20;
2301:19
    **reasonable** [3] - 2196:16; 2197:8;
2204:14
    **reasons** [1] - 2215:2
    **REAVIS** [1] - 2179:2
    **rebate** [1] - 2270:12
    **rebates** [1] - 2270:10
    **rebut** [1] - 2226:7
    **rebuttal** [18] - 2194:25; 2195:4, 6;
2217:7, 10; 2220:4, 6; 2226:10, 14-15,
17, 21, 25; 2229:4, 16; 2231:17
    **rebutting** [1] - 2226:11
    **recalled** [1] - 2188:2
    **recapture** [1] - 2293:1
    **recently** [2] - 2198:16; 2273:23
    **recess** [3] - 2220:9, 17; 2302:23
    **recognize** [3] - 2188:19; 2210:22;
2214:2
    **recognized** [2] - 2199:6; 2214:10
    **recollection** [10] - 2186:16; 2216:16;

2217:5; 2241:7; 2242:20; 2246:13;
2248:7; 2257:6; 2258:3; 2288:13
    **record** [21] - 2181:8; 2186:21; 2188:5;
2194:6; 2198:11; 2200:23; 2201:2;
2203:11; 2217:20; 2219:7; 2291:9;
2303:3
    **recount** [1] - 2213:18
    **recross** [2] - 2226:24
    **red** [1] - 2245:25
    **Red** [1] - 2285:19
    **redactions** [1] - 2291:13
    **redirect** [2] - 2186:11; 2216:24
    **reduce** [5] - 2263:8, 10-11, 13;
2293:13
    **reduction** [4] - 2265:9; 2292:13
    **refer** [15] - 2236:12; 2248:25; 2252:7;
2259:21; 2260:19; 2261:1; 2267:15;
2269:16; 2270:8, 20; 2277:6; 2289:3;
2294:13
    **referenced** [1] - 2222:16
    **referred** [3] - 2235:8; 2237:13; 2249:4
    **referring** [2] - 2262:4; 2267:19
    **refers** [3] - 2243:9; 2265:14; 2270:9
    **reflected** [1] - 2284:25
    **reflects** [2] - 2260:22; 2270:5
    **refrigeration** [11] - 2212:8; 2250:1;
2253:2, 8, 15, 20; 2254:6; 2257:18, 20;
2287:18; 2297:3
    **refrigerator** [16] - 2274:20;
2275:19-21; 2279:21; 2280:15, 21, 23;
2281:1; 2282:8; 2289:18; 2294:19;
2298:16; 2299:1, 4
    **refrigerators** [3] - 2260:16; 2287:15;
2299:5
    **regard** [1] - 2200:25
    **regarded** [1] - 2211:10
    **regarding** [1] - 2247:6
    **regional** [4] - 2235:11; 2237:1; 2257:8;
2267:14; 2290:22, 24
    **regular** [1] - 2237:4
    **rekindle** [1] - 2292:22
    **relationship** [4] - 2191:9; 2258:18, 22;
2292:22
    **relative** [1] - 2211:25
    **relatively** [1] - 2243:25
    **release** [1] - 2185:15
    **relevance** [1] - 2202:24
    **relevant** [5] - 2204:21; 2205:4;
2214:25
    **reliable** [1] - 2215:6
    **relied** [1] - 2194:23
    **reluctant** [1] - 2189:1
    **rely** [1] - 2215:10
    **relying** [4] - 2207:23; 2211:6; 2215:2
    **remain** [5] - 2290:10; 2298:18;
2302:10, 13
    **remained** [1] - 2254:24; 2256:6;
2257:1
    **remember** [1] - 2278:13
    **remind** [1] - 2263:24

