UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Plaintiff,** | ) Civil Action |
| | ) No. 15-1039 |
| **v.** | ) |
| | ) December 3, 2015 |
| **AB ELECTROLUX, et al.,** | ) 11:08 a.m. |
| | ) |
| **Defendants.** | ) Washington, D.C. |
| | ) |
| | ) |

**VOLUME 15 - MORNING and PARTIAL AFTERNOON SESSION**
*TRANSCRIPT OF BENCH TRIAL PROCEEDINGS*
*(Excluding Closed/Sealed Portions)*
*BEFORE THE HONORABLE EMMET G. SULLIVAN,*
*UNITED STATES DISTRICT COURT JUDGE*

APPEARANCES:

For the Plaintiff:       **Ethan Glass, Trial Attorney**
                         U.S. DEPARTMENT OF JUSTICE
                         450 Fifth Street, NW
                         Room 4000
                         Washington, DC 20001
                         (202) 305-1489
                         Email: Ethan.glass@usdoj.gov

                         **William Henderson Jones, II, Trial
                         Attorney**
                         U.S. DEPARTMENT OF JUSTICE
                         Antitrust Division
                         450 Fifth Street, NW, Room 4000
                         Washington, DC 20001
                         (202) 514-0230
                         Fax: (202) 514-7308
                         Email: Bill.jones2@usdoj.gov

                         **Bryson L. Bachman, Trial Attorney**
                         U.S. DEPARTMENT OF JUSTICE
                         Antitrust Division
                         450 Fifth Street, NW, Suite 7026
                         Washington, DC 20530
                         (202) 514-5621
                         Email: Bryson.bachman@usdoj.gov

APPEARANCES:   Cont.

For the Plaintiff:        **Lisa Scanlon, Trial Attorney**
                         U.S. DEPARTMENT OF JUSTICE
                         Antitrust Division
                         450 5th Street, NW
                         Washington, DC 20530
                         (202) 598-8197
                         Email: Lisa.scanlon@usdoj.gov

                         **Rachel Zwolinski, Trial Attorney**
                         U.S. DEPARTMENT OF JUSTICE
                         Antitrust Division
                         450 Fifth Street, NW
                         Suite 4000
                         Washington, DC 20530
                         Email: Rachel.zwolinski@usdoj.gov

For Defendant:            **John M. Majoras, Esq.**
(AB Electrolux)          JONES DAY
                         51 Louisiana Avenue, NW
                         Washington, DC 20001-2113
                         (614) 281-3835
                         Fax: (202) 626-1700
                         Email: Jmmajoras@jonesday.com

                         **Paula W. Render, Esq.**
                         JONES DAY
                         77 West Wacker Drive
                         Chicago, IL 60601
                         (312) 269-1555
                         Email: Prender@jonesday.com

                         **Kristen A. Lejnieks, Esq.**
                         JONES DAY
                         51 Louisiana Avenue, NW
                         Washington, DC 20001-2113
                         (202) 879-3939
                         Fax: (202) 626-1700
                         Email: Kalejnieks@jonesday.com

                         **Michael R. Shumaker, Esq.**
                         JONES DAY
                         51 Louisiana Avenue, NW
                         Washington, DC 20001
                         (202) 879-3939
                         Email: Mrshumaker@jonesday.com

**APPEARANCES:   Cont.**

| | |
|---|---|
| **For the Defendant:**<br>**(AB Electrolux)** | **Andrew Turnier, Esq.**<br>JONES DAY<br>51 Louisiana Avenue, N.W.<br>Washington, DC 20001<br>(202)879-4660 |

**Thomas Demitrack, Esq.**
JONES, DAY, REAVIS & POGUE
North Point
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586-3939

**For Defendant:**
**(General Electric**
**Company)**

**Paul H. Friedman, Esq.**
DECHERT LLP
1900 K Street, NW
Suite 1200
Washington, DC 20006
(202) 261-3398
Email: Paul.friedman@dechert.com

**Paul T. Denis, Esq.**
DECHERT, LLP
1900 K Street NW,  Suite 1200
Washington, DC 20006
(202) 261-3430
Email: Paul.denis@dechert.com

**Michael G. Cowie, Esq.**
DECHERT, LLP
1900 K Street NW,  Suite 1200
Washington, DC 20006
(202) 261-3339

**Brian E. Rafkin, Esq.**
DECHERT, LLP
1900 K Street NW
Suite 1200
Washington, DC 20006
(202) 261-3318
Fax: (202) 261-3333
Email: Brian.rafkin@dechert.com

**APPEARANCES: Cont.**

| | |
|---|---|
| **For Defendant:**<br>**(General Electric**<br>**Company)** | **Anna Revathy Aryankalayil, Esq.**<br>DECHERT, LLP<br>1900 K Street NW<br>Suite 1200<br>Washington, DC 20006<br>(202) 261-3332<br>Fax: (202) 261-3333<br>Email: Anna.aryankalayil@dechert.com |

**Also Present:**

| | |
|---|---|
| **For Samsung**<br>**Electronics America:** | **Michael Edward Antalics, Esq.**<br>O'MELVENY & MYERS LLP<br>1625 Eye Street, NW<br>Washington, DC 20006<br>(202) 383-5343<br>Fax: (202) 383-5414<br>Email: Mantalics@omm.com |
| **Court Reporter:** | **Scott L. Wallace, RDR, CRR**<br>**Official Court Reporter**<br>U.S. District Court for the District<br>of Columbia<br>333 Constitution Avenue, NW<br>Room 6503<br>Washington, DC 20001<br>(202)354-3196<br>Email: Scottlyn01@aol.com |

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

# C O N T E N T S

**EXAMINATIONS**                                                    **Page**

  CONTINUED DIRECT EXAMINATION OF KEVIN DEXTER          4202
  BY MR. SHUMAKER:
  CROSS-EXAMINATION OF KEVIN DEXTER                     4225
  BY MR. GLASS:
  REDIRECT EXAMINATION OF KEVIN DEXTER                  4230
  BY MR. SHUMAKER:
  RECROSS-EXAMINATION OF KEVIN DEXTER                   4232
  BY MR. GLASS:

  CONTINUED DIRECT EXAMINATION OF KEVIN DEXTER          4235
  BY MR. SHUMAKER:
  CONTINUED CROSS-EXAMINATION OF KEVIN DEXTER           4246
  BY MR. GLASS:
  REDIRECT EXAMINATION OF KEVIN DEXTER                  4249
  BY MR. SHUMAKER:

  DIRECT EXAMINATION OF KEVIN BALON                     4253
  BY MR. SHUMAKER:
  CONTINUED DIRECT EXAMINATION OF KEVIN BALON           4281
  BY MR. SHUMAKER:
  CROSS-EXAMINATION OF KEVIN BALON                      4299
  BY MS. SCANLON:

  DIRECT EXAMINATION OF JONATHAN ORSZAG                 4302
  BY MR. DEMITRACK:

## EXHIBITS

**DESCRIPTION**                                                    **Page**

1              __MORNING SESSION, DECEMBER 3, 2015__

2      (11:08 a.m.)

3              THE COURTROOM CLERK:  Your Honor, this is Civil Action

4      15-1039, *United States of America versus AB Electrolux, et al.*

5      Will parties please come forward to the podium, introduce

6      yourselves for the record.

7              MR. GLASS:  Good morning, Your Honor.  Ethan Glass for

8      the United States.

9              THE COURT:  Mr. Glass.

10             MR. GLASS:  With me at counsel table, Mr. Benjamin

11     Adler, Ms. Rose Haag, Mr. William Jones, Mr. Bryson Bachman,

12     Ms. Lisa Scanlon and Ms. Rachel Zwolinski.

13             MR. DENIS:  Good morning, Your Honor.  Paul Denis from

14     Dechert, LLP on behalf of General Electric, and with me at

15     counsel table this morning are my colleagues Paul Friedman,

16     Brian Rafkin, and Anna Aryankalayil.

17             THE COURT:  All right.  Good morning.

18             MR. SHUMAKER:  Good morning, Your Honor.  Mike Shumaker

19     of Jones Day on behalf of the Electrolux defendants.  At the

20     table with me is Theresa Coughlin, John Majoras, Paula Render,

21     Andrew Turnier and Kristen Lejnieks.

22             THE COURT:  All right.  Good morning to everyone.  All

23     right.  GSA has promised us -- only if you want to -- that we

24     could probably stay until 7, 7:30 this evening since we're

25     starting late.  It's kind of up to you, you know.  And, again,

1   I'm sensitive to family demands, you know, childcare issues,

2   so it's kind of up to you, folks.  Really, it is.  It's fine

3   with me.  We're starting a little bit late, and I appreciate

4   that.  I was able to do what I had to do outside of the

5   building.  And, you know, the cafeteria closes at 2, so it

6   probably makes a little sense to not break for lunch past 1:00,

7   so that's what -- that's what we're dealing with today.  So if

8   you want to talk amongst yourselves, as late as you want to stay

9   -- well, not as late as you want to stay, but if you want to

10  stay until 7 or 7:30 or so, GSA has said that they'll keep the

11  air circulating.  But they told me that yesterday, too, but I

12  really believe them now, they'll do it.  So you can talk among

13  yourselves.  Whatever you want to do is fine with me.

14          And, again, thanks.  I was -- it was -- I just wanted

15  to say how appreciative I am on behalf of the Judicial

16  Nomination Commission that the Senate decided to have hearings

17  for two outstanding nominees for the D.C. Superior Court.  I've

18  been waiting for about two years now.  And, you know, the Senate

19  did what it's supposed to do, and hopefully they'll continue to

20  process the President's nominations in a timely manner.  Because

21  there's something -- there's something to be said about

22  justice -- justice delayed is justice denied, and when we have

23  judicial vacancies, I think people are entitled to vote up or

24  down on whether or not they should be approved by the Senate.

25  So we appreciate what the Senate did, and I'm glad I was able to

```
 1    attend.  And thanks a lot for the accommodations of the

 2    attorneys in this case and the parties in this case.

 3              We'll proceed now with the witness who was testifying

 4    yesterday.  And your attorneys are present?

 5              MR. ANTALICS:  Yes.

 6              THE COURT:  Good morning.

 7              MR. ANTALICS:  Good morning, Your Honor.  Michael

 8    Antalics once again.

 9              THE COURT:  And we're in a confidential session?

10              MR. SHUMAKER:  We are in confidential session.

11              THE COURT:  Okay.

12              MR. SHUMAKER:  I will have a few questions for open

13    court.  If it pleases the Court, we can do cross-examination on

14    confidential and then open it up and take it from there, if

15    that's also okay with the government.

16              MR. GLASS:  It is generally, Your Honor, but before we

17    excuse Haier's attorney, I have a continuing objection to the

18    questions about somebody who no longer works at Samsung -- we

19    went through for 30 minutes a document from 2013 about 2015.  It

20    is 2015, Your Honor.

21              THE COURT:  Right.

22              MR. GLASS:  And Mr. Dexter was only at Samsung for half

23    of 2015.  And to the extent that he's going to talk about things

24    that happened in the past, there is record evidence of what

25    Samsung has done in the appliances industry, in the relevant
```

1    markets in the past.  To the extent that the question is what is

2    Samsung do in the future, Mr. Dexter is unable to testify to

3    those things.

4         And, Your Honor, before we go back into this, I want to

5    lodge an objection, 403, on relevance and on the wasting of

6    time, perhaps, and also on Rule 602 on personal knowledge.

7         THE COURT:  All right.  I'm going to let the witness

8    testify.  And, again, at the end of the day I'm going to give it

9    what weight, if any, it's entitled to.  And, again, I've already

10   expressed my concerns as well.  The witness was a very valuable

11   employee up until mid-June or so of this year, and so -- but,

12   you know, the weight to be given, if any, will be determined by

13   the Court, but I'm going to allow the testimony to continue.

14        How much more time do you need on the closed?

15        MR. SHUMAKER:  I only have two documents to go through,

16   Your Honor, so I'm thinking 20 minutes, half hour, tops.

17        THE COURT:  All right.  That's fine.

18        Over objection.  All right.

19        MR. GLASS:  Thank you, Your Honor.

20        THE COURT:  All right.

21                         *  *  *  *  *

22        (Thereupon, the following proceedings were closed by

23   order of the Court but are included as part of the transcript

24   production in this case.)

25

4202



4203



4204



















4213







4216





4218

















4226





4228















```
 1   ████████████████████████████████
 2   ████████████████████████████████████
 3   █████████████████████████
```

 4                      * * * * *

 5          (Previously designated closed proceedings concluded and

 6   the following further proceedings were held in open court:)

 7                      * * * * *

 8          THE COURT:  All right.  Counsel, we're going to proceed

 9   with the public direct examination of the witness.

10          MR. SHUMAKER:  Thank you, Your Honor.

11              CONTINUED DIRECT EXAMINATION OF KEVIN DEXTER

12   BY MR. SHUMAKER:

13   Q.  I want to switch, Mr. Dexter, from your time with Samsung

14   and ask you a little bit about your new job.

15   A.  Okay.

16   Q.  When did you start at Haier America?

17   A.  June of 2015.

18   Q.  And your current role is chief operating officer?

19   A.  It is.

20   Q.  Why did you make that move?

21   A.  Personal reasons.

22   Q.  Okay.  Did you see an opportunity at Haier?

23   A.  I did.

24   Q.  What opportunity did you see?

25   A.  I saw an opportunity for a -- you know, a brand or an entity

1    that has large global scale that has yet to gain traction in the

2    U.S.

3    **Q.**   Are you excited about Haier America's future?

4    **A.**   I am.

5    **Q.**   And why are you excited?

6            THE COURT:   Let me just stop you.   Just so the record's

7    clear, up to this point you've been testifying as a designated

8    30(b)(6) witness on behalf of Samsung, correct?

9            THE WITNESS:   Correct.

10           THE COURT:   All right.   And now counsel is directing

11   your examination as a Haier employee?

12           THE WITNESS:   Correct, Your Honor.

13           THE COURT:   All right.   Just so the record's clear.

14           THE WITNESS:   Thank you.

15           THE COURT:   All right.

16   BY MR. SHUMAKER:

17   **Q.**   And the question's:   Why are you excited about the future

18   for Haier America?

19   **A.**   Just because I think -- as I described earlier, I think

20   there's opportunity for a company that's had a 15-year presence

21   or a bit longer in the U.S. marketplace but has yet to gain

22   traction.

23   **Q.**   Okay.   Notwithstanding --

24           THE COURT:   What do you mean by that?

25           THE WITNESS:   It's --

1          THE COURT:  I think we can all assign a meaning to it,

2     but what do you mean by that when you say it's not --

3          THE WITNESS:  Yeah.  So, you know, what Haier's known

4     for, Your Honor, or what we've participated in up to this point

5     are, you know, products like dorm refrigerators and compact

6     refrigerators and window air-conditioners and wine coolers.

7     There's a whole host of things that we've been good at.

8          What we haven't done yet is do anything of significance

9     in, you know, the large appliance or kitchen market.  And so,

10    you know, really I was asked to join by my boss, who you had a

11    chance to meet earlier in this trial, to join.  And, you know,

12    the personal reasons that I mentioned is that it also allowed me

13    to get my hands in more things, if you will, right?  So I've got

14    a lot more responsibility across functions than just the sales

15    and marketing portion.  So that's really --

16          THE COURT:  All right.

17    BY MR. SHUMAKER:

18    **Q.**  And just to follow up on that, Haier was known in the U.S.

19    market for wine -- smaller refrigerators and things of that

20    sort?

21    **A.**  Yeah, they were.  And in addition to that, you know,

22    they're -- there's a factory in South Carolina that Haier has

23    that was opened in 1999, I believe, that, again, hasn't, you

24    know, really made any significant progress, and so for me

25    personally it was a challenge to see if we could make some

1    progress.

2    **Q.**   And Haier's plans are to expand their cooking appliance

3    offerings moving forward?

4    **A.**   That's correct.

5    **Q.**   And if I understand from prior testimony, you're going to be

6    adding ranges?

7    **A.**   Correct.

8    **Q.**   And cooktops?

9    **A.**   Correct.

10   **Q.**   Okay.  And am I correct that some of those are now starting

11   to hit the market?

12   **A.**   They are.

13   **Q.**   Okay.  Is Haier committed to the U.S. market?

14   **A.**   I hope so.  I believe they are.

15   **Q.**   A very fair answer.

16         Has Haier and Mr. Micu hired any other employees to

17   assist you in that expansion into the U.S. market?

18   **A.**   He has or we have, I guess.

19   **Q.**   Okay.  And how many people have they hired at this point?

20   **A.**   I don't know an exact number.  You know, there are few key

21   individuals that have joined the team in the last, you know,

22   year and a half, two years, since Mr. Micu joined.

23   **Q.**   Is it more than five?  Less than five?  I'm not looking for

24   an exact.

25   **A.**   Well, it would be more.

1    **Q.**   Okay.  And what price point has Haier typically played?

2    **A.**   So typically in the U.S., up to this point, Haier has played

3    in a -- very much in a value price points.

4    **Q.**   And are you going to continue to play in that price point?

5    **A.**   We will.

6    **Q.**   Will you expand beyond that?

7    **A.**   Yeah.  So the expansion that we discussed earlier, if you

8    look at the positioning of our products that we're entering,

9    we're very much in the, again, mass to mass premium price

10   segments of the industry.

11   **Q.**   Okay.  Has Haier approached any retailers about putting

12   their products on the floor?

13   **A.**   Yes.

14   **Q.**   Has Haier had any success in that regard?

15   **A.**   In process, I guess.

16   **Q.**   Yes.

17   **A.**   What's that?

18   **Q.**   Do you have -- have you had success in getting retailers to

19   put Haier's products on the floor?

20   **A.**   Yes.

21   **Q.**   And where -- where can I find a Haier product today at a

22   retail store?

23   **A.**   So, you know, most of the success that we've had so far has

24   been in the regional business out there.

25   **Q.**   When you say "regional business" --

1   **A.**   Yeah, independent dealers, independent appliance retailers.

2   **Q.**   And who would you identify as the type of retail source?

3   **A.**   Those could -- you know, in our categorization that could go

4   anywhere from somebody that's, you know, what I'll call a super

5   regional, like an H.H. Gregg, you know, all the way down to a

6   very small one-store entity.

7   **Q.**   Has Haier entered into any partnerships with third parties

8   to help expand its sales?

9   **A.**   Well, if by third parties -- we do use appliance

10   distributors.

11   **Q.**   And which appliance distributors?

12   **A.**   So right now we are -- have relationships with Almo

13   Corporation in Philadelphia and Climatic Corporation in South

14   Carolina.

15   **Q.**   And do they act as an indirect sales force for you?

16   **A.**   They do.

17   **Q.**   Do these distributors also sell into the builder channel?

18   **A.**   Not specifically targeted, but --

19   **Q.**   But they do sell into the builder channel?

20   **A.**   Those distributors do sell into the builder channel.

21   **Q.**   Since you have left Haier, have you seen in the marketplace

22   a Samsung range priced at 599?

23          THE COURT:   He hasn't left yet.   Sir, the question

24   was --

25          MR. SHUMAKER:   I'm sorry.   Oh, let me rephrase that.

1          THE COURT:  I'm sorry.

2          MR. SHUMAKER:  I probably screwed it up.

3     BY MR. SHUMAKER:

4     **Q.**  Mr. Dexter, since your departure from Samsung in June 2015,

5     have you seen any Samsung ranges offered at 599?

6          MR. GLASS:  Objection, hearsay.

7          THE COURT:  Let me speak with counsel at the bench.

8          You can stay there.

9          (Following sidebar discussion had on the record:)

10         THE COURT:  He's asking him what he's seen, what he's

11    seen.  You're walking a tight rope here, but he's asking what

12    he's seen, as opposed to what he could, but what he's seen.

13    He's going to report, "Well, I saw this for 599, it was

14    advertised -- it was being sold at" -- and there's no way for

15    you to cross-examine him.

16         MR. GLASS:  Sorry, Your Honor.

17         MR. SHUMAKER:  He's got personal knowledge.  He's got

18    the ability to cross-examine him right now.

19         MR. GLASS:  Well, Your Honor --

20         MR. SHUMAKER:  I don't know what is answer will be.

21         MR. GLASS:  Your Honor, we just went through an exam

22    where they tried to get the fictional 599 Samsung range into

23    evidence through Mr. Dexter when he was at Samsung.  Now they're

24    trying to get it in through his time at Haier.

25         THE COURT:  Yeah.  I'm not going to allow it.  I mean,

1    if you have some evidence about 599, you can produce it, but I'm

2    not going to allow it through this witness here.

3              MR. GLASS:  Thank you, Your Honor.

4              THE COURT:  Objection's sustained.

5              MR. SHUMAKER:  Okay.  Your Honor.

6              (Sidebar discussion concluded.)

7              THE COURT:  Objection's sustained.

8    BY MR. SHUMAKER:

9    **Q.**  Now, Mr. Dexter, you've been in the appliance industry for

10   20 years; is that fair?

11   **A.**  That's correct.

12   **Q.**  Do you consider the industry competitive today?

13   **A.**  I do.

14   **Q.**  And do you believe that with respect to cooking appliances?

15   **A.**  I do.

16   **Q.**  If Electrolux and General Electric were able to merge, do

17   you have any concern about price increases post-merger?

18   **A.**  So, you know, speaking on behalf of Haier and how we view

19   the marketplace, I should probably give you some more context.

20   We're in such a small entity at this point in the industry that,

21   quite honestly, we're focussed on getting our house in order at

22   this point.  So I -- you know, I mean, those kinds of -- I don't

23   know what impact it would have on us.

24   **Q.**  Do you recall testifying that you don't have any concern

25   about increases post-merger?

1    **A.**   I don't, but I'm sure you could --

2    **Q.**   Okay.

3             MR. SHUMAKER:  I'll withdraw the question, only because

4    we're in open court and I don't want to close it to bring that

5    out.

6             THE COURT:  Well, if there's one question you want to

7    pursue for that purpose that you just alluded to, you can do it

8    at the bench.

9             MR. SHUMAKER:  That would be great, Your Honor.

10            THE COURT:  All right.  Let me ask you to step around.

11            THE WITNESS:  Okay.

12            (Following sidebar discussion had on the record:)

13            **(Following further proceedings sealed by order of the**

14   **Court.)**

15

16

17

18

19

20

21

22

23

24

25

4244





1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16    **(Previously designated sealed proceedings concluded.)**

17        (Sidebar discussion concluded.)

18        THE COURT:  I'm going to ask Mr. Shumaker just to reask

19   that last question, Counsel.

20        MR. SHUMAKER:  Sure.

21   BY MR. SHUMAKER:

22   **Q.**  Mr. Dexter, if you recall, the question I asked you was:  If

23   Electrolux and GE were to merge, do you have any concern about

24   price increases post-merger?  Do you recall that?

25   **A.**  I do.

1    **Q.**   And what is your answer?

2    **A.**   I don't.

3    **Q.**   And why is that?

4    **A.**   I think it has more to do with segments that folks are

5    competing in, and so, again, as you -- when you asked me the

6    question, and I mentioned a little bit earlier, you know,

7    whether it's Haier, Samsung, even, you know, the places where

8    we're choosing to compete aren't the places necessarily where

9    those others are strong or where we would have some concerns.

10   **Q.**   Okay.  But bottom line:  If a merger goes through, you are

11   not concerned about any price increases in the industry?

12   **A.**   I'm not.

13   **Q.**   Thank you.

14           MR. SHUMAKER:  Nothing further, Your Honor.

15           THE COURT:  All right.  Cross-examination.

16           MR. GLASS:  Thank you, Your Honor.

17              CONTINUED CROSS-EXAMINATION OF KEVIN DEXTER

18   BY MR. GLASS:

19   **Q.**   Mr. Dexter, you left Samsung in June of this year?

20   **A.**   I did.

21   **Q.**   So you would have no idea what Samsung's strategy, plans,

22   prices, products, anything that Samsung is going to do in the

23   future, correct?

24   **A.**   Correct.  Any changes post my departure, I would not have

25   knowledge, other than what I see in the marketplace.

1    **Q.**   So when we went through a series of documents --

2    **A.**   Yes.

3    **Q.**   -- all those strategies could have changed or they could

4    have stayed the same and you have no idea?

5    **A.**   Correct.

6    **Q.**   Are there people at Samsung who are working on strategy for

7    selling appliances in the United States?

8    **A.**   There are.

9    **Q.**   In fact, who was your boss when you were at Samsung?

10   **A.**   So my boss for my -- I had several.  Joe Stinziano who's the

11   EVP for a host of product categories.

12   **Q.**   Including appliances?

13   **A.**   Including appliances.

14   **Q.**   Is Mr. Stinziano still at Samsung, as far as you know?

15   **A.**   He is.

16   **Q.**   So he might be a good person to ask if one wanted to know

17   what Samsung's forward-looking appliances strategy would be?

18   **A.**   Yes.

19   **Q.**   And there are others, and I'm not going to ask you to go

20   through all the names, but there are others?

21   **A.**   Correct.

22   **Q.**   So if I wanted to know whether Samsung intended on

23   introducing cooktops in the future, I would ask somebody who

24   currently works at Samsung, correct?

25   **A.**   Yes.

1   **Q.** And if I wanted to know whether Samsung was going to

2   introduce wall ovens in the future, I would ask somebody who

3   currently works at Samsung?

4   **A.** Correct.

5   **Q.** If I wanted to know whether Samsung was going to introduce

6   particular priced ranges, I would ask somebody who currently

7   works at Samsung?

8   **A.** Correct.

9   **Q.** You now work at Haier?

10  **A.** I do.

11  **Q.** Haier America?

12  **A.** Correct.

13  **Q.** And Haier America is not Haier Group, correct?

14  **A.** Correct.  That's correct.

15  **Q.** Haier Group is the Chinese company, correct?

16  **A.** That's correct.

17  **Q.** And the president of Haier America is Mr. Micu, as you

18  testified?

19  **A.** He is.

20  **Q.** And so if I wanted to know what Haier America's plans,

21  strategy, products, anything going in the future, Mr. Micu would

22  probably be the best person to talk to?

23  **A.** Yes.

24       MR. GLASS:  No further questions, Your Honor.

25       THE COURT:  All right.  Any redirect?

1           MR. SHUMAKER:  Yes, Your Honor.

2           THE COURT:  All right.

3           MR. SHUMAKER:  I'm trying to put my binder back

4   together here.

5              REDIRECT EXAMINATION OF KEVIN DEXTER

6   BY MR. SHUMAKER:

7   **Q.**  Mr. Dexter, do you recall being deposed in this case?

8   **A.**  I do.

9   **Q.**  And do you recall that one of the topics in my 30(b)(6)

10  deposition that the defendant served on you related to strategic

11  plans for Samsung?

12          MR. GLASS:  Objection, Your Honor.  What he was

13  designated for -- on a Rule 30(b)(6) is irrelevant to his

14  testimony at trial.

15          THE COURT:  Let me speak with counsel.

16          (Following sidebar discussion had on the record:)

17          MR. ANTALICS:  May I, Your Honor, as a qualification

18  also?

19          THE COURT:  Yes, sure.

20          MR. ANTALICS:  Mr. Dexter was subpoenaed as a 30(b)(6)

21  Samsung witness at his deposition.

22          THE COURT:  Right.

23          MR. ANTALICS:  But today he was -- he's just testifying

24  as a witness in trial.

25          THE COURT:  Well, I know.  I understand that, right.

```
 1            MR. ANTALICS:  Okay.  And not speaking as Samsung

 2    today.

 3            THE COURT:  No, I understand that.  Thank you.

 4            MR. ANTALICS:  Okay.

 5            MR. SHUMAKER:  The point I'm simply trying to make is

 6    he was the individual identified by Samsung who testified under

 7    oath that he was the most knowledgeable person about Samsung's

 8    strategy, and he can identify anyone else in the future -- he

 9    cannot identify anyone else at that time who knew more than he

10    did.

11            THE COURT:  At that time.

12            MR. SHUMAKER:  At that time.  In fact, that was his

13    testimony.

14            MR. GLASS:  Your Honor, I'm just going read that

15    testimony is inadmissible without personal knowledge.  Rule

16    30(b)(6) "pertains to corporate depositions for purposes of

17    discovery.  It does not govern the admissibility of testimonial

18    evidence at trial."

19            "Moreover, Rule 602 of the Federal Rules of Evidence,

20    which does govern the admissibility of testimony or evidence at

21    trial, clearly states that a witness may testify to a matter

22    only if evidence is introduced sufficient to support a finding

23    that the witness has personal knowledge of the matter."

24            MR. SHUMAKER:  And to be clear, Your Honor, I am simply

25    asking what his personal knowledge was at the time he left in
```

1    June of two thousand --

2              THE COURT:  I think it's already been established.  I

3    mean, I let him testify through June, so I don't think there's

4    any question about.  He can rely on that, and that's fine.  He

5    can testify and he can tell us, you know, what the circumstances

6    were in June, and I'll give it whatever weight, if any, it's

7    entitled to going forward.  So I think that's fair.

8              MR. SHUMAKER:  Thank you, Your Honor.

9              MR. GLASS:  Your Honor, if I may, just for the record,

10   I'll make a record of what I was reading.  I was reading Judge

11   Kessler's decision from October 30th, 2014 in the *Saber*

12   *International Security* case which is found at 72 F.Supp.3d 131,

13   and I was reading from page 146.

14             THE COURT:  All right.

15             MR. SHUMAKER:  And just to be clear, you sustained the

16   objection?

17             THE COURT:  Yes.

18             MR. SHUMAKER:  Okay.  Thank you, Your Honor.

19             (Sidebar discussion concluded.)

20             THE COURT:  Yeah, I think the record -- I'll sustain

21   the objection.

22             I think the record's clear that I did allow the witness

23   to testify about his knowledge at the time that he was an

24   employee at Samsung up through June and what the circumstances

25   were up through in June, and I'll give that testimony whatever

 1    weight, if any, it's entitled to at the appropriate stage.

 2             MR. SHUMAKER:  Thank you, Your Honor.

 3             THE COURT:  All right.

 4             MR. SHUMAKER:  And thank you, Mr. Dexter, I have

 5    nothing further.

 6             THE WITNESS:  All right.  Thank you.

 7             THE COURT:  Any other questions before I let the

 8    witness go?

 9             MR. GLASS:  Thank you, Your Honor, no.

10             THE COURT:  All right.  Thank you, sir.  It's been

11    great to have you here.

12             THE WITNESS:  All right.  Thank you.

13             THE COURT:  Thank you.  Thank you, Counsel.  Thank you

14    very much.

15             All right.  You can call your next witness, Counsel.

16             MR. SHUMAKER:  Your Honor, we're calling Kevin Balon to

17    the stand.

18             THE COURT:  Good afternoon, sir.

19             THE WITNESS:  Hi.  How are you?

20             THE COURT:  Good.  How are you?  Do you have any

21    attorneys present?

22             THE WITNESS:  No, I do not.

23             THE COURT:  All right.  Counsel.

24               (KEVIN BALON, DEFENDANTS' WITNESS, SWORN)

25

1          DIRECT EXAMINATION OF KEVIN BALON

2     BY MR. SHUMAKER:

3     Q.   Mr. Balon, one thing I want to make clear at the start since

4     you don't have counsel present, if at any point in time I ask

5     you any questions or if anyone asks you any question that you

6     feel could delve into confidential material for Best Buy, please

7     let us know and we can ask those questions in a closed session.

8     Okay?

9     A.   Thank you.

10    Q.   Where are you employed, Mr. Balon?

11    A.   Best Buy Company.

12    Q.   And what is your current title?

13    A.   Senior vice president of merchandising, and I focus on our

14    Appliance Division.

15    Q.   How long have you been in that position?

16    A.   A little over two years.

17    Q.   How would you describe your responsibilities?

18    A.   I oversee our entire Appliance Division, which includes our

19    PAC Sales Division, which is located in California; our Major

20    Appliance Division; and our Small Appliance Division.

21    Q.   And how long have you been employed by Best Buy?

22    A.   A little over 18 years.

23    Q.   What prior positions have you held at Best Buy?

24    A.   I have worked in our inventory departments, I worked in an

25    area called customer centricity, I was a vice president of

1    musical instruments, and I've had many different positions

2    throughout the organization.

3    **Q.**   Would you consider yourself to be the person most

4    knowledgeable regarding appliances at Best Buy?

5    **A.**   Yes.

6    **Q.**   Okay.  I think everyone knows, but let's make certain.

7          What is Best Buy?

8    **A.**   Best Buy is a specialty store retailer that sells consumer

9    electronics and appliances.

10   **Q.**   Okay.  And when did Best Buy start selling appliances?

11   **A.**   I don't know exactly, but before my tenure -- I've been

12   there 18 years -- I believe about 25 years ago.

13   **Q.**   Is there anything that -- let me ask it this way:  What

14   distinguishes Best Buy from its competitors?

15   **A.**   We focus -- we're a specialty store retailer that focuses

16   specifically on consumer electronics and appliances, and we

17   don't carry any other types of products in the store.

18   **Q.**   Okay.  How many retail stores does Best Buy have?

19   **A.**   About a 1,046 big-box stores; about 400 mobile stores; and

20   28 PAC sales stores.

21   **Q.**   Can you give the Court an understanding of the difference

22   between a big-box store and a mobile store?

23   **A.**   Our mobile stores are smaller store concepts that focus on

24   mobile phones and their accessories, tablets and some digital

25   imaging type products, typically located in malls or very close

1    to surrounding areas for malls, and a very small format, about

2    3- to 5000 square feet.

3    **Q.**   Okay.  Now, you mentioned the big-box, the mobile stores and

4    PAC sales, right?

5    **A.**   Yes.

6    **Q.**   What is PAC sales?

7    **A.**   Pacific sales.  We have freestanding stores that are located

8    mainly in California, or almost all in California, that focus

9    specifically on appliances.  We do have some home theater

10   products in there as well as plumbing.

11   **Q.**   Do all of those stores sell appliances?  And I meant by all

12   the big-box, the mobile and the PAC sale stores.

13   **A.**   They have access to them, but they do not all have them

14   located in the stores.

15   **Q.**   Can you give a percentage of which of the stores -- some

16   percentage of the stores that actually do sell appliances?

17   **A.**   We do not sell any appliances in the mobile stores.

18   **Q.**   Okay.

19   **A.**   And then for the Best Buy big-box stores, about 950 of our

20   stores sell appliances.

21   **Q.**   Does Best Buy sell any appliances to builders or

22   contractors?

23   **A.**   Very small amount.

24   **Q.**   Okay.  And does Best Buy have a name for that service, the

25   selling of appliances to builders and contractors?

1    **A.**   We have a division called Best Buy Direct that --

2    **Q.**   And --

3    **A.**   -- sells to them.

4    **Q.**   And what is Best Buy Direct?  I'm sorry.

5    **A.**   Best Buy Direct is a portion of our organization that sells

6    products direct to contractors, builders.  It could be different

7    things like education systems or hospitals, stadiums in bulk,

8    and they deal direct with those individuals.

9    **Q.**   So it's not just appliances.  It could be computers or

10   televisions or things of that sort?

11   **A.**   That is correct.

12   **Q.**   Aside from Best Buy Direct, does Best Buy sell appliances to

13   builders and contractors off the retail floor?

14   **A.**   In our PAC Sales Division, we sell to contractors.

15   **Q.**   Let's say I am a custom homebuilder and I came into Best Buy

16   and decided I was going to buy a suite of appliances.  Can I

17   still do that in the retail floor?

18   **A.**   Of course, yes.

19   **Q.**   But I take it you don't know that because there's no

20   reporting?

21   **A.**   Correct.

22   **Q.**   Does Best Buy track the percentage of its sales in its

23   retail stores that go to contractors?

24   **A.**   Given that we don't identify in our -- in the majority of

25   our stores, no.  In Pacific sales, which is a much smaller

1    division, we do track the sales in those stores.

2    **Q.**   Now, you mentioned earlier that you don't have a whole lot

3    of sales in the builder channel; is that right?

4    **A.**   That's correct.

5    **Q.**   Does that include the sales of PAC sales?

6    **A.**   Yes.

7    **Q.**   Do you know the amount of appliance sales that PAC sales has

8    made to builders or contractors for 2014?

9    **A.**   Offhand I don't know the number, but it's probably under

10   $10 million.

11   **Q.**   Who does Best Buy consider to be its competitors in the sale

12   of appliances?

13   **A.**   Sears, Home Depot, Lowe's, H.H. Gregg and other retailers

14   that focus specifically on appliances.

15   **Q.**   What about distributors?

16   **A.**   In some cases.

17   **Q.**   In what cases would that be?

