UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,           )
                                    )
          Plaintiff,                )  Civil Action
                                    )  No. 15-1039
     v.                             )
                                    )  Thursday, December 3, 2015
AB ELECTROLUX, et al.,              )  4:23 p.m.
                                    )  Washington, D.C.
          Defendants.               )
                                    )

VOLUME 15 - AFTERNOON SESSION
TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE EMMET G. SULLIVAN,
UNITED STATES DISTRICT COURT JUDGE

<u>APPEARANCES</u>:

For the Plaintiff:        **Ethan Glass, Esquire**
                          U.S. DEPARTMENT OF JUSTICE
                          450 Fifth Street, NW
                          Room 4000
                          Washington, DC 20001
                          (202) 305-1489
                          Email: Ethan.glass@usdoj.gov

                          **Nina Hale, Esquire**
                          U.S. DEPARTMENT OF JUSTICE
                          450 Fifth Street, NW
                          Room 4000
                          Washington, DC 20001
                          Email: Nina.hale@usdoj.gov

                          **William Henderson Jones, II, Esquire**
                          U.S. DEPARTMENT OF JUSTICE
                          Antitrust Division
                          450 Fifth Street, NW
                          Room 4000
                          Washington, DC 20001
                          (202) 514-0230
                          Fax: (202) 514-7308
                          Email: Bill.jones2@usdoj.gov

**For the Plaintiff:**       **Kelsey W. Shannon, Esquire**
                             U.S. DEPARTMENT OF JUSTICE
                             450 Fifth Street, NW
                             Suite 4000
                             Washington, DC 20530
                             (202) 598-2854
                             Fax: (202) 514-7308
                             Email: Kelsey.shannon@usdoj.gov

                             **David Gelfand, Esquire**
                             U.S. DEPARTMENT OF JUSTICE
                             450 Fifth Street, NW
                             Suite 4000
                             Washington, DC 20530

**For Defendant**            **John M. Majoras, Esquire**
**AB Electrolux:**           JONES DAY
                             51 Louisiana Avenue, NW
                             Washington, DC 20001-2113
                             (614) 281-3835
                             Fax: (202) 626-1700
                             Email: Jmmajoras@jonesday.com

                             **Paula W. Render, Esquire**
                             JONES DAY
                             77 West Wacker Drive
                             Chicago, IL 60601
                             (312) 269-1555
                             Email: Prender@jonesday.com

                             **Kristen A. Lejnieks, Esquire**
                             JONES DAY
                             51 Louisiana Avenue, NW
                             Washington, DC 20001-2113
                             (202) 879-3939
                             Fax: (202) 626-1700
                             Email: Kalejnieks@jonesday.com

                             **Jeremy J. Gray, Esquire**
                             JONES DAY
                             77 West Wacker Drive
                             Chicago, Il 60601
                             (312) 269-1553

**For Defendant General**            **Paul H. Friedman, Esquire**
**Electric Company:**                DECHERT LLP
                                     1900 K Street, NW
                                     Suite 1200
                                     Washington, DC 20006
                                     (202) 261-3398
                                     Email: Paul.friedman@dechert.com

                                     **Paul T. Denis, Esquire**
                                     DECHERT, LLP
                                     1900 K Street NW
                                     Suite 1200
                                     Washington, DC 20006
                                     (202) 261-3430
                                     Email: Paul.denis@dechert.com

                                     **Craig Gerald Falls, Esquire**
                                     DECHERT LLP
                                     1900 K Street, NW
                                     Washington, DC 20006
                                     (202) 261-3373
                                     Fax: (202) 261-3034
                                     Email: Craig.falls@dechert.com

                                     **Michael G. Cowie, Esquire**
                                     DECHERT, LLP
                                     1900 K Street NW
                                     Suite 1200
                                     Washington, DC 20006
                                     (202) 261-3339

                                     **Anna Revathy Aryankalayil, Esquire**
                                     DECHERT, LLP
                                     1900 K Street NW
                                     Suite 1200
                                     Washington, DC 20006
                                     (202) 261-3332
                                     Email: Anna.aryankalayil@dechert.com

**Court Reporter:**                  **Bryan A. Wayne, RPR, CRR**
                                     Official Court Reporter
                                     Room 6503, U.S. Courthouse
                                     Washington, D.C. 20001
                                     (202)354-3186
                                     bryanawayne@gmail.com

Proceedings reported by machine shorthand.  Transcript produced
by computer-aided transcription.

# C O N T E N T S

**WITNESS:**                    **EXAMINATION**                    **PAGE:**


Jonathan Orszag:    Direct Cont' by Mr. Demitrack ........  4396

* * * * *

```
1                     P R O C E E D I N G S
2            THE COURT:  Okay, counsel.  We'll finish direct
3    examination today and start at 9:00 tomorrow with cross-
4    examination.
5                 DIRECT EXAMINATION CONTINUED
6    BY MR. DEMITRACK:
7    Q.   Mr. Orszag, let's return to our discussion of Samsung and
8    LG.  In the course of your work in this case, did you -- and I
9    want to be careful because we're going to get into something
10   confidential here.  Did you see any concern by the legacy
11   firms -- and those firms being GE, Electrolux, and Whirlpool --
12   regarding competition from Samsung and LG in the sale of cooking
13   appliances?
14   A.   Yes, I did.
15   Q.   And have you reported an example of that in your next
16   slide?
17   A.   Yes, I do.
18            MR. DEMITRACK:  Your Honor, we have probably one or
19   two questions that I think we ought to use the husher for --
20            THE COURT:  That's fine.
21            MR. DEMITRACK:  -- while he explains this document and
22   then he can --
23            THE COURT:  That's fine.  Do you want to do that now?
24            MR. DEMITRACK:  I think we should do it right now.
25   Thank you.
```

4397



1        (Sealed bench conference.)





17     (End sealed bench conference.)

18          THE COURT:  All right.

19  BY MR. DEMITRACK:

20  Q.   Mr. Orszag, you've conducted a series of analyses regarding

21  Samsung and LG growth, and if I could direct your attention to

22  the next slide, which is -- there we go -- which is DX-658-019.

23  Can you explain to the Court the economic analysis you're

24  reporting here?

25  A.   So this chart looks at revenue by quarter for Samsung and

1   LG in cooking appliances relative to GE and Electrolux.

2   Q.   May I just interrupt for a minute?  There's a phrase here,

3   "revenue index."  I think it's important that we understand

4   that.  You may have been getting to that, but I want to make

5   sure we have that at the outset.

6   A.   So what this does is it starts in the first part of 2012

7   and sets them all -- imagine they're in a race.  It sets them

8   all in an equal spot.  And it says since 2012, who has grown and

9   who hasn't.  So it sets them equal at a hundred, that's the

10  index, and then it looks at who's grown.  And what you see is

11  that GE and Electrolux have essentially been flat over that

12  period.  LG has more than doubled.  And Samsung has grown

13  dramatically.  Their growth has been 5X.

14       So they've had a dramatic increase in growth.  Recently, in

15  the last year they've grown, I estimate it at 66 percent,

16  Professor Whinston says it's either 55 or 83 percent, depending

17  on which metric he uses.  I think there are different ways to

18  look at growth and to calculate these numbers.  I think it's

19  undeniable that they've grown very rapidly and they've grown

20  very rapidly recently.  It doesn't matter which metric one uses.

21  Q.   When you say they've grown 5X, that's a reflection of

22  moving from 100 in the index, on the left-hand side, to 500 on

23  the index?  And I'm following the blue line on this slide.

24  A.   That is correct.  The revenues are five times higher today

25  than they were at the beginning of 2012.

1    Q.   And did you look at Samsung's performance at particular

2    retailers to see how that informed your economic analysis?

3    A.   Yeah, and this is -- I did, and I looked not only about how

4    they did overall at retailers.  We saw that earlier in the

5    charts that I showed -- the chart that I showed in terms of

6    their market shares at each of the retailers.  I also looked at

7    how they've done during particular periods in time because it

8    helps to fill out the analysis by providing real-world examples.

9    Q.   So if you turn now to the next page, which is 020.  And let

10   me just say, because of confidentiality reasons, Your Honor,

11   we've had to block out the right side which just has some of the

12   prices there.

13             THE COURT:  All right.

14             MR. DEMITRACK:  But I think the witness -- I know the

15   prices are important, but the witness can talk generally about

16   what you see, and I think we'll be able to work on that basis.

17             THE COURT:  All right.

18             THE WITNESS:  Sure.  So this is from Home Depot during

19   the first three weeks of September --

20   BY MR. DEMITRACK:

21   Q.   Of what year?

22   A.   Of this year.  So that was three months ago.  They run a

23   Labor Day sale, and there are Labor Day promotions.

24   Q.   It's a one-day sale?

25   A.   No.  It's not a one-day sale.  It goes for, I believe it's

1  three weeks.  The promotional periods tend to be two to four

2  weeks.  There are eight of them during the year.  And depending

3  upon which promotion they run for different lengths of time.  I

4  believe it was a three-week period.

5        And during that period, what you see is the top-selling

6  SKUs at Home Depot, the top five were all Samsung products.  The

7  first GE product we see comes in at No. 10.  The first

8  Electrolux product doesn't even make the top 10.  It would have

9  been No. 13 if we had continued it farther down.  It's also

10  relevant to look at what the prices are, and I'll try to be --

11  Q.   Let me do it this way.  You read testimony in the course of

12  your work on this case on various segments or ways that the

13  companies evaluate segments, from value to a mass to a mass

14  premium, correct?

15  A.   Yes, I have.

16  Q.   Okay.  And if you look at the Samsung ranges -- and I want

17  to focus you in particular on No. 1 and No. 3 -- where do they

18  fall in terms of the way companies generally evaluate these

19  various segments?

20  A.   Just so the record's clear, each company evaluates those

21  different segments somewhat differently, but at the levels of

22  price that we're talking, given the features that they have,

23  they're clearly in the mass segment at that point.

24  Q.   Thank you.  You also explained that there are eight major

25  holidays over the course of the year.  Can you identify them for

1    the Court?

2    A.   I hope so.  Let me try this.  I'm going to start from

3    today, because there's the -- they call it the X-13, so that's

4    Christmas.

5    Q.   So today would be we're in the middle of Black Friday which

6    is really black November, correct?

7    A.   Yes.  Black November is Black Friday, so that would be

8    what's occurring now.  There's then X-13 which is around the

9    Christmastime.  There's Martin Luther King Day, there's

10   Presidents' Day, there's Memorial Day, there's 4th of July,

11   there's Labor Day, there's Columbus Day.  And what's that?

12   Q.   That's eight.

13   A.   So I got them from memory.

14   Q.   Are we talking about eight days that account for these

15   periods of time, or is it more than that?

16   A.   No.  They're usually two to four weeks as I noted.  It

17   depends on what holiday it is.  It depends -- each one is

18   slightly different.  So it covers a very significant portion of

19   the year.  And we also have to remember, and this is -- each of

20   the retailers has price matching.  And so if I went into a P.C.

21   Richard, which is near to my house in New York, and I ask --

22   it's October, and I ask the question, why should I buy now?

23   Aren't you going to have some good discounts in a few weeks?

24        And the sales person said, that's fine, you can just walk

25   back in in a few weeks, and we have a money-back guarantee.  You

1    just look at the price from Black Friday.  So these periods

2    actually extend further because of those as well.  So each of

3    those retailers has that type of price matching, so that extends

4    the period in addition to when the promotion is actually at the

5    store.

6    Q.   And the period of time for these promotions, how is this

7    relevant if at all to your analysis?

8    A.   That many consumers have the ability to buy during these

9    promotional periods.  Not every single one, but many of the

10   consumers, because they can time their purchases knowing they're

11   about to come, and purchase with one of those promotions.

12           THE COURT:  Can you point to any other mergers, recent

13   or otherwise, wherein promotions factored significantly into

14   economic analysis?

15           THE WITNESS:  Just about any retail deal.  A few years

16   ago I worked on the OfficeMax-Office Depot merger, two office

17   supply companies.  They have posted prices and then there's

18   discounted prices, and they run all kinds of promotions, at the

19   beginning of the school year, for example.  And the types of

20   analyses that were done when that deal was approved by the

21   Federal Trade Commission, the types of econometric analyses done

22   there were directly about what effect does the entry of, say,

23   Office Depot have on the OfficeMax prices.  Or vice versa.  And

24   not just list prices but the net price or the discounted price.

25           THE COURT:  Were you the expert -- were you one of the

1    expert economists in that case?

2            THE WITNESS:  Yes, I was.

3            THE COURT:  All right.  When I'm referring to the

4    case, I'm referring to -- there was litigation.

5            THE WITNESS:  It was not litigation.  That was -- I

6    was presenting in front of the Federal Trade Commission.

7            THE COURT:  I see.  It was not litigation in this

8    court?

9            THE WITNESS:  No.  It was not litigation in this

10   court.  But just about every retail deal, the issue of

11   promotions, and the net prices is the price that most economists

12   will focus on, because most consumers are buying at the net

13   price, not the list price, if there are discounts that are

14   available to consumers.

15           THE COURT:  Did the Federal Trade Commission publish

16   an opinion?

17           THE WITNESS:  Yeah, they did.  They published a

18   closing statement in that case.

19           THE COURT:  Accepting your expert analysis?

20           THE WITNESS:  Now, this is complicated.  They don't

21   ever cite anybody.  What they do is they -- maybe this is a

22   helpful background about the merger process when parties are

23   seeking to merge and getting approval so they don't end up here,

24   is that --

25           THE COURT:  What's wrong with being here?

1        (Laughter)

2      I'm just kidding.

3        THE WITNESS:  It's sunny outside, sir.  I think there

4   are some things many people would rather be doing.

5      In that process, what happens is there's a first period --

6   it's 30 days, sometimes it extends longer because of a

7   procedural issue -- where the Department of Justice or the

8   Federal Trade Commission will seek some information.  Then they

9   will issue a second request if they want to go look at that

10  deeper.

11     Just so you have some context, the vast majority of mergers

12  don't get a second request.  I think in 2013, there were 1,400

13  merger filings and only 3 percent or 4 percent, give or take,

14  maybe 5 percent, got a second request.  So the vast majority,

15  there are no competitive issues.

16     On those that have competitive issues that need to be

17  examined further, there's then this process, and there's a

18  wealth of data that's collected as part of that process.  And

19  myself or others that are similarly situated will analyze that

20  data and then present it to the -- either the Department of

21  Justice or the Federal Trade Commission.

22     The economists at the Federal Trade Commission or the

23  Department of Justice -- many of them are here today -- they

24  will take that information and test the robustness of it.  They

25  will push and pull on it and see if they get the same result.

1    If they get the same result, then usually the merger will

2    be cleared.  If they find an opposite result or doing an

3    opposite analysis, there's then an interaction.  They will give

4    comments and will iterate back and forth.  Then a decision will

5    be made by a more senior person in the staff about whether to

6    proceed with a litigation like this or to allow the deal to go

7    forward.

8    If they allow the deal to go forward, not always but

9    sometimes they issue what's called a closing statement, and that

10   closing statement lays out the rationale behind why they closed

11   the deal.  So in Office Depot-OfficeMax, they laid out that they

12   found the same econometric result that I had presented to them,

13   and they laid that out in their closing statement.  And as we've

14   seen multiple times --

15           THE COURT:  They didn't credit you, though, did they?

16           THE WITNESS:  No, they didn't.  But I'm fine not

17   getting any credit.

18           THE COURT:  No, I was just curious as to whether or

19   not that theory had been accepted with appropriate respect for

20   your judgment in that case.  But you're telling me that what you

21   recommended was indeed accepted -- the position you advocated

22   was indeed accepted by the agency.

23           THE WITNESS:  And just to make sure everything's

24   clear, there are cases where that's not the case and we go back

25   and forth, and there are cases where they are.  And there are

1   cases where, because the Department of Justice or the Federal

2   Trade Commission has access to data that the merging parties

3   don't have, because they have the power to get data from other

4   competitors, they can do more detailed analyses than the merging

5   parties can have.  So they have in essence a leg up.

6         MR. DEMITRACK:  Your Honor, I was just reminded, when

7   we're looking at the slides, including this one on 20 that's

8   blocked off for the public, your paper copy has the entire --

9         THE COURT:  I know it does.  Right.

10        MR. DEMITRACK:  -- slide so you can see the prices

11   there.  Okay.  Thank you.

12   BY MR. DEMITRACK:

13   Q.   You testified earlier today, Mr. Orszag, about innovation

14   in this industry.  Did you test or look at innovation by Samsung

15   and LG?

16   A.   Yes, I did.

17   Q.   Do you report the results of that on this next slide, which

18   is page 21, 658-021?

19   A.   Yes, I do.

20   Q.   By the way, we've blocked off on the right-hand side the

21   percentages, because that would have gotten into some

22   confidential information.  So we'll be careful about that; we

23   can talk about generalities.  The slide is not entirely

24   intuitive.  Can you take us through what it is you're showing

25   here?

A.    Sure.  I did an empirical analysis of the sales by LG and

Samsung and the legacy manufacturers, Electrolux, GE, Whirlpool,

and Kenmore.  And what I looked at is, in the fourth quarter of

2014, what percentage of their sales were from newly introduced

SKUs, products, versus older products.

This goes to the question of the pace of innovation.  And

there's various comments in the testimony here but also in the

documents about the fact that Samsung and LG have a faster pace

of innovation.  And it's reflected in the data.  Their products

tend to be newer products, the products that are being sold to

consumers at the Best Buys, Home Depots, tend to be newer

products than the products that the legacy brands, Electrolux,

GE, Whirlpool and Kenmore, are selling.

Q.    How is that relevant to your analysis?

A.    It's relevant in a number of important respects.  One is

obviously they're coming out with new products.  One of the

products that Samsung has that allows you to have the same

cavity for the range, but it has a shelf in between so you can

cook some things at one temperature and other things at another

temperature.

My wife loves to bake pies, and if they're different types

of pies, they have to be at different temperatures.  But to have

two different ovens then takes up more space in the kitchen.

And you also need the ability -- what happens twice a year, for

us at least, we have a turkey dinner, one for Canadian

Thanksgiving since my wife is Canadian, and one for American

Thanksgiving, we need a bigger cavity.  So you can take the

shelf out and put a turkey into it.

So that's a new innovative product on the market.  So

that's something that's being introduced that consumers benefit

from.

There's another critical element of the competition

analysis.  At each point that they're introducing a new product,

they can position the product to meet the market to compete more

effectively.  If they see a hole in the market or an

opportunity, they can tweak the product as it's being produced

to fit the demand of consumers.  So the product innovation cycle

gives them more opportunities than a legacy brand has.

Q.   And you read testimony and heard testimony about Samsung

and LG entering at certain price points and then moving up and

moving down.  Is that consistent with what you just testified

about?

A.   Yes.  They've had that strategy.  It comes through clear in

the testimony and the documents that they seem to come into an

appliance segment and then grow.  They grow up and they grow

down in terms -- when I say up and down, I mean in terms of

price.  So it allows them to grow their market share.  If they

just stayed at one price, I haven't done that analysis, but I

wouldn't be surprised if their market share was somewhat

stagnant.  By growing the price points at which they offer

1    products, they make themselves more competitively attractive to

2    consumers.

3    Q.   Professor Whinston had a slide, you saw it, where he

4    explained that there were -- the legacy suppliers had more SKUs

5    than Samsung and LG.  Is the number of SKUs offered by a

6    supplier a determining factor in evaluating competitive

7    outcomes?

8    A.   No, it's not.  As a matter of economics, if you think about

9    SKUs, I use this example, and some people may not know it, but

10   on the West Coast there's a fabulous hamburger place called

11   In-N-Out.  They basically have four products.  It's a very

12   simple idea.  You can get a hamburger, cheeseburger, French

13   fries, and I think a drink.  That's what they do.  They make it

14   very simple.  Apple historically has had that approach, too.

15   They make very few products and they try to make them very well.

16        There are other companies that try to be something for

17   everybody.  They try to have a pink product or a purple product

18   and they try to meet each segment of the market.  That adds

19   increased complications for them because they have to have more

20   SKUs, it has increased cost, it makes the business more complex.

21        So businesses make a decision whether to simplify or make

22   it more complex depending upon what they believe is optimal as

23   their business strategy.  The fact that somebody has more SKUs

24   rather than less doesn't -- isn't the determining factor.  The

25   question is do they have the right SKUs to meet market demand,

1    and that's the critical question, and that is then reflected in

2    market share growth and changes in the marketplace.

3    Q.    During his direct testimony, Professor Whinston used a

4    phrase to describe Samsung and LG, and he described their

5    presence in the marketplace as a separate thing from the merger.

6    Do you recall him saying that in the course of his testimony?

7    A.    Yes, I do.

8    Q.    Do you agree with that?

9    A.    No, I don't.

10   Q.    Why not?

11   A.    Because the firms are competing.  We see it in the data.

12   They compete head-to-head.  Samsung's there doing this, LG's

13   there doing that.  They're not separate; they're part of this

14   ecosystem, competing vigorously to gain market share, to get

15   consumers.

16        So to treat it separately is to miss that the ecosystem has

17   that from Samsung and LG as part of the competitive effects.

18   And if the punches aren't as strong post merger between, say, GE

19   and Electrolux, there are all these other entities that want to

20   punch, too.  And that's what the competitive effects analysis is

21   all about.

22        And if we tie it back to what I said earlier, the two

23   competing theories.  One theory is there's that action and

24   there's no reaction from all the other players.  There's the

25   other theory that the market is dynamic.  And if I use this

1   bottle of water as an example, if this were in a tub of water

2   and I lifted it out, the water would cover it up very quickly.

3   You would not know that it was ever taken out because the water

4   would come back quickly.

5   Q.   Sort of like a rock being thrown into a turbulent body of

6   water?

7   A.   You could say so, yes.  So that is -- those are the two

8   competing theories, and then we need to test it empirically.

9   And again, that's why I think the Maytag-Whirlpool merger,

10  retrospective, is such powerful evidence about which of those

11  two theories should win out.

12  Q.   You testified a little earlier about some of the companies

13  that are making appliances in other parts of the country.  Did

14  you investigate further the nature of these global suppliers?

15  A.   Yes, I did.

16  Q.   Is that reported on your next slide?

17  A.   Yes.  And I think you just said other parts of the country.

18  I want to make sure we're clear, it's other parts of the world.

19  Q.   Other parts of the world.  Thank you.

20  A.   So what this lists are the top 10 global producers of major

21  appliances.  And I included Professor Whinston's unit share for

22  all cooking --

23  Q.   This is 2014 data?

24  A.   Yes, it is, sir.  And if we go back to that idea of

25  entrants and capacity and the ability to serve the market, it's

1    important to consider as part of the competitive effects

2    analysis where each of the firms that are big globally sit.

3        So we see Whirlpool is the biggest appliance maker in the

4    world.  Haier is the second biggest.  According to Professor

5    Winston's calculation, they have zero percent share.  They've

6    recently entered the U.S. market.  And so the question is what

7    is reasonable to expect in terms of Haier's growth in the

8    market, not at current market prices, but at the prices that

9    would prevail if the merged entity tried to raise prices.  What

10   kind of opportunities would present themselves in that situation

11   where the merged firm tried to raise prices.  That's directly

12   from the merger guidelines in terms of the approach that one

13   should take.

14   Q.   And let's look down a little farther.  Arçelik, No. 9.

15   You've spoken about Arçelik.

16   A.   Yeah.  Arçelik has recently entered with two brands.  They

17   have a Blomberg brand and a Beko brand.  One is targeting the

18   contract market, one is targeting the low end of the appliance

19   market, low to medium end of the appliance market in the U.S.

20   Or that's their intention to do so.  And that's also assigned a

21   zero share.  And that's one of the points that I make is that

22   it's ignoring the future competitive significance of those

23   players.  Assigning them zero share would be understating their

24   competitive relevance.

25   Q.   Let me just focus on something you just mentioned a little

1   while ago, and that is the economic analysis is to look at what

2   would happen regarding entry assuming hypothetically a price

3   increase after the merger, correct?

4   A.   Precisely.

5   Q.   And when you're doing that analysis, are you first saying,

6   well, if we assume that, what's going to happen to Haier and

7   then make a judgment and then erase that away and then say,

8   okay, what will happen to Arçelik and then erase it away?  Or do

9   we do something else?

10  A.   Well, in the marketplace, they both may take advantage of

11  the opportunity to try to steal share.  Remember, businesses, as

12  I said earlier, are in the business to make money.  And how do

13  they make money?  How does a Haier make money in the U.S.?  They

14  can produce their product for cheap.  If we simplify it to the

15  most basic elements, it's price, quantity, and cost.

16       I mean, we can add lots more complexity with, like,

17  quality, et cetera, but let me just simplify it to the most

18  basic elements.  What they want to do is they want to grab

19  quantity.  They want to get share at the highest price point

20  that they can get given the trade-off between price and

21  quantity.  And they want to produce the product as cheap as

22  possible, so that the gap between price and quantity, which is

23  revenue, is big relative to cost.  That's what the business is

24  trying to do.

25       So if they see that opportunity to take share away from

someone, they can lower price to take quantity or they can try

to produce a better product to take quantity, and that then

increases their profits.

THE COURT:  What's the relevant time frame in your

expert opinion?  The Court's called upon to try and predict what

could happen in the event the merger is approved.  We've heard

various theories about what could happen, what could happen.

What's the time frame?  What could happen when?  The day after,

a year after, five years?  What's the measuring stick here?

THE WITNESS:  I'm sorry that I'm going to have to give

you an imprecise answer.  But I can give a range.  The

guidelines talk about a nontransitory increase in price.  What

does that mean?  I think most practitioners would say two years

is a minimum, and something above that, five years would

probably be too long, but something in that kind of ballpark,

and it depends upon the circumstances in the industry.

But the -- if you look at the guidelines historically,

they've talked about entry in a two-year period.  So two years

would seem to be the minimum one should look at, and it could be

somewhat longer.

THE COURT:  So then the Court would have to take into

consideration performance during the preceding two years?  Would

that be appropriate?  Of manufacturers?  To predict where they

may be in the event of a merger or not two years thereafter?

THE WITNESS:  There's no precise guidance about what

1    to look at.  You can look at a whole host of different types of

2    evidence.

3              THE COURT:  Right.  But the Court's going to have to

4    determine some time frame to support whatever conclusion it

5    reaches.  In other words, if this is all predictive, what could

6    occur.  It would seem to me the Court's going to have to

7    determine something will occur or not occur over a reasonable

8    time frame, a reasonable time frame.  What's a reasonable time

9    frame?

10             THE WITNESS:  So again, we go to the guidance from --

11   what nontransitory may mean.

12             THE COURT:  Right.

13             THE WITNESS:  If we use that the entry would occur

14   within, say, two years, so that the --

15             THE COURT:  Within two years?

16             THE WITNESS:  Although, again, that's not a precisely

17   defined concept.  I think if I were to do it in economic terms,

18   I would look at the net present value, and that's more

19   complicated, so I'm sorry to make it more complicated.

20             THE COURT:  No, no.

21             THE WITNESS:  But if I were thinking about it from

22   purely economic terms, I would never do a cliff of saying yes or

23   no.  I would discount future years more and give more weight to

24   present years.

25             THE COURT:  So tell me if you agree with this.  The

```
 1        1992 U.S. Department of Justice and Federal Trade Commission
 2        horizontal merger guidelines incorporate this approach.  And I'm
 3        kind of ad-libbing here.  The merger guidelines take the
 4        smallest possible group of competing products and ask whether a
 5        hypothetical monopolist over that group of products would
 6        profitably impose at least a small but significant nontransitory
 7        increase or, as we've come to learn, SSNIP.  And, this SSNIP is
 8        usually an increase of 5 percent lasting for the foreseeable
 9        future.  "Foreseeable future."  What the heck does that mean?
10            (Laughter)
11        Two years?  Five years?
12            THE WITNESS:  I think if I were sitting in your chair
13        and I were having to make this decision --
14            THE COURT:  Here, let's switch.  You got it.
15            (Laughter)
16            THE WITNESS:  I would think two to five years.
17            THE COURT:  Two to five years.
18            THE WITNESS:  If I were to turn that into an economic
19        concept, I think two to five years is a -- again, you're asking
20        a question that's very difficult to answer.
21            THE COURT:  I know it is.  That's why I'm asking you.
22        I need some guidance.
23            THE WITNESS:  But I think if you were going to use
24        that language of "foreseeable future," I would use something
25        like --
```

1           THE COURT:  Would that be -- I'm not trying to trip

2   you up with a legal word, but I'm going to ask you, would that

3   be error?  Would that be a mistake to use that approach?

4           THE WITNESS:  I think reasonable people could

5   disagree.  I don't think you're going to go wrong --

6           THE COURT:  If you were me, what language would you

7   use?

8           THE WITNESS:  I would just probably take the

9   foreseeable future or nontransitory, and --

10          THE COURT:  Why?  Just because I read from it?  All

11  right.  It's persuasive language, but what's the alternative to

12  foreseeable future?

13          THE WITNESS:  I think the effects that Professor

14  Whinston talked about, and he described that -- and I'm not

15  going to -- I wouldn't disagree with him on this -- that the

16  internalization effect that he described occurs almost

17  immediately.  So the incentive of the merged party to try to

18  raise prices --

19          THE COURT:  So you don't disagree with him about that,

20  "almost immediately"?

21          THE WITNESS:  No.

22          THE COURT:  But then he factored in -- we've tried to

23  get some guidance from that Whirlpool merger, but that's when --

24  you know, he said, well, you know, the recession occurred almost

25  immediately, so you can't really look at that.

1              THE WITNESS:  But the recession didn't occur almost

2     immediately.

3              THE COURT:  I know, I know, that's your expert

4     opinion.  Right.  I understand that.

5              THE WITNESS:  So that's --

6              THE COURT:  And you disagree with him on that?

7              THE WITNESS:  Well, the official recession started,

8     according to the National Bureau of Economic Research, in

9     December of '07.  A housing downturn started earlier, but in

10    econometrics -- and we'll talk about this later, but I might as

11    well do it right now -- there are well known approaches for

12    controlling for the state of the economy.  And so I do that, and

13    it doesn't change the result, which shows the power of that

14    finding, that no matter what, it doesn't find an effect.

15         The Department of Justice themselves found that.

16              THE COURT:  Right.

17              THE WITNESS:  And there's one piece of literature out

18    there from one of my former mentors, Professor Ashenfelter, and

19    he found in three out of the 16 product categories that he

20    examined that there was price increases.

21              MR. DEMITRACK:  To be clear, this is the

22    Whirlpool-Maytag merger.

23              THE WITNESS:  This is Whirlpool-Maytag.  So three out

24    of 16.  But he wasn't able to control for costs, and we know

25    costs are an important input.  When I run my model without

costs, I also find some significant effects.  As soon as I put

costs in there, the effects go away, because what's driving the

price increase that he observed is not an anticompetitive price

increase, it's due to the fact that they faced higher steel

costs, for example.  Or higher costs.  I can't parse which ones

they come from.

So that's the power of that example of the Maytag-Whirlpool

deal, because it allows us to test these two competing theories,

and how fast, if at all, prices change.  In that case, we didn't

see any price changes.  And if I shorten my period, instead of

looking at, say, two years after the merger, I look at one year

after the merger, it doesn't change the results.

THE COURT:  Okay.  Thank you.

BY MR. DEMITRACK:

Q.   So you did two things, you changed the time period you were

looking at, and then added standard economic controls to control

for the recession, among other things?

A.   While we're on this topic, we might as well just handle

this issue.  Professor Whinston's critique isn't just -- given

the way I did the analysis, it can't just be that the recession

affected appliance prices.

THE COURT:  Well, it's a factor, though, isn't it?

THE WITNESS:  It's certainly a factor.

THE COURT:  In a recession, people aren't going to buy

as much as they would like to.  They're not going to buy, they

1      aren't going to build.

2              THE WITNESS:  Right, but the approach that Professor

3      Ashenfelter and I use is looking at the change in price of, say,

4      laundry, where there was a much bigger increase in

5      concentration, versus the change in price of cooking products,

6      where there was a much smaller increase in concentration.  So in

7      order for Professor Whinston's critique to be relevant, you

8      would actually have to have the recession have a different

9      effect on different appliance categories.

