UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Plaintiff,** | ) Civil Action |
| | ) No. 15-1039 |
| **v.** | ) |
| | ) December 4, 2015 |
| **AB ELECTROLUX, et al.,** | ) 9:06 a.m. |
| | ) |
| **Defendants.** | ) Washington, D.C. |
| | ) |
| | ) |

**VOLUME 16 - MORNING SESSION**
*TRANSCRIPT OF BENCH TRIAL PROCEEDINGS*
*(Excluding Closed/Sealed Portions)*
*BEFORE THE HONORABLE EMMET G. SULLIVAN,*
*UNITED STATES DISTRICT COURT JUDGE*

APPEARANCES:

  **For the Plaintiff:**    **Ethan Glass, Trial Attorney**
                            U.S. DEPARTMENT OF JUSTICE
                            450 Fifth Street, NW
                            Room 4000
                            Washington, DC 20001
                            (202) 305-1489
                            Email: Ethan.glass@usdoj.gov

                            **William Henderson Jones, II, Trial
                            Attorney**
                            U.S. DEPARTMENT OF JUSTICE
                            Antitrust Division
                            450 Fifth Street, NW, Room 4000
                            Washington, DC 20001
                            (202) 514-0230
                            Fax: (202) 514-7308
                            Email: Bill.jones2@usdoj.gov

                            **Mark Hamer, Trial Attorney**
                            U.S. DEPARTMENT OF JUSTICE
                            Antitrust Division
                            450 Fifth Street, NW,
                            Washington, DC 20530
                            Email: Mark.hamer@usdoj.gov

APPEARANCES:   Cont.

For the Plaintiff:          **Lisa Scanlon, Trial Attorney**
                            U.S. DEPARTMENT OF JUSTICE
                            Antitrust Division
                            450 5th Street, NW
                            Washington, DC 20530
                            (202) 598-8197
                            Email: Lisa.scanlon@usdoj.gov

                            **Rachel Zwolinski, Trial Attorney**
                            U.S. DEPARTMENT OF JUSTICE
                            Antitrust Division
                            450 Fifth Street, NW
                            Suite 4000
                            Washington, DC 20530
                            Email: Rachel.zwolinski@usdoj.gov

For Defendant:              **John M. Majoras, Esq.**
(AB Electrolux)             JONES DAY
                            51 Louisiana Avenue, NW
                            Washington, DC 20001-2113
                            (614) 281-3835
                            Fax: (202) 626-1700
                            Email: Jmmajoras@jonesday.com

                            **Paula W. Render, Esq.**
                            JONES DAY
                            77 West Wacker Drive
                            Chicago, IL 60601
                            (312) 269-1555
                            Email: Prender@jonesday.com

                            **Kristen A. Lejnieks, Esq.**
                            JONES DAY
                            51 Louisiana Avenue, NW
                            Washington, DC 20001-2113
                            (202) 879-3939
                            Fax: (202) 626-1700
                            Email: Kalejnieks@jonesday.com

                            **Michael R. Shumaker, Esq.**
                            JONES DAY
                            51 Louisiana Avenue, NW
                            Washington, DC 20001
                            (202) 879-3939
                            Email: Mrshumaker@jonesday.com

**APPEARANCES:   Cont.**

| | |
|---|---|
| **For the Defendant:**<br>**(AB Electrolux)** | **Dana Baiocco, Esq.**<br>JONES DAY<br>100 High Street, 21st Floor<br>Boston, MA<br>(617) 449-6889 |
| | **Thomas Demitrack, Esq.**<br>JONES, DAY, REAVIS & POGUE<br>North Point<br>901 Lakeside Avenue<br>Cleveland, OH 44114<br>(216) 586-3939 |
| **For Defendant:**<br>**(General Electric**<br>**Company)** | **Paul H. Friedman, Esq.**<br>DECHERT LLP<br>1900 K Street, NW<br>Suite 1200<br>Washington, DC 20006<br>(202) 261-3398<br>Email: Paul.friedman@dechert.com |
| | **Paul T. Denis, Esq.**<br>DECHERT, LLP<br>1900 K Street NW,  Suite 1200<br>Washington, DC 20006<br>(202) 261-3430<br>Email: Paul.denis@dechert.com |
| | **Michael G. Cowie, Esq.**<br>DECHERT, LLP<br>1900 K Street NW,  Suite 1200<br>Washington, DC 20006<br>(202) 261-3339 |
| | **Brian E. Rafkin, Esq.**<br>DECHERT, LLP<br>1900 K Street NW<br>Suite 1200<br>Washington, DC 20006<br>(202) 261-3318<br>Fax: (202) 261-3333<br>Email: Brian.rafkin@dechert.com |

**APPEARANCES: Cont.**

| | |
|---|---|
| **For Defendant:** | **Matthew Aaron Tabas, Esq.** |
| **(General Electric** | ARNOLD & PORTER LLP |
| **Company)** | 601 Massachusetts Avenue, NW |
| | Washington, DC 20001-3743 |
| | (202) 942-6224 |
| | Fax: (202) 942-5999 |
| | Email: Matthew.tabas@aporter.com |

**Also Present:**

| | |
|---|---|
| **For Samsung** | **Michael Edward Antalics, Esq.** |
| **Electronics America:** | O'MELVENY & MYERS LLP |
| | 1625 Eye Street, NW |
| | Washington, DC 20006 |
| | (202) 383-5343 |
| | Fax: (202) 383-5414 |
| | Email: Mantalics@omm.com |

| | |
|---|---|
| **Court Reporter:** | **Scott L. Wallace, RDR, CRR** |
| | **Official Court Reporter** |
| | U.S. District Court for the District |
| | of Columbia |
| | 333 Constitution Avenue, NW |
| | Room 6503 |
| | Washington, DC 20001 |
| | (202)354-3196 |
| | Email: Scottlyn01@aol.com |

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

1                    **C O N T E N T S**

2

3

**EXAMINATIONS**                                    **Page**

4
   CONTINUED DIRECT EXAMINATION OF JONATHAN ORSZAG      4512
5  BY MR. DEMITRACK:
   CROSS-EXAMINATION OF JONATHAN ORSZAG                 4594
6  BY MR. GLASS:

7                      **EXHIBITS**

8  **DESCRIPTION**                                      **Page**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **MORNING SESSION, DECEMBER 4, 2015**

2     (9:06 a.m.)

3              THE COURTROOM CLERK:  Your Honor, this is Civil Action

4     15-1039, *United States of America versus AB Electrolux, et al.*

5     Will all parties please come forward and introduce yourselves

6     for the record, please.

7              MR. GLASS:  Good morning, Your Honor.

8              THE COURT:  Good morning, Counsel.

9              MR. GLASS:  Ethan Glass for the United States.

10             THE COURT:  Mr. Glass.

11             MR. GLASS:  With me at counsel table today, Mr. Ihan

12    Kim, Ms. Rose Haag, Mr. David Gelfand, Ms. Miriam Vishio and

13    Mr. Mark Hamer.

14             THE COURT:  All right.  Good morning.

15             MR. DENIS:  Good morning, Your Honor.

16             THE COURT:  Good morning, Counsel.

17             MR. DENIS:  Paul Denis from Dechert, LLP on behalf of

18    General Electric, and with me are my colleagues, Mike Cowie and

19    Craig Falls.

20             THE COURT:  All right.  Good morning.

21             MR. DEMITRACK:  Good morning, Your Honor.  Tom

22    Demitrack for Electrolux.

23             THE COURT:  Mr. Demitrack, good morning.

24             MR. DEMITRACK:  With me at counsel table is John

25    Majoras, Erin Shencopp, Joe Sims, Dana Baiocco and Peter Love.

```
1              THE COURT:  All right.  Good morning, everyone.
2              All right.  Let's proceed.
3              MR. DEMITRACK:  Thank you, Your Honor.
4              THE COURT:  Sure.
5              CONTINUED DIRECT EXAMINATION OF JONATHAN ORSZAG
6   BY MR. DEMITRACK:
7   Q.   Good morning, Mr. Orszag.
8   A.   Good morning to you, Mr. Demitrack.
9   Q.   Did you enjoy your evening without lawyers?
10  A.   Very much so.
11  Q.   Let me ask you to assume that you're the head of the merged
12  company, GE and Electrolux, if the transaction goes forward.
13  And let me also ask you to assume that, like all business folks,
14  you want to make more money in the sale of cooking appliances.
15             Can you just assume that you'll be able to increase
16  profits by raising prices by $25, or is there something more
17  that you need to do?  Do you need to conduct analysis to decide
18  whether it would make business sense to do that?
19  A.   Of course you have to look at whether that attempt would be
20  profitable or not, and so you would have to weigh the competing
21  concerns about that attempt to raise price.
22  Q.   So as part of that analysis, would you need to consider
23  whether some customers would no longer buy your products, your
24  cooking products, if you were to raise those prices?
25  A.   That's basic economics, so that as prices go up, there are
```

1    some consumers who will no longer buy those products, and so

2    demand of quantity sold goes down.

3    **Q.**   And as part of your analysis, would you need to consider

4    what the other companies that are competing with the merged

5    company would do in an effort to attract your customers to their

6    products?

7    **A.**   Of course.

8    **Q.**   And how would you go about resolving these various factors

9    that would affect or relate to the decision on whether to raise

10   price?

11   **A.**   Are you asking me if I were as the head of the business unit

12   or as an economist?

13   **Q.**   As the head of the business unit.

14   **A.**   Um, I would go through the process of asking myself the

15   question:  If I raise price, how many of my consumers are going

16   to leave, and on net, am I worse off now if that happens; or am

17   I better off keeping prices where they are today and selling

18   more product?

19          And that's the trade-off that one has to consider.

20   **Q.**   Would it also be relevant whether other competitors who are

21   not currently selling ranges in the United States would enter?

22   Would that be a factor that you would consider?

23   **A.**   It would be one factor that would be considered, yes.

24   **Q.**   And in turning back to the consumers who would buying or not

25   buying your ranges, you wouldn't actually know which of them

1    would still buy your products and which of them would not buy

2    your products if you were to raise price, correct?

3    **A.**   Correct.  If you're the CEO of the company or the person in

4    charge of pricing, you look out to the consumers who are out

5    there in the marketplace, and it's just a big blob, and you know

6    that there are different types of consumers, but you don't have

7    information about each individual consumer, you just see a group

8    of consumers.

9    **Q.**   And it would be necessary -- now, if you're an economist

10   being asked to advise the president of the company should I

11   raise price, it would be necessary to conduct an empirical

12   analysis to see how many consumers fall into those different

13   camps; is that correct?

14   **A.**   Yes.

15   **Q.**   Let's go back to Mrs. Smith.  We talked about her at length

16   yesterday.

17          Is it possible in the hypothetical that you were

18   discussing yesterday that she might, instead of accepting a

19   higher price, purchase a lower priced range from a company such

20   as Summit or Premier?

21   **A.**   Yes.

22   **Q.**   So when you -- when the Court asked you for what are the top

23   three factors that you would consider, would this be a fourth

24   factor that you would consider?

25   **A.**   Yes.

1    **Q.**   Now, if Mrs. Smith really wants the GE range, and if you'd

2    lose more sales to other customers than you would gain from

3    selling at higher prices to Mrs. Smith and the other consumers

4    like her, it wouldn't be rational to raise your prices, would

5    it?

6    **A.**   No.   The proper maximizing decision for the business would

7    be to keep prices right where they are, and so they would not

8    raise price in that circumstance.

9    **Q.**   And in that case, Mrs. Smith is protected from having to

10   raise -- I mean, sorry, by having to pay a higher price?

11   **A.**   Correct.

12   **Q.**   And that's competition.   That's what happens here.

13          The risk that consumers will move to another product

14   rather than pay a higher price for yours is what protects

15   Mrs. Smith; am I correct?

16   **A.**   That is correct.

17   **Q.**   And that's, again, an empirical question.   You can't just

18   assert it as a matter of theory.   You have to look to see how

19   many Mrs. Smiths there are out there, and whether, in light of

20   the number of Mrs. Smiths, it would be profitable to raise price

21   by $25?

22   **A.**   That is correct.

23   **Q.**   Now, there are models that allow you as an economist to

24   answer that question, correct?

25   **A.**   That is correct.

1    **Q.**  And there's data available in this industry that you could

2    use to run those models and answer that question, correct?

3    **A.**  That is correct, looking historically in a static sense.

4    Obviously this is a dynamic market with firms moving their

5    positioning, so if one just cabins it off into the static

6    models, yes.

7    **Q.**  You looked at the work that Professor Whinston did in this

8    case.  Did you see any evidence that he had conducted this

9    empirical test?

10   **A.**  No, he did not.  That's one of my critiques of him which,

11   when we talk about in particular his UPP model, the upward price

12   pressure model, that is one of the things where I think the

13   model fails significantly, not just for what he did within

14   that -- the four corners of that model.

15   **Q.**  Now, now you're the president of the company again.  Why

16   can't you just raise price to Mrs. Smith and the people like her

17   and not to everyone else?

18   **A.**  Because as I said yesterday, you don't know who the

19   Mrs. Smiths are and who the Mr. Joneses are in the world.  You

20   see -- you just see customers, and you know that they have a

21   range of preferences.  And because you know that they have a

22   range of preferences, you can't target that one customer, and so

23   that informs or affects your business decision-making very

24   significantly.

25   **Q.**  Now, you've read the complaint in this case, correct?

1    **A.**   Yes, I have.

2    **Q.**   The government did not define a market of consumers on fixed

3    income budgets, correct?

4    **A.**   No, they did not.

5    **Q.**   And they did not define a market for consumers who would buy

6    only low-priced ranges, correct?

7    **A.**   Not that I saw.  No, they did not.

8    **Q.**   And if the government wanted to allege either a market for

9    consumers on fixed income budgets or a market for consumers who

10   buy only low-priced ranges, they would need empirical support

11   for that market definition, correct?

12   **A.**   Correct.  You could do the hypothetical monopolist test over

13   just, say, low-priced ranges and ask the question of:  Is that,

14   within the four corners of low-priced ranges, a relevant market?

15   **Q.**   Okay.  And you didn't see any evidence of that empirical

16   work done here?

17   **A.**   There was no hypothetical monopolist test done for the low

18   end ranges, and the empirical evidence that we talked about

19   earlier showing where Samsung was taking share from, would then

20   suggest that that hypothetical monopolist would not find it

21   profitable to raise price, suggesting that the low end of the

22   market is not its own relevant market.

23   **Q.**   And that's because -- just to follow up on this answer --

24   there is substitution between consumers who currently purchase

25   at the low end of the market and consumers that are purchasing

1     either in the mass or a higher level of the market?

2     **A.**   Just -- I just want to make sure it's clear for the record,

3     because I think it's important.  Obviously a consumer -- it's

4     quite unlikely a consumer would move from a $400 range to, say,

5     a $2,000 range, but there's a chain of is substitution.  There's

6     some consumers who are looking for a $400 range but would

7     consider a 5- or $600 range with certain product features.

8     There's consumers who are at $500 that would upgrade or

9     downgrade, depending upon the various pricing of those ranges.

10    Some consumers that are sitting at the $600 range, some at the

11    7, some at the 8, some at the 9, and it's the linkages across

12    all of them, that they're -- the consumers are sitting at each,

13    in essence, bucket, and that there are ranges in each bucket and

14    ranges above and below that are -- that form the dynamic and the

15    complex nature of this market.

16    **Q.**   So there are -- if I could say, there are ranges of ranges,

17    and there are ranges of consumers, and they are all making

18    different decisions as they look at the prices of the various

19    ranges?

20    **A.**   Correct.

21    **Q.**   And the suppliers today are facing that dynamic in the

22    marketplace?

23    **A.**   Correct.

24    **Q.**   And you used the word "heterogeneous" to describe the

25    products that are offered for sale.

1          I believe both you and Professor Whinston used that

2     term, correct?

3     **A.**   Yes.

4     **Q.**   What does that term mean?

5     **A.**   It just means that we're -- we're all different.  I mean, in

6     reality we're all very similar as human beings, et cetera.  We

7     shouldn't focus on our differences, but in terms of our

8     preferences about ranges, we're -- we are all different.  Some

9     people may want to buy GE products for whatever reason, maybe

10    they live near a GE factory, maybe they have a family member

11    that works for GE.  There could be somebody who has a Samsung

12    phone and loves the Samsung phone, so they're looking for

13    Samsung products because they think they're high quality and

14    they like how innovative they are.  There are some people who

15    are on budgets.  There are some people who want to match all

16    their appliances across their kitchen.

17         So when each person walks into a store or each

18    contractor goes to make a decision, they are -- they have

19    different sets of preferences and different budgets, and those

20    different preferences and different budgets are then a critical

21    element of competition in the marketplace.

22    **Q.**   Based on the work that you've done in this case, is price

23    the only factor that consumers consider when they're purchasing

24    a range?

25    **A.**   No, not at all.  There's abundant evidence in this case that

1    consumers look both at price and quality.  And by quality I mean

2    the product feature set that is in the range or the cooktop or

3    the wall oven.

4    **Q.**  Let's return to Defendants' Exhibit 658, the slide deck that

5    we were looking at yesterday.  I want to return very briefly,

6    because I'd like to move on, to Slide 42, which I believe has --

7         MR. DEMITRACK:  One more slide, please, Steve.  It's

8    658-043.

9    BY MR. DEMITRACK:

10   **Q.**  Now, yesterday you testified that Professor Whinston made a

11   mistake in considering recapture from retail when conducting the

12   hypothetical monopolist test for purposes of the contract

13   channel market discussion that he made?

14   **A.**  Yes.

15   **Q.**  And by recapture -- just so I understand -- very briefly,

16   what do you mean and what did he mean?

17   **A.**  What I think he means, and so I -- maybe it's a question

18   best left to him for what he means, but the way -- the only way

19   is to read the words here, is let's think about the hypothetical

20   monopolist over the contract channel, what that -- what we do is

21   we assume a 5 percent increase in price, and we ask the question

22   of:  Is it profitable for that hypothetical monopolist to raise

23   the price by 5 percent for, say, ranges in the contract channel?

24        Of course there's going to be some spill because, as we

25   talked about earlier, as price goes up, some consumers will

1    decide or some, in this case, contract channel customers will

2    decide not to purchase the product because the price has

3    elevated and so quantity goes down, demand goes down.

4         Some of those people will turn to the retail channel.

5    And by recapture, I use -- the way I use the term "recapture"

6    here, and the way it's used by Professor Whinston in his

7    testimony, is the dollars earned in the retail channel on those

8    people who leave.  And you cannot count those dollars to

9    determine whether that elevation in price for the contract

10   channel was profitable.

11   **Q.**   We discussed that yesterday, and I'm not going to go back

12   through that.

13        But just so the record is clear, when you refer to his

14   testimony, you're referring to the testimony that's on page 043

15   here, that is, his trial testimony at page 2721, line 6 through

16   11, and 2721, lines 13 through 18?

17   **A.**   That is correct.

18        MR. DEMITRACK:  Let's go ahead to slide -- or page --

19   Exhibit 0658-048.  And actually, before we do that, let's go

20   back one slide so we can reorient everyone.

21   BY MR. DEMITRACK:

22   **Q.**   We were talking yesterday about Professor Whinston's

23   contract channel, and you testified that, as you understood his

24   trial testimony, it's the entities that are circled in yellow?

25   **A.**   Where it's consistent, and then there's some -- as you

1    recall, I had -- was able to do the John Madden, and there was

2    some sales in this category, and then for Samsung (indicating),

3    some sales in that category.

4    **Q.**   Okay.  So let's go back now to the next slide, 048, which is

5    where we ended our discussion yesterday.

6          And if you could explain to the Court what you are

7    portraying here, in particular starting with the checkmarks, and

8    then moving to the different colored circles.

9    **A.**   Sure.  So I'm sorry this is confusing, but this is, in

10   essence, this is trying to represent the data and how data are

11   being treated, and Professor Whinston's measurements of the

12   contract channel market shares that he puts forward.

13         And so the checkmarks, say, for -- will go -- Home

14   Depot -- actually, I'm going pick P.C. Richard Electrolux.  So

15   he has data for -- and that's the fifth one down.  He has data

16   where Electrolux has identified sales through P.C. Richard as

17   retail sales or contract sales.  And so --

18   **Q.**   And those are the checkmarks?

19   **A.**   Those are the checkmarks.  And he treats them as such.  He

20   treats the sales for retail for Electrolux of P.C. Richard as

21   retail and the sales as contract for P.C. Richard in contract.

22   **Q.**   Okay.  And what does he do with Samsung?

23   **A.**   At P.C. Richard, all of the sales -- this is where the red

24   circle is.  All of the sales are put into the retail category.

25   There are no sales assumed by Professor Whinston in the contract

1    channel.

2    **Q.**   So for the Samsung data that he had, relating to sales to

3    P.C. Richard, he took all of those sales and put them into the

4    retail channel?

5    **A.**   He -- I think the better way to say it is there are data

6    from P.C. Richard that we know they had contract channel sales.

7    We'll see that in a moment.  They're not large, but there are

8    some, and he didn't allocate them to contract.

9    **Q.**   In the purple circles here, what are you reflecting there?

10   And there's a number of them across this slide.

11   **A.**   This is cases where, based on how companies have reported

12   their data, they have allocated all to one category or the

13   other.  So, for example, Electrolux at Home Depot allocates all

14   of its sales to retail.

15   **Q.**   So that's the upper left there.  Okay?

16   **A.**   So that's an upper left-hand corner in purple.  So all of

17   the purple examples are where we observe some contract sales

18   through some entity, through some supplier, but for -- we know

19   that there's a pro desk, say, at Home Depot, and we know that

20   there are contractors who walk down the aisles and purchase

21   product at Home Depot, but all of the sales are treated --

22   instead of to professionals, they're all put into the retail

23   bucket.

24   **Q.**   Even though we know that they are -- there are some sales to

25   professionals?

1  **A.**  Even though that we know that there are some sales to

2  professionals.

3  **Q.**  And, again, that's reflected in the various purple entries?

4  **A.**  That is correct.

5  **Q.**  And the various red entries, in reading your code at the

6  bottom, these are examples where we know there are contract

7  channel sales that are taking place, but they're not in the

8  vendor data or the supplier data?

9  **A.**  They're not in the supplier data, and they're -- I think the

10  most important thing here to focus on is that they're treated

11  inconsistently when we come to the red.

12  **Q.**  Okay.

13  **A.**  So if I could look at just Abt Electronics or Grand

14  Appliance, we can -- they both have very similar treatments.

15  For Abt, Electrolux, GE and Whirlpool report the sales as for

16  retail or contract; Bosch, LG, Samsung do not.  And Professor

17  Whinston treats the data as is for Bosch, LG and Samsung and

18  just puts it all into the retail bucket with no allocation to

19  contract.

20  **Q.**  And then let's look at the yellow.  What's the yellow

21  reflecting?

22  **A.**  Yellow are examples where the entities reported contract

23  sales, but Professor Whinston did not treat them as contract

24  sales.  So we can use -- at Home Depot, GE reported contract

25  sales will through Home Depot, but Professor Whinston treated

1    them all as retail sales, so he did -- he assumed that in this

2    market the sales to contract channel customers, which is what he

3    had described in his report, he would -- were not contract

4    sales.

5    **Q.**   Even though the suppliers reported them as contract sales?

6    **A.**   Even though the supplier reported them as contract sales.

7    **Q.**   Okay.  And did you identify and report in your next slide

8    other issues with what Professor Whinston did in terms of how he

9    calculated the so-called contract channel market shares?

10   **A.**   Yes.

11   **Q.**   Can you briefly take the Court through what you observed

12   based on your work?

13   **A.**   So the next slides are connected together in some ways.  He

14   assumed that certain players had zero sharing contract, so

15   that'd be Arçelik, Haier, Premier, Avanti, Summit, Bertazzoni.

16   And this will be more relevant when you see the next slides.

17          For Sears he made an assumption of allocating Sears

18   sales at 10 percent of them were contract channel sales.  The

19   actual Sears data provided by Sears showed that the number was

20   14.2 percent, so that has some effects.

21          For Sub-Zero, Viking, Crosley, Danby, they did not

22   report the split between contract and retail, so he had to make

23   an allocation.  We know Sub-Zero and Viking are sold primarily

24   through contract, but his allocation was primarily towards

25   retail.  So it's hard to -- he basis it on some other suppliers,

1    and so that's just an empirical fact.

2    **Q.**   And you said there were some other issues that you wanted to

3    discuss with respect to the P.C. Richard's data.

4         MR. DEMITRACK:   Let's turn to that slide, which is the

5    next page, Steve.

6    BY MR. DEMITRACK:

7    **Q.**   Now we -- because P.C. Richard viewed some of this

8    information as confidential, we had to block off the portion of

9    it for the public.  Just so the public knows what's reflected in

10   the black are some market shares or share of sales, and

11   Mr. Orszag will be able to explain that.

12   **A.**   So what this shows -- and maybe there's a little bit of

13   background.  There are two -- Ferguson and P.C. Richard both

14   are -- sell in the contract channel and the retail channel.

15   P.C. Richards primarily retail and then also sells in the

16   contract channel.  I'd say Ferguson primarily contract but also

17   sells to retail customers.

18        And they're the two entities that have provided

19   detailed data for us to analyze, and they're the only two

20   entities I believe that Professor Whinston and I look at in a

21   much greater detail.  And what the data show -- and I'm going to

22   focus first on ranges, and it's actually even more significant

23   when one looks at wall ovens and cooktops -- is that Premier --

24   and we heard about this earlier -- they were not in Professor

25   Whinston's calculation of market shares.  When you look at their

1    share of contract channel sales, through P.C. Richard, they -- I

2    can't mention the number, but they had a --

3    **Q.**  I think we could say it's over 10 percent.

4    **A.**  If we can say that, great.

5         So they're the fourth -- but I think it also matters

6    that they're the fourth largest supplier of ranges.

7         You also have to remember Bertazzoni was not included

8    in the contract channel data, Avanti was not, Arçelik was not,

9    and so these are -- once you start adding them up, Professor

10   Whinston had said that there are essentially only three firms

11   with more than a de minimis share in the contract channel; the

12   three firms being GE, Electrolux and Whirlpool.

13        But when one sums up all the suppliers and ranges that

14   are sold through P.C. Richard, one of the two entities for which

15   we have this detailed data, the number's 24 percent.  So

16   that's -- doesn't meet my definition of de minimis.

17   **Q.**  And these are sales by P.C. Richard to contract channel

18   customers?

19   **A.**  That is correct.

20   **Q.**  And have you also looked at P.C. Richard's contract channel

21   sales of wall ovens and cooktops?

22   **A.**  Yes.  The effects are even more extreme.

23   **Q.**  And let's turn to the next page, which is 658-051.

24        Can you explain to the Court what this is displaying?

25   **A.**  This is the shares of each of the suppliers of P.C. Richard

1    in the -- for contract channel sales for cooktops and wall

2    ovens.  And I think what is important here is, I think, first of

3    all, GE, Electrolux and Whirlpool are number five, six and seven

4    on this list, but if we look at the companies that were excluded

5    from the calculation of market share, it'd be Arçelik and

6    Bertazzoni in this one, and then other, some of the others would

7    be excluded as well.  And especially in cooktops Arçelik is

8    doing very well, and they're a recent entrant.

9    **Q.**  Now, you read Professor Whinston's report and saw Professor

10   Whinston's testimony where he asserted that the P.C. Richard's

11   data was not representative of the rest of the data that he was

12   seeing.

13           Did he have an empirical basis to make that assumption?

14   **A.**  Not that I'm aware of.

15   **Q.**  Do you know whether he did any testing to determine whether

16   the -- what he was seeing in the P.C. Richard's data was an

17   anomaly?

18   **A.**  Not -- you'd have to ask him that question, but there's no

19   empirical analysis, other than him saying that P.C. Richard is

20   focused on the Northeast, because that's where they're located

21   as a retailer, but that doesn't mean they're not representative

22   of other data because we don't have other data, other than

23   looking at Ferguson.  And Ferguson shows a similar pattern of

24   many entities, other GE, Electrolux and Whirlpool, having

25   significant sales in the contract channel consistent with the

1    P.C. Richard's data.  Obviously each of the suppliers have

2    different shares, but the idea that the non-GE, Electrolux,

3    Whirlpool suppliers have very significant shares comes through

4    directly in that data as well.

5    **Q.**   Now, did you also look at margins earned by General Electric

6    and Electrolux in the contract and retail channels?

7    **A.**   Yes, I did.

8    **Q.**   And was that work relevant to your opinions regarding the

9    contract or the claimed contract channel market?

10   **A.**   It is relevant.  It's one of the factors that I consider.

11   And I think Professor Whinston and I probably agree on this.  If

12   you actually look at his figures and my more detailed analysis

13   of this -- because I'm not doing it on an aggregated basis, I'm

14   looking at a product-by-product basis, a much more detailed way

15   to look at it -- we find that the margins are very similar for

16   contract sales and retail sales.

17   **Q.**   And let me ask you to turn to the next slide, please.  And

18   you refer here to Professor Whinston's report, Figure 48?

19   **A.**   That is correct.

20   **Q.**   And does that figure support the opinion that you just

21   offered?

22   **A.**   So he presents it on an aggregated basis, and the numbers

23   bounce around.  It's -- there's a couple percentage point

24   difference in, say, ranges, but then it goes the opposite

25   direction maybe in cooktops.  But you see similar levels across

1    each of the product categories.

2           I do it much more systematically, so I use econometrics

3    to analyze this question to try to control for the various

4    factors that could affect margin differences, and I find a very

5    similar conclusion, that the margins are very similar between

6    sales in the retail channel and the contract channel.

7    **Q.**   So let me ask you to jump forward fairly significantly in

8    the slide deck into the appendix, which is page 96 of the slide

9    deck but 658-097.

10          Is this the regression analysis to which you were

11   referring?

12   **A.**   Yes.

13   **Q.**   Okay.  Lots of numbers.

14          Is there a simple summary you can provide for us?

15   **A.**   Sure.  I'll focus -- what it shows is that for total core

16   appliances, the margin is 1.5 percentage -- 1.6 percentage

17   points lower in the contract channel than in the retail channel,

18   so that would be --

19   **Q.**   And this would be under number one right there (indicating)?

20   **A.**   Oh, okay.  Right there for GE.  And that -- and the three

21   asterisks means that that's actually statistically significant.

22   And for Electrolux, it's .2 percent, and it's not statistically

23   significant, so it's -- it's basically the same as a matter of

24   statistical analysis.

25   **Q.**   Okay.  And let's return to 052 -- 658-052, which is where we

1    were.  And you've titled this slide, "Contract and Retail

2    Channels Show Similar Competitive Outcomes."  We talked about

3    the first bullet.

4         And do the three following bullets support that opinion

5    as well?

6    **A.**   Yeah.  I did analyses of whether you would see the same

7    appliances being sold in the contract channel and in the retail

8    channel, and they look very similar.  Obviously, given that

9    there's the same products being sold, the same innovation

10   benefits are benefitting both channels.  The mix of SKUs and the

11   recent -- how recently they've been introduced is very similar,

12   and -- I mean, again, there was some testimony that the -- when

13   a range is produced at a factory, it doesn't -- there's not one

14   range that says retail on it when it starts down the factory

15   line and another that says contract.  It's a range that's

16   produced, and then once it comes out the door, it's then sold to

17   whatever channel needs the sale at that moment, and sometimes it

18   goes to retail and sometimes it goes to contract.

19   **Q.**   Did you also conduct any analyses to address the extent to

20   which the direct and indirect channels compete?

21   **A.**   Yes, I did.

22        MR. DEMITRACK:  And I think we can skip the next slide

23   and probably look at Slide 054, Exhibit 658-054.

24   BY MR. DEMITRACK:

25   **Q.**   Can you explain to the Court what you did here and what it

1    is that you're reporting?

2    **A.**   So this is a simple graphical representation of what I

3    analyzed more systematically using statistical analysis.  This

4    is the margin that -- on the GE earned --

5    **Q.**   Can I just one -- before you go on.

6         On GE, margin has been redacted, so please don't refer

7    to the number.

8    **A.**   Okay.  I won't.

9    **Q.**   The blue and the red, the rest of it is available to the

10   public.

11   **A.**   So these are the GE margins on cooking appliances in the

12   direct contract segment, and what this looks at is there are --

13   as the -- there's testimony about this.  Electrolux has rolled

14   out -- and had started in the contract channel by selling

15   indirectly through distributors.  It then began to sell

16   directly, and it started with particular geographic areas, and

17   it rolled out those -- it's -- so it took a step-by-step

18   approach to grow into the direct channel.

19        And so we can look at what happens to the GE margin

20   when Electrolux becomes -- goes from being indirect in a market

21   to being direct, and we can test whether that movement from

22   indirect to direct has an effect on GE's direct margins.

23   **Q.**   So what's reflected in the blue here is, in these two

24   cities, is GE's margin on its direct sales from the factory to

25   the direct purchaser, the builder or the other contract channel

1    customer, before Electrolux started serving those customers

2    directly?

3    **A.**   In the aggregate in the market, yes.

4    **Q.**   Okay.

5    **A.**   So this is looking at Dallas, and then in the

6    Washington, D.C. area as well.

7    **Q.**   And the blue is before Electrolux enters?

8    **A.**   The blue is before Electrolux enters, correct.

9    **Q.**   Okay.  Now what -- now can you go on and explain the rest of

10   the slide?

11   **A.**   So Electrolux enters.  And what the bar chart shows is the

12   average margin, and that it's virtually unchanged.  This is a

13   simplistic analysis in terms of graphical representation of it.

14   There's a much more detailed econometric analysis that controls

15   for other factors that then allows me to draw the conclusion

16   that the movement of Electrolux in certain geographic areas into

17   the direct channel does not have a significant effect on GE's

18   margins in those same markets.

19   **Q.**   And did you do this analysis for cities other than Dallas

20   and the Washington area?

21   **A.**   Yes.

22   **Q.**   And did you see any difference in the pattern?

23   **A.**   Once you look at all of the cities together, there was no

24   effect as a matter of statistics on the margins of GE across all

25   of those cities in which Electrolux has entered.

1    **Q.**   Okay.  Did Professor Whinston have a critique of this

2    analysis?

3    **A.**   He had two.

4    **Q.**   And what were they and was he right?

5    **A.**   The first critique he had was he said that I should have

6    controlled for housing starts or building permits in each of the

7    geographic areas that I analyzed.  He did not test that whether

8    it mattered, so I went to the data and I included housing starts

9    as a control variable.

10   **Q.**   So you reran the analysis?

11   **A.**   I reran the analysis, and it showed no significant result.

12   In his last report he said, well, that's --

13   **Q.**   When you said "no significant result," no significant effect

14   or change?

15   **A.**   No significant change.

16   **Q.**   Okay.

17   **A.**   The last result he came back and said something like, "Well,

18   instead of housing starts you should actually include

19   foreclosure rates, the quality of housing, et cetera."  He

20   hasn't done any statistical tests of whether those matter, and

21   at some point you get to the law of diminishing returns, and

22   it's not everything I've tried that he suggested has not had any

23   effect on any of my results, so it's not clear to me why one

24   should think about adding those as well.

25   **Q.**   And what was the second critique?

1    **A.**   The second is what economists call the -- it's an idea of

2    what's called endogeneity, and I'll explain what that means.

3    Instead of the entry of Electrolux affecting the profits of GE,

4    what it may really be is that the profits of GE affect the entry

5    decisions of Electrolux.  And when one thinks about statistical

6    analysis, it's -- when one does the analysis as I've done it,

7    one makes the assumption that it is the entry of Electrolux that

8    affects the margin, and what he's suggesting is that the

9    causation may go the other direction.

10   **Q.**   And what did you conclude?

11   **A.**   I have two general conclusions.  One, on this type of entry

12   exit analysis is done all the time by the antitrust agencies.

13   It's been done in court.  We've mentioned Professor Ashenfelter

14   before.  In the Office Depot/Staples merger case from 1997, I

15   believe it was, or the late '90s, he did exactly this type of

16   entry analysis to look at the effects on prices.  So it's very

17   similar to this approach.

18        But I didn't just stop there and say, "Okay, you know

19   what, that's good enough.  There's some history of doing this

20   type of analysis."

21        I asked the question:  Do you see a different result

22   where Electrolux -- where GE had higher margins verse lower

23   margins, and you don't see a dramatically different result,

24   which would then suggest that that critique is not relevant.

25   But I think the key thing is, there's no evidence that

1    Electrolux's move from the indirect part of the market to the

2    direct part of the market had a downward effect on GE's margins.

3    That's in the end critical.

4    **Q.**  Then you also investigate the extent to which suppliers in

5    the retail channel, so suppliers of cooking appliances, expand

6    into the contract channel?

7    **A.**  Yes, I did.

8    **Q.**  And you report the results of your opinions in the next

9    slide?

10   **A.**  Yes, I do.

11          MR. DEMITRACK:  Let me just state that there's a

12   section here relating to Samsung LG that have been redacted.

13          Your Honor, I need to get his testimony of that into

14   the record.  We can do it with the husher, or if Mr. Glass does

15   not have an objection, we will move this slide in later on.  As

16   long as the slide is in, that's acceptable to me.

17          THE COURT:  Either way is fine.

18          MR. GLASS:  Your Honor, the testimony is in the record.

19          MR. DEMITRACK:  Okay.

20          MR. GLASS:  There's no need for the slide coming in.

21          MR. DEMITRACK:  Okay.  Then let's --

22   BY MR. DEMITRACK:

23   **Q.**  Mr. Orszag, let's do it this way.  It'll be a little more

24   complicated, but I'd like you to explain the support for your

25   opinions for everything, other than the Samsung and LG, those

1   two sub bullets, then we'll have to come up to the husher and

2   get your testimony into the record on that so we have your

3   opinions.

4   **A.**   Sure.  Well, we saw the chart earlier that showed all the

5   paths to end consumers, and there are many paths in which the

6   suppliers today can reach contract channel customers that are

7   very similar to the paths that they reach retail customers.  So

8   the incremental investments necessary to supply are -- the

9   contract channel are relatively small.  We have to remember that

10  in many cases these distribution centers that they create are --

11  are owned by third parties, that the last mile of delivery is

12  actually done by third parties.

13       And I think what comes through in everything that I've

14  seen is that once you're able to serve Home Depot -- which has

15  very tough requirements to serve the market, you have to get the

16  product to one of their 120 distribution centers within 18 hours

17  of an order -- the incremental investments to then serve other

18  parts of the market are a lot less significant.  And so one can

19  reposition oneself into first the direct channel and then grow,

20  if one desires, into the direct channel.  And so that's what

21  Electrolux did, and that's what, based on what I've seen,

22  Samsung and LG plan on doing as well.

23       MR. DEMITRACK:  Okay.  Your Honor, for these next

24  couple of questions, it'd be easier if we just come up to the

25  husher so that --

1              THE COURT:  That's fine.

2              MR. DEMITRACK:  Thank you.

3              THE COURT:  Why don't you step around, sir.

4                        *  *  *  *  *

5              (Thereupon, the following sidebar proceedings were

6    closed by order of the Court and are not included as part of the

7    transcript production in this case.)

8                        *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   ▅▅▅▅▅▅

2         ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

3   ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

4   ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

5   ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

6   ▅▅

7         ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

8   ▅▅▅

9         ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

10        ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

11                     * * * * *

12        (Whereupon, the previously designated closed session

13   sidebar proceedings concluded and the following further

14   proceedings were held in open court.)

15                     * * * * *

16   BY MR. DEMITRACK:

17   **Q.**  Mr. Orszag, did Professor Whinston prepare a slide that, in

18   fact, supports your position that competitors in the retail

19   channel can easily enter and expand into the contract channel?

20   **A.**  Yes, he did.

21           MR. DEMITRACK:  And let's turn to the next page.  Is

22   that the next slide?

23           THE COURT:  Excuse me one minute.

24           (Discussion had off the record.)

25           THE COURT:  All right.  Go ahead.

```
1    BY MR. DEMITRACK:
2    Q.   And just so you know, Mr. Orszag, the center section which
3    is -- reflects quantity into these different channels has been
4    redacted, so please don't refer to those.
5    A.   Sure.  So what this shows is the intensity in which -- for
6    each of the customer channels one uses either the regional
7    distribution centers or factory direct.  And as I've noted, Home
8    Depot is -- has very strict requirements.  And so if one looks
9    at Home Depot here, which is the fifth down, one can see that
10   it -- almost all of the sales or all of the shipments go through
11   the RDC system.
12   Q.   That's 99.7 percent?
13   A.   That is correct.  And that's very similar to the shipments
14   that go through the direct contract channel, which is the next
15   line down.
16   Q.   Where you're reporting that 97 -- or, I'm sorry --
17   A.   98.
18   Q.   -- Professor Whinston is reporting that 97.7 percent go
19   through the RDC?
20   A.   That is correct.  And so once you're -- this is consistent
21   with the testimony in this case -- so this isn't that surprising
22   of a chart -- that once you're able to serve Home Depot, the
23   distribution networks that are required, the infrastructure
24   that's required in terms of distribution, is not very different
25   to serve the contract channel market.
```

1     **Q.**   Okay.  I'd like now to turn several pages ahead, and we're

2     going to talk about efficiencies, so if we could go, please, to

3     658-059, which is the overview slide that you prepared.

4            What are efficiencies in the context of a merger

5     analysis?

6     **A.**   They're the -- one could think about it as the cost savings

7     that businesses can achieve from putting themselves together.

8     They can sometimes be in the form of quality improvements as

9     well.  By putting two entities together, they can actually offer

10    consumers a higher --

11            THE COURT:  Excuse me one second.

12            (Brief pause in proceedings.)

13            THE COURT:  Go right ahead.

14            MR. DEMITRACK:  Thank you, Your Honor.

15    BY MR. DEMITRACK:

16    **Q.**   Mr. Orszag, your voice was fading a little bit, so you might

17    want to keep it up a little bit?

18    **A.**   Oh, I'm sorry.

19    **Q.**   That's okay.  So when we've address efficiencies, you

20    considered three factors, as I understand this slide here.

21            Could you take us first -- through the first one?  And

22    what does it mean to say that efficiencies must be, quote,

23    likely to be accomplished with the proposed merger?

24    **A.**   Well, you can think about efficiencies, there's things

25    businesses can do to reduce costs.  If they can do it on their

1    own, they don't need the merger to do it.  We would say that

2    those are not merger-specific because --

3    **Q.**   You want to exclude those?

4    **A.**   They may be relevant to the business people from an economic

5    perspective; from a antitrust economic's perspective it's

6    appropriate to exclude those.  So we can set aside those items

7    that they could achieve on their own individually and just focus

8    on the ones where the merger is necessary.

9    **Q.**   In order to achieve the efficiencies?

10   **A.**   In order to achieve those cost savings or quality

11   improvements.

12   **Q.**   And when you use the word -- phrase "merger specific,"

13   that's what you're referring to?

14   **A.**   That's precisely what I'm referring to.

15   **Q.**   And let me move to the next factor where you write there

16   that efficiencies must be verifiable.  What does that mean?

17   **A.**   It means that you can't just make them up.  You can't just

18   say, "You know what, we think we're going to get $100 million of

19   efficiencies, thank you very much."  And somebody say, "Well,

20   where'd you get that number?"  And somebody said, "Well, it's

21   what I came up with last night."  It has to be that there's a

22   analysis that supports that conclusion and a rationale behind

23   why they believe that you can get those savings.  So one wants

24   to look at, is it in fact the case that one has buying a product

25   for -- input for cheaper than the other, for example.  Are there

1    the kinds of synergies, when you put their distribution networks

2    together, that can actually be achieved?  So one wants to look

3    at that, too, because if it's just, in essence, pie in the sky,

4    then it doesn't -- it shouldn't count for the merger analysis.

5    **Q.**  And then lastly you say that the focus should be on

6    reductions in variable costs.  What does that mean?

7    **A.**  I think the right -- you used the word the right frame, the

8    focus.  I don't want to ignore merger-specific verified fixed

9    costs because that is a relevant factor to business people, but

10   from an economic perspective, what we're most interested in is

11   reductions in variable costs because economics teaches us -- and

12   this is well-understood -- that those price reductions are

13   passed through to consumers to some degree.  And so that is a

14   relevant factor because if we can -- if a combination of

15   businesses can reduce variable costs, consumers benefit from

16   that.

17   **Q.**  And how do consumers benefit?

18   **A.**  They benefit from lower prices.

19   **Q.**  Did you apply these three factors in your analysis of

20   efficiencies in this case?

21   **A.**  Yes, I did.

22   **Q.**  And let me first ask you to turn to the next slide and take

23   us through the methodology that you used to evaluate the

24   efficiencies in this case.  And let me set it up by saying you

25   read the testimony of the CEO of Electrolux who came in here and

1    he provided a number of the synergies that he expected the

2    company would achieve.

3           Did you simply accept his number and move on?

4    **A.**   No, I did not.

5    **Q.**   What did you do?

6    **A.**   I actually was here to watch him testify about these items,

7    so -- he talked about, I believe the precise number's about

8    $477 million of efficiencies, and that number is built up from a

9    variety of savings models -- 37 to be precise, and there are

10   prior models of that -- that there are teams at Electrolux and

11   GE that are focused primarily on what kind of efficiencies can

12   be achieved, and they've hired additional consultants to help

13   inform their decision because as part of the merger process,

14   there's certain things that they cannot share with each other.

15   And so by using experts who, say, have expertise in purchasing,

16   they can combine that information into a deeper analysis that

17   each firm could not do because they are currently separate

18   firms.

19   **Q.**   And when you say the companies can't share, it's because if

20   they were to share that sensitive information, the government

21   likely would sue them?

22   **A.**   There are -- I don't want to get into the legal aspects of

23   this, but there are provisions about what's called "gun jumping"

24   about trying to merge the firms prior to the merger being

25   consummated.

1    **Q.**   Okay.  So they hired two consultants, which you've

2    identified here, but can you state them for the record, please?

3    **A.**   A.T. Kearney, and PricewaterhouseCoopers.

4    **Q.**   And you reviewed the work that they did?

5    **A.**   So what I did was I took all of the information that they

6    had, all of the underlying data, and I started to analyze it,

7    and just like I would take the data from the companies on sales,

8    say, or transactions.

9          And I tested the validity of the savings.  In fact,

10   myself and my team found some things to improve as part of their

11   analysis, and we made those recommendations and that goes into

12   the calculation.  And what I did was I wanted to segregate the

13   savings that they've identified into those buckets.  Is it

14   merger-specific or not?  Can I verify it or not?  Is it variable

15   cost or not?  And so I put the efficiencies into each of those

16   buckets throughout my analysis.

17   **Q.**   You said that you analyzed the work that A.T. Kearney and

18   PricewaterhouseCoopers had done.

19          Did they provide you a lot of data to look at or a

20   little bit of data to look at?

21   **A.**   It was -- as I said earlier in my testimony -- the most

22   detailed efficiencies analysis I've ever seen.  They looked at

23   over 600 design changes to ranges, cooktops, wall ovens,

24   refrigerators, laundry, et cetera, to the various -- and when I

25   mean design changes -- and I'll talk about this a little bit --

1    they asked the question of:  Could you get a savings if you

2    replaced the use of adhesive tape in one of the products with,

3    say, glue?  Because, say, one of them was using adhesive tape,

4    the other one was using glue, and one was a lower cost option.

5    They went to that level of detail.

6            So these are savings where on the order or magnitude

7    they may be 600,000, $800,000 across both companies, but when

8    you start putting them together, they're very significant.  They

9    looked at 600-plus distribution routes to see if there were

10   efficiencies in terms of the best price they could receive.  So

11   it was an extremely detailed analysis across different

12   categories of efficiencies.

13   **Q.**  So let me first ask you what conclusion you reached in terms

14   of the efficiencies here, and then we'll look at a couple of

15   samples for the Court.  I'm not going to go through all of them.

16           MR. GLASS:  Your Honor, we object to the numbers.  It's

17   hearsay.

18           THE COURT:  Counsel?

19           MR. DEMITRACK:  Your Honor, it's information that's not

20   hearsay.  It comes from --

21           THE COURT:  Let me speak -- let's speak at the bench.

22           (Following sidebar discussion had on the record:)

23           THE COURT:  All right.  Counsel.

24           MR. DEMITRACK:  Your Honor.

25           THE COURT:  You relied upon this?

1           MR. DEMITRACK:  He relied upon it.  Experts can rely on

2     hearsay all the time.  This is his opinion he reached on the

3     level of efficiencies after all the work that he did in this

4     case.

5           MR. GLASS:  Your Honor.

6           MR. DEMITRACK:  There's a rebuttal witness here as

7     well.

8           MR. GLASS:  Rule 703 clearly states that an expert

9     relying on inadmissible information does not render that

10    information admissible.  In the 2000 amendments, the notes to

11    the rule, it reads, "Rule 703 has been amended to emphasize that

12    when an expert reasonably relies on inadmissible information to

13    form an opinion or inference, the underlying information is not

14    admissible simply because the opinion or inference is admitted."

15          I don't object to Mr. Orszag assuming these numbers and

16    then testifying as an economist, if the those numbers are

17    accurate, what that means for his opinion.

18          THE COURT:  But I can't credit the truthfulness of

19    those numbers.

20          MR. GLASS:  That's right, Your Honor.  In fact, Mr.

21    Orszag testified just now that this work was done by

22    A.T. Kearney, PricewaterhouseCoopers and GE and Electrolux

23    personnel.

24          THE COURT:  If he wants to make certain assumptions

25    about that, that's fine, but I can't credit the work of what

```
 1    they did.
 2              MR. DEMITRACK:  We're not asking the witness to put in
 3    those underlying documents.  We're asking for this witness to
 4    testify to his opinion based upon what he was looking at.  And
 5    that's clearly admissible as part of his expert opinion.
 6              THE COURT:  Well, and you're not asking me to accept
 7    that information as true?
 8              MR. DEMITRACK:  We're not asking through this witness
 9    to put that -- those documents into the record.
10              THE COURT:  That's what I thought.
11              MR. GLASS:  Your Honor, I just would note that --
12              THE COURT:  Just a minute.
13              MR. GLASS:  -- there has not been an A.T. Kearney, a
14    PricewaterhouseCoopers or anybody from the integration team come
15    and testify about these numbers.  So we're going to maintain our
16    objection that these numbers are hearsay, and Mr. Orszag can
17    assume these numbers, but to the extent that these are going to
18    end up in the findings of fact --
19              THE COURT:  Well, they're not.  There's no basis for me
20    to accept if the information as true.  I'm not going to do that.
21              MR. GLASS:  Okay.
22              MR. DEMITRACK:  Some of these documents are already in
23    the record in evidence, and the witness can -- I mean counsel
24    can cross him.
25              THE COURT:  What do you mean already in the record?
```

 1        What do you mean?

 2              MR. DEMITRACK:  Some of these exhibits that he's

 3        relying on are --

 4              THE COURT:  But I can't accept that as true what each

 5        of these companies found.  I'm not going to accept that.  I'm

 6        not going to make any finding of fact that the information is

 7        true.

 8              MR. DEMITRACK:  We're not asking the Court to do that,

 9        because I think there's a bit of -- all we want to do is put it

10        in based on his information.

11              THE COURT:  Well, that's fine.  That's fine, but I'm

12        not going to accept that as true.

13              MR. DEMITRACK:  Exactly.

14              THE COURT:  All right.

15              (Sidebar discussion concluded.)

16              THE COURT:  Let me just say this.  To the extent that

17        the witness wants to testify about what he relied upon and make

18        certain assumptions that's true, that's fine.  But this Court's

19        not going to credit inadmissible hearsay as true, and I'm not

20        going to give that any weight whatsoever, but to the extent that

21        he wants to make certain assumptions about what he reviewed, he

22        can do that.

23        BY MR. DEMITRACK:

24        Q.  Mr. Orszag, you reviewed and analyzed a significant amount

25        of information, as you just testified?

1    **A.**   Every single savings model, and then I went to the -- I went

2    to go verify certain assumptions in the data by talking and

3    interviewing other executives and going to other data.  For

4    example --

5                THE COURT:  That's hearsay.  You're going to make

6    certain -- if you want to tell us what you did and made certain

7    assumptions that are true, that's fine, but none of that's

8    before me, none of that's been offered for the truth of the

9    matter asserted, and I'm not assigning any weight whatsoever to

10   what people may have told you or to what other -- what other

11   institutions may have found.  Those institutions are not before

12   the Court.  Those individuals have not testified before the

13   Court, and that information is rank hearsay.

14   BY MR. DEMITRACK:

15   **Q.**   And based on --

16               MR. DEMITRACK:  Thank you, Your Honor.

17   BY MR. DEMITRACK:

18   **Q.**   Based the analysis that you conducted, did you reach

19   opinions regarding the likely efficiencies to be achieved by the

20   combined entity?

21   **A.**   Yes, I did.

22   **Q.**   Okay.  And do you report those conclusions?

23   **A.**   Yes, I do.

24   **Q.**   And where do you do that?

25   **A.**   On Slide 61.

1    **Q.**   And can you take the Court through that slide, please?

2    **A.**   Sure.  So --

3    **Q.**   And these are your opinions, correct?

4    **A.**   These are my opinions.  That of the 478 million, 77 million

5    of efficiencies identified by the business executives, roughly

6    100 million of -- 150 million of them are merger-specific

7    reductions in variable costs, and then there's another 150 that

8    are potentially merger-specific.  I didn't have -- I couldn't

9    draw a firm conclusion about whether they were merger-specific

10   or not because some of them could have been done, potentially,

11   as individual firms.

12          And then if I can give an example.  Going back to

13   buying adhesive tape example and the glue, it's possible that I

14   set a very high standard here, that GE could have torn down the

15   Electrolux product, seen that they used adhesive tape, or glue,

16   I mean, and done the same thing.  They could have done that.

17          Now, as a matter of economics, it's costly to do that,

18   to test it, because they have to go through the engineering

19   process of testing it.  Once you can merge the two entities, the

20   engineers can share their data about whether that's an

21   appropriate and safe mechanism to use, and so that's why it goes

22   into the potentially merger-specific category.

23   **Q.**   Do you -- is it appropriate to exclude potentially

24   merger-specific savings?

25   **A.**   What I'd say is they should be given less weight, but they

1    should not be completely excluded.

2    **Q.**   And what areas of potential efficiencies did you investigate

3    for purposes of your opinion?

4    **A.**   Savings that could be achieved in manufacturing and

5    purchasing and distribution and in design, and then there was

6    also overhead savings that fit into the fixed cost savings

7    category.  And so as we talked about when we're most interested

8    in variable costs, so most of my analysis focuses on the first

9    four categories.

10   **Q.**   Okay.  I want to skip manufacturing for a minute.  We're

11   going to come back to that, but we need to do that in

12   confidential session.

13        And I want you to please move to Slide 658-064, which

14   discusses purchasing.  And I'd like you to explain to the Court

15   the way you analyzed the information in that topic.

16        And, Mr. Orszag, some of these numbers here, the

17   specific numbers, are redacted so please don't refer to those.

18   **A.**   Sure.  So both companies make purchases from U.S. Steel with

19   similar -- for similar steel products.  We observe that GE pays

20   a higher price for that steel than Electrolux.  I then -- what I

21   did was I then went to the actual data, not the analysis that

22   was done by A.T. Kearney with regard to the numbers that are

23   right here.  I went to the actual data for purchases for this

24   year.  And this gap is slightly lower, that is, in the actual

25   data there's a bigger gap.  I also looked at historical

1      information to see if that gap persisted over time, and it has

2      persisted over time.  And so that is why this is counted as a

3      merger-specific verified efficiency in variable costs.

4  **Q.**   And based on the work that you did, what was your opinion

5      regarding purchasing best price savings in terms of dollars?

6      That number you can disclose.

7  **A.**   For steel it was -- it was $13.5 million.

8  **Q.**   Let me ask you to turn to the next page.  Again, the numbers

9      here, the dollar numbers for the various products, are redacted,

10     so please don't refer to those, but if you could explain this

11     part of your work in the analysis that you undertook to reach an

12     opinion?

13 **A.**   Sure.  So both companies buy glass from the same entity.  I

14     see that that's blacked out.  And they buy them in varying

15     degrees, and when you combine together -- when you combine those

16     together, there is the potential to get volume discounts.  And

17     so given the history of volume discounts, the savings that they

18     would be expected to achieve, when they have a 71 percent

19     increase in their purchasing from the same entity, is roughly

20     2 percent of their spend, which is then multiplied by their

21     amount, thus is equal to $1 million in savings in the context of

22     the purchases of this product.  But then it's -- the same

23     analysis is done across many other products.

24 **Q.**   Other than glass?

25 **A.**   Precisely.

1  **Q.**  And let me ask you to turn, please, to the next page, which

2  discusses distribution efficiencies.  Very briefly, can you

3  explain to the Court the analysis that you undertook and the

4  opinion that you reached?

5  **A.**  Sure.  So Electrolux -- I -- just to give you an example of

6  one distribution efficiency, Electrolux has trucks that go at

7  least twice a week from Los Angeles to Fresno, so at least twice

8  a week those trucks go to Fresno, and many of those shipments

9  are only 20 to 40 percent full, 141 shipments in a year.

10        GE, over that same exact route, Los Angeles to Fresno,

11  has 122 shipments that tend to be 40 to 60 percent full, so one

12  can have a fuller truck.  Instead of sending products on two

13  trucks, they can use one, 100 percent loaded truck or 80 percent

14  loaded truck if it's not at the high end of each of these

15  ranges, and then you get additional savings.  On this route

16  alone that would be about $200,00 over the course of a year.  If

17  you look across all of the ways that they can produce

18  efficiencies in truckloads, it comes out to $4 million.

19  **Q.**  And that's the result of being able to use one truck rather

20  than two for a merged entity?

21  **A.**  Precisely.  And when you have the merger you don't need to

22  send -- there's 600-plus distribution routes that they're using.

23  They don't need to send two trucks, two trains, whatever it may

24  be, two shipments over those.  They can try to consolidate them,

25  and in some cases they won't be able to consolidate them.  Those

1    are -- there's not savings there, the only way they can

2    consolidate that there will be savings.

3    **Q.**   And bases on the analysis that you conducted, what opinion

4    did you reach regarding the level of these distribution

5    efficiencies?

6    **A.**   For truckloads it's $4.1 million.

7    **Q.**   And let me ask you to turn, please, to the next slide, which

8    discusses an example of what you have talked about a little

9    while ago in design efficiencies.

10            Very briefly, so we can move onto Whirlpool/Maytag, can

11   you explain for the Court what you're reporting here in terms of

12   your analysis and your opinions?

13   **A.**   Sure.  So there's a -- the analysis of what savings could be

14   achieved, and then the question is:  How much those -- how much

15   all of those different 600-plus design efficiencies would earn

16   for the company.  And the design efficiencies come out to about

17   $100 million, but as I noted, I put them all into the potential

18   merger-specific category for the reasons I've already described.

19            MR. DEMITRACK:  Your Honor, we need to talk very

20   briefly about the manufacturing efficiencies with the husher,

21   given the nature of where we are, so if we can come up?

22            THE COURT:  That's fine.

23            MR. DEMITRACK:  And we'll be turning back to page

24   658-063, which unfortunately for the public will be black, but

25   there's not very much on that.

```
1              THE COURT:  All right.
2                    *  *  *  *  *
3         (Thereupon, the following sidebar proceedings were
4    closed by order of the Court and are not included as part of the
5    transcript production in this case.)
6                    *  *  *  *  *
```



1

2

3

4

5                              *  *  *  *  *

6              (Whereupon, the previously designated closed sidebar

7       proceedings concluded and the following further proceedings were

8       held in open court.)

9                              *  *  *  *  *

10      BY MR. DEMITRACK:

11      **Q.**   Let's turn to DX Exhibit 658-069.  What are you reporting on

12      this slide, Mr. Orszag?

13      **A.**   It's a summary of my analysis of the sayings.  So we start,

14      as I described, with the $477 million, identified by the

15      companies.  Some portion is not merger-specific.  For example,

16      the portion that we just talked about would go into that bucket.

17              There's some additional, potentially, merger-specific

18      costs that are potentially -- that are fixed or predominantly

19      fixed.  That's the next line item.  It's -- the next line item

20      shows what I talked about earlier, about the $150 million that's

21      potentially merger-specific variable cost efficiencies.  There's

22      then merger-specific fixed costs.  Actually to be clear, what we

23      talked about at the bench would be that -- in that category.

24      And then the last are merger-specific variable costs that I've

25      identified as part of my analysis.

1    **Q.**   And that last column on the right is the 151?

2    **A.**   That is correct.  So it's 151 million are merger-specific

3    variable cost savings, and another 150 million, give or take,

4    that are potentially merger-specific.

5    **Q.**   Okay.  Let's go two slides ahead to 658-071.  And we saw

6    this slide at the outset, and you've talked about your opinions

7    regarding some shortcomings in Professor Whinston's testimony.

8    We're going to turn in a minute to UPP and the Whirlpool/Maytag

9    merger and end your direct testimony, which is the last two

10   bullets, but I just want to give you an opportunity to reflect

11   on the rest of the bullets and identify for the Court any other

12   critiques or critical shortcomings that you haven't already

13   testified about.

14   **A.**   I think we've covered the analyses that have ignored market

15   participants, the analyses that have ignored the future

16   competitive significance of competitors, the market dynamics,

17   the fact that there was not an empirical analysis of coordinated

18   effects, the incorrect application of the hypothetical

19   monopolist test, and the flawed market definition for the

20   contract channel.

21        Now we're going to go to the next bullets here really

22   deal with UPP and the Maytag/Whirlpool merger.

23   **Q.**   Okay.  So let's go to the next slide, and just very quickly,

24   can you explain to the Court what the UPP is and what it isn't?

25   **A.**   Sure.  The -- I think the -- a little history may help, and

1      so if I may, in some sense provide that.

2              The merger guidelines had focused on market shares for

3      a long time, and the treatment in the merger guidelines of

4      differentiated products --

5      **Q.**   Just explain what a differentiated product is.

6      **A.**   It's the type of industry we're dealing with here.  If you

7      think about homogeneous products, everything's the same.  It's

8      like, think about a certain type of steel.  It's the same steel

9      product if you're buying it from one manufacturer or the other,

10     in terms of the strength, et cetera.  There's no brand.  There's

11     no product features, et cetera.

12             When we get to differentiated products market, we're

13     talking about we see all these different types of ranges with

14     different types of features.  So there's a disconnect in the

15     guidelines, and this was well-understood among economists.  And

16     there had been an effort over years to better connect the

17     initial screening that one could use to that differentiated

18     products analysis.  And so this started with Professor Willig

19     in, I would say, 1991.  There was work done by Carl Shapiro when

20     he was at the Department of Justice in the mid-'90s.  Should

21     give credit to Greg Worden for his work in this area, too.  And

22     then, really, Joe Farrell and Carl Shapiro put it together into

23     this UPP framework as a better metric than measures of

24     concentration to guide us in the first step of our analysis.

25     **Q.**   First step of our analysis for what kind of a merger?

1    **A.**   For a differentiated products merger like this one.

2    **Q.**   Okay.  And you say a first step.  What do you mean?

3    **A.**   Um, it's an initial screen about whether additional work

4    would be necessary.  And so that's the appropriate starting

5    point for an analysis, not the ending point.  And so that's --

6    UPP is like in the first chapter of a book.  It's not the whole

7    book.

8    **Q.**   And are there generally understood theoretical issues with

9    the UPP analysis?  And by "generally understood" I mean by

10   economists?

11   **A.**   Absolutely.  Carl Shapiro --

12   **Q.**   Can you look at the next slide and perhaps --

13   **A.**   Well, I think Carl Shapiro captured it best, because he was

14   one of the authors of the paper on this, when he said, "It's an

15   excellent simple measure for diagnosing or scoring unilateral

16   price effects, but it cannot capture the real -- the full

17   richness of competition in real world industries."

18          What did he mean by that?  Why can't it capture the

19   real world in the richness of competition?  What is it that the

20   model can do and what can it not do?

21          And these are well-understood.  The authors of it lay

22   out these and understand that this is the -- is supposed to be

23   used as an initial screen.  Those are their words from their

24   paper.  And it's -- the reason is -- and this is laid out now in

25   the slide -- is it's a static model.  It assumes that the

1    behaviors of rivals are unchanged, they are that -- as I

2    described yesterday, the world is frozen in place, but for the

3    merger.  But we know in this industry the world is not frozen in

4    place.  It is churning and there's different products being

5    offered, et cetera, companies entering, repositioning.  This

6    model extracts from that completely, assumes a completely frozen

7    world, just that one action, none of the other reactions.

8         The second flaw of it is it does not account for other

9    options.  It only takes into account the first and second choice

10   that consumers look at.  So if you're a consumer and you have a

11   third choice and you're choosing among three, the model doesn't

12   take that into account.  The third choice and the position of

13   that third choice is not in the model.

14        So if one thinks about how -- I use the example of -- I

15   use convenience stores, I've used gas stations.  If there are

16   two convenience stores on a street corner in New York right next

17   to each other, and one tried to raise the price, say, 5 to

18   10 percent on the newspapers they sell out front, just about

19   everybody's going to walk right next door and buy that newspaper

20   next door.  The UPP for a merger of those two convenience stores

21   would be very high, very high diversion rates from one to the

22   other.

23        However, if there's another convenience store half a

24   block away, so that the combined entity now tried to raise

25   price, guess what, people would just walk the extra five steps

1    and buy it at that third convenience store.  But the model can't

2    see that third convenience store.  It doesn't exist in the

3    model.  And so that's why it's useful as a screen, not useful as

4    a full analysis.

5         It's also well-understood that there are lots of

6    situations where it will just show upward price pressure, even

7    for mergers that practitioners, the government, would never even

8    consider thinking about blocking.  So this would be mergers

9    where there are, say, seven players to six but relatively high

10   margins.  And I give the example here that it would suggest a

11   quiet high UPP in that situation.

12        There's then an issue about inputs into the model, and

13   I'll talk more about this, but the diversion rate that the model

14   is predicated on is not just customer switching, but customer

15   switching due to a price increase.  If there is a price change,

16   what -- where would those customers go?  That's the diversion

17   rate that is supposed to be used in the model.

18        The other element is that margins should be economic

19   margins not accounting margins, and so that's the two pieces of

20   the equation.

21        My final issue is the type of UPP model that Professor

22   Whinston used was -- ignores product quality, but also ignores

23   product complementarity.  What do I mean by product

24   complementarity?  That is when consumers walk into a store and

25   buy a bundle of goods.  So if I walk into Home Depot, and I'm

1    trying to buy a whole new kitchen suite, this model's not taking

2    into account the economics of those additional purchases, those

3    additional products outside of, say, ranges, outside of cooktops

4    or wall ovens.

5            And there's been some recent research that about how to

6    introduce quality into the UPP, how to introduce multiple

7    products into the UPP, but Professor Whinston did not use that

8    multiproduct UPP, although, even though we observe, many people

9    in this market buying multiple products.

10   **Q.**  So did you look at the UPP analysis that Professor Whinston

11   performed?

12   **A.**  Yes.

13   **Q.**  And did you --

14   **A.**  And it --

15   **Q.**  Let me ask the question.

16           Did you observe that he made some assumptions?

17   **A.**  Yes.

18   **Q.**  Was that -- what assumptions did he make, and were those

19   assumptions critical to the analysis that he conducted?

20   **A.**  Yes.

21   **Q.**  Okay.  Can you explain them, please, for the Court, what

22   assumptions he made?  And now turn to 658-074.

23   **A.**  So we're in the world of an initial screen using the UPP,

24   and the first thing one would go look at is diversion.  And what

25   he did -- and I'm not sure if he testified to this, I can't

1    recall -- is he assumed that diversion was what economists would

2    say is proportional to share, so he assumed --

3    **Q.**   To share at what point in time?

4    **A.**   In 2014.  So he assumed that if, say, GE raised its price,

5    consumers would switch to the other suppliers in proportion to

6    their market share in 2014.  That's an extreme assumption at

7    this point in the case.  And let me highlight this, because I

8    think that's important.

9         As folks who do this all the time, I would use that on

10   the first two weeks of looking at a merger because market shares

11   are usually much easier to obtain, but that's not what one

12   should do once one has further data to test empirically the

13   diversion rate, and he did not do that, and --

14   **Q.**   Did he have the data to do it?

15   **A.**   He had more than enough data.  This is -- we -- this case

16   has an unbelievable wealth of data.  If one wants to be in that

17   static type of model that he's using, there's a wealth of data

18   to do this type of modeling.

19        In fact, just turning back to the instructions from

20   Carl Shapiro, when he wrote about this, he said, "Within the UPP

21   framework, starting with market shares is okay but we need to

22   quickly move to additional empirical evidence on diversion."

23        And the merger guidelines say that as well, and there's

24   loads of data that one could do to build the demand system -- is

25   the way economists would talk about it -- that would be to

1    measure more precisely, what happens to share or customers when

2    prices are changed, and so that would go to diversion.

3           In those merger simulation models, what we could call

4    more comprehensive models, the economic margins, not the

5    accounting margins, can often be inferred.  Measuring from

6    accounting data economic margins is challenging.  That's -- it's

7    fair.  But within those demand systems it will often be an

8    output of that model so one would have that information.  But if

9    one were in a more sophisticated merger simulation model, one

10   wouldn't need to use the initial screen.

11   **Q.**  So let me, so we don't get into a peer-reviewed article on

12   this, try to move it along.

13          In addition to the use of the proportional share as an

14   assumption, did he do the diversion ratio with other data?  And

15   if you could quickly explain to the Court what he did and why

16   that was not adequate, if that's what your opinion is.

17   **A.**  He checked the diversion rate versus two other sources,

18   the data we talked about, Smart Quote and Meet Comp.  Those

19   don't reflect actual sales.  They don't -- in one case they have

20   many, many, many entries for actual quotes, but the competitors'

21   presence is not known in the vast majority of the circumstances.

22   So that's not sufficient information, especially given that we

23   have all of this transactions data to do a more comprehensive

24   analysis, if one wants to be in this world of modeling static

25   models.

1           And I should just note, as I described earlier in my
2     testimony, the two theories of this case:  One is a static
3     model, that's what Professor Whinston's putting forward; and one
4     is a much more dynamic industry.  And if one's going to model
5     the industry in a static way, one should use the full toolbox
6     that economists have to test that empirically, and he did not do
7     that.
8     **Q.**  So going back here in this slide, he assumed diversion, he
9     multiplied it by accounting margins, not economic margins, and
10    then he multiplied it by something called a pass-through rate.
11          Did he use actual pass-through rates or assumed
12    pass-through rates?
13    **A.**  He just assumed the pass-through rate.  He did not use the
14    actual pass-through rate.
15          And it's important here because we've heard testimony
16    about some price increases that have occurred in the industry.
17    But the pass-through rate here is not the industry pass-through
18    rate, which would occur if, say, steel prices go up for all
19    manufacturers and so that squeezes the margins of suppliers and
20    they are trying to handle that situation.  This should be the
21    firm specific pass-through rate --
22    **Q.**  Okay.  Thank you.
23    **A.**  -- and that's a different idea.
24    **Q.**  Okay.  Thank you.
25          Now, if you were to take Professor Whinston's UPP

1    approach and look at it or apply it to the Whirlpool/Maytag

2    merger, what would you have seen?

3    **A.**   He would have predicted very high UPPs, upward price

4    pressure, and thus if you use the same framework that he used,

5    very significant price increases.  I'm focusing in on laundry

6    because those were the products that the Department of Justice

7    talked about in their closing statement.  And so he will have

8    predicted very, very high price increases just like he's

9    predicting here.

10   **Q.**   And let's turn to 658-075.  Is this what you're referring to

11   here?

12   **A.**   Yes.  So the red bars reflect his predicted price increase.

13   So for dryers, for example, he would have predicted price

14   increases of 10 percent, give or take.

15   **Q.**   And, in fact, the prices went which way?

16   **A.**   Just so the record's clear, I have multiple analyses of

17   prices after the -- with Maytag/Whirlpool deal.  This -- because

18   of the need to sort of focus in and put a point estimate, this

19   is the most simplistic of the approaches, and so this is just

20   looking before and after the merger controlling for what one can

21   control for in that framework, and one observes decreases in

22   that situation.

23   **Q.**   Okay.  During Professor Whinston's testimony, as he was

24   explaining the UPP, the Court asked Professor Whinston:

25              "What if you doubled Samsung and LG's share?  What if

1    you tripled Samsung and LG's share?  Would that change the UPP?

2    Would that move it down?"

3            And Professor Whinston said, "Not by very much."

4            Did you investigate the extent to which -- as a result

5    of his testimony that you heard, the extent to which you would

6    need to move Samsung and LG's share in order to get the UPP to a

7    level that Professor Whinston would find acceptable?

8    **A.**   Yes, I did.

9    **Q.**   And do you report that in the next slide, 658-076?

10   **A.**   Yes, I do.

11   **Q.**   What do you report here?

12   **A.**   So I took Professor Whinston's model, so his actual

13   spreadsheet, and I increased the combined Samsung and LG share

14   up until the point where the UPP was equal to the marginal cost

15   efficiencies that he identified as the offset to upward price

16   pressure of 3.25 percent.  So I just kept marching upwards, and

17   what this shows --

18   **Q.**   Double?  Triple?  Quadruple?

19   **A.**   What this shows is in his model, Samsung and LG would have

20   to have a, roughly, 75 percent share for his UPP model to show

21   no upward price pressure.  That doesn't make any economic sense.

22   **Q.**   Does that seem rational to you as an economist?

23   **A.**   No, it's -- it's implausible.  It shows how -- it almost

24   shows that the frozen nature of what it assumes, because it

25   doesn't take into account the dynamics of the market.  And if

1    Samsung and LG had 80 percent share or 75 percent share,

2    depending upon which one you use, the idea that at that point a

3    merger of GE and Electrolux, which would be some portion of the

4    remaining part of the market, would somehow allow them to

5    unilaterally raise price, it just -- it defies logic.

6    **Q.**   And do you have an opinion regarding whether one should rely

7    on the UPP analysis for purposes of predicting competitive

8    effects as a result of this merger?

9    **A.**   I do not believe it's reliable for predicting the

10   competitive effects.  I think it's a very useful screen to start

11   the analysis, but it is not reliable to take into account -- to

12   quote Carl again -- the full richness of competition.

13   **Q.**   We've heard a lot at this trial regarding the

14   Whirlpool/Maytag merger, and now I'd like to turn to that and

15   ask whether you undertook a competitive analysis of that merger?

16   **A.**   Yes, I did.

17   **Q.**   And if you could turn, please, to 658-078, I believe.

18   **A.**   (Witness complied.)

19   **Q.**   What is it you're reporting here?

20   **A.**   So I'm reporting the pre-merger HHI, the post-merger HHI and

21   the Delta HHI for each of the appliance categories for the

22   Maytag/Whirlpool deal and the GE/Electrolux deal.

23   **Q.**   And you have two of these sets of numbers that are

24   highlighted in yellow.  What is it that you are displaying

25   there?

1    **A.**   So the primary focus in this merger has, obviously, been on

2    cooking products.  We're here because of the cooking products.

3    The Department of Justice hasn't -- doesn't raise issues or it

4    doesn't appear that they do with the other products.

5         In the Maytag/Whirlpool deal, the focus of the

6    department, based on all the statements that have been made,

7    were on laundry products.  And we can see for laundry products

8    that was the biggest change in the HHI.

9    **Q.**   So the Delta for -- or the change in the HHI in laundry

10   products for the Whirlpool/Maytag merger is 1,081?  That's what

11   you report there?

12   **A.**   Yes.

13   **Q.**   And the change in the HHI or the Delta HHI in cooking

14   products, as you report here, is 586?

15   **A.**   Yes, sir.  And this -- just so we're all clear -- is because

16   I wanted them to be from comparable data sets.  This all comes

17   from TraQline.

18   **Q.**   Okay.  And that's so that you could have comparable data to

19   make a comparison?

20   **A.**   Yes, sir.

21   **Q.**   Let me -- you've read Tom Barnett's speech -- the Court has

22   heard about it already -- regarding the Maytag/Whirlpool merger.

23   And I provided it for you.  It's Exhibit 394 in your materials.

24        And Mr. Barnett was the Assistant Attorney General in

25   charge of antitrust at the time of the Maytag/Whirlpool merger.

1     Let me represent that to you.

2            And I'd like you to turn to that page 14 of that speech

3     that he gave in 2008, and footnote 11.  And let me read that

4     into the record.  It's on the -- let me read that into the

5     record.  He says there, "I sometimes see supposed antitrust

6     experts opining on particular merger enforcement decisions based

7     principally or exclusively on market shares or perceived market

8     shares, given that they do not have access to the investigative

9     record.  While I welcome debate on issues, there is a

10    potentially promiscuous aspect to the former kind of comment."

11           "To the extent that they foster a perception that we

12    should return to the era of *United States versus Von's Grocery*

13    *Company*, 384 U.S. 270, 1966, and that merger decisions should be

14    based solely or principally on an assessment of market shares,

15    such a regression would end up harming consumers."

16           Do you see that, Mr. Orszag?

17    **A.**   Yes, I do.

18    **Q.**   Do you agree with Mr. Barnett?

19    **A.**   On this point I do, yes.

20    **Q.**   Okay.  And did you base your opinions in this case based

21    principally on or exclusively on market shares and concentration

22    ratios?

23    **A.**   No, I did not.

24    **Q.**   And let me ask you to turn to the next slide in the

25    presentation, which --

1          THE COURT:  Let me just throw this out.  At some point

2     the attorneys can comment on it in their written submissions or

3     orally, but -- so what weight does this Court give to what that

4     official at the Department of Justice under a different

5     administration said at a different point in time in history?  I

6     mean, we know things happen differently under different

7     administrations, different Attorney Generals.  The *Keepseagle*

8     case is a very good sample of that.  It's a case I presided over

9     for the past 20 years in which, for 18 of those 20 years, the

10    Department of Justice vigorously fought tooth and nail to defend

11    against alleged violations of rights by Native Americans.  And

12    then there's a new administration and a new President and a new

13    policy, and all of a sudden a new direction, and the case

14    settles for an historical sum of money that goes to the benefit

15    of Native Americans.

16          So this is a snapshot in time with a former

17    high-ranking official of the Department of Justice said about

18    his view of mergers under a different president, a different

19    Attorney General, and he's entitled to his view.

20          The question is:  What weight do I give this?  And this

21    economist relied upon that expert's opinion, so it impacts his

22    decision as well, doesn't it?

23          MR. DEMITRACK:  No, it does not.  I don't believe -- my

24    question to him was as an economist does he agree with that

25    position, and does he agree that market shares and

1    concentrations -- which is the only point I was making.

2              We're now going to look at the empirics.

3              THE COURT:  And that's a big issues in this case, isn't

4    it?

5              MR. DEMITRACK:  The empirics -- the empirics, Your

6    Honor --

7              THE COURT:  That's a large issue in this case, isn't

8    it?

9              MR. DEMITRACK:  The empirics?

10             THE COURT:  Yes.

11             MR. DEMITRACK:  The empirics are a very large issue and

12   that's why we're going to look at them --

13             THE COURT:  All right.

14             MR. DEMITRACK:  -- and we're going to look at -- get

15   into them in terms of how they affect the analysis.

16             THE COURT:  I just want to caution everyone about

17   giving -- putting a lot of weight and asking me to put a lot of

18   weight on what high-ranking officials at DOJ said years ago

19   about a merger that, arguably, was impacted by something that no

20   one foresaw but a few people, and that was the recession as

21   well.  So I have to factor all that into a consideration when I

22   try to reach the right decision for the right reasons.

23             MR. DEMITRACK:  Okay.  Thank you, Your Honor.

24   BY MR. DEMITRACK:

25   **Q.**  Let's turn to the next slide which is 658-080, and this

1    slide sets forth your findings as a result of your empirical

2    investigation of the Maytag/Whirlpool merger, the retrospective

3    look that you did, correct?

4    **A.**   That is correct.

5    **Q.**   And can you summarize those findings for the Court?

6    **A.**   I talked a little bit about this some yesterday.  And I've

7    done this -- at this point, I don't even want to guess how many

8    different ways.  I've tested the Maytag/Whirlpool deal every

9    which way I can, and no matter what one does, one finds no

10   consistent evidence that there was a significant increase in

11   price.  What does that mean?  What does that tell us?  And this

12   goes to -- I often don't give much weight to what lawyers

13   necessarily say.

14           THE COURT:  What's that?

15           THE WITNESS:  I don't give much weight to what lawyers

16   say.  I focus on the economic analysis.  What this tells us is

17   the concentration measures didn't do a good job predicting that

18   merger effect, that the dynamic nature of the market, the

19   dynamic nature of the market is what protected consumers.  And

20   we -- I test this every which way, controlling for the recession

21   in a very -- in a number of different ways, and every which way

22   it shows that same thing.

23           So if we go back to what we talked about yesterday,

24   there's these two competing theories:  The static world where

25   market shares and the internalization that occurs as a result of

1   the combination of the two firms cause an increase in price;

2   versus the alternative world where it's a dynamic market, the

3   merger allows them to achieve efficiencies, that there's big

4   buyers that can discipline them if they try to raise price, and

5   that there's a number of other market players who are

6   repositioning themselves and re- -- and acting as that fist on

7   competition.

8          Those are two competing theories.  They were the same

9   two competing theories at the time of the Maytag/Whirlpool deal,

10  and so we can analyze between those two which one won out as a

11  matter of history, as a matter of empirics.

12  BY MR. DEMITRACK:

13  **Q.**  So let's turn to the next slide which outlines your

14  econometric analysis.  And we've heard a bit about some of what

15  you did, so since we're getting late in the examination here,

16  I'd like to see if we can move efficiently through this slide.

17         And if you could explain what you did.  I understand

18  you testified yesterday that you started with an approach

19  presented by Professor Ashenfelter in a peer-reviewed journal,

20  and then you made some changes to that approach.  So if you

21  could take the Court through what you did, and in particular I'd

22  like you, as part of that, to explain to the Court what a

23  Differences-in-Differences approach is?

24  **A.**   Sure.  So Professor Ashenfelter's paper was my starting

25  point, and he analyzed using survey data from a company called

1    MPD, the effect of the Maytag/Whirlpool merger.  And the way he

2    did it is using a very standard econometric approach, one called

3    "Differences-in-Differences."  And what

4    Differences-in-Differences models do is, at the simplest core,

5    we could think about it as they look at what the change in price

6    was for, say, laundry products, where there was a very

7    significant increase in concentration, versus the change in

8    price in cooking products, where there was less of an increase

9    in concentration.  And it asks the question of:  Did, say,

10   prices increase more for laundry products where there was a

11   larger increase in concentration, than for cooking products

12   where there was a smaller increase in concentration?

13         And so he uses that approach, and he uses cooking

14   products as three of his controls because he said that Maytag's

15   share in cooking was relatively little, and so the increase in

16   concentration that one observed was much smaller than the

17   increase in concentration that one observed for laundry

18   products.  So that forms the basis of the

19   Differences-in-Differences model.

20         And then it's -- let's just start with his conclusion.

21   He found mixed results.  So he found for 13 of the 16 product

22   categories that he analyzed, he found price increases.  That

23   means for 13 out of the 16 he found either no effect or price

24   decreases.

25   **Q.**  So you said for three he found price effects and 13 he found

1    no price effects?

2    **A.**   No price effects or price decreases.

3    **Q.**   Okay.

4    **A.**   But there's one major shortcoming, and I'll just focus on

5    that given -- in the interest of time.  He did not have

6    information on the costs of the products.  The data that he had

7    did not have that.  So I went to my data and I asked the

8    question of:  Would I find similar results some price effects if

9    I didn't control for the cost to produce, to manufacture the

10   product?  And I found that you would also find some price

11   effects.

12        But once I controlled for costs, those results

13   disappeared, that there was no significant price effect once you

14   controlled for costs, which is absolutely appropriate.  I don't

15   think there's any disagreement that one should control for cost

16   in a regression, and so that control is absolutely necessary,

17   and it results in no significant increases in price.

18   **Q.**   In any of the categories?

19   **A.**   In any of the categories.

20   **Q.**   Okay.  And you report on the next slide, 082 of Exhibit 658,

21   the results of your economic -- econometric analysis?

22   **A.**   Yes, sir.

23   **Q.**   What are you reporting here?

24   **A.**   I'm trying to simplify it so we don't have all those numbers

25   and other pieces -- other metrics.  What this shows is that in

1    my model I'm using different, well, treatment groups.  Those are

2    the products where there was a higher increase in concentration,

3    comparing them to control groups, so ranges, cooktops, wall

4    ovens.

5          And what one sees are lots of negatives.  What does

6    that mean?  That means that the prices of the products that had

7    higher increases in concentration fell relative to those

8    products that had less concen- -- changes in concentration.

9          If the theory of Professor Whinston and the government

10   were correct that concentration should be the determining factor

11   of whether the price increases, one would expect these numbers

12   to be red and positive, not mostly red and negative.

13   **Q.**  Okay.

14   **A.**  And so this is actually finding the opposite result to what

15   one would expect if concentration -- increases in concentration

16   caused increases in price.

17   **Q.**  And you provided the results of your regression analysis in

18   the appendices, so we'll -- let's move on for now to your next

19   slide, which is --

20   **A.**  I should just note using -- doing it multiple different ways

21   that are provided there.  So this is just one of the methods

22   that was used, even within the four corners of Professor

23   Ashenfelter's model.

24   **Q.**  Okay.  Thank you.

25         And did you stop with that analysis or did you do more?

1   **A.**   No, I did more.

2           MR. DEMITRACK:  Can you move to the next slide, please?

3   BY MR. DEMITRACK:

4   **Q.**   And what did you do?

5   **A.**   So I extended the model.  Instead of thinking about the

6   model as looking at each pair of appliances as a comparison, so

7   the Differences-in-Differences approach, of looking at laundry

8   products versus, say, ranges, I put it all together into one

9   model, and I ask the question of what's the relationship between

10  the change in the HHI and the prices that one observes, and

11  again, if one -- if concentration were predictive of -- or

12  changes in concentration were predictive of merger effects, one

13  would expect a positive relationship between the change in HHI

14  and post-merger prices.

15  **Q.**   So the higher the change in HHI, the prediction should be

16  the higher the price?

17  **A.**   Precisely.

18  **Q.**   Okay.  And what did you determine?

19  **A.**   In the data you see the opposite result.

20  **Q.**   And do you report that result?

21  **A.**   Yeah.  I show it graphically just for illustrative purposes

22  the --

23          MR. DEMITRACK:  And just so we're clear, we're now at

24  Exhibit 658-084.

25  BY MR. DEMITRACK:

**Q.**  And can you explain what it is you actually observed?

**A.**  Well, you observe a negative relationship between HHI and predicted prices from the model.  And what this shows is that the -- based on the model, you predict the largest price decreases for the products with the largest concentration increases.  This is just reflective of that negative relationship that I identified on the previous slide, and this is just presenting it graphically that concentration -- the simplest way to say this is:  Concentration fails to predict the price changes of the Maytag/Whirlpool deal.

**Q.**  Let's talk about the Great Recession, and I'd like now for you -- I know you've had questions on it, but I want to give you a full opportunity to explain how you accounted for Professor Whinston's criticism regarding the effect of the Great Recession, and for that purpose let's move to the next slide, please.

You saw that Professor Whinston claimed that the Great Recession is a confounding factor, and the Court has asked you, quizzed you, a number of times on how you could possibly tease out or account for the effect of the Great Recession.

Were you able to do that with the economic tools that you had available?

**A.**  Yes.

**Q.**  Okay.  And this tool that you is called what?  What kind of analysis are we talking about here?

1    **A.**   Well, it all falls under regression analysis.   So

2    regressions are:   One, is able to control for the state of the

3    economy; and other factors inside of a regression.

4    **Q.**   Do -- are these types of regression analyses typically

5    accepted in your field as appropriate ways of studying the

6    relationship of various variables?

7    **A.**   Yes.   I mean, Professor Ashenfelter's paper itself looks at

8    the effects of the merger over the same time period that I look,

9    taking into account by the state of the economy and by comparing

10   the prices of one product -- appliance product category versus

11   another.

12   **Q.**   And are there published peer-reviewed articles, other than

13   Professor Ashenfelter's, that use and rely upon regression

14   analyses for various purposes?

15   **A.**   Yeah.   I mean, they're -- just about every article in

16   certain journals are empirical analyses, and they'll be using

17   regression analysis.

18   **Q.**   Now, explain to the Court -- and you've summarized it here

19   on this slide -- what you did to test whether Professor

20   Whinston's Great Recession critique had merit.

21   **A.**   First, I want to just make sure that -- again, we talked

22   about this a little yesterday, but just given the importance of

23   this topic, I'll just repeat it.

24          The merger occurred in the first quarter of 2006.   The

25   National Bureau of Economic Research's determination of the

1    beginning of that recession was December of 2007, a

2    year-and-three-quarters after that merger.

3          What we know as the Great Recession, and what people

4    suffered through and the job loss and the income loss and all of

5    the destruction to the economy that really occurred with the

6    bankruptcies and the financial panic, started in real -- the

7    real time was about September of 2008.  There was inklings of in

8    the months that led up to that.

9          Obviously, one of the causes of the recession was a

10   downturn in housing prices, and that had begun prior to the

11   official start of the recession, according to NBER, but it's not

12   enough that the recession affected all appliance prices.  In

13   order for it to adversely affect these results or to contaminate

14   these results, if I don't control for it, it needs to affect

15   appliance categories differently.  It has to have the effect of

16   saying, "You know what, the Great Recession has a different

17   effect on laundry products or on refrigerators than it does on a

18   wall oven."

19   **Q.**  Why does that matter?

20   **A.**  Because when one's doing that Difference-in-Difference

21   approach -- the same approach that Professor Ashenfelter used

22   over that time period -- one is comparing, in essence, the

23   change in the price of, say, refrigerators where there was a

24   larger increase in concentration, versus the change in the price

25   of wall ovens where there was a smaller increase in

1    concentration.

2          And so in order for the recession to have -- to be a

3    contaminating factor, it has to affect those differently.  If it

4    affects both of them similarly, then it just shifts down the

5    relative changes in each.  But there are techniques that one can

6    use in addition to that Differences-in-Differences approach to

7    seek to control for this.

8    **Q.**   And did you use those approaches here?

9    **A.**   Yes, I did.

10   **Q.**   What did you do to test his critique?

11   **A.**   The first one is I just stopped the regression at a shorter

12   time period.  I said, "Let's stop it when the NBER designated

13   the official recession," which would be December 2007.  It

14   didn't change the results.

15         I then also used the standard econometric technique to

16   seek to control for the possibility -- remember the

17   possibility -- that the housing downturn affected different

18   product categories, different appliance categories differently.

19   And what I did was I introduced housing starts into the model,

20   so I allowed housing starts to help us understand what was going

21   on with prices.  And I interacted it -- is the technical term --

22   with each of the appliance categories, to allow for the

23   possibility that there's a different -- a differential effect

24   for each of the product appliance categories -- a very standard

25   technique to use -- and, again, my results were unchanged.

1          I think one way to sort of take all this is, every

2     single version of this that I've done, if I cut it at a shorter

3     period, if I cut it at a longer period, I control for housing

4     starts, I don't control for housing starts, I add these more

5     flexible controls, the results remain unchanged.  There's not

6     any consistent evidence in these regression of a significant

7     increase in price result from the merger.

8          THE COURT:  Let me ask you this:  Let's just take the

9     recession out of the discussion.

10          What's your expert opinion about the post-merger

11    effects on the market, making an assumption that there had not

12    been a recession?

13          THE WITNESS:  Given the tools that I'm using, that's

14    exactly what I'm doing, is I'm controlling, I'm fixing the state

15    of the economy in some sense, inside of the model, and that's,

16    in essence, what I'm doing by what I just described.

17          THE COURT:  Right.  But you did certain things.  You

18    shortened the time period.  You used different approaches.  I'm

19    just removing it altogether, no recession, no recession at all.

20          THE WITNESS:  Well, so perhaps this is --

21          THE COURT:  Are you able to give us an opinion about

22    what the post-merger effects on the market would have been if no

23    recession?

24          THE WITNESS:  So perhaps this would help if I just

25    describe a little bit about econometrics actually does and what

1    the regression analysis does, is that's exactly what I did with

2    my second approach.

3              THE COURT:  All right.

4              THE WITNESS:  It's -- because what it does is it's --

5              THE COURT:  That's not a factor at all, then?

6              THE WITNESS:  Well, it's clearly a factor.  The

7    question is:  Is it a factor that affects my conclusions?  And

8    the answer is no.  Because what I do is I allow for the state of

9    the economy to be in the model, and I'm -- if you think about it

10   as two variables, the state of the economy is obviously getting

11   much worse.  When one looks at what happens on this variable,

12   which is the merger, I'm holding the state of the economy fixed.

13   And so that's what the econometric analysis actually does, is it

14   does exactly what you're interested in, and when I do that

15   approach I find a significant effect from the merger.

16   BY MR. DEMITRACK:

17   **Q.**  So just to follow up on the Court's question.

18             When the Court asked you, "It's a factor, isn't it," is

19   it correct that it's a factor that you controlled for?

20   **A.**  Yes.

21             MR. DEMITRACK:  And, Your Honor, we're almost finished

22   with the direct, if we could finish that before the break that'd

23   be terrific.

24   BY MR. DEMITRACK:

25   **Q.**  The next -- there's another critique that Professor Whinston

1   made, and that is regarding the expansion of Samsung and LG.

2   You said, well, Samsung and LG were expanding during that period

3   of time, and that was a confounding effect that affected the

4   regression.

5        Do you recall that criticism?

6   **A.**   Yes, I do.

7   **Q.**   And if we turn to the next slide very quickly, what was the

8   point Professor Whinston was making, if you can make that

9   quickly, and then what was your response?

10  **A.**   The way I read his testimony on this is that he said, "I did

11  not find a price effect, no increase in price because Samsung

12  and LG grew quickly following the merger."

13        I agree.  That's competition.  That's what happened.

14  The merged firm, Maytag/Whirlpool, faced the competition of

15  Samsung and LG, and because of Samsung and LG and other

16  competitive -- the presence of other factors, Samsung -- the

17  merged entity was not able to raise price.  That's precisely the

18  analysis here, that because of the presence of Samsung, LG and

19  the other competitors, the merged firm will not be able to raise

20  price based on the economic analysis.

21  **Q.**   And in addition to these two basic critiques, first, the

22  Great Recession, and second the effect of Samsung and LG and its

23  growth, you observed in Professor Whinston's third report that

24  he made a number of other criticisms about the way you went

25  about running the regression and conducting the empirical

1    analysis, correct?

2    **A.**   Yes.

3    **Q.**   Okay.  Did you do anything in response to those criticisms?

4    And I'm now turning to Exhibit 658-087.  Could you tell us --

5    first of all, besides explaining these theoretical criticisms,

6    did you observe that Professor Whinston did any work to see if

7    his theoretical criticisms had any empirical merit?

8    **A.**   He didn't show any of them to me, no.

9    **Q.**   Did you take his theoretical criticisms and conduct any

10   empirical test to determine if his criticisms had merit?

11   **A.**   Yes, I did.

12   **Q.**   What did you determine?

13   **A.**   I took every single one of them that I could take.  I tested

14   them, whether they would change my results, and they did not.

15           To just give some examples, because I'm sure when he

16   comes back up here he may use them, and so there's some more

17   clarity, he says that my HHIs were based on TraQline, and he

18   said TraQline's not reliable.  So I went to the same data that

19   Professor Ashenfelter used.  It doesn't change the result.

20           He said that I used a different method for the age of

21   the product from what Professor Ashenfelter did, although I had

22   tested it using Professor Ashenfelter's approach.  I changed

23   that, too.  It had no effect.

24           He suggested that I shouldn't include certain Maytag

25   SKUs.  I threw them out.  It had no effect.

1              He said that -- I mean, there are a whole host of

2     things.  Each one of them, one, he said that I did not analyze a

3     sufficient amount of the data, and I just want to focus in on

4     that one, because there could be an appealing-looking chart, but

5     that will not provide full information.

6              Professor Ashenfelter and myself, we both excluded a

7     number of SKUs where there were very small numbers of sales.

8     And so if you think about the products that they have that, say,

9     Maytag or Whirlpool had at the time, they had hundreds of SKUs.

10    The vast majority of sales occurred in a small number of those

11    SKUs.  So getting rid of some of these small sale SKUs has no

12    significant effect on the regression, but it's a standard

13    approach to exclude them from the analysis.  I did that.

14             When I added more back in, it had no affect on my

15    results.  My analysis covered SKUs that represented, roughly,

16    90 percent of sales, so if one sees a chart that shows that I

17    focused on a small number of SKUs, I focused on those SKUs that

18    had a very high percentage of the revenue.  And when I made the

19    changes to which SKUs I included, it did not change the results.

20    So over and over again, each one I tested.

21             And then in the last report he said, "No, you tested

22    each of them individually, you should test them jointly.  What

23    if you make all the changes at once?"  So I went and did that,

24    and the results did not change.  My conclusions, the findings,

25    were all the same.

1          So every critique hasn't held water in that no matter

2     what I've done, I found no significant effect and no

3     relationship from that Maytag/Whirlpool deal between market

4     shares or increased concentration and price in this appliance

5     market.

6     **Q.**  Let me ask you one more question, and then I will conclude.

7     I want to go back to efficiencies, and I forgot to ask you this

8     one question.

9          You provide an opinion regarding the level of

10    merger-specific efficiencies, the 151 million, and then you

11    talked about the potential.  Do you remember that testimony?

12    **A.**  Yes, I do.

13    **Q.**  Were those annual figures?

14    **A.**  Yes, they are.

15    **Q.**  Okay.

16          MR. DEMITRACK:  Your Honor, with that I conclude my

17    direct.  At this point I will move into evidence Exhibit 658,

18    move that it be admitted into evidence as a summary under

19    Federal Rule of Evidence 1006.

20          MR. GLASS:  We object.  They have some slides in there,

21    and we'll work with defendants to get those out just like they

22    did.

23          THE COURT:  All right.  Thank you.

24          MR. DEMITRACK:  That's fine.

25          THE COURT:  We'll take a 15-minute recess, and then

1        we'll start cross-examination.  Thank you.

2               THE WITNESS:  Thank you.

3               THE COURT:  You may step down.

4           (Thereupon, a break was had from 11:09 a.m. until

5        11:30 a.m.)

6               THE COURT:  Before we start, Counsel, I just want you

7        to break this down.  With respect to Slide 658-85, you

8        highlighted that it's important, and then you said, "It's not

9        enough that the Great Recession may have affected appliance

10       prices, it would need to affect a different appliance categories

11       differently."

12              What do you mean by that?  Break that down.

13              THE WITNESS:  Sure.  Thank you.  So what the model

14       does, what I'm testing is -- and this is the same approach that

15       Professor Ashenfelter used in his paper -- is you, in essence --

16       if you think about the core of the model -- you look at the

17       change in laundry prices from before the merger to after the

18       merger where there was a very big increase in HHIs, about

19       1,100 points, if I recall correctly, and you compare it to a

20       control group to where the increase in concentration was less

21       significant.  He uses as his control group cooking products, and

22       he also uses freezers as well.

23              So you look at the change in laundry products versus --

24       in price from before the merger to after the merger, versus the

25       change in, say, cooktop prices from before the merger to after

1    the merger.  Under the theory that increased concentration

2    should result in higher prices, one would think you would

3    observe larger increases for laundry and smaller -- relatively

4    smaller increases for the cooking products, because if

5    concentration were the determining factor, that's what one would

6    expect.

7            Now, the question is:  In order for the state of the

8    economy to affect that relationship, it has to have a

9    differential effect on, say, cooking relative to laundry

10   products or relative to refrigerators.  If it does not, if it

11   causes both just to go down, say, prices fell for both because

12   of the state of the economy, we're looking at the relative

13   prices of laundry -- changes in laundry prices versus, say,

14   changes in cooking prices.  And so it's that difference that one

15   is looking at.

16           And so if the economy had the same effect on both, it

17   doesn't change that relative effect.  It has to have a

18   differential effect on one versus the other, and there's no

19   empirical evidence that I'm aware of to support a view that

20   there would be a differential effect, but it -- I go further

21   than that.  I actually test whether there could be by allowing

22   housing starts to affect each appliance category differently,

23   and it doesn't change the results.

24           So when I say it has to affect different appliance

25   categories different, it's based on the structure of the model

1     that's comparing one price to another.

2                 THE COURT:  All right.

3                 MR. DEMITRACK:  May I just follow up very quickly?

4                 THE COURT:  Yes.

5     BY MR. DEMITRACK:

6     **Q.**  So if the -- if there's no differential effect, then you're

7     still able to look at the relationship between concentration and

8     price change?

9     **A.**  Correct.

10                MR. DEMITRACK:  Okay.  Your Honor, the discussion we

11    had at the end of the last session regarding DX658, I believe we

12    have an agreement in principle, essentially.  There are some

13    slides, and I can see in there their argument, and we objected

14    to their argument slides and then the rest of their presentation

15    came in when Professor Whinston was up.  And I believe we'll be

16    able to reach a similar agreement that slides that are argument

17    will not -- will be taken out, and then we'll be able to submit

18    with no objection the remainder of the slides.

19                THE COURT:  That's fine.

20                MR. DEMITRACK:  Thank you, Your Honor.  And in terms of

21    the rest of the day, what are you thinking about for planning

22    purposes?

23                THE COURT:  Well, we're going to break at 1:00.

24                MR. DEMITRACK:  Okay.

25                THE COURT:  I do have an argument in another hearing

```
 1        that I had to -- it's been rescheduled from a prior date, and
 2        I'm trying to accommodate an attorney there.  It's at 2:00.  And
 3        I'm really going to insist that the hearing be no more than an
 4        hour, hour and 15 minutes or so, so I'd like to come back to
 5        this case probably around 3:15 or 3:30.
 6               I assume cross-examination will be concluded by 1:00.
 7        It may be, I don't know.
 8               MR. DEMITRACK:  Mr. Orszag would love for it to be, but
 9        I doubt it.
10               THE COURT:  And I'm not trying to curtail your
11        examination.  I'm just --
12               MR. GLASS:  Of, course not, Your Honor.  I think I have
13        right about two hours --
14               THE COURT:  Yeah, all right.
15               MR. GLASS:  -- give or take.
16               THE COURT:  All right.  That's fine.  But I'd like to
17        use the balance of the day -- and, again, GSA has promised that
18        we can stay late.  You know, maybe we can; maybe we can't, but
19        we should at least be able to go until 6:30, if not later than
20        6:30.
21               And actually, you know, for those who are interested,
22        it's actually a very interesting Constitutional law argument at
23        2:00, you know, and if you want to forget about mergers for an
24        hour or so, you're more than welcome.  And indeed, Shimerenski
25        is going to offer some expert opinions about the
```

1    constitutionality of a D.C. law that treats nonresident

2    businesses differently than D.C. businesses, so it's -- it's

3    very interesting.

4            But with that, we'll start with cross-examination.  All

5    right.

6            All right.  Good afternoon, Counsel.

7            MR. GLASS:  Thank you, Your Honor.

8                    CROSS-EXAMINATION OF JONATHAN ORSZAG

9    BY MR. GLASS:

10   **Q.**  Hello, Mr. Orszag.

11   **A.**  Hello, Mr. Grass.  How are you today?

12   **Q.**  I'm well.

13   **A.**  That's good.

14   **Q.**  Mr. Orszag, has your opinion ever been excluded by a United

15   States Federal Court for failure to meet the standard under Rule

16   702?

17   **A.**  Um, I don't know the legalities of it.  I had one part of

18   one opinion excluded when I analyzed the benefits to an action

19   in a related market.  It was excluded as a matter of law.  It

20   was then criticized as well, and in that same opinion, all of my

21   opinions about econometrics and empirical analysis with regard

22   to those econometrics were allowed in.

23           MR. GLASS:  Mr. Adler, please pull up the *eBooks* case.

24           Your Honor, we're pulling up 2014 Westlaw 1282298.

25   Which is a case from March 28th, 2014, out of the Southern

1    District of New York authored by the Honorable Denise coat.  The

2    case was *In re: Electronic Books Antitrust Litigation.*

3            Mr. Adler, if you can please turn to the page at the

4    bottom right-hand corner which is 11.

5            Your Honor, from the Westlaw numbering, it's actually

6    Star 15.

7            Mr. Adler, if you can please pull out the right column,

8    middle paragraph with the heading.  Thank you, Mr. Adler.

9    BY MR. GLASS:

10   **Q.**  Judge Cote found that your opinions were unreliable,

11   correct?

12   **A.**  The offset opinions, yes.

13   **Q.**  She wrote, "Moreover, even if they weren't irrelevant as a

14   matter of law, Orszag's opinions regarding the amounts of any

15   offset from a damages figure would be independently excluded as

16   unmoored from record facts and unsupported by any rigorous

17   analysis."

18           Did you I read that?

19   **A.**  You read that correctly, yes.

20           MR. GLASS:  Mr. Adler, please turn to the next page.

21   And if we could please pull out on the left column the first

22   full paragraph.

23   BY MR. GLASS:

24   **Q.**  In the middle of this paragraph, Judge Cote writes, "First,

25   Orszag's hypothesis rests on layers of assumptions, many of

1  which are untethered to the real world or at odds with the

2  facts."

3          Did I read that correctly?

4  **A.**  Yes, you did.

5          MR. GLASS:  Now, Mr. Adler, if you can please pull out

6  the top of the next -- the right column, please.  Thank you.

7  BY MR. GLASS:

8  **Q.**  And the first full sentence on this page --

9          MR. GLASS:  And, Your Honor, I just read from page

10  Star 16, and now I'm going read from page Star 17.

11  BY MR. GLASS:

12  **Q.**  Judge Cote wrote, "This calculation is also jerry-rigged."

13          Do you see that?

14  **A.**  That is correct.

15          MR. GLASS:  Now, Mr. Adler, if you can please go to

16  page -- the bottom of the right-hand corner, 13.

17          Your Honor, in Westlaw paging it's Star 18.

18          And the left column, the last full paragraph on the

19  left, please, Mr. Adler.

20  BY MR. GLASS:

21  **Q.**  Judge Cote wrote, "In sum, Orszag's calculation does not

22  illustrate anything that would be useful to a jury; rather, it

23  would merely invite the jury's speculation.  For the absence of

24  the same level of intellectual rigor that characterizes the

25  practice of an expert economist" -- citation -- "for its flawed

1    assumptions and for its invitation to engage in guesswork,

2    Orszag's opinion is barred by both Rules 702 and 403."

3              Correct?

4    **A.**   That is correct.  This was the offset opinion, and then all

5    of my econometric analysis was let in, and she qualified -- she

6    let it in.  I don't know what the precise legal term is.  It was

7    precisely because I did not test empirical analysis because we

8    did not have sufficient data from Amazon to do so, that she

9    excluded it, first, as a matter of law, is how I read it, and

10   then for the reasons you've identified.

11   **Q.**   Mr. Orszag, would a merger between General Electric and

12   Whirlpool be anticompetitive?

13   **A.**   It's not a merger that I've analyzed.

14   **Q.**    If General Electric and Whirlpool merged today, it would not

15   change any of the results of your Whirlpool/Maytag study,

16   correct?

17   **A.**   That is correct.

18   **Q.**   And it would not change any of the facts that you rely upon

19   relating to the large retail buyers, correct?

20   **A.**   That is correct.

21   **Q.**   And it would not change any of the facts regarding the

22   number of appliance manufacturers that would exist after the

23   merger, correct?

24   **A.**   That is correct.

25   **Q.**   So as you sit here today, those three factors are an

1    important part of your analysis here, correct?

2    **A.**   Right.  They're not the only parts, but they're an important

3    part, for sure.

4    **Q.**   And those three parts would not be different if today the

5    merger were between GE and Whirlpool, correct?

6    **A.**   For cooking appliances, yes, those three factors, but

7    there's more factors that would have to be considered.

8    **Q.**   So as you sit here today, with those three factors being the

9    ones that you considered, that you wrote reports about, would a

10   merger between GE and Whirlpool be anticompetitive?

11   **A.**   As I described, merger analysis involves more than just

12   looking at one, two or three factors.  One has to look at many

13   more factors than that.  Based on my analysis in this case,

14   those three factors would suggest that there would not be an

15   anticompetitive effect, but you need to look at all of the

16   factors in one's analysis, not just those three factors.

17   **Q.**   Would a merger of GE, Whirlpool and Electrolux be

18   anticompetitive?

19   **A.**   Again, that's not a merger that I -- an analysis that I have

20   conducted, so I cannot give you an answer to that because one

21   would have to look at all the factors in consideration of that

22   analysis.

23           It's -- as I described on my direct testimony -- and if

24   I may for a moment -- this is not a theoretical exercise, merger

25   analysis, it's an empirical exercise.  So one would have to

1    analyze the empirics of that merger that you hypothetically

2    describe to determine whether it would have an adverse

3    competitive effect.  The answer is one would have to do the

4    empirical analysis, and so I can't give you an answer one way or

5    the other without doing that empirical analysis.

6    **Q.**  Well, you did an empirical analysis of the Whirlpool/Maytag

7    merger, correct?

8    **A.**  Yes, I did.

9    **Q.**  And the results of that don't change which parties are

10   merging today, correct?

11   **A.**  That is correct.  That's one factor in weighing the two

12   competing theories.

13   **Q.**  And you also relied upon the fact that Home Depot, Best Buy,

14   Sears and Lowe's are out there, correct?

15   **A.**  That is correct.

16   **Q.**  And that would not change if it were different appliance

17   manufacturers merging today, correct?

18   **A.**  You just hypothesized a merger of three players in the

19   market, which is one less choice that they have to switch

20   suppliers then under the merger that we are confronting right

21   here and analyzing.  So you're now the changing the fact set,

22   and one would have to go analyze that question as well.

23   **Q.**  So Whirlpool/Maytag, then, by itself isn't enough to learn

24   what the predicted affect would be of a merger today, correct?

25   **A.**  It's directly relevant evidence.  In and of itself, it helps

1    guide between the two competing theories which theory is more

2    powerful and more plausible, given that the fact sets are so

3    similar.

4    **Q.**   Okay.  So I'm asking you, as you sit here today, based upon

5    your analysis of the Whirlpool/Maytag merger, would it be

6    anticompetitive for GE, Whirlpool and Electrolux to merge today?

7    **A.**   That would be one factor which would suggest that it's a

8    dynamic market, and that would be put into the column of that it

9    would not.  But there are other factors that one would have to

10   consider.  All the factors -- I mean, I'm not sure -- I guess

11   it's in this binder.  There's 300 pages worth of analysis

12   looking at a host of different factors, and one would have to

13   look at those factors as part of the analysis.  The guidelines

14   and practitioners don't just look at one fact, you look at --

15   you want to take the full weight of the evidence and the full

16   weight of the empirical evidence.

17   **Q.**   I understand.  But I sat here through the seven hours of

18   your testimony, and I heard you time and time again say that the

19   answer was found in Whirlpool/Maytag, and so I want to make sure

20   I understand.

21          Does Whirlpool/Maytag tell us that GE, Electrolux and

22   Whirlpool could merge today?

23   **A.**   Again, in weighting between the two competing static world

24   models and the dynamic world model, that was a merger -- the

25   Maytag/Whirlpool merger was a merger of two players in the

1    marketplace.  Your hypothesizing a merger of three players in

2    the marketplace, so one would have to give it its appropriate

3    weight in helping determine that if we were in that

4    circumstance.

5    **Q.**  Let's go back to just GE and Whirlpool merging, then.

6          So does your analysis of the Whirlpool/Maytag merger

7    tell us so much about the competitiveness of the appliances

8    market that we would have no problem with GE and Whirlpool

9    merging?

10   **A.**  In a world with no Electrolux merger?  So the -- it's just

11   we're in a pre-merger world; is that fair?

12   **Q.**  What I'm saying is:  The only merger that the Court would

13   have to analyze today would be the merger between General

14   Electric and Whirlpool?

15   **A.**  Again, for the -- I haven't analyzed it.  I don't know if

16   all the factors guiding one to have to look at those between the

17   static and the dynamic would stay the same, but as I've

18   described, the Maytag/Whirlpool merger provides powerful

19   evidence about the dynamic nature of the market, and so we'd be

20   weighting one to a conclusion that it would have no adverse

21   effect, but one would have to do the full analysis in order to

22   draw a firm conclusion.  I -- I'm hesitant to analyze a merger

23   that I haven't analyzed.

24   **Q.**  Professor Whinston did something called upward pricing

25   pressure?

1     **A.**   Yes.

2     **Q.**   Among other things?

3     **A.**   Among other things, yes.

4     **Q.**   And upward pricing pressure is a forward-looking

5     calculation?

6     **A.**   It's a calculation that takes the world from the past,

7     according to him, from 2014, freezes it in place, and asks the

8     question that if the firms had merged in 2014, what would be the

9     internalization effect, holding all else constant from that?  So

10    it's assuming, in essence, that time merger occurred in 2014.

11    **Q.**   But it's forward-looking.  It's telling us what might happen

12    if GE and Electrolux merged, correct?

13    **A.**   I think the better way to describe it is, it provides a

14    screen about the action that would occur based on the

15    internalization of the value of diverted sales from GE to

16    Electrolux or Electrolux to GE with no other changes in the

17    marketplace.

18    **Q.**   If I read your report correctly, you don't have any

19    criticisms of the math that Professor Whinston did in his UPP

20    calculations, correct?

21    **A.**   I don't think that's fair.  And if you mean by math, once

22    he -- I have significant criticisms of the diversion rate that

23    he uses.  I have criticisms, although I would say that they're

24    softer with regard to the margin that he uses.  Those are the

25    two elements.  Does he do the Excel spreadsheet correctly of

1    multiplying the two numbers?  I have no issues with that.  And,

2    in fact, I used his spreadsheet when I sought to answer the

3    judge's question about how large Samsung and LG would have to be

4    in his own model for there to be no upward pricing pressure

5    according to what he did.

6    **Q.**   So you don't have a UPP analysis of your own that you're

7    offering today?

8    **A.**   I think a UPP analysis is a static framework that is

9    appropriately part of a first step in an analysis, not in the

10   context of a case like this.

11   **Q.**   I'm just asking:  Do you have a competing upward pricing

12   pressure analysis with Professor Whinston?

13   **A.**   We're not in competition, but I'd say no, I don't -- for the

14   reasons I've identified, I do not believe that it's the

15   appropriate model to use for this merger.

16   **Q.**   And, in fact, none of your analyses in all of your expert

17   reports are forward-looking analyses, correct?  They're all

18   backward-looking.  You're looking at Whirlpool/Maytag.  You're

19   looking at data that has sales or survey data from the past, but

20   you're not looking forward, correct?

21   **A.**   Well, all of my analyses are looking forward, but as much as

22   economists would like to have data from tomorrow, we only have

23   data from the past, so we're trying to use historical

24   information to look to the future, and so as I described in the

25   presentation, one can look at all of those trends.  And that's,

1    obviously, based on historical information, but that's what

2    we're trying to do is use historical information to predict the

3    future.  And so that's exactly what I do.  But no one can use

4    future information because we don't have that future

5    information.

6    **Q.**  You don't have an economic model that takes the historical

7    information, applies some regularly used economic standard to

8    tell us what happens in the future, correct?

9    **A.**  I did -- the economics literature has developed very

10   sophisticated models that take into static competition, much

11   more sophisticated than the UPP level.  One of my criticisms is,

12   if we're going to be in that static world, Professor Whinston

13   should use one -- should have used one of those more

14   sophisticated models that the Department of Justice and the

15   Federal Trade Commission have used over and over again in

16   mergers with very similar transactions data.  But when we're in

17   a dynamic world, the economics literature is not as well

18   developed about how to model that, given the difficulties in

19   modeling dynamism.  And so there is no good model to use, and

20   that's why I look to -- and it's what the guidelines say to do,

21   is in those situations to look at natural experiments, look at

22   empirical evidence from the past to inform ones self, and that's

23   why I go to the Maytag/Whirlpool merger.

24   **Q.**  So you have no empirical model that uses today's information

25   to look in the future, correct?

1    **A.**   I -- I -- I'm confused about there's -- the question, and

2    I'm sorry to -- so maybe, did you repeat it because it's -- when

3    one looks at historical information, you're forecasting the

4    future.  I'm taking the trends that I observe, for example, in

5    Samsung's revenue, and part of my analysis is forecasting that

6    they will continue to grow and continue to grow in their

7    competitive significance, so that's using historical information

8    to look into the future, so that's why I'm a little bit confused

9    about what you're asking.

10   **Q.**   So upward pricing pressure is mentioned in the horizontal

11   merger guidelines, correct?

12   **A.**   Yes, it is.

13   **Q.**   Okay.  And I think you were just talking about something

14   called a merger simulation; is that correct?

15   **A.**   That is correct.

16   **Q.**   Did you do your own UPP or merger simulation?

17   **A.**   No.  That's one of my criticisms of Professor Whinston that

18   the -- he -- if you're going to be in that static world of

19   looking at market shares and concentration and the closeness of

20   competition that he is using, he should have done that merger

21   simulation.  And you look at the commentary on the merger

22   guidelines that the Department and the Federal Trade Commission

23   put forward, and it gives example after example of cases where

24   the agencies or those testifying on their behalf, use

25   transactions data like we have here to model the industry; and

1    they're assuming a static world, and he did not do that.

2    **Q.**   You didn't do that?

3    **A.**   I did not do that because I don't think that's the right

4    framework of the static model, for the reasons I identified.

5    **Q.**   Right.  You want to use a model that isn't found in any of

6    the literature.  It's not found in the guidelines.  It's a model

7    that you created specifically for this case?

8    **A.**   No, that is not -- hold on.

9    **Q.**   Let's take a look at --

10   **A.**   Hold on a second.  You asked a question or a comment there.

11   Am I allowed to answer?

12            THE COURT:  Yeah, you are.  You are.  It's only fair

13   that you can answer.

14            THE WITNESS:  Thank you, Your Honor.  The literature

15   has not developed a robust merger simulation model that takes

16   into account the full ability of entry expansion repositioning.

17   So given that fact, what information can guide us about what to

18   do when there are dynamic industries?  And the merger guidelines

19   say to look at past mergers, and so that's what I did.  Right in

20   the Section 2 of the guidelines it talks about looking at past

21   mergers as pieces of evidence and incorporating that into one's

22   analysis, and that's exactly what I did to inform how to weigh

23   these two competing views.

24   BY MR. GLASS:

25   **Q.**   All right.  So let's look at your past merger.

```
1              MR. GLASS:  Please bring up Mr. Orszag's Slides 082,
2    please.
3    BY MR. GLASS:
4    Q.  Mr. Orszag, you discussed this in your direct testimony
5    today?
6    A.  Yes, I did.
7    Q.  The title is, "Results of My Econometric Analysis."
8              Do you see that?
9    A.  Yes.
10   Q.  And below that you write, "No evidence that the
11   Whirlpool/Maytag merger led to higher prices."
12             Do you see that?
13   A.  Yes, I do.
14   Q.  Isn't it true that your analysis, your own analysis, in
15   fact, showed that are ranges went up in price after
16   Whirlpool/Maytag?
17   A.  I heard you say that in your opening, and just so we're
18   clear on this -- and I describe this several slides before --
19   that I had done a before and after analysis that doesn't control
20   for other factors, as well as this analysis and the HHI
21   analysis.  And when one does that, one finds that for the
22   products where the UPP model would predict the biggest price
23   increases, you actually had the biggest price falls.
24             The cooking products was where you'd actually have the
25   smallest UPPs, and when you look at those results across a range
```

1    of model specifications, you see, you observe, that there are

2    some increases in price in ranges, and very mixed results when

3    it comes to cooktops and wall ovens, a lot of decreases.

4         But I should note in 2005, 2006, Samsung had 0.0 share

5    of the range market.  They were not a competitive presence in

6    ranges.  So the cooking products as a whole have results that I

7    would call mixed, with some negative results in terms of price

8    with cooktops and wall ovens, relatively small increases in

9    price for ranges, and no presence of Samsung in ranges, cooktops

10   or wall ovens at that time, and a de minimus share for LG at

11   that time.

12   **Q.**  It is true that your own analysis found an average of a

13   7 percent price increase in the base model for ranges, correct?

14   **A.**  I don't believe -- well, you're breaking one model on

15   probably a statistical analysis.  We should probably talk about

16   this.  If you run enough regressions and --

17        THE COURT:  You need to respond to the question,

18   please, first.

19        THE WITNESS:  The answer is, sitting here today, I

20   don't know that point estimate so I can't --

21        MR. GLASS:  Let's turn to PX02049, please.  Mr. Adler,

22   if you can please bring up all of the rows for ranges, please.

23   All the way to the left, please.  Yeah, and then to ranges, just

24   ranges, yeah.  Okay.

25   BY MR. GLASS:

1    **Q.**   Now, I always have trouble reading these because economists

2    use decimal points to talk about percentages, correct?

3    **A.**   That is correct.

4    **Q.**   So when we see in that first line under "Base Model" across

5    from "Pre-Merger SKUs," 0.829, that's an 8.29 percent price

6    increase, correct?

7    **A.**   In this model, yes, that's correct.

8    **Q.**   And then the next line --

9         MR. DEMITRACK:  Your Honor, I object to the use of this

10   exhibit.  This is not Mr. Orszag's exhibit, is it?  This was

11   provided to us this morning in violation --

12        MR. GLASS:  Well, I --

13        THE COURT:  I'm sorry, let's talk at the bench for a

14   second.

15        MR. GLASS:  Your Honor, I think I can solve this by

16   voir dire.

17        THE COURT:  I'm sorry?

18        MR. GLASS:  I can solve this by voir dire.

19        THE COURT:  All right.  Okay.  That's fine.  That's

20   fine.

21   BY MR. GLASS:

22   **Q.**   Mr. Orszag, this table is not found in your report, but is

23   found in the backup data that you provided to the Department of

24   Justice with your report, correct?

25   **A.**   Um, the answer to that is, I don't know one way or the other

1    because we provided reams of backup material.  So this table

2    precisely, I did not commit to memory, so I'm not sure one way

3    or the other.  So it's -- I'm looking at this with you right

4    now, so there's no identifier that I can know if you guys

5    created this or I created this, so I just want to make sure

6    we're clear.

7          MR. GLASS:  Your Honor, I will represent to the Court

8    that this was produced by defendants in the backup to Mr.

9    Orszag's report in the folder "Analysis/Correlation Between UPP

10   Predicted and Actual Price Changes/Correlation Between UPP

11   Predicted and Actual Price Changes-Formatted.xlss."

12         THE COURT:  Counsel, what's that language on the bottom

13   line that refers to sources?  Is that something -- is that edit

14   material provided by the government, or is that -- was that

15   attached to this document?  Because it says "source" or is that

16   a rebuttal report?

17         MR. GLASS:  Your Honor, we printed this exactly out of

18   the backup materials, so these words --

19         THE COURT:  All right.

20         MR. GLASS:  -- can --

21         THE COURT:  So it refers to that rebuttal report, so

22   Counsel, any objection?

23         MR. DEMITRACK:  Your Honor, I'm not going to object to

24   the use of the document, it's just this is -- we do have an

25   agreement that we'd get these beforehand so we can actually

1    avoid this kind of problem and we can check into the --

2          THE COURT:  When did you receive this?

3          MR. DEMITRACK:  I'm not going to object to this.

4          THE COURT:  All right.  Okay.  All right.

5          MR. GLASS:  Okay.

6    BY MR. GLASS:

7    **Q.**  Now, Mr. Orszag, looking at the backup that you sent to the

8    Department of Justice, with your report, your analysis showed

9    that the average, in your base model, for ranges was a

10   7.15 percent price increase, correct?

11   **A.**  Um, for one model -- and you are just breaking the one with

12   the highest price effect and ignoring all the other cooking

13   products.  So maybe this -- if I may?

14         THE COURT:  No, no.  Just respond to his.  It's

15   cross-examination.  You'll get a chance on either redirect or --

16   if necessary to explain your answer, you can, but --

17         THE WITNESS:  Okay.

18         THE COURT:  -- let's just try to be responsive to his

19   questions.

20   BY MR. GLASS:

21   **Q.**  So, Mr. Orszag, your Whirlpool/Maytag calculations showed in

22   your next study called, "Impute Product Age and Keep All

23   Months," that there was a average of 3.47 price increase on

24   ranges due to that merger, correct?

25   **A.**  You're reading that correctly.

1    **Q.**   Looking at your next --

2    **A.**   Although can I correct one thing?

3                    THE COURT:  Yeah, sure.

4                    THE WITNESS:  This was actually not part of the

5    Maytag/Whirlpool retrospective.  This was part of a response to

6    Professor Whinston's UPP model, and so I want to make sure that

7    we -- just so that everything's clear, and so because we had to

8    convert -- this doesn't -- when we talked previously about the

9    differences in difference model and the ability to control for

10   the state of the economy, none of that is in this version

11   because one -- for the reasons that one has to compare it to the

12   UPP, that is not -- one is not able to do that.  That's why when

13   I described it I said, "It's just a simple before and after."

14   So this doesn't include the full set of controls that we talked

15   about earlier, so I just want to make sure that we're clear.  My

16   merger retrospective takes all those into account.  This is just

17   to compare it to Professor Whinston's UPP analysis.

18   BY MR. GLASS:

19   **Q.**   Let's look at the next group.  Your next study of the effect

20   on prices and ranges after Whirlpool/Maytag is titled, "Exclude

21   All Maytag SKUs"?

22   **A.**   That is correct.

23   **Q.**   And for that you found an average of a 3.47 percent price

24   increase, correct?

25   **A.**   Yes, although that may not have been statistically

1    significant.

2    **Q.**  Let's look at cooktops.

3            MR. GLASS:  Mr. Adler, if you can just expand it to the

4    right.

5    BY MR. GLASS:

6    **Q.**  Now, you mentioned just a few minutes ago that by isolating

7    ranges we weren't looking at the other cooking appliances.

8    Let's look at cooktops.

9            In the base model calculations that you did, the

10   average price increase after the Whirlpool/Maytag merger for

11   cooktops was 9.73 percent, correct?

12   **A.**  Yes.  But statistical significance would be another issues

13   here because the pre-merger SKUs were not statistically

14   significant, so that is -- as a matter of statistics, we do not

15   know if it's different from zero for cooktops.

16           And, again, I should just note that in these products

17   Samsung and LG were not present in this time period.

18   **Q.**  They're not present today, Samsung isn't, correct?

19   **A.**  In cooktops they're not present, although they have -- as we

20   described earlier, they have the products overseas, and they

21   have indicated that they are going to be selling them in the

22   near future in the United States.

23   **Q.**  So you mentioned statistical significance.  That's denoted

24   by these asterisks, correct?

25   **A.**  That is correct.

1    **Q.**   So let's just look at the row just above that, "Post-Merger

2    SKUs Using Your Base Models For Cooktops."

3            You found a statistically significant price increase

4    after the Whirlpool/Maytag merger of 16.78 percent, correct?

5    **A.**   In this one model, that is correct.

6    **Q.**   Now let's go to the next model you used, "Impute Product Age

7    and Keep All Months."

8            The average price increase after Whirlpool/Maytag in

9    cooktops was 11.16 percent, correct?

10   **A.**   I'm having trouble with that as a result given that the

11   pre-merger and the post-merger ones say 3 -- would be 3.2 and 3,

12   and neither of them are statistically significant.  So I have a

13   feeling that that average is not correct, because it would be --

14   I'm a little confused on how a 3.3 nonstatistically significant

15   increase and a point -- a not statistically significant increase

16   in post-merger would produce something that high.  And since

17   you're showing this to me, and I don't have the Excel

18   spreadsheet underneath it to know, I -- I don't know one way or

19   the other whether that's correct.  But we can look at the two

20   numbers above it, neither of which are statistically

21   significant.  That means they're not different from zero as a

22   matter of statistical analysis.

23   **Q.**   So there may be a mathematical error in some of your

24   spreadsheets, right?

25   **A.**   No.  I'm sitting here today.  I don't have the spreadsheet

1   to look at it.  It may be right, I just don't have it to look

2   at.

3   **Q.**  Well, how could 3 percent and 3 percent average to

4   11 percent?

5   **A.**  Again, I would want the actual spreadsheet to see if that --

6   what's being calculated there, because it could be that it just

7   had been multiplied -- I don't know is the answer.

8   **Q.**  Let's look at the next model for cooktops, "Exclude All

9   Maytag SKUs."

10          In that model you found an average of 11.6 percent

11  price increase after the Whirlpool/Maytag merger, correct?

12  **A.**  Again, one of them is statistically significant and one is

13  not.

14  **Q.**  Let's look at the statistically significant one.  That's the

15  post-merger SKUs analysis.  That has three asterisks, correct?

16  **A.**  That is correct.

17  **Q.**  And that showed a 21.36 percent price increase after

18  Whirlpool/Maytag, correct?

19  **A.**  That is correct.

20  **Q.**  Now, I would be remiss not to mention the wall ovens column.

21  There's a wall ovens column, correct?

22  **A.**  That is correct.

23  **Q.**  And those numbers are negative, correct?

24  **A.**  Yes, they are.

25  **Q.**  And that suggests that wall ovens either or at zero or

1    prices went down because of the Whirlpool/Maytag merger,

2    correct?

3    **A.**   I wouldn't want to infer the strength of that comment

4    because this is a before-and-after analysis, not as strong and

5    not as robust an analytical approach as the full

6    Differences-in-Differences or the Delta HHI approach that I

7    actually used for my Maytag/Whirlpool retrospective.  This is

8    solely used to show the flaw in Professor Whinston's UPP

9    analysis, not as my retrospective of the merger, so I just want

10   the record to be clear on that.

11   **Q.**   But you're relying on these calculations to come up with

12   some of your opinions in your expert report, correct?

13   **A.**   For one opinion that is stable for all of the results, which

14   is a negative relationship between the UPP prediction and the

15   price effects looking before and after.  But as I talked about

16   at my deposition, for the reasons that the correlation may move

17   up and down, but there's a lot of movement in the different

18   numbers and you observe the -- again, the -- you would have

19   expected the largest price effects, according to the UPP, in

20   cooktops and wall ovens, and that's where you get the smallest

21   price effects.  It shows, again, the weakness of UPP as a

22   predictive model, and that was the purpose of the analysis, not

23   to measure the price effects.  The price effects were measured

24   elsewhere more reliably.

25   **Q.**   So when you say in your presentation, DX0658-082, that there

1    is no evidence that the Whirlpool/Maytag merger led to higher

2    prices, that's actually not consistent with your own analysis

3    found in your own backup data to your own reports, correct?

4    **A.**   I don't agree as a matter of statistics because -- for

5    several reasons.  Number one, for the reasons that I described,

6    one focuses on the Differences-in-Differences model or the Delta

7    HHI approach because it's a more robust framework to analyze the

8    actual price effects here are able to control for the state of

9    the economy, the other factors that are absolutely critical to

10   the analysis.  And so that statement is based on those analyses.

11   This is a much more narrow -- and you're taking this out of

12   context -- critique of the UPP framework in showing that the UPP

13   framework that he's put forward cannot predict the prices that

14   we observe using a simple approach.

15   **Q.**   Let's turn to page DX0658-84 in your slides, please.

16   **A.**   I'm sorry, what was the last three digits?

17   **Q.**   084, please.  This is a slide -- and I'm paraphrasing here,

18   so correct me if I'm wrong -- where you're showing that as the

19   companies in the appliance industry got bigger, the prices went

20   down; is that fair?

21   **A.**   As the del- -- in the -- it's not fair the way you

22   paraphrased it.  So do you mind if I do or --

23   **Q.**   Please.

24   **A.**   Okay.  Thank you.

25            It is that there is a negative relationship between the

1    change in concentration by product and the price effects

2    according to the model.  And this is the Delta HHI approach.  So

3    when we put it altogether, if concentration, if the theory that

4    we've heard is correct, one would expect that this line goes

5    like this (indicating).  You'd have a positive relationship.

6    **Q.**   Okay.  So I think I get it.  I think I get it.

7    **A.**   What this says is when you look at the coefficient in the

8    model, you have a negative relationship.  If you then ask -- and

9    as I described this -- and I just would like to make sure we're

10   all clear -- this is a graphical representation of that

11   relationship that one observes in the model, and that is a

12   negative relationship.  So it uses the predicted -- the model to

13   predict prices by each appliance category.  And the point is:

14   It goes in the opposite direction to what one would expect based

15   on the types of models put forward by Professor Whinston.

16   **Q.**   So the washers and dryers had the greatest change in

17   concentration, correct?

18   **A.**   That is correct.

19   **Q.**   And cooktops and ranges had the least change in

20   concentration, correct?

21   **A.**   That is correct.

22   **Q.**   And so as concentration changes were greater, prices

23   actually fell more.  Is that what you're finding?

24   **A.**   Based on the data, the relationship is negative, as I said.

25   **Q.**   Isn't it true that this is the exact opposite of what every

1  single merger case has found, which is that the greater the

2  increase in HHI, the greater the price increase?  You have

3  disproven every merger case ever, correct?

4  **A.**  No, not at all.  I mean, I'll just leave it at no, and if

5  you'd like me to expand I'm more than happy to because that's --

6  it's just not correct at all.

7  **Q.**  I want to talk about DX0658-38, please.  That's your slide

8  on coordinated effects.

9          Are you with me?

10  **A.**  Yes, I am.

11  **Q.**  The last bullet says, "Electrolux is not a maverick firm."

12          Do you see that?

13  **A.**  Yes.

14  **Q.**  You're aware that in this case, defendants sent a document

15  request to the United States for our entire non-privileged

16  Whirlpool/Maytag file?

17  **A.**  I understand that, yes.

18  **Q.**  And the United States produced many terabytes of data and

19  hundreds of boxes of documents?

20  **A.**  I don't know how much was produced, so I can't give you an

21  answer to that, I'm sorry.

22  **Q.**  Well, so you have an opinion on Whirlpool/Maytag.

23          Did you look at all that data in those documents?

24  **A.**  I did not look at all of that data in those documents, no.

25  **Q.**  Did anyone from your team look at that data or documents?

1    **A.**   There were certain data and documents that were reviewed,

2    yes.

3           MR. GLASS:  Let's turn to PX02053.  And, Mr. Adler, if

4    you can just keep this slide up.

5           THE WITNESS:  What was that?

6    BY MR. GLASS:

7    **Q.**   PX02053.  This is a document dated February 2nd, 2006

8    relating to Whirlpool's proposed acquisition of Maytag's

9    submission to U.S. Department of Justice Antitrust Division.  Do

10   you see that?

11   **A.**   Yes, I do.

12   **Q.**   Have you ever seen this document before?

13   **A.**   I looked at so many different documents I can't -- I can't

14   tell you with certainty whether I looked at this one or not.  I

15   apologize.

16   **Q.**   Let's look at the tile of this particular document, please.

17   The title is, "GE and Frigidaire Play a Dynamic Role in the U.S.

18   Major Appliance Industry."

19           Do you see that?

20   **A.**   Yes, I do.

21   **Q.**   Let's turn just to the table of contents, please.  That's on

22   the page ending in 473.  If you look at Roman 3 --

23           MR. GLASS:  And, Mr. Adler, if you can pull out all of

24   Roman 3.  Thank you.

25   BY MR. GLASS:

1    **Q.**   Roman 3 has a section titled, "Electrolux/Frigidaire."

2            Do you see that?

3    **A.**   Yes, I do.

4    **Q.**   And 3A, the section heading, is, "Electrolux is a Price

5    Maverick with Global Scope and Scale."

6            Do you see that?

7    **A.**   I do see that as of February 2006, they're claiming that.

8    **Q.**   Now let's look down to --

9            MR. GLASS:   So, Mr. Adler, if you can just pull that a

10   little bit up.   It's on top of -- okay.

11   BY MR. GLASS:

12   **Q.**   So you wrote in your slide that Electrolux is not a maverick

13   firm, and Whirlpool wrote in its submission to the Department of

14   Justice, relating to the Whirlpool/Maytag merger that you

15   studied, that Electrolux is a price maverick with global scope

16   and scale, correct?

17   **A.**   Yes.   And the empirical evidence today that I've analyzed

18   for the past few years shows no evidence that Electrolux

19   conducts itself in the past few years as a price maverick.

20   Whether that was the case in 2005 or 2006, is not something that

21   I've analyzed.   I've analyzed whether they are one today.

22           MR. GLASS:   Let's look at Roman 5, please, Mr. Adler,

23   and just stay on the table of contents, please.

24   BY MR. GLASS:

25   **Q.**   Whirlpool writes, "GE and Electrolux/Frigidaire are

1   important components of the competitive mix and will ensure a

2   highly competitive U.S. major appliances business."

3          Do you see that?

4   **A.**  Yes, I do.

5          MR. GLASS:  Now, Mr. Adler, if you can turn to the next

6   page, returning to the page ending in 474, Roman 6, please.

7   BY MR. GLASS:

8   **Q.**  It says on page 474, 6A, "Whirlpool and Maytag recognize GE

9   as an aggressive price competitor," and B says, "Frigidaire's

10  pricing and discounting are extraordinary."

11         Do you see that?

12  **A.**  Yes, I do.

13         MR. GLASS:  Now, Mr. Adler, please turn to the next

14  page.  It's the page ending 475.

15  BY MR. GLASS:

16  **Q.**  And I'm just going to read from the first paragraph.

17  Whirlpool writes, "Any assessment of the competitive dynamics of

18  U.S. major appliances in general, and of washing machines in

19  particular, must recognize that the current market shares of GE

20  and Electrolux/Frigidaire understate their future competitive

21  significance, just as the current market share of Maytag

22  overstates its future competitive significance."

23         Do you see that?

24  **A.**  I see that they wrote that, yes.

25  **Q.**  And then the last sentence in paragraph says, "This paper

1    focuses on the significance of GE and Electrolux/Frigidaire as

2    key competitive threats, along with the foreign expanders that

3    will require the combined Whirlpool/Maytag to increase

4    productivity, improve products and offer low prices on a daily

5    basis to remain competitive."

6             Do you see that?

7    A.  Yes, I do.

8    Q.  Please look in your slides back to the page ending in 020.

9             MR. GLASS:  Your Honor, I apologize for the delay.

10   We're doing a little --

11            THE COURT:  No, no, no.  It's fine.  No, no.

12            MR. GLASS:  There's a little on-the-fly redacting going

13   on.

14            THE COURT:  Not a problem, no.  No, no.

15            MR. GLASS:  Thank you.

16   BY MR. GLASS:

17   Q.  So, Mr. Orszag, you spoke about this slide yesterday?

18   A.  Yes, I did.

19   Q.  This looks at three weeks in September of this year at just

20   Home Depot stores, correct?

21   A.  That is correct.  That's how I described it, and that's what

22   the analysis is.

23   Q.  Do you know how many sales happened for that number one

24   ranking Samsung for it to achieve its number one spot?

25   A.  It would be in my backup material, and I believe it may have

1    been even in my expert report, although you'd have to divide, I

2    think, because it had the dollar amounts.  So if you -- if you'd

3    like me to go to that, I can.

4    **Q.**  Why don't we go to your backup material.

5              MR. GLASS:  Your Honor, we're turning to PX02071.

6              THE COURT:  All right.

7              MR. GLASS:  Mr. Coates, can you take it off of that big

8    screen, please?

9    BY MR. GLASS:

10   **Q.**  Mr. Orszag, I will represent to you that we pulled this

11   directly out of your backup material, exactly as you produced it

12   to us, PX02071.

13             Does this look like the backup to that slide?

14   **A.**  Yes, it does, because the next page says Table 55, which

15   would be directly from my report, and I had the total sales

16   numbers in my report.

17   **Q.**  And, in fact, if you look at your slide, the source says

18   Table V5, and the second page of PX02071 is titled, "Table B5"?

19   **A.**  That is correct.  On the top left corner of that slide, the

20   left part of what's on the screen today is what is presented in

21   my expert report.

22   **Q.**  All right.  Let's look at the number one Samsung range sold

23   at Home Depot in those three weeks.  Do you see that?

24   **A.**  Yes, sir.

25   **Q.**  Okay.  So if I am doing correct math, I believe that means

1    that each week Home Depot across all its stores sold about 1,300

2    of that product?

3    **A.**   Give or take.  That is a fair calculation.

4    **Q.**   Do you know how many Home Depot stores there are in America?

5    **A.**   I believe Mr. Baird said there's something like 1,600 or

6    1,900, something in that ballpark.

7    **Q.**   So to be the number one, in your analysis, Samsung only had

8    to sell less than one unit per store, correct?

9    **A.**   You've done the math about right.  That is correct.

10   **Q.**   And to be number two, you only had to sell a third of a unit

11   a store, one out of every three stores?

12   **A.**   It may be one out of two, but sure.

13   **Q.**   And to be number three, it's about one out of every two

14   stores, correct?

15   **A.**   Per week, when you start narrowing it that way, yes.

16   **Q.**   And to be number four, it's about one out of two?

17   **A.**   Give or take, sure.

18   **Q.**   And to be number five, it would be less than one range in

19   every two Home Depot stores?

20   **A.**   You've done the math roughly correctly, yes.

21   **Q.**   And do you know how many ranges are sold in the United

22   States every year?

23   **A.**   Roughly across all channels, I believe it's 6 million plus

24   or minus a couple hundred thousand.  I have it in my backup

25   material.  I didn't commit it to memory, but I'm sure you have

1    the number right there and so you'll tell me if I'm roughly

2    correct.

3    **Q.**   6.4 sound right?

4    **A.**   I'm not going argue with 6.4 million.

5    **Q.**   So out of 6.4 million sales in a year, this is looking at,

6    at most, one or two units per Home Depot store sold, correct?

7    **A.**   Well, but you have to think about Home Depot is only a

8    portion of those 6.4 million sold.  We can go to the actual

9    data, because we can look at appliance sales, divided by the

10   number of Home Depot stores, and then the right way to look at

11   it is not across the whole year, but look at it relative to the

12   average weekly sales, say, at a Home Depot.  So you -- yes,

13   you're correct, 6.4 million, I'm assuming that that's the right

14   number.  It's roughly what I remembered, and -- but you're

15   comparing apples and oranges.  You want to compare something

16   that's more relevant, which is Home Depot's sales out of that

17   whole pot.

18   **Q.**   And you're aware that Samsung is particularly successful at

19   Home Depot, correct?

20   **A.**   Samsung's particularly successful at Best Buy.  That's where

21   they have, among the various retailers, their highest share.

22   **Q.**   If I told that you Samsung had 12 percent of Home Depot's

23   share would you disagree?

24   **A.**   I'm not sure we're supposed to mention those numbers, but --

25   or at least I was told not to.  So what I probably should say is

1    I don't disagree from that number.

2    **Q.**   And that's greater than Samsung's market share across all

3    sales, correct?

4    **A.**   Across all sales that is greater than their market share by

5    about 1 percentage point.

6    **Q.**   So Samsung does better at Home Depot than on average?

7    **A.**   That's a fair proposition, yes.

8    **Q.**   So I think an issue that you just raised is about sampling

9    and whether or not we can look at samples and we can extrapolate

10   to the whole market.

11            Is that a fair description of what you were just

12   describing?

13   **A.**   That's not what I was describing, but I understand the issue

14   of sampling and surveying and what it -- how it affects issues,

15   so I'm more than happy to discuss it with you.

16   **Q.**   Okay.  Let's look at some samples that you used.  Let's go

17   to Slide 050.  This slide was one of your reasons why you argue

18   Professor Whinston ignored certain appliance manufacturers,

19   correct?

20   **A.**   It was one reason, yes.  It was one piece of evidence.

21   **Q.**   So I want to start by looking and saying, if you just add

22   General Electric and Electrolux, they have over 60 percent

23   share, correct?

24   **A.**   That is correct.

25   **Q.**   Premier is number four, correct?

1    **A.**   That is correct.

2    **Q.**   Are you arguing that this shows that Premier's share is

3    anywhere close to that across the entire market?

4    **A.**   I'm not saying that's their overall market share.   I'm

5    saying this is one piece of evidence that they are a market

6    participant earning revenues in the market, and that their

7    market share should be counted.   I'm not saying it should be

8    counted at 10 percent.   I'm saying it should be counted.   And

9    the ignoring those is inconsistent with the merger guidelines.

10   This is one piece of evidence that is not just tiny, at this one

11   retailer, which I believe is the sixth, seventh or eighth

12   biggest retailer at the country, looking at their contract sales

13   it's quite significant.   It's 10 percent, the fourth biggest at

14   that retailer.

15   **Q.**   So this is looking --

16   **A.**   I'm sorry, I don't think I was supposed to mention that

17   number, so I apologize.

18   **Q.**   You are looking, in Slide 50, at two stores, stores 23 and

19   24, out of 66 stores, correct?

20   **A.**   That's actually not correct.   They categorize them as two

21   stores.   As a contractor you can go into any single P.C. Richard

22   and use your contractor discount to get the discount.

23   **Q.**   Let's look at Premier.   Actually, before I turn to Premier,

24   do you see LG all the way down at the bottom?

25   **A.**   Yes, I do.

1    **Q.**   They have less than 1 percent?

2    **A.**   That is correct.

3    **Q.**   So should I take from that, that LG has less than 1 percent

4    of the entire range market in the United States?

5    **A.**   No.  I'm -- as I said, I -- I said that we should -- it's

6    a -- it's a data point showing that ignoring that market

7    participant, Premier, was wrong, and we need to then use the

8    best available indicator.  I did not say that this was the best

9    available indicator.  I said this is a fact that Premier does

10   well at one retailer and that should be considered.  And it's

11   not just de minimus at that retailer, it's quite significant.

12   **Q.**   Samsung has less than 1 percent share at this one retailer

13   for these purchases?

14   **A.**   When we look at ranges.  And they -- and, obviously, they

15   have nothing when it comes to cooktops and wall ovens on the

16   next page.

17   **Q.**   All right.  Let's remember Premier.  Keep it in your mind.

18   **A.**   Sure.

19   **Q.**   Let's turn to Slide 013 in your presentation, please.

20   **A.**   (Witness complied.)

21   **Q.**   Premier's not listed here, correct?

22   **A.**   That's correct.

23   **Q.**   They're in the other?

24   **A.**   They are in the other.

25   **Q.**   Summit's not listed here?

1    **A.**   That is correct.

2    **Q.**   They're in the other?

3    **A.**   That is correct.

4    **Q.**   Let's look at the source.  It says, "Source:  Orszag

5    rebuttal report, backup materials share tables.xlsx."

6            Do you see that?

7    **A.**   Yes, I do.

8    **Q.**   Why don't you turn to PX02056.

9    **A.**   (Witness complied.)

10   **Q.**   Okay.  Now, here's a lot of numbers, so -- and I need your

11   help a little bit.

12           So this is the backup, share tables.xlsx, correct?

13   **A.**   Um, I have no way to identify it that way, because it says

14   "Master Data" underneath -- on the top left corner.  If you say

15   it is, I'm not going to disagree with you sitting here right now

16   because I haven't matched up the names to this.

17   **Q.**   I will represent to you that we took this, again, not out of

18   your report but out of your backup material, at folder

19   "Analysis/Revenue and Quantity Shares/Share Tables.xls."

20   **A.**   I'm not going to disagree with you.  There's a massive

21   amount of data, and lots of spreadsheets, so this looks like

22   one, but I can't represent it's identical to the one that you

23   cited.

24   **Q.**   Let's look at the first page.  I'm going to refer to rows

25   and columns because I think that'll be a little bit easier for

1   all of us.

2   **A.**   Okay.

3   **Q.**   So Row 1, Column A says "Category."

4        Do you see that?

5   **A.**   Yes, I do.

6   **Q.**   That's the appliance category?

7   **A.**   That is correct.

8   **Q.**   Then on Row 1, Column B, it says "Year."

9        Do you see that?

10  **A.**   That is correct.

11  **Q.**   That's the year in which the sale was made?

12  **A.**   That is correct.

13  **Q.**   Row 1, Column C says, "Channel."

14        Do you see that?

15  **A.**   That's how the companies have identified the sales or

16  they've been attributed.

17  **Q.**   And that's either contract, retail or together in total?

18  **A.**   Correct, taken from the supplier how they identify it.

19  **Q.**   Row 1, Column D says, "Firm."

20        Do you see that?

21  **A.**   Yes, I do.

22  **Q.**   That would be the appliance manufacturer?

23  **A.**   That is correct.

24  **Q.**   Now, I'd like to go to Row 1, Column F.  It says,

25  "Quantity."

1              Do you see that?

2    **A.**  Yes, I do.

3    **Q.**  And quantity is the number of units sold by that

4    manufacturer in that year?

5    **A.**  For that product, that should be the case, yes.

6    **Q.**  And it's got a decimal point.  Can you help me understand

7    what that means?

8    **A.**  Right.  So as I describe, we took the transactions data as

9    the base, and then we used TraQline to fill in for those

10   providers who did not provide their transactions data.  So when

11   one does that, it's relatively simple as a calculation.  You

12   take the providers for which you -- the suppliers for which you

13   have the data, and you -- I looked in TraQline, and those

14   suppliers, say, represented 93 percent of sales in TraQline, so

15   I used that for 93 percent of the sales.  And then for the other

16   suppliers I allocated, based on TraQline, and when you're then

17   multiplying a number by a percentage, it will often, because

18   of -- it's -- we're -- attributing it to it, it will come up

19   with decimal places.  Obviously, whether it had the decimal

20   place or not, it's not going to affect any of the calculations.

21   **Q.**  And are these hundreds or thousands or the exact units?

22   **A.**  Sitting here they look like they're the exact units.

23   **Q.**  Now I'd like to look at Row 1, Column G.  It says,

24   Rev. Share."

25              Do you see that?

1    **A.**   Yes, I do.

2    **Q.**   And that is the market share of that firm in that year for

3    that category by revenue?

4    **A.**   That is correct, if you assume -- just taking their data as

5    is.

6    **Q.**   And, again, we have decimal points because economists don't

7    like to use a percentage sign.

8            Just looking at the first row, Row 2, where it says,

9    "0.033878044," that would mean for that firm in that year in

10   that channel for that product, they had about 3.38 percent

11   market share by revenue?

12   **A.**   I am loathed to use the word "market share" because it has a

13   precise meaning in antitrust, but what I'll just say is that's

14   their revenue share, taking their data as given for that

15   category.

16   **Q.**   Well, let's hold on a second.

17           This is the backup data to Slide 013, which is titled,

18   "Market Shares:  Ranges," right?

19   **A.**   Right, but you've got to -- this would be added with the

20   other -- with -- with the other sales that they have for

21   cooktops that they identify together, so I just want to make

22   sure that we're clear.

23   **Q.**   Oh, I see.  I'm not trying to trick you into agreeing that

24   contract channels are market -- if that's what you're afraid of.

25   I'm not.

1    **A.**   Well, I'm not.

2    **Q.**   Yeah.

3    **A.**   I mean, I just want to make sure that we're all clear.  It's

4    a revenue share.  If you add the two together you'd have their

5    total share of the overall market.

6    **Q.**   I get you.  Okay.

7           So if I look at Row 5 instead where it says, "Wall

8    Oven, 2015, Total, Bosch," and I won't over, "0.046736816,"

9    would mean that they have about 4.67 percent market share of

10   wall ovens?

11   **A.**   From TraQline, that is correct.

12   **Q.**   All right.  Now going back to Row 1.

13   **A.**   Just so we're clear, Bosch did not produce 2015 data for --

14   the transactions data, so that's the indicator that's on the

15   right-hand side that this is a TraQline brand.  So I just want

16   to make sure that we're clear that this is based on TraQline and

17   not based on the transactions data.

18          It's also why once you get to transactions data when

19   there's no 1s, for example, that you don't have these decimal

20   point issues that you raised about the number of units sold

21   because, obviously, GE wasn't selling half of a range, they were

22   selling a whole range.

23   **Q.**   I'd like to look on Row 1, now Column H.  It says, "Quant.

24   Share."

25          Do you see that?

1    **A.**   Yes, I do.

2    **Q.**   And that would be market shares by quantity?

3    **A.**   Yes, by units.

4    **Q.**   By number of units?

5    **A.**   Precisely.

6    **Q.**   Okay.  Now I'd like you to turn to Row 772, please.

7    **A.**   (Witness complied.)

8    **Q.**   Row 772 is ranges in 2014 for the entire market for Premier,

9    correct?

10   **A.**   772?

11   **Q.**   Yes, sir.

12   **A.**   That looks about right, yes.

13   **Q.**   Now let's go over and look at Column H, which was "Unit

14   Shares."  The number there is "0.000895523."

15          Do you see that?

16   **A.**   It would work out to -- I think the right way to say it is

17   .1 percent of share for Premier in ranges in 2014 on a unit

18   basis.

19   **Q.**   .1 percent?

20   **A.**   That is correct.

21   **Q.**   Now, we talked -- you talked about Summit before.  Do you

22   recall that?

23   **A.**   That is correct.

24   **Q.**   And Summit is actually made by a company called Felix

25   Storch; is that correct?

1    **A.**   It sounds correct.  It's not something I committed to my

2    memory, so if you say that's the case, then...

3    **Q.**   So if you look at Row 360, it reports, "Range for 2014 for

4    the total market by Felix Storch."

5           Do you see that?

6    **A.**   Yeah, I think you could be making a mistake here, so maybe I

7    could short-circuit this.  There's another category, and if a

8    consumer responds Felix Storch, they may get put into Felix

9    Storch, obviously, but if they look at what's on their appliance

10   and it says Summit, it may get allocated to the other category

11   which is on page -- in the 720s, give or take, it looks like,

12   and so they may be added to that other category.  So -- because

13   in TraQline survey, for brands that people do not -- where they

14   do not have their own line item, people are categorized into the

15   other.  So, for example, Arçelik is not a line item in TraQline.

16   Bertazzoni is not a line item in TraQline.  Those individuals

17   are then put into the other category, and that other category

18   would then factor into the analysis as I described.

19   **Q.**   This is your share table from your backup data based upon

20   your analysis of TraQline, correct?

21   **A.**   That is correct.

22   **Q.**   Okay.  Let's look at 360.  So for Felix Storch, the total

23   number of ranges that they sold in the United States in 2014 was

24   about 1,335.  Do you see that?  That's in Column F.

25   **A.**   Right.  And what I was saying is that -- you read that

1    correctly.  And Summit Appliances would get categorized by

2    TraQline.  If somebody said they bought a Felix Storch, it would

3    get categorized with Felix Storch.  If somebody says they get

4    categorized by Summit -- and if that's not a line item in the

5    data they will put it in the other category.  That other

6    category is much larger because it reflects all the other brands

7    like NXR, Ancona, that are sold at Costco, et cetera.

8           And so my point here is that there are a number of

9    brands -- Summit, as you know, is sold via Home Depot -- that

10   earn revenues in the market and should be included.  The

11   inclusion of them as a group has an effect of, roughly, 100

12   points -- it's a little less depending on which analysis you

13   look at -- on the first.  Is that the biggest change in the

14   history of the world?  No.  But is it something that is a

15   factor, especially since certainly of these players compete at

16   different price points?  Yes.

17   **Q.**  Let's look in that row, Row 360, at Column H.  That

18   represents the Felix Storch unit shares in 2014 for ranges,

19   correct?

20   **A.**  That is correct.

21   **Q.**  And can you just tell me what that comes to in a percentage?

22   **A.**  It'd be 0.02 percent.

23   **Q.**  Okay.  0.02 percent, is that two-tenths of 1 percent?

24   **A.**  It's a very small number.

25   **Q.**  But is it two-tenths of 1 percent?

1    **A.**   It's two-one hundredths of 1 percent.

2    **Q.**   Two-one hundredths?

3    **A.**   Yes.  And as I noted, just so the record's clear, Summit

4    appliances sold would get put how the consumer identifies them,

5    not necessarily with the named brand of the owner.

6    **Q.**   Are you aware that defendants subpoenaed Felix Storch for

7    all of its invoice data?

8    **A.**   I'm not aware one way or the other.

9    **Q.**   Why don't you take a look at PX02069.

10   **A.**   (Witness complied.)

11   **Q.**   Have you ever seen one of these before?

12   **A.**   Fortunately not really, although I've seen more of what's in

13   the back of this just flipping through it.  I -- the front

14   part -- hopefully I never see one of these.

15   **Q.**   So let's just look at the front page, the cover page, the

16   subpoena itself.

17           Right in the middle it says "To."

18           Do you see that?

19   **A.**   Yes.  I do.

20   **Q.**   "Felix Storch, Inc."

21           Do you see that?

22   **A.**   Yes, I do.

23   **Q.**   And if you look down, "Place," it says "Jones Day"?

24   **A.**   I see that.

25   **Q.**   "Date, August 19th, 2015"?

1   **A.**   I see that.

2   **Q.**   And you see the caption to this case?

3   **A.**   Yes, I do.

4   **Q.**   If you go a few pages in and you get past the subpoena,

5   you'll see something called "Subpoena Attachment" and then some

6   request for production?

7   **A.**   I see that.

8   **Q.**   Okay.  You'll see that there's five on the first page?

9   **A.**   Yes, I do.

10  **Q.**   Let's go to the next page.

11          There's another nine on that page?

12  **A.**   Yes, sir.

13  **Q.**   Number 7 says, "Documents and data sufficient to show and

14  understand (via instructions or related data dictionaries) your

15  sales data for all appliances sold in the U.S., including the

16  identity of all appliance customers to whom your appliances were

17  sold."

18          Do you see that?

19  **A.**   Yes, I do.

20  **Q.**   Did you receive that data?

21  **A.**   No, I did not.

22  **Q.**   Now let's look on the bottom.  Number 14, it says, "All

23  documents and data relating to the tracking of your retail

24  channel pricing and market or industry share (however

25  calculated) for appliances sold in the U.S."

1            Do you see that?

2    **A.**  Yes, I do.

3    **Q.**  Did you ever receive that data?

4    **A.**  No, I did not.

5    **Q.**  I think I have an explanation why.  Let's turn to PX02070.

6            Do you see here there's letter?  The stationery says,

7    "Summit, Accu-Cold"?

8    **A.**  I see that.

9    **Q.**  And if you look at who it was sent to, it was sent to Jones

10   Day.  Do you that?

11   **A.**  I see that.

12   **Q.**  The date was August 15th, 2015?

13   **A.**  I do see that.

14   **Q.**  Now let's go to the last page, second to last page, excuse

15   me.

16   **A.**  Do you mind if I just read this for a second since I haven't

17   seen this before?

18            THE COURT:  That's fine.

19   BY MR. GLASS:

20   **Q.**  Please.

21   **A.**  Okay.

22   **Q.**  All right.  Now let's go to the second to last page.

23            MR. GLASS:  I'm sorry, Mr. Adler.

24   BY MR. GLASS:

25   **Q.**  This letter is signed by Paul Storch.  Do you see that?

1    **A.**   Yes, I do.

2    **Q.**   Storch, the same as Felix Storch?

3    **A.**   I assume so.  I don't know him, so I can't attest to it, but

4    it sounds about right.

5    **Q.**   Okay.  Now let's go to the first page of this letter, the

6    letter from Mr. Storch from Summit Appliances to Jones Day.

7    Right in the middle there's a sentence that says, "To put."

8             Do you see that?

9    **A.**   Yes, sir.

10   **Q.**   And it says, "To put our company into perspective, we sell

11   into niche markets, and our median sale is one unit per

12   transaction.  So much of the information requested simply does

13   not apply to us."

14            Do you see that?

15   **A.**   I do.

16   **Q.**   And you've never seen this letter before?

17   **A.**   No, but I characterize them as focused on one part of the

18   market.  You'd call it a niche part of the market, the low end

19   of the market.

20   **Q.**   But nobody's provided this letter to you?

21   **A.**   I didn't -- I asked if the data were available.  Getting the

22   actual letter seems like more than I needed.

23   **Q.**   Okay.  Let's turn to the next page.

24            Request Number 7, remember that was the request for

25   sales data?

1   **A.**   Yes, sir.

2   **Q.**   Mr. Storch writes, "Request Number 7:  Sales data for all

3   customers is not accessible within the time constraints imposed

4   by the subpoena.  Our database, furthermore, cannot distinguish

5   appliances from other products we distribute, nor can we

6   distinguish customers by their appliances or other purchases

7   alone."

8           Do you see that?

9   **A.**   Yes, I do.

10  **Q.**   Now let's turn to the next page.  Mr. Storch's response.

11          MR. DEMITRACK:  Your Honor, I object at this point.

12  The witness has never seen this.  We're just having this read

13  into the record.  This is rank hearsay.

14          THE COURT:  I'll allow it.  This is cross-examination.

15  I'll allow it.

16  BY MR. GLASS:

17  **Q.**   Request Number 14.

18          MR. GLASS:  Thank you, Your Honor.

19  BY MR. GLASS:

20  **Q.**   "Request Number 14:  We do not track any market share data,

21  so we do not know our market share in appliances, except to know

22  it is inconsequential, certainly less than one-tenth of

23  1 percent based on industry statistics for the size of the

24  industry."

25          Do you see that?

1    **A.**   I do see that, and this is obviously a different calculation

2    than the one you were just showing me, because this would cover

3    all appliances, not just cooking.  And so there's a mismatch of

4    the numbers.

5              MR. GLASS:  Can you keep that up and bring up --

6              Your Honor, I'm going to look at Mr. Orszag's Slide 050

7    again.

8              THE COURT:  All right.  Let me just -- let me just

9    raise a point, though, in response to counsel's objection.

10             You're using this to demonstrate that, notwithstanding

11   the fact that a defendant may have had possession of arguably

12   relevant material, this witness did not have access to the

13   material or the responses.

14             MR. GLASS:  Your Honor --

15             THE COURT:  You're not asking me to accept as true

16   what's stated in those responses?

17             MR. GLASS:  Your Honor, I'm not.

18             THE COURT:  Right, right.

19             MR. GLASS:  What I'm asking is whether or not the

20   jerry-rigged analysis that Mr. Orszag did to try to state that

21   Summit and Premier and some of these small players are big, is

22   actually inconsistent with things that we all have, and so I'm

23   solely using it as impeachment.

24             THE COURT:  That's what I thought.  All right.  I just

25   want to make that clear, because I didn't understand you to at

1   some point later point being be asking me to -- or asking the

2   Court to accept it as true what's asserted in these responses.

3          You're demonstrating what he may have had access to,

4   what he may have not had access to, for purpose of preparing his

5   reports and backup reports?

6          MR. GLASS:  Yes.  Thank you, Your Honor.

7   BY MR. GLASS:

8   **Q.**  Let's go back to PX02056.  We looked at Summit and Premier.

9   Now let's look at Sub-Zero.  Sub-Zero is on Row 817.

10         817 shows the total 2014 range sales for Sub-Zero and

11  Wolf, correct?

12  **A.**  That looks correct, yes, sir.

13  **Q.**  And if you could look at Column H, please, what was the unit

14  share of Sub-Zero and Wolf?

15  **A.**  Unit share was -- would be about .4 percent.

16  **Q.**  Four-tenths of 1 percent.

17  **A.**  That is correct.

18  **Q.**  Let's look at Bosch, please.  That's on Row 193.

19  **A.**  (Witness complied.)

20  **Q.**  Row 193 reports Bosch's total range sales in 2014.  Do you

21  see that?

22  **A.**  Yes, sir.

23  **Q.**  And in Column H, what's Bosch's unit share?

24  **A.**  It is .6 percent.

25  **Q.**  About a half of 1 percent?

1    **A.**   A little over half, yes, sir.

2    **Q.**   Let's look at Viking.  That's Row 653, please.

3    **A.**   (Witness complied.)

4    **Q.**   In Row 653, it reports in the middle, Viking's 2014 total

5    range sales.  Do you see that?

6    **A.**   Yes, I do.

7    **Q.**   And what was Viking's share, unit share?

8    **A.**   In ranges, about 2 percent of unit shares.

9    **Q.**   Two-tenths of 1 percent?

10   **A.**   For ranges in 2014, on a unit basis, yes, sir.

11   **Q.**   Let's look at Avanti.  That is on Row 116, please.

12   **A.**   (Witness complied.)

13   **Q.**   That reports Avanti's 2014 total range sales?

14   **A.**   Yes, sir.

15   **Q.**   And looking at Column H, what was Avanti's market share?

16   **A.**   About .04 percent.

17   **Q.**   That'd be four-tenths of 1 percent?

18   **A.**   It's less than that.

19   **Q.**   Four-one hundredths of 1 percent?

20   **A.**   That is correct.

21   **Q.**   So when we're looking at your backup materials on market

22   shares, we can see that Summit, Premier, Sub-Zero, Bosch,

23   Viking, Avanti, all really are de minimis just as Professor

24   Whinston said, correct?

25   **A.**   No.  You allocated -- well, let's -- there's another

1    category here that would reflect Arçelik, Bertazzoni; Summit

2    could be represented in there if that's how individuals reported

3    it and then they were put into the other category.

4         So the other category includes other sellers like NXR

5    or Ancona, and it's the total of all of these small players,

6    because there are many small players, that moves -- I mean, if

7    you look at my other category, by the way -- I mean, let's just

8    make sure we're all on the same page here -- I said other was

9    1.4 percent in 2015 for ranges.  There are several other

10   providers who aren't listed here that Professor Whinston

11   included, but 1 percent of market share moves the Delta HERF by

12   the numbers that I outlined.

13        And so I agree, these players are small, but when

14   totaled together, they have an effect and they're -- in the

15   market, earning revenues being sold at major retailers.  So it's

16   not clear to me the logic for excluding them, given the fact

17   that they are a firm earning revenues in the relevant market.

18   Q.   Wouldn't one reason to exclude them is, just as we saw from

19   Summit's president, Mr. Storch, that they don't even keep the

20   data?

21   A.   But TraQline does, and TraQline uses -- TraQline is a source

22   that market participants use to make business judgments.  And

23   TraQline includes information about the sales to the nonlarger

24   suppliers, so why should we exclude when we know that, for

25   example, if I walk into Costco, which I did, you can see other

1    makers, other suppliers, that are not included in the

2    transactions data.  It's the third biggest retailer in the

3    country.

4    **Q.**  So when you combine all of these fringe players, all the

5    other, you get 3 percent of units sold in the United States for

6    ranges; is that fair?

7    **A.**  I don't know if it's 3 -- I haven't done that calculation

8    precisely.  When I report revenue shares it's going to be

9    roughly 1 percent for ranges and then several percentage points

10   for cooktops and wall ovens.

11   **Q.**  So 1 percent for ranges.

12          When GE and Electrolux and Whirlpool all have well over

13   20 percent, 1 percent, you're saying is not de minimus, correct?

14   **A.**  You just said something that's factually not true.

15   Electrolux doesn't have over 20 percent share.

16          So just because -- I feel like I'm in the Everett

17   Dirksen, you know, comment about government spending.  It's like

18   a billion here and a billion there, before we're talking about

19   it we're talking about real money.  It's -- these are small

20   players, but the point is there's many of them, and to just say,

21   "You know what, they're not in the market," is ignoring choices

22   that consumers have.

23          So we have a data source that's reputable.  It's one

24   that the business people use in the ordinary course of business,

25   and so it's appropriate to add it.  And it's consistent with the

1    merger guidelines of counting all firms that earn revenue and

2    using the best available indicator.  So you take those two

3    together -- am I going to sit here and tell you this is the

4    biggest issue?  No.  This is -- it's a small issue, but it also

5    means that you -- but it does mean you shouldn't exclude it.

6    There's not a economic basis to say, "You know what, we know

7    somebody's selling a range, we see it at Home Depot, we're just

8    not going to count that range."

9         That's not in the guidelines.  That's not in merger

10   analysis.  There's -- so it's an option consumers have.  It

11   should be counted.  Is it the biggest deal in the world?  No,

12   I'm not going to sit here and say it's the single biggest deal,

13   but it is relevant.

14   **Q.**  So you just said that Electrolux doesn't have 20 percent.

15   Let's just look at row 23, please.

16   **A.**  I was pointing to my revenue shares that were on the slide

17   that you had up previously.

18   **Q.**  Okay.

19   **A.**  Just so we're clear on Slide 013.

20   **Q.**  But when we were looking at PX02056, Row 23, the total range

21   sales for Electrolux in 2015 give them a market share of

22   19.58 percent, correct?

23   **A.**  Yes, which is less than 20 percent, but it's also unit

24   shares, and as I explained in my testimony, revenue shares are

25   the more appropriate -- so all the numbers we've been going

1    through are all unit shares.

2          Revenue shares are the more appropriate metric because

3    they better reflect the competitive significance of the market

4    participants.  And that's why we should focus on revenue shares,

5    and on a revenue share basis, Electrolux has a lower amount of

6    revenue -- a lower share.

7    **Q.**   Revenue shares would treat a $5,000 Wolf range as being 10

8    times more important than a $500 Frigidaire range, correct?

9    **A.**   In the calculation, that is correct.  It has some simplistic

10   appeal the way you describe it, but we know that consumers are

11   making trade-offs between the product features.  And as the

12   guidelines note and state, you look at the competitive

13   significance, and they are -- there are product features in that

14   set that are giving it the quality and the difference that drive

15   those price differences.  We see it every day in terms of the

16   product mix of these ranges.  That's why you go to the revenue

17   shares, and that's why the guidelines dictate that we should use

18   revenue shares when the differences are due to differences in

19   quality in the types of things that matter to competitive

20   significance.

21   **Q.**   You would agree with me that a $5,000 Wolf range is not ten

22   times more competitively significant than a $500 Frigidaire

23   range, correct?

24   **A.**   I haven't conducted that analysis because if that more

25   expensive range lasts for many more years, has lower probability

1    of breaking, has bigger capacity, has more features that matter

2    to consumers, on a annual adjusted basis, it may.  I haven't

3    done the analysis.  The point is:  When -- there -- we observe

4    tons of sales at the price points, such that the competitive

5    significance of those price differences is driven by product

6    features that consumers receive that are ancillary to the

7    product at issue.

8    **Q.**   Let's take a look at your Slide 008, please.

9              THE COURT:  Counsel, I think I'm going to have to stop

10   you now.  I'm not trying to curtail you.  I'll give you as much

11   time as you need for cross-examination, but I think we're going

12   to have to proceed with this at 3:15.

13             MR. GLASS:  Thank you, Your Honor.

14             THE COURT:  Just for timing purposes, how much more

15   time do you think you have?  And, again, I'm not trying to

16   curtail you, I'm just --

17             MR. GLASS:  Unfortunately it's going much slower than I

18   had hoped.

19             THE COURT:  That's all right.  That's all right.  We'll

20   start again at 3:15.

21             MR. GLASS:  I appreciate it, Your Honor.

22             THE COURT:  We'll proceed at 3:15, 3:30, but within

23   that time frame.  All right.  Thank you.

24             MR. GLASS:  Thank you, Your Honor.

25             THE COURT:  And I'd ask you again not to discuss your

1    testimony.

2              THE WITNESS:  Okay.  Thank you.

3              THE COURT:  Enjoy your lunch.  All right.

4              THE WITNESS:  Thank you.

5         (Thereupon, a luncheon recess was had beginning at

6    1:09 p.m.)

7
                         **C E R T I F I C A T E**
8

9              I, Scott L. Wallace, RDR-CRR, certify that
     the foregoing is a correct transcript from the record of
10   proceedings in the above-entitled matter.

11
         /s/ Scott L. Wallace             11/4/15
12       ----------------------------     ----------------
         **Scott L. Wallace, RDR, CRR          Date**
13         **Official Court Reporter**

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$100** [2] - 4542:18; 4555:17
**$150** [1] - 4557:20
**$2,000** [1] - 4518:5
**$20** [2] - 4556:18, 20
**$200,00** [1] - 4554:16
**$23** [1] - 4556:23
**$25** [2] - 4512:16; 4515:21
**$400** [2] - 4518:4, 6
**$43** [1] - 4556:22
**$477** [2] - 4544:8; 4557:14
**$5,000** [2] - 4649:7, 21
**$500** [3] - 4518:8; 4649:8, 22
**$600** [2] - 4518:7, 10
**$800,000** [1] - 4546:7

## '

**'90s** [1] - 4535:15

## /

**/s** [1] - 4651:11

## 0

**0.0** [1] - 4608:4
**0.000895523** [1] - 4635:14
**0.02** [2] - 4637:22
**0.033878044** [1] - 4633:9
**0.046736816** [1] - 4634:8
**0.829** [1] - 4609:5
**008** [1] - 4650:8
**013** [3] - 4629:19; 4633:17; 4648:19
**020** [1] - 4623:8
**04** [1] - 4645:16
**043** [1] - 4521:14
**048** [1] - 4522:4
**050** [2] - 4627:17; 4643:6
**052** [1] - 4530:25
**054** [1] - 4531:23
**0658-048** [1] - 4521:19
**082** [2] - 4577:20; 4607:1
**084** [1] - 4617:17

## 1

**1** [28] - 4553:21; 4627:5; 4629:1, 3, 12; 4631:3, 8, 13, 19, 24; 4632:23; 4634:12, 23; 4635:17, 19; 4637:23, 25; 4638:1; 4642:23; 4644:16, 25; 4645:9, 17, 19; 4646:11; 4647:9, 11, 13
**1,081** [1] - 4570:10
**1,100** [1] - 4590:19
**1,300** [1] - 4625:1

**1,335** [1] - 4636:24
**1,600** [1] - 4625:5
**1,900** [1] - 4625:6
**1.4** [1] - 4646:9
**1.5** [1] - 4530:16
**1.6** [1] - 4530:16
**10** [7] - 4525:18; 4527:3; 4561:18; 4567:14; 4628:8, 13; 4649:7
**100** [4] - 4508:3; 4551:6; 4554:13; 4637:11
**1006** [1] - 4589:19
**11** [4] - 4521:16; 4571:3; 4595:4; 4615:4
**11.16** [1] - 4614:9
**11.6** [1] - 4615:10
**11/4/15** [1] - 4651:11
**116** [1] - 4645:11
**11:09** [1] - 4590:4
**11:30** [1] - 4590:5
**12** [1] - 4626:22
**120** [1] - 4537:16
**1200** [4] - 4508:10, 14, 17, 21
**122** [1] - 4554:11
**1282298** [1] - 4594:24
**13** [5] - 4521:16; 4576:21, 23, 25; 4596:16
**13.5** [1] - 4553:7
**14** [5] - 4556:11; 4571:2; 4639:22; 4642:17, 20
**14.2** [1] - 4525:20
**141** [1] - 4554:9
**15** [2] - 4593:4; 4595:6
**15-1039** [2] - 4506:4; 4511:4
**15-minute** [1] - 4589:25
**150** [3] - 4551:6; 4558:3
**151** [3] - 4558:1; 4589:10
**15th** [1] - 4640:12
**16** [4] - 4506:9; 4576:21, 23; 4596:10
**16.78** [1] - 4614:4
**1625** [1] - 4509:8
**17** [1] - 4596:10
**18** [4] - 4521:16; 4537:16; 4572:9; 4596:17
**19.58** [1] - 4648:22
**1900** [4] - 4508:10, 14, 17, 20
**193** [2] - 4644:18, 20
**1966** [1] - 4571:13
**1991** [1] - 4559:19
**1997** [1] - 4535:14
**19th** [1] - 4638:25
**1:00** [2] - 4592:23; 4593:6
**1:09** [1] - 4651:6
**1s** [1] - 4634:19

## 2

**2** [5] - 4530:22; 4553:20; 4606:20; 4633:8; 4645:8
**20** [8] - 4554:9; 4556:23; 4572:9;

4647:13, 15; 4648:14, 23
**2000** [1] - 4547:10
**20001** [4] - 4506:15, 20; 4507:23; 4509:15
**20001-2113** [2] - 4507:12, 19
**20001-3743** [1] - 4509:3
**20006** [5] - 4508:11, 14, 18, 21; 4509:9
**2005** [2] - 4608:4; 4621:20
**2006** [5] - 4581:24; 4608:4; 4620:7; 4621:7, 20
**2007** [2] - 4582:1; 4583:13
**2008** [2] - 4571:3; 4582:7
**2014** [17] - 4564:4, 6; 4594:24; 4602:7, 10; 4635:8, 17; 4636:3, 23; 4637:18; 4644:10, 20; 4645:4, 10, 13
**2015** [4] - 4506:5; 4511:1; 4634:8, 13; 4638:25; 4640:12; 4646:9; 4648:21
**202** [17] - 4506:16, 20-21; 4507:5, 13, 20, 24; 4508:11, 15, 18, 22; 4509:4, 9
**202)354-3196** [1] - 4509:15
**20530** [2] - 4506:24; 4507:4, 9
**21.36** [1] - 4615:17
**216** [1] - 4508:8
**21st** [1] - 4508:3
**23** [3] - 4628:18; 4648:15, 20
**24** [2] - 4527:15; 4628:19
**261-3318** [1] - 4508:22
**261-3333** [1] - 4508:22
**261-3339** [1] - 4508:18
**261-3398** [1] - 4508:11
**261-3430** [1] - 4508:15
**269-1555** [1] - 4507:16
**270** [1] - 4571:13
**2721** [1] - 4521:15
**281-3835** [1] - 4507:12
**28th** [1] - 4594:25
**2:00** [2] - 4593:2, 23
**2nd** [1] - 4620:7

## 3

**3** [9] - 4614:11; 4615:3; 4620:22, 24; 4621:1; 4647:5, 7
**3.2** [1] - 4614:11
**3.25** [1] - 4568:16
**3.3** [1] - 4614:14
**3.38** [1] - 4633:10
**3.47** [2] - 4611:23; 4612:23
**300** [1] - 4600:11
**305-1489** [1] - 4506:16
**312** [1] - 4507:16
**333** [1] - 4509:14
**360** [3] - 4636:3, 22; 4637:17
**37** [1] - 4544:9
**383-5343** [1] - 4509:9
**383-5414** [1] - 4509:10
**384** [1] - 4571:13
**394** [1] - 4570:23
**3:15** [4] - 4593:5; 4650:12, 20, 22

**3:30** [2] - 4593:5; 4650:22
**3A** [1] - 4621:4

**4**

**4** [4] - 4506:5; 4511:1; 4554:18; 4644:15
**4.1** [1] - 4555:6
**4.67** [1] - 4634:9
**40** [2] - 4554:9, 11
**4000** [3] - 4506:15, 19; 4507:8
**403** [1] - 4597:2
**42** [1] - 4520:6
**44114** [1] - 4508:7
**449-6889** [1] - 4508:4
**450** [5] - 4506:14, 19, 24; 4507:4, 8
**4512** [1] - 4510:4
**4594** [1] - 4510:5
**473** [1] - 4620:22
**474** [2] - 4622:6, 8
**475** [1] - 4622:14
**478** [1] - 4551:4
**48** [1] - 4529:18

**5**

**5** [6] - 4518:7; 4520:21, 23; 4561:17; 4621:22; 4634:7
**50** [1] - 4628:18
**51** [3] - 4507:11, 19, 23
**514-0230** [1] - 4506:20
**514-7308** [1] - 4506:21
**55** [1] - 4624:14
**586** [1] - 4570:14
**586-3939** [1] - 4508:8
**598-8197** [1] - 4507:5
**5th** [1] - 4507:4

**6**

**6** [4] - 4521:15; 4622:6; 4625:23; 4644:24
**6.4** [5] - 4626:3-5, 8, 13
**60** [2] - 4554:11; 4627:22
**600** [1] - 4545:23
**600,000** [1] - 4546:7
**600-plus** [3] - 4546:9; 4554:22; 4555:15
**601** [1] - 4509:3
**60601** [1] - 4507:16
**61** [1] - 4550:25
**614** [1] - 4507:12
**617** [1] - 4508:4
**626-1700** [2] - 4507:13, 20
**6503** [1] - 4509:14
**653** [2] - 4645:2, 4
**658** [3] - 4520:4; 4577:20; 4589:17

**658-043** [1] - 4520:8
**658-051** [1] - 4527:23
**658-052** [1] - 4530:25
**658-054** [1] - 4531:23
**658-059** [1] - 4541:3
**658-063** [1] - 4555:24
**658-064** [1] - 4552:13
**658-069** [1] - 4557:11
**658-071** [1] - 4558:5
**658-074** [1] - 4563:22
**658-075** [1] - 4567:10
**658-076** [1] - 4568:9
**658-078** [1] - 4569:17
**658-080** [1] - 4573:25
**658-084** [1] - 4579:24
**658-087** [1] - 4587:4
**658-097** [1] - 4530:9
**658-85** [1] - 4590:7
**66** [1] - 4628:19
**6:30** [2] - 4593:19
**6A** [1] - 4622:8

**7**

**7** [5] - 4518:11; 4608:13; 4639:13; 4641:24; 4642:2
**7.15** [1] - 4611:10
**702** [2] - 4594:16; 4597:2
**703** [2] - 4547:8, 11
**71** [1] - 4553:18
**720s** [1] - 4636:11
**75** [2] - 4568:20; 4569:1
**77** [2] - 4507:15; 4551:4
**772** [3] - 4635:6, 8, 10

**8**

**8** [1] - 4518:11
**8.29** [1] - 4609:5
**80** [2] - 4554:13; 4569:1
**817** [2] - 4644:9
**879-3939** [2] - 4507:20, 24

**9**

**9** [1] - 4518:11
**9.73** [1] - 4613:11
**90** [1] - 4588:16
**901** [1] - 4508:7
**93** [1] - 4632:14
**942-5999** [1] - 4509:4
**942-6224** [1] - 4509:4
**96** [1] - 4530:8
**97** [1] - 4540:16
**97.7** [1] - 4540:18
**98** [1] - 4540:17
**99.7** [1] - 4540:12

**9:06** [2] - 4506:6; 4511:2

**A**

**a.m** [4] - 4506:6; 4511:2; 4590:4
**A.T** [2] - 4545:3, 17; 4547:22; 4548:13; 4552:22
**Aaron** [1] - 4509:2
**AB** [4] - 4506:6; 4507:11; 4508:3; 4511:4
**ability** [2] - 4606:16; 4612:9
**able** [18] - 4512:15; 4522:1; 4526:11; 4537:14; 4540:22; 4554:19, 25; 4580:21; 4581:2; 4584:21; 4586:17, 19; 4592:7, 16-17; 4593:19; 4612:12; 4617:8
**above-entitled** [1] - 4651:10
**absence** [1] - 4596:23
**absolutely** [4] - 4560:11; 4577:14, 16; 4617:9
**Abt** [2] - 4524:13, 15
**abundant** [1] - 4519:25
**accept** [8] - 4544:3; 4548:6, 20; 4549:4, 12; 4643:15; 4644:2
**acceptable** [2] - 4536:16; 4568:7
**accepted** [2] - 4581:5
**accepting** [1] - 4514:18
**access** [4] - 4571:8; 4643:12; 4644:3
**accessible** [1] - 4642:3
**accommodate** [1] - 4593:2
**accomplished** [1] - 4541:23
**according** [6] - 4582:11; 4602:7; 4603:5; 4616:19; 4618:2
**account** [10] - 4561:8, 12; 4563:2; 4568:25; 4569:11; 4580:20; 4581:9; 4606:16; 4612:16
**accounted** [1] - 4580:13
**accounting** [4] - 4562:19; 4565:5; 4566:9
**Accu** [1] - 4640:7
**Accu-Cold** [1] - 4640:7
**accurate** [1] - 4547:17
**achieve** [9] - 4541:7; 4542:7, 9-10; 4544:2; 4553:18; 4556:24; 4575:3; 4623:24
**achieved** [5] - 4543:2; 4544:12; 4550:19; 4552:4; 4555:14
**acquisition** [1] - 4620:8
**acting** [1] - 4575:6
**action** [3] - 4561:7; 4594:18; 4602:14
**Action** [2] - 4506:4; 4511:3
**actual** [13] - 4525:19; 4552:21, 23-24; 4565:19; 4566:11, 14; 4568:12; 4615:5; 4617:8; 4626:8; 4641:22
**Actual** [1] - 4610:10
**add** [4] - 4584:4; 4627:21; 4634:4; 4647:25
**added** [3] - 4588:14; 4633:19; 4636:12
**adding** [2] - 4527:9; 4534:24

**addition** [3] - 4565:13; 4583:6; 4586:21
**additional** [7] - 4544:12; 4554:15; 4557:17; 4560:3; 4563:2; 4564:22
**address** [2] - 4531:19; 4541:19
**addressable** [1] - 4538:25
**adequate** [1] - 4565:16
**adhesive** [4] - 4546:2; 4551:13, 15
**adjusted** [1] - 4650:2
**Adler** [17] - 4594:23; 4595:3, 7-8, 20; 4596:5, 15, 19; 4608:21; 4613:3; 4620:3, 23; 4621:9, 22; 4622:5, 13; 4640:23
**administration** [2] - 4572:5, 12
**administrations** [1] - 4572:7
**admissible** [3] - 4547:10, 14; 4548:5
**admitted** [2] - 4547:14; 4589:18
**adverse** [2] - 4599:2; 4601:20
**adversely** [1] - 4582:13
**advise** [1] - 4514:10
**affect** [14] - 4513:9; 4530:4; 4535:4; 4573:15; 4582:13; 4583:3; 4588:14; 4590:10; 4591:8, 22, 24; 4599:24; 4632:20
**affected** [4] - 4582:12; 4583:17; 4586:3; 4590:9
**affecting** [1] - 4535:3
**affects** [5] - 4516:23; 4535:8; 4583:4; 4585:7; 4627:14
**afraid** [1] - 4633:24
**afternoon** [1] - 4594:6
**age** [1] - 4587:20
**Age** [2] - 4611:22; 4614:6
**agencies** [2] - 4535:12; 4605:24
**aggregate** [1] - 4533:3
**aggregated** [2] - 4529:13, 22
**aggressive** [1] - 4622:9
**ago** [4] - 4538:12; 4555:9; 4573:18; 4613:6
**agree** [8] - 4529:11; 4571:18; 4572:24; 4586:13; 4617:4; 4646:13; 4649:21
**agreeing** [1] - 4633:23
**agreement** [3] - 4592:12, 16; 4610:25
**ahead** [5] - 4521:18; 4539:25; 4541:1, 13; 4558:5
**aided** [1] - 4509:17
**aisles** [1] - 4523:20
**al** [2] - 4506:6; 4511:4
**allege** [1] - 4517:8
**alleged** [1] - 4572:11
**allocate** [1] - 4523:8
**allocated** [4] - 4523:12; 4632:16; 4636:10; 4645:25
**allocates** [1] - 4523:13
**allocating** [1] - 4525:17
**allocation** [2] - 4524:18; 4525:23
**allow** [6] - 4515:23; 4569:4; 4583:22; 4585:8; 4642:14
**allowed** [3] - 4583:20; 4594:22;

4606:11
**allowing** [1] - 4591:21
**allows** [2] - 4533:15; 4575:3
**almost** [3] - 4540:10; 4568:23; 4585:21
**alone** [2] - 4554:16; 4642:7
**alternative** [1] - 4575:2
**altogether** [2] - 4584:19; 4618:3
**Amazon** [1] - 4597:8
**amended** [1] - 4547:11
**amendments** [1] - 4547:10
**America** [3] - 4509:8; 4511:4; 4625:4
**AMERICA** [1] - 4506:3
**Americans** [2] - 4572:11, 15
**amount** [5] - 4549:24; 4553:21; 4588:3; 4630:21; 4649:5
**amounts** [2] - 4595:14; 4624:2
**analyses** [12] - 4531:6, 19; 4558:14; 4567:16; 4581:4, 14, 16; 4603:16, 21; 4617:10
**analysis** [120] - 4512:17, 22; 4513:3; 4514:12; 4528:19; 4529:12; 4530:10, 24; 4532:3; 4533:13, 19; 4534:2, 10-11; 4535:6, 12, 16, 20; 4541:5; 4542:22; 4543:4, 19; 4544:16; 4545:11, 16, 22; 4546:11; 4550:18; 4552:8, 21; 4553:11, 23; 4554:3; 4555:3, 12-13; 4556:8; 4557:13, 25; 4558:17; 4559:18, 24-25; 4560:5, 9; 4562:4; 4563:10, 19; 4565:24; 4569:7, 11, 15; 4573:15; 4574:16; 4575:14; 4577:21; 4578:17, 25; 4580:25; 4581:1, 17; 4585:1, 13; 4586:18, 20; 4587:1; 4588:13, 15; 4594:21; 4595:17; 4597:5, 7; 4598:1, 11, 13, 16, 19, 22, 25; 4599:4-6; 4600:5, 11, 13; 4601:6, 21; 4603:6, 8-9, 12; 4605:5; 4606:22; 4607:14, 19-21; 4608:12, 15; 4611:8; 4612:17; 4614:22; 4615:15; 4616:4, 9, 22; 4617:2, 10; 4623:22; 4625:7; 4636:18, 20; 4637:12; 4643:20; 4648:10; 4649:24; 4650:3
**Analysis** [1] - 4607:7
**Analysis/Correlation** [1] - 4610:9
**Analysis/Revenue** [1] - 4630:19
**analytical** [1] - 4616:5
**analyze** [10] - 4526:19; 4530:3; 4545:6; 4575:10; 4588:2; 4599:1, 22; 4601:13, 22; 4617:7
**analyzed** [14] - 4532:3; 4534:7; 4545:17; 4549:24; 4552:15; 4575:25; 4576:22; 4594:18; 4597:13; 4601:15, 23; 4621:17, 21
**analyzing** [1] - 4599:21
**ancillary** [1] - 4650:6
**Ancona** [2] - 4637:7; 4646:5
**Angeles** [2] - 4554:7, 10
**annual** [2] - 4589:13; 4650:2
**anomaly** [1] - 4528:17
**answer** [17] - 4515:24; 4516:2; 4517:23; 4538:12; 4585:8; 4598:20;

4599:3; 4600:19; 4603:2; 4606:11, 13; 4608:19; 4609:25; 4611:16; 4615:7; 4619:21
**Antalics** [1] - 4509:7
**anticompetitive** [5] - 4597:12; 4598:10, 15, 18; 4600:6
**Antitrust** [4] - 4506:19, 23; 4507:3, 7; 4595:2; 4620:9
**antitrust** [4] - 4535:12; 4542:5; 4570:25; 4571:5; 4633:13
**apologize** [3] - 4620:15; 4623:9; 4628:17
**appeal** [1] - 4649:10
**appealing** [1] - 4588:4
**appealing-looking** [1] - 4588:4
**appear** [1] - 4570:4
**APPEARANCES** [4] - 4506:12; 4507:1; 4508:1; 4509:1
**appendices** [1] - 4578:18
**appendix** [1] - 4530:8
**apples** [1] - 4626:15
**Appliance** [2] - 4524:14; 4620:18
**appliance** [22] - 4569:21; 4581:10; 4582:12, 15; 4583:18, 22, 24; 4589:4; 4590:9; 4591:22, 24; 4597:22; 4599:16; 4617:19; 4618:13; 4626:9; 4627:18; 4631:6, 22; 4636:9; 4639:16
**appliances** [20] - 4512:14; 4519:16; 4530:16; 4531:7; 4532:11; 4536:5; 4579:6; 4598:6; 4601:7; 4613:7; 4622:2, 18; 4638:4; 4639:15, 25; 4642:5, 21; 4643:3
**Appliances** [2] - 4637:1; 4641:6
**application** [1] - 4558:18
**applies** [1] - 4604:7
**apply** [3] - 4543:19; 4567:1; 4641:13
**appreciate** [1] - 4650:21
**approach** [22] - 4532:18; 4535:17; 4567:1; 4575:18, 20, 23; 4576:2, 13; 4579:7; 4582:21; 4583:6; 4585:2, 15; 4587:22; 4588:13; 4590:14; 4616:5; 4617:7, 14; 4618:2
**approaches** [3] - 4567:19; 4583:8; 4584:18
**appropriate** [11] - 4542:6; 4551:21, 23; 4560:4; 4577:14; 4581:5; 4601:2; 4603:15; 4647:25; 4648:25; 4649:2
**appropriately** [1] - 4603:9
**area** [3] - 4533:6, 20; 4559:21
**areas** [4] - 4532:16; 4533:16; 4534:7; 4552:2
**arguably** [2] - 4573:19; 4643:11
**argue** [2] - 4626:4; 4627:17
**arguing** [1] - 4628:2
**argument** [5] - 4592:13, 16, 25; 4593:22
**ARNOLD** [1] - 4509:2
**article** [2] - 4565:11; 4581:15
**articles** [1] - 4581:12
**Arçelik** [6] - 4525:15; 4527:8; 4528:5,

7; 4636:15; 4646:1
**Ashenfelter** [7] - 4535:13; 4575:19; 4582:21; 4587:19, 21; 4588:6; 4590:15
**Ashenfelter's** [5] - 4575:24; 4578:23; 4581:7, 13; 4587:22
**aside** [1] - 4542:6
**aspect** [1] - 4571:10
**aspects** [1] - 4544:22
**assert** [1] - 4515:18
**asserted** [3] - 4528:10; 4550:9; 4644:2
**assessment** [2] - 4571:14; 4622:17
**assigning** [1] - 4550:9
**Assistant** [1] - 4570:24
**assume** [8] - 4512:11, 13, 15; 4520:21; 4548:17; 4593:6; 4633:4; 4641:3
**assumed** [9] - 4522:25; 4525:1, 14; 4564:1, 4; 4566:8, 11, 13
**assumes** [3] - 4560:25; 4561:6; 4568:24
**assuming** [4] - 4547:15; 4602:10; 4606:1; 4626:13
**assumption** [4] - 4525:17; 4528:13; 4535:7; 4564:6; 4565:14; 4584:11
**assumptions** [11] - 4547:24; 4549:18, 21; 4550:2, 7; 4563:16, 18-19, 22; 4595:25; 4597:1
**asterisks** [3] - 4530:21; 4613:24; 4615:15
**attached** [1] - 4610:15
**Attachment** [1] - 4639:5
**attempt** [2] - 4512:19, 21
**attest** [1] - 4641:3
**attorney** [1] - 4593:2
**Attorney** [8] - 4506:13, 18, 22; 4507:2, 6; 4570:24; 4572:7, 19
**attorneys** [1] - 4572:2
**attract** [1] - 4513:5
**attributed** [1] - 4631:16
**attributing** [1] - 4632:18
**August** [2] - 4638:25; 4640:12
**authored** [1] - 4595:1
**authors** [1] - 4560:14, 21
**available** [7] - 4516:1; 4532:9; 4580:22; 4629:8; 4641:21; 4648:2
**Avanti** [4] - 4525:15; 4527:8; 4645:11, 23
**Avanti's** [2] - 4645:13, 15
**Avenue** [3] - 4507:11, 19, 23; 4508:7; 4509:3, 14
**average** [12] - 4533:12; 4608:12; 4611:9, 23; 4612:23; 4613:10; 4614:8, 13; 4615:3, 10; 4626:12; 4627:6
**avoid** [1] - 4611:1
**aware** [6] - 4528:14; 4591:19; 4619:14; 4626:18; 4638:6, 8

# B

**B5** [1] - 4624:18
**background** [1] - 4526:13
**backup** [18] - 4609:23; 4610:1, 8, 18; 4611:7; 4617:3; 4623:25; 4624:4, 11, 13; 4625:24; 4630:5, 12, 18; 4633:17; 4636:19; 4644:5; 4645:21
**backward** [1] - 4603:18
**backward-looking** [1] - 4603:18
**Baiocco** [2] - 4508:2; 4511:25
**Baird** [1] - 4625:5
**balance** [1] - 4593:17
**ballpark** [1] - 4625:6
**bankruptcies** [1] - 4582:6
**bar** [1] - 4533:11
**Barnett** [2] - 4570:24; 4571:18
**Barnett's** [1] - 4570:21
**barred** [1] - 4597:2
**bars** [1] - 4567:12
**Base** [2] - 4609:4; 4614:2
**base** [5] - 4571:20; 4608:13; 4611:9; 4613:9; 4632:9
**based** [30] - 4519:22; 4523:11; 4525:12; 4527:21; 4538:14; 4548:4; 4549:10; 4550:15, 18; 4553:4; 4570:6; 4571:6, 14, 20; 4580:4; 4586:20; 4587:17; 4591:25; 4598:13; 4600:4; 4602:14; 4604:1; 4617:10; 4618:14, 24; 4632:16; 4634:16; 4636:19; 4642:23
**bases** [1] - 4555:3
**basic** [2] - 4512:25; 4586:21
**basis** [15] - 4525:25; 4528:13; 4529:13, 22; 4538:14, 18; 4548:19; 4576:18; 4623:5; 4635:18; 4645:10; 4648:6; 4649:5; 4650:2
**becomes** [1] - 4532:20
**BEFORE** [1] - 4506:10
**before-and-after** [1] - 4616:4
**beforehand** [1] - 4610:25
**began** [1] - 4532:15
**beginning** [2] - 4582:1; 4651:5
**begun** [1] - 4582:10
**behalf** [2] - 4511:17; 4605:24
**behaviors** [1] - 4561:1
**behind** [1] - 4542:22
**beings** [1] - 4519:6
**below** [2] - 4518:14; 4607:10
**BENCH** [1] - 4506:9
**bench** [3] - 4546:21; 4557:23; 4609:13
**benefit** [4] - 4543:15, 17-18; 4572:14
**benefits** [2] - 4531:10; 4594:18
**benefitting** [1] - 4531:10
**Bertazzoni** [5] - 4525:15; 4527:7; 4528:6; 4636:16; 4646:1
**Best** [2] - 4599:13; 4626:20
**best** [7] - 4520:18; 4546:10; 4553:5; 4560:13; 4629:8; 4648:2
**better** [7] - 4513:17; 4523:5; 4559:16,

23; 4602:13; 4627:6; 4649:3
**between** [19] - 4517:24; 4525:22; 4530:5; 4575:10; 4579:9, 13; 4580:2; 4589:3; 4592:7; 4597:11; 4598:5, 10; 4600:1, 23; 4601:13, 16; 4616:14; 4617:25; 4649:11
**Between** [2] - 4610:9
**big** [6] - 4514:5; 4573:3; 4575:3; 4590:18; 4624:7; 4643:21
**bigger** [3] - 4552:25; 4617:19; 4650:1
**biggest** [10] - 4570:8; 4607:22; 4628:12; 4637:13; 4647:2; 4648:4, 11
**bill.jones2@usdoj.gov** [1] - 4506:21
**billion** [2] - 4647:18
**binder** [1] - 4600:11
**bit** [13] - 4526:12; 4541:16; 4545:20, 25; 4549:9; 4574:6; 4575:14; 4584:25; 4605:8; 4621:10; 4630:11, 25
**black** [2] - 4526:10; 4555:24
**blacked** [1] - 4553:14
**blob** [1] - 4514:5
**block** [2] - 4526:8; 4561:24
**blocking** [1] - 4562:8
**Bloomington** [3] - 4556:17, 19, 22
**blue** [4] - 4532:9, 23; 4533:7
**book** [2] - 4560:6
**Books** [1] - 4595:2
**Bosch** [4] - 4524:16; 4634:8, 13; 4644:18; 4645:22
**Bosch's** [2] - 4644:20, 23
**Boston** [1] - 4508:4
**bottom** [6] - 4524:6; 4595:4; 4596:16; 4610:12; 4628:24; 4639:22
**bought** [1] - 4637:2
**bounce** [1] - 4529:23
**boxes** [1] - 4619:19
**brand** [3] - 4559:10; 4634:15; 4638:5
**brands** [3] - 4636:13; 4637:6, 9
**break** [5] - 4585:22; 4590:4, 7, 12; 4592:23
**breaking** [3] - 4608:14; 4611:11; 4650:1
**Brian** [1] - 4508:19
**brian.rafkin@dechert.com** [1] - 4508:23
**Brief** [1] - 4541:12
**briefly** [6] - 4520:5, 15; 4525:11; 4554:2; 4555:10, 20
**bring** [5] - 4607:1; 4608:22; 4643:5
**bucket** [5] - 4518:13; 4523:23; 4524:18; 4557:16
**buckets** [2] - 4545:13, 16
**budgets** [5] - 4517:3, 9; 4519:15, 19
**build** [1] - 4564:24
**builder** [1] - 4532:25
**building** [1] - 4534:6
**built** [1] - 4544:8
**bullet** [2] - 4531:3; 4619:11
**bullets** [5] - 4531:4; 4537:1; 4558:10,

21
**bundle** [1] - 4562:25
**Bureau** [1] - 4581:25
**business** [13] - 4512:13, 18; 4513:11, 13; 4515:6; 4516:23; 4542:4; 4543:9; 4551:5; 4622:2; 4646:22; 4647:24
**businesses** [5] - 4541:7, 25; 4543:15; 4594:2
**buy** [13] - 4512:23; 4513:1; 4514:1; 4517:5, 10; 4519:9; 4553:13; 4561:19; 4562:1, 25; 4563:1
**Buy** [2] - 4599:13; 4626:20
**buyers** [2] - 4575:4; 4597:19
**buying** [6] - 4513:24; 4542:24; 4551:13; 4559:9; 4563:9
**BY** [51] - 4510:5; 4512:6; 4520:9; 4521:21; 4526:6; 4531:24; 4536:22; 4538:11; 4539:16; 4540:1; 4541:15; 4549:23; 4550:14, 17; 4556:7; 4557:10; 4573:24; 4575:12; 4579:3, 25; 4585:16, 24; 4592:5; 4594:9; 4595:9, 23; 4596:7, 11, 20; 4606:24; 4607:3; 4608:25; 4609:21; 4611:6, 20; 4613:5; 4620:6, 25; 4621:11, 24; 4622:7, 15; 4623:16; 4624:9; 4640:19, 24; 4642:16, 19; 4644:7

**C**

**cabins** [1] - 4516:5
**calculated** [3] - 4525:9; 4615:6; 4639:25
**calculation** [13] - 4526:25; 4528:5; 4545:12; 4556:25; 4596:12, 21; 4602:5; 4625:3; 4632:11; 4643:1; 4647:7; 4649:9
**calculations** [5] - 4602:20; 4611:21; 4613:9; 4616:11; 4632:20
**camps** [1] - 4514:13
**cannot** [6] - 4521:8; 4544:14; 4560:16; 4598:20; 4617:13; 4642:4
**capacity** [1] - 4650:1
**caption** [1] - 4639:2
**capture** [2] - 4560:16, 18
**captured** [1] - 4560:13
**Carl** [5] - 4559:19, 22; 4560:13; 4564:20; 4569:12
**carl** [1] - 4560:11
**case** [39] - 4515:9; 4516:8, 25; 4519:22, 25; 4521:1; 4535:14; 4538:7, 15; 4540:21; 4542:24; 4543:20, 24; 4547:4; 4556:5; 4564:7, 15; 4565:19; 4566:2; 4571:20; 4572:8, 13; 4573:3, 7; 4593:5; 4594:23, 25; 4595:2; 4598:13; 4603:10; 4606:7; 4619:1, 3, 14; 4621:20; 4632:5; 4636:2; 4639:2
**cases** [4] - 4523:11; 4537:10; 4554:25; 4605:23
**categories** [14] - 4530:1; 4546:12;

4552:9; 4569:21; 4576:22; 4577:18; 4582:15; 4583:18, 22, 24; 4590:10; 4591:25
**categorize** [1] - 4628:20
**categorized** [4] - 4636:14; 4637:1, 3
**category** [25] - 4522:2, 24; 4523:12; 4551:22; 4552:7; 4555:18; 4557:23; 4581:10; 4591:22; 4618:13; 4631:6; 4633:3, 15; 4636:7, 10, 12, 17; 4637:5; 4646:1, 3-4, 7
**Category** [1] - 4631:3
**causation** [1] - 4535:9
**caused** [1] - 4578:16
**causes** [2] - 4582:9; 4591:11
**caution** [1] - 4573:16
**center** [1] - 4540:2
**centers** [3] - 4537:10, 16; 4540:7
**CEO** [2] - 4514:3; 4543:25
**certain** [16] - 4518:7; 4525:14; 4533:16; 4544:14; 4547:24; 4549:18, 21; 4550:2, 6; 4559:8; 4581:16; 4584:17; 4587:24; 4620:1; 4627:18
**certainly** [2] - 4637:15; 4642:22
**certainty** [1] - 4620:14
**certify** [1] - 4651:9
**cetera** [8] - 4519:6; 4534:19; 4538:20; 4545:24; 4559:10; 4561:5; 4637:7
**chain** [1] - 4518:5
**challenging** [1] - 4565:6
**chance** [1] - 4611:15
**change** [34] - 4534:14; 4562:15; 4568:1; 4570:8, 13; 4576:5, 7; 4579:10, 13, 15; 4582:23; 4583:14; 4587:14, 19; 4588:19, 24; 4590:17, 23, 25; 4591:17, 23; 4592:8; 4597:15, 18, 21; 4599:9, 16; 4618:1, 16, 19; 4637:13
**changed** [2] - 4565:2; 4587:22
**Changes** [1] - 4610:11
**changes** [13] - 4545:23, 25; 4575:20; 4578:8; 4579:12; 4580:10; 4583:5; 4588:19, 23; 4591:13; 4602:16; 4618:22
**Changes-Formatted.xlss** [1] - 4610:11
**Changes/Correlation** [1] - 4610:10
**changing** [1] - 4599:21
**channel** [54] - 4520:13, 20, 23; 4521:1, 4, 7, 10, 23; 4522:12; 4523:1, 4, 6; 4524:7; 4525:2, 9, 18; 4526:14, 16; 4527:1, 8, 11, 17, 20; 4528:1, 25; 4529:9; 4530:6, 17; 4531:7, 17; 4532:14, 18, 25; 4533:17; 4536:5; 4537:6, 9, 19-20; 4538:17, 22, 24; 4539:19; 4540:14, 25; 4558:20; 4633:10; 4639:24
**Channel** [1] - 4631:13
**Channels** [1] - 4531:2
**channels** [7] - 4529:6; 4531:10, 20; 4540:3, 6; 4625:23; 4633:24
**chapter** [1] - 4560:6

**characterize** [1] - 4641:17
**characterizes** [1] - 4596:24
**charge** [2] - 4514:4; 4570:25
**chart** [5] - 4533:11; 4537:4; 4540:22; 4588:4, 16
**cheaper** [1] - 4542:25
**check** [1] - 4611:1
**checked** [1] - 4565:17
**checkmarks** [4] - 4522:7, 13, 18
**Chicago** [1] - 4507:16
**choice** [5] - 4561:9, 11-13; 4599:19
**choices** [1] - 4647:21
**choosing** [1] - 4561:11
**churning** [1] - 4561:4
**circle** [1] - 4522:24
**circled** [1] - 4521:24
**circles** [2] - 4522:8; 4523:9
**circuit** [1] - 4636:7
**circumstance** [2] - 4515:8; 4601:4
**circumstances** [1] - 4565:21
**citation** [1] - 4596:25
**cited** [1] - 4630:23
**cities** [4] - 4532:24; 4533:19, 23, 25
**Civil** [2] - 4506:4; 4511:3
**claimed** [2] - 4529:9; 4580:17
**claiming** [1] - 4621:7
**clarity** [1] - 4587:17
**clear** [21] - 4518:2; 4521:13; 4534:23; 4557:22; 4567:16; 4570:15; 4579:23; 4607:18; 4610:6; 4612:7, 15; 4616:10; 4618:10; 4633:22; 4634:3, 13, 16; 4638:3; 4643:25; 4646:16; 4648:19
**clearly** [3] - 4547:8; 4548:5; 4585:6
**CLERK** [1] - 4511:3
**Cleveland** [1] - 4508:7
**close** [1] - 4628:3
**closed** [3] - 4538:6; 4539:12; 4556:4
**Closed/Sealed** [1] - 4506:10
**closeness** [1] - 4605:19
**closing** [1] - 4567:7
**coat** [1] - 4595:1
**Coates** [1] - 4624:7
**code** [1] - 4524:5
**coefficient** [1] - 4618:7
**Cold** [1] - 4640:7
**colleagues** [1] - 4511:18
**colored** [1] - 4522:8
**COLUMBIA** [1] - 4506:1
**Columbia** [1] - 4509:13
**Column** [13] - 4631:3, 8, 13, 19, 24; 4632:23; 4634:23; 4635:13; 4636:24; 4637:17; 4644:13, 23; 4645:15
**column** [8] - 4558:1; 4595:7, 21; 4596:6, 18; 4600:8; 4615:20
**columns** [1] - 4630:25
**combination** [2] - 4543:14; 4575:1
**combine** [4] - 4544:16; 4553:15; 4647:4
**combined** [4] - 4550:20; 4561:24;

4568:13; 4623:3
  **coming** [1] - 4536:20
  **comment** [5] - 4571:10; 4572:2;
4606:10; 4616:3; 4647:17
  **commentary** [1] - 4605:21
  **Commission** [2] - 4604:15; 4605:22
  **commit** [2] - 4610:2; 4625:25
  **committed** [1] - 4636:1
  **Comp** [1] - 4565:18
  **companies** [13] - 4513:4; 4523:11;
4528:4; 4544:19; 4545:7; 4546:7;
4549:5; 4552:18; 4553:13; 4557:15;
4561:5; 4617:19; 4631:15
  **Company** [3] - 4508:10; 4509:3;
4571:13
  **company** [12] - 4512:12; 4513:5;
4514:3, 10, 19; 4516:15; 4544:2;
4555:16; 4556:11; 4575:25; 4635:24;
4641:10
  **comparable** [2] - 4570:16, 18
  **compare** [4] - 4590:19; 4612:11, 17;
4626:15
  **comparing** [3] - 4538:3; 4581:9;
4582:22; 4592:1; 4626:15
  **comparison** [2] - 4570:19; 4579:6
  **compete** [2] - 4531:20; 4637:15
  **competing** [10] - 4512:20; 4513:4;
4574:24; 4575:8; 4599:12; 4600:1, 23;
4603:11; 4606:23
  **competition** [11] - 4515:12; 4519:21;
4560:17, 19; 4569:12; 4575:7; 4586:13;
4603:13; 4604:10; 4605:20
  **competitive** [19] - 4558:16; 4569:7,
10, 15; 4586:16; 4599:3; 4605:7;
4608:5; 4622:1, 17, 20, 22; 4623:2, 5;
4649:3, 12, 19; 4650:4
  **Competitive** [1] - 4531:2
  **competitively** [1] - 4649:22
  **competitiveness** [1] - 4601:7
  **competitor** [1] - 4622:9
  **competitors** [4] - 4513:20; 4539:18;
4558:16; 4586:19
  **competitors'** [1] - 4565:20
  **complaint** [1] - 4516:25
  **complementarity** [2] - 4562:23
  **completely** [3] - 4552:1; 4561:6
  **complex** [1] - 4518:15
  **complicated** [1] - 4536:24
  **complied** [8] - 4569:18; 4629:20;
4630:9; 4635:7; 4638:10; 4644:19;
4645:3, 12
  **components** [1] - 4622:1
  **comprehensive** [2] - 4565:4, 23
  **computer** [1] - 4509:17
  **computer-aided** [1] - 4509:17
  **concen** [1] - 4578:8
  **concentration** [33] - 4559:24; 4571:21;
4574:17; 4576:7, 9, 11-12, 16-17;
4578:2, 7-8, 10, 15; 4579:11; 4580:5,
8-9; 4582:24; 4583:1; 4589:4; 4590:20;

4591:1, 5; 4592:7; 4605:19; 4618:1, 3,
17, 20, 22
  **concentrations** [1] - 4573:1
  **concerns** [1] - 4512:21
  **conclude** [3] - 4535:10; 4589:6, 16
  **concluded** [4] - 4539:13; 4549:15;
4557:7; 4593:6
  **conclusion** [9] - 4530:5; 4533:15;
4538:14; 4542:22; 4546:13; 4551:9;
4576:20; 4601:20, 22
  **conclusions** [4] - 4535:11; 4550:22;
4585:7; 4588:24
  **conduct** [4] - 4512:17; 4514:11;
4531:19; 4587:9
  **conducted** [7] - 4516:8; 4550:18;
4555:3; 4556:9; 4563:19; 4598:20;
4649:24
  **conducting** [2] - 4520:11; 4586:25
  **conducts** [1] - 4621:19
  **confidential** [2] - 4526:8; 4552:12
  **confounding** [2] - 4580:18; 4586:3
  **confronting** [1] - 4599:20
  **confused** [3] - 4605:1, 8; 4614:14
  **confusing** [1] - 4522:9
  **connect** [1] - 4559:16
  **connected** [1] - 4525:13
  **consider** [11] - 4512:22; 4513:3, 19,
22; 4514:23; 4518:7; 4519:23; 4529:10;
4562:8; 4600:10
  **consideration** [4] - 4573:21; 4598:21
  **considered** [5] - 4513:23; 4541:20;
4598:7, 9; 4629:10
  **considering** [2] - 4510:11; 4556:16
  **consistent** [7] - 4521:25; 4528:25;
4540:20; 4574:10; 4584:6; 4617:2;
4647:25
  **consolidate** [3] - 4554:24; 4555:2
  **constant** [1] - 4602:9
  **Constitution** [1] - 4509:14
  **Constitutional** [1] - 4593:22
  **constitutionality** [1] - 4594:1
  **constraints** [1] - 4642:3
  **consultants** [2] - 4544:12; 4545:1
  **consumer** [6] - 4514:7; 4518:3;
4561:10; 4636:8; 4638:4
  **consumers** [38] - 4513:1, 15, 24;
4514:4, 6, 8, 12; 4515:3, 13; 4517:2, 5,
9, 24-25; 4518:6, 8, 10, 12, 17;
4519:23; 4520:1, 25; 4537:5; 4541:10;
4543:13, 15, 17; 4561:10; 4562:24;
4564:5; 4571:15; 4574:19; 4647:22;
4648:10; 4649:10; 4650:2, 6
  **consummated** [1] - 4544:25
  **Cont** [2] - 4507:1; 4509:1
  **cont** [1] - 4508:1
  **contaminate** [1] - 4582:13
  **contaminating** [1] - 4583:3
  **contents** [2] - 4620:21; 4621:23
  **context** [4] - 4541:4; 4553:21;
4603:10; 4617:12

  **continue** [2] - 4605:6
  **CONTINUED** [2] - 4510:4; 4512:5
  **contract** [62] - 4520:12, 20, 23;
4521:1, 9, 23; 4522:12, 17, 21, 25;
4523:6, 8, 17; 4524:6, 16, 19, 22-24;
4525:2, 5-6, 9, 14, 18, 22; 4526:14,
16; 4527:1, 8, 11, 17, 20; 4528:1, 25;
4529:6, 9, 16; 4530:6, 17; 4531:7, 15,
18; 4532:12, 14, 25; 4536:6; 4537:6, 9;
4538:17; 4539:19; 4540:14, 25;
4558:20; 4628:12; 4631:17; 4633:24
  **Contract** [1] - 4531:1
  **contractor** [2] - 4519:18; 4628:21
  **contractors** [1] - 4523:20
  **control** [18] - 4530:3; 4534:9; 4567:21;
4577:9, 15-16; 4578:3; 4581:2;
4582:14; 4583:7, 16; 4584:3; 4590:20;
4607:19; 4612:9; 4617:8
  **controlled** [4] - 4534:6; 4577:12, 14;
4585:19
  **controlling** [3] - 4567:20; 4574:20;
4584:14
  **controls** [4] - 4533:14; 4576:14;
4584:5; 4612:14
  **convenience** [6] - 4561:15, 20, 23;
4562:1
  **convert** [1] - 4612:8
  **cooking** [21] - 4512:14, 24; 4532:11;
4536:5; 4570:2, 13; 4576:8, 11, 13, 15;
4590:21; 4591:4, 9, 14; 4598:6;
4607:24; 4608:6; 4611:12; 4613:7;
4643:3
  **cooktop** [2] - 4520:2; 4590:25
  **cooktops** [23] - 4526:23; 4527:21;
4528:1, 7; 4529:25; 4545:23; 4563:3;
4578:3; 4608:3, 8-9; 4613:2, 8, 11, 15,
19; 4614:9; 4615:8; 4616:20; 4618:19;
4629:15; 4633:21; 4647:10
  **Cooktops** [1] - 4614:2
  **coordinated** [2] - 4558:17; 4619:8
  **core** [4] - 4530:15; 4576:4; 4590:16
  **corner** [6] - 4523:16; 4561:16; 4595:4;
4596:16; 4624:19; 4630:14
  **corners** [3] - 4516:14; 4517:14;
4578:22
  **correct** [154] - 4514:2, 13; 4515:11,
15-16, 22, 24-25; 4516:2, 25; 4517:3, 6,
11-12; 4518:20, 23; 4519:2; 4521:17;
4524:4; 4527:19; 4529:19; 4533:8;
4540:13, 20; 4551:3; 4558:2; 4574:3;
4578:10; 4585:19; 4587:1; 4592:9;
4595:11; 4596:14; 4597:3, 16-17,
19-20, 23-24; 4598:1, 5; 4599:7, 10-11,
14-15, 17, 24; 4602:12, 20; 4603:17,
20; 4604:8, 25; 4605:11, 14-15;
4608:13; 4609:2, 6-7, 24; 4611:10, 24;
4612:2, 22, 24; 4613:11, 18, 24-25;
4614:4, 9, 13, 19; 4615:11, 15-16,
18-19, 21-23; 4616:2, 12; 4617:3, 18;
4618:4, 17-18, 20-21; 4619:3, 6;

4621:16; 4623:20; 4624:19, 25; 4625:8, 14; 4626:2, 6, 13, 19; 4627:3, 19, 23-25; 4628:1, 19-20; 4629:2, 21-22; 4630:1, 3, 12; 4631:7, 10, 12, 18, 23; 4633:4; 4634:11; 4635:9, 20, 23, 25; 4636:1, 20-21; 4637:19; 4644:11, 17; 4645:20, 24; 4647:13; 4648:22; 4649:8, 23; 4651:9

**correctly** [8] - 4590:19; 4595:19; 4596:3; 4602:18, 25; 4611:25; 4625:20; 4637:1

**correlation** [1] - 4616:16

**cost** [11] - 4539:4; 4541:6; 4542:10; 4545:15; 4546:4; 4552:6; 4557:21; 4558:3; 4568:14; 4577:9, 15

**Costco** [2] - 4637:7; 4646:25

**costly** [1] - 4551:17

**costs** [14] - 4541:25; 4543:6, 9, 11, 15; 4551:7; 4552:8; 4553:3; 4557:18, 22, 24; 4577:6, 12, 14

**Cote** [4] - 4595:10, 24; 4596:12, 21

**Counsel** [8] - 4511:8, 16; 4546:18, 23; 4590:6; 4594:6; 4610:22; 4650:9

**counsel** [5] - 4511:11, 24; 4539:7; 4548:23; 4610:12

**counsel's** [1] - 4643:9

**count** [4] - 4521:8; 4543:4; 4648:8

**counted** [5] - 4553:2; 4628:7; 4648:11

**counting** [1] - 4648:1

**country** [2] - 4628:12; 4647:3

**couple** [4] - 4529:23; 4537:24; 4546:14; 4625:24

**course** [6] - 4512:19; 4513:7; 4520:24; 4554:16; 4593:12; 4647:24

**Court** [38] - 4509:12; 4514:22; 4522:6; 4525:11; 4527:24; 4531:25; 4538:6, 13; 4546:15; 4549:8; 4550:12; 4551:1; 4552:14; 4554:3; 4555:11; 4556:4, 8; 4558:11, 24; 4563:21; 4565:15; 4567:24; 4570:21; 4572:3; 4574:5; 4575:21; 4580:18; 4581:18; 4585:18; 4594:15; 4601:12; 4610:7; 4644:2; 4651:13

**court** [3] - 4535:13; 4539:14; 4557:8

**Court's** [2] - 4549:18; 4585:17

**COURTROOM** [1] - 4511:3

**cover** [2] - 4638:15; 4643:2

**covered** [2] - 4558:14; 4588:15

**Cowie** [2] - 4508:16; 4511:18

**Craig** [1] - 4511:19

**create** [1] - 4537:10

**created** [3] - 4606:7; 4610:5

**credit** [4] - 4547:18, 25; 4549:19; 4559:21

**critical** [5] - 4519:20; 4536:3; 4558:12; 4563:19; 4617:9

**criticism** [2] - 4580:14; 4586:5

**criticisms** [11] - 4586:24; 4587:3, 5, 7, 9-10; 4602:19, 22-23; 4604:11; 4605:17

**criticized** [1] - 4594:20

---

**critique** [9] - 4534:1, 5, 25; 4535:24; 4581:20; 4583:10; 4585:25; 4589:1; 4617:12

**critiques** [3] - 4516:10; 4558:12; 4586:21

**Crosley** [1] - 4525:21

**cross** [8] - 4539:8; 4548:24; 4590:1; 4593:6; 4594:4; 4611:15; 4642:14; 4650:11

**CROSS** [2] - 4510:5; 4594:8

**cross-examination** [6] - 4590:1; 4593:6; 4594:4; 4611:15; 4642:14; 4650:11

**CROSS-EXAMINATION** [2] - 4510:5; 4594:8

**CRR** [3] - 4509:12; 4651:9, 12

**current** [2] - 4622:19, 21

**curtail** [3] - 4593:10; 4650:10, 16

**customer** [5] - 4516:22; 4533:1; 4540:6; 4562:14

**customers** [14] - 4512:23; 4513:5; 4515:2; 4516:20; 4521:1; 4525:2; 4526:17; 4527:18; 4533:1; 4537:6; 4562:16; 4565:1; 4639:16; 4642:3, 6

**cut** [2] - 4584:2

---

# D

**D.C** [4] - 4506:7; 4533:6; 4594:1

**daily** [1] - 4623:4

**Dallas** [2] - 4533:5, 19

**damages** [1] - 4595:15

**Dana** [2] - 4508:2; 4511:25

**Danby** [1] - 4525:21

**data** [98] - 4516:1; 4522:10, 15; 4523:2, 5, 12; 4524:8, 17; 4525:19; 4526:3, 19, 21; 4527:8, 15; 4528:11, 16, 22; 4529:1, 4; 4534:8; 4545:6, 19-20; 4550:2; 4551:20; 4552:21, 23, 25; 4564:12, 14-17, 24; 4565:6, 14, 18, 23; 4570:16, 18; 4575:25; 4577:6; 4579:19; 4587:18; 4588:3; 4597:8; 4603:19, 22-23; 4604:16; 4605:25; 4609:23; 4617:3; 4618:24; 4619:18, 23-25; 4620:1; 4626:9; 4629:6; 4630:21; 4632:8, 10, 13; 4633:4, 14, 17; 4634:13, 17-18; 4636:19; 4637:5; 4638:7; 4639:13-15, 20, 23; 4640:3; 4641:21, 25; 4642:2, 20; 4646:20; 4647:2, 23

**Data** [1] - 4630:14

**database** [1] - 4642:4

**date** [3] - 4593:1; 4638:25; 4640:12

**Date** [1] - 4651:12

**dated** [1] - 4620:7

**David** [1] - 4511:12

**DAY** [6] - 4507:11, 15, 18, 22; 4508:3, 6

**DC** [15] - 4506:15, 20, 24; 4507:4, 9,

---

12, 19, 23; 4508:11, 14, 18, 21; 4509:3, 9, 15

**de** [6] - 4527:11, 16; 4608:10; 4629:11; 4645:23; 4647:13

**deal** [11] - 4558:22; 4567:17; 4569:22; 4570:5; 4574:8; 4575:9; 4580:10; 4589:3; 4648:11

**dealing** [1] - 4559:6

**debate** [1] - 4571:9

**DECEMBER** [1] - 4511:1

**December** [3] - 4506:5; 4582:1; 4583:13

**DECHERT** [4] - 4508:9, 13, 17, 20

**Dechert** [1] - 4511:17

**decide** [3] - 4512:17; 4521:1

**decided** [1] - 4538:23

**decimal** [6] - 4609:2; 4632:6, 19; 4633:6; 4634:19

**decision** [9] - 4513:9; 4515:6; 4516:23; 4519:18; 4538:23; 4539:5; 4544:13; 4572:22; 4573:22

**decision-making** [1] - 4516:23

**decisions** [4] - 4518:18; 4535:5; 4571:6, 13

**deck** [3] - 4520:4; 4530:8

**decreases** [5] - 4567:21; 4576:24; 4577:2; 4580:5; 4608:3

**deeper** [1] - 4544:16

**defend** [1] - 4572:10

**Defendant** [4] - 4507:10; 4508:2, 9; 4509:2

**defendant** [1] - 4643:11

**defendants** [4] - 4589:21; 4610:8; 4619:14; 4638:6

**Defendants** [1] - 4506:7

**Defendants'** [1] - 4520:4

**defies** [1] - 4569:5

**define** [2] - 4517:2, 5

**definition** [3] - 4517:11; 4527:16; 4558:19

**degree** [1] - 4543:13

**degrees** [1] - 4553:15

**del** [1] - 4617:21

**delay** [1] - 4623:9

**delivery** [1] - 4537:11

**Delta** [7] - 4569:21; 4570:9, 13; 4616:6; 4617:6; 4618:2; 4646:11

**demand** [4] - 4513:2; 4521:3; 4564:24; 4565:7

**Demitrack** [4] - 4508:5; 4511:22; 4512:8

**DEMITRACK** [75] - 4510:5; 4511:21, 24; 4512:3, 6; 4520:7, 9; 4521:18, 21; 4526:4, 6; 4531:22, 24; 4536:11, 19, 21-22; 4537:23; 4538:2, 9, 11; 4539:7, 10, 16, 21; 4540:1; 4541:14; 4546:19, 24; 4547:1, 6; 4548:2, 8, 22; 4549:2, 8, 13, 23; 4550:14, 16-17; 4555:19, 23; 4556:7; 4557:1, 3, 10; 4572:23; 4573:5, 9, 11, 14, 23-24; 4575:12; 4579:2, 23,

25; 4585:16, 21, 24; 4589:16, 24;
4592:3, 5, 10, 20, 24; 4593:8; 4609:9;
4610:23; 4611:3; 4642:11
**demonstrate** [1] - 4643:10
**demonstrating** [1] - 4644:3
**DENIS** [2] - 4511:15, 17
**Denis** [2] - 4508:13; 4511:17
**Denise** [1] - 4595:1
**denoted** [1] - 4613:23
**department** [1] - 4570:6
**Department** [12] - 4559:20; 4567:6;
4570:3; 4572:4, 10, 17; 4604:14;
4605:22; 4609:23; 4611:8; 4620:9;
4621:13
**DEPARTMENT** [5] - 4506:14, 18, 23;
4507:3, 7
**deposition** [1] - 4616:16
**Depot** [25] - 4522:14; 4523:13, 19, 21;
4524:24; 4537:14; 4540:8, 22; 4562:25;
4599:13; 4623:20; 4624:23; 4625:1, 4,
19; 4626:6, 10, 12, 19; 4627:6; 4637:9;
4648:7
**Depot's** [2] - 4626:16, 22
**Depot/Staples** [1] - 4535:14
**describe** [7] - 4518:24; 4584:25;
4599:2; 4602:13; 4607:18; 4632:8;
4649:10
**described** [16] - 4525:3; 4555:18;
4557:14; 4561:2; 4566:1; 4584:16;
4598:11, 23; 4601:18; 4603:24;
4612:13; 4613:20; 4617:5; 4618:9;
4623:21; 4636:18
**describing** [2] - 4627:12
**DESCRIPTION** [1] - 4510:8
**description** [1] - 4627:11
**design** [6] - 4545:23, 25; 4552:5;
4555:9, 15
**designated** [3] - 4539:12; 4557:6;
4583:12
**desires** [1] - 4537:20
**desk** [1] - 4523:19
**destruction** [1] - 4582:5
**detail** [2] - 4526:21; 4546:5
**detailed** [7] - 4526:19; 4527:15;
4529:12, 14; 4533:14; 4545:22;
4546:11
**determination** [1] - 4581:25
**determine** [7] - 4521:9; 4528:15;
4579:18; 4587:10, 12; 4599:2; 4601:3
**determining** [2] - 4578:10; 4591:5
**developed** [2] - 4604:9, 18; 4606:15
**diagnosing** [1] - 4560:15
**dictate** [1] - 4649:17
**dictionaries** [1] - 4639:14
**difference** [6] - 4529:24; 4533:22;
4556:23; 4591:14; 4612:9; 4649:14
**Difference** [1] - 4582:20
**Difference-in-Difference** [1] - 4582:20
**Differences** [16] - 4575:23; 4576:3, 19;
4579:7; 4583:6; 4616:6; 4617:6

**differences** [7] - 4519:7; 4530:4;
4612:9; 4649:15, 18; 4650:5
**Differences-in-Differences** [8] -
4575:23; 4576:3, 19; 4579:7; 4583:6;
4616:6; 4617:6
**different** [50] - 4514:6, 12; 4518:18;
4519:5, 8, 19-20; 4522:8; 4529:2;
4535:21, 23; 4540:3, 24; 4546:11;
4555:15; 4556:11; 4559:13; 4561:4;
4566:23; 4572:4-7, 18; 4574:8, 21;
4578:1, 20; 4582:16; 4583:17, 23;
4584:18; 4587:20; 4590:10; 4591:24;
4598:4; 4599:16; 4600:12; 4613:15;
4614:21; 4616:17; 4620:13; 4637:16;
4643:1
**differential** [5] - 4583:23; 4591:9, 18,
20; 4592:6
**differentiated** [5] - 4559:4, 12, 17;
4560:1
**differently** [7] - 4572:6; 4582:15;
4583:3, 18; 4590:11; 4591:22; 4594:2
**difficulties** [1] - 4604:18
**digits** [1] - 4617:16
**diminishing** [1] - 4534:21
**dire** [2] - 4609:16, 18
**DIRECT** [2] - 4510:4; 4512:5
**direct** [20] - 4531:20; 4532:12, 18,
21-22, 24-25; 4533:17; 4536:2;
4537:19; 4538:24; 4540:7, 14; 4558:9;
4585:22; 4589:17; 4598:23; 4607:4
**direction** [4] - 4529:25; 4535:9;
4572:13; 4618:14
**directly** [6] - 4529:4; 4532:16; 4533:2;
4599:25; 4624:11, 15
**Dirksen** [1] - 4647:17
**disagree** [4] - 4626:23; 4627:1;
4630:15, 20
**disagreement** [1] - 4577:15
**disappeared** [1] - 4577:13
**discipline** [1] - 4575:4
**disclose** [1] - 4553:6
**disconnect** [1] - 4559:14
**discount** [2] - 4628:22
**discounting** [1] - 4622:10
**discounts** [2] - 4553:16
**discuss** [3] - 4526:3; 4627:15;
4650:25
**discussed** [2] - 4521:11; 4607:4
**discusses** [3] - 4552:14; 4554:2;
4555:8
**discussing** [1] - 4514:18
**Discussion** [1] - 4539:24
**discussion** [6] - 4520:13; 4522:5;
4546:22; 4549:15; 4584:9; 4592:10
**displaying** [2] - 4527:24; 4569:24
**disproven** [1] - 4619:3
**distinguish** [2] - 4642:4, 6
**distribute** [1] - 4642:5
**distribution** [12] - 4537:10, 16; 4540:7,
23-24; 4543:1; 4546:9; 4552:5; 4554:2,

6, 22; 4555:4
**distributor** [1] - 4538:17
**distributors** [1] - 4532:15
**DISTRICT** [3] - 4506:1, 11
**District** [3] - 4509:13; 4595:1
**diversion** [12] - 4561:21; 4562:13, 16;
4563:24; 4564:1, 13, 22; 4565:2, 14,
17; 4566:8; 4602:22
**diverted** [1] - 4602:15
**divide** [1] - 4624:1
**divided** [1] - 4626:9
**Division** [5] - 4506:19, 23; 4507:3, 7;
4620:9
**document** [6] - 4610:15, 24; 4619:14;
4620:7, 12, 16
**Documents** [1] - 4639:13
**documents** [11] - 4538:19; 4548:3, 9,
22; 4619:19, 23-25; 4620:1, 13;
4639:23
**DOJ** [1] - 4573:18
**dollar** [2] - 4553:9; 4624:2
**dollars** [3] - 4521:7; 4553:5
**done** [25] - 4517:16; 4519:22; 4534:20;
4535:6, 12-13; 4537:12; 4545:18;
4547:21; 4551:10, 16; 4552:22;
4553:23; 4559:19; 4574:7; 4584:2;
4589:2; 4605:20; 4607:19; 4625:9, 20;
4647:7; 4650:3
**door** [3] - 4531:16; 4561:19
**double** [1] - 4568:18
**doubled** [1] - 4567:25
**doubt** [1] - 4593:9
**down** [21] - 4513:2; 4521:3; 4522:15;
4523:20; 4531:14; 4540:9, 15; 4551:14;
4568:2; 4583:4; 4590:3, 7, 12; 4591:11;
4616:1, 17; 4617:20; 4621:8; 4628:24;
4638:23
**downgrade** [1] - 4518:9
**downturn** [2] - 4582:10; 4583:17
**downward** [1] - 4536:2
**dramatically** [1] - 4535:23
**draw** [3] - 4533:15; 4551:9; 4601:22
**drive** [1] - 4649:14
**Drive** [1] - 4507:15
**driven** [1] - 4650:5
**dryers** [2] - 4567:13; 4618:16
**due** [3] - 4562:15; 4611:24; 4649:18
**during** [2] - 4567:23; 4586:2
**DX** [1] - 4557:11
**DX0658-082** [1] - 4616:25
**DX0658-38** [1] - 4619:7
**DX0658-84** [1] - 4617:15
**DX658** [1] - 4592:11
**Dynamic** [1] - 4620:17
**dynamic** [13] - 4516:4; 4518:14, 21;
4566:4; 4574:18; 4575:2; 4600:8, 24;
4601:17, 19; 4604:17; 4606:18
**dynamics** [3] - 4558:16; 4568:25;
4622:17

**dynamism** [1] - 4604:19

# E

**earn** [3] - 4555:15; 4637:10; 4648:1
**earned** [3] - 4521:7; 4529:5; 4532:4
**earning** [3] - 4628:6; 4646:15, 17
**easier** [3] - 4537:24; 4564:11; 4630:25
**easily** [1] - 4539:19
**eBooks** [1] - 4594:23
**Econometric** [1] - 4607:7
**econometric** [7] - 4533:14; 4575:14; 4576:2; 4577:21; 4583:15; 4585:13; 4597:5
**econometrics** [4] - 4530:2; 4584:25; 4594:21
**economic** [15] - 4542:4; 4543:10; 4562:18; 4565:4, 6; 4566:9; 4568:21; 4574:16; 4577:21; 4580:21; 4581:25; 4586:20; 4604:6; 4648:6
**economic's** [1] - 4542:5
**economics** [6] - 4512:25; 4543:11; 4551:17; 4563:2; 4604:9, 17
**economist** [8] - 4513:12; 4514:9; 4515:23; 4547:16; 4568:22; 4572:21, 24; 4596:25
**economists** [9] - 4535:1; 4559:15; 4560:10; 4564:1, 25; 4566:6; 4603:22; 4609:1; 4633:6
**economy** [12] - 4581:3, 9; 4582:5; 4584:15; 4585:9, 12; 4591:8, 12, 16; 4612:10; 4617:9
**edit** [1] - 4610:13
**Edward** [1] - 4509:7
**effect** [37] - 4532:22; 4533:17, 24; 4534:13, 23; 4536:2; 4574:18; 4576:1, 23; 4577:13; 4580:14, 20; 4582:15, 17; 4583:23; 4585:15; 4586:3, 11, 22; 4587:23, 25; 4588:12; 4589:2; 4591:9, 16-18, 20; 4592:6; 4598:15; 4599:3; 4601:21; 4602:9; 4611:12; 4612:19; 4637:11; 4646:14
**effects** [24] - 4525:20; 4527:22; 4535:16; 4558:18; 4560:16; 4569:8, 10; 4576:25; 4577:1, 8, 11; 4579:12; 4581:8; 4584:11, 22; 4616:15, 19, 21, 23; 4617:8; 4618:1; 4619:8
**efficiencies** [33] - 4541:2, 4, 19, 22, 24; 4542:9, 16, 19; 4543:20, 24; 4544:8, 11; 4545:15, 22; 4546:10, 12, 14; 4547:3; 4550:19; 4551:5; 4552:2; 4554:2, 18; 4555:5, 9, 15-16, 20; 4557:21; 4568:15; 4575:3; 4589:7, 10
**efficiency** [2] - 4553:3; 4554:6
**efficiently** [1] - 4575:16
**effort** [2] - 4513:5; 4559:16
**eighth** [1] - 4628:11
**either** [8] - 4517:8; 4518:1; 4536:17; 4540:6; 4576:23; 4611:15; 4615:25;

4631:17
**Electric** [8] - 4508:9; 4509:2; 4511:18; 4529:5; 4597:11, 14; 4601:14; 4627:22
**ELECTROLUX** [1] - 4506:6
**Electrolux** [56] - 4507:11; 4508:3; 4511:4, 22; 4512:12; 4522:14, 16, 20; 4523:13; 4524:15; 4527:12; 4528:3, 24; 4529:2, 6; 4530:22; 4532:13, 20; 4533:1, 7-8, 11, 16, 25; 4535:3, 5, 7, 22; 4537:21; 4543:25; 4544:10; 4547:22; 4551:15; 4552:20; 4554:5; 4556:20; 4569:3; 4598:17; 4600:6, 21; 4601:10; 4602:12, 16; 4619:11; 4621:4, 12, 15, 18; 4627:22; 4647:12, 15; 4648:14, 21; 4649:5
**Electrolux's** [1] - 4536:1
**Electrolux/Frigidaire** [4] - 4621:1, 25; 4622:20; 4623:1
**electronic** [1] - 4595:2
**Electronics** [2] - 4509:8; 4524:13
**element** [2] - 4519:21; 4562:18
**elements** [1] - 4602:25
**elevated** [1] - 4521:3
**elevation** [1] - 4521:9
**elsewhere** [1] - 4616:24
**Email** [15] - 4506:16, 21, 25; 4507:5, 9, 13, 17, 21, 24; 4508:12, 15, 23; 4509:5, 10, 16
**EMMET** [1] - 4506:10
**emphasize** [1] - 4547:11
**empirical** [27] - 4514:11; 4515:17; 4516:9; 4517:10, 15, 18; 4526:1; 4528:13, 19; 4558:17; 4564:22; 4574:1; 4581:16; 4586:25; 4587:7, 10; 4591:19; 4594:21; 4597:7; 4598:25; 4599:4-6; 4600:16; 4604:22, 24; 4621:17
**empirically** [2] - 4564:12; 4566:6
**empirics** [7] - 4573:2, 5, 9, 11; 4575:11; 4599:1
**end** [11] - 4517:18, 21, 25; 4536:3; 4537:5; 4548:18; 4554:14; 4558:9; 4571:15; 4592:11; 4641:18
**ended** [1] - 4522:5
**ending** [5] - 4560:5; 4620:22; 4622:6, 14; 4623:8
**endogeneity** [1] - 4535:2
**enforcement** [1] - 4571:6
**engage** [2] - 4556:12; 4597:1
**engineering** [1] - 4551:18
**engineers** [1] - 4551:20
**enjoy** [2] - 4512:9; 4651:3
**ensure** [1] - 4622:1
**enter** [2] - 4513:21; 4539:19
**entered** [1] - 4533:25
**entering** [1] - 4561:5
**enters** [3] - 4533:7, 11
**entire** [4] - 4619:15; 4628:3; 4629:4; 4635:8
**entities** [8] - 4521:24; 4524:22; 4526:18, 20; 4527:14; 4528:24; 4541:9;

4551:19
**entitled** [2] - 4572:19; 4651:10
**entity** [7] - 4523:18; 4550:20; 4553:13, 19; 4554:20; 4561:24; 4586:17
**entrant** [1] - 4528:8
**entries** [3] - 4524:3, 5; 4565:20
**entry** [6] - 4535:3, 7, 11, 16; 4606:16
**equal** [3] - 4553:21; 4568:14
**equation** [1] - 4562:20
**era** [1] - 4571:12
**Erin** [1] - 4511:25
**error** [1] - 4614:23
**especially** [3] - 4528:7; 4565:22; 4637:15
**Esq** [12] - 4507:10, 14, 18, 22; 4508:2, 5, 9, 13, 16, 19; 4509:2, 7
**essence** [3] - 4518:13; 4522:10; 4543:3; 4582:22; 4584:16; 4590:15; 4602:10
**essentially** [2] - 4527:10; 4592:12
**estimate** [2] - 4567:18; 4608:20
**et** [10] - 4506:6; 4511:4; 4519:6; 4534:19; 4538:20; 4545:24; 4559:10; 4561:5; 4637:7
**Ethan** [2] - 4506:13; 4511:9
**ethan.glass@usdoj.gov** [1] - 4506:16
**evaluate** [1] - 4543:23
**evening** [1] - 4512:9
**Everett** [1] - 4647:16
**evidence** [25] - 4516:8; 4517:15, 18; 4519:25; 4535:25; 4548:23; 4564:22; 4574:10; 4584:6; 4589:17; 4591:19; 4599:25; 4600:15; 4601:19; 4604:22; 4606:21; 4607:10; 4617:1; 4621:17; 4627:20; 4628:5, 10
**Evidence** [1] - 4589:19
**exact** [4] - 4554:10; 4618:25; 4632:21
**exactly** [9] - 4535:15; 4549:13; 4584:14; 4585:1, 14; 4604:3; 4606:22; 4610:17; 4624:11
**EXAMINATION** [4] - 4510:4; 4512:5; 4594:8
**examination** [4] - 4575:15; 4590:1; 4593:6, 11; 4594:4; 4611:15; 4642:14; 4650:11
**EXAMINATIONS** [1] - 4510:3
**example** [18] - 4523:13; 4542:25; 4550:4; 4551:12; 4554:5; 4555:8; 4556:14; 4557:15; 4561:14; 4562:10; 4567:13; 4605:4, 23; 4634:19; 4636:15; 4646:25
**examples** [4] - 4523:17; 4524:6, 22; 4587:15
**Excel** [2] - 4602:25; 4614:17
**excellent** [1] - 4560:15
**except** [1] - 4642:21
**exclude** [7] - 4542:3, 6; 4551:23; 4588:13; 4646:18, 24; 4648:5
**Exclude** [2] - 4612:20; 4615:8
**excluded** [9] - 4528:4, 7; 4552:1;

4588:6; 4594:14, 18-19; 4595:15; 4597:9

**excluding** [1] - 4646:16
**exclusively** [2] - 4571:7, 21
**excuse** [3] - 4539:23; 4541:11; 4640:14
**executives** [2] - 4550:3; 4551:5
**exercise** [2] - 4598:24
**Exhibit** [9] - 4520:4; 4521:19; 4531:23; 4557:11; 4570:23; 4577:20; 4579:24; 4587:4; 4589:17
**exhibit** [2] - 4609:10
**exhibits** [1] - 4549:2
**EXHIBITS** [1] - 4510:7
**exist** [2] - 4562:2; 4597:22
**exit** [1] - 4535:12
**expand** [6] - 4536:5; 4538:22, 24; 4539:19; 4613:3; 4619:5
**expanders** [1] - 4623:2
**expanding** [1] - 4586:2
**expansion** [2] - 4586:1; 4606:16
**expect** [6] - 4578:11, 15; 4579:13; 4591:6; 4618:4, 14
**expected** [3] - 4544:1; 4553:18; 4616:19
**expensive** [1] - 4649:25
**experiments** [1] - 4604:21
**expert** [10] - 4547:8, 12; 4548:5; 4584:10; 4593:25; 4596:25; 4603:16; 4616:12; 4624:1, 21
**expert's** [1] - 4572:21
**expertise** [1] - 4544:15
**experts** [3] - 4544:15; 4547:1; 4571:6
**explain** [23] - 4522:6; 4526:11; 4527:24; 4531:25; 4533:9; 4535:2; 4536:24; 4538:13; 4552:14; 4553:10; 4554:3; 4555:11; 4556:8; 4558:24; 4559:5; 4563:21; 4565:15; 4575:17, 22; 4580:1, 13; 4581:18; 4611:16
**explained** [1] - 4648:24
**explaining** [2] - 4567:24; 4587:5
**explanation** [1] - 4640:5
**extended** [1] - 4579:5
**extent** [8] - 4531:19; 4536:4; 4548:17; 4549:16, 20; 4568:4; 4571:11
**extra** [1] - 4561:25
**extracts** [1] - 4561:6
**extraordinary** [1] - 4622:10
**extrapolate** [1] - 4627:9
**extreme** [2] - 4527:22; 4564:6
**extremely** [1] - 4546:11
**Eye** [1] - 4509:8

**F**

**faced** [1] - 4586:14
**facing** [1] - 4518:21
**fact** [22] - 4526:1; 4539:18; 4542:24; 4545:9; 4547:20; 4548:18; 4549:6;

4558:17; 4564:19; 4567:15; 4599:13, 21; 4600:2, 14; 4603:2, 16; 4606:17; 4607:15; 4624:17; 4629:9; 4643:11; 4646:16
**factor** [22] - 4513:22; 4514:24; 4519:23; 4539:4; 4542:15; 4543:9, 14; 4573:21; 4578:10; 4580:18; 4583:3; 4585:5-7, 18-19; 4591:5; 4599:11; 4600:7; 4636:18; 4637:15
**factors** [26] - 4513:8; 4514:23; 4529:10; 4530:4; 4533:15; 4541:20; 4543:19; 4581:3; 4586:16; 4597:25; 4598:6-8, 12-14, 16, 21; 4600:9, 12-13; 4601:16; 4607:20; 4617:9
**factory** [5] - 4519:10; 4531:13; 4532:24; 4540:7
**facts** [4] - 4595:16; 4596:2; 4597:18, 21
**factually** [1] - 4647:14
**fading** [1] - 4541:16
**fails** [2] - 4516:13; 4580:9
**failure** [1] - 4594:15
**fair** [10] - 4565:7; 4601:11; 4602:21; 4606:12; 4617:20; 4625:3; 4627:7, 11; 4647:6
**fairly** [1] - 4530:7
**fall** [2] - 4514:12
**Falls** [1] - 4511:19
**falls** [2] - 4581:1; 4607:23
**family** [1] - 4519:10
**Farrell** [1] - 4599:22
**Fax** [6] - 4506:21; 4507:13, 20; 4508:22; 4509:4, 10
**feature** [1] - 4520:2
**features** [7] - 4518:7; 4559:11, 14; 4649:11, 13; 4650:1, 6
**February** [4] - 4620:7; 4621:7
**Federal** [4] - 4589:19; 4594:15; 4604:15; 4605:22
**Felix** [11] - 4635:24; 4636:4, 8, 22; 4637:2, 18; 4638:6, 20; 4641:2
**fell** [3] - 4578:7; 4591:11; 4618:23
**Ferguson** [5] - 4526:13, 16; 4528:23; 4538:17
**few** [5] - 4573:20; 4613:6; 4621:18; 4639:4
**field** [1] - 4581:5
**Fifth** [4] - 4506:14, 19, 24; 4507:8
**fifth** [2] - 4522:15; 4540:9
**Figure** [1] - 4529:18
**figure** [2] - 4529:20; 4595:15
**figures** [2] - 4529:12; 4589:13
**file** [1] - 4619:16
**fill** [1] - 4632:9
**final** [1] - 4562:21
**financial** [1] - 4582:6
**findings** [4] - 4548:18; 4574:1, 5; 4588:24
**fine** [15] - 4536:17; 4538:1; 4547:25; 4549:11, 18; 4550:7; 4555:22; 4589:24;

4592:19; 4593:16; 4609:19; 4623:11; 4640:18
**finish** [1] - 4585:22
**finished** [1] - 4585:21
**firm** [11] - 4544:17; 4551:9; 4566:21; 4586:14, 19; 4601:22; 4619:11; 4621:13; 4633:2, 9; 4646:17
**Firm** [1] - 4631:19
**firms** [9] - 4516:4; 4527:10, 12; 4544:18, 24; 4551:11; 4575:1; 4602:8; 4648:1
**First** [1] - 4595:24
**first** [34] - 4526:22; 4528:2; 4531:3; 4534:5; 4537:19; 4541:21; 4543:22; 4546:13; 4552:8; 4559:24; 4560:2, 6; 4561:9; 4563:24; 4564:10; 4581:21, 24; 4583:11; 4586:21; 4587:5; 4595:21; 4596:8; 4597:9; 4603:9; 4608:18; 4609:4; 4622:16; 4630:24; 4633:8; 4637:13; 4639:8; 4641:5
**fist** [1] - 4575:6
**fit** [1] - 4552:6
**five** [4] - 4528:3; 4561:25; 4625:18; 4639:8
**fixed** [8] - 4517:2, 9; 4543:8; 4552:6; 4557:18, 22; 4585:12
**fixing** [1] - 4584:14
**flaw** [2] - 4561:8; 4616:8
**flawed** [2] - 4558:19; 4596:25
**flexible** [1] - 4584:5
**flipping** [1] - 4638:13
**Floor** [1] - 4508:3
**fly** [1] - 4623:12
**focus** [14] - 4519:7; 4524:10; 4526:22; 4530:15; 4542:7; 4543:5, 8; 4567:18; 4570:1, 5; 4574:16; 4577:4; 4588:3; 4649:4
**focused** [2] - 4528:20; 4544:11; 4559:2; 4588:17; 4641:17
**focuses** [3] - 4552:8; 4617:6; 4623:1
**focusing** [1] - 4567:5
**folder** [2] - 4610:9; 4630:18
**folks** [2] - 4512:13; 4564:9
**follow** [3] - 4517:23; 4585:17; 4592:3
**following** [6] - 4531:4; 4538:5; 4539:13; 4556:3; 4557:7; 4586:12
**Following** [1] - 4546:22
**footnote** [1] - 4571:3
**FOR** [1] - 4506:1
**force** [1] - 4538:21
**forecasting** [2] - 4605:3, 5
**foreclosure** [1] - 4534:19
**foregoing** [1] - 4651:9
**foreign** [1] - 4623:2
**foresaw** [1] - 4573:20
**forget** [1] - 4593:23
**forgot** [1] - 4589:7
**form** [3] - 4518:14; 4541:8; 4547:13
**Formatted.xlss** [1] - 4610:11
**former** [2] - 4571:10; 4572:16

**forms** [1] - 4576:18
**forth** [1] - 4574:1
**fortunately** [1] - 4638:12
**forward** [13] - 4511:5; 4512:12; 4522:12; 4530:7; 4566:3; 4602:4, 11; 4603:17, 20-21; 4605:23; 4617:13; 4618:15
**forward-looking** [3] - 4602:4, 11; 4603:17
**foster** [1] - 4571:11
**fought** [1] - 4572:10
**four** [9] - 4516:14; 4517:14; 4552:9; 4578:22; 4625:16; 4627:25; 4644:16; 4645:17, 19
**four-one** [1] - 4645:19
**four-tenths** [2] - 4644:16; 4645:17
**fourth** [4] - 4514:23; 4527:5; 4628:13
**frame** [2] - 4543:7; 4650:23
**framework** [9] - 4559:23; 4564:21; 4567:4, 21; 4603:8; 4606:4; 4617:7, 12
**freezers** [1] - 4590:22
**freezes** [1] - 4602:7
**Fresno** [1] - 4554:7, 10
**Friedman** [1] - 4508:9
**Frigidaire** [3] - 4620:17; 4649:8, 22
**Frigidaire's** [1] - 4622:9
**fringe** [1] - 4647:4
**front** [3] - 4561:18; 4638:13, 15
**frozen** [4] - 4561:2, 6; 4568:24
**full** [17] - 4554:9, 11; 4560:16; 4562:4; 4566:5; 4569:12; 4580:13; 4588:5; 4595:22; 4596:8, 18; 4600:15; 4601:21; 4606:16; 4612:14; 4616:5
**fuller** [1] - 4554:12
**furthermore** [1] - 4642:4
**future** [12] - 4558:15; 4603:24; 4604:3, 8, 25; 4605:4, 8; 4613:22; 4622:20, 22

# G

**gain** [1] - 4515:2
**gap** [3] - 4552:24; 4553:1
**gas** [1] - 4561:15
**GE** [45] - 4512:12; 4515:1; 4519:9-11; 4524:15, 24; 4527:12; 4528:3, 24; 4529:2; 4530:20; 4532:4, 6, 11, 19; 4533:24; 4535:3, 22; 4544:11; 4547:22; 4551:14; 4552:19; 4554:10; 4556:16; 4564:4; 4569:3; 4598:5, 10, 17; 4600:6, 21; 4601:5, 8; 4602:12, 15-16; 4620:17; 4621:25; 4622:8, 19; 4623:1; 4634:21; 4647:12
**GE's** [4] - 4532:22, 24; 4533:17; 4536:2
**GE/Electrolux** [1] - 4569:22
**Gelfand** [1] - 4511:12
**General** [10] - 4508:9; 4509:2; 4511:18; 4529:5; 4570:24; 4572:19; 4597:11, 14; 4601:13; 4627:22

**general** [2] - 4535:11; 4622:18
**generally** [2] - 4560:8
**Generals** [1] - 4572:7
**geographic** [3] - 4532:16; 4533:16; 4534:7
**given** [15] - 4531:8; 4551:25; 4553:17; 4555:21; 4565:22; 4571:8; 4577:5; 4581:22; 4584:13; 4600:2; 4604:18; 4606:17; 4614:10; 4633:14; 4646:16
**Glass** [2] - 4506:13; 4511:9
**GLASS** [81] - 4510:6; 4511:7, 9, 11; 4536:18, 20; 4546:16; 4547:5, 8, 20; 4548:11, 13, 21; 4589:20; 4593:12, 15; 4594:7, 9, 23; 4595:9, 20, 23; 4596:5, 7, 9, 11, 15, 20; 4606:24; 4607:1, 3; 4608:21, 25; 4609:12, 15, 18, 21; 4610:7, 17, 20; 4611:5, 20; 4612:18; 4613:3, 5; 4620:3, 6, 23, 25; 4621:9, 11, 22, 24; 4622:5, 7, 13, 15; 4623:9, 12, 15-16; 4624:5, 7, 9; 4640:19, 23-24; 4642:16, 18-19; 4643:5, 14, 17, 19; 4644:6; 4650:13, 17, 21, 24
**glass** [4] - 4511:10; 4536:14; 4553:13, 24
**Global** [1] - 4621:5
**global** [1] - 4621:15
**glue** [4] - 4546:3; 4551:13, 15
**goods** [1] - 4562:25
**government** [7] - 4517:2, 8; 4544:20; 4562:7; 4578:9; 4610:14; 4647:17
**Grand** [1] - 4524:13
**graphical** [3] - 4532:2; 4533:13; 4618:10
**graphically** [2] - 4579:21; 4580:8
**grass** [1] - 4594:11
**Great** [9] - 4580:11, 14, 17, 20; 4581:20; 4582:3, 16; 4586:22; 4590:9
**great** [1] - 4527:4
**greater** [6] - 4526:21; 4618:22; 4619:1; 4627:2, 4
**greatest** [1] - 4618:16
**Greg** [1] - 4559:21
**grew** [1] - 4586:12
**Grocery** [1] - 4571:12
**group** [5] - 4514:7; 4590:20; 4612:19; 4637:11
**groups** [2] - 4578:1, 3
**grow** [3] - 4532:18; 4537:19; 4605:6
**growth** [1] - 4586:23
**GSA** [1] - 4593:17
**guess** [3] - 4561:25; 4574:7; 4600:10
**guesswork** [1] - 4597:1
**guide** [3] - 4559:24; 4600:1; 4606:17
**guidelines** [16] - 4559:2, 15; 4564:23; 4600:13; 4604:20; 4605:11, 22; 4606:6, 18, 20; 4628:9; 4648:1, 9; 4649:12, 17
**guiding** [1] - 4601:16
**gun** [1] - 4544:23
**guys** [1] - 4610:4

# H

**Haag** [1] - 4511:12
**Haier** [1] - 4525:15
**half** [4] - 4561:23; 4634:21; 4644:25; 4645:1
**Hamer** [2] - 4506:22; 4511:13
**hand** [4] - 4523:16; 4595:4; 4596:16; 4634:15
**handle** [1] - 4566:20
**happy** [2] - 4619:5; 4627:15
**hard** [1] - 4525:25
**harming** [1] - 4571:15
**head** [3] - 4512:11; 4513:11, 13
**heading** [2] - 4595:8; 4621:4
**heard** [9] - 4526:24; 4566:15; 4568:5; 4569:13; 4570:22; 4575:14; 4600:18; 4607:17; 4618:4
**hearing** [2] - 4592:25; 4593:3
**hearsay** [8] - 4546:17, 20; 4547:2; 4548:16; 4549:19; 4550:5, 13; 4642:13
**held** [3] - 4539:14; 4557:8; 4589:1
**hello** [2] - 4594:10
**help** [6] - 4544:12; 4558:25; 4583:20; 4584:24; 4630:11; 4632:6
**helping** [1] - 4601:3
**helps** [1] - 4599:25
**Henderson** [1] - 4506:17
**HERF** [1] - 4646:11
**hesitant** [1] - 4601:22
**heterogeneous** [1] - 4518:24
**HHI** [16] - 4569:20; 4570:8, 13; 4579:10, 13, 15; 4580:2; 4607:20; 4616:6; 4617:7; 4618:2; 4619:2
**HHIs** [2] - 4587:17; 4590:18
**High** [1] - 4508:3
**high** [13] - 4519:13; 4551:14; 4554:14; 4561:21; 4562:9, 11; 4567:3, 8; 4572:17; 4573:18; 4588:18; 4614:16
**high-ranking** [2] - 4572:17; 4573:18
**higher** [15] - 4514:19; 4515:3, 10, 14; 4518:1; 4535:22; 4541:10; 4552:20; 4578:2, 7; 4579:15; 4591:2; 4607:11; 4617:1
**highest** [2] - 4611:12; 4626:21
**highlight** [1] - 4564:7
**highlighted** [2] - 4569:24; 4590:8
**highly** [1] - 4622:2
**hired** [2] - 4544:12; 4545:1
**historical** [4] - 4552:25; 4572:14; 4603:23; 4604:1, 6; 4605:3, 7
**historically** [1] - 4516:3
**history** [6] - 4535:19; 4553:17; 4558:25; 4572:5; 4575:11; 4637:14
**hold** [3] - 4606:8, 10; 4633:16
**holding** [2] - 4585:12; 4602:9
**Home** [27] - 4522:13; 4523:13, 19, 21; 4524:24; 4537:14; 4540:7, 9, 22; 4562:25; 4599:13; 4623:20; 4624:23;

4625:1, 4, 19; 4626:6, 10, 12, 16, 19, 22; 4627:6; 4637:9; 4648:7
  **homogeneous** [1] - 4559:7
  **Honor** [48] - 4511:3, 7, 15, 21; 4512:3; 4536:13, 18; 4537:23; 4539:10; 4541:14; 4546:16, 19, 24; 4547:5, 20; 4548:11; 4550:16; 4555:19; 4557:3; 4573:6, 23; 4585:21; 4589:16; 4592:10, 20; 4593:12; 4594:7, 24; 4595:5; 4596:9, 17; 4606:14; 4609:9, 15; 4610:7, 17, 23; 4623:9; 4624:5; 4642:11, 18; 4643:6, 14, 17; 4644:6; 4650:13, 21, 24
  **Honorable** [1] - 4595:1
  **HONORABLE** [1] - 4506:10
  **hoped** [1] - 4650:18
  **hopefully** [1] - 4638:14
  **horizontal** [1] - 4605:10
  **host** [2] - 4588:1; 4600:12
  **hour** [3] - 4593:4, 24
  **hours** [3] - 4537:16; 4593:13; 4600:17
  **housing** [11] - 4534:6, 8, 18-19; 4582:10; 4583:17, 19-20; 4584:3; 4591:22
  **human** [1] - 4519:6
  **hundred** [1] - 4625:24
  **hundreds** [3] - 4588:9; 4619:19; 4632:21
  **hundredths** [3] - 4638:1; 4645:19
  **husher** [4] - 4536:14; 4537:1, 25; 4555:20
  **hypothesis** [1] - 4595:25
  **hypothesized** [1] - 4599:18
  **hypothesizing** [1] - 4601:1
  **hypothetical** [8] - 4514:17; 4517:12, 17, 20; 4520:12, 19, 22; 4558:18
  **hypothetically** [1] - 4599:1

# I

  **idea** [4] - 4529:2; 4535:1; 4566:23; 4569:2
  **identical** [1] - 4630:22
  **identified** [13] - 4522:16; 4545:2, 13; 4551:5; 4556:13; 4557:14, 25; 4568:15; 4580:7; 4597:10; 4603:14; 4606:4; 4631:15
  **identifier** [1] - 4610:4
  **identifies** [1] - 4638:4
  **identify** [5] - 4525:7; 4558:11; 4630:13; 4631:18; 4633:21
  **identity** [1] - 4639:16
  **ignore** [1] - 4543:8
  **ignored** [3] - 4558:14; 4627:18
  **ignores** [2] - 4562:22
  **ignoring** [4] - 4611:12; 4628:9; 4629:6; 4647:21
  **Ihan** [1] - 4511:11
  **Il** [1] - 4506:17

**IL** [1] - 4507:16
**illustrate** [1] - 4596:22
**illustrative** [1] - 4579:21
**impacted** [1] - 4573:19
**impacts** [1] - 4572:21
**impeachment** [1] - 4643:23
**implausible** [1] - 4568:23
**importance** [1] - 4581:22
**important** [10] - 4518:3; 4524:10; 4528:2; 4564:8; 4566:15; 4590:8; 4598:1; 4622:1; 4649:8
**imposed** [1] - 4642:3
**improve** [1] - 4545:10; 4623:4
**improvements** [2] - 4541:8; 4542:11
**Impute** [2] - 4611:22; 4614:6
**inadmissible** [3] - 4547:9, 12; 4549:19
**Inc** [1] - 4638:20
**include** [3] - 4534:18; 4587:24; 4612:14
**included** [8] - 4527:7; 4534:8; 4538:6; 4556:4; 4588:19; 4637:10; 4646:11; 4647:1
**includes** [2] - 4646:4, 23
**Including** [1] - 4506:10
**including** [1] - 4639:15
**inclusion** [1] - 4637:11
**income** [3] - 4517:3, 9; 4582:4
**inconsequential** [1] - 4642:22
**inconsistent** [2] - 4628:9; 4643:22
**inconsistently** [1] - 4524:11
**incorporating** [1] - 4606:21
**incorrect** [1] - 4558:18
**increase** [36] - 4512:15; 4520:21; 4553:19; 4562:15; 4567:12; 4574:10; 4575:1; 4576:7, 10-12, 15, 17; 4578:2; 4582:24; 4584:7; 4586:11; 4590:18, 20; 4608:13; 4609:6; 4611:10, 23; 4612:24; 4613:10; 4614:3, 8, 15; 4615:11, 17; 4619:2; 4623:3
**increased** [3] - 4568:13; 4589:4; 4591:1
**increases** [16] - 4566:16; 4567:5, 8, 14; 4576:22; 4577:17; 4578:7, 11, 15-16; 4580:6; 4591:3; 4607:23; 4608:2, 8
**increasing** [1] - 4538:21
**incremental** [2] - 4537:8, 17
**indeed** [1] - 4593:24
**independently** [1] - 4595:15
**Indiana** [1] - 4556:17
**indicated** [3] - 4538:20; 4539:3; 4613:21
**indicating** [2] - 4522:2; 4530:19
**indicating)** [1] - 4618:5
**indicator** [4] - 4629:8; 4634:14; 4648:2
**indirect** [5] - 4531:20; 4532:20, 22; 4536:1; 4538:22
**indirectly** [1] - 4532:15
**individual** [2] - 4514:7; 4551:11

**individually** [2] - 4542:7; 4588:22
**individuals** [3] - 4550:12; 4636:16; 4646:2
**industries** [2] - 4560:17; 4606:18
**Industry** [1] - 4620:18
**industry** [12] - 4516:1; 4559:6; 4561:3; 4566:4, 16-17; 4605:25; 4617:19; 4639:24; 4642:23
**infer** [1] - 4616:3
**inference** [2] - 4547:13
**inferred** [1] - 4565:5
**inform** [3] - 4544:13; 4604:22; 4606:22
**information** [34] - 4514:7; 4526:8; 4544:16, 20; 4545:5; 4546:19; 4547:9, 12-13; 4548:7, 20; 4549:6, 10, 25; 4550:13; 4552:15; 4553:1; 4565:8, 22; 4577:6; 4588:5; 4603:24; 4604:1, 4-5, 7, 24; 4605:3, 7; 4606:17; 4641:12; 4646:23
**informs** [1] - 4516:23
**infrastructure** [1] - 4540:23
**initial** [5] - 4559:17; 4560:3, 23; 4563:23; 4565:10
**inklings** [1] - 4582:7
**innovation** [1] - 4531:9
**innovative** [1] - 4519:14
**input** [1] - 4542:25
**inputs** [1] - 4562:12
**inside** [2] - 4581:3; 4584:15
**insist** [1] - 4593:3
**instead** [7] - 4514:18; 4523:22; 4534:18; 4535:3; 4554:12; 4579:5; 4634:7
**institutions** [2] - 4550:11
**instructions** [2] - 4564:19; 4639:14
**integration** [1] - 4548:14
**intellectual** [1] - 4596:24
**intensity** [1] - 4540:5
**interacted** [1] - 4583:21
**interest** [1] - 4577:5
**interested** [4] - 4543:10; 4552:7; 4585:14; 4593:21
**interesting** [3] - 4557:4; 4593:22; 4594:3
**internalization** [3] - 4574:25; 4602:9, 15
**interviewing** [1] - 4550:3
**introduce** [3] - 4511:5; 4563:6
**introduced** [2] - 4531:11; 4583:19
**investigate** [3] - 4536:4; 4552:2; 4568:4
**investigation** [1] - 4574:2
**investigative** [1] - 4571:8
**investments** [4] - 4537:8, 17; 4538:21; 4539:2
**invitation** [1] - 4597:1
**invite** [1] - 4596:23
**invoice** [1] - 4638:7
**involves** [1] - 4598:11

**irrelevant** [1] - 4595:13
**isolating** [1] - 4613:6
**issue** [9] - 4562:12, 21; 4573:7, 11;
4627:8, 13; 4648:4; 4650:7
**issues** [10] - 4525:8; 4526:2; 4560:8;
4570:3; 4571:9; 4573:3; 4603:1;
4613:12; 4627:14; 4634:20
**it'd** [3] - 4528:5; 4537:24; 4637:22
**it'll** [1] - 4536:23
**item** [6] - 4557:19; 4636:14-16; 4637:4
**items** [2] - 4542:6; 4544:6
**itself** [5] - 4581:7; 4599:23, 25;
4621:19; 4638:16

## J

**jerry** [2] - 4596:12; 4643:20
**jerry-rigged** [2] - 4596:12; 4643:20
**jmmajoras@jonesday.com** [1] -
4507:13
**job** [2] - 4574:17; 4582:4
**Joe** [2] - 4511:25; 4559:22
**John** [3] - 4507:10; 4511:24; 4522:1
**jointly** [1] - 4588:22
**JONATHAN** [4] - 4510:4; 4512:5;
4594:8
**JONES** [6] - 4507:11, 15, 18, 22;
4508:3, 6
**Jones** [4] - 4506:17; 4638:23; 4640:9;
4641:6
**Joneses** [1] - 4516:19
**journal** [1] - 4575:19
**journals** [1] - 4581:16
**Judge** [1] - 4595:24
**judge** [3] - 4595:10; 4596:12, 21
**JUDGE** [1] - 4506:11
**judge's** [1] - 4603:3
**judgments** [1] - 4646:22
**jump** [1] - 4530:7
**jumping** [1] - 4544:23
**jury** [1] - 4596:22
**jury's** [1] - 4596:23
**Justice** [11] - 4559:20; 4567:6; 4570:3;
4572:4, 10, 17; 4604:14; 4609:24;
4611:8; 4620:9; 4621:14
**JUSTICE** [5] - 4506:14, 18, 23; 4507:3,
7
**Juárez** [3] - 4556:17, 21

## K

**kalejnieks@jonesday.com** [1] -
4507:21
**Kearney** [5] - 4545:3, 17; 4547:22;
4548:13; 4552:22
**Keep** [2] - 4611:22; 4614:7
**keep** [6] - 4515:7; 4541:17; 4620:4;
4629:17; 4643:5; 4646:19

**keeping** [1] - 4513:17
**Keepseagle** [1] - 4572:7
**kept** [1] - 4568:16
**key** [2] - 4535:25; 4623:2
**Kim** [1] - 4511:12
**kind** [4] - 4544:11; 4559:25; 4571:10;
4580:24; 4611:1
**kinds** [1] - 4543:1
**kitchen** [2] - 4519:16; 4563:1
**known** [1] - 4565:21
**knows** [1] - 4526:9
**Kristen** [1] - 4507:18

## L

**laid** [1] - 4560:24
**Lakeside** [1] - 4508:7
**language** [1] - 4610:12
**large** [6] - 4523:7; 4538:25; 4573:7,
11; 4597:19; 4603:3
**larger** [4] - 4576:11; 4582:24; 4591:3;
4637:6
**largest** [1] - 4527:6; 4580:4; 4616:19
**last** [17] - 4534:12, 17; 4537:11;
4538:12; 4542:21; 4557:24; 4558:1, 9;
4588:21; 4592:11; 4596:18; 4617:16;
4619:11; 4622:25; 4640:14, 22
**lastly** [1] - 4543:5
**lasts** [1] - 4649:25
**late** [3] - 4535:15; 4575:15; 4593:18
**laundry** [16] - 4545:24; 4567:5;
4570:7, 9; 4576:6, 10, 17; 4579:7;
4582:17; 4590:17, 23; 4591:3, 9, 13
**law** [6] - 4534:21; 4593:22; 4594:1, 19;
4595:14; 4597:9
**lawyers** [3] - 4512:9; 4574:12, 15
**lay** [1] - 4560:21
**layers** [1] - 4595:25
**learn** [1] - 4599:23
**least** [5] - 4554:7; 4593:19; 4618:19;
4626:25
**leave** [3] - 4513:16; 4521:8; 4619:4
**led** [3] - 4582:8; 4607:11; 4617:1
**left** [10] - 4520:18; 4523:15; 4595:21;
4596:18; 4608:23; 4624:19; 4630:14
**left-hand** [1] - 4523:16
**legal** [2] - 4544:22; 4597:6
**legalities** [1] - 4594:17
**Lejnieks** [1] - 4507:18
**length** [1] - 4514:15
**less** [15] - 4537:18; 4551:25; 4576:8;
4578:8; 4590:20; 4599:19; 4625:8, 18;
4629:1, 3, 12; 4637:12; 4642:22;
4645:18; 4648:23
**letter** [7] - 4640:6, 25; 4641:5, 16, 20,
22
**level** [8] - 4518:1; 4546:5; 4547:3;
4555:4; 4568:7; 4589:9; 4596:24;
4604:11

**levels** [1] - 4529:25
**LG** [22] - 4524:16; 4536:12, 25;
4537:22; 4538:13, 16; 4568:13, 19;
4569:1; 4586:1, 12, 15, 18, 22; 4603:3;
4608:10; 4613:17; 4628:24; 4629:3
**LG's** [3] - 4541:23; 4544:21; 4568:1, 6
**light** [1] - 4515:19
**likely** [3] - 4541:23; 4544:21; 4550:19
**line** [13] - 4521:15; 4531:15; 4540:15;
4557:19; 4609:4, 8; 4610:13; 4618:4;
4636:14-16; 4637:4
**lines** [1] - 4521:16
**linkages** [1] - 4518:11
**Lisa** [1] - 4507:2
**lisa.scanlon@usdoj.gov** [1] - 4507:5
**list** [1] - 4528:4
**listed** [3] - 4629:21, 25; 4646:10
**literature** [2] - 4604:9, 17; 4606:6, 14
**Litigation** [1] - 4595:2
**live** [1] - 4519:10
**LLP** [7] - 4508:9, 13, 17, 20; 4509:2, 8;
4511:17
**loaded** [2] - 4554:13
**loads** [1] - 4564:24
**loathed** [1] - 4633:12
**located** [1] - 4528:20
**logic** [2] - 4569:5; 4646:16
**look** [112] - 4512:19; 4514:4; 4515:18;
4518:18; 4520:1; 4524:13, 20; 4526:20,
25; 4528:4; 4529:5, 12, 15; 4531:8, 23;
4532:19; 4533:23; 4535:16; 4542:24;
4543:2; 4545:19; 4546:14; 4554:17;
4560:12; 4561:10; 4563:10, 24; 4567:1;
4573:2, 12, 14; 4574:3; 4576:5; 4581:8;
4590:16, 23; 4592:7; 4598:12, 15, 21;
4600:13; 4601:16; 4603:24; 4604:20,
25; 4605:8, 21; 4606:9, 19, 25;
4607:25; 4612:19; 4613:2, 8; 4614:1,
19; 4615:1, 8, 14; 4618:7; 4619:23-25;
4620:16, 22; 4621:8, 22; 4623:8;
4624:13, 17, 22; 4626:9-11; 4627:9, 16;
4628:23; 4629:14; 4630:4, 24; 4632:22;
4634:7, 23; 4635:13; 4636:3, 9, 22;
4637:13, 17, 4638:9, 15, 23; 4639:22;
4640:9; 4643:6; 4644:9, 13, 18; 4645:2,
11; 4646:7; 4648:15; 4649:12; 4650:8
**looked** [10] - 4516:7; 4527:20;
4545:22; 4546:9; 4552:25; 4556:11;
4620:13; 4632:13; 4644:8
**looking** [41] - 4516:3; 4518:6; 4519:12;
4520:5; 4528:23; 4529:14; 4533:5;
4548:4; 4564:10; 4567:20; 4579:6;
4588:24; 4597:15; 4598:12; 4600:12;
4602:4, 11; 4603:17-21; 4605:19;
4606:20; 4610:3; 4611:7; 4612:1;
4613:7; 4616:15; 4626:5; 4627:21;
4628:12, 15, 18; 4633:8; 4645:15, 21;
4648:20
**looks** [11] - 4526:23; 4532:12; 4540:8;
4581:7; 4585:11; 4605:3; 4623:19;

4630:21; 4635:12; 4636:11; 4644:12
**Los** [2] - 4554:7, 10
**lose** [1] - 4515:2
**loss** [2] - 4582:4
**Louisiana** [3] - 4507:11, 19, 23
**Love** [1] - 4511:25
**love** [1] - 4593:8
**loves** [1] - 4519:12
**low** [9] - 4517:6, 10, 13-14, 17, 21, 25; 4623:4; 4641:18
**low-priced** [4] - 4517:6, 10, 13
**Lowe's** [1] - 4599:14
**lower** [9] - 4514:19; 4530:17; 4535:22; 4543:18; 4546:4; 4552:24; 4649:5, 25
**lunch** [1] - 4651:3
**luncheon** [1] - 4651:5

**M**

**M-A-B-E** [1] - 4556:19
**MA** [1] - 4508:4
**Mabe** [2] - 4556:19
**machine** [1] - 4509:17
**machines** [1] - 4622:18
**Madden** [1] - 4522:1
**magnitude** [1] - 4546:6
**maintain** [1] - 4548:15
**major** [4] - 4577:4; 4622:2, 18; 4646:15
**Major** [1] - 4620:18
**Majoras** [2] - 4507:10; 4511:25
**majority** [2] - 4565:21; 4588:10
**makers** [1] - 4647:1
**mantalics@omm.com** [1] - 4509:10
**manufacture** [1] - 4577:9
**manufacturer** [3] - 4559:9; 4631:22; 4632:4
**manufacturers** [4] - 4566:19; 4597:22; 4599:17; 4627:18
**manufacturing** [5] - 4552:4, 10; 4555:20; 4556:9, 11
**March** [1] - 4594:25
**marching** [1] - 4568:16
**margin** [9] - 4530:4, 16; 4532:4, 6, 19, 24; 4533:12; 4535:8; 4602:24
**marginal** [1] - 4568:14
**margins** [20] - 4529:5, 15; 4530:5; 4532:11, 22; 4533:18, 24; 4535:22; 4536:2; 4562:10, 18-19; 4565:4-6; 4566:9, 19
**Mark** [2] - 4506:22; 4511:13
**Mark.hamer@usdoj.gov** [1] - 4506:25
**market** [97] - 4516:4; 4517:2, 5, 8-9, 11, 14, 22, 25; 4518:1, 15; 4520:13; 4522:12; 4525:2, 9; 4526:10, 25; 4528:5; 4529:9; 4532:20; 4533:3; 4536:1; 4537:15, 18; 4538:25; 4540:25; 4558:14, 16, 19; 4559:2, 12; 4563:9; 4564:6, 10, 21; 4568:25; 4569:4;

4571:7, 14, 21; 4572:25; 4574:18, 25; 4575:2, 5; 4584:11, 22; 4589:3, 5; 4594:19; 4599:19; 4600:8; 4601:8, 19; 4605:19; 4608:5; 4622:19, 21; 4627:2, 4, 10; 4628:3-7; 4629:4, 6; 4633:2, 11-12, 24; 4634:5, 9; 4635:2, 8; 4636:4; 4637:10; 4639:24; 4641:18; 4642:20; 4645:15, 21; 4646:11, 15, 17, 22; 4647:21; 4648:21; 4649:3
**Market** [1] - 4633:18
**marketplace** [6] - 4514:5; 4518:22; 4519:21; 4601:1; 4602:17
**markets** [2] - 4533:18; 4641:11
**mass** [1] - 4518:1
**Massachusetts** [1] - 4509:3
**massive** [1] - 4630:20
**Master** [1] - 4630:14
**match** [1] - 4519:15
**matched** [1] - 4630:16
**material** [9] - 4610:1, 14; 4623:25; 4624:4, 11; 4625:25; 4630:18; 4643:12
**materials** [4] - 4570:23; 4610:18; 4630:5; 4645:21
**math** [5] - 4602:19, 21; 4624:25; 4625:9, 20
**mathematical** [1] - 4614:23
**matter** [20] - 4515:18; 4530:23; 4533:24; 4534:20; 4550:9; 4551:17; 4574:9; 4575:11; 4582:19; 4589:1; 4594:19; 4595:14; 4597:9; 4613:14; 4614:22; 4617:4; 4649:19; 4650:1; 4651:10
**mattered** [1] - 4534:8
**matters** [1] - 4527:5
**Matthew** [1] - 4509:2
**matthew.tabas@aporter.com** [1] - 4509:5
**Maverick** [1] - 4621:5
**maverick** [4] - 4619:11; 4621:12, 15, 19
**maximizing** [1] - 4515:6
**Maytag** [6] - 4587:24; 4588:9; 4612:21; 4615:9; 4622:8, 21
**Maytag's** [1] - 4576:14; 4620:8
**Maytag/Whirlpool** [18] - 4558:22; 4567:17; 4569:22; 4570:5, 22, 25; 4574:2, 8; 4575:9; 4576:1; 4580:10; 4586:14; 4589:3; 4600:25; 4601:18; 4604:23; 4612:5; 4616:7
**mean** [36] - 4515:10; 4519:4; 4520:1, 16; 4528:21; 4531:12; 4541:22; 4542:16; 4543:6; 4545:25; 4548:23, 25; 4549:1; 4551:16; 4560:2, 9, 18; 4562:23; 4572:6; 4574:11; 4578:6; 4581:7, 15; 4588:1; 4590:12; 4600:10; 4602:21; 4619:4; 4633:9; 4634:3, 9; 4646:6; 4648:5
**meaning** [1] - 4633:13
**means** [13] - 4519:5; 4520:17; 4530:21; 4535:2; 4542:17; 4547:17;

4576:23; 4578:6; 4614:21; 4624:25; 4632:7; 4648:5
**measure** [3] - 4560:15; 4565:1; 4616:23
**measured** [1] - 4616:23
**measurements** [1] - 4522:11
**measures** [2] - 4559:23; 4574:17
**measuring** [1] - 4565:5
**mechanism** [1] - 4551:21
**median** [1] - 4641:11
**meet** [2] - 4527:16; 4594:15
**Meet** [1] - 4565:18
**member** [1] - 4519:10
**memory** [3] - 4610:2; 4625:25; 4636:2
**mention** [4] - 4527:2; 4615:20; 4626:24; 4628:16
**mentioned** [4] - 4535:13; 4605:10; 4613:6, 23
**merely** [1] - 4596:23
**merge** [4] - 4544:24; 4551:19; 4600:6, 22
**merged** [9] - 4512:11; 4513:4; 4554:20; 4586:14, 17, 19; 4597:14; 4602:8, 12
**Merger** [2] - 4609:5; 4614:1
**merger** [139] - 4535:14; 4541:4, 23; 4542:1, 8, 12; 4543:4, 8; 4544:13, 24; 4545:14; 4551:6, 8-9, 22, 24; 4553:3; 4554:21; 4555:18; 4556:10, 15, 20, 23-25; 4557:15, 17, 21-22, 24; 4558:2, 4, 9, 22; 4559:2, 25; 4560:1; 4561:3, 20; 4564:10, 23; 4565:3, 9; 4567:2, 20; 4569:3, 8, 14-15, 20; 4570:1, 10, 22, 25; 4571:6, 13; 4573:19; 4574:2, 18; 4575:3; 4576:1; 4579:12, 14; 4581:8, 24; 4582:2; 4584:7, 10, 22; 4585:12, 15; 4586:12; 4589:10; 4590:17, 24-25; 4591:1; 4597:11, 13, 23; 4598:5, 10-11, 17, 19, 24; 4599:1, 7, 18, 20, 24; 4600:5, 24-25; 4601:1, 6, 10-13, 18, 22; 4602:10; 4603:15; 4604:23; 4605:11, 14, 16, 20-21; 4606:15, 18, 25; 4607:11; 4611:24; 4612:16; 4613:10, 13; 4614:4, 11, 16; 4615:11, 15; 4616:1, 9; 4617:1; 4619:1, 3; 4621:14; 4628:9; 4648:1, 9
**merger-specific** [20] - 4542:2; 4543:8; 4545:14; 4551:6, 8-9, 22, 24; 4553:3; 4555:18; 4556:23, 25; 4557:15, 17, 21-22, 24; 4558:2, 4; 4589:10
**merger-specificity** [1] - 4556:15
**mergers** [7] - 4562:7; 4572:18; 4593:23; 4604:16; 4606:19, 21
**merging** [4] - 4599:10, 17; 4601:5, 9
**merit** [3] - 4581:20; 4587:7, 10
**method** [1] - 4587:20
**methodology** [1] - 4543:23
**methods** [1] - 4578:21
**metric** [2] - 4559:23; 4649:2
**metrics** [1] - 4577:25

**Mexico** [2] - 4556:17, 21
**Michael** [3] - 4507:22; 4508:16; 4509:7
**mid-'90s** [1] - 4559:20
**middle** [5] - 4595:8, 24; 4638:17; 4641:7; 4645:4
**might** [3] - 4514:18; 4541:16; 4602:11
**Mike** [1] - 4511:18
**mile** [1] - 4537:11
**million** [26] - 4542:18; 4544:8; 4551:4, 6; 4553:7, 21; 4554:18; 4555:6, 17; 4556:18, 20, 22-23; 4557:14, 20; 4558:2; 4589:10; 4625:23; 4626:4, 8, 13
**mind** - 4617:22; 4629:17; 4640:16
**minimis** [3] - 4527:11, 16; 4645:23
**minimus** [3] - 4608:10; 4629:11; 4647:13
**minus** [1] - 4625:24
**minute** [5] - 4538:12; 4539:23; 4548:12; 4552:10; 4558:8
**minutes** [2] - 4593:4; 4613:6
**Miriam** [1] - 4511:12
**mismatch** [1] - 4643:3
**mistake** [2] - 4520:11; 4636:6
**mix** [3] - 4531:10; 4622:1; 4649:16
**mixed** [3] - 4576:21; 4608:2, 7
**model** [70] - 4516:11-14; 4550:1; 4560:20, 25; 4561:6, 11, 13; 4562:1, 3, 12-13, 17, 21; 4564:17; 4565:8; 4566:3; 4568:12, 19-20; 4576:19; 4578:1, 23; 4579:5, 9; 4580:3; 4583:19; 4584:15; 4585:9; 4590:13, 16; 4591:25; 4600:24; 4603:4, 15; 4604:6, 18-19, 24; 4605:25; 4606:4-6, 15; 4607:22; 4608:1, 13-14; 4609:7; 4611:9, 11; 4612:6, 9; 4613:9; 4614:5; 4615:8, 10; 4616:22; 4617:6; 4618:2, 8, 11
**Model** [1] - 4609:4
**model's** [1] - 4563:1
**modeling** [3] - 4564:18; 4565:24; 4604:19
**Models** [1] - 4614:2
**models** [13] - 4515:23; 4516:2, 6; 4544:9; 4565:3, 25; 4576:4; 4600:24; 4604:10, 14; 4618:15
**modest** [1] - 4538:20
**moment** [3] - 4523:7; 4531:17; 4598:24
**money** [3] - 4512:14; 4572:14; 4647:19
**monopolist** [7] - 4517:12, 17, 20; 4520:12, 20, 22; 4558:19
**Months** [2] - 4611:23; 4614:7
**months** [1] - 4582:8
**Moreover** [1] - 4595:13
**morning** [12] - 4511:7, 14-16, 20-21, 23; 4512:1, 7-8; 4609:11
**MORNING** [2] - 4506:9; 4511:1
**most** [7] - 4524:10; 4543:10; 4545:21; 4552:7; 4567:19; 4626:6

**mostly** [1] - 4578:12
**move** [21] - 4515:13; 4518:4; 4520:6; 4536:1, 15; 4542:15; 4544:3; 4552:13; 4555:10; 4556:19; 4564:22; 4565:12; 4568:2, 6; 4575:16; 4578:18; 4579:2; 4580:15; 4589:17; 4616:16
**movement** [4] - 4532:21; 4533:16; 4556:21; 4616:17
**movements** [1] - 4556:12
**moves** [2] - 4646:6, 11
**moving** [3] - 4516:4; 4522:8; 4556:16
**MPD** [1] - 4576:1
**MR** [158] - 4510:5; 4511:7, 9, 11, 15, 17, 21, 24; 4512:3, 6; 4520:7, 9; 4521:18, 21; 4526:4, 6; 4531:22, 24; 4536:11, 18-22; 4537:23; 4538:2, 9, 11; 4539:7, 10, 16, 21; 4540:1; 4541:14; 4546:16, 19, 24; 4547:1, 5-6, 8, 20; 4548:2, 8, 11, 13, 21-22; 4549:2, 8, 13, 23; 4550:14, 16-17; 4555:19, 23; 4556:7; 4557:1, 3, 10; 4572:23; 4573:5, 9, 11, 14, 23-24; 4575:12; 4579:2, 23, 25; 4585:16, 21, 24; 4589:16, 20, 24; 4592:3, 5, 10, 20, 24; 4593:8, 12, 15; 4594:7, 9, 23; 4595:9, 20, 23; 4596:5, 7, 9, 11, 15, 20; 4606:24; 4607:1, 3; 4608:21, 25; 4609:9, 12, 15, 18, 21; 4610:7, 17, 20, 23; 4611:3, 5-6, 20; 4612:18; 4613:3, 5; 4620:3, 6, 23, 25; 4621:9, 11, 22, 24; 4622:5, 7, 13, 15; 4623:9, 12, 15-16; 4624:5, 7, 9; 4640:19, 23-24; 4642:11, 16, 18-19; 4643:5, 14, 17, 19; 4644:6; 4650:13, 17, 21, 24
**mrshumaker@jonesday.com** [1] - 4507:24
**multiple** [4] - 4563:6, 9; 4567:16; 4578:20
**multiplied** [4] - 4553:20; 4566:9; 4615:7
**multiplying** [2] - 4603:1; 4632:17
**multiproduct** [1] - 4563:8
**must** [3] - 4541:22; 4542:16; 4622:19
**MYERS** [1] - 4509:8

## N

**nail** [1] - 4572:10
**named** [1] - 4638:5
**names** [1] - 4630:16
**narrow** [1] - 4617:11
**narrowing** [1] - 4625:15
**National** [1] - 4581:25
**Native** [2] - 4572:11, 15
**natural** [1] - 4604:21
**nature** [6] - 4518:15; 4555:21; 4568:24; 4574:18; 4601:19
**NBER** [2] - 4582:11; 4583:12
**near** [2] - 4519:10; 4613:22

**necessarily** [2] - 4574:13; 4638:5
**necessary** [7] - 4514:9, 11; 4537:8; 4542:8; 4560:4; 4577:16; 4611:16
**need** [22] - 4512:17, 22; 4513:3; 4517:10; 4536:13, 20; 4542:1; 4552:11; 4554:21, 23; 4555:19; 4564:21; 4565:10; 4567:18; 4568:6; 4590:10; 4598:15; 4608:17; 4629:7; 4630:10; 4650:11
**needed** [1] - 4641:22
**needs** [2] - 4531:17; 4582:14
**negative** [10] - 4578:12; 4580:2, 6; 4608:7; 4615:23; 4616:14; 4617:25; 4618:8, 12, 24
**negatives** [1] - 4578:5
**net** [1] - 4513:16
**networks** [2] - 4540:23; 4543:1
**never** [4] - 4562:7; 4638:14; 4641:16; 4642:12
**New** [2] - 4561:16; 4595:1
**new** [5] - 4563:1; 4572:12
**newspaper** [1] - 4561:19
**newspapers** [1] - 4561:18
**next** [52] - 4522:4; 4525:7, 13, 16; 4526:5; 4527:23; 4529:17; 4531:22; 4536:8; 4537:23; 4539:21; 4540:14; 4542:15; 4543:22; 4553:8; 4554:1; 4555:7; 4557:19; 4558:21, 23; 4560:12; 4561:16, 19-20; 4568:9; 4571:24; 4573:25; 4575:13; 4577:20; 4578:18; 4579:2; 4580:15; 4585:25; 4586:7; 4595:20; 4596:6; 4609:8; 4611:22; 4612:1, 19; 4614:6; 4615:8; 4622:5, 13; 4624:14; 4629:16; 4639:10; 4641:23; 4642:10
**niche** [2] - 4641:11, 18
**night** [1] - 4542:21
**nine** [1] - 4639:11
**nobody's** [1] - 4641:20
**non** [2] - 4529:2; 4619:15
**non-GE** [1] - 4529:2
**non-privileged** [1] - 4619:15
**none** [5] - 4550:7; 4561:7; 4603:16; 4612:10
**nonlarger** [1] - 4646:23
**nonresident** [1] - 4594:1
**nonstatistically** [1] - 4614:14
**North** [1] - 4508:6
**Northeast** [1] - 4528:20
**note** [6] - 4548:11; 4566:1; 4578:20; 4608:4; 4613:16; 4649:12
**noted** [2] - 4540:7; 4555:17; 4638:3
**notes** [1] - 4547:10
**nothing** [2] - 4557:1; 4629:15
**notwithstanding** [1] - 4643:10
**number** [44] - 4515:20; 4523:10; 4525:19; 4527:2; 4528:3; 4530:19; 4532:7; 4542:20; 4544:1, 3, 8; 4553:6; 4574:21; 4575:5; 4580:19; 4586:24; 4588:7, 10, 17; 4597:22; 4617:5;

4623:23; 4624:22; 4625:7, 10, 13, 16,
18; 4626:1, 10, 14; 4627:1, 25;
4628:17; 4632:3, 17; 4634:20; 4635:4,
14; 4636:23; 4637:8, 24; 4639:13
**Number** [5] - 4639:22; 4641:24;
4642:2, 17, 20
**number's** [2] - 4527:15; 4544:7
**numbering** [1] - 4595:5
**numbers** [28] - 4529:22; 4530:13;
4546:16; 4547:15, 19; 4548:15-17;
4552:16, 22; 4553:8; 4569:23; 4577:24;
4578:11; 4588:7; 4603:1; 4614:20;
4615:23; 4616:18; 4624:16; 4626:24;
4630:10; 4643:4; 4646:12; 4648:25
**NW** [15] - 4506:14, 19, 24; 4507:4, 8,
11, 19, 23; 4508:10, 14, 17, 20; 4509:3,
8, 14
**NXR** [2] - 4637:7; 4646:4

## O

**O'MELVENY** [1] - 4509:8
**object** [7] - 4546:16; 4547:15;
4589:20; 4609:9; 4610:23; 4611:3;
4642:11
**objected** [1] - 4592:13
**objection** [5] - 4536:15; 4548:16;
4592:18; 4610:22; 4643:9
**observe** [12] - 4523:17; 4552:19;
4563:8, 16; 4580:2; 4587:6; 4591:3;
4605:4; 4608:1; 4616:18; 4617:14;
4650:3
**observed** [5] - 4525:11; 4576:16;
4580:1; 4586:23
**observes** [3] - 4567:21; 4579:10;
4618:11
**obtain** [1] - 4564:11
**obviously** [14] - 4516:4; 4518:3;
4529:1; 4531:8; 4539:4; 4570:1;
4582:9; 4585:10; 4604:1; 4629:14;
4632:19; 4634:21; 4636:9; 4643:1
**occur** [2] - 4566:18; 4602:14
**occurred** [5] - 4566:16; 4581:24;
4582:5; 4588:10; 4602:10
**occurs** [1] - 4574:25
**odds** [1] - 4596:1
**OF** [12] - 4506:1, 3, 9, 14, 18, 23;
4507:3, 7; 4510:4; 4512:5; 4594:8
**offer** [3] - 4541:9; 4593:25; 4623:4
**offered** [4] - 4518:25; 4529:21; 4550:8;
4561:5
**offering** [1] - 4603:7
**Office** [1] - 4535:14
**Official** [2] - 4509:12; 4651:13
**official** [4] - 4572:4, 17; 4582:11;
4583:13
**officials** [1] - 4573:18
**offs** [1] - 4649:11
**offset** [4] - 4568:15; 4595:12, 15;

4597:4
**often** [4] - 4565:5, 7; 4574:12; 4632:17
**OH** [1] - 4508:7
**on-the-fly** [1] - 4623:12
**once** [13] - 4527:9; 4531:16; 4533:23;
4537:14; 4540:20, 22; 4551:19;
4564:12; 4577:12; 4588:23; 4602:21;
4634:18
**one** [192] - 4513:19, 23; 4516:5, 10,
12, 22; 4520:7; 4521:20; 4522:15;
4523:12; 4526:23; 4527:13; 4528:6;
4529:10; 4530:19; 4531:13; 4532:5;
4534:23; 4535:5-7, 11; 4537:16, 18, 20;
4538:18; 4539:23; 4540:6, 8-9; 4541:6,
11, 21; 4542:23; 4543:2; 4546:2-4;
4554:6, 11, 13, 19; 4559:9, 17; 4560:1,
14; 4561:7, 14, 17, 21; 4563:24;
4564:11, 16, 24; 4565:8, 19, 24;
4566:2, 5; 4567:20; 4569:2, 6; 4573:20;
4574:9; 4575:10; 4576:2, 16-17;
4577:4, 15; 4578:5, 11, 15, 21; 4579:8,
10-12; 4581:2, 10; 4582:9, 22; 4583:5,
11; 4584:1; 4585:11; 4587:13; 4588:2,
4, 16, 20; 4589:6, 8; 4591:2, 5, 14, 18;
4592:1; 4594:17; 4598:12, 20, 25;
4599:3, 11, 19, 22; 4600:7, 9, 12, 14;
4601:2, 16, 20-21; 4603:25; 4604:3, 11,
13; 4605:3, 17; 4607:21; 4608:14;
4609:25; 4610:2; 4611:11; 4612:2,
11-12; 4614:5, 18; 4615:12, 14;
4616:13; 4617:5; 4618:4, 11, 14;
4620:14; 4621:21; 4623:23; 4624:22;
4625:7, 11-13, 16, 18; 4626:6; 4627:17,
20; 4628:5, 10; 4629:10, 12; 4630:22;
4632:11; 4638:1, 8, 11, 14; 4641:11,
17; 4642:22; 4643:2; 4645:19; 4646:18;
4647:23
**one's** [4] - 4566:4; 4582:20; 4598:16;
4606:21
**one-tenth** [1] - 4642:22
**ones** [4] - 4542:8; 4598:9; 4604:22;
4614:11
**oneself** [1] - 4537:19
**open** [2] - 4539:14; 4557:8
**opening** [1] - 4607:17
**opining** [1] - 4571:6
**opinion** [27] - 4529:20; 4531:4;
4547:2, 13-14, 17; 4548:4; 4552:3;
4553:4, 12; 4554:4; 4555:3; 4556:9;
4565:16; 4569:6; 4572:21; 4584:10, 21;
4589:9; 4594:14, 18, 20; 4597:2, 4;
4616:13; 4619:22
**opinions** [16] - 4529:8; 4536:8, 25;
4537:3; 4550:19; 4551:3; 4555:12;
4558:6; 4571:20; 4593:25; 4594:21;
4595:10, 12, 14; 4616:12
**opportunity** [2] - 4558:10; 4580:13
**opposite** [5] - 4529:24; 4578:14;
4579:19; 4618:14, 25
**option** [2] - 4546:4; 4648:10

**options** [1] - 4561:9
**orally** [1] - 4572:3
**oranges** [1] - 4626:15
**order** [15] - 4537:17; 4538:6; 4542:9;
4546:6; 4556:4; 4568:6; 4582:13;
4583:2; 4591:7; 4601:21
**ordinary** [1] - 4647:24
**Orszag** [27] - 4512:7; 4526:11;
4536:23; 4538:12; 4539:17; 4540:2;
4541:16; 4547:15, 21; 4548:16;
4549:24; 4552:16; 4556:8; 4557:12;
4571:16; 4593:8; 4594:10, 14; 4597:11;
4607:4; 4609:22; 4611:7, 21; 4623:17;
4624:10; 4630:4; 4643:20
**ORSZAG** [4] - 4510:4; 4512:5; 4594:8
**Orszag's** [8] - 4595:14, 25; 4596:21;
4597:2; 4607:1; 4609:10; 4610:9;
4643:6
**Outcomes** [1] - 4531:2
**outlined** [1] - 4646:12
**outlines** [1] - 4575:13
**output** [1] - 4565:8
**outset** [1] - 4558:6
**outside** [2] - 4563:3
**Oven** [1] - 4634:8
**oven** [2] - 4520:3; 4582:18
**ovens** [17] - 4526:23; 4527:21; 4528:2;
4545:23; 4563:4; 4578:4; 4582:25;
4608:3, 8, 10; 4615:20, 25; 4616:20;
4629:15; 4634:10; 4647:10
**overall** [2] - 4628:4; 4634:5
**overhead** [1] - 4552:6
**overseas** [1] - 4613:20
**overstates** [1] - 4622:22
**overview** [1] - 4541:3
**own** [12] - 4517:22; 4542:1, 7; 4603:4,
6; 4605:16; 4607:14; 4608:12; 4617:2;
4636:14
**owned** [1] - 4537:11
**owner** [1] - 4638:5

## P

**P.C** [21] - 4522:14, 16, 20-21, 23;
4523:3, 6; 4526:3, 7, 13, 15; 4527:1,
14, 17, 20, 25; 4528:10, 16, 19; 4529:1;
4628:21
**p.m** [1] - 4651:6
**Page** [2] - 4510:3, 8
**page** [42] - 4521:14, 18; 4526:5;
4527:23; 4530:8; 4539:21; 4553:8;
4554:1; 4555:23; 4571:2; 4595:3, 20;
4596:8-10, 16; 4617:15; 4620:22;
4622:6, 8, 14; 4623:8; 4624:14, 18;
4629:16; 4630:24; 4636:11; 4638:15;
4639:8, 10-11; 4640:14, 22; 4641:5, 23;
4642:10; 4646:8
**pages** [4] - 4541:1; 4600:11; 4639:4
**paging** [1] - 4596:17

**pair** [1] - 4579:6
**panic** [1] - 4582:6
**paper** [6] - 4560:14, 24; 4575:24; 4581:7; 4590:15; 4622:25
**paragraph** [5] - 4595:8, 22, 24; 4596:18; 4622:16, 25
**paraphrased** [1] - 4617:22
**paraphrasing** [1] - 4617:17
**part** [25] - 4512:22; 4513:3; 4536:1; 4538:6; 4544:13; 4545:10; 4548:5; 4553:11; 4556:4; 4557:25; 4569:4; 4575:22; 4594:17; 4598:1, 3; 4600:13; 4603:9; 4605:5; 4612:4; 4624:20; 4638:14; 4641:17
**participant** [2] - 4628:6; 4629:7
**participants** [3] - 4558:15; 4646:22; 4649:4
**particular** [7] - 4516:11; 4522:7; 4532:16; 4571:6; 4575:21; 4620:16; 4622:19
**particularly** [2] - 4626:18, 20
**parties** [4] - 4511:5; 4537:11; 4599:9
**parts** [3] - 4537:18; 4598:2, 4
**pass** [3] - 4566:10-14, 17, 21
**pass-through** [8] - 4566:10-14, 17, 21
**passed** [1] - 4543:13
**past** [11] - 4572:9; 4602:6; 4603:19, 23; 4604:22; 4606:19, 25; 4621:18; 4639:4
**paths** [2] - 4537:5, 7
**pattern** [2] - 4528:23; 4533:22
**Paul** [3] - 4508:9, 13; 4511:17; 4640:25
**paul.denis@dechert.com** [1] - 4508:15
**paul.friedman@dechert.com** [1] - 4508:12
**Paula** [1] - 4507:14
**pause** [1] - 4541:12
**pay** [2] - 4515:10, 14
**pays** [1] - 4552:19
**peer** [3] - 4565:11; 4575:19; 4581:12
**peer-reviewed** [3] - 4565:11; 4575:19; 4581:12
**people** [16] - 4516:16; 4519:9, 14-15; 4521:4, 8; 4542:4; 4543:9; 4550:10; 4561:25; 4563:8; 4573:20; 4582:3; 4636:13; 4647:24
**per** [4] - 4625:8, 15; 4626:6; 4641:11
**perceived** [1] - 4571:7
**percent** [73] - 4520:21, 23; 4525:18, 20; 4527:3, 15; 4530:22; 4540:12, 18; 4553:18, 20; 4554:9, 11, 13; 4561:18; 4567:14; 4568:16, 20; 4569:1; 4588:16; 4608:13; 4609:5; 4611:10; 4612:23; 4613:11; 4614:4, 9; 4615:3, 10, 17; 4626:22; 4627:22; 4628:8, 13; 4629:1, 3, 12; 4632:14; 4633:10; 4634:9; 4635:17, 19; 4637:22, 25; 4638:1; 4642:23; 4644:15, 24-25; 4645:8,

16-17, 19; 4646:9, 11; 4647:5, 9, 11, 13, 15; 4648:14, 22
**percentage** [9] - 4529:23; 4530:16; 4588:18; 4627:5; 4632:17; 4633:7; 4637:21; 4647:9
**percentages** [1] - 4609:2
**perception** [1] - 4571:11
**performed** [1] - 4563:11
**perhaps** [3] - 4560:12; 4584:20, 24
**period** [8] - 4581:8; 4582:22; 4583:12; 4584:3, 18; 4586:2; 4613:17
**permits** [1] - 4534:6
**persisted** [2] - 4553:1
**person** [2] - 4514:3; 4519:17
**personally** [1] - 4538:22
**personnel** [1] - 4547:23
**perspective** [4] - 4542:5; 4543:10; 4641:10
**Peter** [1] - 4511:25
**phone** [2] - 4519:12
**phrase** [1] - 4542:12
**pick** [1] - 4522:14
**pie** [1] - 4543:3
**piece** [3] - 4627:20; 4628:5, 10
**pieces** [3] - 4562:19; 4577:25; 4606:21
**Place** [1] - 4638:23
**place** [5] - 4524:7; 4561:2, 4; 4602:7; 4632:20
**places** [1] - 4632:19
**Plaintiff** [3] - 4506:4, 13; 4507:2
**plan** [3] - 4537:22; 4538:13; 4556:20
**planning** [1] - 4592:21
**plants** [1] - 4556:12
**plausible** [1] - 4600:2
**Play** [1] - 4620:17
**players** [13] - 4525:14; 4562:9; 4575:5; 4599:18; 4600:25; 4601:1; 4637:15; 4643:21; 4646:5, 13; 4647:4, 20
**plus** [1] - 4625:23
**POGUE** [1] - 4508:6
**point** [31] - 4529:23; 4534:21; 4560:5; 4564:3, 7; 4567:18; 4568:14; 4569:2; 4571:19; 4572:1, 5; 4573:1; 4574:7; 4575:25; 4586:8; 4589:17; 4608:20; 4614:15; 4618:13; 4627:5; 4629:6; 4632:6; 4634:20; 4637:8; 4642:11; 4643:9; 4644:1; 4647:20; 4650:3
**Point** [1] - 4508:6
**pointing** [1] - 4648:16
**points** [8] - 4530:17; 4590:19; 4609:2; 4633:6; 4637:12, 16; 4647:9; 4650:4
**policy** [1] - 4572:13
**PORTER** [1] - 4509:2
**portion** [5] - 4526:8; 4557:15; 4569:3; 4626:8
**Portions** [1] - 4506:10
**portraying** [1] - 4522:7
**position** [3] - 4539:18; 4561:12; 4572:25

**positioning** [1] - 4516:5
**positive** [3] - 4578:12; 4579:13; 4618:5
**possession** [1] - 4643:11
**possibility** [3] - 4583:16, 23
**possible** [2] - 4514:17; 4551:13
**possibly** [1] - 4580:19
**post** [8] - 4556:20; 4569:20; 4579:14; 4584:10, 22; 4614:11, 16; 4615:15
**Post** [1] - 4614:1
**post-merger** [8] - 4556:20; 4569:20; 4579:14; 4584:10, 22; 4614:11, 16; 4615:15
**Post-Merger** [1] - 4614:1
**pot** [1] - 4626:17
**potential** [4] - 4552:2; 4553:16; 4555:17; 4556:13; 4589:11
**potentially** [9] - 4551:8, 10, 22-23; 4557:17, 21; 4558:4; 4571:10
**powerful** [4] - 4600:2; 4601:18
**practice** [1] - 4596:25
**practitioners** [2] - 4562:7; 4600:14
**Pre** [1] - 4609:5
**pre** [4] - 4569:20; 4601:11; 4613:13; 4614:11
**Pre-Merger** [1] - 4609:5
**pre-merger** [4] - 4569:20; 4601:11; 4613:13; 4614:11
**precise** [4] - 4544:7, 9; 4597:6; 4633:13
**precisely** [10] - 4542:14; 4553:25; 4554:21; 4565:1; 4579:17; 4586:17; 4597:7; 4610:2; 4635:5; 4647:8
**predicated** [1] - 4562:14
**predict** [6] - 4580:4, 9; 4604:2; 4607:22; 4617:13; 4618:13
**predicted** [7] - 4567:3, 8, 12-13; 4580:3; 4599:24; 4618:12
**Predicted** [2] - 4610:10
**predicting** [4] - 4567:9; 4569:7, 9; 4574:17
**prediction** [2] - 4579:15; 4616:14
**predictive** [3] - 4579:11; 4616:22
**predominantly** [1] - 4557:18
**preferences** [5] - 4516:21; 4519:8, 19
**Premier** [14] - 4514:20; 4525:15; 4526:23; 4627:25; 4628:23; 4629:7, 9, 17; 4635:8, 17; 4643:21; 4644:8; 4645:22
**Premier's** [2] - 4628:2; 4629:21
**prender@jonesday.com** [1] - 4507:17
**prepare** [1] - 4539:17
**prepared** [1] - 4541:3
**preparing** [1] - 4644:4
**presence** [5] - 4565:21; 4586:16, 18; 4608:5, 9
**Present** [1] - 4509:6
**present** [3] - 4613:17
**presentation** [5] - 4571:25; 4592:14;

4603:25; 4616:25; 4629:19
**presented** [2] - 4575:19; 4624:20
**presenting** [1] - 4580:8
**presents** [1] - 4529:22
**presided** [1] - 4572:8
**president** [4] - 4514:10; 4516:15; 4572:18; 4646:19
**President** [1] - 4572:12
**pressure** [10] - 4516:12; 4562:6; 4567:4; 4568:16, 21; 4601:25; 4602:4; 4603:4, 12; 4605:10
**previous** [1] - 4580:7
**previously** [4] - 4539:12; 4557:6; 4612:8; 4648:17
**Price** [3] - 4610:10; 4621:4
**price** [103] - 4512:21; 4513:10, 15; 4514:2, 11, 19; 4515:8, 10, 14, 20; 4516:11, 16; 4517:21; 4519:22; 4520:1, 21, 23, 25; 4521:2, 9; 4543:12; 4546:10; 4552:20; 4553:5; 4560:16; 4561:17, 25; 4562:6, 15; 4564:4; 4566:16; 4567:3, 5, 8, 12-13; 4568:15, 21; 4569:5; 4574:11; 4575:1, 4; 4576:5, 8, 22-23, 25; 4577:1, 8, 10, 13, 17; 4578:11, 16; 4579:16; 4580:4, 10; 4582:23; 4584:7; 4586:11, 17, 20; 4589:4; 4590:24; 4592:1, 8; 4607:15, 22-23; 4608:2, 7, 9, 13; 4609:5; 4611:10, 12, 23; 4612:23; 4613:10; 4614:3, 8; 4615:11, 17; 4616:15, 19, 21, 23; 4617:8; 4618:1; 4619:2; 4621:15, 19; 4622:9; 4637:16; 4649:15; 4650:4
**priced** [5] - 4514:19; 4517:6, 10, 13
**prices** [40] - 4512:16, 24-25; 4513:17; 4515:3, 7; 4518:18; 4535:16; 4543:18; 4565:2; 4566:18; 4567:15, 17; 4576:10; 4578:6; 4579:10, 14; 4580:3; 4581:10; 4582:10, 12; 4583:21; 4590:10, 17, 25; 4591:2, 11, 13-14; 4607:11; 4612:20; 4616:1; 4617:2, 13, 19; 4618:13, 22; 4623:4
**PricewaterhouseCoopers** [4] - 4545:3, 18; 4547:22; 4548:14
**pricing** [9] - 4514:4; 4518:9; 4601:24; 4602:4; 4603:4, 11; 4605:10; 4622:10; 4639:24
**primarily** [5] - 4525:23; 4526:15; 4544:11
**primary** [1] - 4570:1
**principally** [3] - 4571:7, 14, 21
**principle** [1] - 4592:12
**printed** [1] - 4610:17
**privileged** [1] - 4619:15
**pro** [1] - 4523:19
**probability** [1] - 4649:25
**problem** [3] - 4601:8; 4611:1; 4623:14
**proceed** [4] - 4512:2; 4538:9; 4650:12, 22
**proceedings** [8] - 4538:5; 4539:13;

4541:12; 4556:3; 4557:7; 4651:10
**Proceedings** [1] - 4509:17
**PROCEEDINGS** [1] - 4506:9
**process** [3] - 4513:14; 4544:13; 4551:19
**produce** [4] - 4554:17; 4577:9; 4614:16; 4634:13
**produced** [7] - 4509:17; 4531:13, 16; 4610:8; 4619:18, 20; 4624:11
**Product** [2] - 4611:22; 4614:6
**product** [35] - 4513:18; 4515:13; 4518:7; 4520:2; 4521:2; 4523:21; 4529:14; 4530:1; 4537:16; 4542:24; 4551:15; 4553:22; 4559:5, 9, 11; 4562:22; 4576:21; 4577:10; 4581:10; 4583:18, 24; 4587:21; 4618:1; 4625:2; 4632:5; 4633:10; 4649:11, 13, 16; 4650:5, 7
**product-by-product** [1] - 4529:14
**production** [5] - 4538:7; 4556:5, 12, 17; 4639:6
**productivity** [1] - 4623:4
**products** [58] - 4512:23; 4513:1, 6; 4514:1; 4518:25; 4519:9, 13; 4531:9; 4546:2; 4552:19; 4553:9, 23; 4554:12; 4559:4, 7, 12, 18; 4560:1; 4561:4; 4563:3, 7, 9; 4567:6; 4570:2, 4, 7, 10, 14; 4576:6, 8, 10-11, 14, 18; 4577:6; 4578:2, 6, 8; 4579:8; 4580:5; 4582:17; 4588:8; 4590:21, 23; 4591:4, 10; 4607:22, 24; 4608:6; 4611:13; 4613:16, 20; 4623:4; 4642:5
**professionals** [3] - 4523:22, 25; 4524:2
**Professor** [66] - 4516:7; 4519:1; 4520:10; 4521:6, 22; 4522:11, 25; 4524:16, 23, 25; 4525:8; 4526:20, 24; 4527:9; 4528:9; 4529:11, 18; 4534:1; 4535:13; 4539:17; 4540:18; 4558:7; 4559:18; 4562:21; 4563:7, 10; 4566:3, 25; 4567:23; 4568:3, 7, 12; 4575:19, 24; 4578:9, 22; 4580:13, 17; 4581:7, 13, 19; 4582:21; 4585:25; 4586:8, 23; 4587:6, 19, 21-22; 4588:6; 4590:15; 4592:15; 4601:24; 4602:19; 4603:12; 4604:12; 4605:17; 4612:6, 17; 4616:8; 4618:15; 4627:18; 4645:23; 4646:10
**profitable** [5] - 4512:20; 4515:20; 4517:21; 4520:22; 4521:10
**profits** [3] - 4512:16; 4535:3
**promiscuous** [1] - 4571:10
**promised** [1] - 4593:17
**proper** [1] - 4515:6
**proportion** [1] - 4564:5
**proportional** [2] - 4564:2; 4565:13
**proposed** [2] - 4541:23; 4620:8
**proposition** [1] - 4627:7
**protected** [2] - 4515:9; 4574:19
**protects** [1] - 4515:14
**provide** [6] - 4530:14; 4545:19;

4559:1; 4588:5; 4589:9; 4632:10
**provided** [11] - 4525:19; 4526:18; 4544:1; 4570:23; 4578:17, 21; 4609:11, 23; 4610:1, 14; 4641:20
**providers** [3] - 4632:10, 12; 4646:10
**provides** [2] - 4601:18; 4602:13
**provisions** [1] - 4544:23
**public** [4] - 4526:9; 4532:10; 4555:24
**published** [1] - 4581:12
**pull** [6] - 4594:23; 4595:7, 21; 4596:5; 4620:23; 4621:9
**pulled** [1] - 4624:10
**pulling** [1] - 4594:24
**purchase** [4] - 4514:19; 4517:24; 4521:2; 4523:20
**purchaser** [1] - 4532:25
**purchases** [6] - 4552:18, 23; 4553:22; 4563:2; 4629:13; 4642:6
**purchasing** [7] - 4517:25; 4519:23; 4544:15; 4552:5, 14; 4553:5, 19
**purple** [4] - 4523:9, 16-17; 4524:3
**purpose** [3] - 4580:15; 4616:22; 4644:4
**purposes** [7] - 4520:12; 4552:3; 4569:7; 4579:21; 4581:14; 4592:22; 4650:14
**put** [26] - 4522:24; 4523:3, 22; 4543:1; 4545:15; 4548:2, 9; 4549:9; 4555:17; 4556:24; 4559:22; 4567:18; 4573:17; 4579:8; 4600:8; 4605:23; 4617:13; 4618:3, 15; 4636:8, 17; 4637:5; 4638:4; 4641:7, 10; 4646:3
**puts** [2] - 4522:12; 4524:18
**putting** [5] - 4541:7, 9; 4546:8; 4566:3; 4573:17
**PX02049** [1] - 4608:21
**PX02053** [2] - 4620:3, 7
**PX02056** [3] - 4630:8; 4644:8; 4648:20
**PX02069** [1] - 4638:9
**PX02070** [1] - 4640:5
**PX02071** [3] - 4624:5, 12, 18

# Q

**quadruple** [1] - 4568:18
**qualified** [1] - 4597:5
**quality** [10] - 4519:13; 4520:1; 4534:19; 4541:8; 4542:10; 4562:22; 4563:6; 4649:14, 19
**Quant** [1] - 4634:23
**Quantity** [2] - 4630:19; 4631:25
**quantity** [5] - 4513:2; 4521:3; 4540:3; 4632:3; 4635:2
**quarter** [1] - 4581:24
**quarters** [1] - 4582:2
**questions** [4] - 4537:24; 4539:9; 4580:12; 4611:19
**quickly** [7] - 4558:23; 4564:22; 4565:15; 4586:7, 9, 12; 4592:3

**quiet** [1] - 4562:11
**quite** [3] - 4518:4; 4628:13; 4629:11
**quizzed** [1] - 4580:19
**Quote** [1] - 4565:18
**quote** [2] - 4541:22; 4569:12
**quotes** [1] - 4565:20

# R

**Rachel** [1] - 4507:6
**rachel.zwolinski@usdoj.gov** [1] - 4507:9
**Rafkin** [1] - 4508:19
**raise** [21] - 4512:21, 24; 4513:9, 15; 4514:2, 11; 4515:4, 8, 10, 20; 4516:16; 4517:21; 4520:22; 4561:17, 24; 4569:5; 4570:3; 4575:4; 4586:17, 19; 4643:9
**raised** [3] - 4564:4; 4627:8; 4634:20
**raising** [1] - 4512:16
**Range** [1] - 4636:3
**range** [33] - 4514:19; 4515:1; 4516:21; 4518:4-7, 10; 4519:24; 4520:2; 4531:13-15; 4607:25; 4608:5; 4624:22; 4625:18; 4629:4; 4634:21; 4644:10, 20; 4645:5, 13; 4648:7, 20; 4649:7, 21, 23, 25
**Ranges** [1] - 4633:18
**ranges** [53] - 4513:21, 25; 4517:6, 10, 13-14, 18; 4518:9, 13-14, 16-17, 19; 4519:8; 4520:23; 4526:22; 4527:6, 13; 4529:24; 4545:23; 4554:15; 4559:13; 4563:3; 4578:3; 4579:8; 4607:15; 4608:2, 6, 9, 13, 22-24; 4611:9, 24; 4612:20; 4613:7; 4618:19; 4625:21; 4629:14; 4635:8, 17; 4636:23; 4637:18; 4645:8, 10; 4646:9; 4647:6, 9, 11; 4649:16
**rank** [2] - 4550:13; 4642:13
**ranking** [3] - 4572:17; 4573:18; 4623:24
**rate** [11] - 4562:13, 17; 4564:13; 4565:17; 4566:10, 13-14, 17-18, 21; 4602:22
**rates** [4] - 4534:19; 4561:21; 4566:11
**rather** [3] - 4515:14; 4554:19; 4596:22
**ratio** [1] - 4565:14
**rational** [2] - 4515:4; 4568:22
**rationale** [1] - 4542:22
**ratios** [1] - 4571:22
**RDC** [2] - 4540:11, 19
**RDR** [3] - 4509:12; 4651:9, 12
**RDR-CRR** [1] - 4651:9
**re** [2] - 4575:6; 4595:2
**reach** [7] - 4537:6; 4550:18; 4553:11; 4555:4; 4573:22; 4592:16
**reached** [4] - 4546:13; 4547:2; 4554:4; 4556:9
**reactions** [1] - 4561:7
**read** [19] - 4516:25; 4520:19; 4528:9;

4543:25; 4570:21; 4571:3; 4586:10; 4595:18; 4596:3, 9-10; 4597:9; 4602:18; 4622:16; 4636:25; 4640:16; 4642:12
**reading** [3] - 4524:5; 4609:1; 4611:25
**reads** [1] - 4547:11
**real** [7] - 4560:16, 19; 4582:6; 4596:1; 4647:19
**reality** [1] - 4519:6
**really** [8] - 4515:1; 4535:4; 4558:21; 4559:22; 4582:5; 4593:3; 4638:12; 4645:23
**reams** [1] - 4610:1
**reason** [4] - 4519:9; 4560:24; 4627:20; 4646:18
**reasonably** [1] - 4547:12
**reasons** [10] - 4555:18; 4573:22; 4597:10; 4603:14; 4606:4; 4612:11; 4616:16; 4617:5; 4627:17
**REAVIS** [1] - 4508:6
**rebuttal** [4] - 4547:6; 4610:16, 21; 4630:5
**recapture** [2] - 4520:11, 15; 4521:5
**receive** [5] - 4546:10; 4611:2; 4639:20; 4640:3; 4650:6
**recent** [3] - 4528:8; 4531:11; 4563:5
**recently** [1] - 4531:11
**recess** [2] - 4589:25; 4651:5
**Recession** [9] - 4580:11, 15, 18, 20; 4581:20; 4582:3, 16; 4586:22; 4590:9
**recession** [13] - 4573:20; 4574:20; 4582:1, 9, 11-12; 4583:2, 13; 4584:9, 12, 19, 23
**recognize** [2] - 4622:8, 19
**recommendations** [1] - 4545:11
**record** [19] - 4511:6; 4518:2; 4521:13; 4536:14, 18; 4537:2; 4539:24; 4545:2; 4546:22; 4548:9, 23, 25; 4571:4, 9; 4595:16; 4616:10; 4642:13; 4651:9
**record's** [2] - 4567:16; 4638:3
**red** [7] - 4522:23; 4524:5, 11; 4532:9; 4567:12; 4578:12
**redacted** [5] - 4532:6; 4536:12; 4540:4; 4552:17; 4553:9
**redacting** [1] - 4623:12
**redirect** [1] - 4611:15
**reduce** [2] - 4541:25; 4543:15
**reductions** [4] - 4543:6, 11-12; 4551:7
**refer** [7] - 4521:13; 4529:18; 4532:6; 4540:4; 4552:17; 4553:10; 4630:24
**referred** [1] - 4538:12
**referring** [5] - 4521:14; 4530:11; 4542:13; 4567:10
**refers** [2] - 4610:13, 21
**reflect** [5] - 4558:10; 4565:19; 4567:12; 4646:1; 4649:3
**reflected** [3] - 4524:3; 4526:9; 4532:23
**reflecting** [2] - 4523:9; 4524:21
**reflective** [1] - 4580:6
**reflects** [2] - 4540:3; 4637:6

**refrigerators** [4] - 4545:24; 4582:17, 23; 4591:10
**regard** [3] - 4552:22; 4594:21; 4602:24
**regarding** [5] - 4529:8; 4550:19; 4553:5; 4555:4; 4556:9; 4558:7; 4569:6, 13; 4570:22; 4580:14; 4586:1; 4589:9; 4592:11; 4595:14; 4597:21
**regards** [1] - 4556:14
**regional** [1] - 4540:6
**regression** [15] - 4530:10; 4571:15; 4577:16; 4578:17; 4581:1, 3-4, 13, 17; 4583:11; 4584:6; 4585:1; 4586:4, 25; 4588:12
**regressions** [2] - 4581:2; 4608:16
**regularly** [1] - 4604:7
**relate** [1] - 4513:9
**related** [2] - 4594:19; 4639:14
**relating** [6] - 4523:2; 4536:12; 4597:19; 4620:8; 4621:14; 4639:23
**relationship** [15] - 4579:9, 13; 4580:2, 7; 4581:6; 4589:3; 4591:8; 4592:7; 4616:14; 4617:25; 4618:5, 8, 11-12, 24
**relative** [7] - 4578:7; 4583:5; 4591:9, 12, 17; 4626:11
**relatively** [7] - 4537:9; 4538:20; 4562:9; 4576:15; 4591:3; 4608:8; 4632:11
**relevant** [15] - 4513:20; 4517:14, 22; 4525:16; 4529:8, 10; 4535:24; 4542:4; 4543:9, 14; 4599:25; 4626:16; 4643:12; 4646:17; 4648:13
**reliable** [3] - 4569:9, 11; 4587:18
**reliably** [1] - 4616:24
**relied** [5] - 4546:25; 4547:1; 4549:17; 4572:21; 4599:13
**relies** [1] - 4547:12
**rely** [4] - 4547:1; 4569:6; 4581:13; 4597:18
**relying** [3] - 4547:9; 4549:3; 4616:11
**remain** [2] - 4584:5; 4623:5
**remainder** [1] - 4592:18
**remaining** [1] - 4569:4
**remember** [6] - 4527:7; 4537:9; 4583:16; 4589:11; 4629:17; 4641:24
**remembered** [1] - 4626:14
**remiss** [1] - 4615:20
**removing** [1] - 4584:19
**render** [1] - 4547:9
**Render** [1] - 4507:14
**reorient** [1] - 4521:20
**repeat** [2] - 4581:23; 4605:2
**replaced** [1] - 4546:2
**report** [32] - 4524:15; 4525:3, 7, 22; 4528:9; 4529:18; 4534:12; 4536:8; 4550:22; 4568:9, 11; 4570:11, 14; 4577:20; 4579:20; 4586:23; 4588:21; 4602:18; 4609:22, 24; 4610:9, 16, 21; 4611:8; 4616:12; 4624:1, 15-16, 21; 4630:5, 18; 4647:8
**reported** [7] - 4509:17; 4523:11;

4524:22, 24; 4525:5; 4646:2
**Reporter** [3] - 4509:12; 4651:13
**reporting** [8] - 4532:1; 4540:16, 18; 4555:11; 4557:11; 4569:19; 4577:23
**reports** [9] - 4598:9; 4603:17; 4617:3; 4636:3; 4644:5, 20; 4645:4, 13
**reposition** [1] - 4537:19
**repositioning** [3] - 4561:5; 4575:6; 4606:16
**represent** [6] - 4522:10; 4571:1; 4610:7; 4624:10; 4630:17, 22
**representation** [3] - 4532:2; 4533:13; 4618:10
**representative** [2] - 4528:11, 21
**represented** [3] - 4588:15; 4632:14; 4646:2
**represents** [1] - 4637:18
**reputable** [1] - 4647:23
**request** [6] - 4619:15; 4639:6; 4641:24; 4642:17, 20
**Request** [1] - 4642:2
**requested** [1] - 4641:12
**require** [1] - 4623:3
**required** [2] - 4540:23
**requirements** [2] - 4537:15; 4540:8
**reran** [2] - 4534:10
**rescheduled** [1] - 4593:1
**research** [1] - 4563:5
**Research's** [1] - 4581:25
**resolving** [1] - 4513:8
**respect** [2] - 4526:3; 4590:7
**respond** [2] - 4608:17; 4611:14
**responds** [1] - 4636:8
**response** [5] - 4586:9; 4587:3; 4612:5; 4642:10; 4643:9
**responses** [3] - 4643:13, 16; 4644:2
**responsive** [1] - 4611:18
**rest** [6] - 4528:11; 4532:9; 4533:9; 4558:11; 4592:14, 21
**rests** [1] - 4595:25
**result** [18] - 4534:11, 13, 17; 4535:21, 23; 4554:19; 4556:10; 4568:4; 4569:8; 4574:1, 25; 4578:14; 4579:19; 4584:7; 4587:19; 4591:2; 4614:10
**Results** [1] - 4607:7
**results** [25] - 4534:23; 4536:8; 4576:21; 4577:8, 12, 17, 21; 4578:17; 4582:13; 4583:14, 25; 4584:5; 4587:14; 4588:15, 19, 24; 4591:23; 4597:15; 4599:9; 4607:25; 4608:2, 6-7; 4616:13
**retail** [31] - 4520:11; 4521:4, 7; 4522:17, 20-21, 24; 4523:4, 14, 22; 4524:16, 18; 4525:1, 22, 25; 4526:14, 17; 4529:6, 16; 4530:6, 17; 4531:7, 14, 18; 4536:5; 4537:7; 4539:18; 4597:19; 4631:17; 4639:23
**Retail** [1] - 4531:1
**retailer** [8] - 4528:21; 4628:11, 14; 4629:10-12; 4647:2
**retailers** [2] - 4626:21; 4646:15

**retrospective** [5] - 4574:2; 4612:5, 16; 4616:7, 9
**return** [4] - 4520:4; 4530:25; 4571:12
**returning** [1] - 4622:6
**returns** [1] - 4534:21
**Rev** [1] - 4632:24
**revenue** [17] - 4588:18; 4605:5; 4633:3, 11, 14; 4634:4; 4647:8; 4648:1, 16, 24; 4649:2, 4-7, 16, 18
**revenues** [4] - 4628:6; 4637:10; 4646:15, 17
**reviewed** [7] - 4545:4; 4549:21, 24; 4565:11; 4575:19; 4581:12; 4620:1
**Richard** [15] - 4522:14, 16, 20-21, 23; 4523:3, 6; 4526:7, 13; 4527:1, 14, 17, 25; 4528:19; 4628:21
**Richard's** [5] - 4526:3; 4527:20; 4528:10, 16; 4529:1
**Richards** [1] - 4526:15
**richness** [3] - 4560:17, 19; 4569:12
**rid** [1] - 4588:11
**rigged** [2] - 4596:12; 4643:20
**right-hand** [4] - 4595:4; 4596:16; 4634:15
**rights** [1] - 4572:11
**rigor** [1] - 4596:24
**rigorous** [1] - 4595:16
**risk** [1] - 4515:13
**rivals** [1] - 4561:1
**robust** [3] - 4606:15; 4616:5; 4617:7
**Role** [1] - 4620:17
**rolled** [2] - 4532:13, 17
**Roman** [5] - 4620:22, 24; 4621:1, 22; 4622:6
**Room** [3] - 4506:15, 19; 4509:14
**Rose** [1] - 4511:12
**roughly** [10] - 4551:5; 4553:19; 4568:20; 4588:15; 4625:20, 23; 4626:1, 14; 4637:11; 4647:9
**route** [2] - 4554:10, 15
**routes** [2] - 4546:9; 4554:22
**Row** [17] - 4631:3, 8, 24; 4632:23; 4633:8; 4634:7, 12, 23; 4635:6; 4636:3; 4637:17; 4644:9, 18; 4645:2, 4, 11; 4648:20
**row** [18] - 4614:1; 4631:13, 19; 4633:8; 4635:8; 4637:17; 4644:20; 4648:15
**rows** [2] - 4608:22; 4630:24
**rule** [2] - 4547:8, 11
**Rule** [3] - 4547:11; 4589:19; 4594:15
**Rules** [1] - 4597:2
**run** [2] - 4516:2; 4608:16
**running** [1] - 4586:25

## S

**safe** [1] - 4551:21
**sale** [6] - 4512:14; 4518:25; 4531:17; 4588:11; 4631:11; 4641:11

**sales** [73] - 4515:2; 4522:2, 16-17, 20-21, 23-25; 4523:2, 6, 14, 17, 21, 24; 4524:1, 7, 15, 23-25; 4525:1, 4-6, 18; 4526:10; 4527:1, 17, 21; 4528:1, 25; 4529:16; 4530:6; 4532:24; 4538:21; 4540:10; 4545:7; 4549:16; 4588:7, 10, 16; 4602:15; 4603:19; 4623:23; 4624:15; 4626:5, 9, 12, 16; 4627:3; 4628:12; 4631:15; 4632:14; 4633:20; 4639:15; 4641:25; 4642:2; 4644:10, 20; 4645:5, 13; 4646:23; 4648:21; 4650:4
**sample** [1] - 4572:8
**samples** [3] - 4546:15; 4627:9, 16
**sampling** [2] - 4627:8, 14
**Samsung** [41] - 4509:7; 4517:19; 4519:11-13; 4522:2, 22; 4523:2; 4524:16; 4536:12, 25; 4537:22; 4538:13, 19; 4567:25; 4568:1, 6, 13, 19; 4569:1; 4586:1, 11, 15-16, 18, 22; 4603:3; 4608:4, 9; 4613:17; 4623:24; 4624:22; 4625:7; 4626:18, 22; 4627:6; 4629:12
**Samsung's** [3] - 4605:5; 4626:20; 4627:2
**sat** [1] - 4600:17
**save** [2] - 4556:18, 20
**savings** [24] - 4541:6; 4542:10, 23; 4544:9; 4545:9, 13; 4546:1, 6; 4550:1; 4551:24; 4552:4, 6; 4553:5, 17, 21; 4554:15; 4555:1, 13; 4556:10, 13, 21; 4558:3
**saw** [4] - 4517:7; 4528:9; 4537:4; 4558:5; 4580:17; 4646:18
**sayings** [1] - 4557:13
**Scale** [1] - 4621:5
**scale** [1] - 4621:16
**Scanlon** [1] - 4507:2
**Scope** [1] - 4621:5
**scope** [1] - 4621:15
**scoring** [1] - 4560:15
**Scott** [4] - 4509:12; 4651:9, 11
**scottlyn01@aol.com** [1] - 4509:16
**screen** [9] - 4560:3, 23; 4562:3; 4563:23; 4565:10; 4569:10; 4602:14; 4624:8, 20
**screening** [1] - 4559:17
**Sears** [5] - 4525:17, 19; 4599:14
**second** [15] - 4534:25; 4535:1; 4538:19; 4541:11; 4561:8; 4585:2; 4586:22; 4606:10; 4609:14; 4624:18; 4633:16; 4640:14, 16, 22
**Section** [1] - 4606:20
**section** [4] - 4536:12; 4540:2; 4621:1, 4
**see** [85] - 4514:7, 12; 4515:18; 4516:8, 20; 4517:15; 4523:7; 4525:16; 4529:25; 4531:6; 4533:22; 4535:21, 23; 4540:9; 4546:9; 4553:1, 14; 4559:13; 4562:2; 4570:7; 4571:5, 16; 4575:16; 4579:19; 4587:6; 4592:13; 4596:13; 4607:8, 12;

4608:1; 4609:4; 4615:5; 4619:12;
4620:10, 19; 4621:2, 6-7; 4622:3, 11,
23-24; 4623:6; 4624:23; 4628:24;
4630:6; 4631:4, 9, 14, 20; 4632:1, 25;
4633:23; 4634:25; 4635:15; 4636:5, 24;
4638:14, 18, 21, 24; 4639:1, 5, 7-8, 18;
4640:1, 6, 8, 11, 13, 25; 4641:8, 14;
4642:8, 25; 4643:1; 4644:21; 4645:5,
22; 4646:25; 4648:7; 4649:15
  **seeing** [2] - 4528:12, 16
  **seek** [2] - 4583:7, 16
  **seem** [1] - 4568:22
  **sees** [2] - 4578:5; 4588:16
  **segment** [1] - 4532:12
  **segregate** [1] - 4545:12
  **self** [1] - 4604:22
  **sell** [6] - 4526:14; 4532:15; 4561:18;
4625:8, 10; 4641:10
  **sellers** [1] - 4646:4
  **selling** [8] - 4513:17, 21; 4515:3;
4532:14; 4613:21; 4634:21; 4648:7
  **sells** [2] - 4526:15, 17
  **send** [2] - 4554:22
  **sending** [1] - 4554:12
  **sense** [5] - 4512:18; 4516:3; 4559:1;
4568:21; 4584:15
  **sensitive** [1] - 4544:20
  **sent** [4] - 4611:7; 4619:14; 4640:9
  **sentence** [3] - 4596:8; 4622:25;
4641:7
  **separate** [1] - 4544:17
  **September** [2] - 4582:7; 4623:19
  **serve** [5] - 4537:14, 17; 4540:22, 25
  **serving** [1] - 4533:1
  **session** [3] - 4539:12; 4552:12;
4592:11
  **SESSION** [2] - 4506:9; 4511:1
  **set** [7] - 4520:2; 4542:6; 4543:24;
4551:14; 4599:21; 4612:14; 4649:14
  **sets** [5] - 4519:19; 4569:23; 4570:16;
4574:1; 4600:2
  **settles** [1] - 4572:14
  **seven** [3] - 4528:3; 4562:9; 4600:17
  **seventh** [1] - 4628:11
  **several** [5] - 4541:1; 4607:18; 4617:5;
4646:9; 4647:9
  **Shapiro** [5] - 4559:19, 22; 4560:11, 13;
4564:20
  **share** [60] - 4517:19; 4526:10; 4527:1,
11; 4528:5; 4544:14, 19-20; 4551:20;
4564:2, 6; 4565:1, 13; 4567:25; 4568:1,
6, 13, 20; 4569:1; 4576:15; 4608:4, 10;
4622:21; 4626:21, 23; 4627:4, 23;
4628:2, 4, 7; 4629:12; 4630:5, 12;
4633:2, 11-12, 14; 4634:4, 9, 24;
4635:17; 4636:19; 4639:24; 4642:20;
4644:14, 23; 4645:7, 15; 4646:11;
4647:15; 4648:21; 4649:5
  **Share** [1] - 4632:24
  **shares** [33] - 4522:12; 4525:9;

4526:10, 25; 4527:25; 4529:2; 4559:2;
4564:10, 21; 4571:7, 14, 21; 4572:25;
4574:25; 4589:4; 4605:19; 4622:19;
4635:2; 4637:18; 4645:8, 22; 4647:8;
4648:16, 24; 4649:1, 4, 7, 17
  **Shares** [2] - 4633:18; 4635:14
  **Shares/Share** [1] - 4630:19
  **sharing** [1] - 4525:14
  **Shencopp** [1] - 4511:25
  **shift** [1] - 4556:18
  **shifts** [1] - 4583:4
  **Shimerenski** [1] - 4593:24
  **shipments** [6] - 4540:10, 13; 4554:8,
11, 24
  **short** [1] - 4636:7
  **short-circuit** [1] - 4636:7
  **shortcoming** [1] - 4577:4
  **shortcomings** [2] - 4558:7, 12
  **shortened** [1] - 4584:18
  **shorter** [2] - 4583:11; 4584:2
  **shorthand** [1] - 4509:17
  **Show** [1] - 4531:2
  **show** [7] - 4526:21; 4562:6; 4568:20;
4579:21; 4587:8; 4616:8; 4639:13
  **showed** [7] - 4525:19; 4534:11;
4537:4; 4607:15; 4611:8, 21; 4615:17
  **showing** [6] - 4517:19; 4614:17;
4617:12, 18; 4629:6; 4643:2
  **shows** [18] - 4526:12; 4528:23;
4530:15; 4533:11; 4540:5; 4557:20;
4568:17, 19, 23-24; 4574:22; 4577:25;
4580:3; 4588:16; 4616:21; 4621:18;
4628:2; 4644:10
  **Shumaker** [1] - 4507:22
  **sic** [1] - 4556:17
  **side** [1] - 4634:15
  **sidebar** [5] - 4538:5; 4539:13;
4546:22; 4556:3; 4557:6
  **Sidebar** [1] - 4549:15
  **sign** [1] - 4633:7
  **signed** [1] - 4640:25
  **significance** [11] - 4558:16; 4605:7;
4613:12, 23; 4622:21; 4623:1; 4649:3,
13, 20; 4650:5
  **significant** [37] - 4526:22; 4528:25;
4529:3; 4530:21, 23; 4533:17; 4534:11,
13, 15; 4537:18; 4538:25; 4546:8;
4549:24; 4567:5; 4574:10; 4576:7;
4577:13, 17; 4584:6; 4585:15; 4588:12;
4589:2; 4590:21; 4602:22; 4613:1, 14;
4614:3, 12, 14-15, 21; 4615:12, 14;
4628:13; 4629:11; 4649:22
  **significantly** [3] - 4516:13, 24; 4530:7
  **Similar** [1] - 4531:2
  **similar** [18] - 4519:6; 4524:14;
4528:23; 4529:15, 25; 4530:5; 4531:8,
11; 4535:17; 4537:7; 4540:13; 4552:19;
4577:8; 4592:16; 4600:3; 4604:16
  **similarly** [1] - 4583:4
  **simple** [6] - 4530:14; 4532:2; 4560:15;

4612:13; 4617:14; 4632:11
  **simplest** [2] - 4576:4; 4580:9
  **simplify** [1] - 4577:24
  **simplistic** [3] - 4533:13; 4567:19;
4649:9
  **simply** [3] - 4544:3; 4547:14; 4641:12
  **Sims** [1] - 4511:25
  **simulation** [6] - 4565:3, 9; 4605:14,
16, 21; 4606:15
  **single** [6] - 4550:1; 4584:2; 4587:13;
4619:1; 4628:21; 4648:12
  **sit** [5] - 4597:25; 4598:8; 4600:4;
4648:3, 12
  **sitting** [5] - 4518:10, 12; 4608:19;
4614:25; 4630:15; 4632:22
  **situation** [3] - 4562:11; 4566:20;
4567:22
  **situations** [2] - 4562:6; 4604:21
  **six** [3] - 4528:3; 4556:13; 4562:9
  **sixth** [1] - 4628:11
  **size** [1] - 4642:23
  **skip** [2] - 4531:22; 4552:10
  **SKUs** [16] - 4531:10; 4587:25; 4588:7,
9, 11, 15, 17, 19; 4609:5; 4612:21;
4613:13; 4614:2; 4615:9, 15
  **sky** [1] - 4543:3
  **slide** [54] - 4520:4, 7; 4521:18, 20;
4522:4; 4523:10; 4525:7; 4526:4;
4529:17; 4530:8; 4531:1, 22; 4533:10;
4536:9, 15-16, 20; 4539:17, 22; 4541:3,
20; 4543:22; 4551:1; 4555:7; 4557:12;
4558:6, 23; 4560:12, 25; 4566:8;
4568:9; 4571:24; 4573:25; 4574:1;
4575:13, 16; 4577:20; 4578:19; 4579:2;
4580:7, 15; 4581:19; 4586:7; 4617:17;
4619:7; 4620:4; 4621:12; 4623:17;
4624:13, 17, 19; 4627:17; 4648:16
  **Slide** [12] - 4520:6; 4531:23; 4550:25;
4552:13; 4590:7; 4627:17; 4628:18;
4629:19; 4633:17; 4643:6; 4648:19;
4650:8
  **Slides** [1] - 4607:1
  **slides** [11] - 4525:13, 16; 4558:5;
4589:20; 4592:13, 16, 18; 4607:18;
4617:15; 4623:8
  **slightly** [1] - 4552:24
  **slower** [1] - 4650:17
  **small** [13] - 4537:9; 4588:7, 10-11, 17;
4608:8; 4637:24; 4643:21; 4646:5, 13;
4647:19; 4648:4
  **smaller** [4] - 4576:12, 16; 4582:25;
4591:3
  **smallest** [2] - 4607:25; 4616:20
  **Smart** [1] - 4565:18
  **Smith** [6] - 4514:15; 4515:1, 3, 9, 15;
4516:16
  **Smiths** [3] - 4515:19; 4516:19
  **snapshot** [1] - 4572:16
  **so-called** [1] - 4525:9
  **softer** [1] - 4602:24

**sold** [22] - 4513:2; 4525:23; 4527:14; 4531:7, 9, 16; 4624:22; 4625:1, 21; 4626:6, 8; 4632:3; 4634:20; 4636:23; 4637:7, 9; 4638:4; 4639:15, 17, 25; 4646:15; 4647:5
**solely** [3] - 4571:14; 4616:8; 4643:23
**solve** [2] - 4609:15, 18
**sometimes** [4] - 4531:17; 4541:8; 4571:5
**sophisticated** [4] - 4565:9; 4604:10, 14
**sorry** [12] - 4515:10; 4522:9; 4540:16; 4541:18; 4556:19; 4605:2; 4609:13, 17; 4617:16; 4619:21; 4628:16; 4640:23
**sort** [2] - 4567:18; 4584:1
**sought** [1] - 4603:2
**sound** [1] - 4626:3
**sounds** [2] - 4636:1; 4641:4
**source** [5] - 4610:15; 4624:17; 4630:4; 4646:21; 4647:23
**Source** [1] - 4630:4
**sources** [2] - 4565:17; 4610:13
**Southern** [1] - 4594:25
**specific** [23] - 4542:2, 12; 4543:8; 4545:14; 4551:6, 8-9, 22, 24; 4552:17; 4553:3; 4555:18; 4556:23, 25; 4557:15, 17, 21-22, 24; 4558:2, 4; 4566:21; 4589:10
**specifically** [1] - 4606:7
**specifications** [1] - 4608:1
**specificity** [1] - 4556:15
**speculation** [1] - 4596:23
**speech** [2] - 4570:21; 4571:2
**spend** [1] - 4553:20
**spending** [1] - 4647:17
**spill** [1] - 4520:24
**split** [1] - 4525:22
**spot** [1] - 4623:24
**spreadsheet** [6] - 4568:13; 4602:25; 4603:2; 4614:18, 25; 4615:5
**spreadsheets** [2] - 4614:24; 4630:21
**squeezes** [1] - 4566:19
**stable** [1] - 4616:13
**standard** [7] - 4551:14; 4576:2; 4583:15, 24; 4588:12; 4594:15; 4604:7
**Star** [4] - 4595:6; 4596:10, 17
**start** [12] - 4527:9; 4546:8; 4557:13; 4569:10; 4576:20; 4582:11; 4590:1, 6; 4594:4; 4625:15; 4627:21; 4650:20
**started** [7] - 4532:14, 16; 4533:1; 4545:6; 4559:18; 4575:18; 4582:6
**starting** [4] - 4522:7; 4560:4; 4564:21; 4575:24
**starts** [9] - 4531:14; 4534:6, 8, 18; 4583:19; 4584:4; 4591:22
**state** [14] - 4536:11; 4545:2; 4581:2, 9; 4584:14; 4585:8, 10, 12; 4591:7, 12; 4612:10; 4617:8; 4643:20; 4649:12
**statement** [2] - 4567:7; 4617:10
**statements** [1] - 4570:6

**States** [12] - 4511:4, 9; 4513:21; 4571:12; 4594:15; 4613:22; 4619:15, 18; 4625:22; 4629:4; 4636:23; 4647:5
**STATES** [3] - 4506:1, 3, 11
**states** [1] - 4547:8
**static** [16] - 4516:3, 5; 4560:25; 4564:17; 4565:24; 4566:2, 5; 4574:24; 4600:23; 4601:17; 4603:8; 4604:10, 12; 4605:18; 4606:1, 4
**stationery** [1] - 4640:6
**stations** [1] - 4561:15
**statistical** [8] - 4530:24; 4532:3; 4534:20; 4535:5; 4608:15; 4613:12, 23; 4614:22
**statistically** [10] - 4530:21; 4612:25; 4613:13; 4614:3, 12, 15, 20; 4615:12, 14
**statistics** [4] - 4533:24; 4613:14; 4617:4; 4642:23
**stay** [3] - 4593:18; 4601:17; 4621:23
**Steel** [1] - 4552:18
**steel** [6] - 4552:19; 4553:7; 4559:8; 4566:18
**step** [8] - 4532:17; 4538:3; 4559:24; 4560:2; 4590:3; 4603:9
**step-by-step** [1] - 4532:17
**steps** [1] - 4561:25
**Steve** [2] - 4520:7; 4526:5
**still** [2] - 4514:1; 4592:7
**stop** [4] - 4535:18; 4578:25; 4583:12; 4650:9
**stopped** [1] - 4583:11
**Storch** [16] - 4635:25; 4636:4, 8-9, 22; 4637:2, 18; 4638:6, 20; 4640:25; 4641:2, 6; 4642:2; 4646:19
**Storch's** [1] - 4642:10
**store** [8] - 4519:17; 4561:23; 4562:1, 24; 4625:8, 11; 4626:6
**stores** [14] - 4561:15, 20; 4563:20; 4625:1, 4, 11, 14, 19; 4626:10; 4628:18, 21
**Street** [11] - 4506:14, 19, 24; 4507:4, 8; 4508:3, 10, 14, 17, 20; 4509:8
**street** [1] - 4561:16
**strength** [2] - 4559:10; 4616:3
**strict** [1] - 4540:8
**strong** [1] - 4616:4
**structure** [1] - 4591:25
**studied** [1] - 4621:15
**study** [3] - 4597:15; 4611:22; 4612:19
**studying** [1] - 4581:5
**Sub** [7] - 4525:21, 23; 4644:9, 14; 4645:22
**sub** [1] - 4537:1
**Sub-Zero** [7] - 4525:21, 23; 4644:9, 14; 4645:22
**submission** [2] - 4620:9; 4621:13
**submissions** [1] - 4572:2
**submit** [1] - 4592:17
**subpoena** [3] - 4638:16; 4639:4;

4642:4
**Subpoena** [1] - 4639:5
**subpoenaed** [1] - 4638:6
**substitution** [2] - 4517:24; 4518:5
**successful** [2] - 4626:18, 20
**sudden** [1] - 4572:13
**sue** [1] - 4544:21
**suffered** [1] - 4582:4
**sufficient** [4] - 4565:22; 4588:3; 4597:8; 4639:13
**suggest** [5] - 4517:20; 4535:24; 4562:10; 4598:14; 4600:7
**suggested** [2] - 4534:22; 4587:24
**suggesting** [2] - 4517:21; 4535:8
**suggests** [1] - 4615:25
**Suite** [5] - 4507:8; 4508:10, 14, 17, 21
**suite** [1] - 4563:1
**SULLIVAN** [1] - 4506:10
**sum** [2] - 4572:14; 4596:21
**summarize** [1] - 4574:5
**summarized** [1] - 4581:18
**summary** [3] - 4530:14; 4557:13; 4589:18
**Summit** [15] - 4514:20; 4525:15; 4635:21, 24; 4636:10; 4637:1, 4, 9; 4638:3; 4640:7; 4641:6; 4643:21; 4644:8; 4645:22; 4646:1
**Summit's** [2] - 4629:25; 4646:19
**sums** [1] - 4527:13
**supplier** [4] - 4523:18; 4524:8; 4525:6; 4527:6; 4631:18
**suppliers** [18] - 4518:21; 4525:5, 25; 4527:13, 25; 4529:1, 3; 4536:4; 4537:6; 4564:5; 4566:19; 4599:20; 4632:12, 14, 16; 4646:24; 4647:1
**supply** [1] - 4537:8
**support** [5] - 4517:10; 4529:20; 4531:4; 4536:24; 4591:19
**supports** [2] - 4539:18; 4542:22
**supposed** [5] - 4560:22; 4562:17; 4571:5; 4626:24; 4628:16
**surprising** [1] - 4540:21
**survey** [3] - 4575:25; 4603:19; 4636:13
**surveying** [1] - 4627:14
**switch** [2] - 4564:5; 4599:19
**switching** [1] - 4562:14
**synergies** [2] - 4543:1; 4544:1
**system** [2] - 4540:11; 4564:24
**systematically** [2] - 4530:2; 4532:3
**systems** [1] - 4565:7

# T

**Tabas** [1] - 4509:2
**Table** [3] - 4624:14, 18
**table** [7] - 4511:11, 24; 4609:22; 4610:1; 4620:21; 4621:23; 4636:19
**Tables.xls** [1] - 4630:19

**tables.xlsx** [2] - 4630:5, 12
**talks** [1] - 4606:20
**tape** [4] - 4546:2; 4551:13, 15
**target** [1] - 4516:22
**teaches** [1] - 4543:11
**team** [3] - 4545:10; 4548:14; 4619:25
**teams** [1] - 4544:10
**tease** [1] - 4580:19
**technical** [1] - 4583:21
**technique** [2] - 4583:15, 25
**techniques** [1] - 4583:5
**ten** [1] - 4649:21
**tend** [1] - 4554:11
**tenth** [1] - 4642:22
**tenths** [5] - 4637:23, 25; 4644:16; 4645:9, 17
**terabytes** [1] - 4619:18
**term** [5] - 4519:2, 4; 4521:5; 4583:21; 4597:6
**terms** [14] - 4519:7; 4525:8; 4533:13; 4538:21; 4540:24; 4546:10, 13; 4553:5; 4555:11; 4559:10; 4573:15; 4592:20; 4608:7; 4649:15
**terrific** [1] - 4585:23
**test** [17] - 4516:9; 4517:12, 17; 4520:12; 4532:21; 4534:7; 4551:18; 4558:19; 4564:12; 4566:6; 4574:20; 4581:19; 4583:10; 4587:10; 4588:22; 4591:21; 4597:7
**tested** [6] - 4545:9; 4574:8; 4587:13, 22; 4588:20
**testified** [8] - 4520:10; 4521:23; 4547:21; 4549:25; 4550:12; 4558:13; 4563:25; 4575:18
**testify** [4] - 4544:6; 4548:4, 15; 4549:17
**testifying** [2] - 4547:16; 4605:24
**testimony** [30] - 4521:7, 14-15, 24; 4528:10; 4531:12; 4532:13; 4536:13, 18; 4537:2; 4538:14, 16, 20; 4540:21; 4543:25; 4545:21; 4558:7, 9; 4566:2, 15; 4567:23; 4568:5; 4586:10; 4589:11; 4598:23; 4600:18; 4607:4; 4648:24; 4651:1
**testing** [3] - 4528:15; 4551:19; 4590:14
**tests** [1] - 4534:20
**that'd** [3] - 4525:15; 4585:22; 4645:17
**that'll** [1] - 4630:25
**themselves** [2] - 4541:7; 4575:6
**then..** [1] - 4636:2
**theoretical** [5] - 4560:8; 4587:5, 7, 9; 4598:24
**theories** [6] - 4566:2; 4574:24; 4575:8; 4599:12; 4600:1
**theory** [5] - 4515:18; 4578:9; 4591:1; 4600:1; 4618:3
**Thereupon** [2] - 4538:5; 4556:3; 4590:4; 4651:5
**they've** [4] - 4531:11; 4544:12;

4545:13; 4631:16
**thinking** [3] - 4562:8; 4579:5; 4592:21
**thinks** [2] - 4535:5; 4561:14
**third** [10] - 4537:11; 4561:11-13; 4562:1; 4586:23; 4625:10; 4647:2
**Thomas** [1] - 4508:5
**thousand** [1] - 4625:24
**thousands** [1] - 4632:21
**threats** [1] - 4623:2
**three** [26] - 4514:23; 4527:10, 12; 4530:20; 4531:4; 4541:20; 4543:19; 4561:11; 4576:14, 25; 4582:2; 4597:25; 4598:4, 6, 8, 12, 14, 16; 4599:18; 4601:1; 4615:15; 4617:16; 4623:19; 4624:23; 4625:11, 13
**threw** [1] - 4587:25
**throughout** [1] - 4545:16
**throw** [1] - 4572:1
**tile** [1] - 4620:16
**timing** [1] - 4650:14
**tiny** [1] - 4628:10
**title** [2] - 4607:7; 4620:17
**titled** [5] - 4531:1; 4612:20; 4621:1; 4624:18; 4633:17
**today** [24] - 4511:11; 4513:17; 4518:21; 4537:6; 4594:11; 4597:14, 25; 4598:4, 8; 4599:10, 17, 24; 4600:4, 6, 22; 4601:13; 4603:7; 4607:5; 4608:19; 4613:18; 4614:25; 4621:17, 21; 4624:20
**today's** [1] - 4604:24
**together** [16] - 4525:13; 4533:23; 4541:7, 9; 4543:2; 4546:8; 4553:15; 4559:22; 4579:8; 4631:17; 4633:21; 4634:4; 4646:14; 4648:3
**Tom** [2] - 4511:21; 4570:21
**tomorrow** [1] - 4603:22
**tons** [1] - 4650:4
**took** [7] - 4523:3; 4532:17; 4545:5; 4568:12; 4587:13; 4630:17; 4632:8
**tool** [1] - 4580:24
**toolbox** [1] - 4566:5
**tools** [2] - 4580:21; 4584:13
**tooth** [1] - 4572:10
**top** [5] - 4514:22; 4596:6; 4621:10; 4624:19; 4630:14
**topic** [2] - 4552:15; 4581:23
**torn** [1] - 4551:14
**total** [13] - 4530:15; 4556:21; 4624:15; 4631:17; 4634:5; 4636:4, 22; 4644:10, 20; 4645:4, 13; 4646:5; 4648:20
**Total** [1] - 4634:8
**totaled** [1] - 4646:14
**tough** [1] - 4537:15
**towards** [1] - 4525:24
**track** [1] - 4642:20
**tracking** [1] - 4639:23
**trade** [2] - 4513:19; 4649:11
**Trade** [2] - 4604:15; 4605:22
**trade-off** [1] - 4513:19

**trade-offs** [1] - 4649:11
**trains** [1] - 4554:23
**transaction** [2] - 4512:12; 4641:12
**transactions** [10] - 4545:8; 4565:23; 4604:16; 4605:25; 4632:8, 10; 4634:14, 17-18; 4647:2
**transcript** [4] - 4509:17; 4538:7; 4556:5; 4651:9
**TRANSCRIPT** [1] - 4506:9
**transcription** [1] - 4509:17
**TraQline** [13] - 4570:17; 4587:17; 4632:9, 13-14, 16; 4634:11, 15-16; 4636:13, 15-16, 20; 4637:2; 4646:21, 23
**TraQline's** [1] - 4587:18
**treat** [2] - 4524:23; 4649:7
**treated** [4] - 4522:11; 4523:21; 4524:10, 25
**treatment** [2] - 4559:3; 4578:1
**treatments** [1] - 4524:14
**treats** [4] - 4522:19; 4524:17; 4594:1
**trends** [2] - 4603:25; 4605:4
**TRIAL** [1] - 4506:9
**trial** [5] - 4521:15, 24; 4538:14, 16; 4569:13
**Trial** [5] - 4506:13, 17, 22; 4507:2, 6
**trick** [1] - 4633:23
**tried** [3] - 4534:22; 4561:17, 24
**triple** [1] - 4568:18
**tripled** [1] - 4568:1
**trouble** [2] - 4609:1; 4614:10
**truck** [4] - 4554:12-14, 19
**truckloads** [2] - 4554:18; 4555:6
**trucks** [4] - 4554:6, 8, 13, 23
**true** [14] - 4548:7, 20; 4549:4, 7, 12, 18-19; 4550:7; 4607:14; 4608:12; 4618:25; 4643:15; 4644:2; 4647:14
**truth** [1] - 4550:8
**truthfulness** [1] - 4547:18
**try** [7] - 4530:3; 4554:24; 4565:12; 4573:22; 4575:4; 4611:18; 4643:20
**trying** [12] - 4522:10; 4544:24; 4563:1; 4566:20; 4577:24; 4593:2, 10; 4603:23; 4604:2; 4633:23; 4650:10, 15
**turn** [36] - 4521:4; 4526:4; 4527:23; 4529:17; 4539:21; 4541:1; 4543:22; 4553:8; 4554:1; 4555:7; 4557:11; 4558:8; 4563:22; 4567:10; 4569:14, 17; 4571:2, 24; 4573:25; 4575:13; 4586:7; 4595:3, 20; 4608:21; 4617:15; 4620:3, 21; 4622:5, 13; 4628:23; 4629:19; 4630:8; 4635:6; 4640:5; 4641:23; 4642:10
**turning** [5] - 4513:24; 4555:23; 4564:19; 4587:4; 4624:5
**twice** [2] - 4554:7
**two** [57] - 4526:13, 18-19; 4527:14; 4532:23; 4534:3; 4535:11; 4537:1; 4541:9; 4545:1; 4551:19; 4554:12, 20, 23-24; 4558:5, 9; 4561:16, 20; 4562:19;

4564:10; 4565:17; 4566:2; 4569:23;
4574:24; 4575:1, 8-10; 4585:10;
4586:21; 4593:13; 4598:12; 4599:11;
4600:1, 23, 25; 4602:25; 4603:1;
4606:23; 4614:19; 4625:10, 12-13, 16,
19; 4626:6; 4628:18, 20; 4634:4;
4637:23, 25; 4638:1; 4645:9; 4648:2
**two-one** [2] - 4638:1
**two-tenths** [3] - 4637:23, 25; 4645:9
**type** [8] - 4535:11, 15, 20; 4559:6, 8;
4562:21; 4564:17
**types** [4] - 4514:6; 4559:13; 4581:4;
4618:15; 4649:19
**typically** [1] - 4581:4

## U

**U.S** [14] - 4506:14, 18, 23; 4507:3, 7;
4509:13; 4552:18; 4571:13; 4620:9, 17;
4622:2, 18; 4639:15, 25
**ultimately** [1] - 4538:23
**unbelievable** [1] - 4564:16
**unchanged** [4] - 4533:12; 4561:1;
4583:25; 4584:5
**under** [10] - 4530:19; 4572:4, 6, 18;
4581:1; 4589:18; 4591:1; 4594:15;
4599:20; 4609:4
**underlying** [3] - 4545:6; 4547:13;
4548:3
**underneath** [2] - 4614:18; 4630:14
**understate** [1] - 4622:20
**understood** [7] - 4521:23; 4543:12;
4559:15; 4560:8, 21; 4562:5
**undertook** [3] - 4553:11; 4554:3;
4569:15
**unfortunately** [2] - 4555:24; 4650:17
**unilateral** [1] - 4560:15
**unilaterally** [1] - 4569:5
**unit** [15] - 4513:11, 13; 4625:8, 10;
4635:17; 4637:18; 4641:11; 4644:13,
15, 23; 4645:7, 10; 4648:23; 4649:1
**Unit** [1] - 4635:13
**United** [12] - 4511:4, 9; 4513:21;
4571:12; 4594:14; 4613:22; 4619:15,
18; 4625:21; 4629:4; 4636:23; 4647:5
**UNITED** [3] - 4506:1, 3, 11
**units** [8] - 4626:6; 4632:3, 21-22;
4634:20; 4635:3; 4647:5
**unlikely** [1] - 4518:4
**unmoored** [1] - 4595:16
**unreliable** [1] - 4595:10
**unsupported** [1] - 4595:16
**untethered** [1] - 4596:1
**up** [36] - 4512:25; 4517:23; 4520:25;
4527:9, 13; 4537:1, 24; 4541:17;
4542:17, 21; 4543:24; 4544:8; 4548:18;
4555:21; 4566:18; 4568:14; 4571:15;
4582:8; 4585:17; 4587:16; 4592:3, 15;
4594:23; 4607:1, 15; 4608:22; 4616:11,

17; 4620:4; 4621:10; 4630:16; 4632:18;
4643:5; 4648:17
**upgrade** [1] - 4518:8
**UPP** [40] - 4516:11; 4558:8, 22, 24;
4559:23; 4560:6, 9; 4561:20; 4562:11,
21; 4563:6-8, 10, 23; 4564:20; 4566:25;
4567:24; 4568:1, 6, 14, 20; 4569:7;
4602:19; 4603:20, 8; 4604:11; 4605:16;
4607:22; 4610:9; 4612:6, 12, 17;
4616:8, 14, 19, 21; 4617:12
**upper** [2] - 4523:15
**UPPs** [2] - 4567:3; 4607:25
**upward** [10] - 4516:11; 4562:6;
4567:3; 4568:15, 21; 4601:24; 4602:4;
4603:4, 11; 4605:10
**upwards** [1] - 4568:16
**useful** [4] - 4562:3; 4569:10; 4596:22
**uses** [10] - 4540:6; 4576:13; 4590:21;
4602:23; 4604:24; 4618:12; 4646:21

## V

**V5** [1] - 4624:18
**validity** [1] - 4545:9
**value** [1] - 4602:15
**variable** [12] - 4534:9; 4543:6, 11, 15;
4545:14; 4551:7; 4552:8; 4553:3;
4557:21, 24; 4558:3; 4585:11
**variables** [4] - 4581:6; 4585:10
**variety** [1] - 4544:9
**various** [13] - 4513:8; 4518:9, 18;
4524:3, 5; 4530:3; 4538:19; 4539:2;
4545:24; 4553:9; 4581:6, 14; 4626:21
**varying** [1] - 4553:14
**vast** [2] - 4565:21; 4588:10
**vendor** [1] - 4524:8
**verifiable** [1] - 4542:16
**verified** [2] - 4543:8; 4553:3
**verify** [2] - 4545:14; 4550:2
**verse** [1] - 4535:22
**version** [2] - 4584:2; 4612:10
**versus** [11] - 4511:4; 4565:17;
4571:12; 4575:2; 4576:7; 4579:8;
4581:10; 4582:24; 4590:23; 4591:13,
18
**via** [2] - 4637:9; 4639:14
**view** [3] - 4572:18; 4591:19
**viewed** [1] - 4526:7
**views** [1] - 4606:23
**vigorously** [1] - 4572:10
**Viking** [4] - 4525:21, 23; 4645:2, 23
**Viking's** [2] - 4645:4, 7
**violation** [1] - 4609:11
**violations** [1] - 4572:11
**virtually** [1] - 4533:12
**Vishio** [1] - 4511:12
**voice** [1] - 4541:16
**voir** [2] - 4609:16, 18
**VOLUME** [1] - 4506:9

**volume** [2] - 4553:16
**Von's** [1] - 4571:12

## W

**Wacker** [1] - 4507:15
**walk** [4] - 4523:20; 4561:19, 25;
4562:24; 4646:25
**walks** [1] - 4519:17
**Wall** [1] - 4634:7
**wall** [19] - 4520:3; 4526:23; 4527:21;
4528:1; 4545:23; 4563:4; 4578:3;
4582:18, 25; 4608:3, 8, 10; 4615:20,
25; 4616:20; 4629:15; 4634:10;
4647:10
**Wallace** [4] - 4509:12; 4651:9, 11
**wants** [8] - 4515:1; 4542:23; 4543:2;
4547:24; 4549:17, 21; 4564:16;
4565:24
**washers** [1] - 4618:16
**washing** [1] - 4622:18
**Washington** [18] - 4506:7, 15, 20, 24;
4507:4, 9, 12, 19, 23; 4508:11, 14, 18,
21; 4509:3, 9, 15; 4533:6, 20
**watch** [1] - 4544:6
**water** [1] - 4589:1
**ways** [6] - 4525:13; 4554:17; 4574:8,
21; 4578:20; 4581:5
**weakness** [1] - 4616:21
**wealth** [2] - 4564:16
**week** [4] - 4554:7; 4625:1, 15
**weekly** [1] - 4626:12
**weeks** [3] - 4564:10; 4623:19; 4624:23
**weigh** [2] - 4512:20; 4606:22
**weighing** [1] - 4599:11
**weight** [12] - 4549:20; 4550:9;
4551:25; 4572:3, 20; 4573:17; 4574:12,
15; 4600:15; 4601:3
**weighting** [2] - 4600:23; 4601:20
**welcome** [1] - 4571:9; 4593:24
**well-understood** [4] - 4543:12;
4559:15; 4560:21; 4562:5
**West** [1] - 4507:15
**Westlaw** [3] - 4594:24; 4595:5;
4596:17
**whatsoever** [2] - 4549:20; 4550:9
**where'd** [1] - 4542:20
**Winston** [36] - 4516:7; 4519:1;
4520:10; 4521:6; 4522:25; 4524:17, 23,
25; 4525:8; 4526:20; 4527:10; 4529:11;
4534:1; 4539:17; 4540:18; 4562:22;
4563:7, 10; 4567:24; 4568:3, 7; 4578:9;
4580:17; 4585:25; 4586:8; 4587:6;
4592:15; 4601:24; 4602:19; 4603:12;
4604:12; 4605:17; 4618:15; 4627:18;
4645:24; 4646:10
**Winston's** [7] - 4521:22; 4522:11;
4526:25; 4528:9; 4529:18; 4558:7;
4566:3, 25; 4567:23; 4568:12; 4580:14;

4581:20; 4586:23; 4612:6, 17; 4616:8
  **Whirlpool** [21] - 4524:15; 4527:12;
4528:3, 24; 4529:3; 4588:9; 4597:12,
14; 4598:5, 10, 17; 4600:6, 22; 4601:5,
8, 14; 4621:13, 25; 4622:8, 17; 4647:12
  **Whirlpool's** [1] - 4620:8
  **Whirlpool/Maytag** [28] - 4555:10;
4558:8; 4567:1; 4569:14; 4570:10;
4597:15; 4599:6, 23; 4600:5, 19, 21;
4601:6; 4603:18; 4607:11, 16; 4611:21;
4612:20; 4613:10; 4614:4, 8; 4615:11,
18; 4616:1; 4617:1; 4619:16, 22;
4621:14; 4623:3
  **whole** [8] - 4560:6; 4563:1; 4588:1;
4608:6; 4626:11, 17; 4627:10; 4634:22
  **William** [1] - 4506:17
  **Willig** [1] - 4559:18
  **Witness** [8] - 4569:18; 4629:20;
4630:9; 4635:7; 4638:10; 4644:19;
4645:3, 12
  **witness** [8] - 4547:6; 4548:2, 8, 23;
4549:17; 4642:12; 4643:12
  **WITNESS** [15] - 4574:15; 4584:13, 20,
24; 4585:4, 6; 4590:2, 13; 4606:14;
4608:19; 4611:17; 4612:4; 4620:5;
4651:2, 4
  **Wolf** [4] - 4644:11, 14; 4649:7, 21
  **won** [1] - 4575:10
  **word** [4] - 4518:24; 4542:12; 4543:7;
4633:12
  **Worden** [1] - 4559:21
  **words** [3] - 4520:19; 4560:23; 4610:18
  **works** [1] - 4519:11
  **world** [22] - 4516:19; 4560:17, 19;
4561:2, 7; 4563:23; 4565:24; 4574:24;
4575:2; 4596:1; 4600:23; 4601:10;
4602:6; 4604:12, 17; 4605:18; 4606:1;
4637:14; 4648:11
  **worse** [2] - 4513:16; 4585:11
  **worth** [1] - 4600:11
  **write** [2] - 4542:15; 4607:10
  **writes** [4] - 4595:24; 4621:25;
4622:17; 4642:2
  **written** [1] - 4572:2
  **wrote** [8] - 4564:20; 4595:13; 4596:12,
21; 4598:9; 4621:12; 4622:24

# Y

  **year** [13] - 4552:24; 4554:9, 16;
4556:18; 4582:2; 4623:19; 4625:22;
4626:5, 11; 4631:11; 4632:4; 4633:2, 9
  **Year** [1] - 4631:8
  **year-and-three-quarters** [1] - 4582:2
  **years** [7] - 4559:16; 4572:9; 4573:18;
4621:18; 4649:25
  **yellow** [5] - 4521:24; 4524:20, 22;
4569:24
  **yesterday** [14] - 4514:16, 18; 4516:18;

4520:5, 10; 4521:11, 22; 4522:5;
4561:2; 4574:6, 23; 4575:18; 4581:22;
4623:17
  **York** [2] - 4561:16; 4595:1
  **yourselves** [1] - 4511:5

# Z

  **Zero** [7] - 4525:21, 23; 4644:9, 14;
4645:22
  **zero** [4] - 4525:14; 4613:15; 4614:21;
4615:25
  **Zwolinski** [1] - 4507:6