    **reminded** [1] - 2194:1
    **Render** [2] - 2178:14; 2181:24
    **reopen** [6] - 2224:10, 20; 2226:3;
2227:4; 2228:25; 2229:1
    **reopened** [1] - 2225:12, 14
    **reopening** [4] - 2224:14; 2231:5, 7, 14
    **repeat** [3] - 2212:12; 2268:17; 2300:16
    **repeatedly** [1] - 2211:8
    **replaced** [3] - 2259:13; 2290:16;
2292:2
    **replacing** [1] - 2260:8
    **replied** [1] - 2293:5
    **reply** [2] - 2197:6, 13
    **reported** [1] - 2179:25
    **Reporter** [2] - 2179:24; 2303:7
    **reports** [1] - 2192:13
    **represent** [2] - 2230:24; 2253:23
    **representation** [2] - 2236:1, 3
    **representative** [3] - 2229:19; 2234:3;
2266:14
    **represented** [3] - 2191:11; 2233:17;
2260:5
    **represents** [2] - 2253:14; 2277:1
    **request** [2] - 2299:23, 25
    **requested** [1] - 2200:12
    **require** [5] - 2201:12; 2299:13;
2301:20
    **required** [1] - 2301:14
    **requirement** [3] - 2266:11; 2299:17
    **requirements** [3] - 2208:21; 2265:16,
24
    **requiring** [1] - 2301:4
    **researched** [1] - 2198:15
    **resolve** [4] - 2189:10; 2190:25;
2219:13; 2220:3
    **resolved** [4] - 2192:6; 2195:9;
2219:11; 2227:12
    **respect** [4] - 2224:22; 2240:22;
2252:5; 2256:23
    **respond** [3] - 2202:16, 18; 2230:20
    **responded** [2] - 2226:6; 2297:6
    **response** [9] - 2188:8; 2189:8;
2194:25; 2195:5; 2196:2, 23; 2209:16;
2224:6; 2261:21
    **responses** [1] - 2218:13
    **responsibilities** [6] - 2234:5, 17,
24-25; 2235:3; 2260:15
    **responsibility** [8] - 2234:1, 7, 10;
2235:9; 2236:18, 22; 2271:14; 2290:25
    **responsible** [9] - 2221:6; 2234:9, 12,
15, 22; 2235:18; 2239:15; 2240:3;
2271:12
    **result** [3] - 2199:15; 2239:23; 2301:4
    **resulted** [1] - 2292:13
    **results** [3] - 2251:2; 2287:8
    **retail** [10] - 2217:1, 3; 2256:4; 2263:13;
2265:22, 25; 2272:3; 2276:6; 2290:9;
2299:12
    **retailer** [6] - 2247:23; 2265:19;

2266:15; 2268:14; 2290:6; 2294:15

**retailers** [8] - 2185:4; 2193:5; 2250:24; 2266:22; 2267:2; 2282:16; 2288:22; 2300:12

**retails** [1] - 2298:1

**return** [2] - 2302:15

**returned** [1] - 2301:7

**revenue** [6] - 2262:21, 24; 2264:1, 12; 2292:14

**revenues** [1] - 2263:16

**reversal** [1] - 2213:1

**reverse** [2] - 2295:16, 18

**review** [25] - 2183:17; 2188:6; 2190:6; 2194:7; 2223:20; 2288:24; 2289:1-4, 7, 9-10, 13-14, 17, 21; 2295:5, 11, 16, 22; 2297:14; 2301:8

**reviewing** [1] - 2215:2

**reviews** [3] - 2295:4, 10; 2296:1

**rhythm** [2] - 2237:2; 2247:20

**Rob** [2] - 2220:21; 2232:3

**ROBERT** [2] - 2180:5; 2232:8

**Roberts** [1] - 2191:18

**role** [2] - 2234:3

**roles** [3] - 2234:4; 2235:5

**Ronald** [1] - 2194:20

**room** [1] - 2219:12

**Room** [1] - 2177:14

**rose** [1] - 2181:12

**rosy** [1] - 2212:13

**roughly** [2] - 2242:23; 2244:19

**round** [2] - 2254:15; 2283:4

**rounded** [1] - 2253:5

**rule** [4] - 2187:17; 2189:16; 2193:14; 2228:4

**Rule** [1] - 2188:15

**ruled** [1] - 2186:4

**rules** [5] - 2187:25; 2190:13; 2225:17; 2228:3

**run** [6] - 2239:2; 2261:2; 2262:23; 2289:19, 24; 2290:14

**running** [2] - 2184:21; 2289:20

## S

**sale** [4] - 2235:23; 2283:16; 2284:5; 2291:3

**sales** [47] - 2184:23; 2193:4; 2221:12; 2232:16; 2233:25; 2234:4, 6, 9, 13; 2235:21; 2236:2, 13, 18; 2240:1; 2244:25; 2251:2; 2253:22; 2260:3; 2261:19; 2262:10; 2280:12; 2282:17; 2283:15, 18; 2284:2, 7; 2285:19; 2286:2; 2287:1, 9-13; 2290:24; 2291:1, 4; 2299:5, 24; 2300:2

**Samsung** [98] - 2182:12; 2184:14, 19; 2185:2, 8, 22; 2192:8; 2198:22; 2199:11; 2211:9, 11; 2212:5; 2214:2, 10-11, 13-14, 16; 2216:3, 24; 2218:5; 2221:9; 2223:15; 2224:9, 25; 2225:8;

2243:18; 2244:2, 19; 2247:9; 2250:2, 4; 2251:13, 24; 2252:2, 9; 2253:7; 2254:18; 2257:5, 18, 22; 2258:5, 7, 12, 22, 24; 2259:4, 12; 2261:23; 2262:3, 15, 18; 2264:3; 2265:5; 2272:5, 8, 14, 16, 19; 2273:8, 23; 2274:3; 2275:14, 21; 2276:2, 11; 2277:15, 21, 23; 2278:4; 2279:4, 20, 23; 2280:9; 2281:1, 6, 13, 16, 20; 2282:13; 2285:11; 2286:5; 2287:1, 9, 20; 2288:8; 2291:25; 2292:1, 6; 2295:9; 2298:18, 24