18   **A.**   I think that as you're looking at the total industry and

19   you're looking at appliance sales, distributors would be

20   competitors but it's not typically who we look at.

21   **Q.**   It's not who you're focusing on?

22   **A.**   Not really.

23   **Q.**   Okay.  How does the amount of Best Buy's appliances compare

24   to your main competitors?

25   **A.**   We would be ranked fourth in the industry.

1    **Q.**   Okay.  Has Best Buy's share of appliances been increasing

2    over the past five years?

3    **A.**   Yes, it has.

4    **Q.**   Has that share been increasing at a greater rate than the

5    other big retailers?

6    **A.**   As far as I know, yes.

7    **Q.**   What brand of appliances does Best Buy sell?

8    **A.**   We sell Samsung, LG, Whirlpool, Electrolux, Frigidaire, GE,

9    would be the biggest brands.

10   **Q.**   And I won't ask you for specifics, but are you able to rank

11   those brands in terms of overall sales at that Best Buy?

12   **A.**   Yes.  Samsung would be number one; LG would be number two;

13   Whirlpool, KitchenAid would be number three; Electrolux,

14   Frigidaire number four; and GE would be number five.

15   **Q.**   Okay.  Have any other manufacturers approached you about

16   selling appliances through Best Buy?

17   **A.**   Yes.

18   **Q.**   Who?

19   **A.**   Haier would be one has approached us.

20   **Q.**   And when did Haier last approach you?

21   **A.**   Probably about a year and a half ago.

22   **Q.**   Okay.  And what happened to that approach?

23   **A.**   It didn't go anywhere.

24   **Q.**   Okay.  Did Haier give you any indication as to what type of

25   appliances it wanted to sell?

1    **A.**   Yes.

2    **Q.**   What appliances?

3    **A.**   They wanted to sell refrigeration, ranges, laundry,

4    dishwashers.

5    **Q.**   Did they indicate what the price point might be for those

6    products?

7    **A.**   I would say yes, but I don't recall.

8    **Q.**   You don't have any specific recollection?

9    **A.**   No, sir.

10   **Q.**   Let's not guess.

11           Does Best Buy display appliances on the floor?

12   **A.**   Yes, we do.

13   **Q.**   Do the appliance manufacturers want their products on your

14   floor?

15   **A.**   Yes, they do.

16   **Q.**   And why is that?

17   **A.**   So customers can see the products.  They think it's a large

18   purchase that will be in your home for a long time, and people

19   still want to come in and see what these appliances look like

20   and be able to compare them against other products on the floor.

21   **Q.**   Do the manufacturers negotiate with Best Buy with respect to

22   getting their products on the floor?

23   **A.**   Yes.

24   **Q.**   Okay.  How often does that occur?

25   **A.**   Daily.

1    **Q.**  You said daily?

2    **A.**  Yes, sir.

3    **Q.**  Is there any difference between the manufacturers that are

4    all trying to get their products on the floor?

5    **A.**  There's differences in the ways that they come to market or

6    offer opportunities of putting products on the floor, but we

7    deal with all manufacturers.

8    **Q.**  Have they ever offered to give up any space?

9    **A.**  Not usually.

10    **Q.**  How does Best Buy determine which manufacturers get their

11    products on the floor?

12    **A.**  We spend a long time analyzing our business.  So we have

13    different buyers that buy different segments of the business.

14    We look at -- we actually try to look at the value of products

15    that are coming to market, where they sit, price points that are

16    on our floor.  We look at the types of offerings that they have,

17    the -- what types of value are being created by the simple steps

18    that -- and additions to the products.  Are we covered on our

19    floor with being able to tell certain stories and communicate to

20    the customer in an effective manner of why certain products have

21    certain prices versus others and have good representation of

22    products on our floor.

23    **Q.**  And how often do you make that assessment of what's on the

24    floor?

25    **A.**  I mean, it's ongoing.  It's -- it's how we operate.  We're

1  constantly evaluating our assortment.  We're trying to

2  understand what sells, what doesn't sell, trying to

3  understand -- everything on our floor -- we have limited space

4  on our floor.  We don't just have ongoing space that we can just

5  do whatever we want, so we evaluate how things are performing on

6  our floor, and everything on our floor has to perform in order

7  to remain on the floor.

8  **Q.**  And I take it that Best Buy determines what's physically

9  placed on the floor, correct?

10  **A.**  Yes.

11  **Q.**  Does the consumer have any role in that?

12  **A.**  Yes.

13  **Q.**  In what way?

14  **A.**  Again, the customer votes every day with the products that

15  they buy, and they help us understand what are the types of

16  value that they're looking for, and they help shape the products

17  that we put on our floors.

18  **Q.**  Can the appliance manufacturers do anything to get more

19  product on the floor?

20  **A.**  Yes.

21  **Q.**  What can they do?

22  **A.**  They can continue to evaluate their products, they can bring

23  good offerings to market, they can help us with advertising and

24  telling the right stories about their product.  They can create

25  displays inside of the store, they can educate our sales

1    associates.   There's a number of thing that they can do to help.

2    **Q.**   So better products would help them?

3    **A.**   Yes.

4    **Q.**   Would better pricing help them as well?

5    **A.**   Yes.

6    **Q.**   Better innovation?

7    **A.**   Yes.

8    **Q.**   And I take it all that would also help Best Buy, correct?

9    **A.**   Yes.

10   **Q.**   Would it help the consumer?

11   **A.**   Yes.

12   **Q.**   In what way?

13   **A.**   I think -- again, customers are looking for good values.

14   They're trying to understand the right value for them, and I

15   think better pricing helps them establish the right values for

16   what they're looking for.

17   **Q.**   Okay.   Has Samsung ever approached you about increasing its

18   amount of floor space at Best Buy?

19   **A.**   Yes.

20   **Q.**   Has LG done the same?

21   **A.**   Yes.

22   **Q.**   What about GE and Electrolux?

23   **A.**   Yes.

24   **Q.**   Is that a regular conversation?

25   **A.**   Yes.

1  **Q.**  Does Best Buy ever remove a particular product from the

2  floor?

3  **A.**  Yes.

4  **Q.**  Why would Best Buy remove an appliance from display on the

5  floor?

6  **A.**  If it's not meeting our sell-through requirements, if it's

7  not delivering profit, and if it's not delivering a good return

8  for the space that it takes up on our floor, then we need to put

9  a more productive unit on the floor.

10  **Q.**  Do you have any discussions with the manufacturer before you

11  take that product off the floor?

12  **A.**  Yes.

13  **Q.**  Do you always have that conversation?

14  **A.**  I think always is a tough word, but we would try to have

15  that conversation before we would remove it from the floor.

16  **Q.**  Are there any discussions in which the manufacturers try to

17  stop you from doing that?

18  **A.**  Yes.

19  **Q.**  Okay.  Are there discussions regarding what the

20  manufacturers can do to make that particular product sell

21  better?

22  **A.**  Yes.

23  **Q.**  And what types of things are discussed on that front?

24  **A.**  Somewhat discussed a few minutes ago, but we -- we can talk

25  about pricing.  We can talk about helping the consumer better

1    understand the value of the product.  They could invest in

2    training on our floors to help talk about the benefits.  They

3    can advertise, help us advertise those products in different

4    vehicles.  They can make investments of how they're displayed on

5    the floor.  So there's a number of different ways that they

6    could increase the sell-through of the product on the floor.

7    **Q.**  Have you ever had the situation where a manufacturer

8    increased the price of the appliance?

9    **A.**  Yes.

10   **Q.**  Have you ever had the situation where following that price

11   increase it led to poor performance for that product?

12   **A.**  Yes.

13   **Q.**  And how did you respond in that situation?

14   **A.**  We worked with the vendor to either make changes to one of

15   the things that we just talked about, or we will -- or we would

16   remove the product from the floor.

17   **Q.**  Have you ever had the manufacturer decrease the price in

18   response to a threat to take the product off the floor?

19   **A.**  Yes.

20   **Q.**  How common is that?

21   **A.**  I think there are -- what I would say is they would try to

22   do a number of things first, but it's fairly common to reduce a

23   price on the floor if the product's not selling.

24   **Q.**  If this merger were to go through and the new emerged entity

25   tried to increase the price of appliances, would you simply

1    accept the price increase?

2    **A.**   No.

3    **Q.**   What would you do in response?

4    **A.**   We would, again, work on the value of the products and how

5    they're coming to market.  We would compare it to the other

6    products that are on the floor, and we would look at the

7    suggestions of -- do we think these are going to work, and do

8    they have the right value statements on our floor?  Do they

9    continue to fit in the right slots on our floor?  And try to

10   work with them to make sure that, again, we're telling the

11   appropriate stories on our floor.

12   **Q.**   Would you consider replacing them on the floor?

13   **A.**   Potentially, but I guess it would all depend on how they

14   perform.

15   **Q.**   Does Best Buy monitor the commodity pricing in anyway?

16   **A.**   Not really.

17   **Q.**   No?  Okay.

18            In the face of a -- of an increase by a -- an appliance

19   manufacturer, do you feel any sense of obligation to push back?

20   **A.**   Yes.

21   **Q.**   What obligation do you have?

22   **A.**   Again, as we look across all products, we look across all

23   manufacturers, we have a responsibility of bringing good value

24   to our customers and helping customers understand what they're

25   getting when they spend their money.  There needs to be logical

1    steps on our floor for the pricing that we put on our floor, and

2    we would try to make sure that our customers are getting good

3    value.

4    **Q.**   So the obligation you would see is to the customer?

5    **A.**   Yes.

6    **Q.**   Who was the first major retailer in the U.S. to carry

7    Samsung --

8    **A.**   I believe it was --

9    **Q.**   -- appliances?

10   **A.**   I believe it was Best Buy.

11   **Q.**   Okay.  Who was the first major retailer in the U.S. to carry

12   LG appliances?

13   **A.**   Again, I believe it was Best Buy.

14   **Q.**   Do you recall when you started to carry Samsung and LG?

15   **A.**   I don't know the exact date.  I believe it was around 10 or

16   11 years ago.

17   **Q.**   Do you recall which types of appliances were introduced by

18   Samsung and LG first?

19   **A.**   Again, I don't know for sure.  And I would give you an

20   educated guess that it started in laundry, but I don't know for

21   sure because I wasn't involved in the business then.

22   **Q.**   And that's the same for Samsung and LG?

23   **A.**   I believe, yes, sir.

24   **Q.**   Since Samsung -- I'm sorry.

25           Since Best Buy began carrying Samsung appliances, has

1    its share of Best Buy's appliance sales increased?

2    **A.**   Yes.

3    **Q.**   By what measure?

4    **A.**   Significant.

5    **Q.**   From coming in ten years ago -- and I presume it was zero --

6    what shares do they have now, Samsung?

7    **A.**   I don't know if I feel comfortable answering that.

8    **Q.**   Okay.  That's fine.

9         In the past five years, how have the individual

10   appliance manufacturers' sales figures changes, if they have

11   changed?

12   **A.**   In the industry?

13   **Q.**   Yes, sir.  Well, not in the industry but at Best Buy, what

14   you know.

15   **A.**   If you're talking specifically at Best Buy, we have seen

16   Samsung and LG have both grown.  And as we talked about before,

17   they were not on our floor ten years ago, and today they would

18   be my number one and number two vendors on floor.

19   **Q.**   And who have they taken that floor space from?

20   **A.**   That would have come from Whirlpool, GE and Electrolux.

21   **Q.**   Do you have a view as to why they have been able to do that

22   over the past five years?

23   **A.**   In my stores?

24   **Q.**   Yes, sir, Best Buy.

25   **A.**   I think there is -- they're large in the CE industry, both

1    Samsung and LG are very large in the consumer electronics

2    industry.  They've built quality brands in both -- for both of

3    them in the CE industry, and I think that correlates onto the

4    appliance floor.  And both manufacturers have worked hard to

5    bring new technologies to market that have differentiated them

6    from other brands on our floor, and our customers seem to

7    respond very well to those technology improvements that they've

8    made.

9    **Q.**   Is there any difference in the pace in which Samsung and LG

10   have brought innovation to the appliance industry?

11   **A.**   In my opinion, yes.

12   **Q.**   In what way?

13   **A.**   They typically just move faster to bring new innovation to

14   their products and introduce that innovation at a faster rate

15   than other manufacturers have.

16   **Q.**   Have you seen Samsung or LG bundling its appliances with

17   consumer electronics?

18   **A.**   Yes.

19   **Q.**   And when you -- I think you and I know what we're talking

20   about.

21          What do you mean by bundling?

22   **A.**   We put together a package, so if you buy a certain amount of

23   appliances, you could get a free TV or a free tablet.

24   **Q.**   And have those promotions been successful?

25   **A.**   Yes.

1   **Q.**  Based upon that success, would you expect it to occur in the

2   future?

3   **A.**  Yes.

4   **Q.**  In your view, does Samsung and LG have an advantage over the

5   manufacturers that don't sell consumer electronics with respect

6   to appliances?

7   **A.**  No.

8   **Q.**  No?  Okay.

9         Why not?

10  **A.**  I think that as you look at the appliance industry, all

11  manufacturers have an opportunity to bring innovation, to create

12  great values and to put quality products on our floors, and the

13  way that they go to market can be different across all of them.

14  **Q.**  Understood, understood.

15        Everyone has a way in which they can compete; is that

16  fair?

17  **A.**  Sure.

18  **Q.**  When Samsung or LG come into the market, do they come in at

19  any particular price point?

20  **A.**  Typically, their price points are mid to upper end.

21  **Q.**  Okay.  Over time, do they expand that price point?

22  **A.**  In some cases.

23  **Q.**  Okay.  In what cases have you seen that happen?

24  **A.**  We've seen -- I think on both sides we've seen introductions

25  of lower price points, and we've also seen introductions of

1    higher price points.

2    **Q.**   Sure.  So they span on both sides?

3    **A.**   Yes.

4    **Q.**   Do Samsung and LG participate in promotional pricing during

5    the year?

6    **A.**   Yes, they do.

7    **Q.**   And do the other manufacturers as well?

8    **A.**   Yes, they do.

9    **Q.**   How would you characterize Samsung and LG's promotional

10   pricing strategy?

11   **A.**   I don't know if I know exactly how to answer the question.

12   **Q.**   Let me ask you:  Are they more aggressive than the other

13   companies?

14   **A.**   Again, depending on the sale or depending on a given product

15   category, they can be.

16   **Q.**   Okay.  It depends on the event?  It depends on the

17   circumstances?

18   **A.**   Correct.

19   **Q.**   In a given year, how many appliance promotions does Best Buy

20   have?

21   **A.**   That's a great question.  Many.

22   **Q.**   Do you have one over Black Friday, I take it, each year?

23   **A.**   Yes, sir.

24   **Q.**   And how long does that run?

25   **A.**   It actually has turned into Black November, and it goes from

1    11-4 through 12-2.

2    **Q.**   Okay.  Do you have a promotional event for appliances during

3    the 4th of July?

4    **A.**   Yes, sir.

5    **Q.**   How long does that run?

6    **A.**   Typically about three weeks.

7    **Q.**   Do you have a promotional event for Labor Day?

8    **A.**   Yes, sir.

9    **Q.**   How long does that run?

10   **A.**   About three weeks.

11   **Q.**   How about President's Day weekend?

12   **A.**   Yes, sir.

13   **Q.**   How long does that run?

14   **A.**   About two weeks.

15   **Q.**   How about MLK Day?

16   **A.**   Yes, sir.

17   **Q.**   How long does that run?

18   **A.**   About a week.

19   **Q.**   I'm going to go through them all.

20           Columbus Day?

21   **A.**   Yes, sir.

22   **Q.**   How long?

23   **A.**   About a week.

24   **Q.**   Memorial Day?

25   **A.**   Yes, sir.

1    **Q.**   And how long?

2    **A.**   About three weeks.

3    **Q.**   This one I'm not sure about.

4              Veteran's Day?

5    **A.**   What I would tell you is Best Buy, we didn't do promotions

6    for Columbus Day and Veteran's Day.  What we tried to do this

7    year was a prep your home event that we did that kind of brought

8    those two holidays together, so instead of making it about

9    Veteran's Day or Columbus Day we talked about prep your home.

10   **Q.**   Okay.  This one was new to me.

11             X13, do you know what that is?

12   **A.**   That's typically the week after Christmas.

13   **Q.**   Okay.  And does that last for a week?

14   **A.**   About, yes.

15   **Q.**   How many weeks in total would you say Best Buy has

16   promotions on appliances?

17   **A.**   On those types of secondary holidays and events, it's

18   probably about 16 weeks.

19   **Q.**   Have you experienced Samsung and LG appliances participate

20   at a lower price point during those promotional periods?

21   **A.**   Yes.

22   **Q.**   Have you ever experienced the promotional discounting moving

23   a product from one general price point category, like mass

24   premium, to a lower price category, like mass?

25   **A.**   Yes.

1    **Q.**   Is it fair to say that the promotional pricing sometimes

2    blurs the lines?

3    **A.**   Yes.

4    **Q.**   Have you seen Samsung or LG introduce any value-priced

5    appliances separate and apart from promotion?

6    **A.**   We've seen Samsung introduce some products in the

7    refrigeration category that would be more everyday pricing but

8    still would not go down into opening price point or value

9    pricing.

10   **Q.**   So a little bit normal -- a little bit lower than normal,

11   but all not all the way down to the bottom?

12   **A.**   Correct.

13   **Q.**   Is that across all cooking appliances?

14   **A.**   We haven't necessarily seen that in cooking.  We had seen

15   that in refrigeration.

16   **Q.**   Refrigeration, okay.

17          Have you seen a situation where a consumer jumps up in

18   price in order to get a particular innovation?

19   **A.**   Yes.

20   **Q.**   Does that happen often?

21   **A.**   Yes.

22   **Q.**   Can you explain how or why that happens?

23   **A.**   I think customers come in expecting to buy -- they've done

24   research.  They come in expecting to buy a certain product at a

25   certain price.  When they engage sales associates on the floor

1    and learn more about what they're trying to do, how the product

2    will fit within their lifestyle, and understanding the benefits

3    that they can get by stepping up to another product, there are

4    times where they he find that to be a better value and make that

5    step into that better product.

6    **Q.**   Okay.  Is it fair to say that competition between the

7    manufacturers is not just on price alone?

8    **A.**   Correct.

9    **Q.**   What other things would they compete on?

10   **A.**   Innovation, communication to the customer, training, point

11   of purchase materials, marketing, advertising, many different

12   ways.

13   **Q.**   And you talked about earlier that you believe Best Buy right

14   now has not a whole lot of sales into the builder channel,

15   correct?

16   **A.**   Correct.

17   **Q.**   Are you looking to change that?

18   **A.**   We have started to look at opportunities to participate in

19   that.

20   **Q.**   Have you spoken to any third parties regarding improving

21   that?

22   **A.**   We have.

23   **Q.**   Who have you spoken with?

24   **A.**   We've spoken to Samsung, LG and GE.

25   **Q.**   And have those companies expressed any interest in

1    partnering with Best Buy?

2    **A.**   Yes.

3    **Q.**   Okay.  Which ones?

4    **A.**   All.

5    **Q.**   And what is the current state of the discussions with

6    respect to those companies?

7    **A.**   Preliminary, we've started to -- it's a -- it's an industry

8    that we have not done a lot of work in.  We're trying to

9    understand if we would have a place in there and it would work

10   for Best Buy.

11   **Q.**   Will there come a time at which you would pick a partner?

12   **A.**   Most likely, yes.

13   **Q.**   What is Samsung Open House?

14   **A.**   It is a designated area on a retail floor that showcases a

15   Samsung product in a given area and only Samsung products.

16   **Q.**   Just Samsung?

17   **A.**   Yes, sir.

18   **Q.**   Does any other manufacturer have that type of approach with

19   Best Buy?

20   **A.**   Not exactly.  We do have vignettes that we have on the floor

21   or feature areas that we have on our floors, but it is different

22   than the majority of manufacturers on our floor.

23   **Q.**   Is it fair to say that no one has it certainly at that size?

24   **A.**   Our Pacific sales store within a store has designated areas

25   for manufacturers.

1    **Q.**   Okay.

2    **A.**   So if you look at Jenn-Air or Thermador or Viking, we have

3    designated areas on those floors but none would be as large as

4    the Samsung Open House.

5    **Q.**   Now, is this a new concept that Best Buy entered into with

6    Samsung?

7    **A.**   Yes.

8    **Q.**   When?

9    **A.**   We introduced it -- the first one was in May of this year.

10   **Q.**   Has it been successful?

11   **A.**   Yes, sir.

12   **Q.**   How many stores currently have a Samsung Open House?

13   **A.**   Approximately 225.

14   **Q.**   And I think you said this, but there's just Samsung in that

15   location?

16   **A.**   That is correct.

17   **Q.**   And that includes appliances?

18   **A.**   Appliances, some microwaves and vacuums.

19            MR. SHUMAKER:  Your Honor, I have nothing further in

20   open session.  I have two documents that I'd like to go through

21   with Mr. Balon if we close it later.

22            THE COURT:  All right.  How much time do you think it

23   would take?

24            MR. SHUMAKER:  For the documents, 15, 20 minutes tops.

25            THE COURT:  All right.  Let's do this.  It's about ten

1    minutes to one.  If we started it we probably couldn't finish

2    it.  Let's break for lunch until 2:00, and then at the 2:00

3    session we'll start on the confidential record.

4              MR. SHUMAKER:  Okay.

5              THE COURT:  So who do you want present for that

6    session?

7              MR. SHUMAKER:  That will be only the in-house counsel

8    that are approved under Your Honor's order.  There's no Best Buy

9    counsel here, but everyone else, of course, the parties can

10   stay.

11             THE COURT:  All right.  Okay.  So we'll break for lunch

12   until 2:00.  And then when we proceed at 2 we'll be off the

13   record, it'll be confidential, and then we'll open the

14   courtroom.

15             And you had one other question that you had asked

16   earlier that you need an answer too as well?

17             MR. SHUMAKER:  Yes, Your Honor.

18             THE COURT:  All right.  Okay.  So enjoy your lunch.

19   We'll start at 2:00.

20             MR. SHUMAKER:  Okay.

21             THE COURT:  What's your pleasure about this evening?

22   What do you want to do?  I don't have any strong feelings.  If

23   you want to stay late, that's fine.

24             MR. MAJORAS:  Your Honor, if it's okay with you,

25   perhaps we can discuss this, and as soon as we come back from

1   lunch we can let you know where we are.

2             THE COURT:  That's fine.

3             MR. MAJORAS:  We might still be perfectly fine on

4   timing.

5             One question I had.  Earlier in the week you mentioned

6   there might be another hearing you had tomorrow.  Is that still

7   on the calendar?

8             THE COURT:  There is at -- it's at 2:00, and it's going

9   to be -- it's going to be a very streamlined.  It's going to be

10  for about an hour, though, maybe an hour and 15 minutes or so at

11  2:00.

12            MR. MAJORAS:  Okay.  Thank you.

13            THE COURT:  It is 2.

14            MR. MAJORAS:  We'll discuss it over the lunch break and

15  respond as soon as we get back from lunch.

16            THE COURT:  All right.  That's fine.  All right.

17            Thank you.  You can enjoy your lunch.  I have to ask

18  you not to discuss your testimony with anyone.

19            THE WITNESS:  Okay.

20            THE COURT:  And we'll see you at 2:00.

21            THE WITNESS:  Thank you.

22

23       (Thereupon, a luncheon recess was had beginning at

24  12:53 p.m.)

25

1                    **AFTERNOON SESSION, DECEMBER 3, 2015**

2      (2:06 p.m.)

3                THE COURT:  All right.  Good afternoon, Counsel.  All

4      right.  We're on the confidential record here, so...

5                MR. SHUMAKER:  Yes.  We're about 15 or 20 minutes in

6      the confidential record, Your Honor.

7                THE COURT:  All right.

8                MR. SHUMAKER:  And it --

9                THE COURT:  Who would you like to be in the courtroom?

10               MR. SHUMAKER:  It would be the counsel for the parties,

11     their agents and in-house counsel have approval under your

12     order.  Everyone else, I believe, will need to leave.

13               THE COURT:  Okay.  If you don't fit into one of those

14     categories, ladies and gentlemen, I have to ask you to step

15     outside just for a few minutes, probably a half hour, probably.

16               MR. SHUMAKER:  And, Your Honor, just following

17     Mr. Glass' lead, I wanted to introduce one of the new member at

18     our table, Joe Sims, partner of ours, is at the table.

19               THE COURT:  Mr. Sims, how are you?  Good.  Welcome.

20                              * * * * *

21               (Thereupon, the following proceedings were closed by

22     order of the court but are included as part of the transcript

23     production in this case.)

24                              * * * * *

25     ████████████████████████████████████████████████









4284



4285



4286





4288



4289





4291



















4300





1

2

3

4

5

6

7

8                          *  *  *  *  *

9          (Thereupon, the previously closed proceedings concluded

10    and the following further proceedings were held in open Court:)

11                          *  *  *  *  *

12          MR. DEMITRACK:  Good afternoon, Your Honor.

13          THE COURT:  Good afternoon, Counsel.

14          MR. DEMITRACK:  Tom Demitrack for the Electrolux

15    defendants.  The defendants call Mr. Jonathan Orszag.

16          THE COURT:  All right.

17          MR. DEMITRACK:  Your Honor, while the witness is

18    approaching, you should have two binders:  One, a small binder

19    with a series of slides that we'll be using, called Volume 1.

20          THE COURT:  Let's see.  I'm sure I do.

21          (Discussion had off the record.)

22          THE COURT:  All right.  Good afternoon, sir.

23          THE WITNESS:  Good afternoon to you.

24          (JONATHAN ORSZAG, DEFENDANTS' WITNESS, SWORN)

25

1          <u>DIRECT EXAMINATION OF JONATHAN ORSZAG</u>

2     <u>BY MR. DEMITRACK:</u>

3     **Q.**   Good afternoon.  Can you please state your name so we have

4     it for the record?

5     **A.**   Jonathan Orszag.

6     **Q.**   Mr. Orszag, where are you currently employed?

7     **A.**   I'm a senior managing director at Compass Lexecon, an

8     economic consulting firm.

9     **Q.**   And what is Compass?

10    **A.**   It's an economic consulting firm.  We do a wide variety of

11    work on economic matters.  A big portion of our work involves

12    antitrust matters.

13    **Q.**   You're married, I assume?

14    **A.**   Yes, I am.

15    **Q.**   You're wearing a ring.  Kids?

16    **A.**   11-month-old daughter who has given me many illnesses, so

17    thus I'm nursing a sore throat again.

18    **Q.**   If you put the mic up close, that will assist, sir.

19    **A.**   Thank you.

20    **Q.**   Could you tell the Court a little bit about your educational

21    background?

22    **A.**   Sure.  I studied first at Princeton.  I studied economics.

23    And given that it's relevant for this case, I had three mentors

24    or advisors while I was there.  One is -- not as relevant for

25    this case -- Alan Krueger, who's gained some notoriety recently

1  because he was mentioned in one of the presidential debates.

2        Another was Orley Ashenfelter, A-S-H-E-N-F-E-L-T-E-R,

3  and Professor Ashenfelter did one of the merger retrospectives

4  on the Maytag/Whirlpool deal which I'll be talking about today.

5        And my final mentor advisor was Robert Willig, who's an

6  antitrust economist and scholar and was mentioned earlier in

7  this case as someone who's laid the foundations for some of the

8  analyses that we will do here.

9  **Q.**   Okay.  And do you have any degrees after Princeton?

10  **A.**   Yes.  I received a scholarship to attend Oxford University,

11  and I received a Master's of Science there at Oxford.

12  **Q.**   No Ph.D.?

13  **A.**   No.  When I was at Oxford I had -- I was given the

14  opportunity to return to Washington and serve for President

15  Clinton on his National Economic Council, and I had to make a

16  tradeoff:  To stay in school and finish my Ph.D., or to try to

17  apply economics in real-world situations.  And I came from an

18  academic family.  My oldest brother was an academic.  My father

19  was one at MIT, Princeton and Yale throughout his career.  And I

20  made the decision at that time that serving in government was

21  what was best for me, and it would allow me to learn from some

22  of the best economists that there were in the world.  At the

23  time Janet Yellen, who's now the chairwoman of the Federal

24  Reserve, was the chair of the Council of Economic Advisors,

25  people like Lori Polsen, Gene Sperling and many others,

1    including Larry Summers, who were there, were people who helped

2    inform how to apply economics to real-world situations for me.

3    **Q.**   And how long did you stay in that position, sir?

4    **A.**   I stayed in there a total of six years working in the

5    Clinton administration.  I started actually in the building

6    right next door here at the Department of Labor, and then --

7    this was before I went to graduate school.  And then I worked at

8    the White House.  And I finished my government career as the

9    director of the Office of Policy and Strategic Planning at the

10   U.S. Department of Commerce.

11   **Q.**   And what did you do in that position, Mr. Orszag?

12   **A.**   I did what I had done at the White House, which was apply

13   economics to real-world policy situations.  It was also right

14   around 1999, 2000, so I was deeply involved in the biggest

15   survey that the government does every year, the decennial

16   census.  And as some people in the room may know, the Department

17   of Commerce also oversees a number of economic statistics

18   agencies, so I was deeply involved in those issues as well.

19   **Q.**   And you said you spent about six years with the Clinton

20   White House.

21        Did you have any subsequent government service?

22   **A.**   No, I left -- when I left the administration, I started in

23   the private sector.  I've continued to keep my hand in the

24   policy world.  I'm a senior fellow at the Center for American

25   Progress here in Washington, D.C., and I've been asked by then

1    candidate Obama to serve on a very small pre-transition economic

2    team to help advise on what to do when -- if he were elected in

3    November of 2008 and how he should get running right away.  And

4    so it was a team that included the current Secretary of the

5    Treasury, Jack Lew; the former ambassador to the OACD; the

6    former White House chief of staff; somebody who runs a think

7    tank here in Washington, D.C.  Let's see, it was also the former

8    director of the Congressional Budget Office.  So it was a very

9    small team.  There were nine of us, and we started meeting in

10   the summer of 2008, and we met up until the election day when we

11   then worked with the transition team.  And I was responsible for

12   overseeing issues with the auto industry.  So how could the

13   president, once he took office, help get the auto industry back

14   up on its feet.

15   **Q.**   In the late summer early fall 2008 was a significant time in

16   this country's history, correct?

17   **A.**   Yes.

18   **Q.**   Economically?

19   **A.**   Economically, yes.  In September of '08 the country went

20   through a very significant market panic, I think, is fair to

21   describe it as, and liquidity crisis.  And we saw companies that

22   we never thought could go under go bankrupt.  And so that period

23   from September to November was particularly an important time

24   for the economy.

25   **Q.**   Let's turn to your work at -- your professional work at

1    Compass Lexecon.  What type of matters do you work on at

2    Compass?

3    **A.**  I like to say I work on anything with interesting economic

4    issues.

5    **Q.**  Have you analyzed mergers?

6    **A.**  That's some of the most interesting work I think that the

7    firm has, and so I'm very involved in the analysis of mergers.

8    It's what I primarily do.

9    **Q.**  Okay.  Approximately how many mergers have you analyzed from

10   a competitive standpoint during your period of time at Compass

11   Lexecon?

12   **A.**  It's too many to count at this point.  I stopped counting

13   when I did about 100, and I believe it's now something on the

14   order or magnitude of 125 to 150 where I've either provided

15   counseling prior to a merger -- so that may be a merger that

16   never got announced -- to working on consummated mergers.

17   **Q.**  And in the course of your work on merger analysis, have you

18   also addressed the issue of efficiencies insofar as they relate

19   to mergers?

20   **A.**  Yes.  Efficiencies are a central part of the analysis of

21   mergers, and so in many, not all cases, I've been involved in

22   the efficiencies analysis.

23   **Q.**  And you've conducted efficiencies in the course of that

24   work?

25   **A.**  Yes, I have.

1    **Q.**   Have you received any professional honors for your work in

2    the field of economics?

3    **A.**   Yes, I have.  When I was in government, I received an award

4    from a nonprofit here in Washington, D.C. for my work for

5    expanding economic opportunity in America.  This was about

6    increasing savings rates among lower income individuals and

7    families.  It was a policy idea that I had worked on for a

8    number of years and then helped get implemented, passed by

9    Congress and then funded.  And so I received an award during

10   that time.

11          In the private sector I've received awards for being

12   40 -- under 40 in the industry magazines, in terms of best

13   competition economists and then one of the best young

14   competition economists, and acknowledged in various other

15   magazines about being at the top of the competition space, I'd

16   say.

17   **Q.**   Have you published any papers in the field of economics?

18   **A.**   Yes, I have.

19   **Q.**   And have you published any papers in the field of economics

20   in a peer-reviewed journal?

21   **A.**   Yes, I have.

22   **Q.**   Okay.  What's a peer-reviewed journal?

23   **A.**   It's when you submit a paper and other economists review it,

24   provide comments and either it's accepted outright, it's

25   accepted with revisions or it's rejected.  And so in the cases

1  where it was either accepted or accepted with revisions, it

2  ended up in the journal.

3  **Q.**  Are you a member of any professional economic associations?

4  **A.**  Yes, I am.  I'm a member of the American Economic

5  Associations, the American Finance Association, and the

6  Econometric Society.

7  **Q.**  Thank you.  Have you testified in or before courts or other

8  judicial bodies or administrative bodies?

9  **A.**  Yes, I have.

10  **Q.**  A number of times?

11  **A.**  I haven't counted.  If I include testifying to Congress, I'd

12  probably say 15 to 20, but I don't have a precise number in my

13  head.

14  **Q.**  All right.  Thank you.

15       And in your testimony in courts or other judicial

16  bodies, have you addressed issues of economics?

17  **A.**  Every single time I would say that they were about economics

18  because that's what I do.

19  **Q.**  Okay.  And is there a particular area of economics that you

20  specialize in?

21  **A.**  I like to call it applied microeconomics.  It's -- because

22  my specialty is in applying economics to real-world situations,

23  so that's why I like using the term "applied microeconomics."

24  And that would cover a subpart of microeconomics, which would be

25  industrial organization, which can also be known as antitrust

1    economics.

2    **Q.**   Industrial organization is the study of the firm?

3    **A.**   Yes.

4    **Q.**   Okay.  And just so we're clear, what do you mean by the firm

5    in that answer?

6    **A.**   I think it's fair to just -- I like to broaden it and use a

7    term that economists often like to use, "industrial

8    organization."  I think it's just better to use "antitrust

9    economics" or "competition economics" because that -- while it

10   may sound nice for economists to use terms like "industrial

11   organization," they don't have much meaning outside of the field

12   of economics, and so using "antitrust economics" or "competition

13   economics" seems to me to be more understandable for people

14   outside of the economists' space.

15          MR. DEMITRACK:  Your Honor, at this time the defendants

16   move to quality Mr. Orszag as an expert in the field of applied

17   microeconomics, industrial organization and antitrust economics.

18          THE COURT:  All right.  Any voir dire, Counsel?

19          MR. SHUMAKER:  No, Your Honor, no objection.

20          THE COURT:  All right.  Then the Court will allow the

21   witness to testify as an expert in those proffered areas.

22          All right, Counsel.

23          MR. DEMITRACK:  Thank you.

24   BY MR. DEMITRACK:

25   **Q.**   When you are retained to evaluate a merger, is there an

1    approach that you typically follow in conducting that

2    investigation?

3    **A.**   Yes.  I would segregate these into two categories, if that's

4    okay.  First, what do I have to do to inform myself; and then

5    what framework do I use to then analyze the issues?

6         So I like to inform myself by, obviously, looking:

7    What are the products at issue?  And in my experience working in

8    all of the different mergers I've worked on, some are tangible.

9    So you can think about appliances here.  We all have appliances

10   in our house, so the first thing you do is you go look at what

11   stove you have or what refrigerator, but then you may walk into

12   a store and you may want to just get information from industry

13   reports or from talking to the business people to understand the

14   structure of the industry.

15        There are other cases where you're working on an issue

16   that isn't, shall we say, as tangible, so it may involve brake

17   pads, say, or the wood production, or something that is less

18   tangible where you really do need to rely on industry reports

19   and talking to the business people in trying to understand

20   information that's available to then analyze.

21        The second part is:  What framework do you use?  And

22   the -- there's a well-known, well-established approach, and much

23   of that is embodied in the Horizontal Merger Guidelines from

24   2010.

25   **Q.**   Thank you.  Now, when we think about merger analysis, is

1       that a backward-looking or a forward-looking exercise?

2       **A.**   It's fundamentally a forward-looking exercise.  We're trying

3       to predict the future.  What will happen following the merger?

4       Will prices go up?  Will prices go down?  Will the prices be

5       unchanged?