10         So you would have to have that the recession affects, say,

11     laundry or refrigeration differently than it affects ranges,

12     cooktops and wall ovens.  If it affects all appliances

13     identically, the regression, the statistical analysis is

14     unchanged in terms of its result.

15         But I didn't stop there.  I said let's allow housing

16     starts.  So I include housing starts as part of my regression,

17     and I relate housing starts to each appliance category to test

18     whether it has an effect differentially, and the results again

19     don't change.

20         I've tried all different ways to handle all standard

21     econometric approaches to address the Great Recession issue that

22     he raises, even though it occurs much later than the discussion

23     would suggest, and it doesn't change the underlying conclusion

24     that that merger had no significant effect on price, to either

25     wholesalers or, in the end presumably, to consumers.

1    BY MR. DEMITRACK:

2    Q.   So just to be clear, you took the housing starts and you

3    used that as a comparison against each of the four core

4    appliance categories to see if the effect was different?

5    A.   It's actually five appliance categories, but yes.

6    Q.   So you looked at washers and dryers as separate categories

7    for purposes of your analysis.

8    A.   Yes.  It's actually more -- I'm sorry.  There's

9    refrigeration.  I did each appliance category separately in the

10   regression, and it does not affect the analysis.

11   Q.   I want to turn back for a minute, because I think it's

12   relevant to this.  We looked previously at -- you don't need to

13   go back to it -- this Whirlpool document that was marked under

14   seal, and you showed me -- you testified about that as being an

15   example of competitors expressing concern about what they saw

16   with Samsung and LG coming into the marketplace.  How is that

17   concern that you see expressed in the documents relevant to the

18   analysis?

19   A.   It's directly relevant to competition.  Think about if

20   you're the business decision-maker at, let's just use

21   Electrolux.  You care about not only what is in the market

22   today, but what may be in the market tomorrow.  You have fear

23   of -- fear is an issue in competition analysis because if, say,

24   you attempt to raise price, you're worried that not only do you

25   lose sales to your competitors, but that you may in essence poke

1    the tiger.  You may induce that competitor to enter.

2         This is a well-known area of economics.  Professor Willig

3    again, was one who's written much about this.  It's called

4    contestable markets.  And so this is a central theory in

5    competition analysis, that you worry not only about the

6    competitors in the market, but about potential competitors and

7    how they may react to the actions that you take.

8    Q.   We'll move on and talk again about retailers.  And you

9    already testified about what you saw with retailers at the time

10   of the Whirlpool-Maytag merger and what you saw about retailers

11   today and that they haven't changed.

12   A.   Their market share today is roughly similar to their market

13   share in 2006 at the time of the Maytag-Whirlpool merger.

14   Q.   We've displayed up here in slide 658-023 a sentence from

15   the DOJ Whirlpool-Maytag closing statement.  And by the way, the

16   closing statement here is similar to the OfficeMax closing

17   statement that you were discussing with the Court when the Court

18   had some questions.  In other words, it's a statement of

19   nonchallenge or the reasons why a transaction wasn't challenged.

20   Correct?

21   A.   Right.  There's an effort to provide more transparency

22   about why the antitrust agencies have made the decisions that

23   they have made, and so this was an effort by the Department of

24   Justice, at the time in 2006, to lay out the rationale why they

25   believed that consumers were protected with the Maytag-Whirlpool

1   merger.  And they gave four or five -- I forget the precise

2   number -- reasons why they thought consumers would be protected,

3   one of which was the statement that the retailers have

4   alternatives available to them to counter any attempted exercise

5   in market power by an appliance manufacturer.

6   Q.   And you're now reading from the statement?

7   A.   That's correct.  And this is entirely consistent with the

8   economics literature.  There's a significant economics

9   literature that looks at these types of issues, and this

10  conclusion is consistent with that, if the retailers have

11  available alternatives to them.

12  Q.   And did you reach a conclusion that is consistent with the

13  conclusion reached by the Department in 2006 regarding the

14  status of retailers in the marketplace?

15  A.   Yes.  That slide we saw earlier that showed the differing

16  market shares by retailer is to me powerful empirical evidence

17  that the retailers have alternatives available to them.  They

18  can decide who they put in front of the store and that person

19  gets sales or that supplier gets sales.  They can decide how

20  much floor space to allocate to each of the players, and they

21  can decide to then proceed accordingly.

22       So if somebody tried to raise price on, say, a range, say

23  the post-merger firm tried to do that, they'd have all kinds of

24  tools available to them to discipline that price increase.  They

25  can say, you know what, you try to do that, we'll take you from

1    the front of the floor to the back of the floor.  We'll give you

2    less display space.  We'll shrink your floor footage.  We can

3    discipline you in all kinds of ways, not just in cooking, but

4    also in other appliances that are being sold at the same time.

5    And that's in part reflected right here.

6    Q.   Moving things along, I'd like to return to that slide.

7    It's actually the next slide.  This was the slide you were

8    talking about just a minute ago, correct?

9    A.   Yes, sir.

10   Q.   And I want to focus on some testimony from Professor

11   Whinston.  It was the morning of the second day he testified,

12   Your Honor.  It was in a closed session.  I think we can do it

13   without creating any issues.

14         THE COURT:  Can I stop you for a second, counsel?  Can

15   you go back to that slide that was previously up there?  I want

16   to know the answer to this question.  So that's DOJ's closing

17   statement with respect to the Whirlpool-Maytag merger.  Tell me

18   what the precise reasons are why that closing statement should

19   be just as applicable here.

20         THE WITNESS:  I think, based on my analysis --

21         THE COURT:  Based on your analysis.

22         THE WITNESS:  -- it is directly applicable.  If you

23   actually look at their reasons for why they say the merger won't

24   result in higher prices -- it may be helpful actually -- do you

25   mind if we look at it?  Because there's a paragraph that --

1           THE COURT:  Go ahead and get it out.  Sure.

2           MR. DEMITRACK:  It's in the binder, Your Honor.  I'll

3      just need to find it.  It's one of the first documents.

4         It's Defense Exhibit --

5           THE WITNESS:  DX 0399, I think.

6           THE COURT:  Okay.

7           THE WITNESS:  And I'm going to point your attention to

8      the last paragraph on the first page.  This follows --

9      BY MR. DEMITRACK:

10     Q.   May I do something before you do that?  I just want to set

11     some point up.  If you look at the second paragraph, third line,

12     the government there writes that there is a combination of

13     strong rival suppliers.  Can we agree as a baseline that there

14     were two strong rival suppliers in 2006 in the name of Whirlpool

15     and Maytag, and as the government points out here, there are two

16     strong rival suppliers?

17     A.   That is correct.  In my report, I actually call Electrolux

18     a strong competitor.

19     Q.   Let me ask you to go on and respond to the Court's

20     question.

21     A.   So they give the rationale behind why prices won't increase

22     in the last paragraph.  I'll paraphrase it because it will be

23     just easier, I think, for me to talk.  Is that they acknowledge

24     there's a very significant increase in share, like in this

25     merger, but they say any attempt to raise prices likely would be

1   unsuccessful.

2       Why?  First, there are two well-known brands but rival

3   appliance brands such as Kenmore -- so they were treating

4   Kenmore as a rival brand -- General Electric, Frigidaire, are

5   also well established.  So this merger now, you would replace,

6   you would say Kenmore, General Electric, and Whirlpool, are well

7   established, and newer brands such as LG and Samsung have

8   quickly established themselves in recent years.  We've observed

9   that in cooking.

10      LG, Samsung and other foreign manufacturers could increase

11  their imports into the United States.  Existing U.S.

12  manufacturers have excess capacity and could increase their

13  production.  That's part of my economic analysis.  We'll see

14  that the existing manufacturers have excess capacity.

15      Further, the large retailers through which the majority of

16  these appliances are sold -- my analysis shows it's basically

17  the same today -- Sears, Lowe's, The Home Depot and Best Buy,

18  have alternatives available to them to help resist an attempt by

19  the merged entity to raise prices.  Finally, the parties

20  substantiated large cost savings and other efficiencies that

21  benefit consumers.

22      I did a detailed analysis of those issues.  If you look at

23  the aggregate efficiencies announced by the parties as a

24  percentage of revenue, in this merger they're roughly identical

25  to the announced efficiencies in the Maytag-Whirlpool deal.  I

was not able to do a detailed comparison, but if you look at the

aggregate level, they're roughly the same.

So all of the same factors are present today.

THE COURT:  With the exception of the recession,

though.  The recession happened and that had an impact on

everything.

THE WITNESS:  But this was in March of '06, so no one

knew -- if people knew in March of '06 what was going to happen

in 2008, then that would -- they would have been quite skilled

at what they were forecasting.

THE COURT:  I think Brooksley Born --

THE WITNESS:  And I think "The Big Short" suggests

that there were some people who got that right.

I think the other way to think about this is Professor

Whinston and I agree that that internalization would happen

quickly, and I analyze that, and you don't see that

anticompetitive price effect happen.  I should also note that

Mr. Barnett --

THE COURT:  That's an interesting point you make,

though.  I mean, it's all about predictions, and predictions

were made assuming that the economy would remain as was when

this closing statement was issued.  No one took into

consideration the recession, none of the effects of the

recession, the dire effects.  And you would agree they were dire

effects.

1           THE WITNESS:  Oh, I mean, the suffering --

2           THE COURT:  Catastrophic.

3           THE WITNESS:  I mean, the amount of job loss that we

4      suffered in the months from the second half of 2008 is --

5           THE COURT:  There was no building, no one's

6      remodeling, no one's spending.

7           THE WITNESS:  Right.  But we have to differentiate the

8      time periods, and that's important.

9           THE COURT:  But all of that happened, even under your

10     analysis, within the first two years or so, which is, as you

11     say, a critical time period.  Right?  Isn't that right?

12          THE WITNESS:  Maybe an ordering would help, so let me

13     try to do this.  Professor Whinston and I agree that the

14     internalization effect, that if we're going to use that (snaps

15     fingers) action, occurs sometime from immediately to soon.

16     Let's just say months.  I think that's fair.  That occurs

17     quickly.

18          The response from competitors takes some more time because

19     they will have to reposition their products.  They have to fight

20     for space on the showroom floor.  That's why the guidelines and

21     sort of antitrust economics gives people time, and they talk

22     about nontransitory price increase.  They're not talking about a

23     temporary one, they're talking about one that stays for the

24     foreseeable future.

25          And so if you do not observe the price increase occurring

relatively quickly, let's say in the first year to 18 months,
basic economics would suggest that that internalization factor
isn't going to cause an upward pressure in price, but rather the
market dynamics are going to protect consumers and that the
efficiencies, the ability of the merged firm to lower cost and
compete more aggressively, is the sort of overwhelming benefit
of the merger to consumers.

So the timing doesn't even work in the story that I heard
Professor Whinston tell because the internalization effect
should occur relatively soon.  So we should pick up in the
econometrics in the first year, say, the anticompetitive price
increase in that then, even if there was entry, it should
dissipate over time.  You don't observe that in the
econometrics.

MR. DEMITRACK:  Thank you, Your Honor.

BY MR. DEMITRACK:

Q.   So let's go back to this slide we were looking at, which
is -- right there.  Slide 658-024.  Professor Whinston, in the
second day of his testimony, in the morning, in the closed
session had a couple of pie charts that he put up, and these
were pie charts where he was allocating margin between retailers
and the manufacturers, and he had some for Electrolux and GE and
he had some for Best Buy and Home Depot.

So the Court recalls, they were green and blue, and it
showed a split between there.  And you recall that testimony?

A.    Yes, I do.

Q.    Do you recall the point he thought those pie charts made

for him?

A.    Yes, I do.

Q.    What was the point he was trying to make?

A.    He was trying to make the point that he thought that the

division of the margin between the retailer and the supplier was

roughly equal.  He said something to the effect of if my story

were correct --

Q.    You, Mr. Orszag?

A.    Me being Mr. Orszag, that you should think that the pie

should be all going to the retailer --

Q.    Because they supposedly would have had the power.

A.    Precisely.

Q.    Do you have a response to his opinion?

A.    Yes.  A number of different responses.  Number one, that

analysis is -- it's not linked to the actual costs of doing

business, the risk of doing business.  So what's relevant is

whether -- one has to think about the rate of return, et cetera,

to the products.  He doesn't look at that issue in the context

of that analysis.

      But you can see the flaw in it very easily.  In his

appendix slides he showed the split between, say, Electrolux and

Best Buy for both ranges, wall ovens, and cooktops.

Q.    The slide that we looked at in court had ranges, but when

1    you go into his appendix, you see it for wall ovens and

2    cooktops.

3    A.   Precisely.

4    Q.   Okay.  Proceed.

5    A.   So when one looks at that, the split between -- and we have

6    to have a basic fact here.  Electrolux does much better with

7    ranges than it does with cooktops and wall ovens.

8    Q.   And we saw that in the market share slides?

9    A.   In market share, in terms of market share.  If Professor

10   Whinston's claim were correct, one would expect that the higher

11   is your market share, the higher is the split of the pie that

12   you get.

13   Q.   So Electrolux should have had a bigger split of the pie in

14   ranges as opposed to cooktops and wall ovens.

15   A.   Precisely.

16   Q.   What do you see?

17   A.   The opposite.

18   Q.   What does that tell you?

19   A.   It shows that this is not -- he's comparing basically

20   apples and oranges.  Each of the retailer and the supplier are

21   bringing different assets to bear with different risks.  So

22   that's not the determining factor of the split in how one should

23   think about the ability of retailers to drive competitive

24   outcomes.  The type of information that's presented in this

25   chart that's on the screen --

1   Q.    024?

2   A.    -- is directly relevant.  And we see this in other

3   retailers, too.  If you go to Costco, the third biggest retailer

4   in the country, not the third biggest retailer selling

5   appliances, but the third biggest retailer total, they sell only

6   four cooking products.  They sell LG, they sell Whirlpool, they

7   sell a company called NXR and a company called Ancona.  Those

8   are the four products they have for sale.  They've made a

9   business decision that they think that they can -- that's the

10  optimal mix for them.

11      If you go to some of the testimony I read about J.C.

12  Penney, they're launching with only three brands, Samsung, LG,

13  and I believe it's GE, if I recall the testimony correctly.  So

14  they've decided they need no one else to compete in the

15  appliance space.

16  Q.    Let me ask you, in addition to looking at this, you

17  described it as a snapshot in time.  Did you also look at

18  changes in suppliers' share in retailers over time?  And if so,

19  what did you report?

20  A.    The next slide includes this information.  I do this for

21  different retailers, but I'm just presenting Best Buy here.

22  Q.    Just so you know, Mr. Orszag, this has been marked

23  confidential.  You can talk generally about it, but let's not

24  use precise numbers.

25  A.    Okay.  What it shows is from 2010 to 2015, Samsung has

grown very rapidly at Best Buy.  It's done extremely well at

Best Buy.  At the same time, Samsung has taken share from

Electrolux and GE.  You can see that in the downward trend that

they have experienced in their shares.  And this is just for

ranges.

    And LG has been largely flat, and Whirlpool is down

slightly.  So this is consistent with that growing competitive

significance of especially Samsung.

Q.   In response to one of the Court's questions a little while

ago, we were looking at the Whirlpool-Maytag closing statement.

You pointed out the portion of the government's statement

regarding the existence of excess capacity.  Do you recall that?

A.   Yes, I do.

Q.   Did you also look at whether there was excess capacity in

the industry today?

A.   Yes.  And I'm citing to a document that Professor Whinston

included, and so this has --

Q.   Again, this document has been marked confidential but we'll

be able to work around it.  Just don't use the exact

percentages.

A.   I was getting all excited because I was going to circle the

different plants here.

Q.   This is a document that Professor Whinston included as

support for his opinions?

A.   Yes, he did.

1  Q.    What does it show you?

2  A.    First of all, it ignores Samsung because it doesn't have

3  information on Samsung.  This is a Whirlpool document.  And if

4  we start -- why don't I start in the Cleveland, Tennessee plant

5  for Whirlpool.  This is for wall ovens and cooktops.  And you

6  can see it in the middle of the page on the right.  They have

7  significant capacity to increase because they show their

8  utilization rate right there.  I can't mention it.

9       If we move down, you have Bosch, and they have capacity for

10  ranges and cooktops at their plant in New Bern, North Carolina.

11  If you move around to -- I'm going to skip GE because they're

12  one of the merging parties.  LG has capacity in Monterey, Mexico

13  for ranges.  Whirlpool has more capacity for ranges in Mexico.

14  I'm going to skip the GE plants again.  Whirlpool has capacity

15  at their plant in Tulsa, Oklahoma for ranges.  Sharp's is a

16  microwave, so I'm going to skip that.  I'm going to skip

17  Electrolux.  And then there's a Bosch plant for ranges that's

18  running at full capacity.

19       This is just one document.  There's more documents that I

20  cited.  And this is obviously a snapshot in time, that at any

21  given time the utilization rates will change.  And the other

22  documents that I had access to showed similar levels of

23  utilization, although obviously the precise numbers were

24  different.

25  Q.    What's the economic effect of excess capacity, just to

1    explain it to the Court?

2    A.   The simplest reason why it's relevant from an economic

3    analysis and why the Department of Justice notes this is if

4    there were an attempt to raise price, that's the ability of the

5    competitor to supply the market quickly.  It's relatively easy

6    to ramp up production.  But if they're at full capacity, it's

7    much harder to ramp up production to defeat that price increase,

8    to sell into the market enough product to bring prices back down

9    to a market level.

10        So when you have excess capacity, you can be a much more

11   rapid response than if you do not.

12   Q.   Let me ask you to turn the page.  We looked at this slide

13   before, and I just have one topic I want to explore at this

14   point as we move into this next area.  And I want to focus on

15   some of Professor Whinston's opinions regarding what he

16   described as the value end of the business.  Do you recall those

17   opinions?

18   A.   Yes, I do.

19   Q.   He explained that at the value end he only saw three

20   competitors, Whirlpool, GE, and Electrolux.  Do you recall that?

21   A.   Yes, I do.

22   Q.   And you saw the existence of other competitors there?

23   A.   I think the more precise way to describe it is there are

24   other competitors there.  We did not get invoice data for those

25   competitors.  And so Premier, Summit, Avanti, et cetera, provide

1    competition at those low price points.

2    Q.   You remember when we looked at the market share slide and

3    you pointed out there was an "other" category, and that "other"

4    category included companies such as Premier and Summit at the

5    low end.

6    A.   That is correct.

7    Q.   And certainly when you're looking at the entire range

8    market, that's a very small percentage.  Basic math, what

9    happens if you look at just the sale of value ranges and think

10   about their sales in that segment of the business?

11   A.   Their presence is magnified.  So they become more

12   important.  I should just note, though, from the transactions

13   data, we don't have detailed information, but you observe those

14   players at those price points in the marketplace.

15   Q.   When you say "in the marketplace," where?  In retailers?

16   A.   In retailers.  Some of these, if you go to Home Depot, for

17   example, on their website you'll see Summit.  If you go into

18   P.C. Richard, they have Premier and Avanti if I'm not mistaken.

19   I may get the precise retailers wrong, so I apologize because

20   I'm doing it from memory.  But you find these lower-priced

21   products available through various retailers, and you'd have to

22   go through each product in each one, but we do not have precise

23   data about them to do the types of market shares that Professor

24   Whinston tried to do.

25        So as a result, it's inflating the market shares of the

merging firms because he's ignoring these market participants.

THE COURT:  If you don't have data, how can you determine share if you don't have data?  Maybe you don't have data because they aren't selling Premier or Summit or the other one.  Or if the sales are so negligible that they aren't --

THE WITNESS:  We do have some data.  The problem is it's -- so we have data, say, for P.C. Richard.

MR. DEMITRACK:  We'll look at this a little later, Your Honor.

THE WITNESS:  And what you see is Premier is not so insignificant at P.C. Richard, and we have -- in the contract sale data.  But the other way to say this is if they're a 1 percent player in the overall market, and then you cut the data and you look at the bottom 20 percent, they become 5 percent. So the issue is they become more relevant.

But in some sense, a lot of this discussion is -- I don't want to say a waste of time because that doesn't sound good.  I would say it's misguided.

THE COURT:  Please don't say that.

(Laughter)

THE WITNESS:  It's misguided because we've already defined the market as the entire marketplace.  So when you're looking at the entire market, cutting the data to look at some subsegment is missing the point of market definition, that that's the entire market, and by definition when you do market

1    definition, you're assuming there's substitution among those

2    products at the different price points.

3    BY MR. DEMITRACK:

4    Q.    Did you also look at the margins earned by suppliers at the

5    low end?

6    A.    Yes.

7    Q.    What did you determine from that work?

8    A.    That margins are thin at the low end of the marketplace.

9    Q.    What does that tell you?

10   A.    That all other things being equal, that would suggest it's

11   a more competitive marketplace than if margins were higher.

12   Q.    You testified a little earlier about the extent to which

13   Samsung has taken share from the legacy suppliers over time in

14   cooking appliance, and I'd like to direct your attention to the

15   next slide, which has been marked confidential, but the basic

16   point here, the title of the slide is available to the public.

17   So let's discuss this.

18          THE COURT:  You're referring to the slide that ends in

19   29, correct?

20          MR. DEMITRACK:  It's slide 658-029, Your Honor.  Thank

21   you.

22          THE WITNESS:  So this helps to inform the question

23   that we were just talking about a little bit ago, that this

24   looks at the top-selling SKU in 2014 for Samsung, Electrolux,

25   and GE at Best Buy.  And the lines show the price point, and the

1    bars show the share for that individual SKU.

2         And what it shows is that as Samsung brought down, or its

3    top-selling SKU in each of these months had a lower price, the

4    share for that SKU was higher.  It's basic economics.  This

5    shouldn't be that surprising that the lower price, bringing down

6    a more full featured product with lower prices increases its

7    share.  That's what one would expect as a matter of economics.

8    BY MR. DEMITRACK:

9    Q.   In the course of your work in this case, did you determine

10   that Samsung has been lowering its price for cooking appliances

11   in the last few years?

12   A.   Yes.  As we talked about, they seem to enter a market, and

13   then they grow, offering lower-priced products, taking their

14   feature set and coming down in price with that product.

15   Q.   Can you describe generally for the Court the evidence that

16   you focused on in reaching the conclusion that prices have been

17   going down?

18   A.   I think some of the data that I just showed earlier -- I

19   don't think I can talk about the price, had -- can I talk about

20   the price range?

21   Q.   You can talk about that price, yes.

22   A.   So they had a price below $600 in the Labor Day sale, and

23   that, obviously, is a price with a product that has many

24   features, and features consumers want.  I have a whole analysis

25   in the appendix about the estimated value of each of those

1    features that consumers place on average.

2         So it goes to show that when you put a product with, say,

3    self-cleaning, smooth cooktop -- I'm not saying -- since it's

4    blacked out, I would have to look at the precise product --

5    consumers weigh that product feature set versus the price.

6         That's one of my critiques of Professor Whinston, is

7    everything in his analysis focuses on price.

8    Q.   I don't mean to interrupt you, but I want to finish one

9    point.  We're going to move on to this.  We'll get to that, hold

10   that thought.  Recognizing that you're here as an expert and not

11   as a fact witness, based on the evidence that you've seen about

12   what Samsung has done with the price of ranges in the

13   marketplace in the last few years, do you expect it to stop, or

14   do you expect those Samsung prices to go down in the future?

15   A.   Based on their pattern, I would expect those prices to

16   continue to march down, and then to continue to serve the

17   market, expanding their market share.

18   Q.   And you said based on the pattern.  What are you referring

19   to?

20   A.   Their pattern in other products and their stated intention

21   to grow market share.

22   Q.   And you testified, and we're going to get into the

23   value/price issue in a minute, but I want to just make sure we

24   have one other point nailed down first.  And that is you

25   testified about vertical competition, how products at different

1    price points take share from each other.  Did you do an analysis

2    to look at whether that supposition is true?

3    A.   Yes.

4    Q.   Okay.  And can you explain to the Court these next two

5    slides?

6    A.   Sure.  So what this shows --

7    Q.   Again, these next two slides, the numbers have been blocked

8    out.  You can talk generally in terms of ranges generically,

9    and -- just please don't use the exact numbers.

10   A.   The ranges of ranges?

11   Q.   Ranges of ranges.

12   A.   So what one observes from May 2014 to November 2014, is

13   that Samsung has gained significant share at Best Buy.  What I

14   ask empirically is where do they take that share from their

15   competitors?  Do they only take it from high-priced products, or

16   do they take it from both high-priced and low-priced products?

17   And remember, Samsung products are not below $500.  They're

18   above $500.

19       So they have products that are above $500, because I just

20   need to talk generally about this.  And I ask, what happens to

21   the share of sales of products below $500 and share of sales

22   above $500.  And based on that composition of the effects, one

23   observes that they took about half of their share, a little less

24   than half at Best Buy from products that were less than $500,

25   and a little bit more than half from products that were priced

1    more than $500.

2         That suggests, that shows, that consumers are trading off

3    lower-priced products for a higher-priced, more full-featured

4    product, consistent with the discussion we had that there's

5    competition not just horizontally at the same price level, but

6    vertically, based on feature set.

7    Q.   And did you observe this trend also in The Home Depot data?

8    A.   It's a very similar result.

9    Q.   We're now looking at the next slide, Exhibit 658-031.

10   A.   Yes, sir.  And so I look at this and you see a growth in

11   Samsung's share at Home Depot from March 2015 to July 2015.  And

12   you see at Home Depot it's roughly half came from products less

13   than $500 and roughly half came from products priced more than

14   $500, consistent with the finding I just gave.

15   Q.   So I cut you off before when you were starting to explain

16   to the Court the relationship between price and value.  And you

17   can continue your answer.

18   A.   Professor Whinston's analysis, what I was just going to

19   say, and I can make it brief, all focus on price.  He doesn't

20   take into account in his analyses this quality product feature

21   set in terms of the work that he did, and it's directly relevant

22   because the competition's occurring in that way in the

23   marketplace.

24   Q.   And you know that because of these slides?

25   A.   These slides and lots of other information.  You see this

in how the businesses behave, in talking to the business people
and the testimony that we heard here in court, or at least the
testimony I've reviewed.

Q.   Early on in this case, and it's come up several times, the
Court and the various parties have asked the question about
Mrs. Smith, hypothetical Mrs. Smith who is on a fixed income or
just doesn't have the money to spend for a snazzy new range with
three doors and whatever else happens.  And the Court asked the
very valid question, who protects Mrs. Smith?

I'd like you to walk the Court through that hypothetical
and explain how, from your analysis, you can help answer that
question.

A.   Sure.  This is -- it's a great question and a really
interesting one as a matter of economics.  And so hopefully in
these slides I'll explain how the vertical competition that I
was just describing works and works to the benefit of
Mrs. Smith.

And so let's just start with the proposition that
Mrs. Smith and Mr. Jones are going to go -- they plan on going
to Home Depot.  Let's assume that they start by doing some
research.

Q.   So we're on slide 658-032.

A.   Yes.  So they start doing some research, and they look
online and they get information about the suppliers that are
available, and they look at Home Depot's website, for example.

And then they decide, let's go to Home Depot.  Mrs. Smith comes

to Home Depot with a budget of $500, and she already has GE

appliances in her kitchen, her range is broken, so she really

wants to buy GE.  That's what she's going to go do.

Mr. Jones, on the other hand, has $600 in his pocket, and

he just wants a range and it depends on the feature set,

et cetera.  So he hasn't made a decision about his brand, or he

doesn't have a strong brand preference.  So now they go to the

website, or they go to Home Depot.  And we can flip the page.

Q.   Continuing to page 033.

A.   And there are a number of different ranges.  Mrs. Smith has

five choices because she only has $500 in her pocket.  So she'll

look at Premier, Summit, Whirlpool, GE, and Electrolux.  Those

are her five choices.

Q.   Let me interrupt here.  These are prices that you've picked

for hypothetical purposes.  They're not actual prices, but it's

designed to replicate what you're seeing in the marketplace?

A.   Roughly speaking.  This is a pure hypothetical example to

highlight the deeper economic issue.  So this is just purely a

illustrative example to help, hopefully, Your Honor to

understand the role of vertical competition.

So Mrs. Smith has five choices with her $500, and she came

wanting GE, and GE's 475.  So she buys GE for $475.  Mr. Jones

has the full range of choices.  He has seven choices, a budget

of $600.  And he looks at the Samsung self-clean option, and he

1    says, you know what --

2    Q.    That's the one for $600?

3    A.    $600.  Maybe if it were a hundred dollars more, I would

4    choose a Samsung product.  But for 125, I don't really need the

5    self-cleaning option.  It's not that important to me.  I'd

6    rather take that extra money and do whatever he's going to do

7    with it.  So he also buys that GE product.  So they both have

8    gone in, pre-merger, and they have bought the GE product for

9    $475.

10        Now let's assume --

11   Q.    Now we're on page 34.

12   A.    Now let's assume that the merger occurs, and let's just

13   assume hypothetically that GE and Electrolux raise their price

14   by $25.  So now that price of that GE range that Mrs. Smith

15   wanted was $500.

16   Q.    And she's been hurt to the extent of $25?

17   A.    When she goes in to buy that range, because she wants GE

18   and she values the brand, she will have to pay $25 more.  She is

19   harmed in that circumstance.  But as I described earlier,

20   Mr. Jones values that self-cleaning option at, let's just say

21   it's $105.  So now he prefers the Samsung range at $600 over the

22   GE range that's now at $500 because the price gap is smaller

23   than he places on the value of the self-cleaning option.  So he

24   chooses to go with the more expensive option.

25        As I was describing, we see that in everyday life.  We

often choose not the cheapest product in the market, we choose

the product that fits the product feature set we want in terms

of cars, airlines.  Everything we do will have that kind of

trade-off of price and quality.  So Mr. Jones --

THE COURT:  What about Mrs. Smith, though?

THE WITNESS:  I'm going to get to this.  This is where

she's now protected.  Now let's think about whether it makes

sense economically for GE and Electrolux to ever raise that

price if they're going to lose Mr. Jones.

BY MR. DEMITRACK:

Q.   And by "raise that price," you mean actually do what's on

page --

A.   This is all hypothetical.

Q.   Page 35.

A.   And remember, they're in the business to make money, the

merged firm, and each individually.  GE today --

THE COURT:  I thought their primary focus was to

benefit the consumer, to keep prices down.

THE WITNESS:  Their primary focus is they want to

maximize --

THE COURT:  Profits.

THE WITNESS:  -- profits.

THE COURT:  Yeah, they want to make as much money as

they can.  That's the bottom line, right?  There's nothing

sinister about that.

1            THE WITNESS:  No, that's going back all the way to

2   Adam Smith.  That's the invisible hand of markets benefiting

3   consumers because it's then the competitive interaction --

4            THE COURT:  Benefiting consumers except Mrs. Smith.

5            THE WITNESS:  Well, no, this is where it's really

6   important.  The next slide ties it together.  So --

7   BY MR. DEMITRACK:

8   Q.   Let me ask a question first.

9   A.   Sure.

10  Q.   These companies want to make as much money as possible.

11  That's what they're in business to do, right?

12  A.   They're in the business to maximize profits, for sure.

13  Q.   And that desire in this hypothetical is not inconsistent

14  with protecting Mrs. Smith, correct?

15  A.   Precisely.

16  Q.   Why?

17  A.   If we go to the next slide, let's think about the world

18  where they don't raise price.  They keep it at $475.  They sell

19  two ranges, they make $75 per range, the difference between

20  their cost at 400 and the price they sell it at, 475.  So they

21  make 150 bucks of profit if they can get the sale to both

22  Mrs. Smith and Mr. Jones.

23  Q.   So this is the example where the product was at $475,

24  Mrs. Smith at $25 under her budget, she buys it.  Mr. Jones

25  doesn't value self-cleaning because it's a $125 difference and

1    he buys the $475 range.  And that's what's reflected on the left

2    side here?