**Samsung's** [7] - 2244:8; 2257:14; 2263:7, 16; 2273:15; 2274:16; 2282:1

**San** [2] - 2245:1

**Saran** [1] - 2255:20

**Saturday** [2] - 2196:10, 17

**save** [5] - 2230:16; 2263:24; 2267:15, 23; 2279:15

**saving** [1] - 2279:12

**savings** [4] - 2279:9; 2281:2; 2282:6, 14

**saw** [1] - 2247:8

**scale** [2] - 2286:11

**scenario** [1] - 2228:12

**schedule** [4] - 2220:19; 2262:11; 2300:22

**scheduled** [1] - 2194:11

**school** [2] - 2232:21

**scope** [3] - 2205:14; 2219:19; 2225:18

**score** [1] - 2284:1

**Scott** [4] - 2179:24; 2303:2, 5

**screen** [7] - 2260:10; 2261:6; 2274:9, 12; 2275:5; 2279:2; 2291:16

**screwed** [1] - 2191:13

**search** [1] - 2190:5

**Sears** [2] - 2185:4; 2259:24

**Sears'** [1] - 2243:4

**season** [1] - 2285:23

**second** [3] - 2222:6; 2256:7; 2302:16

**section** [2] - 2209:11; 2261:10

**Section** [1] - 2211:24

**see** [46] - 2183:4; 2184:8; 2185:9; 2186:1; 2197:23; 2198:11; 2200:9; 2211:25; 2215:18; 2224:6; 2227:24; 2228:6; 2230:20, 22-23; 2239:1, 21; 2242:13; 2246:5; 2249:24; 2261:12; 2262:8, 12; 2274:13; 2275:18; 2277:5; 2279:5, 9; 2280:4; 2281:1; 2282:3; 2293:21; 2294:6; 2296:9, 25; 2297:4, 8, 13, 20; 2298:2, 11, 20; 2300:24; 2301:10; 2302:8

**seeking** [1] - 2211:22

**seem** [2] - 2188:9; 2195:9

**select** [1] - 2296:24

**self** [1] - 2255:22

**sell** [23] - 2214:2; 2234:11; 2236:12, 15-16, 18, 25; 2260:11, 14, 19-20, 22, 24; 2264:21; 2265:19; 2267:4, 9; 2280:18; 2292:6

**sell-through** [8] - 2236:12, 15, 25;

2260:11, 19, 22, 24; 2264:21

**sell-to** [4] - 2236:16; 2260:11, 14, 20

**seller** [3] - 2264:15; 2266:15; 2287:7

**selling** [13] - 2185:5, 7; 2192:9; 2216:23; 2234:10; 2260:17, 21-22; 2269:14; 2290:20; 2292:6, 15

**send** [2] - 2239:14

**sense** [5] - 2209:9; 2221:8; 2226:22; 2237:25; 2249:24

**sensitive** [1] - 2191:7

**sent** [3] - 2261:20; 2296:6, 10

**separate** [5] - 2207:15; 2209:20; 2214:18; 2300:3

**sequence** [1] - 2240:7

**sequencing** [1] - 2217:14

**series** [1] - 2261:7

**serve** [2] - 2245:19; 2260:2

**serves** [1] - 2260:6

**session** [2] - 2263:22

**SESSION** [2] - 2177:9; 2181:1

**set** [2] - 2209:4; 2281:18

**seven** [1] - 2202:10

**several** [3] - 2210:8; 2223:14; 2238:17

**Shannon** [2] - 2177:17; 2181:13

**share** [22] - 2241:7, 9, 14, 18, 21-22; 2242:1, 15, 18; 2243:13, 15-16, 20; 2244:3, 6-8, 10; 2245:14; 2251:25; 2263:19; 2286:21