6                We're not -- we're not looking to what happened in the

7       past to project the merger, except that the past can provide

8       critical information about what will happen in the future.  And

9       so it provides a source of information, so that direct evidence,

10      that natural experiments about what happened in the past, help

11      to inform what will happen in the future.

12      **Q.**   Is this -- this analysis, is this a theoretical or an

13      empirical analysis?

14      **A.**   I believe it's deeply empirical.  It's -- it's looking at

15      data in facts to help guide the decision about or conclusion

16      about whether prices will go up, down or stay the same.

17      **Q.**   The analysis that you described in your responses to these

18      several questions I've asked you, did you apply that fundamental

19      analysis in your work on this case?

20      **A.**   Absolutely.

21      **Q.**   And what did you do?  Did you talk to people?  Look at

22      documents?  Just generally, we don't need to have a lengthy

23      discussion, but just generally explain for the Court.

24      **A.**   All of the above.  I spent a day at each, at Electrolux and

25      GE, so I could walk showrooms that, say, Electrolux has.  I

1   spent time at the GE plant there.  I should note it probably has

2   the biggest parking lot I've ever seen in my entire life.  I've

3   spent time with documents.  I've spent time -- much more time

4   with data.  And we have a wealth of data in this case.  There's

5   transactions data from each of the retailers -- not from the

6   retailer -- from about four to five retailers.  There's

7   information from suppliers.  So we have a wealth of data to

8   analyze in this matter.

9   **Q.**  Did you visit retailers in the course of your work?

10  **A.**  Yes, I did.

11  **Q.**  And which ones, do you recall?

12  **A.**  All of the above.  I spent time at P.C. Richard, Best Buy,

13  Home Depot, Lowe's, Costco, et cetera.

14  **Q.**  Okay.  Did you reach any opinions in this case as a result

15  of your investigations?

16  **A.**  I reached many opinions.  In this binder I think we have

17  three reports that cover hundreds of pages, and in them there

18  are lots of opinions and a lot of detailed econometric and

19  economic analyses.

20      MR. DEMITRACK:  Your Honor, we provided the witness

21  with copies of his three reports, as well as the Court.  He may

22  need to refer to them in the course of his work.

23      THE COURT:  That's fine.

24      MR. DEMITRACK:  Thank you very much.

25  BY MR. DEMITRACK:

1    **Q.**  And did you prepare a document today to assist the Court in

2    understanding your opinions?

3    **A.**  Yes, I did.

4    **Q.**  And would that document assist you in preparing your

5    opinions -- in providing and describing opinions today?

6    **A.**  Yes.  I think they -- the document attempts to summarize my

7    opinions, which are more completely laid out in the reports that

8    I just described.

9    **Q.**  All right.  We placed in front of you Defense Exhibit 658.

10   Is that the document that you prepared?

11   **A.**  Yes, I did.

12   **Q.**  We will have an opportunity in the next several hours to

13   explore your views in detail, Mr. Orszag, but could you give the

14   Court an overview of your opinions as a result of the work that

15   you've done in this case?

16   **A.**  Sure.  I'd say my summary of my opinions are that this is a

17   competitive market today, and post-merger it will continue to be

18   a competitive market.  There are a large number of suppliers.

19   They are competing with each other.  There are multiple paths

20   that they --

21            THE COURT:  What market are you referring to?

22            THE WITNESS:  This is the --

23            THE COURT:  Define the market that you're talking

24   about.

25            THE WITNESS:  Sure.  So for analytical purposes, I'm

1   looking at the market for ranges, cooktops and wall ovens

2   separately.

3           THE COURT:  All right.

4           THE WITNESS:  I should just note right now, there's

5   evidence to suggest that you should combine cooktops and wall

6   ovens because they're often bought in pairs, but it doesn't

7   change the analysis one way or the other if you combine them or

8   not.  So to help present the issues more clearly, I treat them

9   each as separate so that we can go through them, because that's

10  also what Professor Whinston did.

11          THE COURT:  All right.

12  BY MR. DEMITRACK:

13  **Q.**  Can you continue with an overview of what you did in terms

14  of evaluating the competition in this marketplace?

15  **A.**   Sure.  There are -- suppliers have multiple ways to reach

16  consumers.  Those are either individual retail consumers or

17  contract consumers.  They can reach those consumers through

18  retailers, distributors, wholesalers, or in some cases,

19  directly.  So there's multiple ways that they -- that the

20  product gets from the supplier to, in essence, a home or an

21  apartment.  That retailers and other large buyers have the

22  ability to drive competitive outcomes, so they can punish a

23  supplier who gets out of line by moving share from one

24  manufacturer or one supplier to another, and that this

25  environment will continue post-merger.  These factors will all

 1    be present post-merger in a significant way, and as a result,

 2    because of those, there will not be either unilateral or

 3    coordinated anticompetitive effects from the proposed merger.

 4         There will also be -- and I do a detailed analysis of

 5    efficiencies -- sorry, I apologize.

 6         I also do a detailed analysis of efficiencies.  And

 7    there are very significant efficiencies in this matter that

 8    cover things like manufacturing, purchasing, distribution of the

 9    product, the designs of the product, and that those efficiencies

10    will benefit consumers.

11         Now, I've heard --

12         THE COURT:  Let me ask you this:  You said that

13    retailers and other large buyers have the ability to drive

14    competitive outcomes, so they can punish a supplier who gets out

15    of line by moving share from one manufacturer or one supplier to

16    another, and that this environment will continue post-merger.

17         So does that mean, then, that there could never be a

18    merger that would have anticompetitive effects?

19         THE WITNESS:  No, there could be a merger that could

20    have anticompetitive effects.

21         THE COURT:  So that's not a universal rule that could

22    be applied to mergers in general, then?

23         THE WITNESS:  That is not a universal rule, that is

24    correct.

25         THE COURT:  All right.  And this -- why is this merger

1     unique, then, as opposed to one --

2          THE WITNESS:  Um...

3          THE COURT:  Can you think of a merger where, in the

4     past, one of the 120 or so that you've analyzed, wherein there

5     were anticompetitive results by virtue of the merger?

6          THE WITNESS:  Um --

7          THE COURT:  And the power of the retailer didn't --

8     wasn't enough to push back?

9          THE WITNESS:  Right.  I think it may be easier to talk

10    about it in two ways, if it's okay with you, sir?

11         THE COURT:  Yeah, sure.

12         THE WITNESS:  If I can talk about the Maytag/Whirlpool

13    experience, because I think that's relevant, and I'll tie in a

14    directly responsive answer, I hope.

15         THE COURT:  All right.  Because you made a powerful

16    statement there.  I'm just wondering, well gee, if that's true,

17    then all mergers are okay.

18         THE WITNESS:  No.  It's not the case that all mergers

19    are okay.

20         THE COURT:  Right.

21         THE WITNESS:  So let me -- this is -- it's really an

22    empirical question, and so this is -- I think it's helpful to

23    maybe give this context, if I may.

24         The Department of Justice has laid out a plausible

25    theoretical story.  High shares of these two parties, they are

1    competitors today.  There's a significant increase in

2    concentration, and that may, as a matter of economic theory,

3    lead to higher prices.

4         There's a competing, just as plausible, theory that

5    this is a dynamic market, that retailers have the ability to

6    move share, large buyers have the ability to say, "You know

7    what, we're not going to accept that price increase, we'll just

8    buy from another supplier."

9         THE COURT:  Well, why isn't that universal, then?  I

10   mean, if the consumer has this power that everyone says the

11   consumer has, why isn't that universal with respect to

12   appliances and cars and brake pads and --

13        THE WITNESS:  But let's take a situation where there

14   was no LG, no Samsung, no Haier, no one else other than Maytag,

15   Whirlpool -- Maytag, or Whirlpool now, GE and Electrolux.  And

16   then there was a merger from three major suppliers to two, say.

17   That's a very different situation because now the retailer, if

18   the combined companies came to them and said, "You know what,

19   we're going to raise price," the only other option that the

20   retailer has in that hypothetical world is to say, "You know

21   what, we're going to give more sales to Whirlpool, we're going

22   to allocate more floor space to Whirlpool."

23        THE COURT:  Or, "We're not going sell your product at

24   all."

25        THE WITNESS:  Or we're not going to sell their product

```
 1    at all.  But the problem with not selling the product at all --
 2    and this is probably one place where Professor Whinston and I
 3    agree -- is that retailers have to have a number of options.
 4          THE COURT:  Right.
 5          THE WITNESS:  They can't just have one option on the
 6    floor.  That retailers tend to have three, four, five, six,
 7    depending upon the retailer.  They each make their own choice
 8    about what is --
 9          THE COURT:  Right, because they want to be competitive
10    with other retailers, right?
11          THE WITNESS:  Precisely.
12          THE COURT:  All right.
13          THE WITNESS:  And so between those two competing
14    stories, what do we know from history?  Because those two
15    stories were present at the time of the Maytag/Whirlpool merger
16    in 2006.  It's the same two stories.  And the retailers have
17    similar market shares today.  There are similar players in the
18    retail place.  There's similar players in the appliance space,
19    and the time of the Maytag/Whirlpool deal, it was -- LG and
20    Samsung had just entered the relevant --
21          THE COURT:  So nothing's changed?  The government
22    approved that merger, same scenario here.
23          THE WITNESS:  Very similar, but I think it's also
24    important to put some -- more context around it.
25          THE COURT:  Right.
```

1           THE WITNESS:  It wasn't an uncontroversial decision at

2      the time in 2006.  It was hotly debated among antitrust both

3      economists and practitioners whether that approval was

4      appropriate.  And so it wasn't a straightforward decision for

5      the department to make that decision.  I don't think they could

6      testify about that, but it was a hotly debated --

7           THE COURT:  But you offer an expert opinion in the -- I

8      guess it would have been the underlying investigation of that

9      merger?

10          THE WITNESS:  Not in that case, I did not.  But we can

11     look at what happened after that controversial merger.

12          THE COURT:  I'm sorry.  I don't mean to take over your

13     witness.

14          MR. DEMITRACK:  No, no, no.  Your Honor, I think we're

15     on the same basis.

16          THE COURT:  I'm the novice here, and this is very

17     helpful.  I need to understand.  Yeah, all right.

18          THE WITNESS:  So looking -- so what we can do is we can

19     look at what happened with -- between those two competing

20     plausible theories post that controversial merger.  And I go

21     through extremely detailed econometric analysis here, doing it

22     multiple different ways, adopting the same approach that my

23     mentor, Professor Ashenfelter, had used, adding, I think,

24     richness to it because I had access to more information than he

25     had.  I do it alternative ways, and every which way you look at

1    it, it produces no significant increase in price.

2          So between those two plausible theories, it shows very

3    convincingly to me that the theory of a dynamic market, all

4    those factors disciplining a price, preventing a price increase,

5    prevented it in that case, and there's nothing that would

6    suggest it wouldn't happen here.

7          THE COURT:  All right.  Thank you very much.  I

8    appreciate that.

9          MR. DEMITRACK:  And, Your Honor, we'll explore the

10   issue of the Whirlpool/Maytag merger further.

11         THE COURT:  I know you will.  All right.  Thank you.

12         MR. DEMITRACK:  Thank you.

13   BY MR. DEMITRACK:

14   **Q.**  Now, you were here for Professor Whinston's testimony,

15   correct?

16   **A.**  I -- I was.

17   **Q.**  You sat in the back?

18   **A.**  Yes, I did.

19   **Q.**  And you've read his expert reports?

20   **A.**  Very carefully, yes.

21   **Q.**  And you've reviewed his analyses?

22   **A.**  Yes, I have.

23   **Q.**  And you've -- you reached opinions regarding his work and

24   his opinions?

25   **A.**  Yes, I have.

1    **Q.**  And you've prepared a slide that addresses that?

2    **A.**  Yeah.  I don't want to belabor this right now.  I'd rather

3    focus on my analysis, but I'll touch on, throughout my analysis,

4    the differences between what Professor Whinston did and what I

5    did.

6          And I think the simplest way to describe it is, my view

7    isn't as much about what Professor Whinston did, it's about what

8    he didn't do.  He didn't go the extra step of doing the

9    empirical analyses that were necessary to help inform how to

10   weigh the two competing theories that I laid out.  All of the

11   analyses that he put forward, I often think of as the first step

12   in the competition analysis, not the last step.

13         So he really focused his presentation and it had some

14   appeal.  I sat here, and I -- he did a very nice job, but it was

15   focused on the first step.  It didn't take into account the full

16   richness of competition in the marketplace.  And so as we go

17   through a number of the different points, I'll raise that and

18   then I'll come back to other issues as we talk about them today.

19   **Q.**  Let me ask you to turn to Slide 3 -- I'm sorry, Slide 4,

20   which is the agenda.  This is a document or page that you

21   prepared in this slide deck, sir?

22   **A.**  Yes, sir.

23   **Q.**  And what is it you're displaying here?  What's the purpose

24   of setting this out for the Court?

25   **A.**  I would like -- I often like to just provide some

1    organizational framework for what I'm trying to present, and I'd

2    I like to try to be as clear as possible about those issues.

3    **Q.**   Okay.  And this agenda reflects the five-minute overview

4    that I asked to you provide before?

5    **A.**   Yes, it does, and it reflects the analyses that are included

6    in the hundreds of pages that are in this other binder.

7    **Q.**   And how do you go about -- how did you go about in this case

8    investigating whether this market is competitive today and will

9    remain competitive in the future?

10   **A.**   For all the reasons that are outlined in the slide deck, but

11   also in my reports, so this is, by looking at empirical data and

12   looking at market participants and looking at about how they

13   compete and what happens to price and various other factors.

14   **Q.**   Let's look at the market participants.  It's the next slide

15   here.

16              And what is it that you're displaying here besides a

17   lot of logos?

18   **A.**   There are a lot of competitors in this market.  There are

19   lot of firms providing services in this market, and they're

20   serving different parts of the market.  Some are higher-end

21   brands; some are lower-end brands; some are mid-tier brands and

22   some are brands that cross over different tiers, say, serve

23   different parts of the market.  So they're all market

24   participants competing, but competing at the different price

25   segments or price points that is -- they've decided is profit

1    maximizing for them.

2    **Q.**  You testified a little while ago that one of the issues you

3    looked at was the different access points or ways that suppliers

4    have to get to the marketplace.

5            Did you investigate further how cooking appliances

6    reach consumers?

7    **A.**  Yes.  I spent a lot of time focused on this issue because

8    it's critically important.

9    **Q.**  Okay.

10   **A.**  And the next slide tries to present this graphically, and --

11   **Q.**  Let's have a question and answer here.

12           Can you explain what it is that this slide is

13   presenting?

14   **A.**  And I'm sorry for the complexity of this, so I apologize to

15   the Court about that, but the reality is that's what the world

16   looks like, that three -- it's a complex world with lots of ways

17   for the suppliers who are in the top box -- that's the

18   suppliers -- to reach the bottom circles or triangles.  So the

19   red circle represents consumers, so those would be the -- would

20   be myself, if I walked into, say, Home Depot and had to replace

21   a range at my house, to the triangles that would represent a

22   professional, who may be either a homebuilder or multi-family

23   homebuilder, an OEM or a property manager, et cetera, that would

24   be represented by the green box.

25           And there are multiple ways that those suppliers get

1    the products to either the Mrs. Smith that we've heard about or

2    to a contractor.  It can go through retailers, so that's

3    represented on the right-hand side.  That's like Home Depot,

4    Sears, Lowe's.  They can go through other retailers.  Companies

5    like we heard about, P.C. Richard & Son.  So those would be in

6    the other retailers or Best Buy.  On --

7    **Q.**  Can I stop you for a minute and ask you to go up to the blue

8    circle, the one that says "RDC," and explain that to the Court?

9    **A.**  So when a supplier manufactures a product, it needs to send

10   it someplace.  It can -- it has to put it in inventory.  And so

11   let's just use GE as an example.  They will send it to a

12   regional distribution center that can then be distributed out to

13   each of its retailers or distributors who are then going to buy

14   the product from that supplier.  So you can think about the

15   regional distribution centers in some sense as a warehouse.  And

16   it's a place that it goes to be warehoused until it's needed to

17   be -- because the consumer wants it.

18   **Q.**  So the supplier can distribute to the retailers from the

19   RDC, or its distribution center, and also directly from the

20   factory, and that's what you're describing?

21   **A.**  That is correct.  That's why there's green lines for the

22   suppliers directly to each of those, but also blue lines because

23   they often will put the product first in a warehouse and then

24   ship it to either the retailer or the distributor.

25   **Q.**  Okay.  So I stopped you.  You were talking about the

1    retailers, and you were about to go to the left-hand side of the

2    slide there.  Why don't you keep explaining the rest of the

3    distribution options.

4    **A.**   Sure.  So contract distributors, we've heard a lot about

5    those in this case.  Those are people who are primarily selling

6    to contractors, but many of them also sell to retailers.  So

7    they'll have a retail showroom, and you can walk in and purchase

8    at that retail showroom.  So a company like Ferguson, for

9    example.

10         There are then companies that are called wholesalers.

11   So Almo and Climatic are two of them.  And what they do is they

12   purchase a product, and then they themselves are selling to

13   smaller retailers or other contract distributors.

14         And then lastly, I used -- there's the idea of a local

15   distribution center, and that's when that's used to distribute

16   product directly to a contract customer.  You do see in the data

17   every once in a while a small sale to a retail customer, but I

18   exclude that from this chart for simplicity purposes.

19   **Q.**   And if we look at the middle here at the -- sort of the

20   purple section beginning with LDC and ending with other

21   retailers, how is the variety or number of these options

22   relevant to how -- whether and how suppliers can distribute

23   their cooking appliances?

24   **A.**   It's relevant for a number of issues.  One issue is the

25   contract channel customers have lots of different ways that they

1    can buy product.  Retail customers have a number of different

2    ways they can buy product.  So it's relevant to the economic

3    analysis thinking about the circles and the triangles.  It's

4    also relevant for the analysis for a new entrant or somebody

5    who's trying to expand sales, because there's not just one

6    entity that they have to go through.  They have multiple paths

7    to reach the end consumer who would be the contract channel

8    customer or the retail customer.  And so somebody entering the

9    market can say, "You know what, what I really want to do at

10    first is focus in one area and then expand outwards."  Because

11    we know businesses have limits on what they can do all at once,

12    and so let's get -- this market structure allows a new entrant

13    to, in essence, bite off something that they can actually chew,

14    and then grow from there.

15    **Q.**  Now, you talked about manufacturers, distributors and

16    retailers, and a little bit about consumers.  I want to come

17    back to that shortly.

18         Did you investigate further the relationship between

19    and among these various segments in the marketplace?

20    **A.**  Yes, I did.

21    **Q.**  Okay.  Let me ask you, please, to turn to your next slide.

22    And this is a slide that you put together, pretty complicated,

23    but can you take the Court through what it is you're trying to

24    display here?

25    **A.**  It's complicated because there are a lot of market

1    pressures.  This is a -- the full richness of competition in

2    this market isn't as simple as just two firms or three firms

3    butting heads and competing with each other.  It's much more

4    complex than that.  So I used GE as an example today, as the

5    range --

6    **Q.**   GE's in the middle?

7    **A.**   In the middle.  And it's facing constraints, competition

8    from many different players.  It faces competition from

9    Electrolux.  That's the head-to-head competition that Mr. Glass

10   talked about in his opening.  That is there today.  But they

11   also face competition from Samsung and LG and Kenmore and from

12   all these other brands that are surrounding them.  They're

13   facing competition from people who are entering the ring, people

14   like Arçelik, which is, I believe, the ninth largest appliance

15   manufacturer in the world, from the prospects of Haier, which is

16   the second largest manufacturer of appliances in the world.  So

17   they're facing those threats as well.  And that entire system is

18   constrained by buyers who can move share among all the companies

19   inside the system.

20          There's one other point to recognize here.  At every

21   given price point, ranges face competition from below and above,

22   and they have to compete with those products.  We sort of know

23   this from our own experience.  If you go -- I know a lot of

24   people don't like getting on airplanes, but if you get on an

25   airplane, you can pay $20 to get more leg room -- depends on the

1    airline -- for the price.  Some people choose that; some people

2    don't.  You can upgrade yourself in terms of the amen- -- the

3    features that you get in a car, say.  And so you have that same

4    type of competition here, and so consumers will look at a --

5    say, a 4- or $500 range that doesn't offer self-cleaning, and

6    they'll look at a $600 range that offers self-cleaning, and

7    they'll say to themselves, "Is it worth it to me, because I

8    don't need to now spend the time and effort to clean the oven?"

9    Personally I'm probably not the person to ask on that, but that

10   is a relevant factor.  Do they look at the smooth cooktop on a

11   range and do they say, "Is that worth an extra $100 for me to

12   pay?"  And they make those trade-offs.

13          So it's not just about price, it's about quality, too,

14   and the feature set that they get, and so consumers are

15   constantly trading-off those differences in their decisions.

16   And that's very central to the competition analysis because

17   competition isn't only on price.  It's about the price quality

18   trade-off.

19   **Q.**  So up to the upper right here there's an arrow that comes

20   around the circle and there's a word "repositioning."

21          Can you explain what you're portraying there?

22   **A.**  Sure.  And we will -- I do some analyses, some empirical

23   analyses, of how often firms introduce new products.  And what

24   we have seen is Samsung and LG have accelerated the cycle of

25   products, that they offer products on a much more rapid basis

1    than the legacy companies.  It shouldn't be too surprising to

2    people.  That's part of the -- they come from much more of an

3    electronics background where the product cycle -- lives are much

4    shorter.

5         And with each new product when it's coming out, they

6    can choose where to put that product in the distribution of

7    product features.  And it's relatively easy -- and this comes

8    through from the business people and from documents and data, et

9    cetera -- for them to take features out.  They can say, "You

10   know what, we're going to remove the smooth cooktop and just

11   leave the coils."  That saves them money, but it allows them to

12   then offer, say, a cheaper product.  And so with each cycle, if

13   there's an opportunity to take advantage of a market

14   opportunity, they can put that product into that segment of the

15   market.

16   **Q.**   And in the course of your work, have you seen that happening

17   from these companies?

18   **A.**   Yes.

19   **Q.**   And then over to the right -- and we talked a little bit

20   about retailers -- but you have the phrase "retailer leverage."

21   Is that the concept you were talking about before?

22   **A.**   Precisely, that they have the ability to move share among

23   re- -- among suppliers, and they can decide, in some sense,

24   ultimately what the market shares are of those various

25   suppliers.

1    **Q.**   So you've got a lot of companies here, a lot of big

2    companies, and I'm guessing a lot of them make a lot of money.

3          Who -- how does the consumer get protected here in this

4    circle?

5    **A.**   The first principle of economics that we think about is that

6    firms are in this to maximize profits, and that's what they do.

7    The steel company that is selling steel to the appliance maker

8    is trying to, in essence, produce the product for the cheapest

9    price and sell it and make the most money it can.  The appliance

10   maker is trying to buy the inputs for the cheapest price it can,

11   make the product for as cheap as it can and make the most money

12   it can.  The retailer is trying to maximize profits.

13         So how is the consumer protected?  It's because they're

14   protected by what Adam Smith first described in 1776 in his

15   book, "The Wealthy Nations," about the invisible hand of markets

16   producing a outcome that is good for consumers.  It's the

17   competition between the steel companies, the competition between

18   the appliance makers, the competition between the retailers,

19   that protects the consumer.  That's what competition economics

20   is all about.  We're -- we are not focused on what's good for

21   the company.  Competition economics is not about what's good

22   for, say, Home Depot or good for GE or Electrolux.  It's about

23   what's good for the consumer.  Is the consumer better off?  And

24   consumers are better off if there's competition, and they're

25   better off if that competition is enhanced.  And a merger that

1    allows companies to decrease costs without a diminution in

2    competition, the head-to-head competition between all of these

3    players, is one that is good for consumers.  That goes back to

4    the two theories that I described.  There's two plausible

5    theories, and so that's when you then have to go to empirical

6    evidence to inform that decision.

7    **Q.**  And you said in a merger that reduces cost, did you

8    investigate whether this is a merger that if allowed will reduce

9    the combined companies' costs?

10   **A.**  Yes.  And we'll go through this.  There's -- in my

11   experience, and I've done -- been involved in many, many

12   mergers, this was by far the most detailed efficiencies analysis

13   I've ever seen.  It's at a level that is remarkable, in many

14   ways.  They look at whether they could save money by replacing

15   the use of different wires in the ranges, the valves that they

16   use, rather by using instead of adhesive tape and using glue,

17   that would save them money.  And each of those start to add up.

18   It's $500,000 there, $800,000 there.  They have bigger savings

19   as well, but they went through a very detailed level of analysis

20   about savings that could be achieved as a result of the merger.

21   **Q.**  All right.  So go back to you had the fist hitting the open

22   hand.  After this merger, that open hand's not going to be

23   there.

24        Why doesn't the consumer get punched?

25   **A.**  Because for two reasons.  There's lots of fists punching

1    that fist that is there, and there are lots of hands sitting

2    right behind that hand that is there.  And the fist is a very

3    nice, I guess, description of the action.  It doesn't describe

4    the reaction.  And competition economics is about both the

5    action and the reaction.  That's what dynamic markets are about.

6    They're not static.  It's not just look at this.  It's look at

7    this, and then what happens afterwards.

8              And, again, this goes back to what I described that

9    there's two competing theories, and that's why you have to go to

10   empirical evidence to inform one's view between those two

11   empirical -- those two competing theories.

12   **Q.**  In your opinion, will consumers continue to be protected

13   after this merger, assuming it's allowed to go forward?

14   **A.**  Based on all the analysis that I've done, yes.

15   **Q.**  And you also investigated further the role of retailers in

16   this process, and I see you've turned the page to the next

17   slide.

18             Can you explain what you're portraying for the Court

19   here?

20             MR. DEMITRACK:  And, Your Honor, we've endeavored to do

21   the entire examination on the public record.  That are a couple

22   of slides that we had to blackout, but the witness will be able

23   to talk around the issues in a way that will be acceptable, I

24   think, to everyone.

25             THE COURT:  That's fine.

1          THE WITNESS:  Just so I'm clear because this is a

2     little foreign to me, I can -- I can't mention numbers, but I

3     can mention the concepts?

4     BY MR. DEMITRACK:

5     **Q.**  You can mention the concepts, and I think you should not

6     mention the percentages, especially if you tied them to a

7     particular retailer.

8     **A.**  Okay.  The -- it's a little harder this way, but I'll --

9     I'll do my best.  The -- what one sees in this chart -- and this

10    is a very important chart for understanding the role of

11    competition in the space and the role that retailers have in

12    driving competitive outcomes.

13          If the government's theory were correct in this case,

14    one would assume that it would be the supplier that would drive

15    the decisions about market shares in the various retailers.  If

16    they had few choices, you would see that kind of power being

17    reflected in these shares.

18          But rather, what one sees is vastly different answers,

19    depending upon the retailer that one examines.  So if you look

20    at the retailer all the way on the left.

21    **Q.**  Home Depot?

22    **A.**  I was going to -- not use it, so I could talk more freely,

23    but if that's Home Depot, the --

24    **Q.**  We've left it displayed at the bottom, so --

25    **A.**  Oh, I got that.  That's good, because I didn't see that a

1    part.

2              GE does very well at Home Depot, and it's a -- it's a

3    strong player.  At Lowe's, the Electrolux is very strong and GE

4    and Whirlpool are less strong.  They're the second and third

5    players.  At Best Buy, Samsung is the strongest player, then

6    Electrolux, then Whirlpool, then GE.  And then at Sears they

7    push their Kenmore brand, and it is by far the leader within

8    Sears.  And so you see vastly different market outcomes.  So

9    it's the retailer who's driving these outcomes, not the

10   supplier, and that's really directly relevant for the

11   competitive effects analysis.

12   **Q.**  If the manufacturers had the power here, what would you

13   expect to see?

14   **A.**  I would expect to see more similar outcomes, more similarity

15   across -- and especially across Home Depot and Lowe's, since

16   they are more alike, and you see vastly different answers there.

17   **Q.**  Now, these four retailers that are depicted here, they

18   compete with each other, correct?

19   **A.**  Definitely, yes.

20   **Q.**  And consumers, do they benefit from that competition?

21   **A.**  Yes, they do.

22   **Q.**  Now, this particular slide is looking, again, the first six

23   months of this year, January through July of 2015.

24             Have you also looked at what has happened in the sale

25   of core appliances -- and by that I mean the four basic

1    appliances -- over time at retailers?

2    **A.**   Yes.  So just so the record's clear, this chart covers

3    ranges, so cooking ranges.  The next chart is focused on all

4    core appliances, so this would include dishwashers,

5    refrigeration.  It would include laundry as well.

6    **Q.**   And what are we seeing here?

7    **A.**   We're seeing that the legacy firms are losing share.  This

8    is looking from 2005 to 2014.  That the legacy firms are losing

9    significant share.  They've lost 23 percentage points of share

10   over the last -- for this nine-year period.  And in core

11   appliances as a whole, Samsung and LG have gained 22 percentage

12   points of share.  Very significant shifts in the core appliance

13   space away from the legacy brands and to the new entrants,

14   Samsung and LG.

15   **Q.**   Let me ask you to return to the agenda.  It's actually the

16   next slide.  In your second bullet point there, the second part

17   of what you did, your analysis, and you wrote there, "The merger

18   is not likely to create unilateral or coordinated

19   anticompetitive effects."

20           Do you see that?

21   **A.**   Yes, sir.

22   **Q.**   And let's start by explaining or summarizing for the Court

23   what we mean by unilateral effects and coordinated effects?

24   **A.**   Sure.  Unilateral effects are when, as a result of a merger,

25   the merged party has a unilateral incentive to raise price.

1    That's one potential effect.

2           The second could be that because the industry has

3    become smaller, that the firms in the industry can more easily

4    coordinate their economic behavior, and as a result prices come

5    up.

6    **Q.**  And the second one is what we call coordinated effects?

7    **A.**  Correct.

8    **Q.**  So unilateral effects addresses the interaction between the

9    two merging parties, and coordinated effects addresses what

10   might happen in the marketplace or might not happen in the

11   marketplace after the merger?

12   **A.**  That's fair enough as a description, yes.

13   **Q.**  I didn't go to graduate school in economics.

14          FROM THE FLOOR:  (Laughter.)

15   BY MR. DEMITRACK:

16   **Q.**  Your next slide here you talk about market participants, and

17   before we actually spend a little more time on the market

18   participants themselves, I notice this comes from the Horizontal

19   Merger Guidelines?

20   **A.**  Yes.

21   **Q.**  Let me ask what point you want the Court to take from this

22   slide?

23   **A.**  So there are multiple points to take from this slide.  The

24   Horizontal Merger Guidelines provide guidance about how the

25   Department of Justice and the Federal Trade Commission will

1    analyze horizontal mergers.  And the guidelines talk about

2    market participants, and they fall into different categories.

3    The first are current competitors, current producers.  And what

4    the guidelines call market participants are all firms currently

5    earning revenue in the relevant market.

6    **Q.**   So Electrolux is in the market and Samsung is in the market?

7    **A.**   Yes.  Let's just -- maybe for simplicity sake, when we talk

8    about the market we'll talk about the overall market for ranges,

9    just so that there's no confusion.  And then if we're going to

10   be specific about some other market, we will talk about that

11   market.

12          And so, yes, when we think about the market for ranges,

13   we're talking about Samsung, LG and a host of others as the

14   current market participants.

15   **Q.**   Okay.  And then is that all you're looking at, just, the --

16   **A.**   No.

17   **Q.**   -- the market participants?

18   **A.**   The guidelines also include the idea of committed entrants.

19   So the words of the guidelines are right on this slide, so let's

20   just make sure that we use them.  The firms not currently

21   earning revenues in the relevant market, so they're actually not

22   making sales in the relevant market, but they have committed to

23   entering the market in the near future.  And what the guidelines

24   say is, in that case you should assign market shares to those

25   committed entrants.

1    **Q.**   And why would you do that if you're just trying to look at

2    the market shares today?

3    **A.**   Because inherently the question is forecasting the future,

4    and if someone is a committed entrant, they're going to affect

5    competitive outcomes in the future.  And if a firm attempted to

6    raise price, the merging parties attempted to raise price, that

7    increases the incentive of that entrant to come into the market

8    and to take advantage of that situation.

9    **Q.**   And did you investigate whether there were any committed

10   entrants, to use the merger guideline phrase, in this industry

11   in the sale of ranges?

12   **A.**   Yes.

13   **Q.**   Who?

14   **A.**   I would put in that category Haier and Arçelik.  They

15   actually have some small amount of revenues from brands that

16   they've entered with in the past year or two, but they largely

17   are -- their commitment and their focus on the United States

18   market has occurred in the past two years.

19   **Q.**   And then later half of this slide refers to rapid entrants.

20   What are they?  And if I can ask a compound question:  Are they

21   relevant for purposes of assigning market share?

22   **A.**   Absolutely.  They're very central to competitive effects and

23   competition analysis because you can think about the situation

24   that -- imagine if the -- and maybe a simple example could help

25   inform why this is relevant.

1    **Q.**   Please.

2    **A.**   Let's imagine a situation where the retailer actually only

3    wanted to have one supplier.  For whatever reason, they decided

4    that was optimal for them.  And that retailer -- I'm going to

5    make this very hypothetical -- was the only retailer in the

6    country, but there are a lot of suppliers sitting in other

7    countries and wanting to get into that one supplier.  If the

8    supplier to that retailer raised price, and it were easy for

9    those other suppliers to take the market, in essence, to win the

10   business at that retailer, just saying that that one supplier is

11   a monopolist, because it has 100 percent of the market, would be

12   suggesting that there's a lack of competition, when, in fact,

13   there's all of these different players who want to get in, who

14   are sitting on the outside wanting to get in.  So the concept of

15   rapid entrants takes that into account.  So it says, firms that

16   produce the relevant products -- so we're talking about ranges,

17   so say firms that produce ranges, but we could also talk about

18   cooktops and wall ovens.  But don't sell it in the relevant

19   geographic market, but -- they may be rapid entrants.  So if

20   they're selling the product in, say, Europe, and it's relatively

21   easy for them to design the product for the U.S., they would be

22   counted as rapid entrants, and they should also be assigned

23   market shares.  And it's critical, not at the current market

24   price.  They should be assigned market shares based on the idea

25   that there would be a post-merger elevation price because that's

1  what you're trying to examine.

2  **Q.**  So let me just bore down to make sure I understand.

3          Why aren't you just looking at what these rapid

4  entrants would do, assuming the world continues the way it is?

5  Why did you add that extra qualification that what you're

6  looking at is what they will do if after the merger price goes

7  up?

8  **A.**  Because they are another competitive source.  If the merged

9  party tried to raise price, that's why the guidelines include

10  this.

11          THE COURT:  Let me ask you a question about the

12  guidelines.  Most federal judges shutter now when we hear the

13  word "guidelines," because for so many years our discretion to

14  do what we were appointed to do, to make judgments based on the

15  law and our relevant experiences, was hamstrung by Sentencing

16  Guidelines.  And then it was determined that the guidelines,

17  which were binding and mandatory, aren't really binding and

18  mandatory but something we should look at and give consideration

19  to in reaching a judgment that's not dictated by guidelines.

20          All that to say is this:  What -- should this Court

21  give deference to these guidelines from an economist's point?  I

22  recognize you're not a lawyer, but from an economist's point?

23          THE WITNESS:  Yeah.  I was going to say, I'm going to

24  defer on the legal matters and just focus on as a matter of

25  economics.  The --

1          THE COURT:  I guess:  Are they entitled a differential

2     review?  And I'm not sure, maybe the Supreme Court's addressed

3     that, but I'm just curious about your expert opinion.  And I

4     recognize you're using not an attorney, but you've been involved

5     in merger -- more than 100 merger cases, right?

6          THE WITNESS:  So what I would say is this:  The

7     guidelines incorporate a lot of very good economic thoughts.  As

8     an economist they're not perfect.  There's elements of the

9     guidelines that as an economist -- and I think economists

10    generally -- would write them differently.  So you could -- you

11    could imagine the guidelines as a negotiation between the

12    lawyers and the economists that worked on them, but they have

13    important and key economic elements embodied in them that are

14    directly sort of based on sound economics.  So I think there are

15    very good ideas in the guidelines.

16          The guidelines have over time moved to provide more

17    flexibility.  They were somewhat more rigid based on the 1992

18    Horizontal Merger Guidelines, and the current guidelines I often

19    joke have moved from guidelines to a commentary on how the

20    analysis should be done.  But they are -- they provide a very

21    good basis for some very key insights, and they have some -- the

22    right economics.