3    A.    Precisely.

4    Q.    Okay.

5    A.    So if you don't raise price, you make 150 bucks in this

6    example.  If you do raise price and you lose Mr. Jones to

7    Samsung with the self-cleaning feature --

8    Q.    Because he's now bought the $600 range.

9    A.    The combined entity, they sell the product for $500 to

10   Mrs. Smith, their costs are $400, they make a hundred.  So

11   they're better off never raising price.  And so the economic

12   analysis has to be about what percentage of the consumers are

13   like Mrs. Smith and what are like Mr. Jones.  And we can see

14   from our experience with Maytag-Whirlpool that there are so many

15   Mr. Joneses out there that prices aren't elevated post-merger

16   because it's the Mr. Joneses' actions, their willingness to

17   trade off those product feature sets that are protecting the

18   budget-conscious consumer.

19   Q.    Do you also see that in the slides we looked at regarding

20   the Best Buy higher-priced ranges being sold at -- I'm sorry,

21   the Samsung higher-priced ranges being sold at Best Buy, and the

22   Samsung higher-priced ranges being sold at The Home Depot?

23   A.    We're seeing that there are a significant number of

24   customers who are making that product trade-off; they're the

25   people like Mr. Jones.

Q.    Did Professor Whinston test this issue at all empirically?

A.    I didn't see any analysis that he did.

Q.    The empirics that you looked at that we just discussed, the Best Buy and The Home Depot slide, is an example of empirics supporting the fact that there will be those trade-offs between these consumers, correct?

A.    Yes.

Q.    Is this price/quality trade-off that's been reflected in this hypothetical important to the competitive analysis?

A.    Absolutely.  Quality is an important part of competition, and economists often like to talk about it as quality-adjusted prices.  Maybe the easiest way to translate this is to think about the time that you may have a product.  If it cost me $500 to have a product that lasts one year or a thousand dollars to have a product that lasts me, say, four years, which one would I rather have?  I personally would probably rather have the thousand dollar product.

Now, of course, there's going to be some consumers who are budget constrained.  But still, when thinking about that quality metric on an annual basis, having that product, it's beneficial to have the more expensive, higher-quality, longer-lasting product.

Consumers aren't the same.  They're heterogeneous.  They have lots of preferences.  Some are like Mrs. Smith and are very budget conscious, and maybe -- the way economists describe it is

1    liquidity constrained, but you can say they're just budget

2    constrained.  And some are like Mr. Jones that are making those

3    trade-offs.  And it's the balancing of those two that will help

4    to determine competitive effects, and Professor Whinston did not

5    do that analysis.

6    Q.   You testified earlier that based on the evidence you've

7    seen, you expect to see the Samsung price for ranges to continue

8    to go down in the future.  That's your expert opinion, correct?

9    A.   There's nothing that I've seen that would suggest that that

10   would not be the case.

11   Q.   And to the extent that happens, would you expect, based on

12   the evidence you've seen, the empirics you've done, would you

13   expect to see more consumers trading up and buying this more

14   expensive but going-down-in-price Samsung range as opposed to a

15   range below $500?

16   A.   We saw in the data when their top selling range came down

17   in price with the product feature set that they had, they had an

18   increase in share.  So I think that's a reasonable forecast

19   based on the evidence.

20   Q.   I want to go very quickly through the topic of the

21   Herfindahl Index, the HHI Index.  The Court has heard a lot

22   about that already so I don't think we need to repeat that.

23   Except give just a reminder to everyone here what exactly is the

24   Herfindahl Index?

25   A.   The HHI, or the Herfindahl Hirschman Index, or it's more

affectionately called Herfs.  HHI, Herfs or Herfindahl Hirschman

Index are all the same ideas.  And what it does is it takes the

market share of each player and it squares it and it adds it

together.  And so if one player has 100 percent of the market,

the Herfindahl is 10,000.

Q.   A hundred times a hundred?

A.   A hundred times a hundred.  And if there are millions of

competitors out there, the Herfindahl would be basically zero.

So it then ranges from highly competitive to a monopoly at

10,000.

Q.   The topic of the Herfindahl Index, is that discussed in the

merger guidelines?

A.   Yes, it is.

Q.   Is there a level that the agencies or the Department of

Justice and the Federal Trade Commission view as potentially

being a screen that would cause the agency to want to look a

little more at the merger?

A.   All right.  Yes.

Q.   What is that level?

A.   Well, there are various screens in the guidelines.  The

most relevant one here is at, for purposes of this merger, is at

2,500.  And they use numbers as 2,500 as creating a presumption

and ones below that as -- again, those are legal terms.  One of

the things that I agree with Professor Whinston on is that point

about economics doesn't like cliffs.  We don't like sharp edges.

1    We'd rather have some gray area.  But the guidelines lay out

2    2,500 and so that's what it is.

3    Q.    I'm directing your attention to the next slide, 658-036.

4    Can you explain what you're presenting here to the Court?

5    A.    Sure.  So Professor Whinston was here and he showed the

6    Court line 1.  That was unit shares and it showed the Herf or

7    the Herfindahl or the HHI post-merger for ranges, cooktops and

8    wall ovens.

9    Q.    And all of these ranges are above 2,500, correct?

10   A.    That is correct.

11   Q.    Okay.  And what are you doing in row 2?

12   A.    Row 2 uses his numbers if you do it by revenue.  So if you

13   think about when he does a unit metric, he's assuming that each

14   of those product features that we talked about have zero value

15   to consumers.  To me that's a very extreme assumption given both

16   my empirical analyses and also the information, the testimony

17   that I've reviewed.  And also the guidelines.  So the revenues

18   as a starting place is a far more appropriate metric, and so

19   that is shown on line 2.

20   Q.    What's line 3?

21   A.    We have to remember, the guidelines say that we should look

22   at the future competitive significance of the firms.  So if I

23   take the Samsung-LG growth from Professor Whinston's testimony,

24   and I assume that they take it proportionally from all the other

25   players, that then brings the Herfindahl down even further, the

post-merger Herf.

Q.   So you're using Professor Whinston's growth predictions for Samsung and LG for this purpose.

A.   Precisely.

Q.   What does row 4 do?

A.   If I then include the fact that he ignored the TraQline data, so he ignored the data that we had, the best available indicator according to the guidelines, for some of the smaller players, the Premiers, the Avantis, et cetera, the Bertazzoni, Arçelik, that lowers the post-merger Herf or HHI even further.

Q.   Now, in fact also with row 3, we're now below 2,500?

A.   That is correct.

Q.   What does row 5 do?

A.   I just wanted to give this as an illustrative example, and I used Haier and Arçelik, but I wanted to show the sensitivity of the index to assumptions about potential entry that would be in response to a elevated price.  So it's for illustrative purposes, I want to make that clear.  And it shows that if Haier and Arçelik or any players were to gain 2 percent share each, new entrants, that would be the kind of effect one would observe on the Herf, or the post-merger Herf.

Q.   And row 6 is odd.  Why would you take Electrolux back to 2013?  Why would you move its share back from 2014 to 2013?

A.   There's been some suggestion that when Electrolux moved production to a new plant --

1    Q.    This is the Memphis plant?

2    A.    Yes.  It's had some logistical issues, let's say, snafus

3    perhaps, and they have lost share.

4    Q.    In 2014?

5    A.    Since they've moved production.  So I asked the question,

6    how significant would it be to the Herf if they just returned to

7    their 2013 level.  Again, it's not clear that that's

8    appropriate, but if we want to test the sensitivity of these

9    analyses, one can see how sensitive the results are to that kind

10   of change in the assumed market share.

11   Q.    Okay.  Mr. Orszag, I want to quickly talk about unilateral

12   and coordinated effects.  You testified about that before and

13   then moved pretty quickly into the contract channel issues.  You

14   explained before unilateral effects, correct?

15   A.    That is correct, yes.

16   Q.    And unilateral effects relate to issues of lack of

17   competition, alleged lack of competition between the two merging

18   parties and what effects that would have on prices.  And

19   coordinated effects deals with the marketplace as a whole.  What

20   conclusions did you reach regarding whether there would be any

21   unilateral effects?

22   A.    So we have spent the last few hours describing how this is

23   a dynamic market.  The competition, the fist bumps from various

24   competitors come from all kinds of directions.  And there are a

25   large number of suppliers that will continue to be present

1    post-merger:  Whirlpool, Kenmore, Samsung, LG, Bosch, et cetera,

2    new entrants sitting there.  There's no barriers for them to

3    enter that are significant.  They have the ability to enter and

4    grow, especially if the merged firm tried to raise price,

5    because that gives them a new opportunity to try to gain share;

6    that large buyers dictate or discipline attempts to raise price

7    by shifting floor space, switching suppliers, sponsoring entry.

8         And we've talked about it a lot in the context of

9    retailers, but this holds equally for some of the large

10   builders.  And some of the testimony I've reviewed fits that

11   squarely, that they feel like they have enough choices in the

12   marketplace today and they're not worried about those price

13   increases.

14        And again, we talked about capacity.  Existing competitors

15   have the kind of capacity that they could increase if they had

16   to.  And as we'll talk about, there are very significant merger

17   specific efficiencies from this merger.

18   Q.   Did you also look at whether there would be any coordinated

19   effects, that is whether the marketplace would operate less

20   competitively in the future?

21   A.   That is correct.

22   Q.   Is that portrayed on slide 0658-038?

23   A.   Yes.  I look at there are a large number of competitors.

24   This is a dynamic industry.  There's new entry and expansion

25   occurring, which is not consistent with coordinated interaction.

1    Each of the suppliers are selling multiple products with

2    multiple features.  That makes coming to terms of coordination

3    more difficult, it makes deviating from those terms easier, and

4    it makes punishing more --

5    Q.    Easier to detect?

6    A.    To detect.  Sorry.  And it makes punishing those more

7    difficult as well.  And those are the kind of criteria that one

8    looks at.  And it's the frequency of that product introduction

9    that also is another factor because with each product in an

10   introduction, you can -- it changes the terms that one would

11   have to reach.  So the complexity that one would have to have is

12   just too much.

13   Q.    Did Professor Whinston, based on your evaluation of his

14   three reports and listening to him in court, did he conduct any

15   empirical analysis on coordinated effects?

16   A.    No.

17   Q.    Are there standard tests he could have done to test whether

18   there have been coordinated effects?

19   A.    Yes.  And given the richness of data we have in this case,

20   there are all kinds of tests he could have done about

21   coordinated effects, and he did not do them.

22   Q.    We've heard some testimony elicited by the government that

23   pricing is very transparent in this industry.  And by "this

24   industry," I mean the cooking appliance industry.  Is

25   transparency of pricing a sufficient condition for coordination?

1  A.   No, it is not.

2  Q.   Why not?

3  A.   Because most industries in our country, pricing is

4  transparent.  Competitors can see the prices of their rivals.

5  So that in and of itself is not a sufficient metric to determine

6  that there is coordination.  You have to meet the other

7  criteria.  You have to have the ability to come to terms of

8  coordination, the ability to detect deviations from it, and to

9  punish those deviations.

10  Q.   And by punishing and detecting, you mean the competitors

11  reaching an agreement and then being able to keep that collusive

12  agreement webbed together as opposed to it falling apart.

13  A.   Precisely.

14  Q.   You also looked at the issue of whether there was a

15  contract channel market in this case.

16  A.   That is correct.

17  Q.   Let's turn back to slide 658-040.  We'd looked at this

18  slide before.  At the bottom are the triangles and the circles.

19  Those are the contract customers for the triangles, and the

20  consumers are the circles, correct?

21  A.   That is correct.

22  Q.   Now, when we talk about contract channel customers, are

23  there different kinds, or is it a monolithic group?  What's your

24  understanding?

25  A.   They're very different.  There's everybody from the person

1  managing an apartment building who's out there as a property

2  manager, to somebody who's acting as a remodeler, to somebody

3  who's building single family homes one at a time to five at a

4  time, to very large homebuilders like D.R. Horton, et cetera,

5  Toll Brothers.  So this is a very diverse group of customers.

6  Q.   Did Professor Whinston, based on the work you saw, did he

7  conduct any analysis to identify the relative sizes of these

8  different categories of contract channel customers?

9  A.   No, he did not.

10          THE COURT:  Before you go on any further, I want to go

11  back to Mrs. Smith.  I'm very concerned about her, and this is

12  important.  There are competing considerations here.  Businesses

13  merge to make money, to make more money.  They don't merge to

14  lose money, they merge to make more money for their investors.

15  Fair statement?

16          THE WITNESS:  Absolutely.

17          THE COURT:  All right.  Mrs. Smith is going to have

18  that limited fixed income for the rest of her life.  If she has

19  to rely upon the government for an increased cost of living, she

20  might as well forget it, she's not going to get it.  It's a

21  reality of life.  She's got that fixed $450 or $475, and I'm

22  struggling with this concept that prices aren't going to go up,

23  they're going to go down, and she's not going to be the

24  recipient of one of these fist pumps on her face.  I'm concerned

25  about that.

```
1        And -- because it's just counterintuitive when you consider

2    that businesses merge to make more money for their investors.

3    Why are they going to strive to keep the cost down to benefit

4    poor Ms. Smith?

5              THE WITNESS:  Let me try to explain if I may.

6              THE COURT:  And I have to say that the government's

7    hypothetical is not persuasive for the following reasons.  So

8    what are those three important reasons that this court would say

9    that it's not persuaded that Mrs. Smith, the proverbial

10   Mrs. Smith, is going to be harmed?

11             THE WITNESS:  So I'll do it in three ways, and

12   hopefully this will --

13             THE COURT:  Maybe there are more reasons, but there

14   should be three principal reasons that the Court would look to

15   to say that the hypothetical that the Court's portrayed and --

16   that the government's presented to the Court is not persuasive

17   for the following reasons.

18             THE WITNESS:  To me it's not persuasive for the

19   following reasons.  Number one, there are significant

20   efficiencies from this merger.  So that will allow the merged

21   entity to compete more aggressively, to offer products at a

22   lower price.  So that's number one.  We can't ignore the fact

23   that the merger facilitates their ability to offer lower cost

24   products because they'll save on things like steel and on glass

25   and all these other factors that will go into the efficiencies
```

analysis which we'll talk about.  That's number one.

Number two, there are -- the market is filled with
Mr. Joneses who will discipline the price incentive of the
merged entity to raise prices.

THE COURT:  So wait a minute.  So Mrs. Smith's dilemma
is dependent upon the Mr. Joneses out there.

THE WITNESS:  Precisely.

THE COURT:  Why should she have to depend on anyone?

THE WITNESS:  Well, we have some history here, sir.
So this is why I keep turning back to the Maytag-Whirlpool --

THE COURT:  I want to remove Mr. Jones from the
hypothetical.  I want to focus on Ms. Smith, the proverbial
Mrs. Smith on a fixed income who is concerned about not being
able to buy that very low range stove, and take Mr. Jones out of
this.  I can't do that?

THE WITNESS:  You can't because --

THE COURT:  Why?

THE WITNESS:  This would be a different merger if --
under the following scenarios:  All consumers were identical.
That would be a different competitive effects analysis.  So
that, we would have a different consideration.  But the firms --

THE COURT:  Mr. Jones benefits in this hypothetical,
doesn't he?

THE WITNESS:  He doesn't benefit; he actually -- it's
his decision-making that forces the business to keep prices

1   down.  And so one way to think about this is that --

2              THE COURT:  But she's got to rely upon him being at

3   the store at the same time that she is.

4              THE WITNESS:  No.  That's the critical thing.

5              THE COURT:  I want to take him out of this for now.

6   That's what's troubling me.

7              THE WITNESS:  He doesn't have to be at the store at

8   the same time.  He could be at the store a few weeks later.

9              THE COURT:  But he has to be there.

10              THE WITNESS:  Eventually, because the suppliers

11   can't -- in economic terms it's called price discriminate.  We

12   could just say target.  They don't know when you walk into the

13   store, they don't know your -- if you were going to go buy a

14   range and I was going to go buy a range, and Mr. Demitrack were

15   going to go buy a range, they don't know our budgets.  We don't

16   reveal it to them.  We don't show them, hey, guess what, this is

17   how much money we have to spend.

18       So they don't know that Mrs. Smith only has $500 in her

19   pocket.  They don't know that Mr. Jones only has $600.  It's

20   that lack of information that is critically important to this

21   discussion.

22       If they had that information -- the other way to say this

23   is, if you walked into Best Buy today and you told them I have

24   $600 to spend and there were no prices out, what do you think

25   they would charge you for that range?  There was no prices and

1    you had no information, they would charge you the highest price

2    they could.  They would want to get as much of your money.

3        But it's that fact that they don't know how much you have,

4    the fact that they have the prices listed right there, and the

5    fact that there are different types of consumers, Mr. Jones and

6    Mrs. Smith, that are driving the retailers and driving the

7    suppliers to price competitively.  So I understand that you --

8        THE COURT:  Then I'd have to factor Mr. Jones into the

9    answer.

10        THE WITNESS:  You can't ignore Mr. Jones.  He's

11    critically important.  I would agree that the analysis would be

12    wholeheartedly different if we only had Mrs. Smiths in the

13    market.  But we don't have only Mrs. Smiths in the market.

14        THE COURT:  What does the analysis look like?

15        THE WITNESS:  If we only had people who were budget

16    conscious, the product would be much more commoditized.  Because

17    why would anyone produce a product with lots of features?  They

18    couldn't profitably sell them.  So the very fact that we see

19    this wide range of products over a wide range of consumers is

20    reflective of the competitive ecosystem that exists in the

21    marketplace.

22        THE COURT:  So from an economist's point of view,

23    would it be appropriate for the Court to consider or not whether

24    the majority of consumers are budget conscious or not?

25        THE WITNESS:  It would factor into the economic

```
 1    analysis.
 2              THE COURT:  Should the Court make that assumption?
 3              THE WITNESS:  The question is not if they're budget
 4    conscious, but actually if it's a binding constraint.  What I
 5    would say is -- well, everyone is budget conscious.  Well, let
 6    me rephrase that.
 7              THE COURT:  So the Court should make that assumption,
 8    then.
 9              THE WITNESS:  All consumers want to spend --
10              THE COURT:  We're focusing now just on Mrs. Smith.
11    Forget about Mr. Jones.  So this merger is still not
12    anticompetitive?
13              THE WITNESS:  Absolutely, because of --
14              MR. DEMITRACK:  Mr. Jones is still --
15              THE COURT:  Wait a minute.  Answer my question.  Take
16    Mr. Jones out of the equation here.
17              THE WITNESS:  But that's the problem, is in order to
18    take --
19              THE COURT:  It's a problem for Mrs. Smith.  She gets
20    that fist pump, and that's what I'm concerned about.
21              THE WITNESS:  No.  And I wholeheartedly understand
22    your concern, and as someone who believes that competition
23    policy is focused on consumers and consumer welfare, that it
24    is -- the question you ask is a very good one.  But it's
25    precisely because those pieces of information are not known.
```

The retailer does not know that she has a budget, and the

supplier does not know --

THE COURT:  But the Court knows that there are people

out there who have that budget.  I know that.

THE WITNESS:  The suppliers know --

THE COURT:  The suppliers aren't going to care about

that.

THE WITNESS:  Okay.  Let me try this.  Maybe this

would help explain it.  The suppliers look out at the world and

they see some people who will only buy a cheap range, and some

people who will buy an expensive range.  If they raise the price

of the cheap range, there are some people who would move to the

expensive range.

THE COURT:  If they could afford to, but in the

government's hypothetical, she doesn't have that $25 more to

spend.  It may sound like it's minuscule, but to her it's the

difference between walking home without a stove or walking home

with a stove -- or riding home with a stove.

THE WITNESS:  No, it's very significant for her, I

agree.  But if we go back to that hypothetical that I showed,

the business, the supplier -- GE and Electrolux in my example,

but it could be anybody -- makes more profit by selling two

ranges, one to Mr. Jones and one to Mrs. Smith, than it makes if

it just sells to Mrs. Smith.  So as a result, it would rather

price low and sell more product than price high and sell one

product.  In essence that's the simplest way to explain it.

THE COURT:  I understand what you're saying.

THE WITNESS:  So they would rather sell more at a slightly lower price than sell one at a slightly higher price. And that drives their business decision making.

THE COURT:  And selling more will increase the profits that they have a fiduciary duty to make for their shareholders.

THE WITNESS:  And we can go to the Maytag-Whirlpool retrospective, to ask the question of, following that merger -- because there were Mrs. Smiths in 2006.  In some sense, given the housing downturn that occurred sometime thereafter, and if I run the regression, the statistical analysis through 2008, there were more people who were suffering, you don't see price increases, and you don't see price increases more significantly in the products that there were bigger increases in concentration, which is precisely the government's theory, which is that in the products where there are large increases in concentration, you should see larger price increases.  But that's not what we observed empirically.  We actually observed no price increases.  So the government got that decision right, despite how controversial it was at the time.

BY MR. DEMITRACK:

Q.   The combined company in this hypothetical that we've been discussing with Mrs. Smith and Mr. Jones, is this company -- I want to make sure I understand -- is it looking out for the

1    welfare of Mrs. Smith?

2    A.   It's looking out for the welfare of the shareholders.   It

3    just so happens that by looking out for the shareholders through

4    competition, Mrs. Smith is protected.   That is a byproduct of

5    the competitive process.   It's precisely equivalent to the type

6    of invisible hand of markets that Adam Smith talked about now

7    250 years ago.

8    Q.   So we shouldn't --

9         THE COURT:   I don't want to see Ms. Smith get smacked

10   by the invisible hand, though.

11        (Laughter)

12        THE COURT:   I keep coming back to it.

13        THE WITNESS:   I think the metaphor --

14        THE COURT:   It's a big concern, though.

15        THE WITNESS:   It's an appropriate concern.   And what

16   I'm trying to say in multiple ways is that the competition that

17   exists today and that will continue to exist post-merger is

18   precisely the competition that will protect Mrs. Smith.   And we

19   know that from the experience we observed 10 years ago when

20   there was a major merger in the appliance space.

21   BY MR. DEMITRACK:

22   Q.   So do we need to worry about the fact that the company is

23   not concerned about Mrs. Smith in order to reach a conclusion

24   that she is nonetheless protected?

25   A.   No.   We should assume that the company is worried about

1    itself, and not her, and she is still protected.

2    Q.   And in this analysis, does it matter how many Mrs. Smiths

3    and Mr. Joneses there are?

4    A.   Yes, it does.

5    Q.   Are there empirical tests that Professor Whinston could

6    have conducted to answer that question for the Court?

7    A.   Yes, he could have.

8    Q.   And was there data available that you saw in this case that

9    would have allowed him to answer that question?

10   A.   Yes.

11   Q.   But he did not address that question.

12   A.   No, he did not.

13   Q.   Going back to contract channel, now, did you also

14   investigate whether retailers sell to contract channel

15   customers?

16   A.   Yes, I did.

17   Q.   Do they?

18   A.   Yes, they do.

19   Q.   Did you investigate whether contract channel -- I'm

20   sorry -- whether contract channel sellers sell to consumers?

21   A.   Yes, they do.

22   Q.   And let me ask you to please turn to the next page, which

23   is 0658-041, and ask you to explain to the Court what it is

24   you're portraying here.

25   A.   If we looked at the previous chart, we saw a lot of

1    triangles in different places, this is contract channel

2    customers who are acquiring their products from different points

3    in the distribution system.  And the point is there are

4    substantial sales through Home Depot and Lowe's to contract

5    channel customers, through Sears, through the other retailers

6    that are captured in the far right purple box, and those are, in

7    Professor Whinston's analysis, treated in ways that are entirely

8    inconsistent --

9    Q.   Now we're looking, just so the record is clear, at page

10   040.

11   A.   That is correct.

12   Q.   So now let's go to page 041.

13   A.   And my point here is just -- and I'm going to walk through.

14   I have a number of critiques of the contract channel market.

15   And the evidence does not support a contract channel market at

16   all.  And I'm going to walk through that, and they fall into

17   different buckets.

18       One of the buckets is that Professor Whinston -- and the

19   words matter when you're defining markets here.  He in his

20   report called Home Depot and Lowe's a contract -- they act as a

21   contract channel distributor.

22   Q.   And that's in the blue that's on this page here, 041?

23   A.   Correct.  But he did not include in his data contract sales

24   through Home Depot or Lowe's.  In fact, as we'll see, there were

25   sales that were designated by the supplier as contract sales

through, say, Home Depot that he then moved into the retail
channel.  He moved them out of the contract channel.

Q.   Even though he knew they had been reported as contract
channel sales?

A.   They had been reported as contract channel sales.

Q.   How about Sears?  What did he do with Sears?

A.   Well, Sears he treated like Home Depot and Lowe's.  That
is, there are substantial sales to the contract channel
customers, and actually -- let me rephrase, to be entirely
clear.  He assumed that 10 percent of Sears sales were to
contract channel customers.  He made that assumption without
looking at the data.  And in the data, that share was 4.2
percent higher, I believe, I think it was 14.2 percentage
points.

Q.   And how about other retailers?  You note here P.C. Richard,
Abt, Grand Appliance and Best Buy.  Do those companies make
sales into the contract channel as well?

A.   Yes, they do.

Q.   How did he treat their sales?

A.   We'll get to it in a minute, and I would say in an
inconsistent way.  And I think it's obvious, the
inconsistencies.

Q.   I think before we get there, let's step back for a minute
and talk about the theoretical underpinning.  The Court before
talked about the hypothetical monopolist test that the

1    guidelines require to be used.  And turning to the next slide,

2    which is 042, you saw how that test is supposed to work,

3    correct?  You understand how it's supposed to work?

4    A.   Yes.

5    Q.   Let's set the environment here.  In the usual hypothetical

6    monopolist test we're looking at a single product, and we're

7    asking whether that product is a market and we're conducting the

8    test.  Right?

9    A.   That is correct.

10   Q.   It gets a little more complicated when you have a

11   multiproduct situation.  So in this hypothetical that we're

12   going to explore on page 42, it's talking about soft drinks, in

13   this case, just so we have -- everyone here has the sort of

14   background for it, we're talking about contract channel and

15   retail channel and how you treat those when you're thinking

16   about the hypothetical monopolist test.

17       So can you take the Court through how the hypothetical

18   monopolist test works according to the scholars in this area

19   when you're talking about a multiproduct or a multichannel

20   environment?

21   A.   Sure.  So --

22   Q.   And this is going to be technical, but I think it's

23   important that everyone understands it before we move on.

24   A.   I'm going to try to walk through this, because it's

25   critically important, and it is a fundamental mistake that

Professor Whinston made when he sat in this chair.  And it's

central to the conclusion about the contract channel market.

So you have to start with the understanding that when we

move to a world of a hypothetical monopolist, we're moving to a

hypothetical world.  So there are certain assumptions that one

has to make.  And so you assume -- let's just take for ranges,

you assume that one firm controls the decisions for all the

ranges that are sold.  And you ask when that firm raises price,

that hypothetical firm, is that a profitable decision to raise

price?

If you would raise price by 5 percent, that then is a

relevant market.  You do not assume what economists would call

recapture in any other product that you control.  You assume

that you don't own any other products, you don't control any

other products.

So Steve Salop, who is an antitrust scholar, he's a

prolific writer on antitrust issues, a professor at Georgetown

University, has an example that he gives in a paper that I

thought would help illuminate this issue.  He describes a test

where you have soft drink makers.  You have one that makes cola,

one makes lemon-lime, one makes orange.  They each do that.  And

they're all substitutes for each other.

If the price of cola went up, you may want orange drinks or

you may want lemon-lime.  So they're all substitutes for each

other at some point.  And when one wants to determine whether

1   each product, each flavor is its own market, or is one big soda

2   market, you start with the proposition that Coke, Pepsi, RC Cola

3   are one firm, and they raise the price of colas by 5 percent.

4   And you abstract from the real world, you assume they don't

5   control, don't own an orange or a lemon-lime flavored drink.

6   And you ask the question of is that a profitable increase.

7   Q.   Just on the colas.

8   A.   Just on the colas.  So to quote Steve, he says, "Following

9   the guidelines, the hypothetical monopolist is assumed to be the

10  only present and future producer of the relevant product, for

11  example, cola."

12  Q.   And you're looking at the fourth sub-bullet here?

13  A.   Yes, I am.  Most importantly -- and this is my emphasis

14  added -- most importantly, the hypothetical monopolist is also

15  assumed to produce and sell only the relevant product and not

16  any other products, for example, lemon-lime or orange.  And then

17  he continues:  The hypothetical cola monopolist would not take

18  into account any recapture of diversion to the other flavors.

19       The same thought is presented in Professor Willig's work in

20  1991, a very important paper, I'd say, in merger analysis, and

21  then also by two economists, Joe Farrell and Carl Shapiro, who

22  we heard about as well.  They were the folks who wrote about

23  upward price pressure metrics.

24  Q.   And those papers are all cited in a footnote here?

25  A.   Yes, they are.  And those thoughts are captured in their

papers as well, although not as clearly as Steve did in his

paper.

Q.   So now we've had the abstraction of the hypothetical

monopolist test.  How did Professor Whinston apply that test in

order to reach a conclusion that the contract channel is a

market?

A.   So when he was questioned about whether he considered

whether there are consumers who would switch to retail, when he

was sitting here he said it wouldn't matter, because the

hypothetical monopolist would recapture those sales through the

margin that they earn on the retail side.

Q.   And on page 43, is this the testimony you had in mind?

A.   Yes.  And he said that in the afternoon, and he actually

repeated it the next morning.  I just quoted the afternoon

testimony here.  And it's absolutely central.  This is

absolutely central to the hypothetical monopolist test.

Q.   Did he get it right or wrong?

A.   He got it wrong.  He got it absolutely wrong.  There is no

recapture.  The hypothetical monopolist over the elevated price

in the contract channel is not assumed to recapture anything

through the retail channel.

Q.   What's the implication of this error?

A.   There are one of two, so you can take your pick.  One is it

is only profitable to raise the price in the contract channel

for that hypothetical monopolist if they get the recapture in

1    the retail market.  What does that tell us?  That tells us that

2    it's one market; contract and retail are one single unified

3    market, and contract channel is not its own market.

4    Q.   And are you reflecting this on page 44 of your slides?

5    A.   Yes, I am.

6    Q.   And that's the first "if" on that page?

7    A.   Yes.  The second is because Professor Whinston said that he

8    didn't need to do the analysis of whether customers would

9    switch, he has no basis to determine empirically whether it's

10    profitable for the contract channel -- the hypothetical contract

11    channel monopolist to raise price because he doesn't know how

12    many of those customers would switch to buying retail.

13        So one way to say this is, either he agrees with me that

14    it's one market or he does not have the empirical support to do

15    the hypothetical monopolist for his candidate market, the market

16    for the contract channel.

17    Q.   Did you consider Professor Whinston's other evidence

18    supporting his view that there's a contract channel market, and

19    does that somehow persuade you that in fact there is?

20    A.   His other evidence is not persuasive that there's a

21    contract channel market.  There are serious issues with it, and

22    I can walk through those.

23    Q.   So one of the -- on the next page, which is page 45, one of

24    the pieces of evidence, you describe it here as primary

25    evidence, was a slide 31 from his trial testimony where he

1    looked at the difference between direct contract channel prices

2    and average retail prices.

3    A.    That is correct.  That's what he did.

4    Q.    Did he look at the right metric?

5    A.    No.

6    Q.    What should he have looked at?

7    A.    The right metric isn't what a contract, a direct -- let's

8    just focus on that, a direct contract customer pays relative to

9    what a single consumer pays when they go into Best Buy, Home

10   Depot, or Lowe's.  The right metric is what does the contract --

11   contract, not just direct, what does the contract channel price

12   look like relative to what the contract channel customer would

13   pay if it went to retail.

14         Remember, that person's going in with more than just buying

15   five items or one item.  They're buying multiple items.  So

16   that's No. 1.  This is comparing the wrong measures.

17         Number two, even if it were the right analysis, there's

18   different levels of service that are being provided on this.

19   For example, he said this on the stand, and I pointed this out

20   in our back-and-forths in our reports, that it's often, very

21   often the case, about 90 percent of the time that it appears,

22   that when you buy a range through Home Depot or through Best Buy

23   or Lowe's, you get delivery and installation, and that's an

24   additional value that you get as part of the price.  And that

25   when you buy through the direct contract channel, that's an

1    additional cost.  So these are somewhat comparing apples and

2    oranges.