**shareholders** [1] - 2290:25

**shares** [1] - 2262:23

**sharing** [1] - 2263:4

**sheets** [1] - 2301:20

**shift** [1] - 2288:21

**shop** [2] - 2200:20; 2236:8

**shopping** [3] - 2241:24; 2242:11; 2280:21

**short** [5] - 2189:7; 2196:23; 2220:9; 2223:21; 2233:5

**shorthand** [1] - 2179:25

**shortly** [1] - 2241:2

**shot** [1] - 2294:4

**show** [5] - 2208:21; 2215:14; 2238:9; 2260:10; 2289:7

**showing** [2] - 2203:23; 2284:20

**shown** [1] - 2211:11

**shows** [2] - 2284:4, 11

**sic** [2] - 2199:25; 2228:4

**side** [6] - 2235:8; 2253:3; 2257:21; 2270:19; 2271:12; 2297:25

**side-by-sides** [3] - 2253:3; 2257:21; 2297:25

**sides** [3] - 2253:3; 2257:21; 2297:25

**significant** [3] - 2187:7; 2193:7

**significantly** [1] - 2293:7

**silo** [1] - 2234:21

**similar** [10] - 2234:17; 2235:5; 2253:7; 2254:7, 25; 2278:7; 2285:15; 2286:1; 2288:13; 2295:16

**similarly** [1] - 2271:6

**simple** [4] - 2198:12; 2224:7, 9; 2255:19
**simply** [1] - 2293:16
**single** [3] - 2244:5, 12; 2293:25
**sinister** [1] - 2193:17
**sit** [3] - 2196:6; 2219:12; 2252:4
**sitting** [5] - 2188:1; 2196:4, 6; 2219:23; 2229:13
**situated** [1] - 2271:6
**situation** [2] - 2186:20; 2188:16
**six** [3] - 2192:15, 21; 2252:24
**size** [2] - 2249:18
**skinny** [1] - 2275:1
**SKU** [4] - 2236:25; 2260:25; 2261:3; 2293:8
**slide** [2] - 2273:23
**slide-in** [4] - 2273:23
**slow** [2] - 2192:23; 2301:20
**SM's** [1] - 2260:15
**small** [3] - 2184:23; 2243:25; 2281:12
**smaller** [2] - 2234:9; 2257:8
**so..** [2] - 2193:2; 2198:16
**sold** [5] - 2192:8; 2193:8; 2276:11; 2283:25; 2284:8
**someone** [3] - 2227:24; 2228:19; 2283:21
**someplace** [2] - 2244:7; 2253:15
**sometimes** [5] - 2235:23; 2269:9; 2280:20; 2294:13; 2299:17
**somewhat** [1] - 2262:1
**somewhere** [5] - 2191:25; 2219:23; 2241:24; 2242:17; 2292:12
**Sonoma** [1] - 2235:6
**soon** [1] - 2183:17
**sorry** [6] - 2199:25; 2222:12; 2264:4; 2277:11; 2296:8, 11
**sort** [9] - 2215:8; 2256:3; 2263:1; 2265:9; 2266:10; 2267:14; 2277:14; 2300:4; 2301:15
**sorts** [1] - 2249:16
**sound** [4] - 2226:21; 2278:15; 2281:12
**sounds** [1] - 2189:19
**sourcing** [2] - 2243:8; 2300:3
**space** [11] - 2249:1, 5; 2254:13; 2259:22; 2277:2; 2290:9; 2291:1; 2293:1, 7; 2294:2, 15
**spaces** [2] - 2258:24; 2259:2
**speaking** [7] - 2259:17; 2269:6; 2275:20; 2276:18; 2277:25; 2281:25; 2300:13
**Special** [1] - 2274:12
**special** [1] - 2241:3
**specialists** [1] - 2234:2
**specific** [1] - 2200:3
**specifically** [2] - 2200:6; 2241:6
**speed** [2] - 2272:18, 24
**speed-to-market** [1] - 2272:24
**spend** [1] - 2192:20
**spent** [4] - 2202:10; 2219:24; 2235:1

**sponsor** [1] - 2249:15
**spot** [10] - 2277:3, 16; 2289:21; 2290:11, 19; 2293:17
**spots** [4] - 2236:1; 2255:10, 12; 2294:11
**spring** [1] - 2291:22
**square** [4] - 2259:23; 2260:4, 6
**squarely** [1] - 2199:16
**SSI** [2] - 2243:4, 7
**St** [1] - 2233:4
**stainless** [5] - 2274:20; 2275:25; 2282:11
**stand** [2] - 2224:12; 2229:13
**standard** [4] - 2207:18; 2255:18, 20, 22
**standing** [1] - 2235:19
**standpoint** [1] - 2246:3
**stands** [3] - 2219:5; 2275:18
**STAR** [1] - 2256:21
**Star** [2] - 2208:1, 7
**Starmer** [1] - 2293:3
**start** [11] - 2220:10; 2222:4; 2233:7; 2237:17, 21; 2253:17; 2255:18; 2279:21; 2301:17
**started** [7] - 2217:19; 2233:15; 2234:8; 2254:25; 2256:8; 2258:1; 2290:8
**starting** [3] - 2203:21; 2253:7
**state** [1] - 2221:11
**statement** [1] - 2198:12
**STATES** [7] - 2177:1, 3, 10, 18, 22; 2178:3, 7
**States** [11] - 2181:6, 10; 2192:10; 2195:18; 2206:4, 19; 2207:17; 2214:9; 2220:13; 2222:17; 2286:18
**static** [2] - 2254:24; 2256:6
**stating** [2] - 2182:20
**stay** [2] - 2233:9; 2289:5
**stayed** [1] - 2249:19
**Ste** [3] - 2177:18; 2178:4, 8
**steam** [1] - 2246:9
**steel** [3] - 2275:25; 2299:18; 2300:7
**steer** [1] - 2242:14
**step** [5] - 2255:21, 23, 25; 2256:4
**steps** [1] - 2255:12
**still** [16] - 2186:25; 2191:23; 2197:8; 2206:10, 22; 2221:17; 2234:23; 2235:8; 2236:7; 2240:19, 23; 2242:24; 2246:25; 2256:14, 18
**stipulate** [1] - 2231:2
**stop** [5] - 2211:16; 2212:20; 2293:10; 2298:5, 7
**stopped** [2] - 2199:15; 2292:15
**stopping** [3] - 2209:2; 2211:14, 17
**store** [4] - 2236:9; 2242:12; 2282:21
**stores** [6] - 2244:19; 2257:7; 2282:18; 2294:3, 10
**strained** [1] - 2292:18
**strategic** [1] - 2243:8
**strategies** [1] - 2215:23