23          THE COURT:  They highlight the key principles that

24    judges and lawyers and others should be looking at, right?

25          THE WITNESS:  Yes.  Actually, in my presentation

1    there's one or two points that I will discuss where I'd say the

2    economics and the guidelines diverge.  It has to do with

3    efficiencies.

4              THE COURT:  Right.

5              THE WITNESS:  But on competitive effects, the

6    guidelines have a lot of good insights.  But, again, it's not

7    perfect as a matter of economics.

8    BY MR. DEMITRACK:

9    **Q.**  Let me follow up on the Court's question.  I want to

10   focus -- Mr. Orszag, you may not be too familiar with the

11   Sentencing Guidelines, but they -- and hopefully you're not.

12   **A.**  No, I am not at all.

13   **Q.**  No.  They tend to set out rules that one must follow if

14   certain events occur, this happened, so this sort of decision

15   trees.  In the Court's question the Court started out by using

16   the word "discretion" and whether there was discretion in the

17   guidelines.

18        Are these guidelines more like rules with a bunch of

19   decision trees in them, or do they afford a fair amount of

20   discretion and -- well, why don't you answer that question

21   first.

22   **A.**  There's a good amount of discretion.  That's partly my

23   comment that they've moved to more of a commentary.  But on

24   certain issues they're very clear, and they layout certain ideas

25   very clearly.  For example, the idea that all firms that

1   currently are earning revenues in the market, that's a very

2   clear thought.

3           There's other guidance that they provide, for

4   example -- and I'll talk about this today -- where they say you

5   should use the best available indicator of the future

6   competitive significance of a market participant.  That then

7   requires some judgment about what is the best available

8   indicator.  So there is discretion in the guidelines about how

9   to weight those various competing interests.

10  **Q.**   And let me return back to rapid entrants.

11          Do you see any examples, in the course of your work on

12  this transaction, about firms that you would view as a rapid

13  entrant, either in ranges, cooktops or wall ovens?

14  **A.**   There are a number of firms that produce products in other

15  countries that, based on either testimony or documents that I've

16  seen, indicate that they plan on introducing the product into

17  the United States at some point in the near future.  For

18  example, Samsung makes wall ovens and cooktops in Europe, sells

19  wall ovens and cooktops in Europe, and there's testimony that I

20  reviewed as part -- deposition testimony, that it's relatively

21  easy to just bend the product to fit the U.S. sizes, and so --

22  **Q.**   By bend the product you mean the metal?

23  **A.**   The metal, to fit into the U.S. sizes, which tend to be

24  different than the European sizes, and that they plan on

25  entering the U.S. market at some point in the near future.  That

1    would fit the kind of model of a rapid entrant.

2    **Q.**   Okay.  Now, we looked a little while ago at your circle with

3    all the logos inside of it, and I see in this next slide that

4    you've displayed these various suppliers of kitchen appliances

5    in a different way.

6          Can you tell me what you are portraying here, and why

7    it's important to the analysis?

8    **A.**   I'm trying to provide some more context about what products

9    each of the players are supplying.  And what we see is there are

10   a large number of players providing ranges, supplying ranges.

11   And they're supplying ranges at different price points.  The

12   Summits and the Premiers and the Avantis are providing ranges at

13   the lower price points.  The Sub-Zero and Wolfs, for example,

14   are providing ranges at higher price points, and then there's

15   entities in-between.

16         But there's a large number of companies of suppliers

17   that are supplying ranges.  There are fewer that supply cooktops

18   and wall ovens.  And then you can see how the companies that are

19   providing cooking appliances also supply dishwashers,

20   refrigerators and laundry, because there's some consumers who

21   like to have that unified look at their house, so they want to

22   have all GE products or all Samsung products or all whatever

23   company that it may be because they want to have a uniform look.

24         We observe in the data some customers want that, and

25   other customers will pick à la carte.  They're going to do

1    the -- what -- they're going to pick each product that's best

2    for them and mix and match, and that's because there's different

3    types of consumers out in the marketplace.

4            THE COURT:  Do you see -- do you notice a trend in that

5    regard?

6            THE WITNESS:  In the data I was looking at snapshots in

7    time, so I -- sitting here today, I don't know if there was a

8    trend one way or the other, so I -- I can't answer that.  I'm

9    sorry.

10   BY MR. DEMITRACK:

11   **Q.**  Did you also calculate market shares for purposes of the --

12   of ranges, cooktops and wall ovens?

13   **A.**  Yes, I did.

14   **Q.**  Okay.  And how did you go about doing that?

15   **A.**  I started with the transaction data.

16   **Q.**  And we're now looking at the next slide.

17   **A.**  So we received transactions data from a number of suppliers

18   in the marketplace.  And so for those suppliers -- and I think

19   maybe we can focus first on the revenue share for 2015, which

20   more precisely should say January to June 2015.

21   **Q.**  Because the year is still ongoing?

22   **A.**  The year's still ongoing, and so this is what was produced

23   to myself and the folks assisting me; so it's for the first part

24   of the year.  And so let's just focus attention on that for the

25   moment, if it's okay.

1          And what one -- we received first transactions data.

2     And I'm focusing on revenue, so this is -- shows that GE sold

3     27.4 percent of the ranges in terms of the value --

4     **Q.**   Value is dollars?

5     **A.**   Dollars -- in the United States in the first part of 2015.

6          Whirlpool was number two at 24 percent; Electrolux was

7     number three at 15.5 percent; Samsung was number four at

8     10.2 percent.  So that's where I started.  But that's not where

9     I ended because remember, we have to look back at the

10    guidelines.  The guidelines say all firms currently earning

11    revenue, and not all firms currently earning revenue produce

12    data in this case.  So some of the smaller suppliers who focus

13    on the low-end did not produce data, so Summit, Premier, Avanti,

14    for example.  There are some other brands, Bertazzoni, Arçelik,

15    et cetera who also did not produce data.

16          So what did I do?  I went to -- there's a survey done

17    of consumers that's used in the ordinary course of business by

18    the business executives and the businesses in this industry.

19    And I --

20    **Q.**   What's the name of this survey, just so we're clear?

21    **A.**   It's called TraQline, and it's T-R-A-Q-L-I-N-E.  So I went

22    to the TraQline data, and I used the TraQline data to fill in

23    the data that was missing from those people who did not produce

24    data in this case, and so that then means that my other category

25    is including those additional players.

1    **Q.**   And when you -- let's talk a little bit more about TraQline.

2             What is TraQline gathering?  What's it doing?

3    **A.**   It's asking consumers about what appliances they purchased.

4    So they go out and they conducted online.  They ask consumers,

5    "What did you purchase?"  And some consumers, obviously, say GE,

6    some say Whirlpool, some say Samsung, others say products like

7    Premier, others say products like NXR, which is available at

8    Costco, or Ancona, which is available at Costco.  And those are

9    then categorized by TraQline either by name or they put them

10   into an other category.

11   **Q.**   Is this survey data perfect?

12   **A.**   It's survey data, so surveys are not perfect.  And there's

13   some misreporting in the data, obviously, because in surveys

14   consumers often make, or the person being surveyed, often make

15   mistakes.

16   **Q.**   So if it's not perfect, why didn't you just ignore it?

17   **A.**   Because it's the best available indicator.  It's --

18   **Q.**   That's the phrase from the guidelines?

19   **A.**   That's the phrase from the guidelines.  And so ignoring

20   it -- you're confronted with two choices:  You can incorporate

21   it, even though you know it's not perfect; or you can ignore it,

22   and between those two choices it is clearly the best available

23   indicator.

24            And it -- and one of the things that's important here

25   is, it's used by the business people over and over and over

1    again.  If you see document after document after document where

2    the business people are using the TraQline data, and so that's

3    part of what informs why it's a good indicator to use and the

4    best available to add to the market participants as the

5    guidelines dictate.

6    **Q.**   So the middle column here is 2014.  Is this also a

7    combination of supplier invoice data and TraQline?

8    **A.**   Yes, it is.

9    **Q.**   Okay.  And then over in the right you write here,

10   "Whinston's unit share in 2014" -- that's Professor Whinston?

11   **A.**   It is.

12   **Q.**   I should have given him his appropriate title.

13            And the important word here, at least to me, is the

14   word "unit."  What is it that you're showing us here?

15   **A.**   Sure.  So market shares can be measured by revenue or by

16   units.  The question is it's really a question of waiting.

17   Think about two ranges.  One range is a $600 range; one range is

18   a $400 range.  One is, say, sold by Samsung; one's sold by, say,

19   GE.  Is the right way to think about the market that Samsung has

20   one sale and GE has one sale, or is the right way to think about

21   the market that Samsung has $600 worth of the value in the

22   market versus $400 of the value in the market?  What's the right

23   way to do that?  Economics is clear here, and the guidelines are

24   consistent.  It's -- you have to look at is the price difference

25   due to the competitive significance of why prices are different?

 1          So if the price is different, for example, because it

 2    has a self-cleaning function, because it has a smooth cooktop,

 3    the guidelines are absolutely clear:  You should use revenues,

 4    not units.  Why?  Because there's ancillary value to the

 5    consumer of that feature.  If I have a self-cleaning oven, I

 6    don't have to spend the time myself, or the money if you hire

 7    somebody, to clean the oven myself.  If I have a smooth cooktop,

 8    it's a lot easier to clean than if I don't.  That's why the

 9    guidelines dictate that you look at whether the reasons for

10    those difference in price are due to the competitive

11    significance.  And when they are, you use revenues.  When they

12    aren't, units is a sufficient measure.

13          But here, all the analysis that I've done and the

14    testimony that I've seen shows that there are product features

15    that have significant value to consumers that are then reflected

16    in price, and that's why you should use the revenue metric.

17    **Q.**  I'd like you to look at one other aspect of this chart

18    before we go to the next -- before we go on, and that's the

19    fourth one down here is Samsung.  And if you notice for 2014,

20    you report a 6.9 percent share, which is not too different than

21    what Professor Whinston reported at 6.3 percent, but then in

22    2015 you report a 10.2 percent share.  Do you see that?

23    **A.**  Yes.

24    **Q.**  Is that a relevant fact for purposes of your analysis here?

25    **A.**  Absolutely.  One of the other elements of the guidelines

1    when thinking about market participants is to think about the

2    concept of their future competitive significance.  And the

3    trend, the recent market outcomes as reflected in the market

4    share is an important element of the analysis of the future

5    competitive significance.  So the very fact that Samsung has

6    grown so rapidly over the past year is directly relevant to the

7    competitive effects analysis.

8    **Q.**  Did you also look at calculated market shares for cooktops

9    and wall ovens?

10   **A.**  Yes, I did.

11   **Q.**  Okay.  Let's turn to your next slide.  I see you're already

12   doing that.

13            What do we see here?  I know the numbers, not the

14   numbers, but what do you take away from this slide as you're

15   looking at it?

16   **A.**  I think there are two key points here that I'd take -- maybe

17   three -- let's say three key points.  First, Electrolux is a

18   much less significant competitor in cooktops and wall ovens than

19   it is in ranges.  It has a share of 7 and 9 percent.

20            The other thing to look at is, it's particularly

21   relevant about the inclusion of other competitors in the cooktop

22   and wall ovens that they represent, roughly, 4 to 5 percent

23   depending on cooktops or wall ovens.

24   **Q.**  That's the last row?

25   **A.**  That's the last row on here.

1    **Q.**   Okay.

2    **A.**   And that's higher than the numbers that were shown before.

3    So I think one way to think about this, and it's why I'm

4    focusing on ranges in this presentation, is if there were a

5    conclusion that there's no substantial lessening of competition

6    in ranges based on the rule of competition in this market, there

7    would be no basis to draw a conclusion that there's an

8    anticompetitive effect in cooktops or wall ovens.

9          That's why I think Professor Whinston and myself focus

10   on ranges, because the concentration effect is larger in the --

11   in ranges, so it makes more sense to focus our discussion on

12   ranges.

13   **Q.**   You said there was a third point?

14   **A.**   Oh, that was the third point.

15   **Q.**   Okay.  Let me ask you to look at Bosch here.

16         Do you draw any conclusions about Bosch's competitive

17   significance in cooktops and wall ovens?

18   **A.**   Bosch does very well.  They're the third biggest player in

19   cooktops and wall ovens, and so this is an area where they do

20   better.  And in addition, Sub-Zero and Wolf does particularly

21   well in cooktops as well, and they have an 8.2 percent share

22   versus the 6.6 percent share for Electrolux when it comes to

23   cooktops.  So when it comes to cooktops, Electrolux is actually

24   the fifth biggest player, and when it comes to wall ovens

25   they're the fourth biggest player.

1   **Q.**  One of the statements that the government made in -- during

2   the opening statement in this case was that the evidence will

3   show that if you raise price 5 percent in cooktops and wall

4   ovens, people aren't going buy refrigerators.

5          Do you remember seeing -- hearing that testimony?

6   **A.**  I actually think it was during -- it may have been during

7   your opening and I missed it.  I think it was during Professor

8   Whinston's testimony.

9   **Q.**  Okay.  And is that the right way of thinking about it?

10  **A.**  No, it's not.  And I think it's just important to have a

11  clear record on this, a clear discussion.  The right way to

12  think about this is, if there's a 5 percent elevation -- let's

13  just use ranges -- a hypothetical monopolist of all ranges

14  raised prices by 5 percent, would there be sufficient numbers of

15  consumers who would switch to other cooking products?  Not to

16  refrigeration, but to other cooking products, would there be a

17  sufficient number who decide, "You know what, I'm building my

18  home, I'm going to put a wall oven or a cooktop or a combination

19  of the two into my house or maybe I'll use some other form of

20  cooking apparatus."  That's the relevant question, not

21  refrigeration.  Refrigeration would be a consideration if you're

22  going to raise all cooking prices, would people switch to

23  refrigeration.

24          I know this may sound esoteric and getting into the

25  weeds, but it's important in thinking about the hypothetical

1     monopolist test and defining markets to do it correctly in

2     thinking about that framework, so I just wanted to make sure

3     that we were clear on that.

4     **Q.**   Okay.  And in both of these slides -- and we've been looking

5     at these two pages of ranges, on one pages is cooktops and wall

6     ovens on the other -- you list Kenmore as a supplier?

7     **A.**   That is correct.

8     **Q.**   In your view, is it appropriate to consider Kenmore as a

9     supplier or an owned brand by Electrolux?

10    **A.**   The economics of this are -- depend on a question that

11    Professor Whinston and I think agree, which is:  How much

12    control does Electrolux have over the pricing of Kenmore?

13    Kenmore has a very strong brand in the marketplace.  It's

14    well-known.  It's been successful in the marketplace.  And

15    between the two, treating Kenmore as manufactured by Electrolux

16    or treating Kenmore as a separate brand, the economics

17    overwhelmingly supports the idea of treating them as a separate

18    brand because the structure of the contract and the strength of

19    their brand.

20           And so it's -- I don't want to -- I want to make sure

21    it's clear.  It's not a precise thing to say all -- it's not a

22    0-1 decision, but unfortunately in doing market shares you have

23    to do it that way.  And between the two, treating Kenmore as its

24    own brand is the right way to go.

25    **Q.**   You testified -- or said several times that it's important

1    not just to look at historical, but you also want to look into

2    the future.  That's the critical economic analysis that you were

3    considering in the course of this.

4         You did look to the future significance and the growth

5    of these various competitors, correct?

6    **A.**   Yes, I did.

7    **Q.**   Okay.  And that's a concept that also comes from the

8    guidelines?

9    **A.**   Yes, it is.

10   **Q.**   Okay.  Now, there's been testimony in this case that --

11   about Samsung and LG, there's been a lot of testimony about

12   Samsung and LG.

13        And did you reach an opinion whether their competitive

14   significance is greater than what's displayed in their 2014

15   market share?

16   **A.**   Based on their trends, it should be clear, especially for

17   Samsung, that they are growing rapidly and doing extremely well

18   in cooking and that there's -- given their past strategies in

19   other appliance categories, there's no reason to expect that

20   that growth would not continue very strongly into the future and

21   would actually accelerate if the opportunity presented itself if

22   the firm -- if the merged firm tried to raise prices.

23   **Q.**   And you said you look at the other appliance categories, you

24   said, and looked at Samsung's and LG's growth.

25        Did you report that in these slides?

1    **A.**   Yes, I do.  So if we look at slide number --

2          MR. DEMITRACK:  Two slides ahead, Steve.

3          THE WITNESS:  So I included in the appendix

4    refrigeration as well, and --

5          MR. DEMITRACK:  And just for the record, this would be

6    page 0658-016 that we're looking at.

7          THE WITNESS:  Thank you.  I include in the appendix the

8    other appliance categories.  What this shows is what has

9    happened over time in laundry.  And this is looking at laundry

10   market shares for -- in the retail space.  So this is using the

11   TraQline data.  And what one sees -- and I've drawn a line to

12   help give some context -- in 2006 for when the Maytag/Whirlpool

13   deal was consummated --

14   BY MR. DEMITRACK:

15   **Q.**   So that's the vertical dotted line there?

16   **A.**   Yes, sir.

17   **Q.**   Okay.

18   **A.**   And what one sees is that the combined LG/Samsung -- and

19   their combined together in this chart for presentational

20   purposes -- has grown steadily March forward from under

21   5 percent in 2005 to roughly 30 percent in 2014.  This is in

22   laundry.

23          At the same time, you see a drop in Whirlpool's share,

24   a drop in Electrolux's share and a drop in Kenmore's share.

25   **Q.**   Now, we don't need to go there, into the appendix, but you

1  do report there similar trends for refrigeration and dishwasher.

2          Do you see similar trends for dishwasher and

3  refrigeration that you do here for laundry?

4  **A.**  Yes.

5  **Q.**  Okay.  And then --

6          THE COURT:  Why is it relevant to look at what happened

7  after this merger when we know that the Great Recession occurred

8  almost simultaneously, if not immediately after, the merger?

9          THE WITNESS:  So --

10          THE COURT:  Why isn't this just an atypical example of

11  what could happen in an anti-merger environment?

12          THE WITNESS:  So we need to get some dates because I've

13  heard a lot about this Great Recession and the timing.

14          THE COURT:  You'd know more about it than I do.

15          THE WITNESS:  No, I just want to make sure that

16  we're -- let's lay out the --

17          THE COURT:  Well, Professor Whinston in his testimony

18  said almost immediately the day after the merger the Recession

19  occurred.  And I don't think it was that dramatic, but, you

20  know, I query whether experts differ on when the Recession did

21  commence.

22          THE WITNESS:  So hopefully I can enlighten this issue.

23  So the merger occurred in the first quarter of 2006.

24          THE COURT:  After the -- yeah, the merger.  All right.

25          THE WITNESS:  The merger occurred in the first quarter

1     of 2006.  The National Bureau of Economic research is --

2     according to economists and everybody else -- the official

3     arbiter of when recessions begin and when they end.  The

4     National Bureau of Economic Research said that the Recession

5     started in December 2007, a year-and-three-quarters after the

6     merger.

7            The Recession at that time was quite mild in terms of

8     unemployment, et cetera, in the first part of 2008.  It was only

9     once the liquidity crisis and the market panic in the summer to

10    fall of 2008 that the Great Recession really went -- we went

11    into a Great Recession.  So that was quite a long time

12    afterwards.

13           Now, I should go back.

14           THE COURT:  The consumers knew that before the

15    officials declared it, though.

16           THE WITNESS:  It's often the case that consumers know

17    more than economists sometimes prior to economists forecasting

18    it.

19           But the one thing to be clear about is the housing

20    downturn did start in 2006, but it was not -- there are very

21    sort of direct ways in the econometric analysis that I do for

22    Maytag/Whirlpool to take -- to control for the economy and

23    control for the effect of the economy on appliance prices.  And

24    so we'll talk about that when we talk about the Maytag/Whirlpool

25    retrospective, but I deal with that in multiple ways in the

1    regression in the statistical analysis.  And the results don't

2    change depending on how you change it, which suggests that the

3    Great Recession is not the kind of confounding event that would

4    suggest that you should not look directly at the

5    Maytag/Whirlpool merger.

6              THE COURT:  All right.

7              MR. DEMITRACK:  So if we could take the next slide,

8    which would be 017 and put that side by side with 016, hopefully

9    there's enough space there to make that work.

10   BY MR. DEMITRACK:

11   **Q.**  So 016, which is the slide on the left, that's the slide

12   we've been talking about.  That's Samsung and LG's growth in

13   laundry appliances, and you've testified that that growth is

14   similar to the growth that you saw for refrigeration and

15   dishwashers.

16             And on the right what you're reporting here is Samsung

17   and LG growth in cooking appliances, correct?

18   **A.**  That is correct.

19   **Q.**  Okay.  And what lessons do you draw from looking at these

20   two slides side by side?

21   **A.**  Well, one thing I just want to make sure, again, that the

22   record's clear, is that the scale of the two is not identical.

23   So the right-hand one goes from 0 to 35 percent; the left one

24   goes from 0 to 50 percent, just so that that is clear.

25             What is relevant here is, if one looks at -- and I

1    think I can touch the screen, I heard during one of these

2    sessions that --

3    **Q.**  You can make circle if you'd like.

4            THE COURT:  You can mark on it, yes.

5            THE WITNESS:  I always wanted to be John Madden, so

6    this is very exciting for me.

7            FROM THE FLOOR:  (Laughter.)

8            THE WITNESS:  If you look at the growth that LG and

9    Samsung experienced in the three years after the

10   Maytag/Whirlpool merger, and you compared it to the growth --

11   oops -- now I may need Mr. Glass to tell me how to fix this,

12   but --

13   BY MR. DEMITRACK:

14   **Q.**  There you go.  We'll start over again.

15   **A.**  There.  It's roughly correct.

16           If I look at those two growths, in the three years

17   after the Maytag/Whirlpool merger to the growth rate of cooking

18   recently, they're very similar.  And if you did this just for

19   ranges, they'd be virtually identical.  And so the growth that

20   Samsung and LG has experienced is very significant in the last

21   few years, and it's similar to the dramatic growth that they had

22   in laundry in terms of the percentage point growth.  So this is

23   relevant to consider because it helps to inform what the future

24   would look like, because they're using very similar business

25   strategies in cooking that they used in these other products.

1   **Q.**   And just so we have a point of reference here, when we're

2   looking at, on the left-hand side page 16, and we start at about

3   2005, we have LG and Samsung as about what, 5 percent?

4   **A.**   That is correct.

5   **Q.**   And then if we go over here to Slide 17, 5 percent occurs

6   right about 2011 for cooking appliances, correct, somewhere in

7   that range?

8   **A.**   Roughly speaking, yes.

9   **Q.**   So you're starting from the same -- when you're making this

10  point before about the growth of the two companies and laundry

11  versus the growth in the two companies in cooking, you're

12  starting -- endeavoring to start from the same 5 percent?

13  **A.**   Roughly speaking, yes.  It's obvious -- you can't match it

14  up precisely, but as a rough way to say it, they're growing at

15  similar rates.

16          THE COURT:  Let's do this, Counsel.  We started around

17  2:00.  Let's take a 15-minute recess.

18          Let me just inquire whether or not you can finish

19  direct by 6:30 today?

20          MR. DEMITRACK:  I don't think we'll finish by 6:30.  If

21  we can go 6:30, I think --

22          THE COURT:  We can.

23          MR. DEMITRACK:  We can go to 6:30?  That's fine.  I

24  think we'll have a little bit left in the morning.

25          THE COURT:  That's fine.

```
 1            MR. DEMITRACK:  And then a substantial cross.

 2            THE COURT:  All right.  And I'm just asking this

 3    because my recollection is Mr. Glass said he probably needs a

 4    couple of hours for cross-examination.  I just wonder whether we

 5    can finish this witness by 1:00 tomorrow and dispense with lunch

 6    tomorrow, and then call the government's witnesses in rebuttal

 7    on Monday.  I'm just wondering about that.

 8            MR. GLASS:  Yeah, I'd love to be able to say that, Your

 9    Honor.  I think I'll be around two hours.

10            THE COURT:  That's fine.  So even if we started at 9

11    tomorrow and counsel needed another hour, so you could arguably

12    be finished by 1:00 or so tomorrow; is that possible?

13            MR. GLASS:  (Nodded head affirmatively.)

14            THE COURT:  Okay.

15            MR. DEMITRACK:  I think that makes sense.

16            THE COURT:  I might be able to move that hearing to a

17    little bit later.  I'm not sure about that.  I'm trying to

18    accommodate everybody, but we'll do as much as we can today.

19            MR. DEMITRACK:  All right.

20            THE COURT:  And, again, the offer's still open if you

21    want to stay until 7, we can do that, you know.  But it's

22    whatever you want to do, really, but you need to let me know so

23    I can make arrangements for that.

24            MR. DEMITRACK:  Your Honor, when we come back from the

25    break we have probably the only document that a third party has
```

```
 1   marked confidential, and we're going to display just the outline
 2   of the document.
 3            THE COURT:  All right.
 4            MR. DEMITRACK:  I really have -- most of it can be done
 5   publicly.  There's probably one or two questions that if we can
 6   use the husher it'll be just much more efficient to do, as
 7   opposed to asking people to come back.
 8            THE COURT:  No, that's fine.  We'll do that.  We'll do
 9   that.
10            MR. DEMITRACK:  Thank you, Your Honor.
11            THE COURT:  All right.  Had you planned on calling a
12   rebuttal witness, any rebuttal witness, tomorrow at all,
13   assuming I didn't have that hearing tomorrow afternoon?
14            MR. GLASS:  So, Your Honor, we will have a witness
15   prepared just in case Your Honor would like.
16            THE COURT:  All right.
17            MR. GLASS:  But we will defer to whatever Your Honor
18   would like.  We can have the two witnesses on Monday as well.
19            THE COURT:  All right.  All right.  All right.
20            So -- all right.  We'll kind of play it by ear.
21            MR. GLASS:  I mean, we could do it at 7:00 and finish.
22            THE COURT:  We can, but I just need to let -- you just
23   need to let me know if you want to do that so I can make sure
24   GSA knows.
25            MR. GLASS:  I think it might make sense to finish up
```

1    with direct, and then I start the morning with cross.

2            THE COURT:  I totally agree with that.

3            MR. DEMITRACK:  The only issue is that the witness with

4    a young kid that already has a bit of a sore throat, so I just

5    want to make sure that he doesn't lose his voice.  He lost his

6    voice during his deposition, so let's see how we're doing and it

7    may be that --

8            THE COURT:  All right.  Okay.  I prefer to do that,

9    finish direct examination if we can.

10           MR. DEMITRACK:  Yes.

11           THE COURT:  And that way I can accommodate everyone, I

12   think.  All right.

13           MR. DEMITRACK:  Thank you, Your Honor.

14           THE COURT:  We'll take a 15-minute recess.  It looks

15   like it's 4:00, I think, isn't it, Mark?

16           THE COURTROOM CLERK:  Five after.

17           THE COURT:  Five after 4.  We'll start back at 4:20,

18   then.

19           You can step down.  I just have to ask you not to

20   discuss your testimony.

21           THE WITNESS:  Okay.  Thank you.

22           THE COURT:  Sure.

23       (Thereupon, a break was had beginning at 4:06 p.m.)

24

25

1

2
## C E R T I F I C A T E

3

4            I, Scott L. Wallace, RDR-CRR, certify that
the foregoing is a correct transcript from the record of
proceedings in the above-entitled matter.

5

6     /s/ Scott L. Wallace                    12/3/15
      -----------------------------        ----------------
7       **Scott L. Wallace, RDR, CRR**          **Date**
          **Official Court Reporter**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$10** [1] - 4257:10
**$100** [1] - 4328:11
**$20** [1] - 4327:25
**$400** [2] - 4348:18, 22
**$500** [1] - 4328:5
**$500,000** [1] - 4331:18
**$600** [3] - 4328:6; 4348:17, 21
**$800,000** [1] - 4331:18

## '

**'08** [1] - 4305:19

## /

**/s** [1] - 4364:6

## 0

**0** [2] - 4358:23
**0-1** [1] - 4353:22
**016** [2] - 4358:8, 11
**017** [1] - 4358:8
**0658-016** [1] - 4355:6

## 1

**1** [1] - 4301:19
**1,046** [1] - 4254:19
**10** [1] - 4266:15
**10.2** [2] - 4346:8; 4349:22
**100** [3] - 4306:13; 4339:11; 4341:5
**11** [1] - 4266:16
**11-4** [1] - 4271:1
**11-month-old** [1] - 4302:16
**11:08** [2] - 4193:6; 4198:2
**12-2** [1] - 4271:1
**12/3/15** [1] - 4364:6
**120** [1] - 4316:4
**1200** [5] - 4195:10, 14, 17, 21; 4196:3
**125** [1] - 4306:14
**12:53** [1] - 4278:24
**131** [1] - 4251:12
**146** [1] - 4251:13
**15** [5] - 4193:9; 4276:24; 4278:10; 4279:5; 4308:12
**15-1039** [2] - 4193:4; 4198:4
**15-minute** [2] - 4360:17; 4363:14
**15-year** [1] - 4236:20
**15.5** [1] - 4346:7
**150** [1] - 4306:14
**16** [2] - 4272:18; 4360:2
**1625** [1] - 4196:10
**17** [1] - 4360:5

## 1776

**1776** [1] - 4330:14
**18** [2] - 4253:22; 4254:12
**1900** [5] - 4195:10, 14, 17, 20; 4196:3
**1992** [1] - 4341:17
**1999** [2] - 4237:23; 4304:14
**1:00** [3] - 4199:6; 4361:5, 12

## 2

**2** [3] - 4199:5; 4277:12; 4278:13
**20** [5] - 4201:16; 4242:10; 4276:24; 4279:5; 4308:12
**2000** [1] - 4304:14
**20001** [3] - 4193:15, 20; 4194:23; 4195:4; 4196:16
**20001-2113** [2] - 4194:12, 19
**20006** [6] - 4195:11, 14, 18, 21; 4196:4, 10
**2005** [3] - 4335:8; 4355:21; 4360:3
**2006** [6] - 4318:16; 4319:2; 4355:12; 4356:23; 4357:1, 20
**2007** [1] - 4357:5
**2008** [5] - 4305:3, 10, 15; 4357:8, 10
**2010** [1] - 4310:24
**2011** [1] - 4360:6
**2013** [1] - 4200:19
**2014** [8] - 4251:11; 4257:8; 4335:8; 4348:6, 10; 4349:19; 4354:14; 4355:21
**2015** [13] - 4193:5; 4198:1; 4200:19, 23; 4235:17; 4241:4; 4279:1; 4334:23; 4345:19; 4346:5; 4349:22
**202** [18] - 4193:16, 20-21, 25; 4194:5, 13, 20, 24; 4195:11, 15, 18, 22; 4196:4, 11
**202)354-3196** [1] - 4196:17
**202)879-4660** [1] - 4195:4
**20530** [3] - 4193:24; 4194:4, 9
**216** [1] - 4195:8
**22** [1] - 4335:11
**225** [1] - 4276:13
**23** [1] - 4335:9
**24** [1] - 4346:6
**25** [1] - 4254:12
**261-3318** [1] - 4195:22
**261-3332** [1] - 4196:4
**261-3333** [2] - 4195:22; 4196:5
**261-3339** [1] - 4195:18
**261-3398** [1] - 4195:11
**261-3430** [1] - 4195:15
**269-1555** [1] - 4194:16
**27.4** [1] - 4346:3
**28** [1] - 4254:20
**281-3835** [1] - 4194:12
**2:00** [8] - 4277:2, 12, 19; 4278:8, 11, 20; 4360:17
**2:06** [1] - 4279:2

## 3

**3** [5] - 4193:5; 4198:1; 4255:2; 4279:1; 4321:19
**30** [2] - 4200:19; 4355:21
**30(b)(6** [5] - 4236:8; 4249:9, 13, 20; 4250:16
**305-1489** [1] - 4193:16
**30th** [1] - 4251:11
**312** [1] - 4194:16
**333** [1] - 4196:15
**35** [1] - 4358:23
**383-5343** [1] - 4196:11
**383-5414** [1] - 4196:11

## 4

**4** [4] - 4321:19; 4328:5; 4350:22; 4363:17
**40** [2] - 4307:12
**400** [1] - 4254:19
**4000** [3] - 4193:15, 19; 4194:8
**403** [1] - 4201:5
**4202** [1] - 4197:4
**4225** [1] - 4197:5
**4230** [1] - 4197:6
**4232** [1] - 4197:7
**4235** [1] - 4197:9
**4246** [1] - 4197:10
**4249** [1] - 4197:11
**4253** [1] - 4197:12
**4281** [1] - 4197:13
**4299** [1] - 4197:14
**4302** [1] - 4197:16
**44114** [1] - 4195:7
**450** [5] - 4193:14, 19, 24; 4194:4, 8
**4:00** [1] - 4363:15
**4:06** [1] - 4363:23
**4:20** [1] - 4363:17
**4th** [1] - 4271:3

## 5

**5** [8] - 4350:22; 4352:3, 12, 14; 4355:21; 4360:3, 5, 12
**50** [1] - 4358:24
**5000** [1] - 4255:2
**51** [4] - 4194:11, 19, 23; 4195:3
**514-0230** [1] - 4193:20
**514-5621** [1] - 4193:25
**514-7308** [1] - 4193:21
**586-3939** [1] - 4195:8
**598-8197** [1] - 4194:5
**599** [5] - 4240:22; 4241:5, 13, 22; 4242:1
**5th** [1] - 4194:4

## 6

**6.3** [1] - 4349:21
**6.6** [1] - 4351:22
**6.9** [1] - 4349:20
**602** [2] - 4201:6; 4250:19
**60601** [1] - 4194:16
**614** [1] - 4194:12
**626-1700** [2] - 4194:13, 20
**6503** [1] - 4196:16
**658** [1] - 4313:9
**6:30** [4] - 4360:19-21, 23

## 7

**7** [4] - 4198:24; 4199:10; 4350:19; 4361:21
**7026** [1] - 4193:24
**72** [1] - 4251:12
**77** [1] - 4194:15
**7:00** [1] - 4362:21
**7:30** [2] - 4198:24; 4199:10

## 8

**8.2** [1] - 4351:21
**879-3939** [2] - 4194:20, 24

## 9

**9** [2] - 4350:19; 4361:10
**901** [1] - 4195:7
**950** [1] - 4255:19

## A

**a.m** [2] - 4193:6; 4198:2
**AB** [4] - 4193:6; 4194:11; 4195:3; 4198:4
**ability** [6] - 4241:18; 4314:22; 4315:13; 4317:5; 4329:22
**able** [10] - 4199:4, 25; 4242:16; 4258:10; 4259:20; 4260:19; 4267:21; 4332:22; 4361:8, 16
**above-entitled** [1] - 4364:4
**absolutely** [4] - 4311:20; 4338:22; 4349:3, 25
**academic** [2] - 4303:18
**accelerate** [1] - 4354:21
**accelerated** [1] - 4328:24
**accept** [2] - 4265:1; 4317:7
**acceptable** [1] - 4332:23
**accepted** [4] - 4307:24; 4308:1
**access** [4] - 4255:13; 4319:24; 4323:3
**accessories** [1] - 4254:24
**accommodate** [2] - 4361:18; 4363:11

**accommodations** [1] - 4200:1
**according** [1] - 4357:2
**account** [2] - 4321:15; 4339:15
**achieved** [1] - 4331:20
**acknowledged** [1] - 4307:14
**act** [1] - 4240:15
**action** [2] - 4332:3, 5
**Action** [2] - 4193:4; 4198:3
**Adam** [1] - 4330:14
**add** [3] - 4331:17; 4340:5; 4348:4
**adding** [2] - 4238:6; 4319:23
**addition** [1] - 4237:21; 4351:20
**additional** [1] - 4346:25
**additions** [1] - 4260:18
**addressed** [3] - 4306:18; 4308:16; 4341:2
**addresses** [3] - 4321:1; 4336:8
**adhesive** [1] - 4331:16
**Adler** [1] - 4198:11
**administration** [2] - 4304:5, 22
**administrative** [1] - 4308:8
**admissibility** [2] - 4250:17, 20
**adopting** [1] - 4319:22
**advantage** [3] - 4269:4; 4329:13; 4338:8
**advertise** [2] - 4264:3
**advertised** [1] - 4241:14
**advertising** [2] - 4261:23; 4274:11
**advise** [1] - 4305:2
**advisor** [1] - 4303:5
**Advisors** [1] - 4303:24
**advisors** [1] - 4302:24
**affect** [1] - 4338:4
**affirmatively** [1] - 4361:13
**afford** [1] - 4342:19
**AFTERNOON** [2] - 4193:9; 4279:1
**afternoon** [8] - 4252:18; 4279:3; 4301:12, 22-23; 4302:3; 4362:13
**afterwards** [2] - 4332:7; 4357:12
**agencies** [1] - 4304:18
**agenda** [3] - 4321:20; 4322:3; 4335:15
**agents** [1] - 4279:11
**aggressive** [1] - 4270:12
**ago** [8] - 4254:12; 4258:21; 4263:24; 4266:16; 4267:5, 17; 4323:2; 4344:2
**agree** [3] - 4318:3; 4353:11; 4363:2
**ahead** [1] - 4355:2
**aided** [1] - 4196:19
**Air** [1] - 4276:2
**air** [2] - 4199:11; 4237:6
**air-conditioners** [1] - 4237:6
**airline** [1] - 4328:1
**airplane** [1] - 4327:25
**airplanes** [1] - 4327:24
**al** [2] - 4193:6; 4198:4
**Alan** [1] - 4302:25
**alike** [1] - 4334:16
**allocate** [1] - 4317:22
**allow** [6] - 4201:13; 4241:25; 4242:2;