3        There's a third issue I have with this, and I listened very

4    intently.  Actually, I had to go back to the transcript to see

5    if I heard correctly.  Professor Whinston said that because

6    there are so many customers who had a discounted price -- that's

7    direct customers relative to average retail price -- that was

8    evidence that it's a separate market.  But if you total up each

9    of these bars, they add up to I think about 88 percent, and then

10   he said there are 12 percent of people who pay more.

11   Q.   More than?

12   A.   Than the average retail price.  He said that's also

13   evidence that it's a separate market because they are willing to

14   pay for the additional services that one would get from a

15   contract channel sale from going direct.  We could have probably

16   short-circuited the discussion, because if prices are lower,

17   that means it's a separate market, and if prices are higher,

18   that means it's a separate market.  I'm not sure how probative

19   this is as an analysis to begin with.

20   Q.   So can you have it both ways, that prices are lower for

21   some people and prices are higher for other people?

22   A.   You observe that as a matter of fact, that there are some

23   people who --

24   Q.   Do you reach the conclusion that they are separate markets?

25   A.   I'll let him try to explain how that's the case.

1    Q.    Would it have been relevant for Professor Whinston to

2    evaluate the relationship between prices at which contract

3    distributors and retailers were selling cooking appliances?

4    A.    Yes.

5    Q.    Did he do that?

6    A.    Not that I'm aware of.

7    Q.    Did you do that?

8    A.    Yes.

9    Q.    What did you discover?

10   A.    So on the next slide, we have data from Ferguson, which is

11   a distributor.

12   Q.    Just to be clear, Mr. Orszag, the actual numbers have been

13   redacted but you can speak in generalities regarding the

14   conclusions.

15   A.    Sure.  So what this shows is we observe the prices that

16   contract customers of Ferguson pay, in Ferguson's data.  They're

17   an indirect distributor.  So they're a contract distributor.

18   They're not selling direct.  So this is part of the relevant

19   market that Professor Whinston alleges.  And when one looks at

20   the prices in that data, matched to the same data that Professor

21   Whinston used in the previous chart, when you look at the

22   average prices, and I look at the top 100 customers say at

23   Ferguson, or I look at all customers at Ferguson for cooking

24   appliances in the left two bars, the prices are virtually

25   identical.

1          If you do the same thing for all core appliances, so this

2     is abstracting and going to laundry and refrigeration as well

3     and dishwashers, you see a similar pattern.  He focused on the

4     direct channel.  When you go to the indirect channel --

5     Q.   Direct channel is from the manufacturer directly to the

6     builder.

7     A.   Precisely.

8     Q.   Indirect is manufacturer to a contract distributor selling

9     to a builder or another one of the seven channels of distribution.

10    A.   Precisely.  That does not hold.  That finding does not

11    hold.  And so this suggests that his own theory is that because

12    the prices are less in direct than they are for average retail

13    prices, this doesn't hold for indirect and this is part of his

14    market.  And he didn't do this analysis.

15    Q.   Did Professor Whinston have this data available to run this

16    analysis?

17    A.   Yeah, he actually used the Ferguson data for a different

18    type of analysis.  It was directly available to him, but he did

19    not conduct this comparison.

20    Q.   Now let's go back -- actually, let's go forward to the next

21    slide, slide 47, Exhibit 658.  This is the same slide we've been

22    looking at, but now you've colored two circles or two rectangles

23    with yellow.  What's being displayed here?

24    A.   What's in yellow are where he clearly says that those are

25    in his contract market.  If I -- I'm going to use the John

1   Madden device because it may be the only time in my life when

2   I'll be able to.  He also will include certain contract sales

3   through certain retailers in his market.  So that will be --

4   maybe I can fill that in a little bit and make it yellow, and

5   then he also includes -- and that's not for all suppliers, only

6   for some suppliers is he including that in the relevant market.

7   And then for Climatic, right here, he includes Samsung as a

8   contract -- he includes them in the contract channel only for

9   Samsung.

10  Q.   So they're part in and part out depending on whose product

11  they're selling?

12  A.   It's very confusing and I probably should for the record

13  also say that this contract channel that he has changed

14  throughout the case and throughout the reports, in important

15  ways.  And market definition is important, as we know.  And he

16  said sitting here that his market was all the people who are

17  buying directly from the manufacturer, either the builders who

18  are buying directly through the LDCs or the contract

19  distributors, the people like Ferguson who are buying from the

20  suppliers.

21       If you go to his initial report, he talks about how the

22  larger the contract channel customer is, the more likely it is

23  that they're going to buy direct.  But under his market

24  definition described here, they're always buying direct.  So the

25  words that he used in his report were really the triangles down

1   here, not the boxes up here.

2   Q.   So in his original report his contract channel market was

3   focused on the triangles?

4   A.   The only way to fairly read it is yes, because he talked

5   about how, as the triangle got bigger, it had more of an

6   incentive to go buy directly from the supplier.

7        In the end, there are so many holes and so many problems

8   with this market that it doesn't hold together as a matter of

9   economics.  The hypothetical monopolist test was incorrectly

10  applied, the data analysis he did to support the contract

11  channel is incorrect, and then it's been a shifting one.  And

12  there's a further problem with it, which is that the data

13  undergirding his market shares have all kinds of

14  inconsistencies.

15  Q.   Let's look at those for a bit.  Let's turn to the next

16  slide, which is 48.  Is this the slide you prepared to explain

17  that to the Court?

18            THE COURT:  You know what, notwithstanding promises,

19  promises, we don't have any air circulating, and the court

20  reporter has asked for a break.  It probably makes more sense

21  just to recess for the evening.  How much more time -- I'm not

22  trying to curtail you -- how much more time do you think you

23  need, counsel?

24            MR. DEMITRACK:  I was actually -- we're just about to

25  get into efficiencies, and from that we're going to talk about

```
 1      the so-called UPP test, and that links to Whirlpool-Maytag.  So

 2      between an hour, hour and a half.  If we start at nine o'clock,

 3      I should be done by the first break.

 4              THE COURT:  That's fine.  We'll start at nine.  All

 5      right.  Thank you.  I have to ask you, please, to not discuss

 6      your testimony.  We'll start promptly at nine o'clock.  Yes?

 7              MR. DEMITRACK:  Your Honor, with respect to the last

 8      admonition you gave to the witness, when Professor Whinston --

 9              THE COURT:  That's right.  I recall.  I did make an

10      exception for the expert witness.

11              MR. DEMITRACK:  Thank you, Your Honor.

12              MR. GLASS:  Your Honor, there's an important

13      distinction.  While Professor Whinston was on the stand, we did

14      not talk to him, and the request was once he left the stand that

15      we be able to talk to him relating to his rebuttal testimony.

16      Mr. Orszag is on the stand.  I think it's a classic admonition

17      that while somebody's on the stand the attorneys can't work with

18      him.

19              MR. DEMITRACK:  I think the admonition to Professor

20      Whinston as I recall, I suppose I could be wrong, was after the

21      first day, that he was still free and could have spoken to

22      counsel.

23              THE COURT:  Let's see.  He's not finished his direct

24      testimony.  I think it would be highly inappropriate for him to

25      have a discussion about his testimony and about the upcoming
```

1    testimony.  So I'm not going to allow that.

2              MR. DEMITRACK:  Okay.  Thank you, Your Honor.

3              MR. GLASS:  Thank you, Your Honor.

4              THE COURT:  All right.  So you understand you can't

5    discuss your testimony.

6              THE WITNESS:  I understand.

7              THE COURT:  Okay.  Thank you.

8                   (Proceedings adjourned at 6:35 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

\* \* \* \* \* \*

CERTIFICATE

     I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are an accurate transcription of the above-entitled proceedings in the above-entitled matter.


_____
BRYAN A. WAYNE

## $

**$105** [1] - 4447:21
**$125** [1] - 4449:25
**$25** [5] - 4447:14, 4447:16, 4447:18, 4449:24, 4466:15
**$400** [1] - 4450:10
**$450** [1] - 4460:21
**$475** [6] - 4446:23, 4447:9, 4449:18, 4449:23, 4450:1, 4460:21
**$500** [18] - 4443:17, 4443:18, 4443:19, 4443:21, 4443:22, 4443:24, 4444:1, 4444:13, 4444:14, 4446:2, 4446:12, 4446:22, 4447:15, 4447:22, 4450:9, 4451:13, 4452:15, 4463:18
**$600** [9] - 4441:22, 4446:5, 4446:25, 4447:2, 4447:3, 4447:21, 4450:8, 4463:19, 4463:24
**$75** [1] - 4449:19

## '

**'06** [2] - 4429:7, 4429:8
**'07** [1] - 4420:9

## 0

**020** [1] - 4401:9
**024** [1] - 4434:1
**033** [1] - 4446:10
**0399** [1] - 4427:5
**040** [1] - 4470:10
**041** [2] - 4470:12, 4470:22
**042** [1] - 4472:2
**0658-038** [1] - 4457:22
**0658-041** [1] - 4469:23

## 1

**1** [4] - 4402:17, 4439:12, 4454:6, 4477:16
**1,400** [1] - 4406:12
**10** [5] - 4402:7, 4402:8, 4413:20, 4468:19, 4471:10
**10,000** [2] - 4453:5, 4453:10
**100** [3] - 4400:22, 4453:4, 4479:22
**12** [1] - 4478:10
**1200** [4] - 4394:3, 4394:7, 4394:15, 4394:18
**125** [1] - 4447:4
**13** [1] - 4402:9
**14.2** [1] - 4471:13
**15** [1] - 4392:9
**15-1039** [1] - 4392:4
**150** [2] - 4449:21, 4450:5
**16** [2] - 4420:19, 4420:24
**18** [1] - 4431:1

**1900** [5] - 4394:2, 4394:6, 4394:10, 4394:14, 4394:18
**1991** [1] - 4474:20
**1992** [1] - 4418:1

## 2

**2** [4] - 4454:11, 4454:12, 4454:19, 4455:19
**2,500** [5] - 4453:22, 4454:2, 4454:9, 4455:11
**20** [2] - 4408:7, 4439:14
**20001** [4] - 4392:15, 4392:19, 4392:23, 4394:22
**20001-2113** [2] - 4393:10, 4393:18
**20006** [5] - 4394:3, 4394:7, 4394:11, 4394:15, 4394:19
**2006** [5] - 4424:13, 4424:24, 4425:13, 4427:14, 4467:10
**2008** [3] - 4429:9, 4430:4, 4467:12
**2010** [1] - 4434:25
**2012** [3] - 4400:6, 4400:8, 4400:25
**2013** [4] - 4406:12, 4455:23, 4456:7
**2014** [7] - 4409:4, 4413:23, 4440:24, 4443:12, 4455:23, 4456:4
**2015** [4] - 4392:5, 4434:25, 4444:11
**202** [14] - 4392:15, 4392:23, 4392:24, 4393:4, 4393:4, 4393:11, 4393:18, 4393:19, 4394:4, 4394:8, 4394:11, 4394:12, 4394:16, 4394:19
**202)354-3186** [1] - 4394:23
**20530** [2] - 4393:3, 4393:8
**21** [1] - 4408:18
**250** [1] - 4468:7
**261-3034** [1] - 4394:12
**261-3332** [1] - 4394:19
**261-3339** [1] - 4394:16
**261-3373** [1] - 4394:11
**261-3398** [1] - 4394:4
**261-3430** [1] - 4394:8
**269-1553** [1] - 4393:22
**269-1555** [1] - 4393:15
**281-3835** [1] - 4393:11
**29** [1] - 4440:19

## 3

**3** [5] - 4392:5, 4402:17, 4406:13, 4454:20, 4455:11
**30** [1] - 4406:6
**305-1489** [1] - 4392:15
**31** [1] - 4476:25
**312** [2] - 4393:15, 4393:22
**34** [1] - 4447:11
**35** [1] - 4448:14

## 4

**4** [2] - 4406:13, 4455:5
**4.2** [1] - 4471:12
**400** [1] - 4449:20
**4000** [5] - 4392:14, 4392:18, 4392:22, 4393:3, 4393:7
**42** [1] - 4472:12
**43** [1] - 4475:12
**4396** [1] - 4395:4
**44** [1] - 4476:4
**45** [1] - 4476:23
**450** [5] - 4392:14, 4392:18, 4392:22, 4393:2, 4393:7
**47** [1] - 4480:21
**475** [2] - 4446:23, 4449:20
**48** [1] - 4482:16
**4:23** [1] - 4392:6
**4th** [1] - 4403:10

## 5

**5** [6] - 4406:14, 4418:8, 4439:14, 4455:13, 4473:11, 4474:3
**500** [1] - 4400:22
**51** [2] - 4393:10, 4393:17
**514-0230** [1] - 4392:23
**514-7308** [2] - 4392:24, 4393:4
**55** [1] - 4400:16
**598-2854** [1] - 4393:4
**5X** [2] - 4400:13, 4400:21

## 6

**6** [1] - 4455:22
**60601** [2] - 4393:14, 4393:22
**614** [1] - 4393:11
**626-1700** [2] - 4393:11, 4393:19
**6503** [1] - 4394:22
**658** [1] - 4480:21
**658-021** [1] - 4408:18
**658-023** [1] - 4424:14
**658-024** [1] - 4431:18
**658-029** [1] - 4440:20
**658-031** [1] - 4444:9
**658-032** [1] - 4445:22
**658-036** [1] - 4454:3
**658-040** [1] - 4459:17
**66** [1] - 4400:15
**6:35** [1] - 4484:8

## 7

**77** [2] - 4393:14, 4393:21

## 8

**83** [1] - 4400:16
**879-3939** [1] - 4393:18
**88** [1] - 4478:9

## 9

**9** [1] - 4414:14
**90** [1] - 4477:21
**9:00** [1] - 4396:3

## A

**AB** [2] - 4392:6, 4393:9
**ability** [10] - 4404:8, 4409:24, 4413:25, 4431:5, 4433:23, 4437:4, 4457:3, 4459:7, 4459:8, 4461:23
**able** [8] - 4401:16, 4420:24, 4429:1, 4435:19, 4459:11, 4462:14, 4481:2, 4483:15
**above-entitled** [2] - 4485:6
**absolutely** [6] - 4451:10, 4460:16, 4465:13, 4475:15, 4475:16, 4475:18
**abstract** [1] - 4474:4
**abstracting** [1] - 4480:2
**abstraction** [1] - 4475:3
**Abt** [1] - 4471:16
**accepted** [3] - 4407:19, 4407:21, 4407:22
**accepting** [1] - 4405:19
**access** [2] - 4408:2, 4436:22
**according** [4] - 4414:4, 4420:8, 4455:8, 4472:18
**accordingly** [1] - 4425:21
**account** [3] - 4403:14, 4444:20, 4474:18
**accurate** [1] - 4485:5
**acknowledge** [1] - 4427:23
**acquiring** [1] - 4470:2
**act** [1] - 4470:20
**acting** [1] - 4460:2
**Action** [1] - 4392:4
**action** [2] - 4412:23, 4430:15
**actions** [2] - 4424:7, 4450:16
**actual** [3] - 4432:17, 4446:16, 4479:12
**ad** [1] - 4418:3
**ad-libbing** [1] - 4418:3
**Adam** [2] - 4449:2, 4468:6
**add** [2] - 4415:16, 4478:9
**added** [2] - 4421:16, 4474:14
**addition** [2] - 4404:4, 4434:16
**additional** [3] - 4477:24, 4478:1, 4478:14
**address** [2] - 4422:21, 4469:11
**adds** [2] - 4411:18, 4453:3
**adjourned** [1] - 4484:8

**adjusted** [1] - 4451:11
**admonition** [3] - 4483:8, 4483:16, 4483:19
**advantage** [1] - 4415:10
**advocated** [1] - 4407:21
**affect** [1] - 4423:10
**affected** [1] - 4421:21
**affectionately** [1] - 4453:1
**affects** [3] - 4422:10, 4422:11, 4422:12
**afford** [1] - 4466:14
**afternoon** [2] - 4475:13, 4475:14
**AFTERNOON** [1] - 4392:9
**agencies** [2] - 4424:22, 4453:14
**agency** [2] - 4407:22, 4453:16
**aggregate** [2] - 4428:23, 4429:2
**aggressively** [2] - 4431:6, 4461:21
**ago** [8] - 4401:22, 4404:16, 4415:1, 4426:8, 4435:10, 4440:23, 4468:7, 4468:19
**agree** [9] - 4412:8, 4417:25, 4427:13, 4429:15, 4429:24, 4430:13, 4453:24, 4464:11, 4466:20
**agreement** [2] - 4459:11, 4459:12
**agrees** [1] - 4476:13
**ahead** [1] - 4427:1
**aided** [1] - 4394:25
**air** [1] - 4482:19
**airlines** [1] - 4448:3
**al** [1] - 4392:6
**alleged** [1] - 4456:17
**alleges** [1] - 4479:19
**allocate** [1] - 4425:20
**allocating** [1] - 4431:21
**allow** [5] - 4407:6, 4407:8, 4422:15, 4461:20, 4484:1
**allowed** [1] - 4469:9
**allows** [3] - 4409:17, 4410:22, 4421:8
**almost** [4] - 4419:16, 4419:20, 4419:24, 4420:1
**alternative** [1] - 4419:11
**alternatives** [4] - 4425:4, 4425:11, 4425:17, 4428:18
**AMERICA** [1] - 4392:3
**American** [1] - 4410:1
**amount** [1] - 4430:3
**analyses** [7] - 4399:20, 4404:20, 4404:21, 4408:4, 4444:20, 4454:16, 4456:9
**analysis** [58] - 4399:23, 4401:2, 4401:8, 4404:7, 4404:14, 4405:19, 4407:3, 4409:1, 4409:14, 4410:8, 4410:23, 4412:20, 4414:2, 4415:1, 4415:5, 4421:20, 4422:13, 4423:7, 4423:10, 4423:18, 4423:23, 4424:5, 4426:20, 4426:21, 4428:13, 4428:16, 4428:22, 4430:10, 4432:17, 4432:21, 4437:3, 4441:24, 4442:7, 4443:1, 4444:18, 4445:11, 4450:12, 4451:2, 4451:9, 4452:5, 4458:15, 4460:7, 4462:1, 4462:20, 4464:11, 4464:14, 4465:1,

**adjusted** continued...

**4467**:12, 4469:2, 4470:7, 4474:20, 4476:8, 4477:17, 4478:19, 4480:14, 4480:16, 4480:18, 4482:10
**analyze** [2] - 4406:19, 4429:16
**Ancona** [1] - 4434:7
**Anna** [1] - 4394:17
**anna.aryankalayil@dechert.com** [1] - 4394:20
**announced** [2] - 4428:23, 4428:25
**annual** [1] - 4451:20
**answer** [9] - 4416:11, 4418:20, 4426:16, 4444:17, 4445:11, 4464:9, 4465:15, 4469:6, 4469:9
**anticompetitive** [4] - 4421:3, 4429:17, 4431:11, 4465:12
**Antitrust** [1] - 4392:21
**antitrust** [4] - 4424:22, 4430:21, 4473:16, 4473:17
**apart** [1] - 4459:12
**apartment** [1] - 4460:1
**apologize** [1] - 4438:19
**APPEARANCES** [1] - 4392:12
**appendix** [3] - 4432:23, 4433:1, 4441:25
**apple** [1] - 4411:14
**apples** [2] - 4433:20, 4478:1
**appliance** [16] - 4410:20, 4414:3, 4414:18, 4414:19, 4421:21, 4422:9, 4422:17, 4423:4, 4423:5, 4423:9, 4425:5, 4428:3, 4434:15, 4440:14, 4458:24, 4468:20
**Appliance** [1] - 4471:16
**appliances** [13] - 4396:13, 4400:1, 4413:13, 4413:21, 4422:12, 4426:4, 4428:16, 4434:5, 4441:10, 4446:3, 4479:3, 4479:24, 4480:1
**applicable** [2] - 4426:19, 4426:22
**applied** [1] - 4482:10
**apply** [1] - 4475:4
**approach** [5] - 4411:14, 4414:12, 4418:2, 4419:3, 4422:2
**approaches** [2] - 4420:11, 4422:21
**appropriate** [6] - 4407:19, 4416:23, 4454:18, 4456:8, 4464:23, 4468:15
**approval** [1] - 4405:23
**approved** [2] - 4404:20, 4416:6
**area** [4] - 4424:2, 4437:14, 4454:1, 4472:18
**Aryankalayil** [1] - 4394:17
**Arçelik** [7] - 4414:14, 4414:15, 4414:16, 4415:8, 4455:10, 4455:15, 4455:19
**Ashenfelter** [2] - 4420:18, 4422:3
**assets** [1] - 4433:21
**assigned** [1] - 4414:20
**assigning** [1] - 4414:23
**assume** [12] - 4415:6, 4445:20, 4447:10, 4447:12, 4447:13, 4454:24, 4468:25, 4473:6, 4473:7, 4473:12, 4473:13, 4474:4
**assumed** [5] - 4456:10, 4471:10,

4474:9, 4474:15, 4475:20
**assuming** [4] - 4415:2, 4429:21, 4440:1, 4454:13
**assumption** [4] - 4454:15, 4465:2, 4465:7, 4471:11
**assumptions** [2] - 4455:16, 4473:5
**attempt** [4] - 4423:24, 4427:25, 4428:18, 4437:4
**attempted** [1] - 4425:4
**attempts** [1] - 4457:6
**attention** [4] - 4399:21, 4427:7, 4440:14, 4454:3
**attorneys** [1] - 4483:17
**attractive** [1] - 4411:1
**available** [13] - 4405:14, 4425:4, 4425:11, 4425:17, 4425:24, 4428:18, 4438:21, 4440:16, 4445:25, 4455:7, 4469:8, 4480:15, 4480:18
**Avanti** [2] - 4437:25, 4438:18
**Avantis** [1] - 4455:9
**Avenue** [2] - 4393:10, 4393:17
**average** [6] - 4442:1, 4477:2, 4478:7, 4478:12, 4479:22, 4480:12
**aware** [1] - 4479:6

## B

**back-and-forths** [1] - 4477:20
**background** [2] - 4405:22, 4472:14
**bake** [1] - 4409:21
**balancing** [1] - 4452:3
**ballpark** [1] - 4416:15
**Barnett** [1] - 4429:18
**barriers** [1] - 4457:2
**bars** [3] - 4441:1, 4478:9, 4479:24
**based** [12] - 4426:20, 4426:21, 4442:11, 4442:15, 4442:18, 4443:22, 4444:6, 4452:6, 4452:11, 4452:19, 4458:13, 4460:6
**baseline** [1] - 4427:13
**basic** [7] - 4415:15, 4415:18, 4431:2, 4433:6, 4438:8, 4440:15, 4441:4
**basis** [3] - 4401:16, 4451:20, 4476:9
**bear** [1] - 4433:21
**become** [3] - 4438:11, 4439:14, 4439:15
**BEFORE** [1] - 4392:10
**begin** [1] - 4478:19
**beginning** [2] - 4400:25, 4404:19
**behave** [1] - 4445:1
**behind** [2] - 4407:10, 4427:21
**Beko** [1] - 4414:17
**believes** [1] - 4465:22
**below** [6] - 4441:22, 4443:17, 4443:21, 4452:15, 4453:23, 4455:11
**BENCH** [1] - 4392:9
**bench** [2] - 4397:1, 4399:17
**beneficial** [1] - 4451:20
**benefit** [7] - 4410:5, 4428:21, 4431:6,

4445:16, 4448:18, 4461:3, 4462:24
**benefiting** [2] - 4449:2, 4449:4
**benefits** [1] - 4462:22
**Bern** [1] - 4436:10
**Bertazzoni** [1] - 4455:9
**Best** [17] - 4409:11, 4428:17, 4431:23, 4432:24, 4434:21, 4435:1, 4435:2, 4440:25, 4443:13, 4443:24, 4450:20, 4450:21, 4451:4, 4463:23, 4471:16, 4477:9, 4477:22
**best** [1] - 4455:7
**better** [3] - 4416:2, 4433:6, 4450:11
**between** [17] - 4409:18, 4412:18, 4415:20, 4415:22, 4431:21, 4431:25, 4432:7, 4432:23, 4433:5, 4444:16, 4449:19, 4451:5, 4456:17, 4466:17, 4477:1, 4479:2, 4483:2
**big** [4] - 4414:2, 4415:23, 4468:14, 4474:1
**Big** [1] - 4429:12
**bigger** [5] - 4410:2, 4422:4, 4433:13, 4467:15, 4482:5
**biggest** [5] - 4414:3, 4414:4, 4434:3, 4434:4, 4434:5
**bill.jones2@usdoj.gov** [1] - 4392:24
**binder** [1] - 4427:2
**binding** [1] - 4465:4
**bit** [4] - 4440:23, 4443:25, 4481:4, 4482:15
**Black** [3] - 4403:5, 4403:7, 4404:1
**black** [2] - 4403:6, 4403:7
**blacked** [1] - 4442:4
**block** [1] - 4401:11
**blocked** [3] - 4408:8, 4408:20, 4443:7
**Blomberg** [1] - 4414:17
**blue** [3] - 4400:23, 4431:24, 4470:22
**body** [1] - 4413:5
**Born** [1] - 4429:11
**Bosch** [3] - 4436:9, 4436:17, 4457:1
**bottle** [1] - 4413:1
**bottom** [3] - 4439:14, 4448:24, 4459:18
**bought** [2] - 4447:8, 4450:8
**box** [1] - 4470:6
**boxes** [1] - 4482:1
**brand** [7] - 4410:13, 4414:17, 4428:4, 4446:7, 4446:8, 4447:18
**brands** [6] - 4409:12, 4414:16, 4428:2, 4428:3, 4428:7, 4434:12
**break** [2] - 4482:20, 4483:3
**brief** [1] - 4444:19
**bring** [1] - 4437:8
**bringing** [2] - 4433:21, 4441:5
**brings** [1] - 4454:25
**broken** [1] - 4446:3
**Brooksley** [1] - 4429:11
**Brothers** [1] - 4460:5
**brought** [1] - 4441:2
**BRYAN** [2] - 4485:4, 4485:8
**Bryan** [1] - 4394:21

**bryanawayne@gmail.com** [1] - 4394:23
**buckets** [2] - 4470:17, 4470:18
**bucks** [2] - 4449:21, 4450:5
**budget** [13] - 4446:2, 4446:24, 4449:24, 4450:18, 4451:19, 4451:25, 4452:1, 4464:15, 4464:24, 4465:3, 4465:5, 4466:1, 4466:4
**budget-conscious** [1] - 4450:18
**budgets** [1] - 4463:15
**build** [1] - 4422:1
**builder** [2] - 4480:6, 4480:9
**builders** [2] - 4457:10, 4481:17
**building** [3] - 4430:5, 4460:1, 4460:3
**bullet** [1] - 4474:12
**bumps** [1] - 4456:23
**Bureau** [1] - 4420:8
**business** [17] - 4411:20, 4411:23, 4415:12, 4415:23, 4423:20, 4432:18, 4434:9, 4437:16, 4438:10, 4445:1, 4448:15, 4449:11, 4449:12, 4462:25, 4466:21, 4467:5
**businesses** [5] - 4411:21, 4415:11, 4445:1, 4460:12, 4461:2
**buy** [16] - 4403:22, 4404:8, 4421:24, 4421:25, 4446:4, 4447:17, 4462:14, 4463:13, 4463:14, 4463:15, 4466:10, 4466:11, 4477:22, 4477:25, 4481:23, 4482:6
**Buy** [16] - 4428:17, 4431:23, 4432:24, 4434:21, 4435:1, 4435:2, 4440:25, 4443:13, 4443:24, 4450:20, 4450:21, 4451:4, 4463:23, 4471:16, 4477:9, 4477:22
**buyers** [1] - 4457:6
**buying** [9] - 4405:12, 4452:13, 4476:12, 4477:14, 4477:15, 4481:17, 4481:18, 4481:19, 4481:24
**Buys** [1] - 4409:11
**buys** [4] - 4446:23, 4447:7, 4449:24, 4450:1
**BY** [14] - 4396:6, 4399:19, 4401:20, 4408:12, 4421:14, 4423:1, 4427:9, 4431:16, 4440:3, 4441:8, 4448:10, 4449:7, 4467:22, 4468:21
**byproduct** [1] - 4468:4

## C

**calculate** [1] - 4400:18
**calculation** [1] - 4414:5
**Canadian** [2] - 4409:25, 4410:1
**candidate** [1] - 4476:15
**capacity** [16] - 4413:25, 4428:12, 4428:14, 4435:12, 4435:14, 4436:7, 4436:9, 4436:12, 4436:13, 4436:14, 4436:18, 4436:25, 4437:6, 4437:10, 4457:14, 4457:15
**captured** [2] - 4470:6, 4474:25

**care** [2] - 4423:21, 4466:6
**careful** [2] - 4396:9, 4408:22
**Carl** [1] - 4474:21
**Carolina** [1] - 4436:10
**cars** [1] - 4448:3
**case** [18] - 4396:8, 4402:12, 4405:1, 4405:4, 4405:18, 4407:20, 4407:24, 4421:9, 4441:9, 4445:4, 4452:10, 4458:19, 4459:15, 4469:8, 4472:13, 4477:21, 4478:25, 4481:14
**cases** [3] - 4407:24, 4407:25, 4408:1
**catastrophic** [1] - 4430:2
**categories** [6] - 4420:19, 4422:9, 4423:4, 4423:5, 4423:6, 4460:8
**category** [4] - 4422:17, 4423:9, 4438:3, 4438:4
**cavity** [2] - 4409:18, 4410:2
**central** [4] - 4424:4, 4473:2, 4475:15, 4475:16
**certain** [4] - 4410:15, 4473:5, 4481:2, 4481:3
**certainly** [2] - 4421:23, 4438:7
**CERTIFICATE** [1] - 4485:3
**certify** [1] - 4485:4
**cetera** [7] - 4415:17, 4432:19, 4437:25, 4446:7, 4455:9, 4457:1, 4460:4
**chair** [2] - 4418:12, 4473:1
**challenged** [1] - 4424:19
**change** [9] - 4420:13, 4421:9, 4421:12, 4422:3, 4422:5, 4422:19, 4422:23, 4436:21, 4456:10
**changed** [2] - 4421:15, 4424:11, 4481:13
**changes** [4] - 4412:2, 4421:10, 4434:18, 4458:10
**channel** [46] - 4456:13, 4459:15, 4459:22, 4460:8, 4469:13, 4469:14, 4469:19, 4469:20, 4470:1, 4470:5, 4470:14, 4470:15, 4470:21, 4471:2, 4471:4, 4471:5, 4471:8, 4471:11, 4471:17, 4472:14, 4472:15, 4473:2, 4475:5, 4475:20, 4475:21, 4475:24, 4476:3, 4476:10, 4476:11, 4476:16, 4476:18, 4476:21, 4477:1, 4477:11, 4477:12, 4477:25, 4478:15, 4480:4, 4480:5, 4481:8, 4481:13, 4481:22, 4482:2, 4482:11
**channels** [1] - 4480:9
**charge** [2] - 4463:25, 4464:1
**chart** [5] - 4399:25, 4401:5, 4433:25, 4469:25, 4479:21
**charts** [4] - 4401:5, 4431:20, 4431:21, 4432:2
**cheap** [4] - 4415:14, 4415:21, 4466:10, 4466:12
**cheapest** [1] - 4448:1
**cheeseburger** [1] - 4411:12
**Chicago** [2] - 4393:14, 4393:22
**choices** [6] - 4446:12, 4446:14, 4446:22, 4446:24, 4457:11