**strategy** [10] - 2213:19; 2247:6; 2253:8; 2254:5, 7-8; 2255:9; 2257:16; 2286:7
**Street** [9] - 2177:14, 18, 23; 2178:3, 7; 2179:9, 13, 17, 21
**strength** [1] - 2252:10
**stretch** [1] - 2218:24
**strikes** [1] - 2228:3
**strong** [1] - 2258:21
**style** [1] - 2280:5
**styling** [2] - 2255:4, 24
**subject** [1] - 2217:25
**subjects** [1] - 2218:24
**submission** [1] - 2230:3
**submit** [1] - 2208:2
**substantial** [2] - 2211:24; 2212:6
**substantially** [2] - 2203:18; 2204:4
**substantiate** [1] - 2299:22
**substantiates** [1] - 2300:10
**substantiating** [1] - 2301:3
**substantive** [3] - 2186:19; 2215:21; 2217:9
**success** [6] - 2246:2; 2252:6; 2253:18; 2286:13
**successful** [4] - 2212:7; 2252:23; 2254:19; 2289:18
**suffer** [1] - 2298:23
**suggest** [1] - 2226:13
**suggesting** [2] - 2190:20; 2193:17
**suggestions** [1] - 2295:5
**Suite** [4] - 2177:23; 2179:10, 14, 22
**suite** [12] - 2274:13, 18-19; 2275:14, 16; 2277:22; 2278:22; 2280:16, 23; 2281:4; 2282:3; 2294:4
**suites** [1] - 2280:12
**SULLIVAN** [1] - 2177:10
**summarize** [1] - 2291:21
**summary** [1] - 2297:11
**Summit** [1] - 2184:24
**Sunday** [2] - 2196:2, 9
**super** [3] - 2254:19; 2258:14; 2262:3
**supplier** [1] - 2295:22
**suppliers** [1] - 2238:22
**support** [7] - 2206:18; 2215:15; 2266:17; 2292:4, 10; 2294:3; 2299:22
**supporting** [5] - 2187:21; 2188:7; 2301:3, 5, 7
**supposed** [4] - 2227:21; 2230:7; 2289:20, 25
**Supreme** [9] - 2199:6; 2206:4; 2207:17, 25; 2208:10, 20; 2209:4; 2222:22, 25
**surface** [1] - 2273:17
**surfaces** [1] - 2273:17
**surprise** [4] - 2202:9; 2205:24; 2226:5
**surprised** [2] - 2184:25; 2231:12
**surprises** [1] - 2219:1
**surround** [1] - 2191:8
**suspect** [1] - 2289:15

sustain [1] - 2284:14
swap [1] - 2259:14
sweating [1] - 2227:25
switch [1] - 2288:21
SWORN [1] - 2232:8

# T

tab [2] - 2278:25; 2279:3
table [3] - 2181:12, 17, 23
tactic [1] - 2226:22
targets [1] - 2290:19
taste [1] - 2288:3
team [9] - 2262:10; 2271:13, 19-20;
2296:10; 2299:21, 24; 2300:2
teams [3] - 2237:18; 2300:3
technical [2] - 2201:25; 2205:1
television [2] - 2278:6, 8
television's [1] - 2278:6
ten [3] - 2244:13; 2247:12; 2249:19
term [6] - 2200:16; 2242:5; 2247:16;
2254:20; 2255:6; 2260:5
terms [21] - 2199:24; 2202:9; 2203:9;
2204:7; 2211:13; 2212:19; 2224:14;
2225:17; 2235:15; 2246:5, 18; 2249:18;
2256:19; 2262:20; 2263:25; 2272:6, 17;
2275:16; 2284:6, 21; 2301:14
terribly [1] - 2297:16
territory [1] - 2235:7
testified [15] - 2184:4, 19-20; 2186:15;
2191:12; 2194:22; 2198:21, 24; 2205:7;
2218:11; 2226:11, 14; 2231:9, 19
testifies [2] - 2195:11; 2219:11
testify [19] - 2184:1, 14; 2185:1;
2189:10; 2190:22; 2192:6; 2194:12, 22;
2195:4, 6, 10; 2201:2; 2221:1; 2224:2;
2226:13; 2232:2; 2284:18
testifying [4] - 2182:7; 2211:16;
2215:14; 2283:22
testimony [88] - 2182:10, 12, 15, 24;
2184:11, 14, 18; 2185:7, 10, 14, 22;
2186:6, 9-10, 14, 19, 25; 2187:1, 5, 7,
11; 2188:3, 21; 2189:9, 18; 2190:3, 11,
19, 22; 2191:13, 23; 2193:6, 15;
2194:24; 2199:13; 2200:5, 8, 18, 23;
2201:18, 22; 2202:25; 2203:1, 4, 9;
2204:20; 2205:16, 21; 2209:15, 19, 23;
2210:23; 2211:8; 2213:18; 2215:4, 15;
2216:5, 7, 11; 2218:13; 2219:5, 10,
19-20, 24-25; 2220:10; 2223:8;
2224:10, 14; 2226:4, 11; 2227:4, 11,
19; 2228:19; 2229:17, 21; 2230:24;
2231:8; 2250:18
testimony's [2] - 2205:18; 2228:10
that'd [2] - 2197:2, 4
themselves [3] - 2218:2; 2282:9;
2286:6
theories [2] - 2215:9, 23
theory [1] - 2210:1