4251:22; 4303:21; 4309:20
**allowed** [3] - 4237:12; 4331:8; 4332:13
**allows** [3] - 4326:12; 4329:11; 4331:1
**alluded** [1] - 4243:7
**Almo** [2] - 4240:12; 4325:11
**almost** [3] - 4255:8; 4356:8, 18
**alone** [1] - 4274:7
**alternative** [1] - 4319:25
**ambassador** [1] - 4305:5
**amen** [1] - 4328:2
**AMERICA** [1] - 4193:3
**America** [8] - 4196:9; 4198:4; 4235:16; 4236:18; 4248:11, 13, 17; 4307:5
**America's** [2] - 4236:3; 4248:20
**American** [3] - 4304:24; 4308:4
**amount** [8] - 4255:23; 4257:7, 23; 4262:18; 4268:22; 4338:15; 4342:19, 22
**analyses** [8] - 4303:8; 4312:19; 4320:21; 4321:9, 11; 4322:5; 4328:22
**analysis** [34] - 4306:7, 17, 20, 22; 4310:25; 4311:12, 17, 19; 4314:7; 4315:4, 6; 4319:21; 4321:3, 12; 4326:3; 4328:16; 4331:12, 19; 4332:14; 4334:11; 4335:17; 4338:23; 4341:20; 4344:7; 4349:13, 24; 4350:4, 7; 4354:2; 4357:21; 4358:1
**analytical** [1] - 4313:25
**analyze** [4] - 4310:5, 20; 4312:8; 4337:1
**analyzed** [3] - 4306:5, 9; 4316:4
**analyzing** [1] - 4260:12
**ancillary** [1] - 4349:4
**Ancona** [1] - 4347:8
**Andrew** [2] - 4195:2; 4198:21
**Anna** [2] - 4196:2; 4198:16
**anna.aryankalayil@dechert.com** [1] - 4196:5
**announced** [1] - 4306:16
**answer** [10] - 4238:15; 4241:20; 4246:1; 4270:11; 4277:16; 4309:5; 4316:14; 4323:11; 4342:20; 4345:8
**answering** [1] - 4267:7
**answers** [2] - 4333:18; 4334:16
**ANTALICS** [7] - 4200:5, 7; 4249:17, 20, 23; 4250:1, 4
**Antalics** [2] - 4196:9; 4200:8
**anti** [1] - 4356:11
**anti-merger** [1] - 4356:11
**anticompetitive** [6] - 4315:3, 18, 20; 4316:5; 4335:19; 4351:8
**antitrust** [7] - 4302:12; 4303:6; 4308:25; 4309:8, 12, 17; 4319:2
**Antitrust** [4] - 4193:19, 23; 4194:3, 7
**anyway** [1] - 4265:15
**apart** [1] - 4273:5
**apartment** [1] - 4314:21
**apologize** [2] - 4315:5; 4323:14
**apparatus** [1] - 4352:20

**appeal** [1] - 4321:14
**APPEARANCES** [4] - 4193:12; 4194:1; 4195:1; 4196:1
**appendix** [3] - 4355:3, 7, 25
**appliance** [29] - 4237:9; 4238:2; 4240:1, 9, 11; 4242:9; 4257:7, 19; 4259:13; 4261:18; 4263:4; 4264:8; 4265:18; 4267:1, 10; 4268:4, 10; 4269:10; 4270:19; 4318:18; 4327:14; 4330:7, 9, 18; 4335:12; 4354:19, 23; 4355:8; 4357:23
**Appliance** [4] - 4253:14, 18, 20
**appliances** [61] - 4200:25; 4242:14; 4247:7, 12-13, 17; 4254:4, 9-10, 16; 4255:9, 11, 16-17, 20-21, 25; 4256:9, 12, 16; 4257:12, 14, 23; 4258:1, 7, 16, 25; 4259:2, 11, 19; 4264:25; 4266:9, 12, 17, 25; 4268:16, 23; 4269:6; 4271:2; 4272:16, 19; 4273:5, 13; 4276:17; 4310:9; 4317:12; 4323:5; 4325:23; 4327:16; 4334:25; 4335:4, 11; 4344:4, 19; 4347:3; 4358:13, 17; 4360:6
**applied** [4] - 4308:21, 23; 4309:16; 4315:22
**apply** [4] - 4303:17; 4304:2, 12; 4311:18
**applying** [1] - 4308:22
**appointed** [1] - 4340:14
**appreciate** [3] - 4199:3, 25; 4320:8
**appreciative** [1] - 4199:15
**approach** [6] - 4258:20, 22; 4275:18; 4310:1, 22; 4319:22
**approached** [4] - 4239:11; 4258:15, 19; 4262:17
**approaching** [1] - 4301:18
**appropriate** [5] - 4252:1; 4265:11; 4319:4; 4348:12; 4353:8
**approval** [2] - 4279:11; 4319:3
**approved** [3] - 4199:24; 4277:8; 4318:22
**arbiter** [1] - 4357:3
**area** [6] - 4253:25; 4275:14; 4308:19; 4326:10; 4351:19
**areas** [5] - 4255:1; 4275:21, 24; 4276:3; 4309:21
**arguably** [1] - 4361:11
**arrangements** [1] - 4361:23
**arrow** [1] - 4328:19
**Aryankalayil** [2] - 4196:2; 4198:16
**Arçelik** [3] - 4327:14; 4338:14; 4346:14
**Ashenfelter** [3] - 4303:2; 4319:23
**ASHENFELTER** [1] - 4303:2
**aside** [1] - 4256:12
**aspect** [1] - 4349:17
**assessment** [1] - 4260:23
**assign** [2] - 4237:1; 4337:24
**assigned** [2] - 4339:22, 24
**assigning** [1] - 4338:21

**assist** [4] - 4238:17; 4302:18; 4313:1, 4
**assisting** [1] - 4345:23
**associates** [2] - 4262:1; 4273:25
**Association** [1] - 4308:5
**associations** [1] - 4308:3
**Associations** [1] - 4308:5
**assortment** [1] - 4261:1
**assume** [2] - 4302:13; 4333:14
**assuming** [3] - 4332:13; 4340:4; 4362:13
**attempted** [2] - 4338:5
**attempts** [1] - 4313:6
**attend** [2] - 4200:1; 4303:10
**attention** [1] - 4345:24
**Attorney** [5] - 4193:13, 18, 22; 4194:2, 6
**attorney** [2] - 4200:17; 4341:4
**attorneys** [3] - 4200:2, 4; 4252:21
**atypical** [1] - 4356:10
**auto** [1] - 4305:12
**available** [8] - 4310:20; 4343:5, 7; 4347:7, 17, 22; 4348:4
**Avanti** [1] - 4346:13
**Avantis** [1] - 4344:12
**Avenue** [5] - 4194:11, 19, 23; 4195:3, 7; 4196:15
**award** [2] - 4307:3, 9
**awards** [1] - 4307:11

---

## B

**Bachman** [1] - 4198:11
**bachman** [1] - 4193:22
**background** [2] - 4302:21; 4329:3
**backward** [1] - 4311:1
**backward-looking** [1] - 4311:1
**BALON** [5] - 4197:12-14; 4252:24; 4253:1
**Balon** [4] - 4252:16; 4253:3, 10; 4276:21
**bankrupt** [1] - 4305:22
**based** [9] - 4269:1; 4332:14; 4339:24; 4340:14; 4341:14, 17; 4343:15; 4351:6; 4354:16
**basic** [1] - 4334:25
**basis** [4] - 4319:15; 4328:25; 4341:21; 4351:7
**become** [1] - 4336:3
**BEFORE** [1] - 4193:10
**began** [1] - 4266:25
**begin** [1] - 4357:3
**beginning** [3] - 4278:23; 4325:20; 4363:23
**behalf** [5] - 4198:14, 19; 4199:15; 4236:8; 4242:18
**behavior** [1] - 4336:4
**behind** [1] - 4332:2
**belabor** [1] - 4321:2

**below** [1] - 4327:21
**bench** [2] - 4241:7; 4243:8
**BENCH** [1] - 4193:9
**bend** [2] - 4343:21
**benefit** [2] - 4315:10; 4334:20
**benefits** [2] - 4264:2; 4274:2
**Benjamin** [1] - 4198:10
**Bertazzoni** [1] - 4346:14
**Best** [54] - 4253:6, 11, 21, 23; 4254:4, 7-8, 10, 14, 18; 4255:19, 21, 24; 4256:1, 4-5, 12, 15, 22; 4257:11, 23; 4258:1, 7, 11, 16; 4259:11, 21; 4260:10; 4261:8; 4262:8, 18; 4263:1, 4; 4265:15; 4266:10, 13, 25; 4267:1, 13, 15, 24; 4270:19; 4272:5, 15; 4274:13; 4275:1, 10, 19; 4276:5; 4277:8; 4312:12; 4324:6; 4334:5
**best** [12] - 4248:22; 4303:21; 4307:12; 4333:9; 4343:5, 7; 4345:1; 4347:17, 22; 4348:4
**better** [13] - 4262:2, 4, 6, 15; 4263:21, 25; 4274:4; 4309:8; 4330:23-25; 4351:20
**between** [19] - 4254:22; 4260:3; 4274:6; 4318:13; 4319:19; 4320:2; 4321:4; 4326:18; 4330:17; 4331:2; 4332:10; 4336:8; 4341:11; 4344:15; 4347:22; 4353:15, 23
**beyond** [1] - 4239:6
**big** [8] - 4254:19, 22; 4255:3, 12, 19; 4258:5; 4302:11; 4330:1
**big-box** [5] - 4254:19, 22; 4255:3, 12, 19
**bigger** [1] - 4331:18
**biggest** [6] - 4258:9; 4304:14; 4312:2; 4351:18, 24
**bill.jones2@usdoj.gov** [1] - 4193:21
**binder** [4] - 4249:3; 4301:18; 4312:16; 4322:6
**binders** [1] - 4301:18
**binding** [2] - 4340:17
**bit** [13] - 4199:3; 4235:14; 4236:21; 4246:6; 4273:10; 4302:20; 4326:16; 4329:19; 4347:1; 4360:24; 4361:17; 4363:4
**bite** [1] - 4326:13
**Black** [2] - 4270:22, 25
**blackout** [1] - 4332:22
**blue** [2] - 4324:7, 22
**blurs** [1] - 4273:2
**bodies** [3] - 4308:8, 16
**book** [1] - 4330:15
**bore** [1] - 4340:2
**Bosch** [2] - 4351:15, 18
**Bosch's** [1] - 4351:16
**boss** [2] - 4237:10; 4247:9
**bottom** [4] - 4246:10; 4273:11; 4323:18; 4333:24
**bought** [1] - 4314:6
**box** [7] - 4254:19, 22; 4255:3, 12, 19;

4323:17, 24
**brake** [2] - 4310:16; 4317:12
**brand** [9] - 4235:25; 4258:7; 4334:7; 4353:9, 13, 16, 18-19, 24
**brands** [12] - 4258:9, 11; 4268:2, 6; 4322:21; 4327:12; 4335:13; 4338:15; 4346:14
**break** [6] - 4199:6; 4277:2, 11; 4278:14; 4361:25; 4363:23
**Brian** [2] - 4195:19; 4198:16
**brian.rafkin@dechert.com** [1] - 4195:23
**bring** [5] - 4243:4; 4261:22; 4268:5, 13; 4269:11
**bringing** [1] - 4265:23
**broaden** [1] - 4309:6
**brother** [1] - 4303:18
**brought** [2] - 4268:10; 4272:7
**Bryson** [2] - 4193:22; 4198:11
**bryson.bachman@usdoj.gov** [1] - 4193:25
**Budget** [1] - 4305:8
**builder** [5] - 4240:17, 19-20; 4257:3; 4274:14
**builders** [5] - 4255:21, 25; 4256:6, 13; 4257:8
**building** [3] - 4199:5; 4304:5; 4352:17
**built** [1] - 4268:2
**bulk** [1] - 4256:7
**bullet** [1] - 4335:16
**bunch** [1] - 4342:18
**bundling** [2] - 4268:16, 21
**Bureau** [2] - 4357:1, 4
**business** [14] - 4239:24; 4260:12; 4266:21; 4310:13, 19; 4329:8; 4339:10; 4346:17; 4347:25; 4348:2; 4359:24
**businesses** [2] - 4326:11; 4346:18
**butting** [1] - 4327:3
**Buy** [51] - 4253:6, 11, 21, 23; 4254:4, 7-8, 10, 14, 18; 4255:19, 21, 24; 4256:1, 4-5, 12, 15, 22; 4257:11; 4258:7, 11, 16; 4259:11, 21; 4260:10; 4261:8; 4262:8, 18; 4263:1, 4; 4265:15; 4266:10, 13, 25; 4267:13, 15, 24; 4270:19; 4272:5, 15; 4274:13; 4275:1, 10, 19; 4276:5; 4277:8; 4312:12; 4324:6; 4334:5
**buy** [12] - 4256:16; 4260:13; 4261:15; 4268:22; 4273:23; 4317:8; 4324:13; 4326:1; 4330:10; 4352:4
**Buy's** [3] - 4257:23; 4258:1; 4267:1
**buyers** [5] - 4260:13; 4314:21; 4315:13; 4317:6; 4327:18
**BY** [32] - 4197:5-11, 13-16; 4235:12; 4236:16; 4237:17; 4241:3; 4242:8; 4245:21; 4246:18; 4249:6; 4253:2; 4302:2; 4309:24; 4312:25; 4314:12; 4320:13; 4333:4; 4336:15; 4342:8; 4345:10; 4355:14; 4358:10; 4359:13

**C**

**cafeteria** [1] - 4199:5
**calculate** [1] - 4345:11
**calculated** [1] - 4350:8
**calendar** [1] - 4278:7
**California** [3] - 4253:19; 4255:8
**candidate** [1] - 4305:1
**cannot** [1] - 4250:9
**car** [1] - 4308:5
**career** [2] - 4303:19; 4304:8
**carefully** [1] - 4320:20
**Carolina** [2] - 4237:22; 4240:14
**carry** [4] - 4254:17; 4266:6, 11, 14
**carrying** [1] - 4266:25
**cars** [1] - 4317:12
**carte** [1] - 4344:25
**case** [26] - 4200:2; 4201:24; 4249:7; 4251:12; 4279:23; 4302:23, 25; 4303:7; 4311:19; 4312:4, 14; 4313:15; 4316:18; 4319:10; 4320:5; 4322:7; 4325:5; 4333:13; 4337:24; 4346:12, 24; 4352:2; 4354:10; 4357:16; 4362:15
**cases** [9] - 4257:16; 4269:22; 4306:21; 4307:25; 4310:15; 4314:18; 4341:5
**categories** [7] - 4247:11; 4279:14; 4310:3; 4337:2; 4354:19, 23; 4355:8
**categorization** [1] - 4240:3
**categorized** [1] - 4347:9
**category** [7] - 4270:15; 4272:23; 4273:7; 4338:14; 4346:24; 4347:10
**CE** [2] - 4267:25; 4268:3
**census** [1] - 4304:16
**center** [3] - 4324:12, 19; 4325:15
**Center** [1] - 4304:24
**centers** [1] - 4324:15
**central** [3] - 4306:20; 4328:16; 4338:22
**centricity** [1] - 4253:25
**certain** [10] - 4254:6; 4260:19-21; 4268:22; 4273:24; 4342:14, 24
**certainly** [1] - 4275:23
**certify** [1] - 4364:3
**cetera** [5] - 4312:13; 4323:23; 4329:9; 4346:15; 4357:8
**chair** [1] - 4303:24
**chairwoman** [1] - 4303:23
**challenge** [1] - 4237:25
**chance** [1] - 4237:11
**change** [4] - 4274:17; 4314:7; 4358:2
**changed** [3] - 4247:3; 4267:11; 4318:21
**changes** [3] - 4246:24; 4264:14; 4267:10
**channel** [7] - 4240:17, 19-20; 4257:3; 4274:14; 4325:25; 4326:7
**characterize** [1] - 4270:9
**chart** [7] - 4325:18; 4333:9; 4335:2; 4349:17; 4355:19

**cheap** [1] - 4330:11
**cheaper** [1] - 4329:12
**cheapest** [2] - 4330:8, 10
**chew** [1] - 4326:13
**Chicago** [1] - 4194:16
**chief** [2] - 4235:18; 4305:6
**childcare** [1] - 4199:1
**Chinese** [1] - 4248:15
**choice** [1] - 4318:7
**choices** [3] - 4333:16; 4347:20, 22
**choose** [2] - 4328:1; 4329:6
**choosing** [1] - 4246:8
**Christmas** [1] - 4272:12
**circle** [6] - 4323:19; 4324:8; 4328:20; 4330:4; 4342:2; 4359:3
**circles** [2] - 4323:18; 4326:3
**circulating** [1] - 4199:11
**circumstances** [3] - 4251:5, 24; 4270:17
**Civil** [2] - 4193:4; 4198:3
**clean** [3] - 4328:8; 4349:7
**cleaning** [2] - 4328:5; 4349:2, 5
**clear** [23] - 4236:7, 13; 4250:24; 4251:15, 22; 4253:3; 4309:4; 4322:2; 4333:1; 4335:2; 4342:24; 4343:2; 4346:20; 4348:23; 4349:3; 4352:11; 4353:3, 21; 4354:16; 4357:19; 4358:22, 24
**clearly** [4] - 4250:21; 4314:8; 4342:25; 4347:22
**CLERK** [2] - 4198:3; 4363:16
**Cleveland** [1] - 4195:7
**Climatic** [2] - 4240:13; 4325:11
**Clinton** [3] - 4303:15; 4304:5, 19
**close** [4] - 4243:4; 4254:25; 4276:21; 4302:18
**closed** [6] - 4201:14, 22; 4235:5; 4253:7; 4279:21; 4301:9
**Closed/Sealed** [1] - 4193:10
**closes** [1] - 4199:5
**coils** [1] - 4329:11
**colleagues** [1] - 4198:15
**COLUMBIA** [1] - 4193:1
**Columbia** [1] - 4196:15
**Columbus** [3] - 4271:20; 4272:6, 9
**column** [1] - 4348:6
**combination** [2] - 4348:7; 4352:18
**combine** [2] - 4314:5, 7
**combined** [4] - 4317:18; 4331:9; 4355:18
**comfortable** [1] - 4267:7
**coming** [4] - 4260:15; 4265:5; 4267:5; 4329:5
**commence** [1] - 4356:21
**comment** [1] - 4342:23
**commentary** [2] - 4341:19; 4342:23
**comments** [1] - 4307:24
**Commerce** [2] - 4304:10, 17
**Commission** [2] - 4199:16; 4336:25

**commitment** [1] - 4338:17
**committed** [6] - 4238:13; 4337:18, 22, 25; 4338:4, 9
**commodity** [1] - 4265:15
**common** [2] - 4264:20, 22
**communicate** [1] - 4260:19
**communication** [1] - 4274:10
**compact** [1] - 4237:5
**companies** [18] - 4270:13; 4274:25; 4275:6; 4305:21; 4317:18; 4324:4; 4325:10; 4327:18; 4329:1, 17; 4330:1, 17; 4331:1; 4344:16, 18; 4360:10
**companies'** [1] - 4331:9
**company** [6] - 4236:20; 4248:15; 4325:8; 4330:7, 21; 4344:23
**Company** [3] - 4195:10; 4196:3; 4253:11
**compare** [3] - 4257:23; 4259:20; 4265:5
**compared** [1] - 4359:10
**Compass** [5] - 4302:7, 9; 4306:1, 10
**compete** [6] - 4246:8; 4269:15; 4274:9; 4322:13; 4327:22; 4334:18
**competing** [12] - 4246:5; 4313:19; 4317:4; 4318:13; 4319:19; 4321:10; 4322:24; 4327:3; 4332:9, 11; 4343:9
**competition** [35] - 4274:6; 4307:13-15; 4309:9, 12; 4314:14; 4321:12, 16; 4327:1, 7-9, 11, 13, 21; 4328:4, 16-17; 4330:17-19, 21, 24-25; 4331:2; 4332:4; 4333:11; 4334:20; 4338:23; 4339:12; 4351:5
**competitive** [23] - 4242:12; 4306:10; 4313:17; 4314:22; 4315:14; 4318:9; 4322:8; 4333:12; 4334:11; 4338:5, 22; 4340:8; 4342:5; 4343:6; 4348:25; 4349:10; 4350:2, 5, 7; 4351:16; 4354:13
**competitor** [1] - 4350:18
**competitors** [9] - 4254:14; 4257:11, 20, 24; 4317:1; 4322:18; 4337:3; 4350:21; 4354:5
**completely** [1] - 4313:7
**complex** [2] - 4323:16; 4327:4
**complexity** [1] - 4323:14
**complicated** [2] - 4326:22, 25
**compound** [1] - 4338:20
**computer** [1] - 4196:19
**computer-aided** [1] - 4196:19
**computers** [1] - 4256:9
**concentration** [2] - 4317:2; 4351:10
**concept** [5] - 4276:5; 4329:21; 4339:14; 4350:2; 4354:7
**concepts** [3] - 4254:23; 4333:3, 5
**concern** [3] - 4242:17, 24; 4245:23
**concerned** [1] - 4246:11
**concerns** [2] - 4201:10; 4246:9
**concluded** [6] - 4235:5; 4242:6; 4245:16; 4251:19; 4301:9
**conclusion** [3] - 4311:15; 4351:5, 7

**conclusions** [1] - 4351:16
**conditioners** [1] - 4237:6
**conducted** [2] - 4306:23; 4347:4
**conducting** [1] - 4310:1
**confidential** [9] - 4200:9, 14; 4253:6; 4277:3, 13; 4279:4, 6; 4362:1
**confounding** [1] - 4358:3
**confronted** [1] - 4347:20
**confusion** [1] - 4337:9
**Congress** [2] - 4307:9; 4308:11
**Congressional** [1] - 4305:8
**consider** [6] - 4242:12; 4254:3; 4257:11; 4265:12; 4353:8; 4359:23
**consideration** [2] - 4340:18; 4352:21
**considering** [1] - 4354:3
**consistent** [1] - 4348:24
**constantly** [2] - 4261:1; 4328:15
**Constitution** [1] - 4196:15
**constrained** [1] - 4327:18
**constraints** [1] - 4327:7
**consulting** [2] - 4302:8, 10
**consumer** [20] - 4254:8, 16; 4261:11; 4262:10; 4263:25; 4268:1, 17; 4269:5; 4273:17; 4317:10; 4324:17; 4326:7; 4330:3, 13, 19, 23; 4331:24; 4349:5
**consumers** [26] - 4314:16; 4315:10; 4323:6, 19; 4326:16; 4328:4, 14; 4330:16, 24; 4331:3; 4332:12; 4334:20; 4344:20; 4345:3; 4346:17; 4347:3-5, 14; 4349:15; 4352:15; 4357:14, 16
**consummated** [2] - 4306:16; 4355:13
**Cont** [2] - 4194:1; 4196:1
**cont** [1] - 4195:1
**context** [5] - 4242:19; 4316:23; 4318:24; 4344:8; 4355:12
**continue** [14] - 4199:19; 4201:13; 4239:4; 4261:22; 4265:9; 4313:17; 4314:13, 25; 4315:16; 4332:12; 4354:20
**CONTINUED** [6] - 4197:4, 9-10, 13; 4235:11; 4246:17
**continued** [1] - 4304:23
**continues** [1] - 4340:4
**continuing** [1] - 4200:17
**contract** [7] - 4314:17; 4325:4, 13, 16, 25; 4326:7; 4353:18
**contractor** [1] - 4324:2
**contractors** [8] - 4255:22, 25; 4256:6, 13-14, 23; 4257:8; 4325:6
**control** [3] - 4353:12; 4357:22
**controversial** [2] - 4319:11, 20
**conversation** [3] - 4262:24; 4263:13, 15
**convincingly** [1] - 4320:3
**cooking** [18] - 4238:2; 4242:14; 4273:13; 4323:5; 4325:23; 4335:3; 4344:19; 4352:15, 20, 22; 4354:18; 4358:17; 4359:17, 25; 4360:6, 11
**cooktop** [6] - 4328:10; 4329:10; 4349:2, 7; 4350:21; 4352:18

**cooktops** [21] - 4238:8; 4247:23; 4314:1, 5; 4339:18; 4343:13, 18-19; 4344:17; 4345:12; 4350:8, 18, 23; 4351:8, 17, 19, 21, 23; 4352:3; 4353:5
**coolers** [1] - 4237:6
**coordinate** [1] - 4336:4
**coordinated** [5] - 4315:3; 4335:18, 23; 4336:6, 9
**copies** [1] - 4312:21
**core** [4] - 4334:25; 4335:4, 10, 12
**corporate** [1] - 4250:16
**Corporation** [2] - 4240:13
**correct** [47] - 4236:8, 12; 4238:4, 7, 9-10; 4242:11; 4246:23; 4247:5, 21, 24; 4248:4, 8, 12-16; 4256:11, 21; 4257:4; 4261:9; 4262:8; 4270:18; 4273:12; 4274:8, 15-16; 4276:16; 4305:16; 4315:24; 4320:15; 4324:21; 4333:13; 4334:18; 4336:7; 4353:7; 4354:5; 4358:17; 4359:15; 4360:4, 6; 4364:4
**correctly** [1] - 4353:1
**correlates** [1] - 4268:3
**cost** [1] - 4331:7
**Costco** [3] - 4312:13; 4347:8
**costs** [2] - 4331:1, 9
**Coughlin** [1] - 4198:20
**Council** [2] - 4303:15, 24
**counsel** [12] - 4198:10, 15; 4235:8; 4236:10; 4241:7; 4249:15; 4253:4; 4277:7, 9; 4279:10; 4361:11
**Counsel** [9] - 4245:19; 4252:13, 15, 23; 4279:3; 4301:13; 4309:18, 22; 4360:16
**counseling** [1] - 4306:15
**count** [1] - 4306:12
**counted** [2] - 4308:11; 4339:22
**counting** [1] - 4306:12
**countries** [2] - 4339:7; 4343:15
**country** [2] - 4305:19; 4339:6
**country's** [1] - 4305:16
**couple** [2] - 4332:21; 4361:4
**course** [10] - 4256:18; 4277:9; 4306:17, 23; 4312:9, 22; 4329:16; 4343:11; 4346:17; 4354:3
**court** [4] - 4200:13; 4235:6; 4243:4; 4279:22
**Court** [26] - 4196:13; 4199:17; 4200:13; 4201:13, 23; 4243:14; 4254:21; 4301:10; 4302:20; 4309:20; 4311:23; 4312:21; 4313:1, 14; 4321:24; 4323:15; 4324:8; 4326:23; 4332:18; 4335:22; 4336:21; 4340:20; 4342:15; 4364:7
**Court's** [3] - 4341:2; 4342:9, 15
**courtroom** [2] - 4277:14; 4279:9
**COURTROOM** [2] - 4198:3; 4363:16
**courts** [2] - 4308:7, 15
**cover** [3] - 4308:24; 4312:17; 4315:8
**covered** [1] - 4260:18
**covers** [1] - 4335:2

**Cowie** [1] - 4195:16
**create** [3] - 4261:24; 4269:11; 4335:18
**created** [1] - 4260:17
**crisis** [2] - 4305:21; 4357:9
**critical** [3] - 4311:8; 4339:23; 4354:2
**critically** [1] - 4323:8
**CROSS** [4] - 4197:5, 10, 14; 4246:17
**cross** [8] - 4200:13; 4241:15, 18; 4246:15; 4322:22; 4361:1, 4; 4363:1
**CROSS-EXAMINATION** [4] - 4197:5, 10, 14; 4246:17
**cross-examination** [3] - 4200:13; 4246:15; 4361:4
**cross-examine** [2] - 4241:15, 18
**CRR** [3] - 4196:13; 4364:3, 7
**curious** [1] - 4341:3
**current** [9] - 4235:18; 4253:12; 4275:5; 4305:4; 4337:3, 14; 4339:23; 4341:18
**custom** [1] - 4256:15
**customer** [9] - 4253:25; 4260:20; 4261:14; 4266:4; 4274:10; 4325:16; 4326:8
**customers** [11] - 4259:17; 4262:13; 4265:24; 4266:2; 4268:6; 4273:23; 4325:25; 4326:1; 4344:24
**cycle** [3] - 4328:24; 4329:3, 12

## D

**D.C** [5] - 4193:7; 4199:17; 4304:25; 4305:7; 4307:4
**daily** [2] - 4259:25; 4260:1
**data** [26] - 4311:15; 4312:4, 7; 4322:11; 4325:16; 4329:8; 4344:24; 4345:6, 15, 17; 4346:1, 12-13, 15, 22-24; 4347:11-13; 4348:2, 7; 4355:11
**date** [1] - 4266:15
**Date** [1] - 4364:7
**dates** [1] - 4356:12
**daughter** [1] - 4302:16
**DAY** [6] - 4194:11, 15, 18, 22; 4195:3, 6
**DC** [16] - 4193:15, 20, 24; 4194:4, 9, 12, 19, 23; 4195:4, 11, 14, 18, 21; 4196:4, 10, 16
**deal** [6] - 4256:8; 4260:7; 4303:4; 4318:19; 4355:13; 4357:25
**dealers** [1] - 4240:1
**dealing** [1] - 4199:7
**debated** [2] - 4319:2, 6
**debates** [1] - 4303:1
**December** [2] - 4193:5; 4357:5
**DECEMBER** [2] - 4198:1; 4279:1
**decennial** [1] - 4304:15
**DECHERT** [5] - 4195:9, 13, 17, 20; 4196:2
**Dechert** [1] - 4198:14
**decide** [2] - 4329:23; 4352:17

**decided** [4] - 4199:16; 4256:16; 4322:25; 4339:3
**decision** [10] - 4251:11; 4303:20; 4311:15; 4319:1, 4-5; 4331:6; 4342:14, 19; 4353:22
**decisions** [2] - 4328:15; 4333:15
**deck** [2] - 4321:21; 4322:10
**declared** [1] - 4357:15
**decrease** [2] - 4264:17; 4331:1
**deeply** [3] - 4304:14, 18; 4311:14
**defendant** [1] - 4249:10
**Defendant** [4] - 4194:10; 4195:2, 9; 4196:2
**defendants** [4] - 4198:19; 4301:15; 4309:15
**Defendants** [1] - 4193:7
**DEFENDANTS'** [2] - 4252:24; 4301:24
**Defense** [1] - 4313:9
**defer** [2] - 4340:24; 4362:17
**deference** [1] - 4340:21
**define** [1] - 4313:23
**defining** [1] - 4353:1
**definitely** [1] - 4334:19
**degrees** [1] - 4303:9
**delayed** [1] - 4199:22
**delivering** [2] - 4263:7
**delve** [1] - 4253:6
**demands** [1] - 4199:1
**DEMITRACK** [38] - 4197:16; 4301:12, 14, 17; 4302:2; 4309:15, 23-24; 4312:20, 24-25; 4314:12; 4319:14; 4320:9, 12-13; 4332:20; 4333:4; 4336:15; 4342:8; 4345:10; 4355:2, 5, 14; 4358:7, 10; 4359:13; 4360:20, 23; 4361:1, 15, 19, 24; 4362:4, 10; 4363:3, 10, 13
**Demitrack** [2] - 4195:5; 4301:14
**denied** [1] - 4199:22
**DENIS** [1] - 4198:13
**Denis** [2] - 4195:13; 4198:13
**Department** [5] - 4304:6, 10, 16; 4316:24; 4336:25
**department** [1] - 4319:5
**DEPARTMENT** [5] - 4193:14, 18, 23; 4194:3, 7
**departments** [1] - 4253:24
**departure** [2] - 4241:4; 4246:24
**depicted** [1] - 4334:17
**deposed** [1] - 4249:7
**deposition** [4] - 4249:10, 21; 4343:20; 4363:6
**depositions** [1] - 4250:16
**Depot** [9] - 4257:13; 4312:13; 4323:20; 4324:3; 4330:22; 4333:21, 23; 4334:2, 15
**describe** [4] - 4253:17; 4305:21; 4321:6; 4332:3
**described** [6] - 4236:19; 4311:17; 4313:8; 4330:14; 4331:4; 4332:8

**describing** [2] - 4313:5; 4324:20
**DESCRIPTION** [1] - 4197:18
**description** [2] - 4332:3; 4336:12
**design** [1] - 4339:21
**designated** [7] - 4235:5; 4236:7; 4245:16; 4249:13; 4275:14, 24; 4276:3
**designs** [1] - 4315:9
**detail** [1] - 4313:13
**detailed** [6] - 4312:18; 4315:4, 6; 4319:21; 4331:12, 19
**determine** [1] - 4260:10
**determined** [2] - 4201:12; 4340:16
**determines** [1] - 4261:8
**Dexter** [11] - 4200:22; 4201:2; 4235:13; 4241:4, 23; 4242:9; 4245:22; 4246:19; 4249:7, 20; 4252:4
**DEXTER** [10] - 4197:4-7, 9-11; 4235:11; 4246:17; 4249:5
**dictate** [2] - 4348:5; 4349:9
**dictated** [1] - 4340:19
**differ** [1] - 4356:20
**difference** [5] - 4254:21; 4260:3; 4268:9; 4348:24; 4349:10
**differences** [3] - 4260:5; 4321:4; 4328:15
**different** [34] - 4254:1; 4256:6; 4260:13; 4264:3, 5; 4269:13; 4274:11; 4275:21; 4310:8; 4317:17; 4319:22; 4321:17; 4322:20, 22-24; 4323:3; 4325:25; 4326:1; 4327:8; 4331:15; 4333:18; 4334:8, 16; 4337:2; 4339:13; 4343:24; 4344:5, 11; 4345:2; 4348:25; 4349:1, 20
**differential** [1] - 4341:1
**differentiated** [1] - 4268:5
**differently** [1] - 4341:10
**digital** [1] - 4254:24
**diminution** [1] - 4331:1
**dire** [1] - 4309:18
**DIRECT** [8] - 4197:4, 9, 12-13, 16; 4235:11; 4253:1; 4302:1
**direct** [8] - 4235:9; 4256:6, 8; 4311:9; 4357:21; 4360:19; 4363:1, 9
**Direct** [4] - 4256:1, 4-5, 12
**directing** [1] - 4236:10
**directly** [9] - 4314:19; 4316:14; 4324:19, 22; 4325:16; 4334:10; 4341:14; 4350:6; 4358:4
**director** [3] - 4302:7; 4304:9; 4305:8
**disciplining** [1] - 4320:4
**discounting** [1] - 4272:22
**discovery** [1] - 4250:17
**discretion** [6] - 4340:13; 4342:16, 20, 22; 4343:8
**discuss** [5] - 4277:25; 4278:14, 18; 4342:1; 4363:20
**discussed** [2] - 4239:7; 4263:23
**discussion** [9] - 4241:9; 4242:6; 4243:12; 4245:17; 4249:16; 4251:19; 4311:23; 4351:11; 4352:11