**choose** [3] - 4447:4, 4448:1
**chooses** [1] - 4447:24
**Christmas** [1] - 4403:4
**Christmastime** [1] - 4403:9
**circle** [1] - 4435:21
**circles** [3] - 4459:18, 4459:20, 4480:22
**circuited** [1] - 4478:16
**circulating** [1] - 4482:19
**circumstance** [1] - 4447:19
**circumstances** [1] - 4416:16
**cite** [1] - 4405:21
**cited** [2] - 4436:20, 4474:24
**citing** [1] - 4435:16
**Civil** [1] - 4392:4
**claim** [1] - 4433:10
**classic** [1] - 4483:16
**clean** [1] - 4446:25
**cleaning** [6] - 4442:3, 4447:5, 4447:20, 4447:23, 4449:25, 4450:7
**clear** [11] - 4402:20, 4407:24, 4410:18, 4413:18, 4420:21, 4423:2, 4455:18, 4456:7, 4470:9, 4471:10, 4479:12
**cleared** [1] - 4407:2
**clearly** [3] - 4402:23, 4475:1, 4480:24
**Cleveland** [1] - 4436:4
**cliff** [1] - 4417:22
**cliffs** [1] - 4453:25
**Climatic** [1] - 4481:7
**closed** [3] - 4407:10, 4426:12, 4431:19
**closing** [11] - 4405:18, 4407:9, 4407:10, 4407:13, 4424:14, 4424:16, 4426:16, 4426:18, 4429:22, 4435:10
**Coast** [1] - 4411:10
**Coke** [1] - 4474:2
**cola** [4] - 4473:20, 4473:23, 4474:11, 4474:17
**Cola** [1] - 4474:2
**colas** [3] - 4474:3, 4474:7, 4474:8
**collected** [1] - 4406:18
**collusive** [1] - 4459:11
**colored** [1] - 4480:22
**COLUMBIA** [1] - 4392:1
**Columbus** [1] - 4403:11
**combination** [1] - 4427:12
**combined** [2] - 4450:9, 4467:23
**coming** [5] - 4409:16, 4423:16, 4441:14, 4458:2, 4468:12
**comments** [2] - 4407:4, 4409:7
**Commission** [9] - 4404:21, 4405:6, 4405:15, 4406:8, 4406:21, 4406:22, 4408:2, 4418:1, 4453:15
**commoditized** [1] - 4464:16
**companies** [8] - 4402:13, 4402:18, 4404:17, 4411:16, 4413:12, 4438:4, 4449:10, 4471:16
**Company** [1] - 4394:2
**company** [7] - 4402:20, 4434:7, 4467:23, 4467:24, 4468:22, 4468:25
**comparing** [3] - 4433:19, 4477:16,

4478:1
**comparison** [3] - 4423:3, 4429:1, 4480:19
**compete** [5] - 4410:9, 4412:12, 4431:6, 4434:14, 4461:21
**competing** [7] - 4412:11, 4412:14, 4412:23, 4413:8, 4418:4, 4421:8, 4460:12
**competition** [18] - 4396:12, 4410:7, 4423:19, 4423:23, 4424:5, 4438:1, 4442:25, 4444:5, 4445:15, 4446:21, 4451:10, 4456:17, 4456:23, 4465:22, 4468:4, 4468:16, 4468:18
**competition's** [1] - 4444:22
**competitive** [19] - 4406:15, 4406:16, 4411:6, 4412:17, 4412:20, 4414:1, 4414:22, 4414:24, 4433:23, 4435:7, 4440:11, 4449:3, 4451:9, 4452:4, 4453:9, 4454:22, 4462:20, 4464:20, 4468:5
**competitively** [3] - 4411:1, 4457:20, 4464:7
**competitor** [3] - 4424:1, 4427:18, 4437:5
**competitors** [17] - 4408:4, 4423:15, 4423:25, 4424:6, 4430:18, 4437:20, 4437:22, 4437:24, 4437:25, 4443:15, 4453:8, 4456:24, 4457:14, 4457:23, 4459:4, 4459:10
**complex** [2] - 4411:20, 4411:22
**complexity** [2] - 4415:16, 4458:11
**complicated** [4] - 4405:20, 4417:19, 4472:10
**complications** [1] - 4411:19
**composition** [1] - 4443:22
**computer** [1] - 4394:25
**computer-aided** [1] - 4394:25
**concentration** [4] - 4422:5, 4422:6, 4467:16, 4467:18
**concept** [3] - 4417:17, 4418:19, 4460:22
**concern** [6] - 4396:10, 4423:15, 4423:17, 4465:22, 4468:14, 4468:15
**concerned** [5] - 4460:11, 4460:24, 4462:13, 4465:20, 4468:23
**conclusion** [10] - 4417:4, 4422:23, 4425:10, 4425:12, 4425:13, 4441:16, 4468:23, 4473:2, 4475:5, 4478:24
**conclusions** [2] - 4456:20, 4479:14
**condition** [1] - 4458:25
**conduct** [3] - 4458:14, 4460:7, 4480:19
**conducted** [2] - 4399:20, 4469:6
**conducting** [1] - 4472:7
**conference** [2] - 4397:1, 4399:17
**confidential** [5] - 4396:10, 4408:22, 4434:23, 4435:18, 4440:15
**confidentiality** [1] - 4401:10
**confusing** [1] - 4481:12
**conscious** [6] - 4450:18, 4451:25, 4464:16, 4464:24, 4465:4, 4465:5

**consider** [4] - 4414:1, 4461:1, 4464:23, 4476:17
**consideration** [3] - 4416:22, 4429:23, 4462:21
**considerations** [1] - 4460:12
**considered** [1] - 4475:7
**consistent** [8] - 4410:16, 4425:7, 4425:10, 4425:12, 4435:7, 4444:4, 4444:14, 4457:25
**constrained** [3] - 4451:19, 4452:1, 4452:2
**constraint** [1] - 4465:4
**consumer** [4] - 4448:18, 4450:18, 4465:23, 4477:9
**consumers** [36] - 4404:8, 4404:10, 4405:12, 4405:14, 4409:11, 4410:5, 4410:12, 4411:2, 4412:15, 4422:25, 4424:25, 4425:2, 4428:21, 4431:4, 4431:7, 4441:24, 4442:1, 4442:5, 4444:2, 4449:3, 4449:4, 4450:12, 4451:6, 4451:18, 4451:23, 4452:13, 4454:15, 4459:20, 4462:19, 4464:5, 4464:19, 4464:24, 4465:9, 4465:23, 4469:20, 4475:8
**Cont'** [1] - 4395:4
**contestable** [1] - 4424:4
**context** [3] - 4406:11, 4432:20, 4457:8
**continue** [6] - 4442:16, 4444:17, 4452:7, 4456:25, 4468:17
**CONTINUED** [1] - 4396:5
**continued** [1] - 4402:9
**continues** [1] - 4474:17
**continuing** [1] - 4446:10
**contract** [59] - 4414:18, 4439:11, 4456:13, 4459:15, 4459:19, 4459:22, 4460:8, 4469:13, 4469:14, 4469:19, 4469:20, 4470:1, 4470:4, 4470:14, 4470:15, 4470:20, 4470:21, 4470:23, 4470:25, 4471:2, 4471:3, 4471:5, 4471:8, 4471:11, 4471:17, 4472:14, 4473:2, 4475:5, 4475:20, 4475:24, 4476:2, 4476:3, 4476:10, 4476:16, 4476:18, 4476:21, 4477:1, 4477:7, 4477:8, 4477:10, 4477:11, 4477:12, 4477:25, 4478:15, 4479:2, 4479:16, 4479:17, 4480:8, 4480:25, 4481:2, 4481:8, 4481:13, 4481:18, 4481:22, 4482:2, 4482:10
**control** [5] - 4420:24, 4421:16, 4473:13, 4473:14, 4474:5
**controlling** [1] - 4420:12
**controls** [2] - 4421:16, 4473:7
**controversial** [1] - 4467:21
**cook** [1] - 4409:19
**cooking** [12] - 4396:12, 4400:1, 4413:22, 4422:5, 4426:3, 4428:9, 4434:6, 4440:14, 4441:10, 4458:24, 4479:3, 4479:23
**cooktop** [1] - 4442:3
**cooktops** [8] - 4422:12, 4432:24,

4433:2, 4433:7, 4433:14, 4436:5, 4436:10, 4454:7
**coordinated** [7] - 4456:12, 4456:19, 4457:18, 4457:25, 4458:15, 4458:18, 4458:21
**coordination** [4] - 4458:2, 4458:25, 4459:6, 4459:8
**copy** [1] - 4408:8
**core** [2] - 4423:3, 4480:1
**Correct** [1] - 4470:23
**correct** [28] - 4400:24, 4402:14, 4403:6, 4415:3, 4424:20, 4425:7, 4426:8, 4427:17, 4432:9, 4433:10, 4438:6, 4440:19, 4449:14, 4451:6, 4452:8, 4454:9, 4454:10, 4455:12, 4456:14, 4456:15, 4457:21, 4459:16, 4459:20, 4459:21, 4470:11, 4472:3, 4472:9, 4477:3
**correctly** [2] - 4434:13, 4478:5
**cost** [11] - 4411:20, 4415:15, 4415:23, 4428:20, 4431:5, 4449:20, 4451:13, 4460:19, 4461:3, 4461:23, 4478:1
**Costco** [1] - 4434:3
**costs** [8] - 4420:24, 4420:25, 4421:1, 4421:2, 4421:5, 4432:17, 4450:10
**counsel** [4] - 4396:2, 4426:14, 4482:23, 4483:22
**counter** [1] - 4425:4
**counterintuitive** [1] - 4461:1
**country** [4] - 4413:13, 4413:17, 4434:4, 4459:3
**couple** [1] - 4431:20
**course** [6] - 4396:8, 4402:11, 4402:25, 4412:6, 4441:9, 4451:18
**court** [7] - 4405:8, 4405:10, 4432:25, 4445:2, 4458:14, 4461:8, 4482:19
**COURT** [91] - 4392:1, 4392:10, 4396:2, 4396:20, 4396:23, 4399:18, 4401:13, 4401:17, 4404:12, 4404:25, 4405:3, 4405:7, 4405:15, 4405:19, 4405:25, 4407:15, 4407:18, 4408:9, 4416:4, 4416:21, 4417:3, 4417:12, 4417:15, 4417:20, 4417:25, 4418:14, 4418:17, 4418:21, 4419:1, 4419:6, 4419:10, 4419:19, 4419:22, 4420:3, 4420:6, 4420:16, 4421:13, 4421:22, 4421:24, 4426:14, 4426:21, 4427:1, 4427:6, 4429:4, 4429:11, 4429:19, 4430:2, 4430:5, 4430:9, 4439:2, 4439:19, 4440:18, 4448:5, 4448:17, 4448:21, 4448:23, 4449:4, 4460:10, 4460:17, 4461:6, 4461:13, 4462:5, 4462:8, 4462:11, 4462:17, 4462:22, 4463:2, 4463:5, 4463:9, 4464:8, 4464:14, 4464:22, 4465:2, 4465:7, 4465:10, 4465:15, 4465:19, 4466:3, 4466:6, 4466:14, 4467:2, 4467:6, 4468:9, 4468:12, 4468:14, 4482:18, 4483:4, 4483:9, 4483:23, 4484:4, 4484:7
**Court** [30] - 4394:21, 4394:21, 4399:23,

4403:1, 4416:21, 4424:17, 4431:24, 4437:1, 4441:15, 4443:4, 4444:16, 4445:5, 4445:8, 4445:10, 4452:21, 4454:4, 4454:6, 4461:14, 4461:16, 4464:23, 4465:2, 4465:7, 4466:3, 4469:6, 4469:23, 4471:24, 4472:17, 4482:17, 4485:4
**Court's** [6] - 4416:5, 4417:3, 4417:6, 4427:19, 4435:9, 4461:15
**Courthouse** [1] - 4394:22
**cover** [1] - 4413:2
**covers** [1] - 4403:18
**Cowie** [1] - 4394:13
**Craig** [1] - 4394:9
**craig.falls@dechert.com** [1] - 4394:12
**creating** [2] - 4426:13, 4453:22
**credit** [2] - 4407:15, 4407:17
**criteria** [2] - 4458:7, 4459:4
**critical** [4] - 4410:7, 4412:1, 4430:11, 4463:4
**critically** [3] - 4463:20, 4464:11, 4472:25
**critique** [2] - 4421:19, 4422:7
**critiques** [2] - 4442:6, 4470:14
**cross** [1] - 4396:3
**CRR** [1] - 4394:21
**curious** [1] - 4407:18
**current** [1] - 4414:8
**curtail** [1] - 4482:22
**customer** [3] - 4477:8, 4477:12, 4481:22
**customers** [17] - 4450:24, 4459:19, 4459:22, 4460:5, 4460:8, 4469:15, 4470:2, 4470:5, 4471:9, 4471:11, 4476:8, 4476:12, 4478:6, 4478:7, 4479:16, 4479:22, 4479:23
**cut** [2] - 4439:13, 4444:15
**cutting** [1] - 4439:23
**cycle** [1] - 4410:12

**D**

**D.C** [2] - 4392:6, 4394:22
**D.R** [1] - 4460:4
**data** [36] - 4406:18, 4406:20, 4408:2, 4408:3, 4408:9, 4412:11, 4413:23, 4437:24, 4438:13, 4438:23, 4439:2, 4439:3, 4439:4, 4439:6, 4439:7, 4439:12, 4439:13, 4439:23, 4441:18, 4444:7, 4452:16, 4455:7, 4458:19, 4469:8, 4470:23, 4471:12, 4479:10, 4479:16, 4479:20, 4480:15, 4480:17, 4482:10, 4482:12
**David** [1] - 4393:6
**DAY** [4] - 4393:9, 4393:13, 4393:17, 4393:21
**days** [2] - 4403:14, 4406:6
**DC** [12] - 4392:15, 4392:19, 4392:23, 4393:3, 4393:8, 4393:10, 4393:18,

4394:3, 4394:7, 4394:11, 4394:15, 4394:19
**deal** [8] - 4404:15, 4404:20, 4405:10, 4407:6, 4407:8, 4407:11, 4421:8, 4428:25
**deals** [1] - 4456:19
**December** [2] - 4392:5, 4420:9
**DECHERT** [5] - 4394:2, 4394:6, 4394:10, 4394:14, 4394:17
**decide** [4] - 4425:18, 4425:19, 4425:21, 4446:1
**decided** [1] - 4434:14
**decision** [10] - 4407:4, 4411:21, 4418:13, 4423:20, 4434:9, 4446:7, 4462:25, 4467:5, 4467:20, 4473:9
**decision-maker** [1] - 4423:20
**decision-making** [1] - 4462:25
**decisions** [2] - 4424:22, 4473:7
**deeper** [2] - 4406:10, 4446:19
**defeat** [1] - 4437:7
**Defendant** [2] - 4393:9, 4394:1
**Defendants** [1] - 4392:7
**Defense** [1] - 4427:4
**defined** [2] - 4417:17, 4439:22
**defining** [1] - 4470:19
**definition** [5] - 4439:24, 4439:25, 4440:1, 4481:15, 4481:24
**delivery** [1] - 4477:23
**demand** [2] - 4410:12, 4411:25
**demitrack** [1] - 4395:4
**Demitrack** [1] - 4463:14
**DEMITRACK** [31] - 4396:6, 4396:18, 4396:21, 4396:24, 4399:19, 4401:14, 4401:20, 4408:6, 4408:10, 4408:12, 4420:21, 4421:14, 4423:1, 4427:2, 4427:9, 4431:15, 4431:16, 4439:8, 4440:3, 4440:20, 4441:8, 4448:10, 4449:7, 4465:14, 4467:22, 4468:21, 4482:24, 4483:7, 4483:11, 4483:19, 4484:2
**Denis** [1] - 4394:5
**Department** [10] - 4406:7, 4406:20, 4406:23, 4408:1, 4418:1, 4420:15, 4424:23, 4425:13, 4437:3, 4453:14
**DEPARTMENT** [5] - 4392:13, 4392:17, 4392:21, 4393:2, 4393:6
**dependent** [1] - 4462:6
**Depot** [24] - 4401:18, 4402:6, 4404:16, 4404:23, 4407:11, 4428:17, 4431:23, 4438:16, 4444:7, 4444:11, 4444:12, 4445:20, 4446:1, 4446:2, 4446:9, 4450:22, 4451:4, 4470:4, 4470:20, 4470:24, 4471:1, 4471:7, 4477:10, 4477:22
**Depot's** [1] - 4445:25
**Depot-OfficeMax** [1] - 4407:11
**Depots** [1] - 4409:11
**describe** [5] - 4412:4, 4437:23, 4441:15, 4451:25, 4476:24
**described** [7] - 4412:4, 4419:14,

4419:16, 4434:17, 4437:16, 4447:19, 4481:24
**describes** [1] - 4473:19
**describing** [3] - 4445:16, 4447:25, 4456:22
**designated** [1] - 4470:25
**designed** [1] - 4446:17
**desire** [1] - 4449:13
**despite** [1] - 4467:21
**detailed** [4] - 4408:4, 4428:22, 4429:1, 4438:13
**detect** [3] - 4458:5, 4458:6, 4459:8
**detecting** [1] - 4459:10
**determine** [9] - 4417:4, 4417:7, 4439:3, 4440:7, 4441:9, 4452:4, 4459:5, 4473:25, 4476:9
**determining** [3] - 4411:6, 4411:24, 4433:22
**deviating** [1] - 4458:3
**deviations** [2] - 4459:8, 4459:9
**device** [1] - 4481:1
**dictate** [1] - 4457:6
**difference** [4] - 4449:19, 4449:25, 4466:17, 4477:1
**different** [34] - 4400:17, 4402:3, 4402:21, 4403:18, 4409:21, 4409:22, 4409:23, 4417:1, 4422:8, 4422:9, 4422:20, 4423:4, 4432:16, 4433:21, 4434:21, 4435:22, 4436:24, 4440:2, 4442:25, 4446:11, 4459:23, 4459:25, 4460:8, 4462:18, 4462:20, 4462:21, 4464:5, 4464:12, 4470:1, 4470:2, 4470:17, 4477:18, 4480:17
**differentially** [1] - 4422:18
**differentiate** [1] - 4430:7
**differently** [2] - 4402:21, 4422:11
**differing** [1] - 4425:15
**difficult** [3] - 4418:20, 4458:3, 4458:7
**dilemma** [1] - 4462:5
**dinner** [1] - 4409:25
**dire** [2] - 4429:24
**Direct** [1] - 4395:4
**direct** [18] - 4396:2, 4399:21, 4412:3, 4440:14, 4477:1, 4477:7, 4477:8, 4477:11, 4477:25, 4478:7, 4478:15, 4479:18, 4480:4, 4480:5, 4480:12, 4481:23, 4481:24, 4483:23
**DIRECT** [1] - 4396:5
**directing** [1] - 4454:3
**directions** [1] - 4456:24
**directly** [11] - 4404:22, 4414:11, 4423:19, 4426:22, 4434:2, 4444:21, 4480:5, 4480:18, 4481:17, 4481:18, 4482:6
**disagree** [4] - 4419:5, 4419:15, 4419:19, 4420:6
**discipline** [4] - 4425:24, 4426:3, 4457:6, 4462:3
**discount** [1] - 4417:23
**discounted** [3] - 4404:18, 4404:24,

4478:6
**discounts** [2] - 4403:23, 4405:13
**discover** [1] - 4479:9
**discriminate** [1] - 4463:11
**discuss** [3] - 4440:17, 4483:5, 4484:5
**discussed** [2] - 4451:3, 4453:11
**discussing** [2] - 4424:17, 4467:24
**discussion** [7] - 4396:7, 4422:22, 4439:16, 4444:4, 4463:21, 4478:16, 4483:25
**dishwashers** [1] - 4480:3
**display** [1] - 4426:2
**displayed** [2] - 4424:14, 4480:23
**dissipate** [1] - 4431:13
**distinction** [1] - 4483:13
**distribution** [2] - 4470:3, 4480:9
**distributor** [5] - 4470:21, 4479:11, 4479:17, 4480:8
**distributors** [2] - 4479:3, 4481:19
**DISTRICT** [3] - 4392:1, 4392:1, 4392:10
**diverse** [1] - 4460:5
**diversion** [1] - 4474:18
**Division** [1] - 4392:21
**division** [1] - 4432:7
**document** [7] - 4396:21, 4423:13, 4435:16, 4435:18, 4435:23, 4436:3, 4436:19
**documents** [6] - 4409:8, 4410:19, 4423:17, 4427:3, 4436:19, 4436:22
**DOJ** [1] - 4424:15
**DOJ's** [1] - 4426:16
**dollar** [1] - 4451:17
**dollars** [2] - 4447:3, 4451:14
**done** [10] - 4401:7, 4404:20, 4404:21, 4410:23, 4435:1, 4442:12, 4452:12, 4458:17, 4458:20, 4483:3
**doors** [1] - 4445:8
**doubled** [1] - 4400:12
**down** [24] - 4402:9, 4410:16, 4410:21, 4414:14, 4435:6, 4436:9, 4437:8, 4441:2, 4441:5, 4441:14, 4441:17, 4442:14, 4442:16, 4442:24, 4448:18, 4452:8, 4452:14, 4452:16, 4454:25, 4460:23, 4461:3, 4463:1, 4481:25
**downturn** [2] - 4420:9, 4467:11
**downward** [1] - 4435:3
**dramatic** [1] - 4400:14
**dramatically** [1] - 4400:13
**drink** [3] - 4411:13, 4473:20, 4474:5
**drinks** [2] - 4472:12, 4473:23
**Drive** [2] - 4393:14, 4393:21
**drive** [1] - 4433:23
**drives** [1] - 4467:5
**driving** [2] - 4421:2, 4464:6
**dryers** [1] - 4423:6
**due** [1] - 4421:4
**during** [7] - 4401:7, 4401:18, 4402:2, 4402:5, 4404:8, 4412:3, 4416:22
**duty** [1] - 4467:7

**DX** [1] - 4427:5
**DX-658-019** [1] - 4399:22
**dynamic** [3] - 4412:25, 4456:23, 4457:24
**dynamics** [1] - 4431:4

# E

**early** [1] - 4445:4
**earn** [1] - 4475:11
**earned** [1] - 4440:4
**easier** [3] - 4427:23, 4458:3, 4458:5
**easiest** [1] - 4451:12
**easily** [1] - 4432:22
**easy** [1] - 4437:5
**econometric** [3] - 4404:21, 4407:12, 4422:21
**econometrics** [3] - 4420:10, 4431:11, 4431:14
**economic** [15] - 4399:23, 4401:2, 4404:14, 4415:1, 4417:17, 4417:22, 4418:18, 4421:16, 4428:13, 4436:25, 4437:2, 4446:19, 4450:11, 4463:11, 4464:25
**Economic** [1] - 4420:8
**economically** [1] - 4448:8
**economics** [11] - 4411:8, 4424:2, 4425:8, 4430:21, 4431:2, 4441:4, 4441:7, 4445:14, 4453:25, 4482:9
**economist's** [1] - 4464:22
**economists** [7] - 4405:1, 4405:11, 4406:22, 4451:11, 4451:25, 4473:12, 4474:21
**economy** [2] - 4420:12, 4429:21
**ecosystem** [3] - 4412:14, 4412:16, 4464:20
**edges** [1] - 4453:25
**effect** [13] - 4404:22, 4419:16, 4420:14, 4422:9, 4422:18, 4422:24, 4423:4, 4429:17, 4430:14, 4431:9, 4432:8, 4436:25, 4455:20
**effectively** [1] - 4410:10
**effects** [22] - 4412:17, 4412:20, 4414:1, 4419:13, 4421:1, 4421:2, 4429:23, 4429:24, 4429:25, 4443:22, 4452:4, 4456:12, 4456:14, 4456:16, 4456:18, 4456:19, 4456:21, 4457:19, 4458:15, 4458:18, 4458:21, 4462:20
**efficiencies** [8] - 4428:20, 4428:23, 4428:25, 4431:5, 4457:17, 4461:20, 4461:25, 4482:25
**effort** [2] - 4424:21, 4424:23
**eight** [4] - 4402:2, 4402:24, 4403:12, 4403:14
**either** [5] - 4400:16, 4406:20, 4422:24, 4476:13, 4481:17
**Electric** [3] - 4394:2, 4428:4, 4428:6
**ELECTROLUX** [1] - 4392:6
**Electrolux** [24] - 4393:9, 4396:11,

4400:1, 4400:11, 4402:8, 4409:2, 4409:12, 4412:19, 4423:21, 4427:17, 4431:22, 4432:23, 4433:6, 4433:13, 4435:3, 4436:17, 4437:20, 4440:24, 4446:13, 4447:13, 4448:8, 4455:22, 4455:24, 4466:21
**element** [1] - 4410:7
**elements** [2] - 4415:15, 4415:18
**elevated** [3] - 4450:15, 4455:17, 4475:19
**elicited** [1] - 4458:22
**Email** [11] - 4392:16, 4392:19, 4392:24, 4393:5, 4393:12, 4393:15, 4393:19, 4394:4, 4394:8, 4394:12, 4394:20
**EMMET** [1] - 4392:10
**emphasis** [1] - 4474:13
**empirical** [6] - 4409:1, 4425:16, 4454:16, 4458:15, 4469:5, 4476:14
**empirically** [5] - 4413:8, 4443:14, 4451:1, 4467:19, 4476:9
**empirics** [3] - 4451:3, 4451:4, 4452:12
**end** [11] - 4399:17, 4405:23, 4414:18, 4414:19, 4422:25, 4437:16, 4437:19, 4438:5, 4440:5, 4440:8, 4482:7
**ends** [1] - 4440:18
**enter** [4] - 4424:1, 4441:12, 4457:3
**entered** [2] - 4414:6, 4414:16
**entering** [1] - 4410:15
**entire** [5] - 4408:8, 4438:7, 4439:22, 4439:23, 4439:25
**entirely** [4] - 4408:23, 4425:7, 4470:7, 4471:9
**entities** [1] - 4412:19
**entitled** [2] - 4485:6
**entity** [5] - 4414:9, 4428:19, 4450:9, 4461:21, 4462:4
**entrants** [3] - 4413:25, 4455:20, 4457:2
**entry** [6] - 4404:22, 4415:2, 4416:18, 4417:13, 4431:12, 4455:16, 4457:7, 4457:24
**environment** [2] - 4472:5, 4472:20
**equal** [4] - 4400:8, 4400:9, 4432:8, 4440:10
**equally** [1] - 4457:9
**equation** [1] - 4465:16
**equivalent** [1] - 4468:5
**erase** [2] - 4415:7, 4415:8
**error** [2] - 4419:3, 4475:22
**especially** [2] - 4435:8, 4457:4
**Esquire** [14] - 4392:13, 4392:17, 4392:20, 4393:1, 4393:6, 4393:9, 4393:13, 4393:16, 4393:20, 4394:1, 4394:5, 4394:9, 4394:13, 4394:17
**essence** [3] - 4408:5, 4423:25, 4467:1
**essentially** [1] - 4400:11
**established** [3] - 4428:5, 4428:7, 4428:8
**estimate** [1] - 4400:15
**estimated** [1] - 4441:25
**et** [8] - 4392:6, 4415:17, 4432:19,

4437:25, 4446:7, 4455:9, 4457:1, 4460:4
**Ethan** [1] - 4392:13
**ethan.glass@usdoj.gov** [1] - 4392:16
**evaluate** [3] - 4402:13, 4402:18, 4479:2
**evaluates** [1] - 4402:20
**evaluating** [1] - 4411:6
**evaluation** [1] - 4458:13
**evening** [1] - 4482:21
**event** [2] - 4416:6, 4416:24
**eventually** [1] - 4463:10
**everyday** [1] - 4447:25
**evidence** [15] - 4413:10, 4417:2, 4425:16, 4441:15, 4442:11, 4452:6, 4452:12, 4452:19, 4470:15, 4476:17, 4476:20, 4476:24, 4476:25, 4478:8, 4478:13
**exact** [2] - 4435:19, 4443:9
**exactly** [1] - 4452:23
**EXAMINATION** [2] - 4395:2, 4396:5
**examination** [2] - 4396:3, 4396:4
**examined** [2] - 4406:17, 4420:20
**example** [20] - 4396:15, 4404:19, 4411:9, 4413:1, 4421:5, 4421:7, 4423:15, 4438:17, 4445:25, 4446:18, 4446:20, 4449:23, 4450:6, 4451:4, 4455:14, 4466:21, 4473:18, 4474:11, 4474:16, 4477:19
**examples** [1] - 4401:8
**except** [2] - 4449:4, 4452:23
**exception** [2] - 4429:4, 4483:10
**excess** [6] - 4428:12, 4428:14, 4435:12, 4435:14, 4436:25, 4437:10
**excited** [1] - 4435:21
**exercise** [1] - 4425:4
**Exhibit** [3] - 4427:4, 4444:9, 4480:21
**exist** [1] - 4468:17
**existence** [2] - 4435:12, 4437:22
**existing** [3] - 4428:11, 4428:14, 4457:14
**exists** [2] - 4464:20, 4468:17
**expanding** [1] - 4442:17
**expansion** [1] - 4457:24
**expect** [9] - 4414:7, 4433:10, 4441:7, 4442:13, 4442:14, 4442:15, 4452:7, 4452:11, 4452:13
**expensive** [5] - 4447:24, 4451:21, 4452:14, 4466:11, 4466:13
**experience** [2] - 4450:14, 4468:19
**experienced** [1] - 4435:4
**expert** [8] - 4404:25, 4405:1, 4405:19, 4416:5, 4420:3, 4442:10, 4452:8, 4483:10
**explain** [13] - 4399:23, 4437:1, 4443:4, 4444:15, 4445:11, 4445:15, 4454:4, 4461:5, 4466:9, 4467:1, 4469:23, 4478:25, 4482:16
**explained** [4] - 4402:24, 4411:4, 4437:19, 4456:14
**explains** [1] - 4396:21
**explore** [2] - 4437:13, 4472:12

**expressed** [1] - 4423:17
**expressing** [1] - 4423:15
**extend** [1] - 4404:2
**extends** [2] - 4404:3, 4406:6
**extent** [3] - 4440:12, 4447:16, 4452:11
**extra** [1] - 4447:6
**extreme** [1] - 4454:15
**extremely** [1] - 4435:1

## F

**fabulous** [1] - 4411:10
**face** [1] - 4460:24
**faced** [1] - 4421:4
**facilitates** [1] - 4461:23
**fact** [17] - 4409:8, 4411:23, 4421:4, 4433:6, 4442:11, 4451:5, 4455:6, 4455:11, 4461:22, 4464:3, 4464:4, 4464:5, 4464:18, 4468:22, 4470:24, 4476:19, 4478:22
**factor** [9] - 4411:6, 4411:24, 4421:22, 4421:23, 4431:2, 4433:22, 4458:9, 4464:8, 4464:25
**factored** [1] - 4404:13, 4419:22
**factors** [2] - 4429:3, 4461:25
**fair** [2] - 4430:16, 4460:15
**fairly** [1] - 4482:4
**fall** [2] - 4402:18, 4470:16
**falling** [1] - 4459:12
**Falls** [1] - 4394:9
**family** [1] - 4460:3
**far** [2] - 4454:18, 4470:6
**Farrell** [1] - 4474:21
**fast** [1] - 4421:9
**faster** [1] - 4409:8
**Fax** [5] - 4392:24, 4393:4, 4393:11, 4393:19, 4394:12
**fear** [2] - 4423:22, 4423:23
**feature** [9] - 4441:14, 4442:5, 4444:6, 4444:20, 4446:6, 4448:2, 4450:7, 4450:17, 4452:17
**featured** [2] - 4441:6, 4444:3
**features** [7] - 4402:22, 4441:24, 4442:1, 4454:14, 4458:2, 4464:17
**Federal** [9] - 4404:21, 4405:6, 4405:15, 4406:8, 4406:21, 4406:22, 4408:1, 4418:1, 4453:15
**Ferguson** [6] - 4479:10, 4479:16, 4479:23, 4480:17, 4481:19
**Ferguson's** [1] - 4479:16
**few** [8] - 4403:23, 4403:25, 4404:15, 4411:15, 4441:11, 4442:13, 4456:22, 4463:8
**fiduciary** [1] - 4467:7
**Fifth** [5] - 4392:14, 4392:18, 4392:22, 4393:2, 4393:7
**fight** [1] - 4430:19
**filings** [1] - 4406:13
**fill** [2] - 4401:8, 4481:4