there'd [1] - 2188:13
there'll [2] - 2286:2, 25
thereafter [2] - 2186:6
therefore [2] - 2208:14; 2209:2
Thereupon [3] - 2222:10; 2302:18, 23
Thermador [1] - 2240:16
they've [18] - 2193:5; 2230:11;
2244:12, 17; 2252:6, 10, 18, 20, 22, 25;
2253:2, 5, 18; 2254:17; 2272:10;
2273:19, 24; 2275:13
think's [1] - 2210:8
thinking [1] - 2280:25
third [4] - 2239:4; 2252:25; 2274:11;
2275:13
Thomas [1] - 2179:2
thorny [2] - 2192:4; 2193:12
thoughtful [1] - 2262:11
thousand [2] - 2233:12; 2285:16
three [8] - 2238:20; 2243:5, 12;
2259:25; 2287:20, 25; 2294:10; 2300:3
threshold [2] - 2268:2; 2269:7
thresholds [1] - 2268:1
throughout [2] - 2205:8; 2219:2
throw [1] - 2284:22
timing [1] - 2194:10
today [24] - 2181:12, 23; 2182:18;
2185:5; 2187:1; 2203:21; 2213:23;
2214:16; 2216:1; 2221:12; 2232:2, 11;
2241:21; 2242:16; 2244:6, 8; 2247:1;
2249:24; 2256:15, 24; 2260:19; 2290:8;
2297:19
today's [1] - 2194:11
token [1] - 2220:3
Tom [1] - 2181:23
tomorrow [8] - 2195:23; 2196:1;
2197:1, 3; 2218:15; 2297:7, 12
took [5] - 2192:15, 20; 2233:4;
2258:22; 2292:19
tool [6] - 2201:7; 2215:3, 7; 2218:1;
2221:15; 2282:24
tools [5] - 2215:22; 2221:20; 2223:14;
2224:12; 2282:20
top [10] - 2252:20; 2255:12, 20;
2256:8; 2257:19; 2269:5; 2270:6;
2282:11; 2297:25
top-load [4] - 2252:20; 2256:8;
2257:19
top-loads [1] - 2255:12
top-mounts [1] - 2297:25
total [6] - 2232:18; 2233:10; 2253:22;
2262:20; 2279:8, 11
touch [1] - 2236:11
touches [2] - 2191:7
tough [4] - 2239:16; 2249:1; 2258:14;
2273:5
track [1] - 2294:17
trade [1] - 2277:4
traditional [2] - 2253:15; 2256:4
traffic [2] - 2242:10; 2278:4

train [1] - 2234:13
trained [1] - 2233:18
training [1] - 2234:8
transcript [5] - 2179:25; 2183:17;
2223:20; 2302:19; 2303:3
TRANSCRIPT [1] - 2177:9
transcription [1] - 2179:25
translucent [1] - 2271:21
transparent [1] - 2271:22
transportation [1] - 2236:20
traveling [1] - 2221:4
Traverse [1] - 2234:11
tremendous [6] - 2238:5; 2250:4;
2275:22; 2277:1; 2286:2, 25
trend [2] - 2211:11
trends [1] - 2212:7
TRIAL [1] - 2177:9
trial [16] - 2186:4, 17; 2187:19, 24;
2188:2, 22; 2189:25; 2190:3; 2201:6;
2202:19; 2205:8; 2206:20; 2207:12;
2219:3; 2220:7; 2225:19
Trial [5] - 2177:13, 17, 21; 2178:2, 6
trials [2] - 2219:2
tripled [1] - 2264:1
truck [1] - 2236:19
truckload [1] - 2236:20
trucks [1] - 2260:15
true [2] - 2231:21; 2256:23
try [15] - 2196:25; 2203:15; 2209:22;
2219:22; 2237:4; 2255:3; 2275:23;
2281:23; 2286:4; 2292:22; 2300:3;
2301:13, 17, 22
trying [9] - 2186:7; 2188:1, 15;
2193:25; 2197:23; 2206:8; 2214:19;
2223:4
Ts&Cs [2] - 2301:14
tub [1] - 2256:17
Tucson [3] - 2208:8, 12, 19
Tuesday [4] - 2195:14; 2196:5, 7;
2235:20
turn [4] - 2221:16; 2272:22; 2274:11;
2278:25
turnaround [1] - 2272:24
TVs [1] - 2252:8
twice [2] - 2259:24; 2260:5
two [20] - 2183:20; 2194:13; 2207:16;
2209:17; 2214:5; 2219:21; 2222:23;
2233:12; 2237:11; 2238:20; 2239:2;
2243:12; 2248:16; 2254:12; 2285:16;
2287:25; 2289:12
two-week [1] - 2248:16
type [6] - 2218:16; 2257:16; 2267:24;
2277:5, 7; 2280:3
types [5] - 2189:21; 2194:22; 2265:17;
2295:15
typical [3] - 2293:22; 2301:12
typically [3] - 2248:20; 2249:24;
2250:1