**Discussion** [1] - 4301:21
**discussions** [4] - 4263:10, 16, 19; 4275:5
**dishwasher** [2] - 4356:1
**dishwashers** [4] - 4259:4; 4335:4; 4344:19; 4358:15
**dispense** [1] - 4361:5
**display** [4] - 4259:11; 4263:4; 4326:24; 4362:1
**displayed** [4] - 4264:4; 4333:24; 4344:4; 4354:14
**displaying** [2] - 4321:23; 4322:16
**displays** [1] - 4261:25
**distinguishes** [1] - 4254:14
**distribute** [3] - 4324:18; 4325:15, 22
**distributed** [1] - 4324:12
**distribution** [7] - 4315:8; 4324:12, 15, 19; 4325:3, 15; 4329:6
**distributor** [1] - 4324:24
**distributors** [11] - 4240:10, 17, 20; 4257:15, 19; 4314:18; 4324:13; 4325:4, 13; 4326:15
**District** [2] - 4196:14
**DISTRICT** [3] - 4193:1, 11
**diverge** [1] - 4342:2
**Division** [10] - 4193:19, 23; 4194:3, 7; 4253:14, 18-20; 4256:14
**division** [2] - 4256:1; 4257:1
**document** [11] - 4200:19; 4313:1, 4, 6, 10; 4321:20; 4348:1; 4361:25; 4362:2
**documents** [8] - 4201:15; 4247:1; 4276:20, 24; 4311:22; 4312:3; 4329:8; 4343:15
**dollars** [2] - 4346:4
**done** [13] - 4200:25; 4237:8; 4262:20; 4273:23; 4275:8; 4304:12; 4313:15; 4331:11; 4332:14; 4341:20; 4346:16; 4349:13; 4362:4
**door** [1] - 4304:6
**dorm** [1] - 4237:5
**dotted** [1] - 4355:15
**down** [9] - 4199:24; 4240:5; 4273:8, 11; 4311:4, 16; 4340:2; 4349:19; 4363:19
**downturn** [1] - 4357:20
**dramatic** [2] - 4356:19; 4359:21
**draw** [3] - 4351:7, 16; 4358:19
**drawn** [1] - 4355:11
**drive** [3] - 4314:22; 4315:13; 4333:14
**Drive** [1] - 4194:15
**driving** [2] - 4333:12; 4334:9
**drop** [1] - 4355:23
**due** [2] - 4348:25; 4349:10
**during** [11] - 4270:4; 4271:2; 4272:20; 4306:10; 4307:9; 4352:1, 6-7; 4359:1; 4363:6
**dynamic** [3] - 4317:5; 4320:3; 4332:5

**E**

**ear** [1] - 4362:20
**early** [1] - 4305:15
**earning** [5] - 4337:5, 21; 4343:1; 4346:10
**easier** [2] - 4316:9; 4349:8
**easily** [1] - 4336:3
**easy** [4] - 4329:7; 4339:8, 21; 4343:21
**Econometric** [1] - 4308:6
**econometric** [3] - 4312:18; 4319:21; 4357:21
**economic** [16] - 4302:8, 10-11; 4304:17; 4305:1; 4306:3; 4307:5; 4308:3; 4312:19; 4317:2; 4326:2; 4336:4; 4341:7, 13; 4354:2; 4357:4
**Economic** [4] - 4303:15, 24; 4308:4; 4357:1
**economically** [1] - 4305:18
**economics** [31] - 4302:22; 4303:17; 4304:2, 13; 4307:2, 17, 19; 4308:16, 19, 22; 4309:1, 9, 12-13, 17; 4330:5, 19, 21; 4332:4; 4336:13; 4340:25; 4341:14, 22; 4342:2, 7; 4348:23; 4353:10, 16
**economist** [3] - 4303:6; 4341:8
**economist's** [2] - 4340:21
**economists** [12] - 4303:22; 4307:13, 23; 4309:7, 10; 4319:3; 4341:9, 12; 4357:2, 17
**economists'** [1] - 4309:14
**economy** [3] - 4305:24; 4357:22
**educate** [1] - 4261:25
**educated** [1] - 4266:20
**education** [1] - 4256:7
**educational** [1] - 4302:20
**Edward** [1] - 4196:9
**effect** [4] - 4336:1; 4351:8, 10; 4357:23
**effective** [1] - 4260:20
**effects** [14] - 4315:3, 18, 20; 4334:11; 4335:19, 23-24; 4336:6, 8-9; 4338:22; 4342:5; 4350:7
**efficiencies** [10] - 4306:18, 20, 22-23; 4315:5-7, 9; 4331:12; 4342:3
**efficient** [1] - 4362:6
**effort** [1] - 4328:8
**either** [12] - 4264:14; 4306:14; 4307:24; 4308:1; 4314:16; 4315:2; 4323:22; 4324:1, 24; 4343:13, 15; 4347:9
**elected** [1] - 4305:2
**election** [1] - 4305:10
**Electric** [4] - 4195:9; 4196:2; 4198:14; 4242:16
**ELECTROLUX** [1] - 4193:6
**Electrolux** [26] - 4194:11; 4195:3; 4198:4, 19; 4242:16; 4245:23; 4258:8, 13; 4262:22; 4267:20; 4301:14;

4311:24; 4317:15; 4327:9; 4330:22; 4334:3, 6; 4337:6; 4346:6; 4350:17; 4351:22; 4353:9, 12, 15
**Electrolux's** [1] - 4355:24
**electronics** [6] - 4254:9, 16; 4268:1, 17; 4269:5; 4329:3
**Electronics** [1] - 4196:9
**element** [1] - 4350:4
**elements** [3] - 4341:8, 13; 4349:25
**elevation** [3] - 4339:25; 4352:12
**Email** [15] - 4193:16, 21, 25; 4194:5, 9, 13, 17, 21, 24; 4195:12, 15, 23; 4196:5, 12, 17
**embodied** [2] - 4310:23; 4341:13
**emerged** [1] - 4264:24
**EMMET** [1] - 4193:10
**empirical** [9] - 4311:13; 4316:22; 4321:9; 4322:11; 4328:22; 4331:5; 4332:10
**employed** [3] - 4253:10, 21; 4302:6
**employee** [3] - 4201:11; 4236:11; 4251:24
**employees** [7] - 4201:8; 4269:20; 4322:20; 4326:7; 4346:13; 4357:3
**endeavored** [1] - 4332:20
**endeavoring** [1] - 4360:12
**ended** [2] - 4308:2; 4346:9
**ending** [1] - 4325:20
**engage** [1] - 4273:25
**enhanced** [1] - 4330:25
**enjoy** [2] - 4277:18; 4278:17
**enlighten** [1] - 4356:22
**entered** [4] - 4240:7; 4276:5; 4318:20; 4338:16
**entering** [5] - 4239:8; 4326:8; 4327:13; 4337:23; 4343:25
**entire** [4] - 4253:18; 4312:2; 4327:17; 4332:21
**entities** [1] - 4344:15
**entitled** [5] - 4199:23; 4201:9; 4251:7; 4252:1; 4341:1; 4364:4
**entity** [5] - 4235:25; 4240:6; 4242:20; 4264:24; 4326:6
**entrant** [6] - 4326:4, 12; 4338:4, 7; 4343:13; 4344:1
**entrants** [10] - 4335:13; 4337:18, 25; 4338:10, 19; 4339:15, 19, 22; 4340:4; 4343:10
**environment** [3] - 4314:25; 4315:16; 4356:11
**esoteric** [1] - 4352:24
**especially** [3] - 4333:6; 4334:15; 4354:16
**Esq** [12] - 4194:10, 14, 18, 22; 4195:2, 5, 9, 13, 16, 19; 4196:2, 9
**essence** [4] - 4314:20; 4326:13; 4330:8; 4339:9
**establish** [1] - 4262:15
**established** [2] - 4251:2; 4310:22

**et** [7] - 4193:6; 4198:4; 4312:13; 4323:23; 4329:8; 4346:15; 4357:8
**Ethan** [2] - 4193:13; 4198:7
**ethan.glass@usdoj.gov** [1] - 4193:16
**Europe** [2] - 4339:20; 4343:18
**European** [1] - 4343:24
**evaluate** [3] - 4261:5, 22; 4309:25
**evaluating** [2] - 4261:1; 4314:14
**evening** [2] - 4198:24; 4277:21
**event** [5] - 4270:16; 4271:2, 7; 4272:7; 4358:3
**events** [2] - 4272:17; 4342:14
**everyday** [1] - 4273:7
**evidence** [11] - 4200:24; 4241:23; 4242:1; 4250:18, 20, 22; 4311:9; 4314:5; 4331:6; 4332:10; 4352:2
**Evidence** [1] - 4250:19
**EVP** [1] - 4247:11
**exact** [3] - 4238:20, 24; 4266:15
**exactly** [3] - 4254:11; 4270:11; 4275:20
**exam** [1] - 4241:21
**examination** [7] - 4200:13; 4235:9; 4236:11; 4246:15; 4332:21; 4361:4; 4363:9
**EXAMINATION** [16] - 4197:4-7, 9-14, 16; 4235:11; 4246:17; 4249:5; 4253:1; 4302:1
**EXAMINATIONS** [1] - 4197:3
**examine** [3] - 4241:15, 18; 4340:1
**examines** [1] - 4333:19
**example** [11] - 4324:11; 4325:9; 4327:4; 4338:24; 4342:25; 4343:4, 18; 4344:13; 4346:14; 4349:1; 4356:10
**examples** [1] - 4343:11
**except** [1] - 4311:7
**excited** [3] - 4236:3, 5, 17
**exciting** [1] - 4359:6
**exclude** [1] - 4325:18
**Excluding** [1] - 4193:10
**excuse** [1] - 4200:17
**executives** [1] - 4346:18
**exercise** [2] - 4311:1
**Exhibit** [1] - 4313:9
**EXHIBITS** [1] - 4197:17
**expand** [6] - 4238:2; 4239:6; 4240:8; 4269:21; 4326:5, 10
**expanding** [1] - 4307:5
**expansion** [2] - 4238:17; 4239:7
**expect** [4] - 4269:1; 4334:13; 4354:19
**expecting** [2] - 4273:23
**experience** [4] - 4310:7; 4316:13; 4327:23; 4331:11
**experienced** [4] - 4272:19, 22; 4359:9, 20
**experiences** [1] - 4340:15
**experiments** [1] - 4311:10
**expert** [5] - 4309:16, 21; 4319:7; 4320:19; 4341:3

**experts** [1] - 4356:20
**explain** [6] - 4273:22; 4311:23; 4323:12; 4324:8; 4328:21; 4332:18
**explaining** [2] - 4325:2; 4335:22
**explore** [2] - 4201:10; 4274:25
**expressed** [1] - 4274:25
**extent** [2] - 4200:23; 4201:1
**extra** [3] - 4321:8; 4328:11; 4340:5
**extremely** [2] - 4319:21; 4354:17
**Eye** [1] - 4196:10

## F

**F.Supp.3d** [1] - 4251:12
**face** [2] - 4265:18; 4327:11, 21
**faces** [1] - 4327:8
**facing** [3] - 4327:7, 13, 17
**fact** [5] - 4247:9; 4250:12; 4339:12; 4349:24; 4350:5
**factor** [1] - 4328:10
**factors** [4] - 4314:25; 4320:4; 4322:13
**factory** [2] - 4237:22; 4324:20
**facts** [1] - 4311:15
**fair** [11] - 4238:15; 4242:10; 4251:7; 4269:16; 4273:1; 4274:6; 4275:23; 4305:20; 4309:6; 4336:12; 4342:19
**fairly** [1] - 4264:22
**fall** [3] - 4305:15; 4337:2; 4357:10
**familiar** [1] - 4342:10
**families** [1] - 4307:7
**family** [3] - 4199:1; 4303:18; 4323:22
**far** [5] - 4239:23; 4247:14; 4258:6; 4331:12; 4334:7
**faster** [2] - 4268:13
**father** [1] - 4303:18
**Fax** [6] - 4193:21; 4194:13, 20; 4195:22; 4196:5, 11
**feature** [3] - 4275:21; 4328:14; 4349:5
**features** [4] - 4328:3; 4329:7, 9; 4349:14
**federal** [1] - 4340:12
**Federal** [3] - 4250:19; 4303:23; 4336:25
**feelings** [1] - 4277:22
**feet** [2] - 4255:2; 4305:14
**fellow** [1] - 4304:24
**Ferguson** [1] - 4325:8
**few** [6] - 4200:12; 4238:20; 4263:24; 4279:15; 4333:16; 4359:21
**fewer** [1] - 4344:17
**fictional** [1] - 4241:22
**field** [5] - 4307:2, 17, 19; 4309:11, 16
**Fifth** [4] - 4193:14, 19, 24; 4194:8
**fifth** [1] - 4351:24
**figures** [1] - 4267:10
**fill** [1] - 4346:22
**final** [1] - 4303:5
**Finance** [1] - 4308:5
**fine** [15] - 4199:2, 13; 4201:17; 4251:4;

4267:8; 4277:23; 4278:2, 16; 4312:23; 4332:25; 4360:23, 25; 4361:10; 4362:8
**finish** [8] - 4277:1; 4303:16; 4360:18, 20; 4361:5; 4362:21, 25; 4363:9
**finished** [2] - 4304:8; 4361:12
**firm** [8] - 4302:8, 10; 4306:7; 4309:2, 4; 4338:5; 4354:22
**firms** [17] - 4322:19; 4327:2; 4328:23; 4330:6; 4335:7; 4336:3; 4337:4, 20; 4339:15, 17; 4342:25; 4343:12, 14; 4346:10
**first** [25] - 4264:22; 4266:6, 11, 18; 4276:9; 4302:22; 4310:4, 10; 4321:11, 15; 4324:23; 4326:10; 4330:5, 14; 4334:22; 4337:3; 4342:21; 4345:19, 23; 4346:1, 5; 4350:17; 4356:23, 25; 4357:8
**fist** [3] - 4331:21; 4332:1
**fists** [1] - 4331:25
**fit** [6] - 4265:9; 4274:2; 4279:13; 4343:21, 23; 4344:1
**five** [11] - 4238:23; 4258:2, 14; 4267:9, 22; 4312:6; 4318:6; 4322:3; 4363:16
**five-minute** [1] - 4322:3
**fix** [1] - 4359:11
**flexibility** [1] - 4341:17
**FLOOR** [2] - 4336:14; 4359:7
**floor** [52] - 4239:12, 19; 4256:13, 17; 4259:11, 14, 20, 22; 4260:4, 6, 11, 16, 19, 22, 24; 4261:3, 6-7, 9, 19; 4262:18; 4263:2, 5, 8-9, 11, 15; 4264:5, 16, 18, 23; 4265:6, 8-9, 11-12; 4266:1; 4267:17-19; 4268:4, 6; 4273:25; 4275:14, 20, 22; 4317:22; 4318:6
**floors** [5] - 4261:17; 4264:2; 4269:12; 4275:21; 4276:3
**focus** [15] - 4253:13; 4254:15, 23; 4255:8; 4257:14; 4321:3; 4326:10; 4338:17; 4340:24; 4342:10; 4345:19, 24; 4346:12; 4351:9, 11
**focused** [5] - 4321:13, 15; 4323:7; 4330:20; 4335:3
**focuses** [1] - 4254:15
**focusing** [3] - 4257:21; 4346:2; 4351:4
**focussed** [1] - 4242:21
**folks** [3] - 4199:2; 4246:4; 4345:23
**follow** [5] - 4237:18; 4310:1; 4342:9, 13
**following** [7] - 4201:22; 4235:6; 4264:10; 4279:16, 21; 4301:10; 4311:3
**Following** [4] - 4241:9; 4243:12; 4249:16
**FOR** [1] - 4193:1
**force** [1] - 4240:15
**forecasting** [2] - 4338:3; 4357:17
**foregoing** [1] - 4364:4
**foreign** [1] - 4333:2
**form** [1] - 4352:19
**format** [1] - 4255:1
**former** [3] - 4305:5

**forward** [9] - 4198:5; 4238:3; 4247:17; 4251:7; 4311:1; 4321:11; 4332:13; 4355:20
**forward-looking** [3] - 4247:17; 4311:1
**foundations** [1] - 4303:7
**four** [6] - 4258:14; 4312:6; 4318:6; 4334:17, 25; 4346:7
**fourth** [3] - 4257:25; 4349:19; 4351:25
**framework** [4] - 4310:5, 21; 4322:1; 4353:2
**free** [2] - 4268:23
**freely** [1] - 4333:22
**freestanding** [1] - 4255:7
**Friday** [1] - 4270:22
**Friedman** [2] - 4195:9; 4198:15
**Frigidaire** [2] - 4258:8, 14
**FROM** [2] - 4336:14; 4359:7
**front** [2] - 4263:23; 4313:9
**full** [2] - 4321:15; 4327:1
**function** [1] - 4349:2
**functions** [1] - 4237:14
**fundamental** [1] - 4311:18
**fundamentally** [1] - 4311:2
**funded** [1] - 4307:9
**future** [25] - 4201:2; 4236:3, 17; 4246:23; 4247:23; 4248:2, 21; 4250:8; 4269:2; 4311:3, 8, 11; 4322:9; 4337:23; 4338:3, 5; 4343:5, 17, 25; 4350:2, 4; 4354:2, 4, 20; 4359:23

# G

**gain** [2] - 4236:1, 21
**gained** [2] - 4302:25; 4335:11
**gathering** [1] - 4347:2
**GE** [20] - 4245:23; 4258:8, 14; 4262:22; 4267:20; 4274:24; 4311:25; 4312:1; 4317:15; 4324:11; 4327:4; 4330:22; 4334:2, 6; 4344:22; 4346:2; 4347:5; 4348:19
**GE's** [1] - 4327:6
**gee** [1] - 4316:16
**Gene** [1] - 4303:25
**general** [2] - 4272:23; 4315:22
**General** [4] - 4195:9; 4196:2; 4198:14; 4242:16
**generally** [4] - 4200:16; 4311:22; 4341:10
**gentlemen** [1] - 4279:14
**geographic** [1] - 4339:19
**given** [11] - 4201:12; 4256:24; 4270:14, 19; 4275:15; 4302:16, 23; 4303:13; 4327:21; 4348:12; 4354:18
**glad** [1] - 4199:25
**Glass** [2] - 4193:13; 4198:7
**GLASS** [26] - 4197:6, 8, 10; 4198:7, 10; 4200:16, 22; 4201:19; 4241:6, 16, 19, 21; 4242:3; 4246:16, 18; 4248:24; 4249:12; 4250:14; 4251:9; 4252:9;

4361:8, 13; 4362:14, 17, 21, 25
**glass** [4] - 4198:9; 4327:9; 4359:11; 4361:3
**glass'** [1] - 4279:17
**global** [1] - 4236:1
**glue** [1] - 4331:16
**govern** [2] - 4250:17, 20
**government** [8] - 4200:15; 4303:20; 4304:8, 15, 21; 4307:3; 4318:21; 4352:1
**government's** [2] - 4333:13; 4361:6
**graduate** [2] - 4304:7; 4336:13
**graphically** [1] - 4323:10
**great** [4] - 4243:9; 4252:11; 4269:12; 4270:21
**Great** [4] - 4356:7, 13; 4357:10; 4358:3
**greater** [2] - 4258:4; 4354:14
**green** [2] - 4323:24; 4324:21
**Gregg** [2] - 4240:5; 4257:13
**Group** [2] - 4248:13, 15
**grow** [1] - 4326:14
**growing** [2] - 4354:17; 4360:14
**grown** [3] - 4267:16; 4350:6; 4355:20
**growth** [15] - 4354:4, 20, 24; 4358:12-14, 17; 4359:8, 10, 17, 19, 21-22; 4360:10
**growths** [1] - 4359:16
**GSA** [3] - 4198:23; 4199:10; 4362:24
**guess** [8] - 4238:18; 4239:15; 4259:10; 4265:13; 4266:20; 4319:8; 4332:3; 4341:1
**guessing** [1] - 4330:2
**guidance** [2] - 4336:24; 4343:3
**guide** [1] - 4311:15
**guideline** [1] - 4338:10
**Guidelines** [6] - 4310:23; 4336:19, 24; 4340:16; 4341:18; 4342:11
**guidelines** [33] - 4337:1, 4, 18-19, 23; 4340:9, 12-13, 16, 19, 21; 4341:7, 9, 11, 15-16, 18-19; 4342:2, 6, 17-18; 4343:8; 4346:10; 4347:18; 4348:5, 23; 4349:3, 9, 25; 4354:8

# H

**H.H** [2] - 4240:5; 4257:13
**Haag** [1] - 4198:11
**Haier** [32] - 4235:16, 22; 4236:3, 11, 18; 4237:18, 22; 4238:13, 16; 4239:1, 11, 14, 21; 4240:7, 21; 4241:24; 4242:18; 4246:7; 4248:9, 11, 13, 15, 17, 20; 4258:19, 24; 4317:14; 4327:15; 4338:14
**Haier's** [4] - 4200:17; 4237:3; 4238:2; 4239:19
**half** [6] - 4200:22; 4201:16; 4238:22; 4258:21; 4279:15; 4338:19
**hamstrung** [1] - 4340:15

**hand** [8] - 4304:23; 4324:3; 4325:1; 4330:15; 4331:22; 4332:2; 4358:23; 4360:2
**hand's** [1] - 4331:22
**hands** [2] - 4237:13; 4332:1
**hard** [1] - 4268:4
**harder** [1] - 4333:8
**head** [6] - 4308:13; 4327:9; 4331:2; 4361:13
**head-to-head** [2] - 4327:9; 4331:2
**heads** [1] - 4327:3
**hear** [1] - 4340:12
**heard** [6] - 4315:11; 4324:1, 5; 4325:4; 4356:13; 4359:1
**hearing** [4] - 4278:6; 4352:5; 4361:16; 4362:13
**hearings** [1] - 4199:16
**hearsay** [1] - 4241:6
**held** [4] - 4235:6; 4253:23; 4301:10
**help** [19] - 4240:8; 4261:15, 23; 4262:1, 4, 8, 10; 4264:2; 4305:2, 13; 4311:10, 15; 4314:8; 4321:9; 4338:24; 4355:12
**helped** [2] - 4304:1; 4307:8
**helpful** [2] - 4316:22; 4319:17
**helping** [2] - 4263:25; 4265:24
**helps** [2] - 4262:15; 4359:23
**Henderson** [1] - 4193:17
**hi** [1] - 4252:19
**high** [1] - 4316:25
**higher** [5] - 4270:1; 4317:3; 4322:20; 4344:14; 4351:2
**higher-end** [1] - 4322:20
**highlight** [1] - 4341:23
**hire** [1] - 4349:6
**hired** [2] - 4238:16, 19
**historical** [1] - 4354:1
**history** [2] - 4305:16; 4318:14
**hit** [1] - 4238:11
**hitting** [1] - 4331:21
**holidays** [2] - 4272:8, 17
**home** [6] - 4255:9; 4259:18; 4272:7, 9; 4314:20; 4352:18
**Home** [5] - 4327:13; 4312:13; 4323:20; 4324:3; 4330:22; 4333:21, 23; 4334:2, 15
**homebuilder** [3] - 4256:15; 4323:22
**honestly** [1] - 4242:21
**Honor** [53] - 4198:3, 7, 13, 18; 4200:7, 16, 20; 4201:4, 16, 19; 4235:10; 4236:12; 4237:4; 4241:16, 19, 21; 4242:3, 5; 4243:9; 4246:14, 16; 4248:24; 4249:1, 12, 17; 4250:14, 24; 4251:8, 18; 4252:2, 9, 16; 4276:19; 4277:17, 24; 4279:6, 16; 4301:12, 17; 4309:15, 19; 4312:20; 4319:14; 4320:9; 4332:20; 4361:9, 24; 4362:10, 14-15, 17; 4363:13
**Honor's** [1] - 4277:8
**HONORABLE** [1] - 4193:10

honors [1] - 4307:1
hope [2] - 4238:14; 4316:14
hopefully [4] - 4199:19; 4342:11; 4356:22; 4358:8
Horizontal [4] - 4310:23; 4336:18, 24; 4341:18
horizontal [1] - 4337:1
hospitals [1] - 4256:7
host [3] - 4237:7; 4247:11; 4337:13
hotly [2] - 4319:2, 6
hour [5] - 4201:16; 4278:10; 4279:15; 4361:11
hours [3] - 4313:12; 4361:4, 9
house [7] - 4242:21; 4277:7; 4279:11; 4310:10; 4323:21; 4344:21; 4352:19
House [7] - 4275:13; 4276:4, 12; 4304:8, 12, 20; 4305:6
housing [1] - 4357:19
hundreds [2] - 4312:17; 4322:6
husher [1] - 4362:6
hypothetical [4] - 4317:20; 4339:5; 4352:13, 25


I

idea [8] - 4246:21; 4247:4; 4307:7; 4325:14; 4337:18; 4339:24; 4342:25; 4353:17
ideas [2] - 4341:15; 4342:24
identical [2] - 4358:22; 4359:19
identified [1] - 4250:6
identify [4] - 4240:2; 4250:8; 4256:24
ignore [2] - 4347:16, 21
ignoring [1] - 4347:19
II [1] - 4193:17
IL [1] - 4194:16
illnesses [1] - 4302:16
imagine [3] - 4338:24; 4339:2; 4341:11
imaging [1] - 4254:25
immediately [2] - 4356:8, 18
impact [1] - 4242:23
implemented [1] - 4307:8
important [12] - 4305:23; 4318:24; 4323:8; 4333:10; 4341:13; 4344:7; 4347:24; 4348:13; 4350:4; 4352:10, 25; 4353:25
improvements [1] - 4268:7
improving [1] - 4274:20
in-between [1] - 4344:15
in-house [2] - 4277:7; 4279:11
inadmissible [1] - 4250:15
incentive [2] - 4335:25; 4338:7
include [7] - 4257:5; 4308:11; 4335:4; 4337:18; 4340:9; 4355:7
included [5] - 4201:23; 4279:22; 4305:4; 4322:5; 4355:3
includes [2] - 4253:18; 4276:17
including [4] - 4247:12; 4304:1;

4346:25
inclusion [1] - 4350:21
income [1] - 4307:6
incorporate [2] - 4341:7; 4347:20
increase [9] - 4264:6, 11, 25; 4265:1, 18; 4317:1, 7; 4320:1, 4
increased [2] - 4264:8; 4267:1
increases [5] - 4242:17, 25; 4245:24; 4246:11; 4338:7
increasing [4] - 4258:1, 4; 4262:17; 4307:6
independent [2] - 4240:1
indicate [2] - 4259:5; 4343:16
indication [1] - 4258:24
indicator [5] - 4343:5, 8; 4347:17, 23; 4348:3
indirect [1] - 4240:15
individual [3] - 4250:6; 4267:9; 4314:16
individuals [3] - 4238:21; 4256:8; 4307:6
industrial [5] - 4308:25; 4309:2, 7, 10, 17
industry [26] - 4200:25; 4239:10; 4242:9, 12, 20; 4246:11; 4257:18, 25; 4267:12, 25; 4268:2, 10; 4269:10; 4275:7; 4305:12; 4307:12; 4310:12, 14, 18; 4336:2; 4338:10; 4346:18
inform [4] - 4304:2; 4310:4, 6; 4311:11; 4321:9; 4331:6; 4332:10; 4338:25; 4359:23
information [6] - 4310:12, 20; 4311:8; 4312:7; 4319:24
informs [1] - 4348:3
inherently [1] - 4338:3
innovation [5] - 4262:6; 4268:10, 13-14; 4269:11; 4273:18; 4274:10
inputs [1] - 4330:10
inquire [1] - 4360:18
inside [3] - 4261:25; 4327:19; 4344:3
insights [2] - 4341:21; 4342:6
insofar [1] - 4306:18
instead [2] - 4272:8; 4331:16
instruments [1] - 4254:1
intended [1] - 4247:22
interaction [1] - 4336:8
interest [1] - 4274:25
interesting [2] - 4306:3, 6
interests [1] - 4343:9
International [1] - 4251:12
introduce [8] - 4198:5; 4248:2, 5; 4268:14; 4273:4, 6; 4279:17; 4328:23
introduced [3] - 4250:22; 4266:17; 4276:9
introducing [2] - 4247:23; 4343:16
introductions [2] - 4269:24
inventory [2] - 4253:24; 4324:10
invest [1] - 4264:1
investigate [4] - 4323:5; 4326:18;

4331:8; 4338:9
investigated [1] - 4332:15
investigating [1] - 4322:8
investigation [2] - 4310:2; 4319:8
investigations [1] - 4312:15
investments [1] - 4264:4
invisible [1] - 4330:15
invoice [1] - 4348:7
involve [1] - 4310:16
involved [7] - 4266:21; 4304:14, 18; 4306:7, 21; 4331:11; 4341:4
involves [1] - 4302:11
irrelevant [1] - 4249:13
issue [8] - 4306:18; 4310:7, 15; 4320:10; 4323:7; 4325:24; 4356:22; 4363:3
issues [13] - 4199:1; 4304:18; 4305:12; 4306:4; 4308:16; 4310:5; 4314:8; 4321:18; 4322:2; 4323:2; 4325:24; 4332:23; 4342:24
it'll [2] - 4277:13; 4362:6
itself [1] - 4354:21


J

Jack [1] - 4305:5
Janet [1] - 4303:23
January [2] - 4334:23; 4345:20
Jenn [1] - 4276:2
Jenn-Air [1] - 4276:2
jmmajoras@jonesday.com [1] - 4194:13
job [2] - 4235:14; 4321:14
Joe [2] - 4247:10; 4279:18
John [3] - 4194:10; 4198:20; 4359:5
join [2] - 4237:10
joined [2] - 4238:21
joke [1] - 4341:19
Jonathan [2] - 4301:15; 4302:5
JONATHAN [3] - 4197:16; 4301:24; 4302:1
Jones [3] - 4193:17; 4198:11, 19
JONES [6] - 4194:11, 15, 18, 22; 4195:3, 6
journal [2] - 4307:20, 22; 4308:2
JUDGE [1] - 4193:11
Judge [1] - 4251:10
judges [2] - 4340:12; 4341:24
judgment [2] - 4340:19; 4343:7
judgments [1] - 4340:14
Judicial [1] - 4199:15
judicial [3] - 4199:23; 4308:8, 15
July [2] - 4271:3; 4334:23
jumps [1] - 4273:17
June [10] - 4201:11; 4235:17; 4241:4; 4246:19; 4251:1, 3, 6, 24-25; 4345:20
JUSTICE [5] - 4193:14, 18, 23; 4194:3, 7
Justice [2] - 4316:24; 4336:25

**justice** [3] - 4199:22

## K

**kalejnieks@jonesday.com** [1] - 4194:21
**keep** [3] - 4199:10; 4304:23; 4325:2
**Kenmore** [9] - 4327:11; 4334:7; 4353:6, 8, 12-13, 15-16, 23
**Kenmore's** [1] - 4355:24
**Kessler's** [1] - 4251:11
**KEVIN** [15] - 4197:4-7, 9-14; 4235:11; 4246:17; 4249:5; 4252:24; 4253:1
**Kevin** [1] - 4252:16
**key** [6] - 4238:20; 4341:13, 21, 23; 4350:16
**kid** [1] - 4363:4
**kids** [1] - 4302:15
**kind** [7] - 4198:25; 4199:2; 4272:7; 4333:16; 4344:1; 4358:3; 4362:20
**kinds** [1] - 4242:22
**kitchen** [2] - 4237:9; 4344:4
**KitchenAid** [1] - 4258:13
**knowledge** [7] - 4201:6; 4241:17; 4246:25; 4250:15, 23, 25; 4251:23
**knowledgeable** [2] - 4250:7; 4254:4
**known** [5] - 4237:3, 18; 4308:25; 4310:22; 4353:14
**knows** [2] - 4254:6; 4362:24
**Kristen** [2] - 4194:18; 4198:21
**Krueger** [1] - 4302:25

## L

**Labor** [2] - 4271:7; 4304:6
**lack** [1] - 4339:12
**ladies** [1] - 4279:14
**laid** [4] - 4303:7; 4313:7; 4316:24; 4321:10
**Lakeside** [1] - 4195:7
**large** [12] - 4236:1; 4237:9; 4259:17; 4267:25; 4268:1; 4276:3; 4313:18; 4314:21; 4315:13; 4317:6; 4344:10, 16
**largely** [1] - 4338:16
**larger** [1] - 4351:10
**largest** [2] - 4327:14, 16
**Larry** [1] - 4304:1
**last** [9] - 4238:21; 4245:19; 4258:20; 4272:13; 4321:12; 4335:10; 4350:24; 4359:20
**lastly** [1] - 4325:14
**late** [6] - 4198:25; 4199:3, 8-9; 4277:23; 4305:15
**Laughter** [2] - 4336:14; 4359:7
**laundry** [11] - 4259:3; 4266:20; 4335:5; 4344:20; 4355:9, 22; 4356:3; 4358:13; 4359:22; 4360:10
**law** [1] - 4340:15

**lawyer** [1] - 4340:22
**lawyers** [2] - 4341:12, 24
**lay** [1] - 4356:16
**layout** [1] - 4342:24
**LDC** [1] - 4325:20
**lead** [2] - 4279:17; 4317:3
**leader** [1] - 4334:7
**learn** [2] - 4274:1; 4303:21
**least** [1] - 4348:13
**leave** [2] - 4279:12; 4329:11
**led** [1] - 4264:11
**left** [13] - 4240:21, 23; 4246:19; 4250:25; 4304:22; 4325:1; 4333:20, 24; 4358:11, 23; 4360:2, 24
**left-hand** [2] - 4325:1; 4360:2
**leg** [1] - 4327:25
**legacy** [4] - 4329:1; 4335:7, 13
**legal** [1] - 4340:24
**Lejnieks** [2] - 4194:18; 4198:21
**lengthy** [1] - 4311:22
**less** [4] - 4238:23; 4310:17; 4334:4; 4350:18
**lessening** [1] - 4351:5
**lessons** [1] - 4358:19
**level** [2] - 4331:13, 19
**leverage** [1] - 4329:20
**Lew** [1] - 4305:5
**Lexecon** [3] - 4302:7; 4306:1, 11
**LG** [30] - 4258:8, 12; 4262:20; 4266:12, 14, 18, 22; 4267:16; 4268:1, 9, 16; 4269:4, 18; 4270:4; 4272:9; 4273:4; 4274:24; 4317:14; 4318:19; 4327:11; 4328:24; 4335:11, 14; 4337:13; 4354:11; 4358:17; 4359:8, 20; 4360:3
**LG's** [3] - 4270:9; 4354:24; 4358:12
**LG/Samsung** [1] - 4355:18
**life** [1] - 4312:2
**lifestyle** [1] - 4274:2
**likely** [2] - 4275:12; 4335:18
**limited** [1] - 4261:3
**limits** [1] - 4326:11
**line** [5] - 4246:10; 4314:23; 4315:15; 4355:11, 15
**lines** [2] - 4273:2; 4324:21
**liquidity** [2] - 4305:21; 4357:9
**Lisa** [2] - 4194:2; 4198:12
**lisa.scanlon@usdoj.gov** [1] - 4194:5
**list** [1] - 4353:6
**lives** [1] - 4329:3
**LLP** [7] - 4195:9, 13, 17, 20; 4196:2, 9; 4198:14
**local** [1] - 4325:14
**located** [3] - 4253:19; 4254:25; 4255:7, 14
**location** [1] - 4276:15
**lodge** [1] - 4201:5
**logical** [1] - 4265:25
**logos** [2] - 4322:17; 4344:3

**look** [47] - 4239:8; 4257:20; 4259:19; 4260:14, 16; 4265:6, 22; 4269:10; 4274:18; 4276:2; 4310:10; 4311:21; 4319:11, 19, 25; 4322:14; 4325:19; 4328:4, 6, 10; 4331:14; 4332:6; 4333:19; 4338:1; 4340:18; 4344:21, 23; 4346:9; 4348:24; 4349:9, 17; 4350:8, 20; 4351:15; 4354:1, 4, 23; 4355:1; 4356:6; 4358:4; 4359:8, 16, 24
**looked** [4] - 4323:3; 4334:24; 4344:2; 4354:24
**looking** [33] - 4238:23; 4247:17; 4257:18; 4261:16; 4262:13, 16; 4274:17; 4310:6; 4311:1, 6, 14; 4314:1; 4319:18; 4322:11; 4334:22; 4335:8; 4337:15; 4340:3, 6; 4341:24; 4345:6, 16; 4350:15; 4353:4; 4355:6, 9; 4358:19; 4360:2
**looks** [4] - 4323:16; 4358:25; 4363:14
**Lori** [1] - 4303:25
**lose** [1] - 4363:5
**losing** [1] - 4335:7
**lost** [3] - 4335:9; 4363:5
**Louisiana** [4] - 4194:11, 19, 23; 4195:3
**love** [1] - 4361:8
**low** [1] - 4346:13
**low-end** [1] - 4346:13
**Lowe's** [5] - 4257:13; 4312:13; 4324:4; 4334:3, 15
**lower** [4] - 4269:25; 4272:20, 24; 4273:10; 4307:6; 4322:21; 4344:13
**lower-end** [1] - 4322:21
**lunch** [9] - 4199:6; 4277:2, 11, 18; 4278:1, 14-15, 17; 4361:5
**luncheon** [1] - 4278:23