**filled** [1] - 4462:2
**finally** [1] - 4428:19
**fine** [5] - 4396:20, 4396:23, 4403:24, 4407:16, 4483:4
**fingers** [1] - 4430:15
**finish** [2] - 4396:2, 4442:8
**finished** [1] - 4483:23
**firm** [9] - 4414:11, 4425:23, 4431:5, 4448:16, 4457:4, 4473:7, 4473:8, 4473:9, 4474:3
**firms** [7] - 4396:11, 4412:11, 4414:2, 4439:1, 4454:22, 4462:21
**first** [18] - 4400:6, 4401:19, 4402:7, 4406:5, 4415:5, 4427:3, 4427:8, 4428:2, 4430:10, 4431:1, 4431:11, 4436:2, 4442:24, 4449:8, 4476:6, 4483:3, 4483:21
**fist** [3] - 4456:23, 4460:24, 4465:20
**fit** [1] - 4410:12
**fits** [2] - 4448:2, 4457:10
**five** [5] - 4400:24, 4402:6, 4416:9, 4416:14, 4418:11, 4418:16, 4418:17, 4418:19, 4423:5, 4425:1, 4446:12, 4446:14, 4446:22, 4460:3, 4477:15
**fixed** [4] - 4445:6, 4460:18, 4460:21, 4462:13
**flat** [2] - 4400:11, 4435:6
**flavor** [1] - 4474:1
**flavored** [1] - 4474:5
**flavors** [1] - 4474:18
**flaw** [1] - 4432:22
**flip** [1] - 4446:9
**floor** [6] - 4425:20, 4426:1, 4426:2, 4430:20, 4457:7
**focus** [10] - 4402:17, 4405:12, 4414:25, 4426:10, 4437:14, 4444:19, 4448:17, 4448:19, 4462:12, 4477:8
**focused** [4] - 4441:16, 4465:23, 4480:3, 4482:3
**focuses** [1] - 4442:7
**focusing** [1] - 4465:10
**folks** [1] - 4474:22
**following** [7] - 4400:23, 4461:7, 4461:17, 4461:19, 4462:19, 4467:9, 4474:8
**follows** [1] - 4427:8
**footage** [1] - 4426:2
**footnote** [1] - 4474:24
**FOR** [1] - 4392:1
**forces** [1] - 4462:25
**forecast** [1] - 4452:18
**forecasting** [1] - 4429:10
**foregoing** [1] - 4485:5
**foreign** [1] - 4428:10
**foreseeable** [6] - 4418:8, 4418:9, 4418:24, 4419:9, 4419:12, 4430:24
**forget** [1] - 4425:1, 4460:20, 4465:11
**former** [1] - 4420:18
**forth** [2] - 4407:4, 4407:25

**forths** [1] - 4477:20
**forward** [3] - 4407:7, 4407:8, 4480:20
**four** [8] - 4402:1, 4403:16, 4411:11, 4423:3, 4425:1, 4434:6, 4434:8, 4451:15
**fourth** [2] - 4409:2, 4474:12
**frame** [6] - 4416:4, 4416:8, 4417:4, 4417:8, 4417:9
**free** [1] - 4483:21
**French** [1] - 4411:12
**frequency** [1] - 4458:8
**Friday** [3] - 4403:5, 4403:7, 4404:1
**Friedman** [1] - 4394:1
**fries** [1] - 4411:13
**Frigidaire** [1] - 4428:4
**front** [3] - 4405:6, 4425:18, 4426:1
**full** [5] - 4436:18, 4437:6, 4441:6, 4444:3, 4446:24
**full-featured** [1] - 4444:3
**fundamental** [1] - 4472:25
**future** [7] - 4414:22, 4417:23, 4418:9, 4418:24, 4419:9, 4419:12, 4430:24, 4442:14, 4452:8, 4454:22, 4457:20, 4474:10

## G

**gain** [3] - 4412:14, 4455:19, 4457:5
**gained** [1] - 4443:13
**gap** [2] - 4415:22, 4447:22
**GE** [28] - 4396:11, 4400:1, 4400:11, 4402:7, 4409:2, 4409:13, 4412:18, 4431:22, 4434:13, 4435:3, 4436:11, 4436:14, 4437:20, 4440:25, 4446:2, 4446:4, 4446:13, 4446:23, 4447:7, 4447:8, 4447:13, 4447:14, 4447:17, 4447:22, 4448:8, 4448:16, 4466:21
**GE's** [1] - 4446:23
**Gelfand** [1] - 4393:6
**General** [3] - 4394:1, 4428:4, 4428:6
**generalities** [2] - 4408:23, 4479:13
**generally** [6] - 4401:15, 4402:18, 4434:23, 4441:15, 4443:8, 4443:20
**generically** [1] - 4443:8
**Georgetown** [1] - 4473:17
**Gerald** [1] - 4394:9
**given** [7] - 4402:22, 4415:20, 4421:19, 4436:21, 4454:15, 4458:19, 4467:10
**Glass** [1] - 4392:13
**GLASS** [2] - 4483:12, 4484:3
**glass** [1] - 4461:24
**global** [2] - 4413:14, 4413:20
**globally** [1] - 4414:2
**going-down-in-price** [1] - 4452:14
**government** [5] - 4427:12, 4427:15, 4458:22, 4460:19, 4467:20
**government's** [5] - 4435:11, 4461:6, 4461:16, 4466:15, 4467:16
**grab** [1] - 4415:18

**Grand** [1] - 4471:16
**gray** [1] - 4454:1
**Gray** [1] - 4393:20
**Great** [1] - 4422:21
**great** [1] - 4445:13
**green** [1] - 4431:24
**group** [4] - 4418:4, 4418:5, 4459:23, 4460:5
**grow** [7] - 4410:20, 4410:22, 4441:13, 4442:21, 4457:4
**growing** [2] - 4410:25, 4435:7
**grown** [8] - 4400:8, 4400:10, 4400:12, 4400:15, 4400:19, 4400:21, 4435:1
**growth** [9] - 4399:21, 4400:13, 4400:14, 4400:18, 4412:2, 4414:7, 4444:10, 4454:23, 4455:2
**guarantee** [1] - 4403:25
**guess** [1] - 4463:16
**guidance** [4] - 4416:25, 4417:10, 4418:22, 4419:23
**guidelines** [14] - 4414:12, 4416:12, 4416:17, 4418:2, 4418:3, 4430:20, 4453:12, 4453:20, 4454:1, 4454:17, 4454:21, 4455:8, 4472:1, 4474:9

## H

**Haier** [5] - 4414:4, 4415:6, 4415:13, 4455:15, 4455:18
**Haier's** [1] - 4414:7
**Hale** [1] - 4392:17
**half** [7] - 4430:4, 4443:23, 4443:24, 4443:25, 4444:12, 4444:13, 4483:2
**hamburger** [2] - 4411:10, 4411:12
**hand** [6] - 4400:22, 4408:20, 4446:5, 4449:2, 4468:6, 4468:10
**handle** [2] - 4421:18, 4422:20
**harder** [1] - 4437:7
**harmed** [2] - 4447:19, 4461:10
**head** [2] - 4412:12
**head-to-head** [1] - 4412:12
**heard** [8] - 4410:14, 4416:6, 4431:8, 4445:2, 4452:21, 4458:22, 4474:22, 4478:5
**heck** [1] - 4418:9
**help** [7] - 4428:18, 4430:12, 4445:11, 4446:20, 4452:3, 4466:9, 4473:19
**helpful** [2] - 4405:22, 4426:24
**helps** [2] - 4401:8, 4440:22
**Henderson** [1] - 4392:20
**Herf** [6] - 4454:6, 4455:1, 4455:10, 4455:21, 4456:6
**Herfindahl** [9] - 4452:21, 4452:24, 4452:25, 4453:1, 4453:5, 4453:8, 4453:11, 4454:7, 4454:25
**Herfs** [2] - 4453:1
**heterogeneous** [1] - 4451:23
**HHI** [5] - 4452:21, 4452:25, 4453:1, 4454:7, 4455:10

**high** [3] - 4443:15, 4443:16, 4466:25
**high-priced** [2] - 4443:15, 4443:16
**higher** [17] - 4400:24, 4421:4, 4421:5, 4426:24, 4433:10, 4433:11, 4440:11, 4441:4, 4444:3, 4450:20, 4450:21, 4450:22, 4451:21, 4467:4, 4471:13, 4478:17, 4478:21
**higher-priced** [4] - 4444:3, 4450:20, 4450:21, 4450:22
**higher-quality** [1] - 4451:21
**highest** [2] - 4415:19, 4464:1
**highlight** [1] - 4446:19
**highly** [2] - 4453:9, 4483:24
**Hirschman** [2] - 4452:25, 4453:1
**historically** [2] - 4411:14, 4416:17
**history** [1] - 4462:9
**hold** [5] - 4442:9, 4480:10, 4480:11, 4480:13, 4482:8
**holds** [1] - 4457:9
**hole** [1] - 4410:10
**holes** [1] - 4482:7
**holiday** [1] - 4403:17
**holidays** [1] - 4402:25
**home** [3] - 4466:17, 4466:18
**Home** [23] - 4401:18, 4402:6, 4409:11, 4428:17, 4431:23, 4438:16, 4444:7, 4444:11, 4444:12, 4445:20, 4445:25, 4446:1, 4446:2, 4446:9, 4450:22, 4451:4, 4470:4, 4470:20, 4470:24, 4471:1, 4471:7, 4477:9, 4477:22
**homebuilders** [1] - 4460:4
**homes** [1] - 4460:3
**Honor** [7] - 4396:18, 4401:10, 4408:6, 4426:12, 4427:2, 4431:15, 4439:9, 4440:20, 4446:20, 4483:7, 4483:11, 4483:12, 4484:2, 4484:3
**HONORABLE** [1] - 4392:10
**hope** [1] - 4403:2
**hopefully** [3] - 4445:14, 4446:20, 4461:12
**horizontal** [1] - 4418:2
**horizontally** [1] - 4444:5
**Horton** [1] - 4460:4
**host** [1] - 4417:1
**hour** [2] - 4483:2
**hours** [1] - 4456:22
**house** [1] - 4403:21
**housing** [6] - 4420:9, 4422:15, 4422:16, 4422:17, 4423:2, 4467:11
**hundred** [7] - 4400:9, 4447:3, 4450:10, 4453:6, 4453:7
**hurt** [1] - 4447:16
**husher** [1] - 4396:19
**hypothetical** [34] - 4418:5, 4445:6, 4445:10, 4446:16, 4446:18, 4448:13, 4449:13, 4451:9, 4461:7, 4461:15, 4462:12, 4462:22, 4466:15, 4466:20, 4467:23, 4471:25, 4472:5, 4472:11, 4472:16, 4472:17, 4473:4, 4473:5, 4473:9, 4474:9, 4474:14, 4474:17,

4475:3, 4475:10, 4475:16, 4475:19, 4475:25, 4476:10, 4476:15, 4482:9
**hypothetically** [2] - 4415:2, 4447:13

## I

**idea** [2] - 4411:12, 4413:24
**ideas** [1] - 4453:2
**identical** [3] - 4428:24, 4462:19, 4479:25
**identically** [1] - 4422:13
**identify** [2] - 4402:25, 4460:7
**ignore** [1] - 4461:22, 4464:10
**ignored** [2] - 4455:6, 4455:7
**ignores** [1] - 4436:2
**ignoring** [2] - 4414:22, 4439:1
**II** [1] - 4392:20
**IL** [1] - 4393:14
**II** [1] - 4393:22
**illuminate** [1] - 4473:19
**illustrative** [3] - 4446:20, 4455:14, 4455:17
**imagine** [1] - 4400:7
**immediately** [5] - 4419:17, 4419:20, 4420:2, 4430:15
**impact** [1] - 4429:5
**implication** [1] - 4475:22
**important** [21] - 4400:3, 4401:15, 4409:15, 4414:1, 4420:25, 4430:8, 4438:12, 4447:5, 4449:6, 4451:9, 4451:10, 4460:12, 4461:8, 4463:20, 4464:11, 4472:23, 4472:25, 4474:20, 4481:14, 4481:15, 4483:12
**importantly** [2] - 4474:13, 4474:14
**imports** [1] - 4428:11
**impose** [1] - 4418:6
**imprecise** [1] - 4416:11
**In-N-Out** [1] - 4411:11
**inappropriate** [1] - 4483:24
**incentive** [3] - 4419:17, 4462:3, 4482:6
**include** [3] - 4422:16, 4455:6, 4470:23, 4481:2
**included** [4] - 4413:21, 4435:17, 4435:23, 4438:4
**includes** [4] - 4434:20, 4481:5, 4481:7, 4481:8
**including** [2] - 4408:7, 4481:6
**income** [3] - 4445:6, 4460:18, 4462:13
**inconsistencies** [2] - 4471:22, 4482:14
**inconsistent** [3] - 4449:13, 4470:8, 4471:21
**incorporate** [1] - 4418:2
**incorrect** [1] - 4482:11
**incorrectly** [1] - 4482:9
**increase** [23] - 4400:14, 4415:3, 4416:12, 4418:7, 4418:8, 4421:3, 4421:4, 4422:4, 4422:6, 4425:24, 4427:21, 4427:24, 4428:10, 4428:12, 4430:22, 4430:25, 4431:12, 4436:7,

4437:7, 4452:18, 4457:15, 4467:6, 4474:6
**increased** [3] - 4411:19, 4411:20, 4460:19
**increases** [10] - 4416:3, 4420:20, 4441:6, 4457:13, 4467:14, 4467:15, 4467:17, 4467:18, 4467:20
**indeed** [2] - 4407:21, 4407:22
**index** [5] - 4400:3, 4400:10, 4400:22, 4400:23, 4455:16
**Index** [6] - 4452:21, 4452:24, 4452:25, 4453:2, 4453:11
**indicator** [1] - 4455:8
**indirect** [4] - 4479:17, 4480:4, 4480:8, 4480:13
**individual** [1] - 4441:1
**individually** [1] - 4448:16
**induce** [1] - 4424:1
**industries** [1] - 4459:3
**industry** [7] - 4408:14, 4416:16, 4435:15, 4457:24, 4458:23, 4458:24
**inflating** [1] - 4438:25
**inform** [1] - 4440:22
**information** [14] - 4406:8, 4406:24, 4408:22, 4433:24, 4434:20, 4436:3, 4438:13, 4444:25, 4445:24, 4454:16, 4463:20, 4463:22, 4464:1, 4465:25
**informed** [1] - 4401:2
**initial** [1] - 4481:21
**innovation** [5] - 4408:13, 4408:14, 4409:6, 4409:9, 4410:12
**innovative** [1] - 4410:4
**input** [1] - 4420:25
**insignificant** [1] - 4439:11
**installation** [1] - 4477:23
**instead** [1] - 4421:10
**intention** [2] - 4414:20, 4442:20
**intently** [1] - 4478:4
**interaction** [3] - 4407:3, 4449:3, 4457:25
**interesting** [2] - 4429:19, 4445:14
**internalization** [5] - 4419:16, 4429:15, 4430:14, 4431:2, 4431:9
**interrupt** [3] - 4400:2, 4442:8, 4446:15
**introduced** [2] - 4409:4, 4410:5
**introducing** [1] - 4410:8
**introduction** [2] - 4458:8, 4458:10
**intuitive** [1] - 4408:24
**investigate** [3] - 4413:14, 4469:14, 4469:19
**investors** [2] - 4460:14, 4461:2
**invisible** [3] - 4449:2, 4468:6, 4468:10
**invoice** [1] - 4437:24
**issue** [14] - 4405:10, 4406:7, 4406:9, 4407:9, 4421:19, 4422:21, 4423:23, 4432:20, 4439:15, 4442:23, 4446:19, 4451:1, 4459:14, 4473:19, 4478:3
**issued** [1] - 4429:22
**issues** [10] - 4406:15, 4406:16, 4425:9, 4426:13, 4428:22, 4456:2, 4456:13,

4456:16, 4473:17, 4476:21
**item** [1] - 4477:15
**items** [2] - 4477:15
**iterate** [1] - 4407:4
**itself** [2] - 4459:5, 4469:1

## J

**J.C** [1] - 4434:11
**Jeremy** [1] - 4393:20
**jmmajoras@jonesday.com** [1] - 4393:12
**job** [1] - 4430:3
**Joe** [1] - 4474:21
**John** [2] - 4393:9, 4480:25
**Jonathan** [1] - 4395:4
**Jones** [25] - 4392:20, 4445:19, 4446:5, 4446:23, 4447:20, 4448:4, 4448:9, 4449:22, 4449:24, 4450:6, 4450:13, 4450:25, 4452:2, 4462:11, 4462:14, 4462:22, 4463:19, 4464:5, 4464:8, 4464:10, 4465:11, 4465:14, 4465:16, 4466:23, 4467:24
**JONES** [4] - 4393:9, 4393:13, 4393:17, 4393:21
**Joneses** [4] - 4450:15, 4462:3, 4462:6, 4469:3
**Joneses'** [1] - 4450:16
**JUDGE** [1] - 4392:10
**judgment** [2] - 4407:20, 4415:7
**July** [2] - 4403:10, 4444:11
**JUSTICE** [5] - 4392:13, 4392:17, 4392:21, 4393:2, 4393:6
**Justice** [9] - 4406:7, 4406:21, 4406:23, 4408:1, 4418:1, 4420:15, 4424:24, 4437:3, 4453:15

## K

**kalejnieks@jonesday.com** [1] - 4393:19
**keep** [7] - 4448:18, 4449:18, 4459:11, 4461:3, 4462:10, 4462:25, 4468:12
**Kelsey** [1] - 4393:1
**kelsey.shannon@usdoj.gov** [1] - 4393:5
**Kenmore** [6] - 4409:3, 4409:13, 4428:3, 4428:4, 4428:6, 4457:1
**kidding** [1] - 4406:2
**kind** [8] - 4414:10, 4416:15, 4418:3, 4448:3, 4455:20, 4456:9, 4457:15, 4458:7
**kinds** [7] - 4404:18, 4425:23, 4426:3, 4456:24, 4458:20, 4459:23, 4482:13
**King** [1] - 4403:9
**kitchen** [2] - 4409:23, 4446:3
**knowing** [1] - 4404:10
**known** [4] - 4420:11, 4424:2, 4428:2,

4465:25
**knows** [1] - 4466:3
**Kristen** [1] - 4393:16

## L

**Labor** [4] - 4401:23, 4403:11, 4441:22
**lack** [3] - 4456:16, 4456:17, 4463:20
**laid** [2] - 4407:11, 4407:13
**language** [3] - 4418:24, 4419:6, 4419:11
**large** [8] - 4428:15, 4428:20, 4456:25, 4457:6, 4457:9, 4457:23, 4460:4, 4467:17
**largely** [1] - 4435:6
**larger** [2] - 4467:18, 4481:22
**last** [9] - 4400:15, 4427:8, 4427:22, 4441:11, 4442:13, 4456:22, 4483:7
**lasting** [2] - 4418:8, 4451:21
**lasts** [2] - 4451:14, 4451:15
**Laughter** [5] - 4406:1, 4418:10, 4418:15, 4439:20, 4468:11
**launching** [1] - 4434:12
**laundry** [3] - 4422:4, 4422:11, 4480:2
**lay** [2] - 4424:24, 4454:1
**lays** [1] - 4407:10
**LDCs** [1] - 4481:18
**learn** [1] - 4418:7
**least** [3] - 4409:25, 4418:6, 4445:2
**left** [4] - 4420:22, 4450:1, 4479:24, 4483:14
**left-hand** [1] - 4400:22
**leg** [1] - 4408:5
**legacy** [6] - 4396:10, 4409:2, 4409:12, 4410:13, 4411:4, 4440:13
**legal** [2] - 4419:2, 4453:23
**Lejnieks** [1] - 4393:16
**lemon** [4] - 4473:21, 4473:24, 4474:5, 4474:16
**lemon-lime** [4] - 4473:21, 4473:24, 4474:5, 4474:16
**lengths** [1] - 4402:3
**less** [7] - 4411:24, 4426:2, 4443:23, 4443:24, 4444:12, 4457:19, 4480:12
**level** [4] - 4429:2, 4437:9, 4444:5, 4453:14, 4453:19, 4456:7
**levels** [3] - 4402:21, 4436:22, 4477:18
**LG** [22] - 4396:8, 4396:12, 4399:21, 4400:1, 4400:12, 4408:15, 4409:1, 4409:8, 4410:15, 4411:5, 4412:4, 4412:17, 4423:16, 4428:7, 4428:10, 4434:6, 4434:12, 4435:6, 4436:12, 4454:23, 4455:3, 4457:1
**LG's** [1] - 4412:12
**libbing** [1] - 4418:3
**life** [4] - 4447:25, 4460:18, 4460:21, 4481:1
**lifted** [1] - 4413:2
**likely** [2] - 4427:25, 4481:22

**lime** [4] - 4473:21, 4473:24, 4474:5, 4474:16
**limited** [1] - 4460:18
**line** [6] - 4400:23, 4427:11, 4448:24, 4454:6, 4454:19, 4454:20
**lines** [1] - 4440:25
**linked** [1] - 4432:17
**links** [1] - 4483:1
**liquidity** [1] - 4452:1
**list** [2] - 4404:24, 4405:13
**listed** [1] - 4464:4
**listened** [1] - 4478:3
**listening** [1] - 4458:14
**lists** [1] - 4413:20
**literature** [3] - 4420:17, 4425:8, 4425:9
**litigation** [5] - 4405:4, 4405:5, 4405:7, 4405:9, 4407:6
**living** [1] - 4460:19
**LLP** [5] - 4394:2, 4394:6, 4394:10, 4394:14, 4394:17
**logistical** [1] - 4456:2
**longer-lasting** [1] - 4451:21
**look** [48] - 4400:18, 4401:1, 4402:10, 4402:16, 4404:1, 4406:9, 4408:14, 4414:14, 4415:1, 4416:17, 4416:19, 4417:1, 4417:18, 4419:25, 4421:11, 4426:23, 4426:25, 4427:11, 4428:22, 4429:1, 4432:20, 4434:17, 4435:14, 4438:9, 4439:8, 4439:14, 4439:23, 4440:4, 4442:4, 4443:2, 4444:10, 4445:23, 4445:25, 4446:13, 4453:16, 4454:21, 4457:18, 4457:23, 4461:14, 4464:14, 4466:9, 4477:4, 4477:12, 4479:21, 4479:22, 4479:23, 4482:15
**looked** [15] - 4401:3, 4401:6, 4409:3, 4423:6, 4423:12, 4432:25, 4437:12, 4438:2, 4450:19, 4451:3, 4459:14, 4459:17, 4469:25, 4477:1, 4477:6
**looking** [18] - 4408:7, 4421:11, 4421:16, 4422:3, 4431:17, 4434:16, 4435:10, 4438:7, 4439:23, 4444:9, 4467:25, 4468:2, 4468:3, 4470:9, 4471:12, 4472:6, 4474:12, 4480:22
**looks** [8] - 4399:25, 4400:10, 4425:9, 4433:5, 4440:24, 4446:25, 4458:8, 4479:19
**lose** [4] - 4423:25, 4448:9, 4450:6, 4460:14
**loss** [1] - 4430:3
**lost** [1] - 4456:3
**Louisiana** [2] - 4393:10, 4393:17
**loves** [1] - 4409:21
**low** [9] - 4414:18, 4414:19, 4438:1, 4438:5, 4440:5, 4440:8, 4443:16, 4462:14, 4466:25
**low-priced** [1] - 4443:16
**Lowe's** [7] - 4428:17, 4470:4, 4470:20, 4470:24, 4471:7, 4477:10, 4477:23
**lower** [13] - 4416:1, 4431:5, 4438:20, 4441:3, 4441:5, 4441:6, 4441:13,

4444:3, 4461:22, 4461:23, 4467:4, 4478:16, 4478:20
**lower-priced** [3] - 4438:20, 4441:13, 4444:3
**lowering** [1] - 4441:10
**lowers** [1] - 4455:10
**Luther** [1] - 4403:9

**M**

**machine** [1] - 4394:25
**Madden** [1] - 4481:1
**magnified** [1] - 4438:11
**major** [3] - 4402:24, 4413:20, 4468:20
**Majoras** [1] - 4393:9
**majority** [4] - 4406:11, 4406:14, 4428:15, 4464:24
**maker** [2] - 4414:3, 4423:20
**makers** [1] - 4473:20
**manager** [1] - 4460:2
**managing** [1] - 4460:1
**manufacturer** [4] - 4425:5, 4480:5, 4480:8, 4481:17
**manufacturers** [6] - 4409:2, 4416:23, 4428:10, 4428:12, 4428:14, 4431:22
**march** [1] - 4442:16
**March** [3] - 4429:7, 4429:8, 4444:11
**margin** [3] - 4431:21, 4432:7, 4475:11
**margins** [3] - 4440:4, 4440:8, 4440:11
**marked** [4] - 4423:13, 4434:22, 4435:18, 4440:15
**market** [89] - 4401:6, 4410:4, 4410:9, 4410:10, 4410:22, 4410:24, 4411:18, 4411:25, 4412:2, 4412:14, 4412:25, 4413:25, 4414:6, 4414:8, 4414:18, 4414:19, 4423:21, 4423:22, 4424:6, 4424:12, 4425:5, 4425:16, 4431:4, 4433:8, 4433:9, 4433:11, 4437:5, 4437:8, 4437:9, 4438:2, 4438:8, 4438:23, 4438:25, 4439:1, 4439:13, 4439:22, 4439:23, 4439:24, 4439:25, 4441:12, 4442:17, 4442:21, 4448:1, 4453:3, 4453:4, 4456:10, 4456:23, 4459:15, 4462:2, 4464:13, 4470:14, 4470:15, 4472:7, 4473:2, 4473:12, 4474:1, 4474:2, 4475:6, 4476:1, 4476:2, 4476:3, 4476:14, 4476:15, 4476:18, 4476:21, 4478:8, 4478:13, 4478:17, 4478:18, 4479:19, 4480:14, 4480:25, 4481:3, 4481:6, 4481:15, 4481:16, 4481:23, 4482:2, 4482:8, 4482:13
**marketplace** [17] - 4412:2, 4412:5, 4415:10, 4423:16, 4425:14, 4438:14, 4438:15, 4439:22, 4440:8, 4440:11, 4442:13, 4444:23, 4444:17, 4456:19, 4457:12, 4457:19, 4464:21
**markets** [5] - 4424:4, 4449:2, 4468:6, 4470:19, 4478:24

**Martin** [1] - 4403:9
**mass** [3] - 4402:13, 4402:23
**matched** [1] - 4479:20
**matching** [2] - 4403:20, 4404:3
**math** [1] - 4438:8
**matter** [14] - 4400:20, 4411:8, 4420:14, 4441:7, 4445:14, 4469:2, 4470:19, 4475:9, 4478:22, 4482:8, 4485:6
**maximize** [2] - 4448:20, 4449:12
**Maytag** [16] - 4413:9, 4420:22, 4420:23, 4421:7, 4424:10, 4424:13, 4424:15, 4424:25, 4426:17, 4427:15, 4428:25, 4435:10, 4450:14, 4462:10, 4467:8, 4483:1
**Maytag-Whirlpool** [8] - 4413:9, 4421:7, 4424:13, 4424:25, 4428:25, 4450:14, 4462:10, 4467:8
**mean** [12] - 4410:21, 4415:16, 4416:13, 4417:11, 4418:9, 4429:20, 4430:1, 4430:3, 4442:8, 4448:11, 4458:24, 4459:10
**means** [2] - 4478:17, 4478:18
**measures** [1] - 4477:16
**measuring** [1] - 4416:9
**medium** [1] - 4414:19
**meet** [4] - 4410:9, 4411:18, 4411:25, 4459:6
**Memorial** [1] - 4403:17
**memory** [2] - 4403:13, 4438:20
**Memphis** [1] - 4456:1
**mention** [1] - 4436:8
**mentioned** [1] - 4414:25
**mentors** [1] - 4420:18
**merge** [5] - 4405:23, 4460:13, 4460:14, 4461:2
**merged** [9] - 4414:9, 4414:11, 4419:17, 4428:19, 4431:5, 4448:16, 4457:4, 4461:20, 4462:4
**merger** [49] - 4404:16, 4405:22, 4406:13, 4407:1, 4412:5, 4412:18, 4413:9, 4414:12, 4415:3, 4416:6, 4416:24, 4418:2, 4418:3, 4419:23, 4420:22, 4421:11, 4421:12, 4422:24, 4424:10, 4424:13, 4425:1, 4425:23, 4426:17, 4426:23, 4427:25, 4428:5, 4428:24, 4431:7, 4447:8, 4447:12, 4450:15, 4453:12, 4453:17, 4453:21, 4454:7, 4455:1, 4455:10, 4455:21, 4457:1, 4457:16, 4457:17, 4461:20, 4461:23, 4462:18, 4465:11, 4467:9, 4468:17, 4468:20, 4474:20
**mergers** [2] - 4404:12, 4406:11
**merging** [5] - 4408:2, 4408:4, 4436:12, 4439:1, 4456:17
**metaphor** [1] - 4468:13
**metric** [9] - 4400:17, 4400:20, 4451:20, 4454:13, 4454:18, 4459:5, 4477:4, 4477:7, 4477:10
**metrics** [1] - 4474:23
**Mexico** [2] - 4436:12, 4436:13

**Michael** [1] - 4394:13
**microwave** [1] - 4436:16
**middle** [2] - 4403:5, 4436:6
**might** [3] - 4420:10, 4421:18, 4460:20
**millions** [1] - 4453:7
**mind** [2] - 4426:25, 4475:12
**minimum** [2] - 4416:14, 4416:19
**minuscule** [1] - 4466:16
**minute** [8] - 4400:2, 4423:11, 4426:8, 4442:23, 4462:5, 4465:15, 4471:20, 4471:23
**misguided** [2] - 4439:18, 4439:21
**miss** [1] - 4412:16
**missing** [1] - 4439:24
**mistake** [2] - 4419:3, 4472:25
**mistaken** [1] - 4438:18
**mix** [1] - 4434:10
**model** [1] - 4420:25
**money** [16] - 4403:25, 4415:12, 4415:13, 4445:7, 4447:6, 4448:15, 4448:23, 4449:10, 4460:13, 4460:14, 4461:2, 4463:17, 4464:2
**money-back** [1] - 4403:25
**monolithic** [1] - 4459:23
**monopolist** [17] - 4418:5, 4471:25, 4472:6, 4472:16, 4472:18, 4473:4, 4474:9, 4474:14, 4474:17, 4475:4, 4475:10, 4475:16, 4475:19, 4475:25, 4476:11, 4476:15, 4482:9
**monopoly** [1] - 4453:9
**Monterey** [1] - 4436:12
**months** [5] - 4401:22, 4430:4, 4430:16, 4431:1, 4441:3
**morning** [3] - 4426:11, 4431:19, 4475:14
**most** [9] - 4405:11, 4405:12, 4415:15, 4415:17, 4416:13, 4453:21, 4459:3, 4474:13, 4474:14
**move** [9] - 4424:8, 4436:9, 4436:11, 4437:14, 4442:9, 4455:23, 4466:12, 4472:23, 4473:4
**moved** [5] - 4455:24, 4456:5, 4456:13, 4471:1, 4471:2
**moving** [5] - 4400:22, 4410:15, 4410:16, 4426:6, 4473:4
**MR** [33] - 4396:6, 4396:18, 4396:21, 4396:24, 4399:19, 4401:14, 4401:20, 4408:6, 4408:10, 4408:12, 4420:21, 4421:14, 4423:1, 4427:2, 4427:9, 4431:15, 4431:16, 4439:8, 4440:3, 4440:20, 4441:8, 4448:10, 4449:7, 4465:14, 4467:22, 4468:21, 4482:24, 4483:7, 4483:11, 4483:12, 4483:19, 4484:2, 4484:3
**multichannel** [1] - 4472:19
**multiple** [5] - 4407:14, 4458:1, 4458:2, 4468:16, 4477:15
**multiproduct** [2] - 4472:11, 4472:19