# U

**U.S** [4] - 2177:13; 2211:11; 2222:19; 2252:1
**um-hmm** [1] - 2272:7
**unchanged** [1] - 2257:2
**uncommon** [1] - 2273:3
**under** [11] - 2184:1, 21; 2186:6, 10, 14; 2191:10, 12; 2205:13; 2211:24; 2259:7; 2278:14
**underperforming** [1] - 2293:6
**understood** [2] - 2184:20; 2293:11
**unfold** [1] - 2253:10
**unfolded** [1] - 2259:20
**unfortunately** [1] - 2208:1
**unique** [2] - 2246:9, 11
**United** [11] - 2181:6, 10; 2192:9; 2195:18; 2206:4, 19; 2207:17; 2214:9; 2220:12; 2222:17; 2286:17
**UNITED** [7] - 2177:1, 3, 10, 18, 22; 2178:3, 7
**units** [8] - 2253:14; 2281:9, 11, 14; 2283:25; 2284:2, 8
**University** [1] - 2232:23
**unlikely** [2] - 2230:2, 25
**unproductive** [1] - 2294:15
**unquote** [1] - 2205:15
**unredacted** [1] - 2291:14
**unsubstantiated** [1] - 2301:9
**unusual** [2] - 2186:5; 2204:6
**up** [36] - 2183:13; 2187:9; 2189:24; 2190:2, 9; 2191:13; 2200:8, 20; 2205:4; 2209:18; 2214:25; 2218:4; 2219:1; 2221:11; 2238:9; 2239:24; 2240:10; 2243:20, 23; 2246:8, 15; 2253:18; 2255:19, 25; 2257:11; 2260:10; 2261:6; 2268:5; 2270:3; 2274:9, 12; 2291:12; 2297:19; 2299:18; 2301:22
**updates** [1] - 2283:15
**upper** [1] - 2256:2
**upset** [1] - 2228:8
**upshot** [1] - 2197:25
**uses** [1] - 2256:20
**usual** [1] - 2286:24

# V

**value** [21] - 2238:12; 2239:17; 2247:3; 2249:18; 2255:2, 4; 2256:11; 2257:2; 2268:5, 8; 2275:17, 24; 2276:4; 2277:1; 2278:3, 19; 2280:21; 2282:12, 22
**values** [17] - 2238:18; 2242:14; 2247:14, 20; 2249:20, 22, 25; 2250:4; 2263:8, 10; 2265:10; 2275:22; 2281:10, 22; 2285:15, 24
**varies** [2] - 2270:25; 2271:3
**various** [1] - 2234:4
**vary** [1] - 2270:23

**vendors** [1] - 2292:1
**verbatim** [1] - 2212:12
**version** [2] - 2273:15; 2291:14
**versus** [9] - 2181:6; 2222:17; 2255:12, 21-22; 2260:8; 2280:23; 2282:10
**vice** [3] - 2238:16; 2240:2; 2262:23
**view** [4] - 2202:17; 2204:21; 2218:18; 2292:21
**vignette** [3] - 2294:12, 19
**vignettes** [1] - 2294:18
**Viking** [1] - 2240:17
**Vincent** [1] - 2233:4
**volume** [7] - 2236:24; 2239:5; 2257:17; 2270:10, 12; 2293:9; 2298:17
**VOLUME** [1] - 2177:9