## M

**machine** [1] - 4196:18
**Madden** [1] - 4359:5
**magazines** [2] - 4307:12, 15
**magnitude** [1] - 4306:14
**main** [1] - 4257:24
**Major** [1] - 4253:19
**major** [3] - 4266:6, 11; 4317:16
**MAJORAS** [4] - 4277:24; 4278:3, 12, 14
**Majoras** [2] - 4194:10; 4198:20
**majority** [2] - 4256:24; 4275:22
**maker** [2] - 4330:7, 10
**makers** [1] - 4330:18
**malls** [2] - 4254:25; 4255:1
**manager** [1] - 4323:23
**managing** [1] - 4302:7
**mandatory** [2] - 4340:17
**manner** [2] - 4199:20; 4260:20
**mantalics@omm.com** [1] - 4196:12
**manufactured** [1] - 4353:15

**manufacturer** [9] - 4263:10; 4264:7, 17; 4265:19; 4275:18; 4314:24; 4315:15; 4327:15
**manufacturers** [20] - 4258:15; 4259:13, 21; 4260:3, 7, 10; 4261:18; 4263:16, 20; 4265:23; 4268:4, 15; 4269:5, 11; 4270:7; 4274:7; 4275:22, 25; 4326:15; 4334:12
**manufacturers'** [1] - 4267:10
**manufactures** [1] - 4324:9
**manufacturing** [1] - 4315:8
**March** [1] - 4355:20
**Mark** [1] - 4363:15
**mark** [1] - 4359:4
**marked** [1] - 4362:1
**market** [85] - 4237:9, 19; 4238:11, 13, 17; 4260:5, 15; 4261:23; 4265:5; 4268:5; 4269:13, 18; 4305:20; 4313:17, 21, 23; 4314:1; 4317:5; 4318:17; 4320:3; 4322:8, 12, 14, 18-20, 23; 4326:9, 12, 25; 4327:2; 4329:13, 15, 24; 4333:15; 4334:8; 4336:16; 4337:2, 4-6, 8, 10-12, 14, 17, 21-24; 4338:2, 7, 18, 21; 4339:9, 11, 19, 23-24; 4343:1, 6, 25; 4345:11; 4348:4, 15, 19, 21-22; 4350:1, 3, 8; 4351:6; 4353:22; 4354:15; 4355:10; 4357:9
**marketing** [2] - 4237:15; 4274:11
**marketplace** [14] - 4236:21; 4240:21; 4242:19; 4246:25; 4314:14; 4321:16; 4323:4; 4326:19; 4336:10; 4345:3, 18; 4353:13
**markets** [4] - 4201:1; 4330:15; 4332:5; 4353:1
**married** [1] - 4302:13
**mass** [4] - 4239:9; 4272:23
**Master's** [1] - 4303:11
**match** [2] - 4345:2; 4360:13
**material** [1] - 4253:6
**materials** [1] - 4274:11
**matter** [8] - 4250:21, 23; 4312:8; 4315:7; 4317:2; 4340:24; 4342:7; 4364:4
**matters** [4] - 4302:11; 4306:1; 4340:24
**maximize** [2] - 4330:6, 12
**maximizing** [1] - 4323:1
**Maytag** [2] - 4317:14
**Maytag/Whirlpool** [10] - 4303:4; 4316:12; 4318:15, 19; 4355:12; 4357:22, 24; 4358:5; 4359:10, 17
**mean** [15] - 4236:24; 4237:2; 4241:25; 4242:22; 4251:3; 4260:25; 4268:21; 4309:4; 4315:17; 4317:10; 4319:12; 4334:25; 4335:23; 4343:22; 4362:21
**meaning** [2] - 4237:1; 4309:11
**means** [1] - 4346:24
**meant** [1] - 4255:11
**measure** [2] - 4267:3; 4349:12
**measured** [1] - 4348:15
**meet** [1] - 4237:11

**meeting** [2] - 4263:6; 4305:9
**member** [3] - 4279:17; 4308:3
**Memorial** [1] - 4271:24
**mention** [2] - 4333:2, 5
**mentioned** [7] - 4237:12; 4246:6; 4255:3; 4257:2; 4278:5; 4303:1, 6
**mentor** [2] - 4303:5; 4319:23
**mentors** [1] - 4302:23
**merchandising** [1] - 4253:13
**merge** [2] - 4242:16; 4245:23
**merged** [3] - 4335:25; 4340:8; 4354:22
**Merger** [4] - 4310:23; 4336:19, 24; 4341:18
**merger** [55] - 4242:17, 25; 4245:24; 4246:10; 4264:24; 4303:3; 4306:15, 17; 4309:25; 4310:25; 4311:3, 7; 4313:17; 4314:25; 4315:1, 3, 16, 18-19, 25; 4316:3, 5; 4317:16; 4318:15, 22; 4319:9, 11, 20; 4320:10; 4330:25; 4331:7, 20, 22; 4332:13; 4335:17, 24; 4336:11; 4338:10; 4340:6; 4341:5; 4356:7, 11, 18, 23-25; 4357:6; 4358:5; 4359:10, 17
**mergers** [12] - 4306:5, 7, 9, 16, 19, 21; 4310:8; 4315:22; 4316:17; 4331:12; 4337:1
**merging** [2] - 4336:9; 4338:6
**met** [1] - 4305:10
**metal** [2] - 4343:22
**metric** [1] - 4349:16
**mic** [1] - 4302:18
**Michael** [4] - 4194:22; 4195:16; 4196:9; 4200:7
**microeconomics** [4] - 4308:21, 23-24; 4309:17
**microwaves** [1] - 4276:18
**Micu** [4] - 4238:16, 22; 4248:17, 21
**mid** [3] - 4201:11; 4269:20; 4322:21
**mid-June** [1] - 4201:11
**mid-tier** [1] - 4322:21
**middle** [4] - 4325:19; 4327:6; 4348:6
**might** [8] - 4247:16; 4259:5; 4278:3, 6; 4336:10; 4361:16; 4362:25
**Mike** [1] - 4198:18
**mild** [1] - 4357:7
**million** [1] - 4257:10
**minute** [2] - 4322:3; 4324:7
**minutes** [8] - 4200:19; 4201:16; 4263:24; 4276:24; 4277:1; 4278:10; 4279:5, 15
**misreporting** [1] - 4347:13
**missed** [1] - 4352:7
**missing** [1] - 4346:23
**mistakes** [1] - 4347:15
**MIT** [1] - 4303:19
**mix** [1] - 4345:2
**MLK** [1] - 4271:15
**mobile** [7] - 4254:19, 22-24; 4255:3, 12, 17

**model** [1] - 4344:1
**moment** [1] - 4345:25
**Monday** [2] - 4361:7; 4362:18
**money** [8] - 4265:25; 4329:11; 4330:2, 9, 11; 4331:14, 17; 4349:6
**monitor** [1] - 4265:15
**monopolist** [3] - 4339:11; 4352:13; 4353:1
**months** [1] - 4334:23
**moreover** [1] - 4250:19
**MORNING** [2] - 4193:9; 4198:1
**morning** [10] - 4198:7, 13, 15, 17-18, 22; 4200:6; 4360:24; 4363:1
**most** [10] - 4239:23; 4250:7; 4254:3; 4275:12; 4306:6; 4330:9, 11; 4331:12; 4340:12; 4362:4
**move** [7] - 4235:20; 4268:13; 4309:16; 4317:6; 4327:18; 4329:22; 4361:16
**moved** [3] - 4341:16, 19; 4342:23
**moving** [4] - 4238:3; 4272:22; 4314:23; 4315:15
**MR** [126] - 4197:5-11, 13-14, 16; 4198:7, 10, 13, 18; 4200:5, 7, 10, 12, 16, 22; 4201:15, 19; 4235:10, 12; 4236:16; 4237:17; 4240:25; 4241:2, 6, 16-17, 19-21; 4242:3, 5, 8; 4243:3, 9; 4245:20; 4246:14, 16, 18; 4248:24; 4249:1, 3, 6, 12, 17, 20, 23; 4250:1, 4-5, 12, 14, 24; 4251:8, 15, 18; 4252:2, 4, 9, 16; 4253:2; 4276:19, 24; 4277:4, 7, 17, 20, 24; 4278:3, 12, 14; 4279:5, 8, 10, 16; 4301:12, 14, 17; 4302:2; 4309:15, 19, 23-24; 4312:20, 24-25; 4314:12; 4319:14; 4320:9, 12-13; 4332:20; 4333:4; 4336:15; 4342:8; 4345:10; 4355:2, 5, 14; 4358:7, 10; 4359:13; 4360:20, 23; 4361:1, 8, 13, 15, 19, 24; 4362:4, 10, 14, 17, 21, 25; 4363:3, 10, 13
**mrshumaker@jonesday.com** [1] - 4194:24
**MS** [1] - 4197:15
**multi** [1] - 4323:22
**multi-family** [1] - 4323:22
**multiple** [8] - 4313:19; 4314:15, 19; 4319:22; 4323:25; 4326:6; 4336:23; 4357:25
**musical** [1] - 4254:1
**must** [1] - 4342:13
**MYERS** [1] - 4196:9

**N**

**N.W** [1] - 4195:3
**name** [4] - 4255:24; 4302:3; 4346:20; 4347:9
**names** [1] - 4247:20
**National** [3] - 4303:15; 4357:1, 4
**Nations** [1] - 4330:15

**natural** [1] - 4311:10
**near** [3] - 4337:23; 4343:17, 25
**necessarily** [2] - 4246:8; 4273:14
**necessary** [1] - 4321:9
**need** [15] - 4201:14; 4263:8; 4277:16;
4279:12; 4310:18; 4311:22; 4312:22;
4319:17; 4328:8; 4355:25; 4356:12;
4359:11; 4361:22; 4362:22
**needed** [2] - 4324:16; 4361:11
**needs** [3] - 4265:25; 4324:9; 4361:3
**negotiate** [1] - 4259:21
**negotiation** [1] - 4341:11
**never** [3] - 4305:22; 4306:16; 4315:17
**new** [12] - 4235:14; 4264:24; 4268:5,
13; 4272:10; 4276:5; 4279:17; 4326:4,
12; 4328:23; 4329:5; 4335:13
**next** [15] - 4252:15; 4304:6; 4313:12;
4322:14; 4323:10; 4326:21; 4332:16;
4335:3, 16; 4336:16; 4344:3; 4345:16;
4349:18; 4350:11; 4358:7
**nice** [3] - 4309:10; 4321:14; 4332:3
**nine** [2] - 4305:9; 4335:10
**nine-year** [1] - 4335:10
**ninth** [1] - 4327:14
**Nomination** [1] - 4199:16
**nominations** [1] - 4199:20
**nominees** [1] - 4199:17
**none** [1] - 4276:3
**nonprofit** [1] - 4307:4
**normal** [2] - 4273:10
**North** [1] - 4195:6
**note** [2] - 4312:1; 4314:4
**nothing** [4] - 4246:14; 4252:5;
4276:19; 4320:5
**nothing's** [1] - 4318:21
**notice** [3] - 4336:18; 4345:4; 4349:19
**notoriety** [1] - 4302:25
**notwithstanding** [1] - 4236:23
**November** [3] - 4270:25; 4305:3, 23
**novice** [1] - 4319:16
**number** [31] - 4238:20; 4257:9;
4258:12-14; 4262:1; 4264:5, 22;
4267:18; 4304:17; 4307:8; 4308:10, 12;
4313:18; 4318:3; 4321:17; 4325:21, 24;
4326:1; 4343:14; 4344:10, 16; 4345:17;
4346:6; 4352:17; 4355:1
**numbers** [5] - 4333:2; 4350:13;
4351:2; 4352:14
**nursing** [1] - 4302:17
**NW** [15] - 4193:14, 19, 24; 4194:4, 8,
11, 19, 23; 4195:10, 14, 17, 20; 4196:3,
10, 15
**NXR** [1] - 4347:7

**O**

**O'MELVENY** [1] - 4196:9
**OACD** [1] - 4305:5
**oath** [1] - 4250:7

**Obama** [1] - 4305:1
**objection** [8] - 4200:17; 4201:5, 18;
4241:6; 4249:12; 4251:16, 21; 4309:19
**objection's** [2] - 4242:4, 7
**obligation** [2] - 4265:19, 21; 4266:4
**observe** [1] - 4344:24
**obvious** [1] - 4360:13
**obviously** [3] - 4310:6; 4347:5, 14
**occur** [3] - 4259:24; 4269:1; 4342:14
**occurred** [5] - 4338:18; 4356:7, 19,
23, 25
**occurs** [1] - 4360:5
**October** [1] - 4251:11
**OEM** [1] - 4323:23
**OF** [24] - 4193:1, 3, 9, 14, 18, 23;
4194:3, 7; 4197:4-7, 9-14, 16; 4235:11;
4246:17; 4249:5; 4253:1; 4302:1
**offer** [5] - 4260:6; 4319:7; 4328:5, 25;
4329:12
**offer's** [1] - 4361:20
**offered** [2] - 4241:5; 4260:8
**offerings** [2] - 4238:3; 4260:16;
4261:23
**offers** [1] - 4328:6
**offhand** [1] - 4257:9
**office** [1] - 4305:13
**Office** [2] - 4304:9; 4305:8
**officer** [1] - 4235:18
**Official** [2] - 4196:14; 4364:7
**official** [1] - 4357:2
**officials** [1] - 4357:15
**offs** [1] - 4328:12
**often** [13] - 4259:24; 4260:23; 4273:20;
4309:7; 4314:6; 4321:11, 25; 4324:23;
4328:23; 4341:18; 4347:14; 4357:16
**OH** [1] - 4195:7
**oldest** [1] - 4303:18
**once** [5] - 4200:8; 4305:13; 4325:17;
4326:11; 4357:9
**one** [77] - 4240:6; 4243:6; 4247:16;
4249:9; 4253:3; 4258:12, 19; 4264:14;
4267:18; 4270:22; 4272:3, 10, 23;
4275:23; 4276:9; 4277:1, 15; 4278:5;
4279:13, 17; 4301:18; 4302:24; 4303:1,
3, 19; 4307:13; 4314:7, 23-24; 4315:15;
4316:1, 4; 4317:14; 4318:2, 5; 4323:2;
4324:8; 4325:24; 4326:5, 10; 4327:20;
4331:3; 4333:9, 14, 18-19; 4336:1, 6;
4339:3, 7, 10; 4342:1, 13; 4345:8;
4346:1; 4347:24; 4348:17, 20; 4349:17,
19, 25; 4351:3; 4352:1; 4353:5;
4355:11, 18; 4357:19; 4358:21, 23, 25;
4359:1; 4362:5
**one's** [2] - 4332:10; 4348:18
**one-store** [1] - 4240:6
**ones** [2] - 4275:3; 4312:11
**ongoing** [4] - 4260:25; 4261:4;
4345:21
**online** [1] - 4347:4
**oops** [1] - 4359:11

**open** [10] - 4200:12, 14; 4235:6;
4243:4; 4276:20; 4277:13; 4301:10;
4331:21; 4361:20
**Open** [3] - 4275:13; 4276:4, 12
**opened** [1] - 4237:23
**opening** [4] - 4273:8; 4327:10; 4352:2,
7
**operate** [1] - 4260:25
**operating** [1] - 4235:18
**opinion** [5] - 4268:11; 4319:7;
4332:12; 4341:3; 4354:13
**opinions** [11] - 4312:14, 16, 18;
4313:2, 5, 7, 14, 16; 4320:23
**opportunities** [2] - 4260:6; 4274:18
**opportunity** [11] - 4235:22, 24-25;
4236:20; 4269:11; 4303:14; 4307:5;
4313:12; 4329:13; 4354:21
**opposed** [3] - 4241:12; 4316:1; 4362:7
**optimal** [1] - 4339:4
**option** [2] - 4317:19; 4318:5
**options** [3] - 4318:3; 4325:3, 21
**order** [9] - 4201:23; 4242:21; 4243:13;
4261:6; 4273:18; 4277:8; 4279:12, 22;
4306:14
**ordinary** [1] - 4346:17
**organization** [7] - 4254:2; 4256:5;
4308:25; 4309:2, 8, 11, 17
**organizational** [1] - 4322:1
**Orley** [1] - 4303:2
**ORSZAG** [3] - 4197:16; 4301:24;
4302:1
**Orszag** [7] - 4301:15; 4302:5; 4304:11;
4309:16; 4313:13; 4342:10
**outcome** [1] - 4330:16
**outcomes** [8] - 4314:22; 4315:14;
4333:12; 4334:8, 14; 4338:5; 4350:3
**outline** [1] - 4362:1
**outlined** [1] - 4322:10
**outright** [1] - 4307:24
**outside** [5] - 4199:4; 4279:15;
4309:11, 14; 4339:14
**outstanding** [1] - 4199:17
**outwards** [1] - 4326:10
**oven** [4] - 4328:8; 4349:5, 7; 4352:18
**ovens** [19] - 4248:2; 4314:1, 6;
4339:18; 4343:13, 18-19; 4344:18;
4345:12; 4350:9, 18, 22-23; 4351:8, 17,
19, 24; 4352:4; 4353:6
**overall** [2] - 4258:11; 4337:8
**oversee** [1] - 4253:18
**overseeing** [1] - 4305:12
**oversees** [1] - 4304:17
**overview** [3] - 4313:14; 4314:13;
4322:3
**overwhelmingly** [1] - 4353:17
**own** [3] - 4318:7; 4327:23; 4353:24
**owned** [1] - 4353:9
**Oxford** [3] - 4303:10, 13

# P

**P.C** [2] - 4312:12; 4324:5
**p.m** [3] - 4278:24; 4279:2; 4363:23
**PAC** [8] - 4253:19; 4254:20; 4255:4, 6, 12; 4256:14; 4257:5, 7
**pace** [1] - 4268:9
**Pacific** [3] - 4255:7; 4256:25; 4275:24
**package** [1] - 4268:22
**pads** [2] - 4310:17; 4317:12
**page** [5] - 4251:13; 4321:20; 4332:16; 4355:6; 4360:2
**Page** [2] - 4197:3, 18
**pages** [4] - 4312:17; 4322:6; 4353:5
**pairs** [1] - 4314:6
**panic** [2] - 4305:20; 4357:9
**paper** [1] - 4307:23
**papers** [2] - 4307:17, 19
**parking** [1] - 4312:2
**part** [12] - 4201:23; 4279:22; 4306:20; 4310:21; 4329:2; 4334:1; 4335:16; 4343:20; 4345:23; 4346:5; 4348:3; 4357:8
**PARTIAL** [1] - 4193:9
**participant** [1] - 4343:6
**participants** [11] - 4322:12, 14, 24; 4336:16, 18; 4337:2, 4, 14, 17; 4348:4; 4350:1
**participate** [3] - 4270:4; 4272:19; 4274:18
**participated** [1] - 4237:4
**particular** [8] - 4248:6; 4263:1, 20; 4269:19; 4273:18; 4308:19; 4333:7; 4334:22
**particularly** [3] - 4305:23; 4350:20; 4351:20
**parties** [10] - 4198:5; 4200:2; 4240:7, 9; 4274:20; 4277:9; 4279:10; 4316:25; 4336:9; 4338:6
**partly** [1] - 4342:22
**partner** [2] - 4275:11; 4279:18
**partnering** [1] - 4275:1
**partnerships** [1] - 4240:7
**parts** [2] - 4322:20, 23
**party** [3] - 4335:25; 4340:9; 4361:25
**passed** [1] - 4307:8
**past** [14] - 4199:6; 4200:24; 4201:1; 4258:2; 4267:9, 22; 4311:7, 10; 4316:4; 4338:16, 18; 4350:6; 4354:18
**paths** [2] - 4313:19; 4326:6
**Paul** [4] - 4195:9, 13; 4198:13, 15
**paul.denis@dechert.com** [1] - 4195:15
**paul.friedman@dechert.com** [1] - 4195:12
**Paula** [2] - 4194:14; 4198:20
**pay** [2] - 4327:25; 4328:12
**peer** [2] - 4307:20, 22
**peer-reviewed** [2] - 4307:20, 22

**people** [25] - 4199:23; 4238:19; 4247:6; 4259:18; 4303:25; 4304:1, 16; 4309:13; 4310:13, 19; 4311:21; 4325:5; 4327:13, 24; 4328:1; 4329:2, 8; 4346:23; 4347:25; 4348:2; 4352:4, 22; 4362:7
**percent** [22] - 4339:11; 4346:3, 6-8; 4349:20-22; 4350:19, 22; 4351:21; 4352:3, 12, 14; 4355:21; 4358:23; 4360:3, 5, 12
**percentage** [6] - 4255:15; 4256:22; 4335:9, 11; 4359:22
**percentages** [1] - 4333:6
**perfect** [6] - 4341:8; 4342:7; 4347:11, 16, 21
**perfectly** [1] - 4278:3
**perform** [2] - 4261:6; 4265:14
**performance** [1] - 4264:11
**performing** [1] - 4261:5
**perhaps** [2] - 4201:6; 4277:25
**period** [3] - 4305:22; 4306:10; 4335:10
**periods** [1] - 4272:20
**person** [6] - 4247:16; 4248:22; 4250:7; 4254:3; 4328:9; 4347:14
**personal** [7] - 4201:6; 4235:21; 4237:12; 4241:17; 4250:15, 23, 25
**personally** [2] - 4237:25; 4328:9
**pertains** [1] - 4250:16
**Ph.D** [2] - 4303:12, 16
**Philadelphia** [1] - 4240:13
**phones** [1] - 4254:24
**phrase** [4] - 4329:20; 4338:10; 4347:18
**physically** [1] - 4261:8
**pick** [3] - 4275:11; 4344:25; 4345:1
**place** [4] - 4275:9; 4318:2, 18; 4324:16
**placed** [2] - 4261:9; 4313:9
**places** [2] - 4246:7
**Plaintiff** [3] - 4193:4, 13; 4194:2
**plan** [2] - 4343:16, 24
**planned** [1] - 4362:11
**Planning** [1] - 4304:9
**plans** [4] - 4238:2; 4246:21; 4248:20; 4249:11
**plant** [1] - 4312:1
**plausible** [4] - 4316:24; 4317:4; 4319:20; 4320:2; 4331:4
**play** [2] - 4239:4; 4362:20
**played** [2] - 4239:1
**player** [5] - 4334:3, 5; 4351:18, 24
**players** [9] - 4318:17; 4327:8; 4331:3; 4334:5; 4339:13; 4344:9; 4346:25
**pleases** [1] - 4200:13
**pleasure** [1] - 4277:21
**plumbing** [1] - 4255:10
**podium** [1] - 4198:5
**POGUE** [1] - 4195:6
**point** [31] - 4236:7; 4237:4; 4238:19; 4239:1, 4; 4242:20, 22; 4250:5; 4253:4;

4259:5; 4269:19, 21; 4272:20, 23; 4273:8; 4274:10; 4306:12; 4327:20; 4335:16; 4336:21; 4340:21; 4343:17, 25; 4351:13; 4359:22; 4360:1, 10
**Point** [1] - 4195:6
**points** [17] - 4239:3; 4260:15; 4269:20, 25; 4270:1; 4321:17; 4322:25; 4323:3; 4335:9, 12; 4336:23; 4342:1; 4344:11, 13-14; 4350:16
**Policy** [1] - 4304:9
**policy** [3] - 4304:13, 24; 4307:7
**Polsen** [1] - 4303:25
**poor** [1] - 4264:11
**portion** [3] - 4237:15; 4256:5; 4302:11
**Portions** [1] - 4193:10
**portraying** [3] - 4328:21; 4332:18; 4344:6
**position** [3] - 4253:15; 4304:3, 11
**positioning** [1] - 4239:8
**positions** [2] - 4253:23; 4254:1
**possible** [2] - 4322:2; 4361:12
**post** [10] - 4242:17, 25; 4245:24; 4246:24; 4313:17; 4314:25; 4315:1, 16; 4319:20; 4339:25
**post-merger** [8] - 4242:17, 25; 4245:24; 4313:17; 4314:25; 4315:1, 16; 4339:25
**potential** [1] - 4336:1
**potentially** [1] - 4265:13
**power** [4] - 4316:7; 4317:10; 4333:16; 4334:12
**powerful** [1] - 4316:15
**practitioners** [1] - 4319:3
**pre** [1] - 4305:1
**pre-transition** [1] - 4305:1
**precise** [2] - 4308:12; 4353:21
**precisely** [4] - 4318:11; 4329:22; 4345:20; 4360:14
**predict** [1] - 4311:3
**prefer** [1] - 4363:8
**preliminary** [1] - 4275:7
**Premier** [2] - 4346:13; 4347:7
**Premiers** [1] - 4344:12
**premium** [2] - 4239:9; 4272:24
**prender@jonesday.com** [1] - 4194:17
**prep** [2] - 4272:7, 9
**prepare** [1] - 4313:1
**prepared** [4] - 4313:10; 4321:1, 21; 4362:15
**preparing** [1] - 4313:4
**presence** [1] - 4236:20
**present** [9] - 4200:4; 4252:21; 4253:4; 4277:5; 4314:8; 4315:1; 4318:15; 4322:1; 4323:10
**Present** [1] - 4196:8
**presentation** [3] - 4321:13; 4341:25; 4351:4
**presentational** [1] - 4355:19
**presented** [1] - 4354:21

**presenting** [1] - 4323:13
**president** [4] - 4248:17; 4253:13, 25; 4305:13
**President** [1] - 4303:14
**President's** [2] - 4199:20; 4271:11
**presidential** [1] - 4303:1
**pressures** [1] - 4327:1
**presume** [1] - 4267:5
**pretty** [1] - 4326:22
**prevented** [1] - 4320:5
**preventing** [1] - 4320:4
**Previously** [2] - 4235:5; 4245:16
**previously** [1] - 4301:9
**price** [58] - 4239:1, 3-4, 9; 4242:17; 4245:24; 4246:11; 4259:5; 4260:15; 4264:8, 10, 17, 23, 25; 4265:1; 4269:19-21, 25; 4270:1; 4272:20, 23-24; 4273:8, 18, 25; 4274:7; 4317:7, 19; 4320:1, 4; 4322:13, 24-25; 4327:21; 4328:1, 13, 17; 4330:9; 4335:25; 4338:6; 4339:8, 24; 4340:6, 9; 4344:11, 13-14; 4348:24; 4349:1, 10, 16; 4352:3
  **priced** [3] - 4240:22; 4248:6; 4273:4
  **prices** [13] - 4246:22; 4260:21; 4311:4, 16; 4317:3; 4336:4; 4348:25; 4352:14, 22; 4354:22; 4357:23
  **pricing** [11] - 4262:4, 15; 4263:25; 4265:15; 4266:1; 4270:4, 10; 4273:1, 7, 9; 4353:12
**primarily** [2] - 4306:8; 4325:5
**Princeton** [3] - 4302:22; 4303:9, 19
**principle** [1] - 4330:5
**principles** [1] - 4341:23
**private** [2] - 4304:23; 4307:11
**problem** [1] - 4318:1
**proceed** [3] - 4200:3; 4235:8; 4277:12
**Proceedings** [1] - 4196:18
**PROCEEDINGS** [1] - 4193:9
**proceedings** [9] - 4201:22; 4235:5; 4243:13; 4245:16; 4279:21; 4301:9; 4364:4
**process** [3] - 4199:20; 4239:15; 4332:16
**produce** [9] - 4242:1; 4330:8; 4339:16; 4343:14; 4346:11, 13, 15, 23
**produced** [2] - 4196:18; 4345:22
**producers** [1] - 4337:3
**produces** [1] - 4320:1
**producing** [1] - 4330:16
**product** [47] - 4239:21; 4247:11; 4261:19, 24; 4263:1, 11, 20; 4264:1, 6, 11, 16, 18; 4270:14; 4272:23; 4273:24; 4274:1, 3, 5; 4275:15; 4314:20; 4315:9; 4317:23, 25; 4318:1; 4324:9, 14, 23; 4325:12, 16; 4326:1; 4329:3, 5-7, 12, 14; 4330:8, 11; 4339:20; 4343:16, 21-22; 4345:1; 4349:14
  **product's** [1] - 4264:23
**production** [3] - 4201:24; 4279:23;

4310:17
**productive** [1] - 4263:9
**products** [50] - 4237:5; 4239:8, 12, 19; 4246:22; 4248:21; 4254:17, 25; 4255:10; 4256:6; 4259:6, 13, 17, 20, 22; 4260:4, 6, 11, 14, 18, 20, 22; 4261:14, 16, 22; 4262:2; 4264:3; 4265:4, 6, 22; 4268:14; 4269:12; 4273:6; 4275:15; 4310:7; 4324:1; 4327:22; 4328:23, 25; 4339:16; 4343:14; 4344:8, 22; 4347:6; 4352:15; 4359:25
**professional** [4] - 4305:25; 4307:1; 4308:3; 4323:22
**Professor** [13] - 4303:3; 4314:10; 4318:2; 4319:23; 4320:14; 4321:4, 7; 4348:10; 4349:21; 4351:9; 4352:7; 4353:11; 4356:17
**proffered** [1] - 4309:21
**profit** [2] - 4263:7; 4322:25
**profits** [2] - 4330:6, 12
**progress** [2] - 4237:24; 4238:1
**Progress** [1] - 4304:25
**project** [1] - 4311:7
**promised** [1] - 4198:23
**promotion** [1] - 4273:5
**promotional** [7] - 4270:4, 9; 4271:2, 7; 4272:20, 22; 4273:1
**promotions** [2] - 4268:24; 4270:19; 4272:5, 16
**property** [1] - 4323:23
**proposed** [1] - 4315:3
**prospects** [1] - 4327:15
**protected** [4] - 4330:3, 13-14; 4332:12
**protects** [1] - 4330:19
**provide** [9] - 4307:24; 4311:7; 4321:25; 4322:4; 4336:24; 4341:16, 20; 4343:3; 4344:8
**provided** [2] - 4306:14; 4312:20
**provides** [1] - 4311:9
**providing** [5] - 4313:5; 4322:19; 4344:10, 12, 14, 19
**public** [2] - 4235:9; 4332:21
**publicly** [1] - 4362:5
**published** [2] - 4307:17, 19
**punched** [1] - 4331:24
**punching** [1] - 4331:25
**punish** [2] - 4314:22; 4315:14
**purchase** [5] - 4259:18; 4274:11; 4325:7, 12; 4347:5
**purchased** [1] - 4347:3
**purchasing** [1] - 4315:8
**purple** [1] - 4325:20
**purpose** [2] - 4243:7; 4321:23
**purposes** [7] - 4250:16; 4313:25; 4325:18; 4338:21; 4345:11; 4349:24; 4355:20
**pursue** [1] - 4243:7
**push** [3] - 4265:19; 4316:8; 4334:7
**put** [19] - 4239:19; 4249:3; 4261:17;

4263:8; 4266:1; 4268:22; 4269:12; 4302:18; 4318:24; 4321:11; 4324:10, 23; 4326:22; 4329:6, 14; 4338:14; 4347:9; 4352:18; 4358:8
  **putting** [2] - 4239:11; 4260:6

## Q

**qualification** [2] - 4249:17; 4340:5
**quality** [5] - 4268:2; 4269:12; 4309:16; 4328:13, 17
**quarter** [2] - 4356:23, 25
**quarters** [1] - 4357:5
**query** [1] - 4356:20
**question's** [1] - 4236:17
**questions** [8] - 4200:12, 18; 4248:24; 4252:7; 4253:5, 7; 4311:18; 4362:5
**quite** [3] - 4242:21; 4357:7, 11

## R

**Rachel** [2] - 4194:6; 4198:12
**rachel.zwolinski@usdoj.gov** [1] - 4194:9
**Rafkin** [2] - 4195:19; 4198:16
**raise** [9] - 4317:19; 4321:17; 4335:25; 4338:6; 4340:9; 4352:3, 22; 4354:22
**raised** [2] - 4339:8; 4352:14
**range** [12] - 4240:22; 4241:22; 4323:21; 4327:5; 4328:5, 11; 4348:17; 4360:7
**ranges** [34] - 4238:6; 4241:5; 4248:6; 4259:3; 4314:1; 4327:21; 4331:15; 4335:3; 4337:8, 12; 4338:11; 4339:16; 4343:13; 4344:10-12, 14, 17; 4345:12; 4346:3; 4348:17; 4350:19; 4351:4, 6, 10-12; 4352:13; 4353:5; 4359:19
**rank** [1] - 4258:10
**ranked** [1] - 4257:25
**rapid** [9] - 4328:25; 4338:19; 4339:15, 19, 22; 4340:3; 4343:10, 12; 4344:1
**rapidly** [2] - 4350:6; 4354:17
**rate** [3] - 4258:4; 4268:14; 4359:17
**rates** [2] - 4307:6; 4360:15
**rather** [3] - 4321:2; 4331:16; 4333:18
**RDC** [2] - 4324:8, 19
**RDR** [3] - 4196:13; 4364:3, 7
**RDR-CRR** [1] - 4364:3
**re** [1] - 4329:23
**reach** [7] - 4312:14; 4314:15, 17; 4323:6, 18; 4326:7; 4354:13
**reached** [2] - 4312:16; 4320:23
**reaching** [1] - 4340:19
**reaction** [2] - 4332:4
**read** [2] - 4250:14; 4320:19
**reading** [2] - 4251:10, 13
**real** [4] - 4303:17; 4304:2, 13; 4308:22
**real-world** [4] - 4303:17; 4304:2, 13;

4308:22
**reality** [1] - 4323:15
**really** [17] - 4199:2, 12; 4237:10, 15, 24; 4257:22; 4265:16; 4310:18; 4316:21; 4321:13; 4326:9; 4334:10; 4340:17; 4348:16; 4357:10; 4361:22; 4362:4
**reask** [1] - 4245:18
**reason** [2] - 4339:3; 4354:19
**reasons** [5] - 4235:21; 4237:12; 4322:10; 4331:25; 4349:9
**REAVIS** [1] - 4195:6
**rebuttal** [3] - 4361:6; 4362:12
**received** [8] - 4303:10; 4307:1, 3, 9, 11; 4345:17; 4346:1
**recent** [1] - 4350:3
**recently** [2] - 4302:25; 4359:18
**recess** [3] - 4278:23; 4360:17; 4363:14
**Recession** [9] - 4356:7, 13, 18, 20; 4357:4, 7, 10-11; 4358:3
**recessions** [1] - 4357:3
**recognize** [3] - 4327:20; 4340:22; 4341:4
**recollection** [2] - 4259:8; 4361:3
**record** [18] - 4198:6; 4200:24; 4241:9; 4243:12; 4249:16; 4251:9, 20; 4277:3, 13; 4279:4, 6; 4301:21; 4302:4; 4332:21; 4352:11; 4355:5; 4364:4
**record's** [5] - 4236:6, 13; 4251:22; 4335:2; 4358:22
**RECROSS** [1] - 4197:7
**RECROSS-EXAMINATION** [1] - 4197:7
**red** [1] - 4323:19
**redirect** [1] - 4248:25
**REDIRECT** [3] - 4197:6, 11; 4249:5
**reduce** [2] - 4264:22; 4331:8
**reduces** [1] - 4331:7
**refer** [1] - 4312:22
**reference** [1] - 4360:1
**referring** [1] - 4313:21
**refers** [1] - 4338:19
**reflected** [3] - 4333:17; 4349:15; 4350:3
**reflects** [2] - 4322:3, 5
**refrigeration** [13] - 4259:3; 4273:7, 15-16; 4335:5; 4352:16, 21, 23; 4355:4; 4356:1, 3; 4358:14
**refrigerator** [1] - 4310:11
**refrigerators** [5] - 4237:5, 19; 4344:20; 4352:4
**regard** [2] - 4239:14; 4345:5
**regarding** [4] - 4254:4; 4263:19; 4274:20; 4320:23
**regional** [5] - 4239:24; 4240:5; 4324:12, 15
**regression** [1] - 4358:1
**regular** [1] - 4262:24
**rejected** [1] - 4307:25