## N

**nailed** [1] - 4442:24
**name** [1] - 4427:14
**National** [1] - 4420:8
**nature** [1] - 4413:14
**near** [1] - 4403:21
**need** [14] - 4406:16, 4409:24, 4410:2, 4413:8, 4418:22, 4423:12, 4427:3, 4434:14, 4443:20, 4447:4, 4452:22, 4468:22, 4476:8, 4482:23
**negligible** [1] - 4439:5
**net** [4] - 4404:24, 4405:11, 4405:12, 4417:18
**never** [2] - 4417:22, 4450:11
**new** [9] - 4409:16, 4410:4, 4410:8, 4445:7, 4455:20, 4455:25, 4457:2, 4457:5, 4457:24
**New** [2] - 4403:21, 4436:10
**newer** [3] - 4409:10, 4409:11, 4428:7
**newly** [1] - 4409:4
**next** [22] - 4396:15, 4399:22, 4401:9, 4408:17, 4413:16, 4426:7, 4434:20, 4437:14, 4440:15, 4443:4, 4443:7, 4444:9, 4449:6, 4449:17, 4454:3, 4469:22, 4472:1, 4475:14, 4476:23, 4479:10, 4480:20, 4482:15
**Nina** [1] - 4392:17
**nina.hale@usdoj.gov** [1] - 4392:19
**nine** [3] - 4483:2, 4483:4, 4483:6
**nonchallenge** [1] - 4424:19
**none** [1] - 4429:23
**nonetheless** [1] - 4468:24
**nontransitory** [5] - 4416:12, 4417:11, 4418:6, 4419:9, 4430:22
**North** [1] - 4436:10
**note** [3] - 4429:17, 4438:12, 4471:15
**noted** [1] - 4403:16
**notes** [1] - 4437:3
**nothing** [2] - 4448:24, 4452:9
**notwithstanding** [1] - 4482:18
**November** [3] - 4403:6, 4403:7, 4443:12
**number** [15] - 4409:15, 4411:5, 4425:2, 4432:16, 4446:11, 4450:23, 4456:25, 4457:23, 4461:19, 4461:22, 4462:1, 4462:2, 4470:14, 4477:17
**numbers** [8] - 4400:18, 4434:24, 4436:23, 4443:7, 4443:9, 4453:22, 4454:12, 4479:12
**NW** [12] - 4392:14, 4392:18, 4392:22, 4393:2, 4393:7, 4393:10, 4393:17, 4394:2, 4394:6, 4394:10, 4394:14, 4394:18
**NXR** [1] - 4434:7

## O

**o'clock** [2] - 4483:2, 4483:6

**observe** [7] - 4430:25, 4431:13, 4438:13, 4444:7, 4455:20, 4478:22, 4479:15
**observed** [5] - 4421:3, 4428:8, 4467:19, 4468:19
**observes** [2] - 4443:12, 4443:23
**obvious** [1] - 4471:21
**obviously** [4] - 4409:16, 4436:20, 4436:23, 4441:23
**occur** [6] - 4417:6, 4417:7, 4417:13, 4420:1, 4431:10
**occurred** [2] - 4419:24, 4467:11
**occurring** [2] - 4403:8, 4430:25, 4444:22, 4457:25
**occurs** [5] - 4419:16, 4422:22, 4430:15, 4430:16, 4447:12
**October** [1] - 4403:22
**odd** [1] - 4455:22
**OF** [8] - 4392:1, 4392:3, 4392:9, 4392:13, 4392:17, 4392:21, 4393:2, 4393:6
**offer** [3] - 4410:25, 4461:21, 4461:23
**offered** [1] - 4411:5
**offering** [1] - 4441:13
**Office** [3] - 4404:16, 4404:23, 4407:11
**office** [1] - 4404:16
**OfficeMax** [4] - 4404:16, 4404:23, 4407:11, 4424:16
**OfficeMax-Office** [1] - 4404:16
**official** [1] - 4420:7
**Official** [2] - 4394:21, 4485:4
**offs** [2] - 4451:5, 4452:3
**often** [4] - 4448:1, 4451:11, 4477:20, 4477:21
**Oklahoma** [1] - 4436:15
**older** [1] - 4409:5
**once** [1] - 4483:14
**one** [94] - 4396:18, 4400:20, 4401:24, 4401:25, 4403:17, 4404:9, 4404:11, 4404:25, 4408:7, 4409:15, 4409:16, 4409:19, 4409:25, 4410:1, 4410:23, 4412:23, 4414:12, 4414:17, 4414:18, 4414:21, 4416:19, 4420:17, 4420:18, 4421:11, 4424:3, 4425:3, 4427:3, 4429:7, 4429:22, 4430:23, 4432:16, 4432:19, 4433:5, 4433:10, 4433:22, 4434:14, 4435:9, 4436:12, 4436:19, 4437:13, 4438:22, 4439:5, 4441:7, 4442:6, 4442:8, 4442:24, 4443:12, 4443:22, 4445:14, 4447:2, 4451:14, 4451:15, 4453:4, 4453:21, 4453:23, 4455:20, 4456:9, 4458:7, 4458:10, 4458:11, 4460:3, 4460:24, 4461:19, 4461:22, 4462:1, 4463:1, 4465:24, 4466:23, 4466:25, 4467:4, 4470:18, 4473:5, 4473:7, 4473:20, 4473:21, 4473:25, 4474:1, 4474:3, 4475:23, 4476:2, 4476:13, 4476:14, 4476:23, 4477:15, 4478:14, 4479:19, 4480:9, 4482:11

**one's** [2] - 4430:5, 4430:6
**one-day** [2] - 4401:24, 4401:25
**ones** [2] - 4421:5, 4453:23
**online** [1] - 4445:24
**operate** [1] - 4457:19
**opinion** [5] - 4405:16, 4416:5, 4420:4, 4432:15, 4452:8
**opinions** [3] - 4435:24, 4437:15, 4437:17
**opportunities** [2] - 4410:13, 4414:10
**opportunity** [4] - 4410:11, 4415:11, 4415:25, 4457:5
**opposed** [3] - 4433:14, 4452:14, 4459:12
**opposite** [3] - 4407:2, 4407:3, 4433:17
**optimal** [2] - 4411:22, 4414:10
**option** [5] - 4446:25, 4447:5, 4447:20, 4447:23, 4447:24
**orange** [4] - 4473:21, 4473:23, 4474:5, 4474:16
**oranges** [2] - 4433:20, 4478:2
**order** [4] - 4422:7, 4465:17, 4468:23, 4475:5
**ordering** [1] - 4430:12
**original** [1] - 4482:2
**Orszag** [10] - 4395:4, 4396:7, 4399:20, 4408:13, 4432:10, 4432:11, 4434:22, 4456:11, 4479:12, 4483:16
**otherwise** [1] - 4404:13
**ought** [1] - 4396:19
**outcomes** [2] - 4411:7, 4433:24
**outset** [1] - 4400:5
**outside** [1] - 4406:3
**ovens** [8] - 4409:23, 4422:12, 4432:24, 4433:1, 4433:7, 4433:14, 4436:5, 4454:8
**overall** [2] - 4401:4, 4439:13
**overwhelming** [1] - 4431:6
**own** [5] - 4473:14, 4474:1, 4474:5, 4476:3, 4480:11

**P**

**P.C** [5] - 4403:20, 4438:18, 4439:7, 4439:11, 4471:15
**p.m** [2] - 4392:6, 4484:8
**pace** [2] - 4409:6, 4409:8
**page** [20] - 4401:9, 4408:18, 4427:8, 4436:6, 4437:12, 4446:9, 4446:10, 4447:11, 4448:12, 4448:14, 4469:22, 4470:9, 4470:12, 4470:22, 4472:12, 4475:12, 4476:4, 4476:6, 4476:23
**PAGE** [1] - 4395:2
**pages** [1] - 4485:5
**paper** [4] - 4408:8, 4473:18, 4474:20, 4475:2
**papers** [2] - 4474:24, 4475:1
**paragraph** [4] - 4426:25, 4427:8, 4427:11, 4427:22

**paraphrase** [1] - 4427:22
**parse** [1] - 4421:5
**part** [14] - 4400:6, 4406:18, 4412:13, 4412:17, 4414:1, 4422:16, 4426:5, 4428:13, 4451:10, 4477:24, 4479:18, 4480:13, 4481:10
**participants** [1] - 4439:1
**particular** [3] - 4401:1, 4401:7, 4402:17
**parties** [8] - 4405:22, 4408:2, 4408:5, 4428:19, 4428:23, 4436:12, 4445:5, 4456:18
**parts** [4] - 4413:13, 4413:17, 4413:18, 4413:19
**party** [1] - 4419:17
**pattern** [4] - 4442:15, 4442:18, 4442:20, 4480:3
**Paul** [2] - 4394:1, 4394:5
**paul.denis@dechert.com** [1] - 4394:8
**paul.friedman@dechert.com** [1] - 4394:4
**Paula** [1] - 4393:13
**pay** [5] - 4447:18, 4477:13, 4478:10, 4478:14, 4479:16
**pays** [2] - 4477:8, 4477:9
**Penney** [1] - 4434:12
**people** [21] - 4406:4, 4411:9, 4419:4, 4421:24, 4429:8, 4429:13, 4430:21, 4445:1, 4450:25, 4464:15, 4466:3, 4466:10, 4466:11, 4466:12, 4467:13, 4478:10, 4478:21, 4478:23, 4481:16, 4481:19
**Pepsi** [1] - 4474:2
**per** [1] - 4449:19
**percent** [19] - 4400:15, 4400:16, 4406:13, 4406:14, 4414:5, 4418:8, 4439:13, 4439:14, 4453:4, 4455:19, 4471:10, 4471:13, 4473:11, 4474:3, 4477:21, 4478:9, 4478:10
**percentage** [5] - 4409:4, 4428:24, 4438:8, 4450:12, 4471:13
**percentages** [2] - 4408:21, 4435:20
**performance** [2] - 4401:1, 4416:22
**perhaps** [1] - 4456:3
**period** [10] - 4400:12, 4402:4, 4402:5, 4404:4, 4404:6, 4406:5, 4416:18, 4421:10, 4421:15, 4430:11
**periods** [6] - 4401:7, 4402:1, 4403:15, 4404:1, 4404:9, 4430:8
**person** [4] - 4403:24, 4407:5, 4425:18, 4459:25
**person's** [1] - 4477:14
**personally** [1] - 4451:16
**persuade** [1] - 4476:19
**persuaded** [1] - 4461:9
**persuasive** [5] - 4419:11, 4461:7, 4461:16, 4461:18, 4476:20
**phrase** [2] - 4400:2, 4412:4
**pick** [2] - 4431:10, 4475:23
**picked** [1] - 4446:15
**pie** [6] - 4431:20, 4431:21, 4432:2,

4432:11, 4433:11, 4433:13
**piece** [1] - 4420:17
**pieces** [2] - 4465:25, 4476:24
**pies** [2] - 4409:21, 4409:22
**pink** [1] - 4411:17
**place** [3] - 4411:10, 4442:1, 4454:18
**places** [2] - 4447:23, 4470:1
**Plaintiff** [3] - 4392:4, 4392:13, 4393:1
**plan** [1] - 4445:19
**plant** [6] - 4436:4, 4436:10, 4436:15, 4436:17, 4455:25, 4456:1
**plants** [2] - 4435:22, 4436:14
**player** [3] - 4439:13, 4453:3, 4453:4
**players** [7] - 4412:24, 4414:23, 4425:20, 4438:14, 4454:25, 4455:9, 4455:19
**pocket** [3] - 4446:5, 4446:12, 4463:19
**point** [21] - 4402:23, 4404:12, 4410:8, 4415:19, 4427:7, 4427:11, 4429:19, 4432:2, 4432:5, 4432:6, 4437:14, 4439:24, 4440:16, 4440:25, 4442:9, 4442:24, 4453:24, 4464:22, 4470:3, 4470:13, 4473:25
**pointed** [3] - 4435:11, 4438:3, 4477:19
**points** [10] - 4410:15, 4410:25, 4414:21, 4427:15, 4438:1, 4438:14, 4440:2, 4443:1, 4470:2, 4471:14
**poke** [1] - 4423:25
**policy** [1] - 4465:23
**poor** [1] - 4461:4
**portion** [2] - 4403:18, 4435:11
**portrayed** [2] - 4457:22, 4461:15
**portraying** [1] - 4469:24
**position** [2] - 4407:21, 4410:9
**possible** [3] - 4415:22, 4418:4, 4449:10
**post** [9] - 4412:18, 4425:23, 4450:15, 4454:7, 4455:1, 4455:10, 4455:21, 4457:1, 4468:17
**post-merger** [8] - 4425:23, 4450:15, 4454:7, 4455:1, 4455:10, 4455:21, 4457:1, 4468:17
**posted** [1] - 4404:17
**potential** [2] - 4424:6, 4455:16
**potentially** [1] - 4453:15
**power** [5] - 4408:3, 4420:13, 4421:7, 4425:5, 4432:13
**powerful** [2] - 4413:10, 4425:16
**practitioners** [1] - 4416:13
**pre** [1] - 4447:8
**pre-merger** [1] - 4447:8
**preceding** [1] - 4416:22
**precise** [9] - 4416:25, 4425:1, 4426:18, 4434:24, 4436:23, 4437:23, 4438:19, 4438:22, 4442:4
**precisely** [16] - 4415:4, 4417:16, 4432:14, 4433:3, 4433:15, 4449:15, 4450:3, 4455:4, 4459:13, 4462:7, 4465:25, 4467:16, 4468:5, 4468:18, 4480:7, 4480:10
**predict** [2] - 4416:5, 4416:23
**predictions** [3] - 4429:20, 4455:2

**predictive** [1] - 4417:5
**preference** [1] - 4446:8
**preferences** [1] - 4451:24
**prefers** [1] - 4447:21
**Premier** [6] - 4437:25, 4438:4, 4438:18, 4439:4, 4439:10, 4446:13
**Premiers** [1] - 4455:9
**premium** [1] - 4402:14
**prender@jonesday.com** [1] - 4393:15
**prepared** [1] - 4482:16
**presence** [2] - 4412:5, 4438:11
**present** [7] - 4406:20, 4414:10, 4417:18, 4417:24, 4429:3, 4456:25, 4474:10
**presented** [4] - 4407:12, 4433:24, 4461:16, 4474:19
**presenting** [3] - 4405:6, 4434:21, 4454:4
**Presidents'** [1] - 4403:10
**pressure** [2] - 4431:3, 4474:23
**presumably** [1] - 4422:25
**presumption** [1] - 4453:22
**pretty** [1] - 4456:13
**prevail** [1] - 4414:9
**previous** [2] - 4469:25, 4479:21
**previously** [2] - 4423:12, 4426:15
**price** [103] - 4402:22, 4403:20, 4404:1, 4404:3, 4404:24, 4405:11, 4405:13, 4410:15, 4410:22, 4410:23, 4410:25, 4415:2, 4415:15, 4415:19, 4415:20, 4415:22, 4416:1, 4416:12, 4420:20, 4421:3, 4421:10, 4422:3, 4422:5, 4422:24, 4423:24, 4425:22, 4425:24, 4429:17, 4430:22, 4430:25, 4431:3, 4431:11, 4437:4, 4437:7, 4438:1, 4438:14, 4440:2, 4440:25, 4441:3, 4441:5, 4441:10, 4441:14, 4441:19, 4441:20, 4441:21, 4441:22, 4441:23, 4442:5, 4442:7, 4442:12, 4443:1, 4444:5, 4444:16, 4444:19, 4447:13, 4447:14, 4447:22, 4448:4, 4448:9, 4448:11, 4449:18, 4449:20, 4450:5, 4450:6, 4450:11, 4452:7, 4452:14, 4452:17, 4455:17, 4457:4, 4457:6, 4457:12, 4461:22, 4462:3, 4463:11, 4464:1, 4464:7, 4466:11, 4466:25, 4467:4, 4467:13, 4467:14, 4467:18, 4467:20, 4473:8, 4473:10, 4473:11, 4473:23, 4474:3, 4474:23, 4475:19, 4475:24, 4476:11, 4477:11, 4477:24, 4478:6, 4478:7, 4478:12
**price/quality** [1] - 4451:8
**priced** [12] - 4438:20, 4441:13, 4443:15, 4443:16, 4443:25, 4444:3, 4444:13, 4450:20, 4450:21, 4450:22
**prices** [51] - 4401:12, 4401:15, 4402:10, 4404:17, 4404:18, 4404:23, 4404:24, 4405:11, 4408:10, 4414:8, 4414:9, 4414:11, 4419:18, 4421:9, 4421:21, 4426:24, 4427:21, 4427:25, 4428:19,

4437:8, 4441:6, 4441:16, 4442:14, 4442:15, 4446:15, 4446:16, 4448:18, 4450:15, 4451:12, 4456:18, 4459:4, 4460:22, 4462:4, 4462:25, 4463:24, 4463:25, 4464:4, 4477:1, 4477:2, 4478:16, 4478:17, 4478:20, 4478:21, 4479:2, 4479:15, 4479:20, 4479:22, 4479:24, 4480:12, 4480:13
**pricing** [3] - 4458:23, 4458:25, 4459:3
**primary** [3] - 4448:17, 4448:19, 4476:24
**principal** [1] - 4461:14
**probative** [1] - 4478:18
**problem** [4] - 4439:6, 4465:17, 4465:19, 4482:12
**problems** [1] - 4482:7
**procedural** [1] - 4406:7
**proceed** [3] - 4407:6, 4425:21, 4433:4
**proceedings** [1] - 4485:6
**Proceedings** [2] - 4394:25, 4484:8
**process** [5] - 4405:22, 4406:5, 4406:17, 4406:18, 4468:5
**produce** [5] - 4415:14, 4415:21, 4416:2, 4464:17, 4474:15
**produced** [2] - 4394:25, 4410:11
**producer** [1] - 4474:10
**producers** [1] - 4413:20
**product** [54] - 4402:7, 4402:8, 4410:4, 4410:8, 4410:9, 4410:11, 4410:12, 4411:17, 4415:14, 4415:21, 4416:2, 4420:19, 4437:8, 4438:22, 4441:6, 4441:14, 4441:23, 4442:2, 4442:4, 4442:5, 4444:4, 4444:20, 4447:4, 4447:7, 4447:8, 4448:1, 4448:2, 4449:23, 4450:9, 4450:17, 4450:24, 4451:13, 4451:14, 4451:15, 4451:17, 4451:20, 4451:22, 4452:17, 4454:14, 4458:8, 4458:9, 4464:16, 4464:17, 4466:25, 4467:1, 4472:6, 4472:7, 4473:13, 4474:1, 4474:10, 4474:15, 4481:10
**production** [5] - 4428:13, 4437:6, 4437:7, 4455:25, 4456:5
**products** [45] - 4402:6, 4409:5, 4409:9, 4409:10, 4409:12, 4409:16, 4409:17, 4411:1, 4411:11, 4411:15, 4418:4, 4418:5, 4422:5, 4430:19, 4432:20, 4434:6, 4434:8, 4438:21, 4440:2, 4441:13, 4442:20, 4442:25, 4443:15, 4443:16, 4443:17, 4443:19, 4443:21, 4443:24, 4443:25, 4444:3, 4444:12, 4444:13, 4458:1, 4461:21, 4461:24, 4464:19, 4467:15, 4467:17, 4470:2, 4473:14, 4473:15, 4474:16
**Professor** [46] - 4400:16, 4411:3, 4412:3, 4413:21, 4414:4, 4419:13, 4420:18, 4421:19, 4422:2, 4422:7, 4426:10, 4429:14, 4430:13, 4431:9, 4431:18, 4433:9, 4435:16, 4435:23, 4437:15, 4438:23, 4442:6, 4444:18, 4451:1, 4452:4, 4453:24, 4454:5,

4454:23, 4455:2, 4458:13, 4460:6, 4469:5, 4470:7, 4470:18, 4473:1, 4474:19, 4475:4, 4476:7, 4476:17, 4478:5, 4479:1, 4479:19, 4479:20, 4480:15, 4483:8, 4483:13, 4483:19
**professor** [2] - 4424:2, 4473:17
**profit** [2] - 4449:21, 4466:22
**profitable** [4] - 4473:9, 4474:6, 4475:24, 4476:10
**profitably** [2] - 4418:6, 4464:18
**profits** [5] - 4416:3, 4448:21, 4448:22, 4449:12, 4467:6
**prolific** [1] - 4473:17
**promises** [2] - 4482:18, 4482:19
**promotion** [2] - 4402:3, 4404:4
**promotional** [2] - 4402:1, 4404:9
**promotions** [6] - 4401:23, 4404:6, 4404:11, 4404:13, 4404:18, 4405:11
**promptly** [1] - 4483:6
**property** [1] - 4460:1
**proportionally** [1] - 4454:24
**proposition** [2] - 4445:18, 4474:2
**protect** [2] - 4431:4, 4468:18
**protected** [5] - 4424:25, 4425:2, 4448:7, 4468:4, 4468:24, 4469:1
**protecting** [2] - 4449:14, 4450:17
**protects** [1] - 4445:9
**proverbial** [2] - 4461:9, 4462:12
**provide** [2] - 4424:21, 4437:25
**provided** [1] - 4477:18
**providing** [1] - 4401:8
**public** [2] - 4408:8, 4440:16
**publish** [1] - 4405:15
**published** [1] - 4405:17
**pull** [1] - 4406:25
**pump** [1] - 4465:20
**pumps** [1] - 4460:24
**punch** [1] - 4412:20
**punches** [1] - 4412:18
**punish** [1] - 4459:9
**punishing** [3] - 4458:4, 4458:6, 4459:10
**purchase** [1] - 4404:11
**purchases** [1] - 4404:10
**pure** [1] - 4446:18
**purely** [2] - 4417:22, 4446:19
**purple** [2] - 4411:17, 4470:6
**purpose** [1] - 4455:3
**purposes** [4] - 4423:7, 4446:16, 4453:21, 4455:18
**push** [1] - 4406:25
**put** [5] - 4410:3, 4421:1, 4425:18, 4431:20, 4442:2

## Q

**quality** [7] - 4415:17, 4444:20, 4448:4, 4451:10, 4451:11, 4451:11, 4451:19, 4451:21
**quality-adjusted** [1] - 4451:11
**quantity** [6] - 4415:15, 4415:19,

4415:21, 4415:22, 4416:1, 4416:2
**quarter** [2] - 4399:25, 4409:3
**questioned** [1] - 4475:7
**questions** [3] - 4396:19, 4424:18, 4435:9
**quickly** [10] - 4413:2, 4413:4, 4428:8, 4429:16, 4430:17, 4431:1, 4437:5, 4452:20, 4456:11, 4456:13
**quite** [1] - 4429:9
**quote** [1] - 4474:8
**quoted** [1] - 4475:14

# R

**race** [1] - 4400:7
**raise** [23] - 4414:9, 4414:11, 4419:18, 4423:24, 4425:22, 4427:25, 4428:19, 4437:4, 4447:13, 4448:8, 4448:11, 4449:18, 4450:5, 4450:6, 4457:4, 4457:6, 4462:4, 4466:11, 4473:9, 4473:11, 4474:3, 4475:24, 4476:11
**raises** [2] - 4422:22, 4473:8
**raising** [1] - 4450:11
**ramp** [2] - 4437:6, 4437:7
**range** [33] - 4409:18, 4416:11, 4425:22, 4438:7, 4441:20, 4445:7, 4446:3, 4446:6, 4446:24, 4447:14, 4447:17, 4447:21, 4447:22, 4449:19, 4450:1, 4450:8, 4452:14, 4452:15, 4452:16, 4462:14, 4463:14, 4463:15, 4463:25, 4464:19, 4466:10, 4466:11, 4466:12, 4466:13, 4477:22
**ranges** [31] - 4402:16, 4422:11, 4432:24, 4432:25, 4433:7, 4433:14, 4435:5, 4436:10, 4436:13, 4436:15, 4436:17, 4438:9, 4442:12, 4443:8, 4443:10, 4443:11, 4446:11, 4449:19, 4450:20, 4450:21, 4450:22, 4452:7, 4453:9, 4454:7, 4454:9, 4466:23, 4473:6, 4473:8
**rapid** [1] - 4437:11
**rapidly** [3] - 4400:19, 4400:20, 4435:1
**rate** [2] - 4432:19, 4436:8
**rates** [1] - 4436:21
**rather** [9] - 4406:4, 4411:24, 4431:3, 4447:6, 4451:16, 4454:1, 4466:24, 4467:3
**rationale** [3] - 4407:10, 4424:24, 4427:21
**RC** [1] - 4474:2
**reach** [6] - 4425:12, 4456:20, 4458:11, 4468:23, 4475:5, 4478:24
**reached** [1] - 4425:13
**reaches** [1] - 4417:5
**reaching** [2] - 4441:16, 4459:11
**react** [1] - 4424:7
**reaction** [1] - 4412:24
**read** [5] - 4402:11, 4410:14, 4419:10, 4434:11, 4482:4

**reading** [1] - 4425:6
**real** [2] - 4401:8, 4474:4
**real-world** [1] - 4401:8
**reality** [1] - 4460:21
**really** [7] - 4403:6, 4419:25, 4445:13, 4446:3, 4447:4, 4449:5, 4481:25
**reason** [1] - 4437:2
**reasonable** [6] - 4414:7, 4417:7, 4417:8, 4419:4, 4452:18
**reasons** [11] - 4401:10, 4424:19, 4425:2, 4426:18, 4426:23, 4461:7, 4461:8, 4461:13, 4461:14, 4461:17, 4461:19
**rebuttal** [1] - 4483:15
**recapture** [6] - 4473:13, 4474:18, 4475:10, 4475:19, 4475:20, 4475:25
**recent** [2] - 4404:12, 4428:8
**recently** [4] - 4400:14, 4400:20, 4414:6, 4414:16
**recess** [1] - 4482:21
**recession** [12] - 4419:24, 4420:1, 4420:7, 4421:17, 4421:20, 4421:24, 4422:8, 4422:10, 4429:4, 4429:5, 4429:23, 4429:24
**Recession** [1] - 4422:21
**recipient** [1] - 4460:24
**recognizing** [1] - 4442:10
**recommended** [1] - 4407:21
**record** [2] - 4470:9, 4481:12
**record's** [1] - 4402:20
**rectangles** [1] - 4480:22
**redacted** [1] - 4479:13
**referring** [4] - 4405:3, 4405:4, 4440:18, 4442:18
**reflected** [5] - 4409:9, 4412:1, 4426:5, 4450:1, 4451:8
**reflecting** [1] - 4476:4
**reflection** [1] - 4400:21
**reflective** [1] - 4464:20
**refrigeration** [3] - 4422:11, 4423:9, 4480:2
**regarding** [9] - 4396:12, 4399:20, 4415:2, 4425:13, 4435:12, 4437:15, 4450:19, 4456:20, 4479:13
**regression** [4] - 4422:13, 4422:16, 4423:10, 4467:12
**relate** [2] - 4422:17, 4456:16
**relating** [1] - 4483:15
**relationship** [2] - 4444:16, 4479:2
**relative** [6] - 4400:1, 4415:23, 4460:7, 4477:8, 4477:12, 4478:7
**relatively** [4] - 4431:1, 4431:10, 4437:5
**relevance** [1] - 4414:24
**relevant** [21] - 4402:10, 4404:7, 4409:14, 4409:15, 4416:4, 4422:7, 4423:12, 4423:17, 4423:19, 4432:18, 4434:2, 4437:2, 4439:15, 4444:21, 4453:21, 4473:12, 4474:10, 4474:15, 4479:1, 4479:18, 4481:6
**rely** [2] - 4460:19, 4463:2

**remain** [1] - 4429:21
**remember** [7] - 4403:19, 4415:11, 4438:2, 4443:17, 4448:15, 4454:21, 4477:14
**reminded** [1] - 4408:6
**reminder** [1] - 4452:23
**remodeler** [1] - 4460:2
**remodeling** [1] - 4430:6
**remove** [1] - 4462:11
**Render** [1] - 4393:13
**repeat** [1] - 4452:22
**repeated** [1] - 4475:14
**rephrase** [2] - 4465:6, 4471:9
**replace** [1] - 4428:5
**replicate** [1] - 4446:17
**report** [9] - 4408:17, 4427:17, 4434:19, 4470:20, 4481:21, 4481:25, 4482:2
**reported** [5] - 4394:25, 4396:15, 4413:16, 4417:3, 4471:5
**reporter** [1] - 4482:20
**Reporter** [3] - 4394:21, 4394:21, 4485:4
**reporting** [1] - 4399:24
**reports** [3] - 4458:14, 4477:20, 4481:14
**reposition** [1] - 4430:19
**request** [4] - 4406:9, 4406:12, 4406:14, 4483:14
**require** [1] - 4472:1
**Research** [1] - 4420:8
**research** [2] - 4445:21, 4445:23
**resist** [1] - 4428:18
**respect** [3] - 4407:19, 4426:17, 4483:7
**respects** [1] - 4409:15
**respond** [1] - 4427:19
**response** [5] - 4430:18, 4432:15, 4435:9, 4437:11, 4455:17
**responses** [1] - 4432:16
**rest** [1] - 4460:18
**result** [10] - 4406:25, 4407:1, 4407:2, 4407:12, 4420:13, 4422:14, 4426:24, 4438:25, 4444:8, 4466:24
**results** [7] - 4408:17, 4421:12, 4422:18, 4456:9
**retail** [15] - 4404:15, 4405:10, 4471:1, 4472:15, 4475:8, 4475:11, 4475:21, 4476:1, 4476:2, 4476:12, 4477:2, 4477:13, 4478:7, 4478:12, 4480:12
**retailer** [8] - 4425:16, 4432:7, 4432:12, 4433:20, 4434:3, 4434:4, 4434:5, 4466:1
**retailers** [29] - 4401:2, 4401:4, 4401:6, 4403:20, 4404:3, 4424:8, 4424:9, 4424:10, 4425:3, 4425:10, 4425:14, 4425:17, 4428:15, 4431:21, 4433:23, 4434:3, 4434:18, 4434:21, 4438:15, 4438:16, 4438:19, 4438:21, 4457:9, 4464:6, 4469:14, 4470:5, 4471:15, 4479:3, 4481:3
**retrospective** [2] - 4413:10, 4467:9
**return** [3] - 4396:7, 4426:6, 4432:19
**returned** [1] - 4456:6

**Revathy** [1] - 4394:17
**reveal** [1] - 4463:16
**revenue** [5] - 4399:25, 4400:3, 4415:23, 4428:24, 4454:12
**revenues** [2] - 4400:24, 4454:17
**reviewed** [3] - 4445:3, 4454:17, 4457:10
**Richard** [5] - 4403:21, 4438:18, 4439:7, 4439:11, 4471:15
**richness** [1] - 4458:19
**riding** [1] - 4466:18
**right-hand** [1] - 4408:20
**risk** [1] - 4432:18
**risks** [1] - 4433:21
**rival** [5] - 4427:13, 4427:14, 4427:16, 4428:2, 4428:4
**rivals** [1] - 4459:4
**robustness** [1] - 4406:24
**rock** [1] - 4413:5
**role** [1] - 4446:21
**Room** [4] - 4392:14, 4392:18, 4392:22, 4394:22
**roughly** [7] - 4424:12, 4428:24, 4429:2, 4432:8, 4444:12, 4444:13, 4446:18
**row** [6] - 4454:11, 4454:12, 4455:5, 4455:11, 4455:13, 4455:22
**RPR** [1] - 4394:21
**run** [6] - 4401:22, 4402:3, 4404:18, 4420:25, 4467:12, 4480:15
**running** [1] - 4436:18

**S**

**sale** [10] - 4396:12, 4401:23, 4401:24, 4401:25, 4434:8, 4438:9, 4439:12, 4441:22, 4449:21, 4478:15
**sales** [22] - 4403:24, 4409:1, 4409:4, 4423:25, 4425:19, 4438:10, 4439:5, 4443:21, 4470:4, 4470:23, 4470:25, 4471:4, 4471:5, 4471:8, 4471:10, 4471:17, 4471:19, 4475:10, 4481:2
**Salop** [1] - 4473:16
**Samsung** [45] - 4396:7, 4396:12, 4399:21, 4399:25, 4400:12, 4402:6, 4402:16, 4408:14, 4409:2, 4409:8, 4409:17, 4410:14, 4411:5, 4412:4, 4412:17, 4423:16, 4428:7, 4428:10, 4434:12, 4434:25, 4435:2, 4435:8, 4436:2, 4436:3, 4440:13, 4440:24, 4441:2, 4441:10, 4442:12, 4442:14, 4443:13, 4443:17, 4446:25, 4447:4, 4447:21, 4450:7, 4450:21, 4450:22, 4452:7, 4452:14, 4454:23, 4455:3, 4457:1, 4481:7, 4481:9
**Samsung's** [3] - 4401:1, 4412:12, 4444:11
**Samsung-LG** [1] - 4454:23
**sat** [1] - 4473:1
**save** [1] - 4461:24
**savings** [1] - 4428:20