# W

**Wacker** [1] - 2178:15
**wait** [2] - 2205:24; 2274:12
**waited** [2] - 2258:3
**walk** [3] - 2230:12; 2233:13; 2252:17; 2276:10
**walking** [1] - 2236:10
**Wallace** [4] - 2179:24; 2303:2, 5
**Walter** [1] - 2177:17
**wants** [7] - 2189:18; 2198:10; 2204:22; 2205:21; 2210:12; 2211:15; 2213:20; 2218:2; 2224:17; 2226:19; 2278:3
**washer** [4] - 2256:8, 17; 2281:17
**washing** [1] - 2256:14
**Washington** [14] - 2177:7, 15, 19, 24; 2178:4, 8, 12, 19, 23; 2179:7, 10, 14, 18, 22
**watched** [1] - 2241:4
**watching** [1] - 2253:10
**water** [1] - 2256:21
**ways** [2] - 2201:23; 2206:13
**Wednesday** [2] - 2196:4; 2235:20
**week** [6] - 2203:22; 2214:10; 2237:11, 13; 2248:11, 16
**weekend** [2] - 2191:22; 2192:16; 2248:10
**weekend-long** [1] - 2248:10
**weekly** [8] - 2236:13; 2261:2; 2262:23; 2264:16, 19; 2289:19, 24; 2290:14
**weeks** [5] - 2194:2; 2248:19, 23; 2249:11
**weight** [14] - 2200:4; 2201:20, 22; 2202:24; 2203:4, 13; 2204:22; 2205:4; 2206:16; 2210:12, 19; 2212:16; 2228:19
**welcome** [1] - 2295:21
**well-featured** [1] - 2280:4
**West** [1] - 2178:15
**Western** [1] - 2235:10
**wherein** [1] - 2191:20
**Whinston** [4] - 2194:17; 2195:11, 13;

2214:9
**Whinston's** [1] - 2220:20
**Whirlpool** [23] - 2182:17; 2184:22; 2221:10; 2240:15, 18; 2241:10, 18; 2242:18, 24; 2243:13, 21; 2251:10; 2259:6-8, 12, 15; 2265:6; 2277:15; 2281:24; 2287:18; 2295:9
**Whirlpool's** [1] - 2242:18
**Whirlpool/Maytag** [2] - 2221:5; 2248:5
**White** [1] - 2285:19
**white** [2] - 2248:25; 2249:5
**whole** [7] - 2187:14; 2214:6; 2256:15; 2271:17, 21; 2278:14; 2281:4
**wholesale** [11] - 2216:25; 2239:11; 2269:17, 20; 2270:4, 7, 14; 2276:11, 17; 2277:20
**wife** [1] - 2241:1
**wild** [2] - 2245:25; 2246:12
**win** [2] - 2262:7, 15
**window** [1] - 2280:5
**windowless** [1] - 2219:12
**winners** [1] - 2243:18
**winning** [1] - 2263:7
**wish** [4] - 2182:2; 2183:3; 2225:20; 2226:2
**withdrawing** [1] - 2200:25
**WITNESS** [32] - 2232:7; 2251:18, 20; 2264:4; 2269:22, 25; 2270:2; 2276:7, 9, 14, 16, 20, 22, 25; 2277:6, 25; 2278:2; 2285:21, 24; 2286:4, 10, 13, 19, 21, 23; 2287:3, 14, 17, 23; 2288:1; 2291:8
**witness** [36] - 2186:5; 2188:1; 2190:3; 2191:10, 21; 2194:11, 19; 2195:10; 2201:7; 2205:12; 2210:7, 24; 2215:13; 2216:12; 2220:10, 18, 23; 2221:16; 2222:4; 2223:4, 7, 10; 2224:11; 2226:10, 15, 25; 2227:18; 2228:13; 2230:7; 2231:18; 2250:11, 16; 2284:17
**witness's** [4] - 2209:15; 2210:23; 2213:18; 2215:15
**witnessed** [3] - 2212:7; 2221:3; 2257:15
**witnesses** [16] - 2185:23; 2187:1; 2193:14, 19; 2206:11; 2210:9; 2211:13, 16; 2212:3, 18, 22; 2213:6; 2218:20; 2219:6; 2220:5; 2226:2
**wondering** [2] - 2218:4; 2227:25
**words** [7] - 2203:1; 2225:11; 2272:20; 2285:17; 2294:14; 2295:8; 2300:6
**worksheet** [2] - 2299:15
**world** [5] - 2203:19; 2204:17; 2278:6; 2281:12; 2286:15
**worried** [1] - 2281:3
**worse** [2] - 2204:2; 2292:9
**write** [1] - 2298:9
**writes** [3] - 2297:10, 18, 24

## Y

**year** [26] - 2185:6; 2239:8; 2243:6;
2247:22; 2248:15, 19-20, 24; 2249:7;
2263:17; 2270:13; 2278:23; 2279:4;
2285:19, 23; 2286:25; 2287:11; 2291:4;
2292:12
**year's** [1] - 2287:6
**year-over-year** [3] - 2239:8; 2287:11;
2291:4
**years** [23] - 2221:4; 2232:18; 2233:10;
2243:5, 12; 2244:13; 2247:12; 2249:19;
2253:10; 2254:23; 2256:6, 12-13, 16,
20, 25; 2272:21; 2273:3; 2282:17;
2287:25; 2301:24
**yesterday** [15] - 2182:6; 2184:5, 12;
2186:21; 2194:23; 2198:3; 2201:2;
2202:15; 2211:1, 18; 2216:2; 2224:15;
2231:8; 2283:11
**yourselves** [2] - 2181:8; 2230:16