**relate** [1] - 4306:18
**related** [1] - 4249:10
**relationship** [1] - 4326:18
**relationships** [1] - 4240:12
**relatively** [3] - 4329:7; 4339:20; 4343:20
**relevance** [1] - 4201:5
**relevant** [26] - 4200:25; 4302:23; 4316:13; 4318:20; 4325:22, 24; 4326:2, 4; 4328:10; 4334:10; 4337:5, 21-22; 4338:21, 25; 4339:16, 18; 4340:15; 4349:24; 4350:6, 21; 4352:20; 4356:6; 4358:25; 4359:23
**rely** [2] - 4251:4; 4310:18
**remain** [2] - 4261:7; 4322:9
**remarkable** [1] - 4331:13
**remember** [2] - 4346:9; 4352:5
**remove** [5] - 4263:1, 4, 15; 4264:16; 4329:10
**Render** [1] - 4194:14; 4198:20
**rephrase** [1] - 4240:25
**replace** [1] - 4323:20
**replacing** [2] - 4265:12; 4331:14
**report** [5] - 4241:13; 4249:20, 22; 4354:25; 4356:1
**reported** [2] - 4196:18; 4349:21
**Reporter** [3] - 4196:13; 4364:7
**reporting** [2] - 4256:20; 4358:16
**reports** [7] - 4310:13, 18; 4312:17, 21; 4313:7; 4320:19; 4322:11
**repositioning** [1] - 4328:20
**represent** [2] - 4323:21; 4350:22
**representation** [1] - 4260:21
**represented** [2] - 4323:24; 4324:3
**represents** [1] - 4323:19
**requirements** [1] - 4263:6
**requires** [1] - 4343:7
**research** [2] - 4273:24; 4357:1
**Research** [1] - 4357:4
**Reserve** [1] - 4303:24
**respect** [5] - 4242:14; 4259:21; 4269:5; 4275:6; 4317:11
**respond** [3] - 4264:13; 4268:7; 4278:15
**response** [2] - 4264:18; 4265:3
**responses** [1] - 4311:17
**responsibilities** [1] - 4253:17
**responsibility** [2] - 4237:14; 4265:23
**responsible** [1] - 4305:11
**responsive** [1] - 4316:14
**rest** [1] - 4325:2
**result** [6] - 4312:14; 4313:14; 4315:1; 4331:20; 4335:24; 4336:4
**results** [2] - 4316:5; 4358:1
**retail** [15] - 4239:22; 4240:2; 4254:18; 4256:13, 17, 23; 4275:14; 4314:16; 4318:18; 4325:7, 17; 4326:1, 8; 4355:10
**retailer** [21] - 4254:8, 15; 4266:6, 11;

4312:6; 4316:7; 4317:17, 20; 4318:7; 4324:24; 4329:20; 4330:12; 4333:7, 19-20; 4334:9; 4339:2, 4-5, 8, 10
**retailers** [33] - 4239:11, 18; 4240:1; 4257:13; 4258:5; 4312:5, 9; 4314:18, 21; 4315:13; 4317:5; 4318:3, 6, 10, 16; 4324:2, 4, 6, 13, 18; 4325:1, 6, 13, 21; 4326:16; 4329:20; 4330:18; 4332:15; 4333:11, 15; 4334:17; 4335:1
**retained** [1] - 4309:25
**retrospective** [1] - 4357:25
**retrospectives** [1] - 4303:3
**return** [4] - 4263:7; 4303:14; 4335:15; 4343:10
**Revathy** [1] - 4196:2
**revenue** [7] - 4337:5; 4345:19; 4346:2, 11; 4348:15; 4349:16
**revenues** [2] - 4337:21; 4338:15; 4343:1; 4349:3, 11
**review** [2] - 4307:23; 4341:2
**reviewed** [4] - 4307:20, 22; 4320:21; 4343:20
**revisions** [2] - 4307:25; 4308:1
**Richard** [2] - 4312:12; 4324:5
**richness** [3] - 4319:24; 4321:16; 4327:1
**right-hand** [2] - 4324:3; 4358:23
**rigid** [1] - 4341:17
**ring** [2] - 4302:15; 4327:13
**Robert** [1] - 4303:5
**role** [5] - 4235:18; 4261:11; 4332:15; 4333:10
**room** [2] - 4304:16; 4327:25
**Room** [3] - 4193:15, 19; 4196:16
**rope** [1] - 4241:11
**Rose** [1] - 4198:11
**rough** [1] - 4360:14
**roughly** [5] - 4350:22; 4355:21; 4359:15; 4360:8, 13
**row** [1] - 4350:24
**rule** [3] - 4315:21, 23; 4351:6
**Rule** [5] - 4201:6; 4249:13; 4250:15, 19
**rules** [2] - 4342:13, 18
**Rules** [1] - 4250:19
**run** [5] - 4270:24; 4271:5, 9, 13, 17
**running** [1] - 4305:3
**runs** [1] - 4305:6

**S**

**Saber** [1] - 4251:11
**sake** [1] - 4337:7
**sale** [8] - 4255:12; 4257:11; 4270:14; 4325:17; 4334:24; 4338:11; 4348:20
**sales** [26] - 4237:14; 4240:8, 15; 4254:20; 4255:4, 6-7; 4256:22, 25; 4257:1, 3, 5, 7, 19; 4258:11; 4261:25; 4267:1, 10; 4273:25; 4274:14; 4275:24;

4317:21; 4326:5; 4337:22
**Sales** [2] - 4253:19; 4256:14
**Samsung** [85] - 4196:9; 4200:18, 22, 25; 4201:2; 4235:13; 4236:8; 4240:22; 4241:4, 22-23; 4246:7, 19, 22; 4247:6, 9, 14, 22, 24; 4248:1, 3, 5, 7; 4249:11, 21; 4250:1, 6; 4251:24; 4258:8, 12; 4262:17; 4266:7, 14, 18, 22, 24-25; 4267:6, 16; 4268:1, 9, 16; 4269:4, 18; 4270:4, 9; 4272:19; 4273:4, 6; 4274:24; 4275:13, 15-16; 4276:4, 6, 12, 14; 4317:14; 4318:20; 4327:11; 4328:24; 4334:5; 4335:11, 14; 4337:6, 13; 4343:18; 4344:22; 4346:7; 4347:6; 4348:18, 21; 4349:19; 4350:5; 4354:11, 17; 4358:12, 16; 4359:9, 20; 4360:3
**Samsung's** [4] - 4246:21; 4247:17; 4250:7; 4354:24
**sat** [2] - 4320:17; 4321:14
**save** [2] - 4331:14, 17
**saves** [1] - 4329:11
**savings** [3] - 4307:6; 4331:18, 20
**saw** [4] - 4235:25; 4241:13; 4305:21; 4358:14
**scale** [2] - 4236:1; 4358:22
**SCANLON** [1] - 4197:15
**Scanlon** [2] - 4194:2; 4198:12
**scenario** [1] - 4318:22
**scholar** [1] - 4303:6
**scholarship** [1] - 4303:10
**school** [3] - 4303:16; 4304:7; 4336:13
**Science** [1] - 4303:11
**Scott** [4] - 4196:13; 4364:3, 6
**scottlyn01@aol.com** [1] - 4196:17
**screen** [1] - 4359:1
**screwed** [1] - 4241:2
**sealed** [2] - 4243:13; 4245:16
**Sears** [4] - 4257:13; 4324:4; 4334:6, 8
**second** [7] - 4310:21; 4327:16; 4334:4; 4335:16; 4336:2, 6
**secondary** [1] - 4272:17
**Secretary** [1] - 4305:4
**section** [1] - 4325:20
**sector** [2] - 4304:23; 4307:11
**Security** [1] - 4251:12
**see** [31] - 4235:22, 24; 4237:25; 4246:25; 4259:17, 19; 4266:4; 4278:20; 4301:20; 4305:7; 4325:16; 4332:16; 4333:16, 25; 4334:8, 13-14, 16; 4335:20; 4343:11; 4344:3, 9, 18; 4345:4; 4348:1; 4349:22; 4350:11, 13; 4355:23; 4356:2; 4363:6
**seeing** [3] - 4335:6; 4352:5
**seem** [1] - 4268:6
**sees** [4] - 4333:9, 18; 4355:11, 18
**segment** [1] - 4329:14
**segments** [5] - 4239:10; 4246:4; 4260:13; 4322:25; 4326:19
**segregate** [1] - 4310:3
**self** [4] - 4328:5; 4349:2, 5

**self-cleaning** [4] - 4328:5; 4349:2, 5
**sell** [24] - 4240:17, 19-20; 4255:11, 16-17, 20-21; 4256:12, 14; 4258:7, 25; 4259:3; 4261:2; 4263:6, 20; 4264:6; 4269:5; 4317:23, 25; 4325:6; 4330:9; 4339:18
**sell-through** [2] - 4263:6; 4264:6
**selling** [10] - 4247:7; 4254:10; 4255:25; 4258:16; 4264:23; 4318:1; 4325:5, 12; 4330:7; 4339:20
**sells** [4] - 4254:8; 4256:3, 5; 4261:2; 4343:18
**Senate** [4] - 4199:16, 18, 24
**send** [2] - 4324:9, 11
**senior** [3] - 4253:13; 4302:7; 4304:24
**sense** [7] - 4199:6; 4265:19; 4324:15; 4329:23; 4351:11; 4361:15; 4362:25
**sensitive** [1] - 4199:1
**Sentencing** [4] - 4340:15; 4342:11
**separate** [4] - 4273:5; 4314:9; 4353:16
**separately** [1] - 4314:2
**September** [2] - 4305:19, 23
**series** [2] - 4247:1; 4301:19
**serve** [3] - 4303:14; 4305:1; 4322:22
**served** [1] - 4249:10
**service** [2] - 4255:24; 4304:21
**services** [1] - 4322:19
**serving** [2] - 4303:20; 4322:20
**SESSION** [3] - 4193:9; 4198:1; 4279:1
**session** [6] - 4200:9; 4253:7; 4276:20; 4277:3, 6
**sessions** [1] - 4359:2
**set** [2] - 4328:14; 4342:13
**setting** [1] - 4321:24
**several** [4] - 4247:10; 4311:18; 4313:12; 4353:25
**shall** [1] - 4310:16
**shape** [1] - 4261:16
**share** [25] - 4258:1, 4; 4267:1; 4314:23; 4315:15; 4317:6; 4327:18; 4329:22; 4335:7, 9, 12; 4338:21; 4345:19; 4348:10; 4349:20, 22; 4350:4, 19; 4351:21; 4354:15; 4355:23
**shares** [15] - 4267:6; 4316:25; 4318:17; 4329:24; 4333:15, 17; 4337:24; 4338:2; 4339:23; 4345:11; 4348:15; 4350:8; 4353:22; 4355:10
**shifts** [1] - 4335:12
**ship** [1] - 4324:24
**shorter** [1] - 4329:4
**shorthand** [1] - 4196:18
**shortly** [1] - 4326:17
**show** [1] - 4352:3
**showcases** [1] - 4275:14
**showing** [1] - 4348:14
**shown** [1] - 4351:2
**showroom** [2] - 4325:7
**showrooms** [1] - 4311:25
**shows** [4] - 4320:2; 4346:2; 4349:14;

4355:8
**Shumaker** [3] - 4194:22; 4198:18; 4245:18
**SHUMAKER** [50] - 4197:5, 7, 9, 11, 13-14; 4198:18; 4200:10, 12; 4201:15; 4235:10, 12; 4236:16; 4237:17; 4240:25; 4241:2, 17, 20; 4242:5, 8; 4243:3, 9; 4245:20; 4246:14; 4249:1, 3, 6; 4250:5, 12, 24; 4251:8, 15, 18; 4252:2, 4, 16; 4253:2; 4276:19, 24; 4277:4, 7, 17, 20; 4279:5, 8, 10, 16; 4309:19
**shutter** [1] - 4340:12
**side** [7] - 4324:3; 4325:1; 4358:8, 20; 4360:2
**sidebar** [3] - 4241:9; 4243:12; 4249:16
**Sidebar** [3] - 4242:6; 4245:17; 4251:19
**sides** [2] - 4269:24; 4270:2
**significance** [9] - 4237:8; 4343:6; 4348:25; 4349:11; 4350:2, 5; 4351:17; 4354:4, 14
**significant** [13] - 4237:24; 4267:4; 4305:15, 20; 4310:15, 17; 4320:1; 4335:9, 12; 4349:15; 4350:18; 4359:20
**similar** [12] - 4318:17, 23; 4334:14; 4356:1; 4358:14; 4359:18, 21, 24; 4360:15
**similarity** [1] - 4334:14
**simple** [3] - 4260:17; 4327:2; 4338:24
**simplest** [1] - 4321:6
**simplicity** [2] - 4325:18; 4337:7
**simply** [4] - 4250:5, 24; 4264:25
**Sims** [2] - 4279:18
**simultaneously** [1] - 4356:8
**single** [1] - 4308:17
**sit** [1] - 4260:15
**sitting** [4] - 4332:1; 4339:6, 14; 4345:7
**situation** [9] - 4264:7, 10, 13; 4273:17; 4317:13, 17; 4338:8, 23; 4339:2
**situations** [4] - 4303:17; 4304:2, 13; 4308:22
**six** [4] - 4304:4, 19; 4318:6; 4334:22
**size** [1] - 4275:23
**sizes** [3] - 4343:21, 23
**slide** [25] - 4321:1, 2; 4322:10, 14; 4323:10, 12; 4325:2; 4326:21; 4332:17; 4334:22; 4335:16; 4336:16, 22-23; 4337:19; 4338:19; 4344:3; 4345:16; 4350:11, 14; 4355:1; 4358:7, 11
**Slide** [3] - 4321:19; 4360:5
**slides** [6] - 4301:19; 4332:22; 4353:4; 4354:25; 4355:2; 4358:20
**slots** [1] - 4265:9
**Small** [1] - 4253:20
**small** [9] - 4240:6; 4242:20; 4255:1, 23; 4301:18; 4305:1, 9; 4325:17; 4338:15
**smaller** [6] - 4237:19; 4254:23; 4256:25; 4325:13; 4336:3; 4346:12
**Smith** [2] - 4324:1; 4330:14

**smooth** [4] - 4328:10; 4329:10; 4349:2, 7

**snapshots** [1] - 4345:6

**so..** [1] - 4279:4

**Society** [1] - 4308:6

**sold** [4] - 4241:14; 4346:2; 4348:18

**someone** [2] - 4303:7; 4338:4

**someplace** [1] - 4324:10

**sometimes** [2] - 4273:1; 4357:17

**somewhat** [2] - 4263:24; 4341:17

**somewhere** [1] - 4360:6

**Son** [1] - 4324:5

**soon** [2] - 4277:25; 4278:15

**sore** [2] - 4302:17; 4363:4

**sorry** [10] - 4240:25; 4241:1, 16; 4256:4; 4266:24; 4315:5; 4319:12; 4321:19; 4323:14; 4345:9

**sort** [7] - 4237:20; 4256:10; 4325:19; 4327:22; 4341:14; 4342:14; 4357:21

**sound** [3] - 4309:10; 4341:14; 4352:24

**source** [3] - 4240:2; 4311:9; 4340:8

**South** [2] - 4237:22; 4240:13

**space** [14] - 4260:8; 4261:3; 4262:18; 4263:8; 4267:19; 4307:15; 4309:14; 4317:22; 4318:18; 4333:11; 4335:13; 4355:10; 4358:9

**span** [1] - 4270:2

**speaking** [4] - 4242:18; 4250:1; 4360:8, 13

**specialize** [1] - 4308:20

**specialty** [3] - 4254:8, 15; 4308:22

**specific** [2] - 4259:8; 4337:10

**specifically** [5] - 4240:18; 4254:16; 4255:9; 4257:14; 4267:15

**specifics** [1] - 4258:10

**spend** [5] - 4260:12; 4265:25; 4328:8; 4336:17; 4349:6

**spent** [7] - 4304:19; 4311:24; 4312:1, 3, 12; 4323:7

**Sperling** [1] - 4303:25

**spoken** [3] - 4274:20, 23

**square** [1] - 4255:2

**stadiums** [1] - 4256:7

**staff** [1] - 4305:8

**stage** [1] - 4252:1

**stand** [1] - 4252:17

**standpoint** [1] - 4306:10

**start** [13] - 4235:14; 4253:3; 4254:10; 4277:3, 19; 4331:17; 4335:22; 4357:20; 4359:14; 4360:2, 12; 4363:1, 17

**started** [14] - 4266:14, 20; 4274:18; 4275:7; 4277:1; 4304:5, 22; 4305:9; 4342:15; 4345:15; 4346:8; 4357:5; 4360:16; 4361:10

**starting** [5] - 4198:25; 4199:3; 4238:10; 4360:9, 12

**state** [2] - 4275:5; 4302:3

**statement** [2] - 4316:16; 4352:2

**statements** [2] - 4265:8; 4352:1

**States** [6] - 4198:4, 8; 4247:7; 4338:17; 4343:17; 4346:5

**states** [1] - 4250:21

**STATES** [3] - 4193:1, 3, 11

**static** [1] - 4332:6

**statistical** [1] - 4358:1

**statistics** [1] - 4304:17

**stay** [11] - 4198:24; 4199:8-10; 4241:8; 4277:10, 23; 4303:16; 4304:3; 4311:16; 4361:21

**stayed** [2] - 4247:4; 4304:4

**steadily** [1] - 4355:20

**steel** [3] - 4330:7, 17

**step** [8] - 4243:10; 4274:5; 4279:14; 4321:8, 11-12, 15; 4363:19

**stepping** [1] - 4274:3

**steps** [2] - 4260:17; 4266:1

**Steve** [1] - 4355:2

**still** [9] - 4247:14; 4256:17; 4259:19; 4273:8; 4278:3, 6; 4345:21; 4361:20

**Stinziano** [1] - 4247:10, 14

**stop** [3] - 4236:6; 4263:17; 4324:7

**stopped** [2] - 4306:12; 4324:25

**store** [12] - 4239:22; 4240:6; 4254:8, 15, 17, 22-23; 4261:25; 4275:24; 4310:12

**stores** [15] - 4254:18-20, 23; 4255:3, 7, 11-12, 14-17, 19-20; 4256:23, 25; 4257:1; 4267:23; 4276:12

**stories** [6] - 4260:19; 4261:24; 4265:11; 4318:14

**story** [1] - 4316:25

**stove** [1] - 4310:11

**straightforward** [1] - 4319:4

**Strategic** [1] - 4304:9

**strategic** [1] - 4249:10

**strategies** [3] - 4247:3; 4354:18; 4359:25

**strategy** [6] - 4246:21; 4247:6, 17; 4248:21; 4250:8; 4270:10

**streamlined** [1] - 4278:9

**Street** [5] - 4193:14, 19, 24; 4194:4, 8; 4195:10, 14, 17, 20; 4196:3, 10

**strength** [1] - 4249:10

**strong** [6] - 4246:9; 4277:22; 4334:3; 4353:13

**strongest** [1] - 4334:5

**strongly** [1] - 4354:20

**structure** [1] - 4310:14; 4326:12; 4353:18

**studied** [2] - 4302:22

**study** [1] - 4309:2

**Sub** [2] - 4344:13; 4351:20

**Sub-Zero** [2] - 4344:13; 4351:20

**submit** [1] - 4307:23

**subpart** [1] - 4308:24

**subpoenaed** [1] - 4249:20

**subsequent** [1] - 4304:21

**substantial** [2] - 4351:5; 4361:1

**success** [4] - 4239:14, 18, 23; 4269:1

**successful** [3] - 4268:24; 4276:10; 4353:14

**sufficient** [4] - 4250:22; 4349:12; 4352:14, 17

**suggest** [3] - 4314:5; 4320:6; 4358:4

**suggesting** [1] - 4339:12

**suggestions** [1] - 4265:7

**suggests** [1] - 4358:2

**Suite** [7] - 4193:24; 4194:8; 4195:10, 14, 17, 21; 4196:3

**suite** [1] - 4256:16

**SULLIVAN** [1] - 4193:10

**summarize** [1] - 4313:6

**summarizing** [1] - 4335:22

**summary** [1] - 4313:16

**summer** [3] - 4305:10, 15; 4357:9

**Summers** [1] - 4304:1

**Summit** [1] - 4346:13

**Summits** [1] - 4344:12

**super** [1] - 4240:4

**Superior** [1] - 4199:17

**supplier** [18] - 4314:20, 23-24; 4315:14; 4317:8; 4324:9, 14, 18; 4333:14; 4334:10; 4339:3, 7-8, 10; 4348:7; 4353:6, 9

**suppliers** [19] - 4312:7; 4313:18; 4314:15; 4317:16; 4323:3, 17-18, 25; 4324:22; 4325:22; 4329:23, 25; 4339:6, 9; 4344:4, 16; 4345:17; 4346:12

**supply** [2] - 4344:17, 19

**supplying** [4] - 4344:9-11, 17

**support** [1] - 4250:22

**supports** [1] - 4353:17

**supposed** [1] - 4199:19

**Supreme** [1] - 4341:2

**surprising** [1] - 4329:1

**surrounding** [2] - 4255:1; 4327:12

**survey** [4] - 4304:15; 4346:16, 20; 4347:11

**surveyed** [1] - 4347:14

**surveys** [1] - 4347:12

**sustain** [1] - 4251:20

**sustained** [3] - 4242:4, 7; 4251:15

**switch** [3] - 4235:13; 4352:15, 22

**SWORN** [2] - 4252:24; 4301:24

**system** [3] - 4327:17, 19

**systems** [1] - 4256:7

# T

**T-R-A-Q-L-I-N-E** [1] - 4346:21

**table** [5] - 4198:10, 15, 20; 4279:18

**tablet** [1] - 4268:23

**tablets** [1] - 4254:24

**tangible** [3] - 4310:8, 16, 18

**tank** [1] - 4305:7

**tape** [1] - 4331:16

**targeted** [1] - 4240:18

4383

**team** [5] - 4238:21; 4305:2, 4, 9, 11
**technologies** [1] - 4268:5
**technology** [1] - 4268:7
**televisions** [1] - 4256:10
**ten** [3] - 4267:5, 17; 4276:25
**tend** [3] - 4318:6; 4342:13; 4343:23
**tenure** [1] - 4254:11
**term** [2] - 4308:23; 4309:7
**terms** [8] - 4258:11; 4307:12; 4309:10; 4314:13; 4328:2; 4346:3; 4357:7; 4359:22
**test** [1] - 4353:1
**testified** [6] - 4248:18; 4250:6; 4308:7; 4323:2; 4353:25; 4358:13
**testify** [8] - 4201:2, 8; 4250:21; 4251:3, 5, 23; 4309:21; 4319:6
**testifying** [5] - 4200:3; 4236:7; 4242:24; 4249:23; 4308:11
**testimonial** [1] - 4250:17
**testimony** [20] - 4201:13; 4238:5; 4249:14; 4250:13, 15, 20; 4251:25; 4278:18; 4308:15; 4320:14; 4343:15, 19-20; 4349:14; 4352:5, 8; 4354:10; 4356:17; 4363:20
**theater** [1] - 4255:9
**themselves** [3] - 4325:12; 4328:7; 4336:18
**theoretical** [2] - 4311:12; 4316:25
**theories** [7] - 4319:20; 4320:2; 4321:10; 4331:4; 4332:9, 11
**theory** [4] - 4317:2, 4; 4320:3; 4333:13
**Theresa** [1] - 4198:20
**Thereupon** [5] - 4201:22; 4278:23; 4279:21; 4301:9; 4363:23
**Thermador** [1] - 4276:2
**they've** [7] - 4268:2, 7; 4273:23; 4322:25; 4335:9; 4338:16; 4342:23
**thinking** [6] - 4201:16; 4326:3; 4350:1; 4352:9, 25; 4353:2
**third** [8] - 4240:7, 9; 4274:20; 4334:4; 4351:13, 18; 4361:25
**Thomas** [1] - 4195:5
**thoughts** [1] - 4341:7
**thousand** [1] - 4251:1
**threat** [1] - 4264:18
**threats** [1] - 4327:17
**three** [17] - 4258:13; 4271:6, 10; 4272:2; 4302:23; 4312:17, 21; 4317:16; 4318:6; 4323:16; 4327:2; 4346:7; 4350:17; 4357:5; 4359:9, 16
**throat** [2] - 4302:17; 4363:4
**throughout** [3] - 4254:2; 4303:19; 4321:3
**tie** [1] - 4316:13
**tied** [1] - 4333:6
**tier** [1] - 4322:21
**tiers** [1] - 4322:22
**tight** [1] - 4241:11
**timely** [1] - 4199:20

**timing** [2] - 4278:4; 4356:13
**title** [2] - 4253:12; 4348:12
**today** [21] - 4199:7; 4239:21; 4242:12; 4249:23; 4250:2; 4267:17; 4303:4; 4313:1, 5, 17; 4317:1; 4318:17; 4321:18; 4322:8; 4327:4, 10; 4338:2; 4343:4; 4345:7; 4360:19; 4361:18
**together** [5] - 4249:4; 4268:22; 4272:8; 4326:22; 4355:19
**Tom** [1] - 4301:14
**tomorrow** [7] - 4278:6; 4361:5, 11-12; 4362:12
**took** [1] - 4305:13
**top** [2] - 4307:15; 4323:17
**topics** [1] - 4249:9
**tops** [2] - 4261:16; 4276:24
**total** [3] - 4257:18; 4272:15; 4304:4
**totally** [1] - 4363:2
**touch** [2] - 4321:3; 4359:1
**tough** [1] - 4263:14
**track** [2] - 4256:22; 4257:1
**traction** [2] - 4236:1, 22
**Trade** [1] - 4336:25
**trade** [2] - 4328:12, 18
**trade-off** [1] - 4328:18
**trade-offs** [1] - 4328:12
**tradeoff** [1] - 4303:16
**trading** [1] - 4328:15
**trading-off** [1] - 4328:15
**training** [2] - 4264:2; 4274:10
**transaction** [2] - 4343:12; 4345:15
**transactions** [3] - 4312:5; 4345:17; 4346:1
**transcript** [4] - 4196:18; 4201:23; 4279:22; 4364:4
**TRANSCRIPT** [1] - 4193:9
**transcription** [1] - 4196:19
**transition** [2] - 4305:1, 11
**TraQline** [9] - 4346:21; 4347:1, 9; 4348:2, 7; 4355:11
**Treasury** [1] - 4305:5
**treat** [1] - 4314:8
**treating** [4] - 4353:15-17, 23
**trees** [2] - 4342:15, 19
**trend** [3] - 4345:4, 8; 4350:3
**trends** [3] - 4354:16; 4356:1
**trial** [5] - 4237:11; 4249:14, 24; 4250:18, 21
**TRIAL** [1] - 4193:9
**Trial** [5] - 4193:13, 17, 22; 4194:2, 6
**triangles** [1] - 4323:18, 21; 4326:3
**tried** [5] - 4241:22; 4264:25; 4272:6; 4340:9; 4354:22
**tries** [1] - 4323:10
**true** [1] - 4316:16
**try** [8] - 4260:14; 4263:14, 16; 4264:21; 4265:9; 4266:2; 4303:16; 4322:2
**trying** [21] - 4241:24; 4249:3; 4250:5;

4260:4; 4261:1; 4262:14; 4274:1; 4275:8; 4310:19; 4311:2; 4322:1; 4326:5, 23; 4330:8, 10, 12; 4338:1; 4340:1; 4344:8; 4361:17
**turn** [4] - 4305:25; 4321:19; 4326:21; 4350:11
**turned** [4] - 4270:25; 4332:16
**Turnier** [2] - 4195:2; 4198:21
**TV** [1] - 4268:23
**two** [52] - 4199:17; 4201:15; 4238:22; 4251:1; 4253:16; 4258:12; 4267:18; 4271:14; 4272:8; 4276:20; 4301:18; 4310:3; 4316:10, 25; 4317:16; 4318:13, 16; 4319:19; 4320:2; 4321:10; 4325:11; 4327:2; 4331:4, 25; 4332:9-11; 4336:9; 4338:16, 18; 4342:1; 4346:6; 4347:20, 22; 4348:17; 4350:16; 4352:19; 4353:5, 15, 23; 4355:2; 4358:20, 22; 4359:16; 4360:10; 4361:9; 4362:5, 18
**type** [6] - 4240:2; 4254:25; 4258:24; 4275:18; 4306:1; 4328:4
**types** [4] - 4254:17; 4260:16; 4261:15; 4263:23; 4266:17; 4272:17; 4345:3
**typically** [9] - 4239:1; 4254:25; 4257:20; 4268:13; 4269:20; 4271:6; 4272:12; 4310:1

## U

**U.S** [19] - 4193:14, 18, 23; 4194:3, 7; 4196:14; 4236:2, 21; 4237:18; 4238:13, 17; 4239:2; 4266:6, 11; 4304:10; 4339:21; 4343:21, 23, 25
**ultimately** [1] - 4329:24
**um..** [1] - 4316:2
**unable** [1] - 4201:2
**unchanged** [1] - 4311:5
**uncontroversial** [1] - 4319:1
**under** [7] - 4250:6; 4257:9; 4277:8; 4279:11; 4305:22; 4307:12; 4355:20
**underlying** [1] - 4319:8
**understandable** [1] - 4309:13
**understood** [2] - 4269:14
**unemployment** [1] - 4357:8
**unfortunately** [1] - 4353:22
**unified** [1] - 4344:21
**uniform** [1] - 4344:23
**unilateral** [6] - 4315:2; 4335:18, 23-25; 4336:8
**unique** [1] - 4316:1
**unit** [3] - 4263:9; 4348:10, 14
**UNITED** [3] - 4193:1, 3, 11
**United** [6] - 4198:4, 8; 4247:7; 4338:17; 4343:17; 4346:5
**units** [3] - 4348:16; 4349:4, 12
**universal** [4] - 4315:21, 23; 4317:9, 11
**University** [1] - 4303:10
**up** [30] - 4198:25; 4199:2, 23; 4200:14; 4201:11; 4236:7; 4237:4, 18; 4239:2;

4241:2; 4251:24; 4260:8; 4263:8;
4273:17; 4274:3; 4302:18; 4305:10, 14;
4308:2; 4311:4, 16; 4324:7; 4328:19;
4331:17; 4336:5; 4340:7; 4342:9;
4360:14; 4362:25
**upgrade** [1] - 4328:2
**upper** [2] - 4269:20; 4328:19

## V

**vacancies** [1] - 4199:23
**vacuums** [1] - 4276:18
**valuable** [1] - 4201:10
**value** [19] - 4239:3; 4260:14, 17;
4261:16; 4262:14; 4264:1; 4265:4, 8,
23; 4266:3; 4273:4, 8; 4274:4; 4346:3;
4348:21; 4349:4, 15
**value-priced** [1] - 4273:4
**values** [3] - 4262:13, 15; 4269:12
**valves** [1] - 4331:15
**variety** [2] - 4302:10; 4325:21
**various** [8] - 4307:14; 4322:13;
4326:19; 4329:24; 4333:15; 4343:9;
4344:4; 4354:5
**vastly** [3] - 4333:18; 4334:8, 16
**vehicles** [1] - 4264:4
**vendor** [1] - 4264:14
**vendors** [1] - 4267:18
**versus** [5] - 4198:4; 4260:21; 4348:22;
4351:22; 4360:11
**vertical** [1] - 4355:15
**Veteran's** [3] - 4272:4, 6, 9
**vice** [2] - 4253:13, 25
**view** [7] - 4242:18; 4267:21; 4269:4;
4321:6; 4332:10; 4343:12; 4353:8
**views** [1] - 4313:13
**vignettes** [1] - 4275:20
**Viking** [1] - 4276:2
**virtually** [1] - 4359:19
**virtue** [1] - 4316:5
**visit** [1] - 4312:9
**voice** [2] - 4363:5
**voir** [1] - 4309:18
**Volume** [1] - 4301:19
**VOLUME** [1] - 4193:9
**vote** [1] - 4199:23
**votes** [1] - 4261:14

## W

**Wacker** [1] - 4194:15
**waiting** [2] - 4199:18; 4348:16
**walk** [3] - 4310:11; 4311:25; 4325:7
**walked** [1] - 4323:20
**walking** [1] - 4241:11
**wall** [20] - 4248:2; 4314:1, 5; 4339:18;
4343:13, 18-19; 4344:18; 4345:12;
4350:9, 18, 22-23; 4351:8, 17, 19, 24;

4352:3, 18; 4353:5
**Wallace** [4] - 4196:13; 4364:3, 6
**wants** [1] - 4324:17
**warehouse** [2] - 4324:15, 23
**warehoused** [1] - 4324:16
**Washington** [21] - 4193:7, 15, 20, 24;
4194:4, 9, 12, 19, 23; 4195:4, 11, 14,
18, 21; 4196:4, 10, 16; 4303:14;
4304:25; 4305:7; 4307:4
**wasting** [1] - 4201:5
**ways** [16] - 4260:5; 4264:5; 4274:12;
4314:15, 19; 4316:10; 4319:22, 25;
4323:3, 16, 25; 4325:25; 4326:2;
4331:14; 4357:21, 25
**wealth** [2] - 4312:4, 7
**Wealthy** [1] - 4330:15
**wearing** [1] - 4302:15
**weeds** [1] - 4352:25
**week** [5] - 4271:18, 23; 4272:12;
4278:5
**weekend** [1] - 4271:11
**weeks** [6] - 4271:6, 10, 14; 4272:2, 15,
18
**weigh** [1] - 4321:10
**weight** [5] - 4201:9, 12; 4251:6;
4252:1; 4343:9
**welcome** [1] - 4279:19
**well-established** [1] - 4310:22
**well-known** [2] - 4310:22; 4353:14
**West** [1] - 4194:15
**wherein** [1] - 4316:4
**Whinston** [9] - 4314:10; 4318:2;
4321:4, 7; 4348:10; 4349:21; 4351:9;
4353:11; 4356:17
**Whinston's** [3] - 4320:14; 4348:10;
4352:8
**Whirlpool** [11] - 4258:8, 13; 4267:20;
4317:15, 21-22; 4334:4, 6; 4346:6;
4347:6
**Whirlpool's** [1] - 4355:23
**Whirlpool/Maytag** [1] - 4320:10
**White** [4] - 4304:8, 12, 20; 4305:6
**whole** [4] - 4237:7; 4257:2; 4274:14;
4335:11
**wholesalers** [1] - 4314:18; 4325:10
**wide** [1] - 4302:10
**William** [2] - 4193:17; 4198:11
**Willig** [1] - 4303:5
**win** [1] - 4339:9
**window** [1] - 4237:6
**wine** [2] - 4237:6, 19
**wires** [1] - 4331:15
**withdraw** [1] - 4243:3
**witness** [23] - 4200:3; 4201:7, 10;
4235:9; 4236:8; 4242:2; 4249:21, 24;
4250:21, 23; 4251:22; 4252:8, 15;
4301:17; 4309:21; 4312:20; 4319:13;
4332:22; 4361:5; 4362:12, 14; 4363:3
**WITNESS** [52] - 4236:9, 12, 14, 25;
4237:3; 4243:11; 4252:6, 12, 19, 22,

24; 4278:19, 21; 4301:23; 4313:22, 25;
4314:4; 4315:19, 23; 4316:2, 6, 9, 12,
18, 21; 4317:13, 25; 4318:5, 11, 13, 23;
4319:1, 10, 18; 4333:1; 4340:23;
4341:6, 25; 4342:5; 4345:6; 4355:3, 7;
4356:9, 12, 15, 22, 25; 4357:16;
4359:5, 8; 4363:21
**witnesses** [4] - 4361:6; 4362:18
**Wolf** [1] - 4351:20
**Wolfs** [1] - 4344:13
**wonder** [1] - 4361:4
**wondering** [2] - 4316:16; 4361:7
**wood** [1] - 4310:17
**word** [6] - 4263:14; 4328:20; 4340:13;
4342:16; 4348:13
**words** [1] - 4337:19
**works** [4] - 4200:18; 4247:24; 4248:3,
7
**world** [12] - 4303:17, 22; 4304:2, 13,
24; 4308:22; 4317:20; 4323:15;
4327:15; 4340:4
**worth** [3] - 4328:7, 11; 4348:21
**write** [2] - 4341:10; 4348:9
**wrote** [1] - 4335:17

## X

**X13** [1] - 4272:11

## Y

**Yale** [1] - 4303:19
**year** [17] - 4201:11; 4238:22; 4246:19;
4258:21; 4270:5, 19, 22; 4272:7;
4276:9; 4304:15; 4334:23; 4335:10;
4338:16; 4345:21, 24; 4350:6; 4357:5
**year's** [1] - 4345:22
**year-and-three-quarters** [1] - 4357:5
**years** [24] - 4199:18; 4238:22;
4242:10; 4253:16, 22; 4254:12; 4258:2;
4266:16; 4267:5, 9, 17, 22; 4304:4, 19;
4307:8; 4338:18; 4340:13; 4359:9, 16,
21
**Yellen** [1] - 4303:23
**yesterday** [2] - 4199:11; 4200:4
**young** [2] - 4307:13; 4363:4
**yourself** [2] - 4254:3; 4328:2
**yourselves** [3] - 4198:6; 4199:8, 13

## Z

**Zero** [2] - 4344:13; 4351:20
**zero** [1] - 4267:5
**Zwolinski** [2] - 4194:6; 4198:12

| À |
|---|
| **à** [1] - 4344:25 |