**saw** [14] - 4401:4, 4411:3, 4423:15, 4424:9, 4424:10, 4425:15, 4433:8, 4437:19, 4437:22, 4452:16, 4460:6, 4469:8, 4469:25, 4472:2
**scenarios** [1] - 4462:19
**scholar** [1] - 4473:16
**scholars** [1] - 4472:18
**school** [1] - 4404:19
**screen** [2] - 4433:25, 4453:16
**screens** [1] - 4453:20
**seal** [1] - 4423:14
**sealed** [2] - 4397:1, 4399:17
**Sears** [6] - 4428:17, 4470:5, 4471:6, 4471:7, 4471:10
**second** [10] - 4406:9, 4406:12, 4406:14, 4414:4, 4426:11, 4426:14, 4427:11, 4430:4, 4431:19, 4476:7
**see** [47] - 4396:10, 4400:10, 4401:2, 4401:16, 4402:5, 4402:7, 4405:7, 4406:25, 4408:10, 4410:10, 4412:11, 4414:3, 4415:25, 4421:10, 4423:4, 4423:17, 4428:13, 4429:16, 4432:22, 4433:1, 4433:16, 4434:2, 4435:3, 4436:6, 4438:17, 4439:10, 4444:10, 4444:12, 4444:25, 4447:25, 4450:13, 4450:19, 4451:2, 4452:7, 4452:13, 4456:9, 4459:4, 4464:18, 4466:10, 4467:13, 4467:14, 4467:18, 4468:9, 4470:24, 4478:4, 4480:3, 4483:23
**seeing** [2] - 4446:17, 4450:23
**seek** [1] - 4406:8
**seeking** [1] - 4405:23
**seem** [4] - 4410:19, 4416:19, 4417:6, 4441:12
**segment** [4] - 4402:23, 4410:20, 4411:18, 4438:10
**segments** [4] - 4402:12, 4402:13, 4402:19, 4402:21
**self** [7] - 4442:3, 4446:25, 4447:5, 4447:20, 4447:23, 4449:25, 4450:7
**self-clean** [1] - 4446:25
**self-cleaning** [6] - 4442:3, 4447:5, 4447:20, 4447:23, 4449:25, 4450:7
**sell** [16] - 4434:5, 4434:6, 4434:7, 4437:8, 4449:18, 4449:20, 4450:9, 4464:18, 4466:25, 4467:3, 4467:4, 4469:14, 4469:20, 4474:15
**sellers** [1] - 4469:20
**selling** [14] - 4402:5, 4409:13, 4434:4, 4439:4, 4440:24, 4441:3, 4452:16, 4458:1, 4466:22, 4467:6, 4479:3, 4479:18, 4480:8, 4481:11
**sells** [1] - 4466:24
**senior** [1] - 4407:5
**sense** [4] - 4439:16, 4448:8, 4467:10, 4482:20
**sensitive** [1] - 4456:9
**sensitivity** [2] - 4455:15, 4456:8
**sentence** [1] - 4424:14
**separate** [8] - 4412:5, 4412:13, 4423:6,

**separately** [2] - 4412:16, 4423:9
**September** [1] - 4401:19
**series** [1] - 4399:20
**serious** [1] - 4476:21
**serve** [2] - 4413:25, 4442:16
**service** [1] - 4477:18
**services** [1] - 4478:14
**SESSION** [1] - 4392:9
**session** [2] - 4426:12, 4431:20
**set** [9] - 4427:10, 4441:14, 4442:5, 4444:6, 4444:21, 4446:6, 4448:2, 4452:17, 4472:5
**sets** [4] - 4400:7, 4400:9, 4450:17
**seven** [2] - 4446:24, 4480:9
**several** [1] - 4445:4
**Shannon** [1] - 4393:1
**Shapiro** [1] - 4474:21
**share** [43] - 4410:22, 4410:24, 4412:2, 4412:14, 4413:21, 4414:5, 4414:21, 4414:23, 4415:11, 4415:19, 4415:25, 4424:12, 4424:13, 4427:24, 4433:8, 4433:9, 4433:11, 4434:18, 4435:2, 4438:2, 4439:3, 4440:13, 4441:1, 4441:4, 4441:7, 4442:17, 4442:21, 4443:1, 4443:13, 4443:14, 4443:21, 4443:23, 4444:11, 4452:18, 4453:3, 4455:19, 4455:23, 4456:3, 4456:10, 4457:5, 4471:12
**shareholders** [3] - 4467:7, 4468:2, 4468:3
**shares** [7] - 4401:6, 4425:16, 4435:4, 4438:23, 4438:25, 4454:6, 4482:13
**sharp** [1] - 4453:25
**sharp's** [1] - 4436:15
**shelf** [2] - 4409:18, 4410:3
**shifting** [2] - 4457:7, 4482:11
**Short** [1] - 4429:12
**short** [1] - 4478:16
**short-circuited** [1] - 4478:16
**shorten** [1] - 4421:10
**shorthand** [1] - 4394:25
**show** [7] - 4436:1, 4436:7, 4440:25, 4441:1, 4442:2, 4455:15, 4463:16
**showed** [11] - 4401:5, 4423:14, 4425:15, 4431:25, 4432:23, 4436:22, 4441:18, 4454:5, 4454:6, 4466:20
**showing** [1] - 4408:24
**shown** [1] - 4454:19
**showroom** [1] - 4430:20
**shows** [9] - 4420:13, 4428:16, 4433:19, 4434:25, 4441:2, 4443:6, 4444:2, 4455:18, 4479:15
**shrink** [1] - 4426:2
**side** [5] - 4400:22, 4401:11, 4408:20, 4450:2, 4475:11
**significance** [3] - 4414:22, 4435:8, 4454:22
**significant** [14] - 4403:18, 4418:6,

4421:1, 4422:24, 4425:8, 4427:24, 4436:7, 4443:13, 4450:23, 4456:6, 4457:3, 4457:16, 4461:19, 4466:19
**significantly** [2] - 4404:13, 4467:14
**similar** [5] - 4424:12, 4424:16, 4436:22, 4444:8, 4480:3
**similarly** [1] - 4406:19
**simple** [2] - 4411:12, 4411:14
**simplest** [2] - 4437:2, 4467:1
**simplify** [3] - 4411:21, 4415:14, 4415:17
**single** [5] - 4404:9, 4460:3, 4472:6, 4476:2, 4477:9
**sinister** [1] - 4448:25
**sit** [1] - 4414:2
**sitting** [4] - 4418:12, 4457:2, 4475:9, 4481:16
**situated** [1] - 4406:19
**situation** [2] - 4414:10, 4472:11
**sizes** [1] - 4460:7
**skilled** [1] - 4429:9
**skip** [4] - 4436:11, 4436:14, 4436:16
**SKU** [4] - 4440:24, 4441:1, 4441:3, 4441:4
**SKUs** [8] - 4402:6, 4409:5, 4411:4, 4411:5, 4411:9, 4411:20, 4411:23, 4411:25
**slide** [41] - 4396:16, 4399:22, 4400:23, 4408:10, 4408:17, 4408:23, 4411:3, 4413:16, 4424:14, 4425:15, 4426:6, 4426:7, 4426:15, 4431:17, 4431:18, 4432:25, 4434:20, 4437:12, 4438:2, 4440:15, 4440:16, 4440:18, 4440:20, 4444:9, 4445:22, 4449:6, 4449:17, 4451:4, 4454:3, 4457:22, 4459:17, 4459:18, 4472:1, 4476:25, 4479:10, 4480:21, 4482:16
**slides** [10] - 4408:7, 4432:23, 4433:8, 4443:5, 4443:7, 4444:24, 4444:25, 4445:15, 4450:19, 4476:4
**slightly** [4] - 4403:18, 4435:7, 4467:4
**smacked** [1] - 4468:9
**small** [2] - 4418:6, 4438:8
**smaller** [3] - 4422:6, 4447:22, 4455:8
**smallest** [1] - 4418:4
**Smith** [38] - 4445:6, 4445:9, 4445:17, 4445:19, 4446:1, 4446:11, 4446:22, 4447:14, 4448:5, 4449:2, 4449:4, 4449:14, 4449:22, 4449:24, 4450:10, 4450:13, 4451:24, 4460:11, 4460:17, 4461:4, 4461:9, 4461:10, 4462:12, 4462:13, 4463:18, 4464:6, 4465:10, 4465:19, 4466:23, 4466:24, 4467:24, 4468:1, 4468:4, 4468:6, 4468:9, 4468:18, 4468:23
**Smith's** [1] - 4462:5
**Smiths** [4] - 4464:12, 4464:13, 4467:10, 4469:2
**smooth** [1] - 4442:3
**snafus** [1] - 4456:2
**snaps** [1] - 4430:14

**snapshot** [2] - 4434:17, 4436:20
**snazzy** [1] - 4445:7
**so-called** [1] - 4483:1
**soda** [1] - 4474:1
**soft** [2] - 4472:12, 4473:20
**sold** [7] - 4409:10, 4426:4, 4428:16, 4450:20, 4450:21, 4450:22, 4473:8
**someone** [2] - 4416:1, 4465:22
**sometime** [2] - 4430:15, 4467:11
**sometimes** [2] - 4406:6, 4407:9
**somewhat** [4] - 4402:21, 4410:24, 4416:20, 4478:1
**soon** [3] - 4421:1, 4430:15, 4431:10
**sorry** [6] - 4416:10, 4417:19, 4423:8, 4450:20, 4458:6, 4469:20
**sort** [4] - 4413:5, 4430:21, 4431:6, 4472:13
**sound** [2] - 4439:17, 4466:16
**space** [7] - 4409:23, 4425:20, 4426:2, 4430:20, 4434:15, 4457:7, 4468:20
**speaking** [1] - 4446:18
**specific** [1] - 4457:17
**spend** [5] - 4445:7, 4463:17, 4463:24, 4465:9, 4466:16
**spending** [1] - 4430:6
**spent** [1] - 4456:22
**split** [6] - 4431:25, 4432:23, 4433:5, 4433:11, 4433:13, 4433:22
**spoken** [2] - 4414:15, 4483:21
**sponsoring** [1] - 4457:7
**spot** [1] - 4440:8
**squarely** [1] - 4457:11
**squares** [1] - 4453:3
**SSNIP** [2] - 4418:7
**staff** [1] - 4407:5
**stagnant** [1] - 4410:25
**stand** [5] - 4477:19, 4483:13, 4483:14, 4483:16, 4483:17
**standard** [3] - 4421:16, 4422:20, 4458:17
**start** [12] - 4396:3, 4403:2, 4436:4, 4445:18, 4445:20, 4445:23, 4473:3, 4474:2, 4483:2, 4483:4, 4483:6
**started** [2] - 4420:7, 4420:9
**starting** [2] - 4444:15, 4454:18
**starts** [5] - 4400:6, 4422:16, 4422:17, 4423:2
**state** [1] - 4420:12
**statement** [16] - 4405:18, 4407:9, 4407:10, 4407:13, 4424:15, 4424:16, 4424:17, 4424:18, 4425:3, 4425:6, 4426:17, 4426:18, 4429:22, 4435:10, 4435:11, 4460:15
**States** [1] - 4428:11
**STATES** [3] - 4392:1, 4392:3, 4392:10
**statistical** [2] - 4422:13, 4467:12
**status** [1] - 4425:14
**stayed** [1] - 4410:23
**stays** [1] - 4430:23

**steal** [1] - 4415:11
**steel** [2] - 4421:4, 4461:24
**step** [1] - 4471:23
**Steve** [3] - 4473:16, 4474:8, 4475:1
**stick** [1] - 4416:9
**still** [5] - 4451:19, 4465:11, 4465:14, 4469:1, 4483:21
**stop** [3] - 4422:15, 4426:14, 4442:13
**store** [6] - 4404:5, 4425:18, 4463:3, 4463:7, 4463:8, 4463:13
**story** [2] - 4431:8, 4432:8
**stove** [4] - 4462:14, 4466:17, 4466:18
**strategy** [2] - 4410:18, 4411:23
**Street** [10] - 4392:14, 4392:18, 4392:22, 4393:2, 4393:7, 4394:2, 4394:6, 4394:10, 4394:14, 4394:18
**strive** [1] - 4461:3
**strong** [6] - 4412:18, 4427:13, 4427:14, 4427:16, 4427:18, 4446:8
**struggling** [1] - 4460:22
**sub** [1] - 4474:12
**sub-bullet** [1] - 4474:12
**subsegment** [1] - 4439:24
**substantial** [2] - 4470:4, 4471:8
**substantiated** [1] - 4428:20
**substitutes** [2] - 4473:22, 4473:24
**substitution** [1] - 4440:1
**suffered** [1] - 4430:4
**suffering** [2] - 4430:1, 4467:13
**sufficient** [2] - 4458:25, 4459:5
**suggest** [4] - 4422:23, 4431:2, 4440:10, 4452:9
**suggestion** [1] - 4455:24
**suggests** [3] - 4429:12, 4444:2, 4480:11
**Suite** [6] - 4393:3, 4393:7, 4394:3, 4394:7, 4394:15, 4394:18
**SULLIVAN** [1] - 4392:10
**Summit** [5] - 4437:25, 4438:4, 4438:17, 4439:4, 4446:13
**sunny** [1] - 4406:3
**supplier** [8] - 4411:6, 4425:19, 4432:7, 4433:20, 4466:2, 4466:21, 4470:25, 4482:6
**suppliers** [19] - 4411:4, 4413:14, 4427:13, 4427:14, 4427:16, 4440:4, 4440:13, 4445:24, 4456:25, 4457:7, 4458:1, 4463:10, 4464:7, 4466:5, 4466:6, 4466:9, 4481:5, 4481:6, 4481:20
**suppliers'** [1] - 4434:18
**supply** [2] - 4404:17, 4437:5
**support** [5] - 4417:4, 4435:24, 4470:15, 4476:14, 4482:10
**supporting** [2] - 4451:5, 4476:18
**suppose** [1] - 4483:20
**supposed** [2] - 4472:2, 4472:3
**supposedly** [1] - 4432:13
**supposition** [1] - 4443:2

**surprised** [1] - 4410:24
**surprising** [1] - 4441:5
**switch** [4] - 4418:14, 4475:8, 4476:9, 4476:12
**switching** [1] - 4457:7
**system** [1] - 4470:3

# T

**talks** [1] - 4481:21
**target** [1] - 4463:12
**targeting** [2] - 4414:17, 4414:18
**technical** [1] - 4472:22
**temperature** [2] - 4409:19, 4409:20
**temperatures** [1] - 4409:22
**temporary** [1] - 4430:23
**tend** [3] - 4402:1, 4409:10, 4409:11
**Tennessee** [1] - 4436:4
**terms** [19] - 4401:5, 4402:18, 4410:21, 4414:7, 4414:12, 4417:17, 4417:22, 4422:14, 4433:9, 4443:8, 4444:21, 4448:2, 4453:23, 4458:2, 4458:3, 4458:10, 4459:7, 4463:11
**test** [20] - 4406:24, 4408:14, 4413:8, 4421:8, 4422:17, 4451:1, 4456:8, 4458:17, 4471:25, 4472:2, 4472:6, 4472:8, 4472:16, 4472:18, 4473:19, 4475:4, 4475:16, 4482:9, 4483:1
**testified** [11] - 4408:13, 4410:16, 4413:12, 4423:14, 4424:9, 4426:11, 4440:12, 4442:22, 4442:25, 4452:6, 4456:12
**testimony** [27] - 4402:11, 4409:7, 4410:14, 4410:19, 4412:3, 4412:6, 4426:10, 4431:19, 4431:25, 4434:11, 4434:13, 4445:2, 4445:3, 4454:16, 4454:23, 4457:10, 4458:22, 4475:12, 4475:15, 4476:25, 4483:6, 4483:15, 4483:24, 4483:25, 4484:1, 4484:5
**tests** [3] - 4458:17, 4458:20, 4469:5
**Thanksgiving** [2] - 4410:1, 4410:2
**THE** [169] - 4392:1, 4392:10, 4396:2, 4396:20, 4396:23, 4399:18, 4401:13, 4401:17, 4401:18, 4404:12, 4404:15, 4404:25, 4405:2, 4405:3, 4405:5, 4405:7, 4405:9, 4405:15, 4405:17, 4405:19, 4405:20, 4405:25, 4406:3, 4407:15, 4407:16, 4407:18, 4407:23, 4408:9, 4416:4, 4416:10, 4416:21, 4416:25, 4417:3, 4417:10, 4417:12, 4417:13, 4417:15, 4417:16, 4417:20, 4417:21, 4417:25, 4418:12, 4418:14, 4418:16, 4418:17, 4418:18, 4418:21, 4418:23, 4419:1, 4419:4, 4419:6, 4419:8, 4419:10, 4419:13, 4419:19, 4419:21, 4419:22, 4420:1, 4420:3, 4420:5, 4420:6, 4420:7, 4420:16, 4420:17, 4420:23, 4421:13, 4421:22, 4421:23, 4421:24, 4422:2, 4426:14,

4426:20, 4426:21, 4426:22, 4427:1, 4427:5, 4427:6, 4427:7, 4429:4, 4429:7, 4429:11, 4429:12, 4429:19, 4430:1, 4430:2, 4430:3, 4430:5, 4430:7, 4430:9, 4430:12, 4439:2, 4439:6, 4439:10, 4439:19, 4439:21, 4440:18, 4440:22, 4448:5, 4448:6, 4448:17, 4448:19, 4448:21, 4448:22, 4448:23, 4449:1, 4449:4, 4449:5, 4460:10, 4460:16, 4460:17, 4461:5, 4461:6, 4461:11, 4461:13, 4461:18, 4462:5, 4462:7, 4462:8, 4462:9, 4462:11, 4462:16, 4462:17, 4462:18, 4462:22, 4462:24, 4463:2, 4463:4, 4463:5, 4463:7, 4463:9, 4463:10, 4464:8, 4464:10, 4464:14, 4464:15, 4464:22, 4464:25, 4465:2, 4465:3, 4465:7, 4465:9, 4465:10, 4465:13, 4465:15, 4465:17, 4465:19, 4465:21, 4466:3, 4466:5, 4466:6, 4466:8, 4466:14, 4466:19, 4467:2, 4467:3, 4467:6, 4467:8, 4468:9, 4468:12, 4468:13, 4468:14, 4468:15, 4482:18, 4483:4, 4483:9, 4483:23, 4484:4, 4484:6, 4484:7
**themselves** [4] - 4411:1, 4414:10, 4420:15, 4428:8
**theoretical** [1] - 4471:24
**theories** [5] - 4412:23, 4413:8, 4413:11, 4416:7, 4421:8
**theory** [6] - 4407:19, 4412:23, 4412:25, 4424:4, 4467:16, 4480:11
**thereafter** [2] - 4416:24, 4467:11
**they've** [12] - 4400:14, 4400:15, 4400:19, 4400:21, 4401:7, 4410:18, 4414:5, 4416:18, 4434:8, 4434:14, 4456:5
**thin** [1] - 4440:8
**thinking** [3] - 4417:21, 4451:19, 4472:15
**third** [5] - 4427:11, 4434:3, 4434:4, 4434:5, 4478:3
**thoughts** [1] - 4474:25
**thousand** [2] - 4451:14, 4451:17
**three** [13] - 4401:19, 4401:22, 4402:1, 4402:4, 4420:19, 4420:23, 4434:12, 4437:19, 4445:8, 4458:14, 4461:8, 4461:11, 4461:14
**three-week** [1] - 4402:4
**throughout** [2] - 4481:14
**thrown** [1] - 4413:5
**Thursday** [1] - 4392:5
**tie** [1] - 4412:22
**ties** [1] - 4449:6
**tiger** [1] - 4424:1
**timing** [1] - 4431:8
**title** [1] - 4440:16
**today** [16] - 4396:3, 4400:24, 4403:3, 4403:5, 4406:23, 4408:13, 4423:22, 4424:11, 4424:12, 4428:17, 4429:3,

4435:15, 4448:16, 4457:12, 4463:23, 4468:17
**together** [4] - 4449:6, 4453:4, 4459:12, 4482:8
**Toll** [1] - 4460:5
**tomorrow** [2] - 4396:3, 4423:22
**took** [3] - 4423:2, 4429:22, 4443:23
**tools** [1] - 4425:24
**top** [8] - 4402:5, 4402:6, 4402:8, 4413:20, 4440:24, 4441:3, 4452:16, 4479:22
**top-selling** [3] - 4402:5, 4440:24, 4441:3
**topic** [4] - 4421:18, 4437:13, 4452:20, 4453:11
**total** [2] - 4434:5, 4478:8
**Trade** [9] - 4404:21, 4405:6, 4405:15, 4406:8, 4406:21, 4406:22, 4408:2, 4418:1, 4453:15
**trade** [7] - 4415:20, 4448:4, 4450:17, 4450:24, 4451:5, 4451:8, 4452:3
**trade-off** [4] - 4415:20, 4448:4, 4450:24, 4451:8
**trade-offs** [2] - 4451:5, 4452:3
**trading** [2] - 4444:2, 4452:13
**transaction** [1] - 4424:19
**transactions** [1] - 4438:12
**TRANSCRIPT** [1] - 4392:9
**transcript** [2] - 4394:25, 4478:4
**transcription** [2] - 4394:25, 4485:5
**translate** [1] - 4451:12
**transparency** [2] - 4424:21, 4458:25
**transparent** [2] - 4458:23, 4459:4
**TraQline** [1] - 4455:6
**treat** [3] - 4412:16, 4471:19, 4472:15
**treated** [2] - 4470:7, 4471:7
**treating** [1] - 4428:3
**trend** [2] - 4435:3, 4444:7
**trial** [1] - 4476:25
**TRIAL** [1] - 4392:9
**triangle** [1] - 4482:5
**triangles** [5] - 4459:18, 4459:19, 4470:1, 4481:25, 4482:3
**tried** [8] - 4414:9, 4414:11, 4419:22, 4422:20, 4425:22, 4425:23, 4438:24, 4457:4
**trip** [1] - 4419:1
**troubling** [1] - 4463:6
**true** [1] - 4443:2
**try** [17] - 4402:10, 4403:2, 4411:15, 4411:16, 4411:17, 4411:18, 4415:11, 4416:1, 4416:5, 4419:17, 4425:25, 4430:13, 4457:5, 4461:5, 4466:8, 4472:24, 4478:25
**trying** [6] - 4415:24, 4419:1, 4432:5, 4432:6, 4468:16, 4482:22
**tub** [1] - 4413:1
**Tulsa** [1] - 4436:15
**turbulent** [1] - 4413:5

**turkey** [2] - 4409:25, 4410:3
**turn** [7] - 4401:9, 4418:18, 4423:11, 4437:12, 4459:17, 4469:22, 4482:15
**turning** [2] - 4462:10, 4472:1
**tweak** [1] - 4410:11
**twice** [1] - 4409:24
**two** [40] - 4396:19, 4402:1, 4403:16, 4404:16, 4409:23, 4412:22, 4413:7, 4413:11, 4414:16, 4416:13, 4416:18, 4416:22, 4416:24, 4417:14, 4417:15, 4418:11, 4418:16, 4418:17, 4418:19, 4421:8, 4421:11, 4421:15, 4427:14, 4427:15, 4428:2, 4430:10, 4443:4, 4443:7, 4449:19, 4452:3, 4456:17, 4462:2, 4466:22, 4474:21, 4475:23, 4477:17, 4479:24, 4480:22
**two-year** [1] - 4416:18
**type** [4] - 4404:3, 4433:24, 4468:5, 4480:18
**types** [7] - 4404:19, 4404:21, 4409:21, 4417:1, 4425:9, 4438:23, 4464:5

**U**

**U.S** [11] - 4392:13, 4392:17, 4392:21, 4393:2, 4393:6, 4394:22, 4414:6, 4414:19, 4415:13, 4418:1, 4428:11
**unchanged** [1] - 4422:14
**undeniable** [1] - 4400:19
**under** [5] - 4423:13, 4430:9, 4449:24, 4462:19, 4481:23
**undergirding** [1] - 4482:13
**underlying** [1] - 4422:23
**underpinning** [1] - 4471:24
**understating** [1] - 4414:23
**unified** [1] - 4476:2
**unilateral** [4] - 4456:11, 4456:14, 4456:16, 4456:21
**unit** [3] - 4413:21, 4454:6, 4454:13
**UNITED** [3] - 4392:1, 4392:3, 4392:10
**United** [1] - 4428:11
**University** [1] - 4473:18
**unsuccessful** [1] - 4428:1
**up** [22] - 4405:23, 4408:5, 4409:23, 4410:15, 4410:20, 4410:21, 4413:2, 4419:2, 4424:14, 4426:15, 4427:11, 4431:10, 4431:20, 4437:6, 4437:7, 4445:4, 4452:13, 4460:22, 4473:23, 4478:8, 4478:9, 4482:1
**upcoming** [1] - 4483:25
**UPP** [1] - 4483:1
**upward** [2] - 4431:3, 4474:23
**uses** [3] - 4400:17, 4400:20, 4454:12
**usual** [1] - 4472:5
**utilization** [3] - 4436:8, 4436:21, 4436:23

**V**

**valid** [1] - 4445:9
**value** [11] - 4402:13, 4417:18, 4437:16, 4437:19, 4438:9, 4441:25, 4444:16, 4447:23, 4449:25, 4454:14, 4477:24
**value/price** [1] - 4442:23
**values** [3] - 4447:18, 4447:20
**various** [8] - 4402:12, 4402:19, 4409:7, 4416:7, 4438:21, 4445:5, 4453:20, 4456:23
**vast** [2] - 4406:11, 4406:14
**versa** [1] - 4404:23
**versus** [3] - 4409:5, 4422:5, 4442:5
**vertical** [3] - 4442:25, 4445:15, 4446:21
**vertically** [1] - 4444:6
**vice** [1] - 4404:23
**view** [3] - 4453:15, 4464:22, 4476:18
**vigorously** [1] - 4412:14
**virtually** [1] - 4479:24
**VOLUME** [1] - 4392:9

**W**

**Wacker** [2] - 4393:14, 4393:21
**wait** [2] - 4462:5, 4465:15
**walk** [7] - 4403:24, 4445:10, 4463:12, 4470:13, 4470:16, 4472:24, 4476:22
**walked** [1] - 4463:23
**walking** [2] - 4466:17
**wall** [7] - 4422:12, 4432:24, 4433:1, 4433:7, 4433:14, 4436:5, 4454:8
**wants** [4] - 4446:4, 4446:6, 4447:17, 4473:25
**washers** [1] - 4423:6
**Washington** [4] - 4392:6, 4392:15, 4392:19, 4392:23, 4393:3, 4393:8, 4393:10, 4393:18, 4394:3, 4394:7, 4394:11, 4394:15, 4394:19, 4394:22
**waste** [1] - 4439:17
**water** [5] - 4413:1, 4413:2, 4413:3, 4413:6
**Wayne** [1] - 4394:21
**WAYNE** [2] - 4485:4, 4485:8
**ways** [9] - 4400:17, 4402:12, 4422:20, 4426:3, 4461:11, 4468:16, 4470:7, 4478:20, 4481:15
**wealth** [1] - 4406:18
**webbed** [1] - 4459:12
**website** [3] - 4438:17, 4445:25, 4446:9
**week** [1] - 4402:4
**weeks** [7] - 4401:19, 4402:1, 4402:2, 4403:16, 4403:23, 4403:25, 4463:8
**weigh** [1] - 4442:5
**weight** [1] - 4417:23
**welfare** [3] - 4465:23, 4468:1, 4468:2
**well-known** [2] - 4424:2, 4428:2
**West** [3] - 4393:14, 4393:21, 4411:10

**wherein** [1] - 4404:13
**Whinston** [32] - 4400:16, 4411:3, 4412:3, 4419:14, 4426:11, 4429:15, 4430:13, 4431:9, 4431:18, 4435:16, 4435:23, 4438:24, 4442:6, 4451:1, 4452:4, 4453:24, 4454:5, 4458:13, 4460:6, 4469:5, 4470:18, 4473:1, 4475:4, 4476:7, 4478:5, 4479:1, 4479:19, 4479:21, 4480:15, 4483:8, 4483:13, 4483:20
**Whinston's** [7] - 4413:21, 4414:5, 4421:19, 4422:7, 4433:10, 4437:15, 4444:18, 4454:23, 4455:2, 4470:7, 4476:17
**Whirlpool** [32] - 4396:11, 4409:2, 4409:13, 4413:9, 4414:3, 4419:23, 4420:22, 4420:23, 4421:7, 4423:13, 4424:10, 4424:13, 4424:15, 4424:25, 4426:17, 4427:14, 4428:6, 4428:25, 4434:6, 4435:6, 4435:10, 4436:3, 4436:5, 4436:13, 4436:14, 4437:20, 4446:13, 4450:14, 4457:1, 4462:10, 4467:8, 4483:1
**Whirlpool-Maytag** [7] - 4420:22, 4420:23, 4424:10, 4424:15, 4426:17, 4435:10, 4483:1
**whole** [3] - 4417:1, 4441:24, 4456:19
**wholeheartedly** [2] - 4464:12, 4465:21
**wholesalers** [1] - 4422:25
**wide** [2] - 4464:19
**wife** [2] - 4409:21, 4410:1
**William** [1] - 4392:20
**Willig** [1] - 4424:2
**Willig's** [1] - 4474:19
**willing** [1] - 4478:13
**willingness** [1] - 4450:16
**win** [1] - 4413:11
**WITNESS** [79] - 4395:2, 4401:18, 4404:15, 4405:2, 4405:5, 4405:9, 4405:17, 4405:20, 4406:3, 4407:16, 4407:23, 4416:10, 4416:25, 4417:10, 4417:13, 4417:16, 4417:21, 4418:12, 4418:16, 4418:18, 4418:23, 4419:4, 4419:8, 4419:13, 4419:21, 4420:1, 4420:5, 4420:7, 4420:17, 4420:23, 4421:23, 4422:2, 4426:20, 4426:22, 4427:5, 4427:7, 4429:7, 4429:12, 4430:1, 4430:3, 4430:7, 4430:12, 4439:6, 4439:10, 4439:21, 4440:22, 4448:6, 4448:19, 4448:22, 4449:1, 4449:5, 4460:16, 4461:5, 4461:11, 4461:18, 4462:7, 4462:9, 4462:16, 4462:18, 4462:24, 4463:4, 4463:7, 4463:10, 4464:10, 4464:15, 4464:25, 4465:3, 4465:9, 4465:13, 4465:17, 4465:21, 4466:5, 4466:8, 4466:19, 4467:3, 4467:8, 4468:13, 4468:15, 4484:6
**witness** [5] - 4401:14, 4401:15, 4442:11, 4483:8, 4483:10

**word** [1] - 4419:2

**words** [4] - 4417:5, 4424:18, 4470:19, 4481:25

**works** [3] - 4445:16, 4472:18

**world** [9] - 4401:8, 4413:18, 4413:19, 4414:4, 4449:17, 4466:9, 4473:4, 4473:5, 4474:4

**worried** [3] - 4423:24, 4457:12, 4468:25

**worry** [2] - 4424:5, 4468:22

**writer** [1] - 4473:17

**writes** [1] - 4427:12

**written** [1] - 4424:3

**wrote** [1] - 4474:22

# X

**X-13** [2] - 4403:3, 4403:8

# Y

**year** [14] - 4400:15, 4401:21, 4401:22, 4402:2, 4402:25, 4403:19, 4404:19, 4409:24, 4416:9, 4416:18, 4421:11, 4431:1, 4431:11, 4451:14

**years** [24] - 4404:15, 4416:9, 4416:13, 4416:14, 4416:18, 4416:22, 4416:24, 4417:14, 4417:15, 4417:23, 4417:24, 4418:11, 4418:16, 4418:17, 4418:19, 4421:11, 4428:8, 4430:10, 4441:11, 4442:13, 4451:15, 4468:7, 4468:19

**yellow** [3] - 4480:23, 4480:24, 4481:4

**York** [1] - 4403:21

# Z

**zero** [5] - 4414:5, 4414:21, 4414:23, 4453:8, 4454:14