# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,     )
                                 )
        Plaintiff,     )  Civil Action
                                 )  No. 15-1039
        v.              )
                                 )  Friday, December 4, 2015
AB ELECTROLUX, et al.,      )  3:22 p.m.
                                 )  Washington, D.C.
        Defendants.    )
                                 )

## VOLUME 16 - AFTERNOON SESSION
## TRANSCRIPT OF BENCH TRIAL
### BEFORE THE HONORABLE EMMET G. SULLIVAN,
### UNITED STATES DISTRICT COURT JUDGE

**APPEARANCES:**

For the Plaintiff:    **Ethan Glass, Esquire**
                          U.S. DEPARTMENT OF JUSTICE
                          450 Fifth Street, NW
                          Room 4000
                          Washington, DC 20001
                          (202) 305-1489
                          Email: Ethan.glass@usdoj.gov

                          **Nina Hale, Esquire**
                          U.S. DEPARTMENT OF JUSTICE
                          450 Fifth Street, NW
                          Room 4000
                          Washington, DC 20001
                          Email: Nina.hale@usdoj.gov

                          **William Henderson Jones, II, Esquire**
                          U.S. DEPARTMENT OF JUSTICE
                          Antitrust Division
                          450 Fifth Street, NW
                          Room 4000
                          Washington, DC 20001
                          (202) 514-0230
                          Fax: (202) 514-7308
                          Email: Bill.jones2@usdoj.gov

For the Plaintiff:          **Kelsey W. Shannon, Esquire**
                            U.S. DEPARTMENT OF JUSTICE
                            450 Fifth Street, NW
                            Suite 4000
                            Washington, DC 20530
                            (202) 598-2854
                            Fax: (202) 514-7308
                            Email: Kelsey.shannon@usdoj.gov

                            **David Gelfand, Esquire**
                            U.S. DEPARTMENT OF JUSTICE
                            450 Fifth Street, NW
                            Suite 4000
                            Washington, DC 20530

For Defendant               **John M. Majoras, Esquire**
AB Electrolux:              JONES DAY
                            51 Louisiana Avenue, NW
                            Washington, DC 20001-2113
                            (614) 281-3835
                            Fax: (202) 626-1700
                            Email: Jmmajoras@jonesday.com

                            **Paula W. Render, Esquire**
                            JONES DAY
                            77 West Wacker Drive
                            Chicago, IL 60601
                            (312) 269-1555
                            Email: Prender@jonesday.com

                            **Kristen A. Lejnieks, Esquire**
                            JONES DAY
                            51 Louisiana Avenue, NW
                            Washington, DC 20001-2113
                            (202) 879-3939
                            Fax: (202) 626-1700
                            Email: Kalejnieks@jonesday.com

                            **Jeremy J. Gray, Esquire**
                            JONES DAY
                            77 West Wacker Drive
                            Chicago, Il 60601
                            (312) 269-1553

**For Defendant General**          **Paul H. Friedman, Esquire**
**Electric Company:**              DECHERT LLP
                                  1900 K Street, NW
                                  Suite 1200
                                  Washington, DC 20006
                                  (202) 261-3398
                                  Email: Paul.friedman@dechert.com

                                  **Paul T. Denis, Esquire**
                                  DECHERT, LLP
                                  1900 K Street NW
                                  Suite 1200
                                  Washington, DC 20006
                                  (202) 261-3430
                                  Email: Paul.denis@dechert.com

                                  **Craig Gerald Falls, Esquire**
                                  DECHERT LLP
                                  1900 K Street, NW
                                  Washington, DC 20006
                                  (202) 261-3373
                                  Fax: (202) 261-3034
                                  Email: Craig.falls@dechert.com

                                  **Michael G. Cowie, Esquire**
                                  DECHERT, LLP
                                  1900 K Street NW
                                  Suite 1200
                                  Washington, DC 20006
                                  (202) 261-3339

                                  **Anna Revathy Aryankalayil, Esquire**
                                  DECHERT, LLP
                                  1900 K Street NW
                                  Suite 1200
                                  Washington, DC 20006
                                  (202) 261-3332
                                  Email: Anna.aryankalayil@dechert.com

**Court Reporter:**               **Bryan A. Wayne, RPR, CRR**
                                  Official Court Reporter
                                  Room 6503, U.S. Courthouse
                                  Washington, D.C. 20001
                                  (202)354-3186
                                  bryanawayne@gmail.com

Proceedings reported by machine shorthand.  Transcript produced
by computer-aided transcription.

# C O N T E N T S

**WITNESS:**                    **EXAMINATION**                    **PAGE:**


Jonathan Orszag:    Continued Cross by Mr. Glass ........... 4681
                    Redirect by Mr. Demitrack .............. 4732

* * * * *

1                        P R O C E E D I N G S

2               THE COURT:  All right.  Thank you.  Let's proceed.

3      How are you?

4               THE WITNESS:  I'm good.  How are you?

5               THE COURT:  Good.

6                    CROSS-EXAMINATION CONTINUED

7      BY MR. GLASS:

8      Q.    Hello, Mr. Orszag.

9      A.    Hello, Mr. Glass.  How are you this afternoon?

10     Q.    Doing well.

11     A.    That's good.

12     Q.    Can you please turn in your slides, which are DX 0658, to

13     the page 008.

14     A.    Yes, sir.

15     Q.    And on this slide, it shows that you studied sales at the

16     four big-box retailers for the dates January through July of

17     2015, right?

18     A.    That is correct.

19     Q.    Now let's turn to the page ending in 019.  In 019, you

20     looked at Samsung and LG growth in cooking appliances for 2012

21     through 2015.  Is that correct?

22     A.    That is correct.

23     Q.    Now let's go to the next page, 020.  Here you looked at

24     sales of cooking appliances at Home Depot for three weeks in

25     September of 2015.  Correct?

1    A.    That is correct.

2    Q.    Let's go to the next page, 021.  Here you looked at SKUs

3    introduced in 2013 and 2014, correct?

4    A.    That is correct.

5    Q.    Let's go to 025, please.  Here you looked at ranges from

6    2010 through 2015 sold at Best Buy, correct?

7    A.    That's correct.

8    Q.    Let's go to 029.  Here you looked at the sale of ranges

9    from May of 2014 through November of 2014 at Best Buy.

10   A.    That is correct.

11   Q.    Now let's go to 031, please.  You looked at March of 2015

12   through July of 2015 at Home Depot.  Correct?

13   A.    That is correct.

14   Q.    Look at 050.  Here you looked at the sale of ranges at two

15   P.C. Richard stores in January through August of 2015?

16   A.    Let's be clear.  Categorized as their builder stores,

17   because you can go into any store as a builder and make

18   purchases as a contractor and be counted as a contractor.  But

19   this is for January through August 2015 was your direct

20   question.

21   Q.    Now let's look at 099.  This is SKUs in the retailing

22   contract channels for cooking appliances in the fourth quarter

23   of 2014, correct?

24   A.    This is the data in essence underlying the chart that

25   you've already asked about, but yes, it is.  It's repetitive of

1    what -- this is the more detailed analysis of a chart that we've

2    already looked at.

3    Q.    Now at 104.   This is July through December of 2014,

4    correct?

5    A.    That is correct.

6    Q.    By my count, in just the slides that you have here, you had

7    one, two, three, four, five, six, seven, seven different time

8    frames for each of your various analyses; is that correct?

9    A.    That is correct.

10   Q.    You are the senior managing director of Compass Lexecon,

11   correct?

12   A.    That is correct.

13   Q.    Senior managing director of Compass Lexecon, L-E-X-E-C-O-N?

14   A.    You got it right, Mr. Glass.

15   Q.    That's your full-time job.

16   A.    That's my full-time job.   That's fair.

17   Q.    Compass Lexecon has on its roster a number of world-class

18   economists.   Correct?

19   A.    I'd like to say so, yes.   We do.

20   Q.    Professors of economics at some of the best economics

21   departments in the country?

22   A.    I would agree with that.   They're my friends, they're my

23   colleagues.   I would say that that is correct.

24   Q.    Professor Dennis Carlton?

25   A.    That is correct.

```
1    Q.   Professor Carlton is a professor at the University of

2    Chicago?

3    A.   That is correct.

4    Q.   World-renowned economist?

5    A.   An absolutely terrific economist.

6    Q.   Professor Richard Gilbert.

7    A.   Yes.

8    Q.   He's affiliated with Compass Lexecon?

9    A.   Yes, he is.

10   Q.   He's a professor at the University of California Berkeley?

11   A.   That is correct.

12   Q.   Another world-renowned economist?

13   A.   Absolutely.

14   Q.   Professor Michael Katz.

15   A.   That is correct.

16   Q.   Affiliated with Compass Lexecon?

17   A.   That is correct.

18   Q.   At Berkeley, world-renowned?

19   A.   That is correct.  And -- yes.  I want to make sure he gets

20   his appropriate credit.  He's world-renowned as well.

21   Q.   Professor Janusz Ordover?

22   A.   Yes.

23   Q.   Professor Ordover is at NYU?

24   A.   Yes, he is.

25   Q.   At Compass Lexecon and world-renowned?
```

1    A.    Absolutely.

2    Q.    Professor Daniel Rubinfeld?

3    A.    Yes.

4    Q.    Professor Rubinfeld is also at Berkeley?

5    A.    He's at Berkeley and NYU.  So he spends the falls at NYU

6    and the springs at Berkeley.

7    Q.    At Compass, world-renowned?

8    A.    Absolutely.

9    Q.    Professor Marius Schwartz?

10   A.    Yes.  He's affiliated with us.  It's a slightly different

11   affiliation arrangement than the ones you just described, but

12   yes, he's affiliated with us.

13   Q.    So not to get too far into the details of Compass Lexecon's

14   organization, all the other professors I named are actually an

15   employee or an owner of Compass Lexecon?

16   A.    No, that's not correct.

17   Q.    They're all affiliated with Compass Lexecon?

18   A.    That's fair.  Well, they're all -- Marius is as well.  So

19   they're all affiliated in some way, shape, or form.  Correct.

20   Q.    Professor Robert Willig?

21   A.    We've mentioned Professor Willig multiple times here, yes.

22   And Professor Willig and myself and Professor Ordover had

23   started the Compass part of Compass Lexecon.

24   Q.    And Professor Carlton and some others started the Lexecon

25   part?

1    A.   Dennis actually joined I believe a couple years after it

2    had been started by a group that included Andy Rosenfield, Bill

3    Landes, and I believe Judge Posner and Easterbrook were part of

4    that original group.

5    Q.   Professor Gilbert isn't working on this case, correct?

6    A.   No, he is not.

7    Q.   Professor Katz is not working on this case?

8    A.   No, he is not.

9    Q.   Professor Ordover is not working on this case?

10   A.   I have consulted with Professor Ordover about certain

11   aspects of this case, yes.

12   Q.   Professor Rubinfeld isn't working on this case?

13   A.   No.

14   Q.   Professor Schwartz?

15   A.   No, he's not.

16   Q.   Professor Willig?

17   A.   I've consulted with him about certain aspects of this case

18   as well.

19   Q.   What about Professor Carlton?  Have you consulted with him

20   about this case?

21   A.   No, I have not.

22   Q.   Professor Jonathan Baker is affiliated with Compass

23   Lexecon?

24   A.   Yes, he is.

25   Q.   Professor Baker is here in D.C. at American University?

A.    Yes, he is.

Q.    Professor Baker's another world-renowned economist?

A.    Yes, he is.

Q.    Is Professor Baker working on this case?

A.    No, he is not.

Q.    Have any of those Compass Lexecon-affiliated professors written about mergers in the appliance industry?

A.    Mr. Baker has.

Q.    What did Professor Baker write?

A.    He's written -- after the Maytag-Whirlpool deal, Jon and Carl Shapiro, who we've talked about as well, wrote an op-ed suggesting that the merger was let through and that it would result in higher prices to consumers.  And they were critical of the Antitrust Division for what they deemed as lax enforcement.

      They then followed it up with a paper about a year later, I'd say -- I don't have the time frames in my mind -- where they together were critical of the enforcement agency and they, in the context of that, they also used as an example Maytag-Whirlpool.

Q.    Why didn't you consult with Professor Baker about this case?

A.    I have talked about certain aspects of this case with Professor Baker informally in terms of market definition.  You didn't ask me if I'd consulted with him.  And I have talked to him about certain aspects of market definition, and certain

aspects of what standards one should use, because he has an ALJ paper, an Antitrust Law Journal paper, where he talks about the way that simple measures, simple models for unilateral effects, like UPP, are very useful for the initial phase, but then in that same paper he talks about when you get to the kind of stage we're in here, one has to look at comprehensive models.  And by that -- the only way to read it, and I think he actually says it explicitly, is merger simulation.

And that's why I'm critical of Professor Whinston for not going beyond that first step of just looking at UPPs based on only market shares, and why he didn't do merger simulation.  And Professor Baker's paper lays out that one should go to those more comprehensive merger simulations once you get past that first step of merger analysis.

Q.   You didn't talk with Professor Baker about this merger, correct?

A.   Let's be clear.  I talked to him about his views about when UPP should be used and when you should go beyond that.  So I've had those general conversations, I talk to my colleagues all the time about thoughts about unilateral effects, coordinated effects.  I did not talk to him about the specific details of, say, hey, I'm finding this effect.  No.  It was much more general in terms of the framework of analysis and those discussions.

Q.   Let's look at exactly what Professor Baker has said.

PX 02065, please.  PX 02065 is a chapter from a book titled "How the Chicago School Overshot the Mark:  The Effect of Conservative Economic Analysis on U.S. Antitrust."  Do you see that?

A.   Yes, I do.

Q.   There's a chapter starting at page 235 entitled "Reinvigorating Horizontal Merger Enforcement."  Do you see that?

A.   Yes.  This is a paper that I discussed when you asked me about who has written about the Whirlpool-Maytag merger.  And they first wrote an op-ed and then they wrote a longer paper.

Q.   And this is the same Professor Baker who is affiliated with your firm, Compass Lexecon?

A.   That is correct.

Q.   And Professor Shapiro, that's the same Professor Shapiro you were talking about earlier today?

A.   That is correct.

Q.   Let's take a look on page 248, please.  Mr. Adler, on the left column, if you could bring out the first full paragraph. Thank you.

     Professors Baker and Shapiro wrote, "The perception that the Justice Department has adopted a very lax merger enforcement policy was unquestionably fueled by the March 2006 decision of Assistant Attorney General Barnett not to take any enforcement action when Whirlpool sought to acquire Maytag.  For a number of

1    reasons, this merger was especially revealing regarding the

2    current Justice Department's merger enforcement policy and

3    especially influential in shaping the advice given by antitrust

4    lawyers to their clients."  Do you see that?

5    A.    Yes, I do.

6    Q.    Now, Mr. Adler, if you can pull up the fourth bullet point

7    below that, please.

8          Professors Baker and Shapiro say, "In explaining its

9    decision not to take any enforcement action, the Justice

10   Department embraced three arguments often made by merging firms:

11   (1) the ability of two recent entrants into the market (LG and

12   Samsung) to expand significantly their imports into the U.S.;

13   (2) the presence of large buyers in the wholesale markets for

14   washing machines and dryers (Sears, Lowe's, The Home Depot, and

15   Best Buy); and (3) cost savings from the merger would reduce the

16   likelihood of harm to competition."  Do you see that?

17   A.    Yes, I do.

18   Q.    And those are the same arguments that are being made in

19   this case, correct?

20   A.    They are part of the overall competitive effects analysis.

21   Q.    Mr. Adler, if you could please go to the right column.  I'm

22   now on page 249, the first paragraph.  The last sentence reads,

23   "Yet the Justice Department's closing statement gives short

24   shrift to at least three important points which could have

25   supported an enforcement action."  Do you see that?

1   A.   Yes, I do.

2   Q.   Now, Mr. Adler, if you can pull out the first paragraph

3   after that?  Thank you.

4       "First, the statement does not explain why the recent entry

5   by LG and Samsung was sufficient to solve any competitive

6   problems caused by the merger.  In a mature market in which

7   brand names are important and market shares have generally been

8   stable, why does the presence of a new entrant into the market

9   that has grown to, say, 5 percent of the market over two or

10  three years imply that there is no competitive harm when the

11  leading firm, with 50 percent of the market, acquires the number

12  two firm, with 20 percent of the market?"  Do you see that?

13  A.   Yes, I do.

14  Q.   Now let's look at the second --

15  A.   Should we continue reading the paragraph too?

16  Q.   You'll have an opportunity to do that.

17      "Second, the statement does not address the extent of

18  direct competition between Whirlpool and Maytag or the extent to

19  which the merger raised a unilateral effects problem (absent

20  entry, repositioning, or efficiencies).  Following the standard

21  approach to unilateral effects as discussed in the '92 merger

22  guidelines, one would naturally hypothesize that a post-merger

23  unilateral price increase would be profitable for Whirlpool,

24  with the magnitude of the price increase depending on the

25  price-cost margins on washers and dryers and on the diversion

ratio between Whirlpool and Maytag models."  Do you see that?

A.   Yes, I do.

Q.   And the price-cost margins and the diversion ratio is exactly what the UPP looks at, correct?

A.   I could disagree slightly, but that's one of the elements.

Q.   Now reading -- there's an "in fact" sentence.

"In fact, since the inroads made by LG and Samsung largely involved higher-end, front-loading washing machines, Whirlpool and Maytag may be closer competitors in the lower-end, top-loading segment than would be reflected in their overall market shares."  Do you see that?

A.   Yes, I do.

Q.   Now let's go to the third paragraph.  It says, "Third, the statement does not explain the basis for concluding that the efficiencies asserted by the merging parties were merger-specific and sufficient in magnitude to offset the elimination of Maytag as an independent competitor in the markets for washers and dryers."

And now looking to the next page, page 250, there's a sentence that begins "normally."  "Normally, absent merger, the lower-cost firm would compete to gain share from the higher-cost firm, to the benefit of consumers.  Such competitive pressure often also causes the higher-cost firm to become more efficient, again to the benefit of consumers.  Plus, rivalry from the higher-cost firm with a substantial (if slowly declining) market

1  share, typically puts important competitive pressure on the

2  lower-cost firm, inducing it to trim its costs and improve its

3  products."  Do you see that?

4  A.   I see where you read those words, yes.

5  Q.   Now let's go to the next page, page 251.  If you look at

6  the heading on page 251, it reads, "III."  This is again

7  Professor Baker at Compass Lexecon and Professor Shapiro.

8  A.   He's at American University.  He's just affiliated with us.

9  Q.   "Economic arguments merging firms love to make."  Now let's

10  look at the second full paragraph, Mr. Adler, please, going down

11  all the way down to the bottom of the page.  And this is under

12  the heading of "Economic arguments merging firms love to make."

13          MR. DEMITRACK:  Your Honor, we've had a series of

14  quotations from this.  If there's a question here, otherwise I'm

15  going to object to simply reading from this article.

16          MR. GLASS:  The question is coming, Your Honor.

17          THE COURT:  All right.  Is everyone experiencing the

18  blinking screens?

19          MR. GLASS:  Yes, Your Honor.

20          THE COURT:  I'm not sure what's wrong.  We'll ask John

21  about it.

22          THE DEPUTY CLERK:  I just sent an e-mail about that

23  and made a call.

24          THE COURT:  Okay.  All right.  Go ahead.

25          MR. GLASS:  Thank you, Your Honor.

1   BY MR. GLASS:

2   Q.   So under the heading, "Economic arguments merging firms

3   love to make," Professors Baker and Shapiro say, "Merging

4   parties routinely put forward several substantive claims that if

5   routinely and uncritically accepted by the agencies and the

6   courts, would collectively remove virtually all mergers from

7   antitrust review.  We structure our analysis around three

8   substantive claims where we detect overreaching."

9       The first bullet:  "Effective competition generally

10  requires only three or even two rivals."

11      The second bullet:  "The prospect of entry typically deters

12  or counteracts anticompetitive effects of mergers."

13      Third bullet:  "Mergers often spur competition and benefit

14  consumers by enabling efficiencies."

15      Did I read that correctly?

16  A.   You read those correctly, yes.

17  Q.   Those are exactly the arguments that defendants are making

18  in this case today, correct?

19  A.    Not exactly.  Not at all.  Can I explain that, by the way?

20          MR. GLASS:  You've had seven hours to talk about it.

21  You'll have an opportunity on redirect.

22          THE COURT:  You'll get an opportunity in rebuttal,

23  redirect.

24          THE WITNESS:  Okay.

25  BY MR. GLASS:

1    Q.    Who is Colleen Loughlin?

2    A.    Colleen is, I believe her title would be a senior vice

3    president in our Chicago office of Compass Lexecon.

4    Q.    Are you aware that Ms. Loughlin signed a joint defense

5    agreement between the lawyers for General Electric, Electrolux,

6    Whirlpool, as well as someone from Charles River Associates who

7    was working on behalf of General Electric and Electrolux?

8    A.    I was first made aware of those signatures at my

9    deposition, and so that was the first time I had heard about

10   that.  I have not seen the document to the best of my knowledge.

11   Q.    Well, I'll show it to you.  It's PX 01656.  On the page

12   ending in 264, there's an e-mail.  The e-mail is from Elaine

13   Ewing to a number of people, including Colleen Loughlin.  Do you

14   see that?

15   A.    Yes, I do.

16   Q.    And Dr. Loughlin has a Compass Lexecon e-mail address?

17   A.    Yes, she does.

18   Q.    Because she works at Compass Lexecon?

19   A.    Yes, she does.

20   Q.    Now let's go to the page ending in 271.  If you look at the

21   signature at the very bottom, it's Dr. Loughlin's signature?

22   A.    I assume so.  I've never seen her signature before, but

23   given it's in that block, I assume it is.

24   Q.    And it's dated April 21, 2015?

25   A.    That is correct.

1    Q.    And April 21, 2015 was after the GE-Electrolux merger was

2    announced, but before the United States brought the lawsuit.

3    A.    That is correct.

4    Q.    Now, you are here today hired by General Electric and

5    Electrolux, correct?

6    A.    That is correct.

7    Q.    But Dr. Loughlin of Compass Lexecon signed this because she

8    works on behalf of Whirlpool, correct?

9    A.    She's done work for Whirlpool for years.  What she's done I

10   do not know, because I am walled off from her.

11   Q.    In fact, Dr. Loughlin worked on the Whirlpool-Maytag

12   merger, correct?

13   A.    Given that she's worked for them for years, that's

14   possible.  The details of that, I do not know.

15   Q.    If I showed you her CV, would that help?

16   A.    I'm not going to disagree with you, because I know that

17   prior to the combination of Compass Lexecon, Lexecon and Dennis

18   Carlton, who you mentioned earlier, worked on that merger, and

19   it would not surprise me -- because Dennis and Rick Flyer and

20   Colleen often work together on mergers like this -- that she

21   worked on it.  I just have no personal knowledge of that because

22   it's not something I've ever inquired about.

23   Q.    So Dr. Loughlin, Dr. Flyer, and Dr. Carlton all worked on

24   behalf of Whirlpool in the Whirlpool-Maytag merger.

25   A.    Yes, they did.

1    Q.    And all three of them are Compass Lexecon economists,

2    today?

3    A.    That is correct.

4    Q.    You said you weren't aware of the joint defense agreement.

5    Were you aware that Whirlpool provided nonpublic information to

6    GE and Electrolux before the beginning of this lawsuit?

7    A.    As I said in my deposition, because this topic came up, I

8    had been asked a question by Colleen that involved some issue --

9    I can't remember what -- and I remember responding because it

10   went beyond just what she was committing herself to.  And so I

11   knew that there was some work on something for Whirlpool.  What

12   it involved, I did not know, and what has been supplied, I did

13   not know either until really at my deposition, although as I

14   noted at my deposition, I recall seeing submissions to the

15   Department of Justice that, based on my review, had included

16   Whirlpool data.  So putting those two things together, it would

17   make sense, but I did not have any personal knowledge of those

18   issues.

19   Q.    So let's look at PX 01105, please.  This is an e-mail from

20   Mr. Peter Love to Ms. Elaine Ewing dated April 8, 2015.  Do you

21   see that?

22   A.    Yes, I do.

23   Q.    Let's look at the first paragraph, please.

24         MR. DEMITRACK:  Your Honor, this witness has clearly

25   not seen these documents.  He testified he had not seen them at

1    the deposition.

2           THE COURT:  I don't know whether he's seen this or

3    not.  I'll give counsel some leeway.

4           MR. DEMITRACK:  Thank you, Your Honor.

5           MR. GLASS:  Thank you, Your Honor.

6    BY MR. GLASS:

7    Q.   Mr. Love writes, "Elaine, following up on our calls and my

8    voice mail to you yesterday, we have sign-off on the Lexecon

9    proposal from both Electrolux and GE."  Do you see that?

10    A.   Yes, I do.

11    Q.   "Once you're able to get that underway with Lexecon, we

12    would appreciate it if Colleen also could provide an estimate on

13    a timing for her projects."  Do you see that?

14    A.   Yes, I do.

15    Q.   And Ms. Ewing represents Whirlpool, as far as you know?

16    A.   I don't know.  This is the first time I've seen this

17    document, so as far as I know, if you say it's the case, sure.

18    Q.   Were you aware that Dr. Loughlin on behalf of Whirlpool was

19    working with General Electric and Electrolux to do economic

20    analysis about the General Electric-Electrolux merger?

21    A.   The only information I know is that she was working with

22    Whirlpool.  What she was doing, I have no knowledge of

23    whatsoever.

24    Q.   Did you have to get permission from Whirlpool to work on

25    this case?

1    A.    I don't know how that worked.  I believe the counsel talked

2    to them, but I don't know.  So that would be a question you'd

3    have to gear towards counsel about what precisely was required.

4    Q.    Were you aware or are you aware about the need for General

5    Electric and Electrolux counsel to get permission from Whirlpool

6    for you personally to work on this case?

7    A.    Sitting here today, I can't recall one way or the other

8    whether there was notice or permission or something.  I don't

9    know one way or the other.

10   Q.    Mr. Orszag, I'd like to talk for one minute about Mr. Jones

11   and Ms. Smith.  Slide 032 in your presentation.  I just want to

12   make sure I understand because I've heard a lot of words used

13   throughout this trial.  Would you describe, as an economist,

14   Mr. Jones as a marginal consumer?

15   A.    In this example, Mr. Jones would fit as a marginal

16   consumer.  Obviously, there's many Mr. Joneses, some of whom may

17   be marginal and some of whom may be what economists would say

18   would be inframarginal, and it depends on their preference set

19   in terms of where they would fall, whether they end up as the

20   marginal customer or an inframarginal customer.

21   Q.    In your example that's on your page 032, though, Mr. Jones

22   is marginal customer?

23   A.    In the end, when one analyzes the hypothetical price rise,

24   he's acting as a marginal customer in this example.  But

25   obviously, this is an abstraction, and the world is many, many

1   individuals, some of whom would fit into each of those two

2   categories.

3   Q.   Right.  But in this example, Mr. Jones is an abstraction of

4   a marginal customer?

5   A.   That is correct.

6   Q.   And Ms. Smith, is she something like a committed customer

7   or core customer?  Does that make sense?

8   A.   I wouldn't use those words.

9   Q.   Inframarginal customer?

10  A.   That sounds like a more economic term to me, and that fits

11  the example much better to call her an inframarginal customer.

12              THE COURT:  Mr. Glass, excuse me.  Mr. Cramer needs

13  about five minutes.  Thank you very much.

14      (Pause)

15  BY MR. GLASS:

16  Q.   Mr. Orszag, you would agree that the relevant geographic

17  market in this case is the United States?

18  A.   That is correct.

19  Q.   And you would agree that ranges are a relevant product

20  market?

21  A.   For analytical purposes, I look at ranges.  I discuss my

22  caution that the analysis that's been conducted wasn't precisely

23  correct.  So for analytical purposes I consider ranges and

24  analyze it as such.

25  Q.   But you don't dispute that ranges is a relevant antitrust

1   market, correct?

2   A.   I don't have a empirical analysis that is inconsistent with

3   that, and so I just analyze it for what it is, is ranges, and I

4   do all my analyses with ranges as a market.

5   Q.   You don't dispute that cooktops are a relevant antitrust

6   market?

7   A.   As I talked about yesterday, there's some evidence to

8   suggest, given that consumers will often buy them as bundles,

9   that you would combine them together with wall ovens, but for

10  the same logic and reason that I just gave with regard to

11  ranges, I'll give you the same answer.  I conduct all the

12  analyses of cooktops and wall ovens separately.

13  Q.   So you don't dispute that cooktops is a relevant antitrust

14  market?

15  A.   The same answer I gave with ranges in terms of empirical

16  evidence that would be contradictory to that, but I do think

17  there is some evidence to support the view that the lines aren't

18  as strong as were drawn by Professor Whinston and in the

19  complaint.

20  Q.   You don't dispute that wall ovens are a relevant antitrust

21  market, correct?

22  A.   I don't have any empirical basis to rebut that or to

23  suggest that it's not correct.

24  Q.   You would agree that Electrolux competes with General

25  Electric in the market for ranges sold in the United States,

1    correct?

2    A.   Yes, I do.

3    Q.   You would agree that Electrolux competes with General

4    Electric in the market for sale of wall ovens sold in the United

5    States.

6    A.   Yes, I do.

7    Q.   And you would agree that Electrolux competes with General

8    Electric in the sale of cooktops sold in the United States.

9    A.   Yes, I do.

10   Q.   You would agree that Electrolux competes with General

11   Electric in the sale of those cooking appliances through the

12   contract channel.

13   A.   So it's that they're competing for that business to

14   customers who happen to be professionals?  Yes, they do.

15   Q.   Does Electrolux compete with GE in the sale of these

16   cooking appliances through the contract channel?

17   A.   Can we define contract channel?  Because there's been

18   multiple definitions.  Are you talking do they compete with them

19   at distributors?  Distributors offer both products and they

20   compete, yes.

21   Q.   Let's take a look at your deposition.  It's in the

22   defendants' binder, volume 2, the one behind your screen.  There

23   you'll see your deposition.  Do you recall being deposed on

24   October 28?

25   A.   Yes, I do.

1    Q.   Let's look at page 7, please, of the deposition.  On page

2    7, lines 18 to 21, you were asked, "Question:  Does Electrolux

3    compete with GE in the sale of these cooking appliances through

4    the contract channel?"

5         Your answer:  "Yes, they do."

6         Do you see that?

7    A.   Yes.  And I was trying to give some more detail here.

8    Both for contract channel customers or for the distributors, the

9    contract distributors, there is competition.  Of course these

10   two firms compete.

11   Q.   You would agree that there's a significant amount of

12   competition between GE and Electrolux in the sale of cooking

13   appliances in the United States.

14   A.   I agree to that, too.

15   Q.   You would agree that Electrolux is a strong competitor in

16   the market.

17   A.   I agree to that too.

18   Q.   You would agree that Electrolux is a significant,

19   important, and effective competitor.

20   A.   I agree with that as well.

21   Q.   You would agree that General Electric is a strong

22   competitor in the market.

23   A.   Today they are, yes.

24   Q.   You would agree that General Electric is a significant,

25   important, and effective competitor?

1    A.   Yes.   That's part of my analysis.   I'm taking that into

2    account, yes.

3    Q.   You would agree that historically, buyers of cooking

4    appliances have benefited from the competition between

5    Electrolux and General Electric.

6    A.   The analysis is a little bit more complicated.   I think as

7    a general proposition, there has been, if you go -- depends

8    obviously how far you go back -- competition has benefited

9    consumers, but you'll have to remember that competition is

10   dynamic, and so what sits behind each competitor is important to

11   the competitive effects analysis.

12   Q.   Let's take a look at your deposition, page 10, lines 12

13   through 15.   On line 12, you were asked:   "Have customers of

14   cooking appliances benefited from competition between Electrolux

15   and GE?"

16        And your answer was:   "In a -- historically, yes."

17        Do you see that?

18   A.   I think I just gave roughly that same answer here, not

19   having memorized precisely what I said then.

20   Q.   If the merger between General Electric and Electrolux is

21   not stopped, all of that significant competition will end.

22   Correct?

23   A.   As I described in my testimony, the merger will reduce or

24   eliminate that action.   The question for a competitive effects

25   analysis is the reaction by the ecosystem that is competition.

1   So that is just one element of the whole competitive effects

2   analysis, and the question is where do competitors sit and their

3   ability to replace.  And then the other question is the ability

4   of the merged firm to compete more effectively because they can

5   have lower cost.

6       So that all has to be put into the mix.  The same issues we

7   observed with Maytag-Whirlpool.  That was lost, and we then have

8   empirical evidence about what happened following that merger.

9   Q.   Let's take a look at these surrounding competitors.  I

10  believe that's slide 007 of DX-0658.  I'd like to go through

11  some of these competitors, but I want to start with the middle

12  of the circle.  General Electric was in the middle, correct?

13  A.   That is correct.

14  Q.   You're showing all these arrows from all these other

15  companies to demonstrate competition between those companies and

16  General Electric.  Is that fair?

17  A.   That is correct.

18  Q.   Are you aware that General Electric maintains a meeting

19  competition database that tracks competition between General

20  Electric and other appliance manufacturers?

21  A.   I am aware of that.  I talked about it during my testimony.

22  Q.   In that meeting competition database, how many times have

23  you seen Summit?

24  A.   Sitting here today, that's not an analysis that I've

25  undertaken.  As you know, that data -- and there's two

1    databases, so I just want to make sure we're clear -- doesn't

2    reflect final sales.  So there could be information that is

3    missed because it's not reflecting what actually ends up

4    happening in the marketplace.

5    Q.    Looking at the General Electric regularly kept meeting

6    competition database, how many times does Summit appear?

7    A.    As I said, it's not an empirical analysis that I've

8    undertaken.

9    Q.    If I told you zero, would you have any reason to disagree?

10   A.    I haven't done the analysis, so I can't agree or disagree,

11   but if you say it's true, I have no reason to doubt you.

12   Q.    Okay.  What about Premier?  How many times does Premier

13   show up in the General Electric meeting competition database?

14   A.    Again, the same answer.  Since I haven't done that

15   analysis, I can't give you an answer about how many times it

16   shows up.

17   Q.    How many times has Avanti appeared in the General Electric

18   meeting competition database?

19   A.    The same answer for Avanti.

20   Q.    How many times has Danby shown up in the General Electric

21   meeting competition database?

22   A.    The same answer.  I haven't done that analysis.

23   Q.    How many times does Crosley appear in the General Electric

24   meeting competition database?

25   A.    The same answer.  I haven't done that analysis.

1    Q.    How many times does Haier appear in the General Electric

2    meeting competition database?

3    A.    Same answer.

4    Q.    How many times does Arçelik appear in the General Electric

5    meeting competition database?

6    A.    It's going to be the same answer for all of them since I

7    haven't done the empirical analysis to give you an answer.  So

8    as a result, if you want to just make this quick, you can say

9    for all of them I haven't done that analysis for the reasons I

10   identified, that the data doesn't represent the final sales that

11   occurred.

12   Q.    So you don't know how many times Arçelik, Miele,

13   Bertazzoni, Viking, Wolf, Dacor or Bosch appear in the General

14   Electric meeting competition database?

15   A.    For every single one I'll give you the same answer, since I

16   have not done that analysis.

17   Q.    Are you aware that Professor Whinston did do that analysis?

18   A.    I'm aware that he presented some data about the number of

19   times that different competitors showed up in both the Smart

20   Quote and the meet comp database, yes.

21   Q.    Are you aware that Professor Whinston found that LG and

22   Samsung combined appeared only 3.1 percent of the time?

23   A.    I saw that testimony, yes.

24   Q.    Are you aware that Professor Whinston also found that for

25   ranges, Electrolux appeared 22 percent of the time?

1    A.   I don't recall the precise numbers that he gave, so I can't

2    give you a precise answer since I didn't commit those to memory.

3    Q.   Do you recall that Professor Whinston found that Whirlpool

4    appeared 71.4 percent of the time for ranges?

5    A.   Same answer for Whirlpool as well.

6    Q.   So as far as you know, using the regularly kept business

7    records of General Electric, which is in the middle of your

8    circle on page 007, there's only three companies that appear in

9    the meeting competition database.

10   A.   In the meet comp and Smart Quote data, so take them

11   together since that encompasses the whole market, there are

12   thousands and thousands and thousands of entries of GE meeting

13   competition for which there are no competitors mentioned.  So

14   there are -- the database doesn't reflect final sales, but it

15   also has thousands of entries for which there are no answers,

16   that we don't know why they changed prices as a result.

17        So we have the answers for a limited number, and that's the

18   data that Professor Whinston used, but again, that's not data on

19   diversion, which is then what feeds into that static model.

20   Q.   I just want to look at your chart, 007.  So you have

21   General Electric in the middle with a bunch of arrows, and

22   General Electric maintains databases that track competition with

23   it.  And Professor Whinston found that for ranges in the retail

24   channel, Whirlpool competed 71.4 percent of the time, Electrolux

25   21.8, Samsung and LG a combined 3.1, and all others 3.7 percent

1    of the time.  And you have nothing to refute that is the

2    analysis of what should be looking at 007, correct?

3    A.   Of all the times that it was reported.  But there were many

4    multiples of that where there was no indication they changed

5    prices in response to what would show up as no data, no

6    competitor.  So you have to take that into account in

7    considering whether that data has the type of richness to then

8    inform one's analysis.

9    Q.   Looking just at indirect contract channel purchases, in

10   fact the General Electric meet comp database shows LG and

11   Samsung combined at zero, correct?

12   A.   Historically, I believe I saw that in one of the charts I

13   was given.  Again, that's based on the past and that is not

14   necessarily the present.

15   Q.   And it shows that indirect Electrolux is at 53.7.  Correct?

16   A.   I did not commit that to memory.  If you say that's

17   correct, I'm not going to sit here -- if there's a chart you

18   want me to look at, that may short-circuit the ability to sort

19   of just go through the numbers.  But it's up to you, obviously.

20   Q.   Are you aware that Professor Whinston also studied the

21   Smart Quote database that GE maintains in the regular course of

22   business?

23   A.   I just discussed both of them together.  Yes, I am.  And

24   for the reasons I've already identified, it doesn't reflect

25   final sales.  There's often a mix-match of products as the

1   quotes are revised.  And so you see circumstances where, in

2   response to competition, prices actually go up, not because

3   prices went up but rather because the products mix in the data

4   changed.

5       And we also know that there are a very high percentage of

6   missing data points where no competitors -- I believe in the

7   Smart Quote data, it's 90 percent plus of the data does not have

8   an observation in terms of who the competitor was in response to

9   that price change.  I did that from memory.  It may be slightly

10  different, but that's roughly the right number.

11  Q.   So looking at DX-0658-007, only one person in this case

12  actually measured how much these competitors in the circle are

13  actually competing with GE.  Professor Whinston, correct?

14  A.   That is not correct.

15  Q.   I think I heard correctly, but you are not qualified as an

16  accounting expert.  Is that correct?

17  A.   I'm an economist, and an applied microeconomist, and that's

18  my area of specialty.

19  Q.   So you're not an expert in accounting.

20  A.   I've spent a lot of time in accounting.  I'm not a CPA, no.

21  Q.   And there was no motion to designate you as an -- to

22  recognize you as an expert in accounting today, correct?

23  A.   No.  I'm an antitrust economist, a microeconomist, I'm not

24  a CPA.

25  Q.   And you're not an expert in manufacturing?

1    A.   No, I'm not.

2    Q.   You're not an expert in purchasing?

3    A.   Other than the fact that I have a wife who loves to

4    purchase, I am not an expert in purchasing.

5    Q.   You're not an expert in distribution?

6    A.   No, I'm not.

7    Q.   You're not an expert in design?

8    A.   No, I'm not.

9    Q.   You're not an expert in commercial support functions?

10   A.   No, I'm an expert economist and I apply economic tools to

11   the analysis of mergers, business conduct, and in the context of

12   doing that, one analyzes all kinds of those issues.  So I have

13   done many mergers in the manufacturing space, in the

14   distribution space, transportation space.  And so I bring the

15   toolbox of an economist to each of those different facets, but I

16   have not worked at, for example, a manufacturing company, so I'm

17   not a manufacturing expert; I'm an economic expert.

18   Q.   PricewaterhouseCoopers has thousands of accountants,

19   correct?

20   A.   I'm sure they do.  I don't know the precise number, but

21   yes, I'm not going to disagree that it's thousands.

22   Q.   PricewaterhouseCoopers is an accounting firm?

23   A.   Yes, it is.

24   Q.   And A.T. Kearney has lots of accountants as well?

25   A.   They have accountants and engineers.  So they have a

1    combination of both.  So it has more of a mix of services that

2    they provide.

3    Q.   You mentioned earlier TraQline.  Do you remember that?

4    A.   Yes, I do.

5    Q.   TraQline is a survey?

6    A.   Yes, it is.

7    Q.   TraQline isn't records of actual sales, correct?

8    A.   Well, it's an interview of customers about their purchasing

9    behavior.

10   Q.   You used a mix of TraQline and invoice data?

11   A.   Where -- as I've described multiple times, where invoice

12   data were not available, transactions data from the companies

13   were not available, I supplemented it with the best available

14   indicator, which was the TraQline data.

15   Q.   Invoice data is better than survey data, generally?

16   A.   Yes.

17   Q.   You would agree that TraQline includes respondents who did

18   not remember the brand purchased, purchased a product without a

19   clear brand identification, or otherwise confused the brand name

20   with some other product identifier.  Correct?

21   A.   There are examples in the data of misreporting, and I've

22   looked at those, and they are relatively small.  But there are

23   certainly examples of misreporting.

24   Q.   It's also correct that internally at Electrolux, when they

25   use TraQline data, they use it with a disclaimer saying TraQline

to be used for trending only, Electrolux is understated, while

competitors are overstated.  Are you aware of that?

A.   I am aware that Electrolux and one other competitor

relative to the invoice data come out differently than the

invoice data, because I examined it.  But again, the very fact

that it's a survey that may not be precisely identical to the

invoice data does not mean that it is not the best available

indicator we have for those smaller competitors.

     And so it is appropriate, consistent with the merger

guidelines, to include those smaller competitors using that

data.  Even though it is not perfect, it is still the best

available indicator that we have.

Q.   Let's look at PX 02064, please.  Do you see that this is a

document produced by Electrolux in the bottom right-hand corner?

A.   Yes, I do.

Q.   Let's look right in the middle of this document under the

chart.  There's a disclaimer.  Do you see that?

A.   I do see that.

Q.   It says, "Disclaimer:  TraQline to be used for trending

only.  EMA is understated, while competitors are overstated."

Do you see that?

A.   Yes, I do.

Q.   So when you were calculating market shares, you looked at

revenue because that showed a smaller combined share between GE

and Electrolux.  You used TraQline data because that

1    underestimated Electrolux and overstated its competitors.  And

2    you picked and chose what date ranges you were going to look at,

3    all to come to the conclusion that you came to today, correct?

4    A.   No, not at all.  Let's just be very clear about this.

5    Number one in your list that you provided, we cannot just assume

6    that people we observe in the marketplace selling do not exist

7    even if they are small.  That is number one.  And the TraQline

8    data is the best available indicator.  You can't throw the baby

9    out with the bath water.  That's number one.

10       Number two, the reason that I looked at certain -- although

11   you tried to mix and match the date ranges, was because certain

12   suppliers, certain retailers only provided data up to certain

13   points.  And so one was limited because of that to the time

14   periods that one examined.  And so you pulled that out, but the

15   reason why I was trying to use the best available data for each

16   of the analyses, and so that's why I went to those time periods,

17   to look at the best available data that one could have.

18       So that is necessary because we don't have -- not every

19   provider, not every retailer, not every supplier said, you know

20   what, we're going to provide the data through June or July of

21   2015, for example.  Bosch did not report 2015 data.  Others

22   reported it through August.  Others reported it through June.

23   That then dictated the analysis.

24       Home Depot, for example, provided what happened at Labor

25   Day.  None of the other retailers did.  So am I just supposed to

ignore that because it's an additional data point?  No.  It's
part of the economic analysis.  It's additional data.  It
deepens the framework and allows one to have a fuller picture.
So the insinuation is just very misguided when you look at the
bases for this.

   And you also mentioned I looked at revenue shares versus
unit shares.  I didn't write the guidelines.  The guidelines say
you should use, in differentiated product markets, when the
difference in price is based on a -- of competitive
significance, you should use revenues.  The guidelines continue,
and we can read them, where it says the reason when you use
units is the example where there's a lower-price product that
would replace unit for unit a higher-priced product, for
example, because that lower-priced product is new and
innovative.

   And so you have an older product -- this is the guidelines.
We can get the precise wording; I'm paraphrasing it.  You have
an older higher-cost product being treated as being more
relevant to the market than the lower-priced, higher-quality
product.  And in that case, the guidelines say you should use
units.  But otherwise, it says you should generally use revenue.
And there is no sound basis, given the importance of product
quality, to then use units in this case.  So it wasn't that I
chose it because it produced a result; it's because that's what
you're supposed to do when you look at the competitive

1    significance of the players.

2         So I take great issue with how you asked the question, and

3    I hope I laid out each of the rationales behind the three points

4    that you raised.

5    Q.   Please turn to PX 02056.  That's the table of shares.

6              MR. GLASS:  Your Honor, may I use the ELMO?

7              THE COURT:  Sure.

8    BY MR. GLASS:

9    Q.   I'd like to first look at GE ranges.  Okay?  Let's start

10   with row 34.  On row 34, it reports GE ranges in 2015 total

11   market share.  Correct?

12   A.   That is correct.

13   Q.   And on column H, using units, it reports GE is at about 29

14   percent.  Correct?

15   A.   That is correct.

16   Q.   Okay.  Now I'd like to look at GE for 2014, and that's row

17   387, please.  387 is 2014 total range sales by General Electric.

18   Correct?

19   A.   That is correct.

20   Q.   And column H reports about a 27 percent market share.

21   A.   Sorry, just lost my spot.

22   Q.   Row 387.

23   A.   27.4, to be precise.  And if we're going to do it decimal

24   places, perhaps you should use 28.8 instead of rounding for

25   2015.  Sorry that I've made it a little messier for you.

```
1    Q.   That's okay.  I want it to reflect your testimony.
2         Okay.  Now let's look at 2013, which is row 421.  Row 421
3    is 2013 total range sales by General Electric.  Correct?
4    A.   That is correct.
5    Q.   28 percent?
6    A.   You can do 28.0 for that one, yes.
7    Q.   Okay.  Now I'd like to do it for Electrolux ranges.
8    Electrolux for 2015 is row 23.  Correct?
9    A.   That is correct.
10   Q.   And that reports 19.6?
11   A.   Sure.
12   Q.   Electrolux's 2014 is at row 344.  Correct?
13   A.   Yes.  That is correct.
14   Q.   That's 22.2?
15   A.   Yes, it is.
16   Q.   And Electrolux 2013 is at 321.  Do you see that?
17   A.   That is correct.
18   Q.   And Electrolux's share is 23.1, 23.2?
19   A.   23.2.  And this is all on a unit basis.  On a revenue
20   basis, the numbers would be right next to them in each of them,
21   and the numbers for 2014 and 2015 on a revenue basis are in my
22   presentation as well.  By the way, I should just note I have
23   both unit shares and revenue shares in my expert reports.
24   Q.   Okay.  I'd like to do the same thing for Kenmore, please.
25   So 2015 is on row 54.  Correct?
```

1   A.    If it would help, I actually in my expert report include

2   all cooking appliances by revenues and units.  We could just

3   look at that if that would help.

4   Q.    Let's just do it this way.  We're almost done.

5   A.    Okay.  I just thought it may speed it along.

6   Q.    Row 54, Kenmore, all ranges, 11.6?

7   A.    That is correct.

8   Q.    And 2014 for Kenmore is at 541.  11.9?

9   A.    That is correct.

10  Q.    2013 is at 544.  Correct?

11  A.    That is correct.

12  Q.    12.2?

13  A.    That is correct.

14  Q.    All right.  Last one, Whirlpool.  Whirlpool in 2015 is

15  found on row 108.  Correct?

16  A.    That is correct.

17  Q.    And that's 24.9?

18  A.    That is correct.

19  Q.    2014 for Whirlpool is found at 851.  Correct?

20  A.    24.9.  Again on a unit basis.

21  Q.    And 2013 is at 866.

22  A.    It's 24.2 percent.

23  Q.    Okay.  Over time, from 2013 to 2014 to 2015, for the four

24  biggest players in ranges in the United States, their shares

25  have been pretty stable, correct?

1    A.    Can we go back and look at each of these?

2    Q.    Sure.  Which would you like to look at first?

3    A.    You may be able to get them side-by-side, I don't know.

4    There seems to be enough room there.  Electrolux has fallen by

5    3.6 percentage points.  GE has grown on a unit basis by .8

6    percentage points from 2013 to '15.  Kenmore has fallen by .6

7    percentage points.  And Whirlpool has increased by .7 percentage

8    points.  So each of them has had mixed results.  I would say

9    Electrolux has lost the most share, obviously.  That's just a

10   statement of fact.

11   Q.   But as an economist, when looking at those shares from

12   2013, 2014, 2015, they're very stable.  Correct?

13   A.   I'm not going to agree that they're very stable because

14   you're looking over a two-year period.  I think if you look over

15   a five-year period, the shares have moved much more

16   significantly towards LG and Samsung and away from the legacy

17   brands, and that's the chart that I showed in my presentation

18   about what's happened to cooking appliances.

19   Q.   I want to look at what's happened most recently.  In the

20   three most recent years reported in the backup data to your

21   report, Electrolux, GE, Kenmore, and Whirlpool shares have been

22   very stable?

23   A.   If you go back -- can you show me the Electrolux numbers

24   again?  They've lost about, as a group, over 2 percentage

25   points, if I just did the math correctly, in a two-year period.

1    So the four of them combined have lost 2 to 3 percentage points.

2    I was just trying to do the math.

3        So I think if you went and asked the business people if

4    losing 2 or 3 percentage points was stability, I think the

5    answer would be no.  What matters as a matter of economics is

6    looking not just in a two-year window but over a multiple-year

7    window, and one sees the trend I put forward in the charts I

8    presented earlier.

9            MR. GLASS:  Your Honor, may I mark each of these as an

10   exhibit for the record?

11           THE COURT:  Sure.

12           MR. GLASS:  Your Honor, I'm going to mark the one that

13   has GE ranges and Electrolux ranges numbers as Government's

14   Exhibit 1.  And the one that has Kenmore ranges and Whirlpool

15   ranges as Government's Exhibit 2.

16           THE COURT:  That's fine.

17           MR. GLASS:  Thank you, Your Honor.

18                           (Government Exhibit Nos. 1, 2

19                           marked for identification.)

20   BY MR. GLASS:

21   Q.   All right.  So you mentioned the Samsung growth outside of

22   these three years.  Let's look at DX 0658, page 019, please.

23   A.   Yes, sir.

24   Q.   This is what you were talking about?

25   A.   No.  I was actually focused on 017.

1    Q.   Okay.  Let's look at 019.  So 019 -- so looking at this

2    chart, we can see three spikes in the Samsung numbers that you

3    have here, correct?

4    A.   Three peak -- well, we don't know because we don't have

5    data after this whether that's a peak.  I would say there's two

6    peaks and then there's one that is on an upward trend.

7    Obviously, there's data points between your first peak and your

8    second peak.  But the other way to describe this is there's two

9    periods in which there's a drop.

10   Q.   Okay.  So let's look at all four of those periods then.  So

11   I'll redraw it without the end one since you're right, we don't

12   know what happened.  So these are the four periods you were just

13   talking about, correct?  Two peaks and two drops.

14   A.   Yeah.  Obviously, the drops are in one quarter and the

15   growth's in three quarters.  So if I could just highlight that,

16   if you don't mind, that's the one-quarter drop, and then you

17   have multiple quarter increases.  So if you think about it as

18   they take four steps forward, one step back, four steps forward

19   is in essence what you're seeing in those two periods.

20   Q.   Okay.  So let me take a look at the four big moves.  Okay?

21   You've got the four moves -- let's look at -- so GE is the red

22   line down below, correct?

23   A.   That is correct.

24   Q.   And Electrolux is the purple line?

25   A.   That is correct.

Q.   So Samsung spikes, GE and Electrolux are flat.  Samsung
goes down, GE and Electrolux are flat.  Samsung spikes again, GE
and Electrolux are flat.  Samsung goes down, GE and Electrolux
are flat.  Correct?

A.   You've so aggregated this analysis that it is -- I really
am surprised that you would make those comments.  This is -- if
you want to do that, you would want to look at it much more
granularly.  So doing it that way is just -- you're missing the
movements that may be occurring.  So, for example, you just made
that statement, but if you look right there, and what I can see
in this chart, Electrolux falls when Samsung goes up at that
same time period.  So I'm just -- you've tried to do an analysis
that this chart is not prone to allow you to do.

Q.   Let's look at page 029 of your slides.  So if I understood
correctly, your testimony was the dotted line is the price of a
particular Samsung SKU.

A.   That is correct.

Q.   The solid blue line is the price of a particular Electrolux
SKU.

A.   That is correct.

Q.   And the green line is the price of a particular GE SKU.

A.   That is correct.

Q.   Okay.  And you chose those SKUs because you thought they
were similar to each other?

A.   No.  They were the top-selling SKU in each of those

1    periods.

2    Q.   All right.  Let's look at the starting price.  The starting

3    price for the Samsung was $1,002, correct?

4    A.   I don't have the data in front of me, but if you say it's

5    $1,002, I'm not going to disagree with you.

6    Q.   Just in case you need it, the data from your backup

7    materials are PX 02072.  Do you see the first page is the same

8    chart?

9    A.   Yes.  I see it.

10   Q.   And then if you go to the fourth page, it actually has the

11   prices that the lines represent?

12   A.   Yes.  I see that.

13   Q.   And you'll see for May the Samsung price was $1,002?

14   A.   I see that, yes.

15   Q.   And the price for the Electrolux range was $686.

16   A.   That is correct.

17   Q.   And the price of the GE range was $540.

18   A.   That is correct.

19   Q.   All right.  Now let's look at the end of your slide.  The

20   Samsung range has come all the way down to $644.  Correct?

21   A.   That is correct.

22   Q.   If my math is correct, $1,002 minus $644 is a $358 decrease

23   in price.

24   A.   That is correct.

25   Q.   Okay.  Now let's look at the Electrolux.  The Electrolux

1   range went from $686 to $634.  Correct?

2   A.   That is correct.

3   Q.   And that is a decrease for the Electrolux range of $52.

4   A.   That is correct.

5   Q.   And the GE range went from $540 to $527, correct?

6   A.   That is correct.

7   Q.   That's a decrease of $13?

8   A.   That is correct.

9   Q.   So while the Samsung range is coming all the way down, a

10  third of the price cut, shown by the line on DX 0658-029, it's

11  putting so little pressure on Electrolux and GE that Electrolux

12  only had to go down $52 and GE only had to go down $13.

13  Correct?

14  A.   So there are a lot of competitive forces in place.  We

15  observed that they came down in price in responses, but perhaps

16  even more relevant is that they also lost significant share and

17  Samsung gained very significant share.  As it came down in

18  price, it saw its share go from 1.2 percent to 13.1 percent for

19  that one SKU.  At the same time, the combined share for the

20  Electrolux and GE SKUs fell by roughly 3 percentage points.

21       So what you see is a combination of two factors: losing

22  share and some modest downward pressure on price from the drop

23  in price of the Samsung product.

24  Q.   So if I can put names on this, Mr. Jones is substituting to

25  the Samsung range.  He's bringing the price down because he's

1    switching.  But Mrs. Smith, she is not benefiting from that

2    switching because the Electrolux and the GE products are about

3    the same price all along.  Correct?

4    A.   Well, she benefited because the price came down $13, and to

5    her that's not insignificant, or the Electrolux product came

6    down $50, and there are a lot of people who would love to have

7    that $50 in their pocket, sir.

8    Q.   But it's an overstatement to say that the Samsung decrease

9    of 30 percent resulted in Electrolux and GE moving significantly

10   down.  Correct?

11   A.   Significantly down in price?  They moved down $50.  I

12   didn't test the statistical significance of this, so -- in terms

13   of the decline, whether that's a statistically significant drop

14   in price.  It's a real drop in price.  Consumers benefit to the

15   tune of that $50 for those consumers who buy it.  And the

16   consumers who have chosen to now purchase the Samsung range

17   benefit from the fact that they have switched to a product that

18   gives them more value.  Because if not, they would have stayed

19   with the prior range.  So they're getting a better product.

20        And the people who are continuing to buy, the Mrs. Smiths

21   who are continuing to buy Electrolux and GE products, are

22   getting a cheaper product.

23   Q.   So if this merger goes through, GE and Electrolux would be

24   one company and that green line for the GE range will be right

25   where that Electrolux blue line is, costing Mrs. Smith $107,

1   correct?

2   A.   No.   First of all, this is just the top-selling range.   And

3   obviously, each of them is offering many, many ranges.   The idea

4   would be that they would -- why would the combined company not

5   keep both ranges in the market, serving one price point at 527

6   and one price point at 634?   So they would be two different

7   products.   They're products that have already been produced.

8        So the suggestion that they would just take a product and

9   wipe it out is inconsistent with sound economics if that is what

10  is profit-maximizing for them to do to continue to offer both

11  ranges to try to target different parts of the market.

12  Q.   You would agree that there is an industry-recognized

13  contract channel, correct?

14  A.   Each person you talk to defines it differently.   I would

15  say that there's a defined direct channel, and that the contract

16  customers obtain product through many different mechanisms, and

17  people recognize people as contract channel customers.   So I

18  would just want to make sure that we -- but each person has a

19  somewhat different definition of those issues.

20  Q.   In fact, you criticize Professor Whinston, you did so

21  yesterday, for his contract channel market definition, correct?

22  A.   Absolutely, yes.

23  Q.   You say that you don't understand what he's talking about,

24  you don't know how he got to the shares, you even had a slide

25  with a bunch of different colors saying it's confusing where all

1    these numbers are coming from.  Is that fair?

2    A.    No, I can see where the numbers are coming from.  Why he

3    chose to treat the same -- different suppliers differently

4    within the same customer is confusing to me.  But it's not even

5    clear why we would end up getting to that place to calculate

6    market shares when he misapplied the hypothetical monopolist

7    test fundamentally, and the primary evidence he puts forward to

8    support his contract market channel is really problematic for

9    the reasons that I outlined.

10    Q.    Let's turn to your slide 097 in DX 0658.  This slide is

11    titled "Profit Margins in Retail Versus Contract Channel Sales."

12    Correct?

13    A.    That is correct.

14    Q.    Let's look at the next slide.  This is titled "Product

15    Availability For Cooking Appliances in the Retail and Contract

16    Channels."  Correct?

17    A.    That is correct.  As defined by GE, Whirlpool, and

18    Electrolux, how they're using the terms "contract."  Yes.

19    Q.    Let's look at 099.  "Share of Sales Based on Recently

20    Introduced SKUs in the Retail and Contract Channels," correct?

21    A.    Using that same data of how GE, Electrolux, Whirlpool, and

22    Sears define the contract channel.

23    Q.    Next page is 100.  You split the table into retail channel

24    and contract channel, correct?

25    A.    As defined by these three companies.

1   Q.   In fact, you have calculated market shares in the contract

2   channel, haven't you?

3   A.   No, I have not.

4   Q.   Let's turn back to PX 02056.  Let's look at row 37, please,

5   in 02056.  Row 37 is range for 2015 contract General Electric,

6   and column H has 43.3 percent market share, correct?

7   A.   That's what the number reports, but it's 45.3 percent -- I

8   would need the underlying data to show -- because that's not

9   what was used for the market shares that I report in my report.

10  And as I note in my report, each company reported the data

11  differently.  So this table includes the companies as they

12  reported it for each one, but I'm looking at the combined

13  market.  So I'm -- including the totals are the relevant

14  metrics.

15  Q.   In your backup materials to your expert reports, you report

16  the market shares by unit and by revenue for General Electric

17  selling ranges in the contract channel in 2015.  Correct?

18  A.   Can you show me the underlying -- what the 345,732 units

19  sold that General Electric identified as units sold to the

20  contract channel is then divided by?  Because I would need to

21  see that to -- I didn't commit that to memory.

22  Q.   This is your backup material.

23  A.   I know.  What I'm saying is, as what we can turn to, you

24  have to show me what that is being divided by.  As I've stated

25  in my expert report and I've talked about, each company reports

1    their data differently.  And as a result, one is not able to do

2    an apples-to-apples comparison for the contract channel because

3    some companies like General Electric provide the data precisely

4    between retail and contract, where other companies just provided

5    aggregated information.

6        So to measure market shares, one would have to have that

7    information divided.  And so that's what is relevant.

8    Q.   Let's just look at this row.  In your backup material, row

9    37 reports in column C, which says channel for contract, column

10   H has 43.3 percent.  Correct?

11   A.   That's the number you are reporting here, but can you show

12   me what it's divided by?  This is a multiple-page spreadsheet,

13   and if one can look at the cells, then one would know what that

14   is divided by because I would want to look at that to give you

15   an answer.  Because to do market share, it's sales divided by a

16   number.  And for me to just look at this on a printout is rather

17   difficult because that's not a number that then went into my

18   report.

19       As I noted in my report, the contract channel is reported

20   differently for each of the suppliers.  So I don't know, for

21   example, if this is 43 percent of the total for GE sitting here

22   today.

23   Q.   Okay.  Let's look at row 26, please.

24   A.   Yes, sir.

25   Q.   Row 26 reports the range sales in 2015 in the contract

1   channel for Electrolux.  If you go to column H, the quantity

2   share, the unit share, is 15.7 percent.  Correct?

3   A.   Again, the same answer I provided earlier, that you're not

4   showing me what that's in proportion to.

5   Q.   All right.  Let's look at row 47, please.  Row 47 reports

6   the range sales in 2015 for the contract channel for Kenmore in

7   column H as being 7.7 percent.  Correct?

8   A.   You're reading the number correctly, but you're not telling

9   me for contract what it's divided by.  So it's -- I don't know

10  what else to do other than to read you the number.  Those

11  numbers were not used, the contract piece, other than for the

12  total numbers that I report and why there are apples-to-oranges

13  comparisons between how each of the suppliers reported their

14  data.  And that's critically important, because if it's apples

15  to oranges, then you're not measuring the same thing.

16       And so we can do that for the overall market because we

17  have the combined data.  But when you have a situation that one

18  supplier provided it one way and say Samsung supplied it -- they

19  actually just allocated it all to retail, what are we supposed

20  to do?  And that's one of the reasons why these market share

21  calculations for the contract that Professor Whinston did don't

22  sort of hold together because there's so many inconsistencies.

23  Q.   Let's look at row 102, please.  Row 102 reports the range

24  sales in 2015 in the contract channel by Whirlpool and column H

25  identifies 32 percent.  Correct?

1    A.   You read that correctly, yes.

2            MR. GLASS:  Your Honor, may I use the ELMO one more

3    time?

4            THE COURT:  Of course.  Sure.

5            MR. GLASS:  Thank you.

6    BY MR. GLASS:

7    Q.   I just wrote those numbers down.  What do those numbers add

8    up to?

9    A.   Roughly 99 percent, if I'm doing it correctly.

10           MR. GLASS:  Your Honor, may I mark this for

11   identification purposes only?

12           THE COURT:  Sure.

13           THE WITNESS:  And you wrote "Market Shares" on the top

14   of that.  Given the fact that you haven't shown what it's

15   divided by, to do a market share correctly would be a unit or

16   revenue divided by a total, and so one would need the total to

17   be able to do that correctly.

18           MR. GLASS:  Your Honor, I have marked for

19   identification purposes only as Government Exhibit 3 the numbers

20   that we just went through in PX 02056 from Mr. Orszag's backup

21   material.

22           THE COURT:  All right.

23           MR. GLASS:  Your Honor, I have no further questions.

24           THE COURT:  All right.  It's five o'clock.  Let's take

25   a 15-minutes recess.  How much time do you need for redirect,

1    counsel?

2             MR. DEMITRACK:  I would be shocked if I would be more

3    than 10 or 15 minutes.  But I might be shocked.

4             THE COURT:  It's appropriate.  We started around 3:15.

5    Let's take a 15-minute recess.

6        (Recess from 5:03 to 5:19 p.m.)

7             THE COURT:  All right, counsel.

8                      REDIRECT EXAMINATION

9    BY MR. DEMITRACK:

10   Q.   Mr. Orszag, it's been a long day.  This will be brief.

11   A.   Thank you.  I appreciate that.

12   Q.   During his cross-examination Mr. Glass asked you some

13   questions about Plaintiff's Exhibit 2049.  We're not able to put

14   it up on the screen because we didn't get it in time in order to

15   do that.  But you're familiar with that; that's the backup

16   information regarding cooking appliances.  Do you recall that

17   document?  2049, sir.

18   A.   Yes, sir.

19   Q.   Let me just ask you a single question here.  What

20   conclusions do you draw as an economist from what is displayed

21   in PX 2049?

22   A.   That the UPP model is an extremely poor predictor of the

23   price effects measured simply that were observed following the

24   Maytag-Whirlpool merger.  It in fact not only got the magnitude

25   wrong, it got the direction wrong, got the direction wrong

1  across all products and within cooking products it got the

2  direction wrong.  So that's a significant condemnation of the

3  UPP framework in an industry such as this one.

4  Q.   And that's for the reasons you testified in response to

5  Mr. Glass's questions and in response to my questions earlier?

6  A.   Yes.

7  Q.   Thank you.  Let me also direct your attention to

8  Plaintiff's Exhibit 2053.  That was a white paper submitted to

9  the government by a law firm on behalf of one of the parties in

10  the Whirlpool-Maytag merger.  Do you see that?

11  A.   Just to be precise, it looks like multiple law firms.

12  Q.   It may be multiple law firms.  Thank you.  Do you recall

13  that Mr. Glass pointed to a section in the table of contents

14  describing Electrolux as a price maverick?

15  A.   Yes, I do.

16  Q.   Now, you've read the closing statement in the

17  Whirlpool-Maytag merger?

18  A.   Yes, I did.

19  Q.   We marked that as Defense Exhibit 399 in case you want to

20  refer to it.  Did you see any reference in the government's

21  explanation of why it closed the Whirlpool-Maytag merger to

22  Electrolux supposedly being a price maverick?

23  A.   I don't recall one, so if you would just give me one second

24  to quickly review it.

25       (Witness reviewing document.)

1    I do not see any reference to the government calling

2    Electrolux a maverick in its closing statement.

3    Q.   Thank you.  Mr. Glass asked you a number of questions about

4    TraQline and the use by you of TraQline in some of the share

5    figures that you prepared.  Does TraQline include sales to

6    professionals?

7    A.   No.  It only includes sales to retail customers.

8    Q.   Mr. Glass also asked you several questions about Summit and

9    Premier.  Would you agree that today Samsung and LG are

10   effective competitors in the sale of cooking appliances in the

11   United States?

12   A.   Yes, I do.

13   Q.   Would you also agree with me based on the work you've done

14   in this case that they started from very small shares?

15   A.   Yes, they did.  By definition.  They entered the U.S.

16   market sometime in the late 2000s with cooking products,

17   mid-2000s with cooking products, so they obviously started with

18   very small shares.

19   Q.   And part of the dynamic nature of this business is that

20   competitors grow and shares change.  That's what you reported

21   earlier today in your data, correct?

22   A.   That is correct.

23   Q.   Mr. Glass asked you several questions about whether there

24   was any evidence of GE competing with Premier.  Did you

25   investigate and determine at least one situation where GE and

1    Premier competed and GE lost business to Premier for a contract

2    channel project?

3    A.    They lost -- I cited in my expert report, they lost a

4    significant contract to the Boston Housing Authority.

5    Q.    Do you recall the volume of ranges involved?

6    A.    Off the top of my head, I don't, but I remember it being a

7    substantial or significant number.

8    Q.    That's fine.  Now, our hypothetical Mrs. Smith that we've

9    heard so much about in these various hypotheticals, she

10   purchases value ranges, correct?  That's the hypothetical?

11   A.    In the hypothetical she is producing value or mass, and

12   she's producing -- depends what number.  People put different

13   numbers.  She could be at the $500 or the $400 level.  It

14   depends which example I've seen.  I've seen multiple ones so

15   far.

16   Q.    At the price levels that you were identifying that we've

17   had, $500, those products, based on your investigation, you

18   determined are sold by Premier today, correct?

19   A.    Premier has a range of products at lower and mid-price

20   points.

21   Q.    And those products are available in retailers across the

22   country, correct?

23   A.    They are available at retailers across the country.

24   Q.    And Summit produces and sells value-priced ranges, correct?

25   A.    Based on that letter that I saw, I would say they are a

1   supplier of those value ranges, and you see them -- they have a

2   number of products that are available at The Home Depot.

3   Q.   Mr. Glass characterized in an exchange with the Court, he

4   characterized your market shares as a jerry-rigged analysis.  Do

5   you agree with that conclusion -- statement.

6   A.   I think that was not about my market shares.  I thought he

7   quoted somebody else about that issue.

8   Q.   Do you believe that you conducted and presented a

9   jerry-rigged market share analysis?

10  A.   No, not at all.  I took the revenues as reported in the

11  transactions data.  I went to the best available indicator for

12  the other suppliers.  I followed the guidance of the guidelines

13  to use revenue shares when the difference in price that you

14  observe has competitive significance associated with it.  And

15  the guidelines provide that guidance.  So that's what I did.  I

16  followed the guidelines approach, and that is entirely

17  appropriate.

18      And I should just note that the market shares that were

19  presented did not incorporate into it the future competitive

20  significance.  And the guidelines say you should add market

21  share to, say, Samsung.  If you reasonably predict or reasonably

22  forecast that Samsung is growing, you should adjust the market

23  shares to take that into account.

24      So in many respects what I've done understates the market

25  shares of the -- overstates the market shares of the parties and

1    understates the market shares of Samsung.

2    Q.   Mr. Glass asked you several questions to the effect that

3    you're not a manufacturing expert, you're not a distribution

4    expert.  Do you recall that testimony?

5    A.   Yes, I do.

6    Q.   You are an economist, correct?

7    A.   Yes, I am.

8    Q.   And you applied the tools of economics to evaluate the

9    efficiency claims in this case, correct?

10   A.   Yes.  I'm also not an expert in the sales of appliances.

11   I'm an expert at analyzing the sales of appliances, or sales

12   data more generally.  Similarly, I've analyzed manufacturing

13   industries, transportation industries, distribution industries,

14   I've analyzed volume discounts before, and in many cases done

15   the same types of analyses of the best price or volume discounts

16   that companies can receive.

17   Q.   And you made expert judgments based on your training as an

18   economist regarding the efficiencies in this case, correct?

19   A.   Yes, I did.

20   Q.   And one of the issues you looked at was merger-specific

21   efficiencies relating to cooking products and merger-specific

22   efficiencies related to or associated with noncooking products,

23   correct?

24   A.   That is correct.

25   Q.   And do you believe, based on your expert opinion and

1    judgment, that it is appropriate to include merger-specific

2    efficiencies associated with noncooking appliances in an

3    efficiencies analysis in this case?

4              MR. GLASS:  Objection.  Beyond the scope of the cross.

5              MR. DEMITRACK:  He asked a number of questions, Your

6    Honor --

7              THE COURT:  I'll allow it over objection.

8              MR. DEMITRACK:  It's the only question I'm going to

9    ask on this.  Thank you, Your Honor.

10             THE WITNESS:  The guidelines to me use the term that

11   efficiencies should be counted when they are inextricably

12   linked.  So when we observe those kind of distribution

13   efficiencies that I showed with the trucks, those trucks include

14   both cooking appliances and refrigerators.  So you can't

15   separate one from the other.  So those clearly are inextricably

16   linked.

17       We also talked about how there are a number of consumers

18   who buy cooking appliances at the same time they're buying the

19   rest of their kitchen, so they're buying a kitchen bundle.  So

20   if there's a efficiency in, say, refrigeration, the price of a

21   refrigerator that the combined GE-Electrolux produces, that

22   accrues to the benefit of that same consumer that is buying a

23   cooking product.  So it's inextricably linked because of that as

24   well.

25       So, yes, they should be included because when efficiencies

1   are inextricably linked, it's appropriate to look at all of

2   them.

3   BY MR. DEMITRACK:

4   Q.   Thank you.  Since the time you've been retained in this

5   case on behalf of the defendants, have you had any contact with

6   anyone at Compass Lexecon who has worked on the Whirlpool-Maytag

7   merger or Whirlpool antitrust matters regarding the substance of

8   their work?

9   A.   No.  No, I have not.  We have a very -- I'm quite proud of

10  our firm, and we have put together, as Mr. Glass said, a

11  wonderful roster of economists, that I often joke that if we

12  were an economics department in an industrial organization, we'd

13  probably be the best in the world.

14       We take these issues of confidentiality extremely

15  seriously.  The Justice Department has, in the past, said to us

16  that they're comfortable with Compass Lexecon actually being on

17  the opposite sides of the identical matter, and they've written

18  why they believe that's the case.

19  Q.   They wrote a letter to Compass Lexecon on that?

20  A.   Yes, they did, and it was during this administration.  And

21  the reason why they said it was okay is because experts are

22  sources are information, and as long as confidentiality is

23  protected, then it's fine.

24       And we use very strict ethical walls.  If I tried to access

25  a folder that had any Whirlpool information, not even about this

```
 1    case, a message would go immediately to our head of IT

 2    indicating that I had tried to just -- even though I don't have

 3    access to it, just the act of trying to access it.  So these

 4    issues we take extremely seriously, and as a result, there is no

 5    sharing of confidential information between experts when there

 6    are ethical walls in place.

 7    Q.   Now, you've been a professional economist for quite some

 8    time following your government service, correct?

 9    A.   Yes, sir.

10    Q.   Is it unusual based on your experience and what you've seen

11    in your industry, the economics consulting industry, for

12    economic consulting firms to work for many different companies?

13    A.   Yes.

14    Q.   It's not unusual?

15    A.   It happens all the time.  We do it all the time, our

16    competitors do it all the time.  It's something that, because of

17    the nature of our -- the fact that we have academics who are

18    part of the firm and that they desire to work on multiple

19    things, that's what is very standard in our industry.

20    Q.   And it's not unusual for economic consulting firms to work

21    for companies that are competitors of each other?

22    A.   Not at all.  We do that quite often, as do our competitors.

23    Q.   Let me ask you, please, to turn to PX 02065, which is the

24    article written by Jonathan Baker and Carl Shapiro.

25    A.   What was the number again?
```

1    Q.    PX 02065.  Do you have that in front of you?

2    A.    Yes, I do.

3    Q.    You've read this article before?

4    A.    It's been some time, but yes, I have.

5    Q.    Did Mr. Baker and Mr. Shapiro report in this article that

6    they had conducted any empirical analysis of the

7    Whirlpool-Maytag merger?

8    A.    No.  They did not conduct any empirical analysis in the

9    context of this.  They were raising theoretical concerns about

10   what could have happened or would have happened if or when the

11   Whirlpool-Maytag deal was approved.  They did not conduct an

12   empirical analysis of those issues.

13   Q.    And Professor Whinston did not conduct an empirical

14   exercise either, did he?

15   A.    No, he did not.

16   Q.    He had a series of theoretical critiques of your work,

17   correct?

18   A.    A series, each of which I have shown does not change my

19   results.

20   Q.    Let me direct your attention to the same pages that

21   Mr. Glass showed you.  Let me first go to page 249.  I'm sorry

22   we don't have a copy to put up on the screen for the public, but

23   we just received this article earlier today and didn't have time

24   to convert it.

25   A.    You could use the ELMO.

1    Q.   I could, but I wrote all over my copy.  On page 249,

2    Mr. Glass -- are you on that page, sir?

3    A.   Yes, I am.

4    Q.   Mr. Glass read to you from the second paragraph on that

5    page beginning, "First, the statement does not explain why the

6    recent entry by LG and Samsung was sufficient to solve any

7    competitive problems caused by the merger."  Do you see that?

8    A.   Yes, I do.

9    Q.   And he read down all the way to a sentence that described

10   the market shares, where the authors write, "implying" -- that's

11   my use of I-N-G -- "that there is no competitive harm when a

12   leading firm with 50 percent of the market acquires the No. 2

13   firm with 20 percent of the market."  Do you see that?

14   A.   Yes, I do.

15   Q.   He did not read the rest of that paragraph, as you pointed

16   out to him.  And the rest of that paragraph reads, "In the case

17   at hand, would LG, Samsung, or other foreign firms or fringe

18   domestic products have the production capacity and brand

19   reputation needed to convince large distributors like Best Buy

20   to carry them?  If so, would their products be attractive to

21   those consumers who now see Whirlpool and Maytag as their first

22   and second choices?"  Do you see that?

23   A.   Yes, I do.

24   Q.   Did you investigate those questions in this transaction?

25   A.   Yes, I did.

1    Q.   What is your opinion?

2    A.   We can go to the actual data for Best Buy.  Is it possible

3    to pull up --

4    Q.   Yes, we can put your slide back up again.

5    A.   So this would be ending in 024.  I think this was redacted

6    earlier.

7    Q.   You can speak generally about that slide.  The Court has an

8    unredacted copy.

9    A.   So Carl and John write that what they're worried about is

10   that Samsung and LG may not grow that rapidly post the merger to

11   actually defeat any post-merger price increase.  That's what

12   they're worried about in this paragraph.  And so we can go and

13   question whether they would actually succeed at Best Buy.

14        Samsung and LG today have more than -- actually, it's as of

15   the June to July 2015 period -- have more than 55 percent

16   combined of sales at Best Buy.  That means that they clearly

17   have gotten their product -- they clearly have the production

18   capacity and brand reputation to succeed there, and it's clearly

19   that those products are attractive to consumers because more

20   than 55 percent of them are buying from those two brands at Best

21   Buy.

22   Q.   So once you look at the facts, Mr. Orszag, those

23   theoretical questions raised by Mr. Baker and Mr. Shapiro don't

24   hold water.

25   A.   Yes.  I think that the theory that they raise is a sound

1    concern, just as the theory that the government raises here is a

2    sound concern.  The question is, does it fit the facts?  And the

3    facts, if you look at what happened post that Maytag-Whirlpool

4    deal, are very clear, because there's no evidence to support a

5    conclusion that prices went up.

6        I did this hundreds of different ways at this point, tested

7    it every which way, and you do not see those higher prices that

8    Carl and John were worried about.

9    Q.   And if you look at the next paragraph which begins,

10   "Second, the statement does not address the extent of direct

11   competition between Whirlpool and Maytag."  And he goes on.  Do

12   you see that?

13   A.   Yes, I do.

14   Q.   You can see that there is direct competition between

15   Electrolux and GE today, correct?

16   A.   Yes.

17   Q.   And if you look in the next sentence, the authors write,

18   "Following the standard approach to unilateral effects as

19   discussed in the 1992 merger guidelines, one would naturally

20   hypothesize that a post-merger unilateral price increase would

21   be profitable."  Do you see that?

22   A.   Yes, I do.

23   Q.   And that's a hypothetical speculative -- let me withdraw

24   that.  That is a theoretical possibility.  Correct?

25   A.   Correct.

1    Q.    And that's a testable proposition.  One can look to see

2    whether that theoretical concern is actually met by the facts of

3    a particular case, correct?

4    A.    That's exactly what I did here, is I went to the data to

5    help inform this theoretical concern and to see whether it held

6    water, to use your words.

7    Q.    And a little farther down in that paragraph, about 10 lines

8    from the bottom, there's a sentence beginning with the word "in

9    fact."  Do you see that?

10   A.    Yes, I do.

11   Q.    The authors there write, "In fact, since the inroads made

12   by LG and Samsung largely involved higher-end front-loading

13   washing machines, Whirlpool and Maytag may be closer competitors

14   in the lower-end top-loading segment than would be reflected in

15   their overall market shares."  Do you see that?

16   A.    Yes, I do.

17   Q.    Have you investigated the extent to which or if Samsung and

18   Whirlpool, while they may have entered at higher ends, have

19   moved up and down in the product segments?

20   A.    Yes.  And we talked about this in my testimony, that they

21   enter the market, and then they reposition within the market to

22   serve the parts of the market to grow their market share.

23   Q.    Let's go to the next paragraph, which is the paragraph

24   dealing with efficiencies.  Mr. Glass read you the beginning of

25   that.  "Third, the statement does not explain the basis for

```
 1   concluding that the efficiencies asserted by the merging parties
 2   were merger-specific."  He goes on, in the next sentence, the
 3   authors write, "The press has reported widely that Maytag was a
 4   high-cost producer and that Whirlpool was a more efficient
 5   manufacturer than Maytag."  Do you see that?
 6   A.   Yes, I do.
 7   Q.   For purposes of the efficiencies analysis that you
 8   conducted in this case, did you rely on what the press said?
 9   A.   No.  Not at all.
10   Q.   And you've explained the basis for your efficiencies
11   analysis earlier today?
12   A.   Yes, I did.
13   Q.   Thank you.  And then finally with respect to this article,
14   let's go to page 251.  Mr. Glass highlighted these three bullets
15   here following the sentence that reads, "We structure our
16   analysis around three substantive claims where we detect
17   overreaching."  Bullet 1:  "Effective competition generally
18   requires only three or even two rivals.  2.  The prospect of
19   entry typically deters or counteracts anticompetitive effects of
20   mergers.  3.  Mergers often spur competition and benefit
21   consumers by enabling efficiencies."  Do you see that?
22   A.   Yes, I do.
23   Q.   That's not the entirety of the argument the defendants are
24   making in this case, is it, as you understand it?
25   A.   Of course not, and then --
```

1    Q.    Let me ask you a question so we have a question and answer.

2    And that's not the entirety of the basis for your opinions in

3    this case, correct?

4    A.    No.  I'm not relying on -- if I may.  I'm sorry to jump

5    ahead, but I wanted to talk about this earlier.

6    Q.    Okay.  What I want --

7    A.    I'll let you ask the question.  I'm sorry.

8    Q.    Thank you.  My next question, you wanted an opportunity to

9    explain what you did and why this statement in this article is

10   not reflective of the work that you did in this case.  And let

11   me give you that opportunity.

12   A.    Thank you.  I appreciate that.  First of all, obviously,

13   there are more than three or two rivals in the market

14   post-merger.  So that's just factually different.  You can just

15   look at the chart that's on the screen right now, and there are

16   four competing companies at, say, Home Depot.  There are five

17   competing companies at Sears post-merger.  So that is a factual

18   difference, obviously.

19        The prospect of entry as a deterrent or as counteracting

20   the anticompetitive effects, when we talk about it in my

21   analysis, and my analysis is focused not just on the committed

22   entrants, this isn't people who would come in if there's an

23   elevation in the price, they're already here, Arçelik and Haier.

24   The question is, they're already here, how would they do if

25   there was an elevation in price.  That's a different analysis

1    than entry.

2         Let me just give a real-world example.  I don't count on

3    Midea to discipline the price -- alleged hypothetical price

4    increase.  That would be entry, because they're not in the

5    market today.  So my analysis is about expansion and

6    repositioning.  They're talking about relying on, say, a Midea,

7    which isn't currently serving the market, although they've

8    indicated that they will enter at some point.  So I do not rely

9    on that as the constraining factor.

10        And mergers -- and as I've said, I've seen dozens of

11   efficiencies analyses, and there are lots of companies that put

12   forward efficiencies analysis and say here's our evidence that

13   we're going to lower cost and benefit consumers.  The one here

14   is extremely detailed and focused and has a level of detail like

15   I've never seen before.

16        So it's a very different circumstance.  And this is just

17   three bullets.  There's all the other data and information that

18   we've talked about throughout the direct testimony and even

19   during cross that informs the entire analysis.

20   Q.   Thank you.  Mr. Glass asked you whether you would agree

21   that General Electric and Electrolux were significant

22   competitors, and then he said strong competitors, and then he

23   said important competitors, and then he said effective

24   competitors.  And you agreed with those statements, right?

25   A.   Yes, I did.

1    Q.   Are those facts dispositive of the competitive effects

2    analysis that an economist needs to do?

3    A.   No.  For all the reasons I articulated.  And it's just,

4    that's the action.  You'll have to consider the reaction.  And

5    the reaction -- the combination of the action and the reaction

6    is what ultimately determines the effect on consumers, and so we

7    can see that in a past merger, that there was no adverse effect

8    on consumers.

9    Q.   And these facts which you knew about early on, soon after

10   you were retained, this is not rocket science to understand that

11   these were two companies with large shares in this business,

12   correct?

13   A.   It's very obvious that they are large companies in the

14   cooking business.

15   Q.   And those facts caused you to want to look further,

16   correct?

17   A.   Precisely.  As I've tried to describe and give a

18   description of, that is just the first step.  The question then

19   is -- that's the action.  The question is the reaction and how

20   the dynamic market changes in response to this.  And that's why

21   you have to look at empirical evidence, as I did.

22   Q.   And did those facts, that they were significant, strong,

23   important and effective historic competitors, cause you to doubt

24   any of your opinions regarding the competitive effects of this

25   transaction that you've explained to the Court?

1    A.   Let me give a little bit more color than just "doubt,"

2    because I'm not sure I like that term.  Because they have high

3    shares, by definition that then requires further analysis.  If

4    they didn't have high shares, I would have no concerns

5    whatsoever.  So you have to then do the full analysis.  Do I

6    have any doubts based on the full analysis that I've done?  No,

7    I do not.

8    Q.   You've testified over the course of two days, probably 10

9    hours, Mr. Orszag, including being cross-examined.  Have any of

10   your opinions about the competitive effects of this transaction

11   that you explained to the Court changed as a result of your

12   testimony here today?

13   A.   Not at all.

14            MR. DEMITRACK:  No further questions, Your Honor.

15            THE COURT:  All right.  Any other questions before I

16   let the witness go?

17            MR. GLASS:  No thank you, Your Honor.

18            THE COURT:  Thank you.  You may be excused.

19            THE WITNESS:  Thank you very much, Your Honor.

20        (The witness steps down.)

21            MR. DEMITRACK:  Your Honor, one statement.  Now that

22   Mr. Orszag is done, I assume that the Court's ban on him

23   communicating with --

24            THE COURT:  Yes, I have no problem with that.  Any

25   objections?

1          MR. GLASS:  I'm sorry?

2          THE COURT:  Counsel inquired whether, since the

3    witness has finished testifying, whether he couldn't speak with

4    counsel for the defendants.

5          MR. GLASS:  No objection.

6          MR. DEMITRACK:  Thank you.

7          THE COURT:  All right.  Any additional witnesses?

8          MR. MAJORAS:  Good afternoon, Your Honor.  John

9    Majoras.  There are a few evidentiary issues that the parties

10   are continuing to work out, including the slide set that we just

11   saw.  We're hoping to reach an agreement on those by this

12   Monday.  But subject to that, the defense rests, Your Honor.

13         THE COURT:  And rebuttal?  You have two witnesses, if

14   I recall correctly?

15         MR. GLASS:  Well, Your Honor, that's an interesting

16   question.  So, we didn't hear any accounting evidence, any

17   testimony providing the basis, no PricewaterhouseCoopers

18   testimony, no A.T. Kearney testimony, no testimony from an

19   executive that was on the integration team that specifically put

20   numbers to the efficiencies, and we have a rebuttal expert for

21   that, but I'm afraid he has nothing to rebut at this point.

22         MR. MAJORAS:  Your Honor, I'm curious that Mr. Glass

23   is raising that objection now than when the witness testified,

24   but we have evidence in the record from Mr. McLoughlin in terms

25   of the work that the company had done both prior to the merger

1    to allow it to proceed with the transaction in terms of

2    financing, and in terms of the basis for it.

3        There was additional work that he testified about including

4    the amounts moving forward in the ordinary course of the

5    integration process of the merger.  And then we had the opinion

6    testimony of Mr. Orszag earlier today at great length in terms

7    of his view of what the efficiencies are, how they were measured

8    and the effect that they have.  If Mr. Glass doesn't feel a need

9    to rebut that, I'm not going to argue with him to do that.  But

10   that's all record evidence and he can make the decision of

11   whether he needs to provide a rebuttal witness.

12             THE COURT:  It's your call, counsel.

13             MR. GLASS:  Your Honor, I would like the weekend to

14   look at the record.  Because I've got to tell you, I mean, the

15   work done for litigation is not regular course of business.

16   Wouldn't satisfy the hearsay exception.  That's why we normally

17   have experts.  That's why we have an accounting expert, so that

18   our accounting expert can respond to their accounting expert.

19   But there was none.

20       So I will look at the record, Your Honor, and we will

21   inform defendants and Your Honor on Monday whether we --

22             THE COURT:  That's fine.  We have the daily

23   transcripts as well.  We'll take a look at it.  But I'm

24   certainly not going to tell you how to try your case.  If you

25   decide not to call it, it's your call.  If you wish to call,

based upon the record, then that's fine as well.

Assuming that scenario, how long would your accounting expert take?

MR. GLASS:  If I may introduce Mr. Hamer.  Mr. Hamer is actually --

THE COURT:  All right, counsel.  Good afternoon.

MR. HAMER:  Good afternoon.  Best guess, 45 minutes direct.

THE COURT:  That's fine.  And do you plan on recalling Professor Whinston?

MR. GLASS:  Your Honor, I'm pretty sure we will, but again, we would need to examine, since he would just be rebutting what Mr. Orszag said --

THE COURT:  That's fine.  You can reserve on it. That's fine.  I have a matter I think at nine o'clock on Monday, but it's going to take about 15 minutes, if that, and I have to call it.  Again, I'm trying to accommodate an attorney who's traveling.  So this trial could be over today.  So what's your pleasure?  You want to start at 9:30?  I don't have anything else on the calendar Monday, I don't think.  What's your pleasure?  Do you want to start a little bit later?

If you were to recall Professor Whinston, how long would your portion take?

MR. GLASS:  I believe 90 minutes, maybe.

THE COURT:  We have the luxury of some time.  If you

1    want to start a little bit later, that's fine.  If you want to

2    start at 9:30, we can do that as well.

3         MR. MAJORAS:  Your Honor, the opportunity to sleep in

4    an extra hour wouldn't bother me.  However, I think in terms

5    of -- especially as we've estimated our time with these experts,

6    I know we've all done the best that we can, I think we heard

7    estimates as to how long today would go, and we thought really

8    at one point we might be able to be done by the lunch break.

9         My suggestion would be that we start at 9:30.  If you want

10   to conclude at the end of the rebuttal case for Monday, then

11   obviously we'd have extra time during the day.

12        THE COURT:  Sure.  We can start at 9:30.  That's fine

13   with me.  Give me one second.

14        (Court conferring with law clerk.)

15        THE COURT:  It's interesting that we're having this

16   discussion about the need for rebuttal, and actually over the

17   lunch hour we were talking about -- I'll say accounting

18   loosely -- testimony that came in through McLoughlin, and there

19   were no objections.  I'll just leave it at that.  But we've been

20   thinking about that.

21        And now that the objection came up to information that the

22   expert relied upon Pricewaterhouse, et cetera, et cetera, query

23   whether analogous information came up through McLoughlin.  But

24   again, it's your case, you try it any way you want to.  Take a

25   look at the transcript.  We actually gave it some thought over

1    the lunch hour, too.  I'll leave it at that.  It's your call to

2    make.

3              MR. GLASS:  Thank you, Your Honor.

4              MR. MAJORAS:  And Your Honor, certainly we'll

5    obviously have a chance for summation here, but in terms of the

6    argument that Mr. Glass raised, the type of information that an

7    expert is looked to rely upon and that the expert finds reliable

8    certainly includes a number of things that in and of themselves

9    may not be admissible.  And again, we think the record is

10   clearly reflective of that.

11       The last thing, Your Honor, I just spoke to counsel from

12   the government and they've agreed they will let us know as soon

13   as they know this weekend, but no later than 9 on Sunday

14   morning, about whether they'll recall witnesses, just to help

15   people who are doing preparation.

16             THE COURT:  All right.

17        (Court conferring with law clerk.)

18             THE COURT:  All right.  We talked about again brief

19   summations without being repetitive.  This would not be in lieu

20   of closing argument, of course.  But what are your

21   recommendations there in terms of timing and in terms of when --

22   I guess a lot depends on whether there will be rebuttal

23   evidence, testimony.  I guess one approach would be -- well, let

24   me hear from you.  What would you like to do?

25             MR. MAJORAS:  Your Honor, I think it would be helpful,

1    as you've done throughout this case, to have some summations.  I

2    certainly agree, not only in terms of the time that the Court

3    spends on this, but the time to pull it together, that it

4    shouldn't be repetitive to what we've done in court.

5         THE COURT:  We have the daily transcripts of the last

6    arguments which were very helpful.  So that's there.  That's in

7    the record.

8         MR. MAJORAS:  Our suggestion, Your Honor, is -- we

9    think it is helpful to have some summation prior to the

10   arguments we'll have that you scheduled in January.  Our

11   proposal would be an hour per side, Your Honor, with one that is

12   honored.

13        THE COURT:  As time goes, right?

14        MR. MAJORAS:  Yes, sir.

15        THE COURT:  I have no problems with that.  When do you

16   want to do it?  Wednesday?  I guess it depends on rebuttal.

17   Let's assume rebuttal testimony.  You want to do it Monday

18   afternoon?  What's your pleasure?

19        MR. MAJORAS:  Again, we're open, Your Honor.  It's

20   hard to guess in terms of the witnesses.  From a planning

21   standpoint, if we said we'd come back Tuesday morning for the

22   summations, that's fine with us.  I think some of us anticipated

23   that.  But if the Court's pleasure is to move right into that

24   after the witnesses, we can do that too.

25        THE COURT:  You know what?  Look, we've invested a lot

1    of time and effort, resources and energy into this case.  I'm

2    not going to be stingy with respect to that time.  If you need

3    some time to gather your thoughts, I mean, Tuesday morning, I

4    don't have any problems with Tuesday morning as well for

5    summations.  Even if there's no rebuttal, we could still do

6    Tuesday morning.  That's fine with me.

7         So let us know also.  File something on the docket to let

8    us know, give us an idea whether or not there will be any

9    rebuttal testimony, evidence.  And even if there is, we can do

10   the summations Tuesday morning.  That'll be fine.

11             MR. MAJORAS:  Thank you, Your Honor.

12             MR. GLASS:  That sounds good to us, Your Honor.  I

13   need to look at the McLoughlin transcript.

14             THE COURT:  Yeah.  We raised it, too.  The discussion

15   came up because of the objection to the Pricewaterhouse.  And I

16   think McLoughlin did allude to some materials.  That's our

17   recollection of what was relevant.  And there were no

18   objections.  But I didn't revisit the issue, no one asked me to.

19   You know, again, this is not jury.  If you want to offer it out

20   of an abundance of caution, you can.  That's fine.  I may use

21   it, I may not.  It's kind of up to you.

22             MR. GLASS:  Yeah, I appreciate that, Your Honor.

23   Mr. McLoughlin came and testified, he's not an accountant, and

24   he certainly can't make hearsay statements non-hearsay

25   statements.  We know that under rule 703 an expert can't make

 1    underlying hearsay admissible.

 2         And I note that even on Mr. Orszag's own slides, DX

 3    0658-060, he doesn't mention relying upon Mr. McLoughlin's trial

 4    testimony.  He talks about A.T. Kearney, PricewaterhouseCoopers

 5    and GE and Electrolux personnel and executives.  I would say

 6    that those interviews, there are no notes of those.  So we don't

 7    know whether he spoke to Mr. McLoughlin and took detailed notes

 8    and that's what came in here.  We don't know.  There was no

 9    opportunity to examine him.  So we will look at the transcript

10    for Mr. McLoughlin, and we may take Your Honor up on the

11    invitation, just to make the proffer --

12         THE COURT:  I have allowed all sorts of information.

13    There may be a lot of testimony that the Court's not going to

14    consider.  You may decide out of an abundance of caution to

15    offer it -- you've told me 45 minutes, half an hour or so.

16    That's fine -- but never use it, that's fine.  But, you know, at

17    the end of the day, a month from now you say, gee, I wish I

18    would have, you know, I'm giving you the opportunity to do it

19    now.

20         MR. GLASS:  Thank you, Your Honor.

21         THE COURT:  And hook it up with whatever argument you

22    wish to make.  It may not be necessary.  But I think I would be

23    ill advised to make that judgment now and say counsel, you don't

24    really need it, I don't want to do that.  So it's your call.  If

25    you want to do it and I never get to it, fine, so we lost an

1    hour over five weeks, right?  No big deal, right?

2              MR. GLASS:  Okay.  Thank you, Your Honor.

3              THE COURT:  Sure.

4              MR. MAJORAS:  One last thing I'll say on that point,

5    Your Honor, is that Mr. Orszag today testified on the basis he

6    talks about the interviews he's done, he talked about the

7    analysis that he looked at, he talked about his own individual

8    analysis.  And to suggest somehow in the time that counsel spent

9    with Mr. Orszag that they did not have the ability to ask about

10   that I think is not correct.  But we understand the ruling.  The

11   only thing I would like to ask for clarification is if we're not

12   here on Monday, will we start at nine o'clock on Tuesday?

13             THE COURT:  I think that's fair, yeah.  That's fair.

14   Sure, I can make that assumption that there won't be any

15   rebuttal evidence and we'll start at nine o'clock on Tuesday.

16   Sure.

17             MR. MAJORAS:  I wasn't asking you to make that

18   assumption.  Just for planning.

19             THE COURT:  No, no, no.  That's a legitimate

20   assumption the Court could make.  Assuming that the government

21   decides not to call anyone in rebuttal, sure, we can proceed at

22   nine o'clock on Tuesday morning with summations.

23             MR. GLASS:  Your Honor, we will file something, and we

24   will notice defendants on whether we, after looking at the

25   transcript, feel the need to have a rebuttal witness or two.

1     But I can't let go this idea that because Mr. Orszag did a bunch

2     of interviews, that he took no notes, and that he heard from

3     employees of GE and employees of Electrolux and he talked to

4     PricewaterhouseCoopers and talked to A.T. Kearney, that

5     certainly is not admissible evidence.  And so we appreciate the

6     opportunity, Your Honor --

7          THE COURT:  I think I said I would not credit any of

8     that as a fact, any of that -- I would assume he relied upon

9     information that no one was asking him.  I didn't get the

10     impression that defendants were asking me to credit any of that

11     material as indeed true.  We had that discussion at the bench.

12     I allowed it, I accepted it as assumptions that the witness was

13     making, this was what he was relying upon, but no one was asking

14     me to accept that out-of-court information as being offered for

15     the truth of the matter asserted.

16          MR. MAJORAS:  Your Honor, we have offered the opinion

17     testimony of Mr. Orszag in the analysis that he did, and that is

18     his evidence that he put forward which I think is quite clear on

19     the efficiencies.  So Mr. Glass can make whatever decision he

20     wants in terms of his rebuttal.  If he lets us know, we'll be

21     here Monday.  If not, we'll be here at 9:00 a.m. on Tuesday,

22     sir.

23          THE COURT:  All right.  So either 9:30 on Monday if we

24     proceed with rebuttal testimony, or nine o'clock on Tuesday

25     morning with summations for an hour or two.

1          MR. GLASS:  Thank you very much, Your Honor.

2          MR. MAJORAS:  Thank you, Your Honor.

3          THE COURT:  Okay.  Thank you.

4              (Proceedings adjourned at 6:02 p.m.)

\*   \*   \*   \*   \*   \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are an accurate transcription of the above-entitled proceedings in the above-entitled matter.


*Bryan A. Wayne*
_____
BRYAN A. WAYNE

## $

**$1,002** [4] - 4723:3, 4723:5, 4723:13, 4723:22
**$107** [1] - 4725:25
**$13** [3] - 4724:7, 4724:12, 4725:4
**$358** [1] - 4723:22
**$400** [1] - 4735:13
**$50** [4] - 4725:6, 4725:7, 4725:11, 4725:15
**$500** [2] - 4735:13, 4735:17
**$52** [2] - 4724:3, 4724:12
**$527** [1] - 4724:5
**$540** [2] - 4723:17, 4724:5
**$634** [1] - 4724:1
**$644** [2] - 4723:20, 4723:22
**$686** [2] - 4723:15, 4724:1

## '

**'15** [1] - 4719:6
**'92** [1] - 4691:21

## 0

**007** [4] - 4705:10, 4708:8, 4708:20, 4709:2
**008** [1] - 4681:13
**01105** [1] - 4697:19
**01656** [1] - 4695:11
**017** [1] - 4720:25
**019** [5] - 4681:19, 4720:22, 4721:1
**020** [1] - 4681:23
**02056** [4] - 4716:5, 4728:4, 4728:5, 4731:20
**02064** [1] - 4713:13
**02065** [4] - 4689:1, 4740:23, 4741:1
**02072** [1] - 4723:7
**021** [1] - 4682:2
**024** [1] - 4743:5
**025** [1] - 4682:5
**029** [2] - 4682:8, 4722:14
**031** [1] - 4682:11
**032** [2] - 4699:11, 4699:21
**050** [1] - 4682:14
**0658** [3] - 4681:12, 4720:22, 4727:10
**0658-029** [1] - 4724:10
**0658-060** [1] - 4758:3
**097** [1] - 4727:10
**099** [2] - 4682:21, 4727:19

## 1

**1** [4] - 4690:11, 4720:14, 4720:18, 4746:17
**1.2** [1] - 4724:18
**10** [4] - 4704:12, 4732:3, 4745:7, 4750:8

**100** [1] - 4727:23
**102** [2] - 4730:23
**104** [1] - 4683:3
**108** [1] - 4718:15
**11.6** [1] - 4718:6
**11.9** [1] - 4718:8
**12** [2] - 4704:12, 4704:13
**12.2** [1] - 4718:12
**1200** [4] - 4679:3, 4679:7, 4679:15, 4679:18
**13.1** [1] - 4724:18
**15** [3] - 4704:13, 4732:3, 4753:16
**15-1039** [1] - 4677:4
**15-minute** [1] - 4732:5
**15-minutes** [1] - 4731:25
**15.7** [1] - 4730:2
**16** [1] - 4677:9
**18** [1] - 4703:2
**19.6** [1] - 4717:10
**1900** [5] - 4679:2, 4679:6, 4679:10, 4679:14, 4679:18
**1992** [1] - 4744:19

## 2

**2** [9] - 4690:13, 4702:22, 4719:24, 4720:1, 4720:4, 4720:15, 4720:18, 4742:12, 4746:18
**20** [2] - 4691:12, 4742:13
**20001** [4] - 4677:15, 4677:19, 4677:23, 4679:22
**20001-2113** [2] - 4678:10, 4678:18
**20006** [5] - 4679:3, 4679:7, 4679:11, 4679:15, 4679:19
**2000s** [1] - 4734:16
**2006** [1] - 4689:23
**2010** [1] - 4682:6
**2012** [1] - 4681:20
**2013** [9] - 4682:3, 4717:2, 4717:3, 4717:16, 4718:10, 4718:21, 4718:23, 4719:6, 4719:12
**2014** [13] - 4682:3, 4682:9, 4682:23, 4683:3, 4716:16, 4716:17, 4717:12, 4717:21, 4718:8, 4718:19, 4718:23, 4719:12
**2015** [28] - 4677:5, 4681:17, 4681:21, 4681:25, 4682:6, 4682:11, 4682:12, 4682:15, 4682:19, 4695:24, 4696:1, 4697:20, 4714:21, 4716:10, 4716:25, 4717:8, 4717:21, 4717:25, 4718:14, 4718:23, 4719:12, 4728:5, 4728:17, 4729:25, 4730:6, 4730:24, 4743:15
**202** [14] - 4677:15, 4677:23, 4677:24, 4678:4, 4678:4, 4678:11, 4678:18, 4678:19, 4679:4, 4679:8, 4679:11, 4679:12, 4679:16, 4679:19
**202)354-3186** [1] - 4679:23
**2049** [3] - 4732:13, 4732:17, 4732:21
**2053** [1] - 4733:8

**20530** [2] - 4678:3, 4678:8
**21** [3] - 4695:24, 4696:1, 4703:2
**21.8** [1] - 4708:25
**22** [1] - 4707:25
**22.2** [1] - 4717:14
**23** [1] - 4717:8
**23.1** [1] - 4717:18
**23.2** [2] - 4717:18, 4717:19
**235** [1] - 4689:6
**24.2** [1] - 4718:22
**24.9** [2] - 4718:17, 4718:20
**248** [1] - 4689:18
**249** [3] - 4690:22, 4741:21, 4742:1
**250** [1] - 4692:19
**251** [3] - 4693:5, 4693:6, 4746:14
**26** [2] - 4729:23, 4729:25
**261-3034** [1] - 4679:12
**261-3332** [1] - 4679:19
**261-3339** [1] - 4679:16
**261-3373** [1] - 4679:11
**261-3398** [1] - 4679:4
**261-3430** [1] - 4679:8
**264** [1] - 4695:12
**269-1553** [1] - 4678:22
**269-1555** [1] - 4678:15
**27** [1] - 4716:20
**27.4** [1] - 4716:23
**271** [1] - 4695:20
**28** [2] - 4702:24, 4717:5
**28.0** [1] - 4717:6
**28.8** [1] - 4716:24
**281-3835** [1] - 4678:11
**29** [1] - 4716:13

## 3

**3** [6] - 4690:15, 4720:1, 4720:4, 4724:20, 4731:19, 4746:20
**3.1** [2] - 4707:22, 4708:25
**3.6** [1] - 4719:5
**3.7** [1] - 4708:25
**30** [1] - 4725:9
**305-1489** [1] - 4677:15
**312** [2] - 4678:15, 4678:22
**32** [1] - 4730:25
**321** [1] - 4717:16
**34** [2] - 4716:10
**344** [1] - 4717:12
**345,732** [1] - 4728:18
**37** [3] - 4728:4, 4728:5, 4729:9
**387** [3] - 4716:17, 4716:22
**399** [1] - 4733:19
**3:15** [1] - 4732:4
**3:22** [1] - 4677:6

## 4

**4** [1] - 4677:5

**4000** [5] - 4677:14, 4677:18, 4677:22, 4678:3, 4678:7
**421** [2] - 4717:2
**43** [1] - 4729:21
**43.3** [2] - 4728:6, 4729:10
**45** [2] - 4753:7, 4758:15
**45.3** [1] - 4728:7
**450** [5] - 4677:14, 4677:18, 4677:22, 4678:2, 4678:7
**4681** [1] - 4680:5
**47** [2] - 4730:5
**4732** [1] - 4680:5

# 5

**5** [1] - 4691:9
**50** [2] - 4691:11, 4742:12
**51** [2] - 4678:10, 4678:17
**514-0230** [1] - 4677:23
**514-7308** [2] - 4677:24, 4678:4
**527** [1] - 4726:5
**53.7** [1] - 4709:15
**54** [2] - 4717:25, 4718:6
**541** [1] - 4718:8
**544** [1] - 4718:10
**55** [2] - 4743:15, 4743:20
**598-2854** [1] - 4678:4
**5:03** [1] - 4732:6
**5:19** [1] - 4732:6

# 6

**6** [1] - 4719:6
**60601** [2] - 4678:14, 4678:22
**614** [1] - 4678:11
**626-1700** [2] - 4678:11, 4678:19
**634** [1] - 4726:6
**6503** [1] - 4679:22
**6:02** [1] - 4761:4

# 7

**7** [3] - 4703:1, 4703:2, 4719:7
**7.7** [1] - 4730:7
**703** [1] - 4757:25
**71.4** [2] - 4708:4, 4708:24
**77** [2] - 4678:14, 4678:21

# 8

**8** [2] - 4697:20, 4719:5
**851** [1] - 4718:19
**866** [1] - 4718:21
**879-3939** [1] - 4678:18

# 9

**9** [1] - 4755:13
**90** [2] - 4710:7, 4753:24
**99** [1] - 4731:9
**9:00** [1] - 4760:21
**9:30** [5] - 4753:19, 4754:2, 4754:9, 4754:12, 4760:23

# A

**a.m** [1] - 4760:21
**A.T** [4] - 4711:24, 4751:18, 4758:4, 4760:4
**AB** [2] - 4677:6, 4678:9
**ability** [4] - 4690:11, 4705:3, 4709:18, 4759:9
**able** [6] - 4698:11, 4719:3, 4729:1, 4731:17, 4732:13, 4754:8
**above-entitled** [1] - 4762:6
**absent** [2] - 4691:19, 4692:20
**absolutely** [5] - 4684:5, 4684:13, 4685:1, 4685:8, 4726:22
**abstraction** [2] - 4699:25, 4700:3
**abundance** [2] - 4757:20, 4758:14
**academics** [1] - 4740:17
**accept** [1] - 4760:14
**accepted** [2] - 4694:5, 4760:12
**access** [3] - 4739:24, 4740:3
**accommodate** [1] - 4753:17
**account** [3] - 4704:2, 4709:6, 4736:23
**accountant** [1] - 4757:23
**accountants** [3] - 4711:18, 4711:24, 4711:25
**accounting** [11] - 4710:16, 4710:19, 4710:20, 4710:22, 4711:22, 4751:16, 4752:17, 4752:18, 4753:2, 4754:17
**accrues** [1] - 4738:22
**accurate** [1] - 4762:5
**acquire** [1] - 4689:25
**acquires** [2] - 4691:11, 4742:12
**act** [1] - 4740:3
**acting** [1] - 4699:24
**Action** [1] - 4677:4
**action** [7] - 4689:25, 4690:9, 4690:25, 4704:24, 4749:4, 4749:5, 4749:19
**actual** [2] - 4712:7, 4743:2
**add** [2] - 4731:7, 4736:20
**additional** [4] - 4715:1, 4715:2, 4751:7, 4752:3
**address** [3] - 4691:17, 4695:16, 4744:10
**adjourned** [1] - 4761:4
**adjust** [1] - 4736:22
**Adler** [5] - 4689:18, 4690:6, 4690:21, 4691:2, 4693:10
**administration** [1] - 4739:20
**admissible** [3] - 4755:9, 4758:1, 4760:5
**adopted** [1] - 4689:22

**adverse** [1] - 4749:7
**advice** [1] - 4690:3
**advised** [1] - 4758:23
**affiliated** [10] - 4684:8, 4684:16, 4685:10, 4685:12, 4685:17, 4685:19, 4686:22, 4687:6, 4689:12, 4693:8
**affiliation** [1] - 4685:11
**afraid** [1] - 4751:21
**AFTERNOON** [1] - 4677:9
**afternoon** [5] - 4681:9, 4751:8, 4753:6, 4753:7, 4756:18
**agencies** [1] - 4694:5
**agency** [1] - 4687:17
**aggregated** [2] - 4722:5, 4729:5
**agree** [25] - 4683:22, 4700:16, 4700:19, 4701:24, 4702:3, 4702:7, 4702:10, 4703:11, 4703:14, 4703:15, 4703:17, 4703:18, 4703:20, 4703:21, 4703:24, 4704:3, 4706:10, 4712:17, 4719:13, 4726:12, 4734:9, 4734:13, 4736:5, 4748:20, 4756:2
**agreed** [2] - 4748:24, 4755:12
**agreement** [3] - 4695:5, 4697:4, 4751:11
**ahead** [2] - 4693:24, 4747:5
**aided** [1] - 4679:25
**al** [1] - 4677:6
**ALJ** [1] - 4688:1
**alleged** [1] - 4748:3
**allocated** [1] - 4730:19
**allow** [3] - 4722:13, 4738:7, 4752:1
**allowed** [2] - 4758:12, 4760:12
**allows** [1] - 4715:3
**allude** [1] - 4757:16
**almost** [1] - 4718:4
**AMERICA** [1] - 4677:3
**American** [2] - 4686:25, 4693:8
**amount** [1] - 4703:11
**amounts** [1] - 4752:4
**analogous** [1] - 4754:23
**analyses** [6] - 4683:8, 4701:4, 4701:12, 4714:16, 4737:15, 4748:11
**Analysis** [1] - 4689:3
**analysis** [52] - 4683:1, 4688:14, 4688:23, 4690:20, 4694:7, 4698:20, 4700:22, 4701:2, 4704:1, 4704:6, 4704:11, 4704:25, 4705:2, 4705:24, 4706:7, 4706:10, 4706:15, 4706:22, 4706:25, 4707:7, 4707:9, 4707:16, 4707:17, 4709:2, 4709:8, 4711:11, 4714:23, 4715:2, 4722:5, 4722:12, 4736:4, 4736:9, 4738:3, 4741:6, 4741:8, 4741:12, 4746:7, 4746:11, 4746:16, 4747:21, 4747:25, 4748:5, 4748:12, 4748:19, 4749:2, 4750:3, 4750:5, 4750:6, 4759:7, 4759:8, 4760:17
**analytical** [2] - 4700:21, 4700:23
**analyze** [2] - 4700:24, 4701:3
**analyzed** [2] - 4737:12, 4737:14

**analyzes** [2] - 4699:23, 4711:12
**analyzing** [1] - 4737:11
**Andy** [1] - 4686:2
**Anna** [1] - 4679:17
**anna.aryankalayil@dechert.com** [1] - 4679:20
**announced** [1] - 4696:2
**answer** [20] - 4701:11, 4701:15, 4703:5, 4704:16, 4704:18, 4706:14, 4706:15, 4706:19, 4706:22, 4706:25, 4707:3, 4707:6, 4707:7, 4707:15, 4708:2, 4708:5, 4720:5, 4729:15, 4730:3, 4747:1
**answers** [2] - 4708:15, 4708:17
**anticipated** [1] - 4756:22
**anticompetitive** [3] - 4694:12, 4746:19, 4747:20
**antitrust** [8] - 4690:3, 4694:7, 4700:25, 4701:5, 4701:13, 4701:20, 4710:23, 4739:7
**Antitrust** [4] - 4677:21, 4687:14, 4688:2, 4689:3
**appear** [6] - 4706:6, 4706:23, 4707:1, 4707:4, 4707:13, 4708:8
**APPEARANCES** [1] - 4677:12
**appeared** [4] - 4706:17, 4707:22, 4707:25, 4708:4
**apples** [4] - 4729:2, 4730:12, 4730:14
**apples-to-apples** [1] - 4729:2
**apples-to-oranges** [1] - 4730:12
**appliance** [2] - 4687:7, 4705:20
**appliances** [18] - 4681:20, 4681:24, 4682:22, 4702:11, 4702:16, 4703:3, 4703:13, 4704:4, 4704:14, 4718:2, 4719:18, 4732:16, 4734:10, 4737:10, 4737:11, 4738:2, 4738:14, 4738:18
**Appliances** [1] - 4727:15
**applied** [2] - 4710:17, 4737:8
**apply** [1] - 4711:10
**appreciate** [5] - 4698:12, 4732:11, 4747:12, 4757:22, 4760:5
**approach** [4] - 4691:21, 4736:16, 4744:18, 4755:23
**appropriate** [6] - 4684:20, 4713:9, 4732:4, 4736:17, 4738:1, 4739:1
**approved** [1] - 4741:11
**April** [3] - 4695:24, 4696:1, 4697:20
**area** [1] - 4710:18
**argue** [1] - 4752:9
**argument** [4] - 4746:23, 4755:6, 4755:20, 4758:21
**arguments** [8] - 4690:10, 4690:18, 4693:9, 4693:12, 4694:2, 4694:17, 4756:6, 4756:10
**arrangement** [1] - 4685:11
**arrows** [2] - 4705:14, 4708:21
**article** [7] - 4693:15, 4740:24, 4741:3, 4741:5, 4741:23, 4746:13, 4747:9
**articulated** [1] - 4749:3
**Aryankalayil** [1] - 4679:17

**Arçelik** [3] - 4707:4, 4707:12, 4747:23
**aspects** [5] - 4686:11, 4686:17, 4687:22, 4687:25, 4688:1
**asserted** [3] - 4692:15, 4746:1, 4760:15
**Assistant** [1] - 4689:24
**associated** [3] - 4736:14, 4737:22, 4738:2
**Associates** [1] - 4695:6
**assume** [6] - 4695:22, 4695:23, 4714:5, 4750:22, 4756:17, 4760:8
**assuming** [2] - 4753:2, 4759:20
**assumption** [3] - 4759:14, 4759:18, 4759:20
**assumptions** [1] - 4760:12
**attention** [2] - 4733:7, 4741:20
**Attorney** [1] - 4689:24
**attorney** [1] - 4753:17
**attractive** [2] - 4742:20, 4743:19
**August** [3] - 4682:15, 4682:19, 4714:22
**Authority** [1] - 4735:4
**authors** [4] - 4742:10, 4744:17, 4745:11, 4746:3
**Availability** [1] - 4727:15
**available** [12] - 4712:12, 4712:13, 4713:7, 4713:12, 4714:8, 4714:15, 4714:17, 4735:21, 4735:23, 4736:2, 4736:11
**Avanti** [2] - 4706:17, 4706:19
**Avenue** [2] - 4678:10, 4678:17
**aware** [16] - 4695:4, 4695:8, 4697:4, 4697:5, 4698:18, 4699:4, 4705:18, 4705:21, 4707:17, 4707:18, 4707:21, 4707:24, 4709:20, 4713:2, 4713:3

## B

**baby** [1] - 4714:8
**backup** [7] - 4719:20, 4723:6, 4728:15, 4728:22, 4729:8, 4731:20, 4732:15
**Baker** [16] - 4686:22, 4686:25, 4687:4, 4687:9, 4687:20, 4687:23, 4688:15, 4688:25, 4689:12, 4689:21, 4690:8, 4693:7, 4694:3, 4740:24, 4741:5, 4743:23
**baker** [1] - 4687:8
**Baker's** [2] - 4687:2, 4688:12
**ban** [1] - 4750:22
**Barnett** [1] - 4689:24
**based** [12] - 4688:10, 4697:15, 4709:13, 4715:9, 4734:13, 4735:17, 4735:25, 4737:17, 4737:25, 4740:10, 4750:6, 4753:1
**Based** [1] - 4727:19
**bases** [1] - 4715:5
**basis** [14] - 4692:14, 4701:22, 4715:22, 4717:19, 4717:20, 4717:21, 4718:20, 4719:5, 4745:25, 4746:10, 4747:2, 4751:17, 4752:2, 4759:5
**bath** [1] - 4714:9

**become** [1] - 4692:23
**BEFORE** [1] - 4677:10
**beginning** [4] - 4697:6, 4742:5, 4745:8, 4745:24
**begins** [2] - 4692:20, 4744:9
**behalf** [6] - 4695:7, 4696:8, 4696:24, 4698:18, 4733:9, 4739:5
**behavior** [1] - 4712:9
**behind** [3] - 4702:22, 4704:10, 4716:3
**below** [2] - 4690:7, 4721:22
**bench** [1] - 4760:11
**BENCH** [1] - 4677:9
**benefit** [8] - 4692:22, 4692:24, 4694:13, 4725:14, 4725:17, 4738:22, 4746:20, 4748:13
**benefited** [4] - 4704:4, 4704:8, 4704:14, 4725:4
**benefiting** [1] - 4725:1
**Berkeley** [4] - 4684:10, 4684:18, 4685:4, 4685:5, 4685:6
**Bertazzoni** [1] - 4707:13
**Best** [4] - 4682:6, 4682:9, 4690:15, 4742:19, 4743:2, 4743:13, 4743:16, 4743:20
**best** [13] - 4683:20, 4695:10, 4712:13, 4713:7, 4713:11, 4714:8, 4714:15, 4714:17, 4736:11, 4737:15, 4739:13, 4753:7, 4754:6
**better** [3] - 4700:11, 4712:15, 4725:19
**between** [16] - 4691:18, 4692:1, 4695:5, 4703:12, 4704:4, 4704:14, 4704:20, 4705:15, 4705:19, 4713:24, 4721:7, 4729:4, 4730:13, 4740:5, 4744:11, 4744:14
**beyond** [4] - 4688:10, 4688:18, 4697:10, 4738:4
**big** [3] - 4681:16, 4721:20, 4759:1
**big-box** [1] - 4681:16
**biggest** [1] - 4718:24
**Bill** [1] - 4686:2
**bill.jones2@usdoj.gov** [1] - 4677:24
**binder** [1] - 4702:22
**bit** [4] - 4704:6, 4750:1, 4753:21, 4754:1
**blinking** [1] - 4693:18
**block** [1] - 4695:23
**blue** [2] - 4722:18, 4725:25
**book** [1] - 4689:1
**Bosch** [2] - 4707:13, 4714:21
**Boston** [1] - 4735:4
**bother** [1] - 4754:4
**bottom** [4] - 4693:11, 4695:21, 4713:14, 4745:8
**box** [1] - 4681:16
**brand** [6] - 4691:7, 4712:18, 4712:19, 4742:18, 4743:18
**brands** [2] - 4719:17, 4743:20
**break** [1] - 4754:8
**brief** [2] - 4732:10, 4755:18
**bring** [2] - 4689:19, 4711:14

**bringing** [1] - 4724:25
**brought** [1] - 4696:2
**Bryan** [1] - 4679:21
**BRYAN** [2] - 4762:4, 4762:8
**bryanawayne@gmail.com** [1] - 4679:23
**builder** [2] - 4682:16, 4682:17
**bullet** [5] - 4690:6, 4694:9, 4694:11, 4694:13, 4746:17
**bullets** [2] - 4746:14, 4748:17
**bunch** [3] - 4708:21, 4726:25, 4760:1
**bundle** [1] - 4738:19
**bundles** [1] - 4701:8
**business** [10] - 4702:13, 4708:6, 4709:22, 4711:11, 4720:3, 4734:19, 4735:1, 4749:11, 4749:14, 4752:15
**Buy** [8] - 4682:6, 4682:9, 4690:15, 4742:19, 4743:2, 4743:13, 4743:16, 4743:21
**buy** [5] - 4701:8, 4725:15, 4725:20, 4725:21, 4738:18
**buyers** [2] - 4690:13, 4704:3
**buying** [4] - 4738:18, 4738:19, 4738:22, 4743:20
**BY** [10] - 4681:7, 4694:1, 4694:25, 4698:6, 4700:15, 4716:8, 4720:20, 4731:6, 4732:9, 4739:3

## C

**calculate** [1] - 4727:5
**calculated** [1] - 4728:1
**calculating** [1] - 4713:23
**calculations** [1] - 4730:21
**calendar** [1] - 4753:20
**California** [1] - 4684:10
**cannot** [1] - 4714:5
**capacity** [2] - 4742:18, 4743:18
**Carl** [4] - 4687:11, 4740:24, 4743:9, 4744:8
**Carlton** [6] - 4683:24, 4684:1, 4685:24, 4686:19, 4696:18, 4696:23
**carry** [1] - 4742:20
**case** [39] - 4686:5, 4686:7, 4686:9, 4686:11, 4686:12, 4686:17, 4686:20, 4687:4, 4687:21, 4687:22, 4690:19, 4694:18, 4698:17, 4698:25, 4699:6, 4700:17, 4710:11, 4715:20, 4715:23, 4723:6, 4733:19, 4734:14, 4737:9, 4737:18, 4738:3, 4739:5, 4739:18, 4740:1, 4742:16, 4745:3, 4746:8, 4746:24, 4747:3, 4747:10, 4752:24, 4754:10, 4754:24, 4756:1, 4757:1
**cases** [1] - 4737:14
**categories** [1] - 4700:2
**categorized** [1] - 4682:16
**caused** [3] - 4691:6, 4742:7, 4749:15
**causes** [1] - 4692:23
**caution** [3] - 4700:22, 4757:20, 4758:14

**cells** [1] - 4729:13
**certain** [9] - 4686:10, 4686:17, 4687:22, 4687:25, 4714:10, 4714:11, 4714:12
**certainly** [7] - 4712:23, 4752:24, 4755:4, 4755:8, 4756:2, 4757:24, 4760:5
**CERTIFICATE** [1] - 4762:3
**certify** [1] - 4762:4
**cetera** [2] - 4754:22
**chance** [1] - 4755:5
**change** [3] - 4710:9, 4734:20, 4741:18
**changed** [4] - 4708:16, 4709:4, 4710:4, 4750:11
**changes** [1] - 4749:20
**channel** [25] - 4702:12, 4702:16, 4702:17, 4703:4, 4703:8, 4708:24, 4709:9, 4726:13, 4726:15, 4726:17, 4726:21, 4727:8, 4727:22, 4727:23, 4727:24, 4728:2, 4728:17, 4728:20, 4729:2, 4729:9, 4729:19, 4730:1, 4730:6, 4730:24, 4735:2
**Channel** [1] - 4727:11
**channels** [1] - 4682:22
**Channels** [2] - 4727:16, 4727:20
**chapter** [2] - 4689:1, 4689:6
**characterized** [2] - 4736:3, 4736:4
**Charles** [1] - 4695:6
**chart** [11] - 4682:24, 4683:1, 4708:20, 4709:17, 4713:17, 4719:17, 4721:2, 4722:11, 4722:13, 4723:8, 4747:15
**charts** [2] - 4709:12, 4720:7
**cheaper** [1] - 4725:22
**Chicago** [5] - 4678:14, 4678:22, 4684:2, 4689:2, 4695:3
**choices** [1] - 4742:22
**chose** [4] - 4714:2, 4715:24, 4722:23, 4727:3
**chosen** [1] - 4725:16
**circle** [3] - 4705:12, 4708:8, 4710:12
**circuit** [1] - 4709:18
**circumstance** [1] - 4748:16
**circumstances** [1] - 4710:1
**cited** [1] - 4735:3
**Civil** [1] - 4677:4
**claims** [4] - 4694:4, 4694:8, 4737:9, 4746:16
**clarification** [1] - 4759:11
**class** [1] - 4683:17
**clear** [8] - 4682:16, 4688:17, 4706:1, 4712:19, 4714:4, 4727:5, 4744:4, 4760:18
**clearly** [6] - 4697:24, 4738:15, 4743:16, 4743:17, 4743:18, 4755:10
**clerk** [2] - 4754:14, 4755:17
**CLERK** [1] - 4693:22
**clients** [1] - 4690:4
**closed** [1] - 4733:21
**closer** [2] - 4692:9, 4745:13
**closing** [4] - 4690:23, 4733:16, 4734:2, 4755:20

**colleagues** [2] - 4683:23, 4688:19
**collectively** [1] - 4694:6
**Colleen** [6] - 4695:1, 4695:2, 4695:13, 4696:20, 4697:8, 4698:12
**color** [1] - 4750:1
**colors** [1] - 4726:25
**COLUMBIA** [1] - 4677:1
**column** [10] - 4689:19, 4690:21, 4716:13, 4716:20, 4728:6, 4729:9, 4730:1, 4730:7, 4730:24
**combination** [4] - 4696:17, 4712:1, 4724:21, 4749:5
**combine** [1] - 4701:9
**combined** [14] - 4707:22, 4708:25, 4709:11, 4713:24, 4720:1, 4724:19, 4726:4, 4728:12, 4730:17, 4738:21, 4743:16
**comfortable** [1] - 4739:16
**coming** [4] - 4693:16, 4724:9, 4727:1, 4727:2
**comments** [1] - 4722:6
**commercial** [1] - 4711:9
**commit** [3] - 4708:2, 4709:16, 4728:21
**committed** [2] - 4700:6, 4747:21
**committing** [1] - 4697:10
**communicating** [1] - 4750:23
**comp** [3] - 4707:20, 4708:10, 4709:10
**companies** [16] - 4705:15, 4708:8, 4712:12, 4727:25, 4728:11, 4729:3, 4729:4, 4737:16, 4740:12, 4740:21, 4747:16, 4747:17, 4748:11, 4749:11, 4749:13
**Company** [1] - 4679:2
**company** [6] - 4711:16, 4725:24, 4726:4, 4728:10, 4728:25, 4751:25
**comparison** [1] - 4729:2
**comparisons** [1] - 4730:13
**Compass** [25] - 4683:10, 4683:13, 4683:17, 4684:8, 4684:16, 4684:25, 4685:7, 4685:13, 4685:15, 4685:17, 4685:23, 4686:22, 4687:6, 4689:13, 4693:7, 4695:3, 4695:16, 4695:18, 4696:7, 4696:17, 4697:1, 4739:6, 4739:16, 4739:19
**compete** [7] - 4692:21, 4702:15, 4702:18, 4702:20, 4703:3, 4703:10, 4705:4
**competed** [2] - 4708:24, 4735:1
**competes** [4] - 4701:24, 4702:3, 4702:7, 4702:10
**competing** [5] - 4702:13, 4710:13, 4734:24, 4747:16, 4747:17
**competition** [32] - 4690:16, 4691:18, 4694:9, 4694:13, 4703:9, 4703:12, 4704:4, 4704:8, 4704:9, 4704:14, 4704:21, 4704:24, 4705:15, 4705:19, 4705:22, 4706:6, 4706:13, 4706:18, 4706:21, 4706:24, 4707:2, 4707:5, 4707:14, 4708:9, 4708:13, 4708:22, 4710:2, 4744:11, 4744:14, 4746:17,

4746:20

**competitive** [18] - 4690:20, 4691:5, 4691:10, 4692:22, 4693:1, 4704:11, 4704:24, 4705:1, 4715:9, 4715:25, 4724:14, 4736:14, 4736:19, 4742:7, 4742:11, 4749:1, 4749:24, 4750:10

**competitor** [9] - 4692:17, 4703:15, 4703:19, 4703:22, 4703:25, 4704:10, 4709:6, 4710:8, 4713:3

**competitors** [24] - 4692:9, 4705:2, 4705:9, 4705:11, 4707:19, 4708:13, 4710:6, 4710:12, 4713:2, 4713:8, 4713:10, 4713:20, 4714:1, 4734:10, 4734:20, 4740:16, 4740:21, 4740:22, 4745:13, 4748:22, 4748:23, 4748:24, 4749:23

**complaint** [1] - 4701:19

**complicated** [1] - 4704:6

**comprehensive** [2] - 4688:6, 4688:13

**computer** [1] - 4679:25

**computer-aided** [1] - 4679:25

**concern** [4] - 4744:1, 4744:2, 4745:2, 4745:5

**concerns** [2] - 4741:9, 4750:4

**conclude** [1] - 4754:10

**concluding** [2] - 4692:14, 4746:1

**conclusion** [3] - 4714:3, 4736:5, 4744:5

**conclusions** [1] - 4732:20

**condemnation** [1] - 4733:2

**conduct** [5] - 4701:11, 4711:11, 4741:8, 4741:11, 4741:13

**conducted** [4] - 4700:22, 4736:8, 4741:6, 4746:8

**conferring** [2] - 4754:14, 4755:17

**confidential** [1] - 4740:5

**confidentiality** [2] - 4739:14, 4739:22

**confused** [1] - 4712:19

**confusing** [2] - 4726:25, 4727:4

**Conservative** [1] - 4689:3

**consider** [3] - 4700:23, 4749:4, 4758:14

**considering** [1] - 4709:7

**consistent** [1] - 4713:9

**constraining** [1] - 4748:9

**consult** [1] - 4687:20

**consulted** [4] - 4686:10, 4686:17, 4686:19, 4687:24

**consulting** [3] - 4740:11, 4740:12, 4740:20

**consumer** [3] - 4699:14, 4699:16, 4738:22

**consumers** [16] - 4687:13, 4692:22, 4692:24, 4694:14, 4701:8, 4704:9, 4725:14, 4725:15, 4725:16, 4738:17, 4742:21, 4743:19, 4746:21, 4748:13, 4749:6, 4749:8

**contact** [1] - 4739:5

**contents** [1] - 4733:13

**context** [3] - 4687:18, 4711:11, 4741:9

**continue** [3] - 4691:15, 4715:10, 4726:10

**Continued** [1] - 4680:5

**CONTINUED** [1] - 4681:6

**continuing** [3] - 4725:20, 4725:21, 4751:10

**Contract** [3] - 4727:11, 4727:15, 4727:20

**contract** [32] - 4682:22, 4702:12, 4702:16, 4702:17, 4703:4, 4703:8, 4703:9, 4709:9, 4726:13, 4726:15, 4726:17, 4726:21, 4727:8, 4727:18, 4727:22, 4727:24, 4728:1, 4728:5, 4728:17, 4728:20, 4729:2, 4729:4, 4729:9, 4729:19, 4729:25, 4730:6, 4730:9, 4730:11, 4730:21, 4730:24, 4735:1, 4735:4

**contractor** [2] - 4682:18

**contradictory** [1] - 4701:16

**conversations** [1] - 4688:19

**convert** [1] - 4741:24

**convince** [1] - 4742:19

**cooking** [21] - 4681:20, 4681:24, 4682:22, 4702:11, 4702:16, 4703:3, 4703:12, 4704:3, 4704:14, 4718:2, 4719:18, 4732:16, 4733:1, 4734:10, 4734:16, 4734:17, 4737:21, 4738:14, 4738:18, 4738:23, 4749:14

**Cooking** [1] - 4727:15

**cooktops** [4] - 4701:5, 4701:12, 4701:13, 4702:8

**coordinated** [1] - 4688:20

**copy** [3] - 4741:22, 4742:1, 4743:8

**core** [1] - 4700:7

**corner** [1] - 4713:14

**correct** [153] - 4681:18, 4681:21, 4681:22, 4681:25, 4682:1, 4682:3, 4682:4, 4682:6, 4682:7, 4682:10, 4682:12, 4682:13, 4682:23, 4683:4, 4683:5, 4683:8, 4683:9, 4683:11, 4683:12, 4683:18, 4683:23, 4683:25, 4684:3, 4684:11, 4684:15, 4684:17, 4684:19, 4685:16, 4685:19, 4686:5, 4688:16, 4689:14, 4689:17, 4690:19, 4692:4, 4694:18, 4695:25, 4696:3, 4696:5, 4696:6, 4696:8, 4696:12, 4697:3, 4700:5, 4700:18, 4700:23, 4701:1, 4701:21, 4701:23, 4702:1, 4704:22, 4705:12, 4705:13, 4705:17, 4709:2, 4709:11, 4709:15, 4709:17, 4710:13, 4710:14, 4710:16, 4710:22, 4711:19, 4712:7, 4712:20, 4712:24, 4714:3, 4716:11, 4716:12, 4716:14, 4716:15, 4716:18, 4716:19, 4717:3, 4717:4, 4717:8, 4717:9, 4717:12, 4717:13, 4717:17, 4717:25, 4718:7, 4718:9, 4718:10, 4718:11, 4718:13, 4718:15, 4718:16, 4718:18, 4718:19, 4718:25, 4719:12, 4721:3, 4721:13, 4721:22, 4721:23, 4721:25, 4722:4, 4722:17, 4722:20, 4722:22, 4723:3, 4723:16, 4723:18, 4723:20, 4723:21, 4723:22, 4723:24, 4724:1, 4724:2, 4724:4, 4724:5, 4724:6, 4724:8, 4724:13, 4725:3, 4725:10, 4726:1, 4726:13, 4726:21, 4727:12, 4727:13, 4727:16, 4727:17, 4727:20, 4727:24, 4728:6, 4728:17, 4729:10, 4730:2, 4730:7, 4730:25, 4734:21, 4734:22, 4735:10, 4735:18, 4735:22, 4735:24, 4737:6, 4737:9, 4737:18, 4737:23, 4737:24, 4740:8, 4741:17, 4744:15, 4744:24, 4744:25, 4745:3, 4747:3, 4749:12, 4749:16, 4759:10

**correctly** [11] - 4694:15, 4694:16, 4710:15, 4719:25, 4722:15, 4730:8, 4731:1, 4731:9, 4731:15, 4731:17, 4751:14

**cost** [12] - 4690:15, 4691:25, 4692:3, 4692:21, 4692:23, 4692:25, 4693:2, 4705:5, 4715:18, 4746:4, 4748:13

**costing** [1] - 4725:25

**costs** [1] - 4693:2

**counsel** [13] - 4698:3, 4699:1, 4699:3, 4699:5, 4732:1, 4732:7, 4751:2, 4751:4, 4752:12, 4753:6, 4755:11, 4758:23, 4759:8

**count** [2] - 4683:6, 4748:2

**counted** [2] - 4682:18, 4738:11

**counteracting** [1] - 4747:19

**counteracts** [2] - 4694:12, 4746:19

**country** [3] - 4683:21, 4735:22, 4735:23

**couple** [1] - 4686:1

**course** [8] - 4703:9, 4709:21, 4731:4, 4746:25, 4750:8, 4752:4, 4752:15, 4755:20

**COURT** [49] - 4677:1, 4677:10, 4681:2, 4681:5, 4693:17, 4693:20, 4693:24, 4694:22, 4698:2, 4700:12, 4716:7, 4720:11, 4720:16, 4731:4, 4731:12, 4731:22, 4731:24, 4732:4, 4732:7, 4738:7, 4750:15, 4750:18, 4750:24, 4751:2, 4751:7, 4751:13, 4752:12, 4752:22, 4753:6, 4753:9, 4753:14, 4753:25, 4754:12, 4754:15, 4755:16, 4755:18, 4756:5, 4756:13, 4756:15, 4756:25, 4757:14, 4758:12, 4758:21, 4759:3, 4759:13, 4759:19, 4760:7, 4760:23, 4761:3

**court** [4] - 4754:14, 4755:17, 4756:4, 4760:14

**Court** [9] - 4679:21, 4679:21, 4736:3, 4743:7, 4749:25, 4750:11, 4756:2, 4759:20, 4762:4

**Court's** [3] - 4750:22, 4756:23, 4758:13

**Courthouse** [1] - 4679:22

**courts** [1] - 4694:6

**Cowie** [1] - 4679:13

**CPA** [2] - 4710:20, 4710:24

**Craig** [1] - 4679:9

**craig.falls@dechert.com** [1] - 4679:12

**Cramer** [1] - 4700:12

**credit** [3] - 4684:20, 4760:7, 4760:10
**critical** [3] - 4687:13, 4687:17, 4688:9
**critically** [1] - 4730:14
**criticize** [1] - 4726:20
**critiques** [1] - 4741:16
**Crosley** [1] - 4706:23
**cross** [4] - 4732:12, 4738:4, 4748:19, 4750:9
**Cross** [1] - 4680:5
**CROSS** [1] - 4681:6
**cross-examination** [1] - 4732:12
**CROSS-EXAMINATION** [1] - 4681:6
**cross-examined** [1] - 4750:9
**CRR** [1] - 4679:21
**curious** [1] - 4751:22
**current** [1] - 4690:2
**customer** [10] - 4699:20, 4699:22, 4699:24, 4700:4, 4700:6, 4700:7, 4700:9, 4700:11, 4727:4
**customers** [7] - 4702:14, 4703:8, 4704:13, 4712:8, 4726:16, 4726:17, 4734:7
**cut** [1] - 4724:10
**CV** [1] - 4696:15

# D

**D.C** [3] - 4677:6, 4679:22, 4686:25
**Dacor** [1] - 4707:13
**daily** [2] - 4752:22, 4756:5
**Danby** [1] - 4706:20
**Daniel** [1] - 4685:2
**data** [53] - 4682:24, 4697:16, 4705:25, 4707:10, 4707:18, 4708:10, 4708:18, 4709:5, 4709:7, 4710:3, 4710:6, 4710:7, 4712:10, 4712:12, 4712:14, 4712:15, 4712:21, 4712:25, 4713:4, 4713:5, 4713:7, 4713:11, 4713:25, 4714:8, 4714:12, 4714:15, 4714:17, 4714:20, 4714:21, 4715:1, 4715:2, 4719:20, 4721:5, 4721:7, 4723:4, 4723:6, 4727:21, 4728:8, 4728:10, 4729:1, 4729:3, 4730:14, 4730:17, 4734:21, 4736:11, 4737:12, 4743:2, 4745:4, 4748:17
**database** [15] - 4705:19, 4705:22, 4706:6, 4706:13, 4706:18, 4706:21, 4706:24, 4707:2, 4707:5, 4707:14, 4707:20, 4708:9, 4708:14, 4709:10, 4709:21
**databases** [2] - 4706:1, 4708:22
**date** [2] - 4714:2, 4714:11
**dated** [2] - 4695:24, 4697:20
**dates** [1] - 4681:16
**David** [1] - 4678:6
**DAY** [4] - 4678:9, 4678:13, 4678:17, 4678:21
**days** [1] - 4750:8
**DC** [12] - 4677:15, 4677:19, 4677:23,

4678:3, 4678:8, 4678:10, 4678:18, 4679:3, 4679:7, 4679:11, 4679:15, 4679:19
**deal** [4] - 4687:10, 4741:11, 4744:4, 4759:1
**dealing** [1] - 4745:24
**December** [2] - 4677:5, 4683:3
**DECHERT** [5] - 4679:2, 4679:6, 4679:10, 4679:14, 4679:17
**decide** [2] - 4752:25, 4758:14
**decides** [1] - 4759:21
**decimal** [1] - 4716:23
**decision** [4] - 4689:23, 4690:9, 4752:10, 4760:19
**decline** [1] - 4725:13
**declining** [1] - 4692:25
**decrease** [4] - 4723:22, 4724:3, 4724:7, 4725:8
**deemed** [1] - 4687:14
**deepens** [1] - 4715:3
**defeat** [1] - 4743:11
**Defendant** [2] - 4678:9, 4679:1
**Defendants** [1] - 4677:7
**defendants** [7] - 4694:17, 4739:5, 4746:23, 4751:4, 4752:21, 4759:24, 4760:10
**defendants'** [1] - 4702:22
**Defense** [1] - 4733:19
**defense** [3] - 4695:4, 4697:4, 4751:12
**define** [2] - 4702:17, 4727:22
**defined** [3] - 4726:15, 4727:17, 4727:25
**defines** [1] - 4726:14
**definition** [6] - 4687:23, 4687:25, 4726:19, 4726:21, 4734:15, 4750:3
**definitions** [1] - 4702:18
**Demitrack** [1] - 4680:5
**DEMITRACK** [11] - 4693:13, 4697:24, 4698:4, 4732:2, 4732:9, 4738:5, 4738:8, 4739:3, 4750:14, 4750:21, 4751:6
**demonstrate** [1] - 4705:15
**Denis** [1] - 4679:5
**Dennis** [4] - 4683:24, 4686:1, 4696:17, 4696:19
**department** [1] - 4739:12
**Department** [4] - 4689:22, 4690:10, 4697:15, 4739:15
**DEPARTMENT** [5] - 4677:13, 4677:17, 4677:21, 4678:2, 4678:6
**Department's** [2] - 4690:2, 4690:23
**departments** [1] - 4683:21
**deposed** [1] - 4702:23
**deposition** [9] - 4695:9, 4697:7, 4697:13, 4697:14, 4698:1, 4702:21, 4702:23, 4703:1, 4704:12
**Depot** [6] - 4681:24, 4682:12, 4690:14, 4714:24, 4736:2, 4747:16
**DEPUTY** [1] - 4693:22
**describe** [3] - 4699:13, 4721:8, 4749:17

**described** [4] - 4685:11, 4704:23, 4712:11, 4742:9
**describing** [1] - 4733:14
**description** [1] - 4749:18
**design** [1] - 4711:7
**designate** [1] - 4710:21
**desire** [1] - 4740:18
**detail** [2] - 4703:7, 4748:14
**detailed** [3] - 4683:1, 4748:14, 4758:7
**details** [2] - 4685:13, 4688:21, 4696:14
**detect** [2] - 4694:8, 4746:16
**determine** [1] - 4734:25
**determined** [1] - 4735:18
**determines** [1] - 4749:6
**deterrent** [1] - 4747:19
**deters** [2] - 4694:11, 4746:19
**dictated** [1] - 4714:23
**difference** [3] - 4715:9, 4736:13, 4747:18
**different** [17] - 4683:7, 4685:10, 4707:19, 4710:10, 4711:15, 4726:6, 4726:11, 4726:16, 4726:19, 4726:25, 4727:3, 4735:12, 4740:12, 4744:6, 4747:14, 4747:25, 4748:16
**differentiated** [1] - 4715:8
**differently** [6] - 4713:4, 4726:14, 4727:3, 4728:11, 4729:1, 4729:20
**difficult** [1] - 4729:17
**direct** [4] - 4682:19, 4691:18, 4726:15, 4733:7, 4741:20, 4744:10, 4744:14, 4748:18, 4753:8
**direction** [3] - 4732:25, 4733:2
**director** [2] - 4683:10, 4683:13
**disagree** [5] - 4692:5, 4696:16, 4706:9, 4706:10, 4711:21, 4723:5
**discipline** [1] - 4748:3
**disclaimer** [3] - 4712:25, 4713:17, 4713:19
**discounts** [2] - 4737:14, 4737:15
**discuss** [1] - 4700:21
**discussed** [4] - 4689:9, 4691:21, 4709:23, 4744:19
**discussion** [3] - 4754:16, 4757:14, 4760:11
**discussions** [1] - 4688:24
**displayed** [1] - 4732:20
**dispositive** [1] - 4749:1
**dispute** [4] - 4700:25, 4701:5, 4701:13, 4701:20
**distribution** [5] - 4711:5, 4711:14, 4737:3, 4737:13, 4738:12
**distributors** [5] - 4702:19, 4703:8, 4703:9, 4742:19
**DISTRICT** [3] - 4677:1, 4677:1, 4677:10
**diversion** [3] - 4691:25, 4692:3, 4692:5
**divided** [9] - 4728:20, 4728:24, 4729:7, 4729:12, 4729:14, 4729:15, 4730:9, 4731:15, 4731:16

**Division** [2] - 4677:21, 4687:14
**docket** [1] - 4757:7
**document** [6] - 4695:10, 4698:17, 4713:14, 4713:16, 4732:17, 4733:25
**documents** [1] - 4697:25
**domestic** [1] - 4742:18
**done** [23] - 4696:9, 4706:10, 4706:14, 4706:22, 4706:25, 4707:7, 4707:9, 4707:16, 4711:13, 4718:4, 4734:13, 4736:24, 4737:14, 4750:6, 4750:22, 4751:25, 4752:15, 4754:6, 4754:8, 4756:1, 4756:4, 4759:6
**dotted** [1] - 4722:15
**doubt** [3] - 4706:11, 4749:23, 4750:1
**doubts** [1] - 4750:6
**down** [22] - 4693:10, 4693:11, 4721:22, 4722:2, 4722:3, 4723:20, 4724:9, 4724:12, 4724:15, 4724:17, 4724:25, 4725:4, 4725:6, 4725:10, 4725:11, 4731:7, 4742:9, 4745:7, 4745:19, 4750:20
**downward** [1] - 4724:22
**dozens** [1] - 4748:10
**Dr** [8] - 4695:16, 4695:21, 4696:7, 4696:11, 4696:23, 4698:18
**draw** [1] - 4732:20
**drawn** [1] - 4701:18
**Drive** [2] - 4678:14, 4678:21
**drop** [5] - 4721:9, 4721:16, 4724:22, 4725:13, 4725:14
**drops** [2] - 4721:13, 4721:14
**dryers** [3] - 4690:14, 4691:25, 4692:18
**during** [5] - 4705:21, 4732:12, 4739:20, 4748:19, 4754:11
**DX** [5] - 4681:12, 4720:22, 4724:10, 4727:10, 4758:2
**DX-0658** [1] - 4705:10
**DX-0658-007** [1] - 4710:11
**dynamic** [3] - 4704:10, 4734:19, 4749:20

# E

**e-mail** [5] - 4693:22, 4695:12, 4695:16, 4697:19
**early** [1] - 4749:9
**Easterbrook** [1] - 4686:3
**Economic** [3] - 4689:3, 4693:12, 4694:2
**economic** [8] - 4693:9, 4698:19, 4700:10, 4711:10, 4711:17, 4715:2, 4740:12, 4740:20
**economics** [7] - 4683:20, 4720:5, 4726:9, 4737:8, 4739:12, 4740:11
**economist** [15] - 4684:4, 4684:5, 4684:12, 4687:2, 4699:13, 4710:17, 4710:23, 4711:10, 4711:15, 4719:11, 4732:20, 4737:6, 4737:18, 4740:7, 4749:2
**economists** [4] - 4683:18, 4697:1,

4699:17, 4739:11
**ecosystem** [1] - 4704:25
**ed** [2] - 4687:11, 4689:11
**effect** [5] - 4688:22, 4737:2, 4749:6, 4749:7, 4752:8
**Effect** [1] - 4689:2
**effective** [7] - 4694:9, 4703:19, 4703:25, 4734:10, 4746:17, 4748:23, 4749:23
**effectively** [1] - 4705:4
**effects** [17] - 4688:3, 4688:20, 4688:21, 4690:20, 4691:19, 4691:21, 4694:12, 4704:11, 4704:24, 4705:1, 4732:23, 4744:18, 4746:19, 4747:20, 4749:1, 4749:24, 4750:10
**efficiencies** [20] - 4692:15, 4694:14, 4737:18, 4737:21, 4737:22, 4738:2, 4738:3, 4738:11, 4738:13, 4738:25, 4745:24, 4746:1, 4746:7, 4746:10, 4746:21, 4748:11, 4748:12, 4751:20, 4752:7, 4760:19
**efficiencies)** [1] - 4691:20
**efficiency** [2] - 4737:9, 4738:20
**efficient** [2] - 4692:23, 4746:4
**effort** [1] - 4757:1
**either** [3] - 4697:13, 4741:14, 4760:23
**Elaine** [3] - 4695:12, 4697:20, 4698:7
**Electric** [38] - 4679:2, 4695:5, 4695:7, 4696:4, 4698:19, 4698:20, 4699:5, 4701:25, 4702:4, 4702:8, 4702:11, 4703:21, 4703:24, 4704:5, 4704:20, 4705:12, 4705:16, 4705:18, 4705:20, 4706:5, 4706:13, 4706:17, 4706:20, 4706:23, 4707:1, 4707:4, 4707:14, 4708:7, 4708:21, 4708:22, 4709:10, 4716:17, 4717:3, 4728:5, 4728:16, 4729:3, 4729:3, 4748:21
**Electric-Electrolux** [1] - 4698:20
**ELECTROLUX** [1] - 4677:6
**Electrolux** [70] - 4678:9, 4695:5, 4695:7, 4696:1, 4696:5, 4697:6, 4698:9, 4698:19, 4698:20, 4699:5, 4701:24, 4702:3, 4702:7, 4702:10, 4702:15, 4703:2, 4703:12, 4703:15, 4703:18, 4704:5, 4704:14, 4704:20, 4707:25, 4708:24, 4709:15, 4712:24, 4713:1, 4713:3, 4713:14, 4713:25, 4714:1, 4717:7, 4717:8, 4717:16, 4719:4, 4719:9, 4719:21, 4719:23, 4720:13, 4721:24, 4722:1, 4722:2, 4722:3, 4722:11, 4722:18, 4723:15, 4723:25, 4724:3, 4724:11, 4724:20, 4725:2, 4725:5, 4725:9, 4725:21, 4725:23, 4725:25, 4727:18, 4727:21, 4730:1, 4733:14, 4733:22, 4734:2, 4738:21, 4744:15, 4748:21, 4758:5, 4760:3
**Electrolux's** [2] - 4717:12, 4717:18
**element** [1] - 4705:1
**elements** [1] - 4692:5
**elevation** [2] - 4747:23, 4747:25

**eliminate** [1] - 4704:24
**elimination** [1] - 4692:17
**ELMO** [3] - 4716:6, 4731:2, 4741:25
**EMA** [1] - 4713:20
**Email** [11] - 4677:16, 4677:19, 4677:24, 4678:5, 4678:12, 4678:15, 4678:19, 4679:4, 4679:8, 4679:12, 4679:20
**embraced** [1] - 4690:10
**EMMET** [1] - 4677:10
**empirical** [11] - 4701:2, 4701:15, 4701:22, 4705:8, 4706:7, 4707:7, 4741:6, 4741:8, 4741:12, 4741:13, 4749:21
**employee** [1] - 4685:15
**employees** [2] - 4760:3
**enabling** [2] - 4694:14, 4746:21
**encompasses** [1] - 4708:11
**end** [12] - 4692:8, 4692:9, 4699:19, 4699:23, 4704:21, 4721:11, 4723:19, 4727:5, 4745:12, 4745:14, 4754:10, 4758:17
**ending** [4] - 4681:19, 4695:12, 4695:20, 4743:5
**ends** [2] - 4706:3, 4745:18
**energy** [1] - 4757:1
**Enforcement** [1] - 4689:7
**enforcement** [7] - 4687:14, 4687:17, 4689:22, 4689:24, 4690:2, 4690:9, 4690:25
**engineers** [1] - 4711:25
**enter** [2] - 4745:21, 4748:8
**entered** [2] - 4734:15, 4745:18
**entire** [1] - 4748:19
**entirely** [1] - 4736:16
**entirety** [2] - 4746:23, 4747:2
**entitled** [2] - 4689:6, 4762:6
**entrant** [1] - 4691:8
**entrants** [2] - 4690:11, 4747:22
**entries** [2] - 4708:12, 4708:15
**entry** [8] - 4691:4, 4691:20, 4694:11, 4742:6, 4746:19, 4747:19, 4748:1, 4748:4
**especially** [3] - 4690:1, 4690:3, 4754:5
**Esquire** [14] - 4677:13, 4677:17, 4677:20, 4678:1, 4678:6, 4678:9, 4678:13, 4678:16, 4678:20, 4679:1, 4679:5, 4679:9, 4679:13, 4679:17
**essence** [2] - 4682:24, 4721:19
**estimate** [1] - 4698:12
**estimated** [1] - 4754:5
**estimates** [1] - 4754:7
**et** [3] - 4677:6, 4754:22
**Ethan** [1] - 4677:13
**ethan.glass@usdoj.gov** [1] - 4677:16
**ethical** [2] - 4739:24, 4740:6
**evaluate** [1] - 4737:8
**evidence** [17] - 4701:7, 4701:16, 4701:17, 4705:8, 4727:7, 4734:24, 4744:4, 4748:12, 4749:21, 4751:16,

4751:24, 4752:10, 4755:23, 4757:9, 4759:15, 4760:5, 4760:18
**evidentiary** [1] - 4751:9
**Ewing** [3] - 4695:13, 4697:20, 4698:15
**exactly** [5] - 4688:25, 4692:4, 4694:17, 4694:19, 4745:4
**examination** [1] - 4732:12
**EXAMINATION** [3] - 4680:3, 4681:6, 4732:8
**examine** [2] - 4753:12, 4758:9
**examined** [3] - 4713:5, 4714:14, 4750:9
**example** [15] - 4687:18, 4699:15, 4699:21, 4699:24, 4700:3, 4700:11, 4711:16, 4714:21, 4714:24, 4715:12, 4715:14, 4722:9, 4729:21, 4735:14, 4748:2
**examples** [2] - 4712:21, 4712:23
**exception** [1] - 4752:16
**exchange** [1] - 4736:3
**excuse** [1] - 4700:12
**excused** [1] - 4750:18
**executive** [1] - 4751:19
**executives** [1] - 4758:5
**exercise** [1] - 4741:14
**exhibit** [1] - 4720:10
**Exhibit** [7] - 4720:14, 4720:15, 4720:18, 4731:19, 4732:13, 4733:8, 4733:19
**exist** [1] - 4714:6
**expand** [1] - 4690:12
**expansion** [1] - 4748:5
**experience** [1] - 4740:10
**experiencing** [1] - 4693:17
**expert** [32] - 4710:16, 4710:19, 4710:22, 4710:25, 4711:2, 4711:4, 4711:5, 4711:7, 4711:9, 4711:10, 4711:17, 4717:23, 4718:1, 4728:15, 4728:25, 4735:3, 4737:3, 4737:4, 4737:10, 4737:11, 4737:17, 4737:25, 4751:20, 4752:17, 4752:18, 4753:3, 4754:22, 4755:7, 4757:25
**experts** [4] - 4739:21, 4740:5, 4752:17, 4754:5
**explain** [6] - 4691:4, 4692:14, 4694:19, 4742:5, 4745:25, 4747:9
**explained** [3] - 4746:10, 4749:25, 4750:11
**explaining** [1] - 4690:8
**explanation** [1] - 4733:21
**explicitly** [1] - 4688:8
**extent** [4] - 4691:17, 4691:18, 4744:10, 4745:17
**extra** [2] - 4754:4, 4754:11
**extremely** [4] - 4732:22, 4739:14, 4740:4, 4748:14

## F

**facets** [1] - 4711:15
**fact** [16] - 4692:6, 4692:7, 4696:11,

4709:10, 4711:3, 4713:5, 4719:10, 4725:17, 4726:20, 4728:1, 4731:14, 4732:24, 4740:17, 4745:9, 4745:11, 4760:8
**factor** [1] - 4748:9
**factors** [1] - 4724:21
**facts** [8] - 4743:22, 4744:2, 4744:3, 4745:2, 4749:1, 4749:9, 4749:15, 4749:22
**factual** [1] - 4747:17
**factually** [1] - 4747:14
**fair** [6] - 4683:16, 4685:18, 4705:16, 4727:1, 4759:13
**fall** [1] - 4699:19
**fallen** [2] - 4719:4, 4719:6
**Falls** [1] - 4679:9
**falls** [2] - 4685:5, 4722:11
**familiar** [1] - 4732:15
**far** [6] - 4685:13, 4698:15, 4698:17, 4704:8, 4708:6, 4735:15
**Fax** [5] - 4677:24, 4678:4, 4678:11, 4678:19, 4679:12
**feeds** [1] - 4708:19
**fell** [1] - 4724:20
**few** [1] - 4751:9
**Fifth** [5] - 4677:14, 4677:18, 4677:22, 4678:2, 4678:7
**figures** [1] - 4734:5
**file** [2] - 4757:7, 4759:23
**final** [4] - 4706:2, 4707:10, 4708:14, 4709:25
**finally** [1] - 4746:13
**financing** [1] - 4752:2
**fine** [17] - 4720:16, 4735:8, 4739:23, 4752:22, 4753:1, 4753:9, 4753:14, 4753:15, 4754:1, 4754:12, 4756:22, 4757:6, 4757:10, 4757:20, 4758:16, 4758:25
**finished** [1] - 4751:3
**firm** [15] - 4689:13, 4691:11, 4691:12, 4692:21, 4692:22, 4692:23, 4692:25, 4693:2, 4705:4, 4711:22, 4733:9, 4739:10, 4740:18, 4742:12, 4742:13
**firms** [10] - 4690:10, 4693:9, 4693:12, 4694:2, 4703:10, 4733:11, 4733:12, 4740:12, 4740:20, 4742:17
**first** [21] - 4688:10, 4688:14, 4689:11, 4689:19, 4690:22, 4691:2, 4691:4, 4694:9, 4695:8, 4695:9, 4697:23, 4698:16, 4716:9, 4719:2, 4721:7, 4723:7, 4726:2, 4741:21, 4742:21, 4747:12, 4749:18
**First** [1] - 4742:5
**fit** [3] - 4699:15, 4700:1, 4744:2
**fits** [1] - 4700:10
**five** [6] - 4683:7, 4700:13, 4719:15, 4731:24, 4747:16, 4759:1
**five-year** [1] - 4719:15
**flat** [4] - 4722:1, 4722:2, 4722:3, 4722:4
**Flyer** [1] - 4696:19

**flyer** [1] - 4696:23
**focused** [3] - 4720:25, 4747:21, 4748:14
**folder** [1] - 4739:25
**followed** [3] - 4687:15, 4736:12, 4736:16
**following** [7] - 4691:20, 4698:7, 4705:8, 4732:23, 4740:8, 4744:18, 4746:15
**FOR** [1] - 4677:1
**forces** [1] - 4724:14
**forecast** [1] - 4736:22
**foregoing** [1] - 4762:5
**foreign** [1] - 4742:17
**form** [1] - 4685:19
**forward** [8] - 4694:4, 4720:7, 4721:18, 4727:7, 4748:12, 4752:4, 4760:18
**four** [11] - 4681:16, 4683:7, 4718:23, 4720:1, 4721:10, 4721:12, 4721:18, 4721:20, 4721:21, 4747:16
**fourth** [3] - 4682:22, 4690:6, 4723:10
**frames** [2] - 4683:8, 4687:16
**framework** [3] - 4688:23, 4715:3, 4733:3
**Friday** [1] - 4677:5
**Friedman** [1] - 4679:1
**friends** [1] - 4683:22
**fringe** [1] - 4742:17
**front** [4] - 4692:8, 4723:4, 4741:1, 4745:12
**front-loading** [2] - 4692:8, 4745:12
**fueled** [1] - 4689:23
**full** [6] - 4683:15, 4683:16, 4689:19, 4693:10, 4750:5, 4750:6
**full-time** [2] - 4683:15, 4683:16
**fuller** [1] - 4715:3
**functions** [1] - 4711:9
**fundamentally** [1] - 4727:7
**future** [1] - 4736:19

## G

**gain** [1] - 4692:21
**gained** [1] - 4724:17
**gather** [1] - 4757:3
**GE** [44] - 4696:1, 4697:6, 4698:9, 4702:15, 4703:3, 4703:12, 4704:15, 4708:12, 4709:21, 4710:13, 4713:24, 4716:9, 4716:10, 4716:13, 4716:16, 4719:5, 4719:21, 4720:13, 4721:21, 4722:1, 4722:2, 4722:3, 4722:21, 4723:17, 4724:5, 4724:11, 4724:12, 4724:20, 4725:2, 4725:9, 4725:21, 4725:23, 4725:24, 4727:17, 4727:21, 4729:21, 4734:24, 4734:25, 4735:1, 4738:21, 4744:15, 4758:5, 4760:3
**GE-Electrolux** [2] - 4696:1, 4738:21
**gear** [1] - 4699:3
**gee** [1] - 4758:17
**Gelfand** [1] - 4678:6
**general** [3] - 4688:19, 4688:23, 4704:7

**General** [39] - 4679:1, 4689:24, 4695:5, 4695:7, 4696:4, 4698:19, 4698:20, 4699:4, 4701:24, 4702:3, 4702:7, 4702:10, 4703:21, 4703:24, 4704:5, 4704:20, 4705:12, 4705:16, 4705:18, 4705:19, 4706:5, 4706:13, 4706:17, 4706:20, 4706:23, 4707:1, 4707:4, 4707:13, 4708:7, 4708:21, 4708:22, 4709:10, 4716:17, 4717:3, 4728:5, 4728:16, 4728:19, 4729:3, 4748:21

**generally** [7] - 4691:7, 4694:9, 4712:15, 4715:21, 4737:12, 4743:7, 4746:17

**geographic** [1] - 4700:16

**Gerald** [1] - 4679:9

**Gilbert** [2] - 4684:6, 4686:5

**given** [7] - 4690:3, 4695:23, 4696:13, 4701:8, 4709:13, 4715:22, 4731:14

**GLASS** [38] - 4681:7, 4693:16, 4693:19, 4693:25, 4694:1, 4694:20, 4694:25, 4698:5, 4698:6, 4700:15, 4716:6, 4716:8, 4720:9, 4720:12, 4720:17, 4720:20, 4731:2, 4731:5, 4731:6, 4731:10, 4731:18, 4731:23, 4738:4, 4750:17, 4751:1, 4751:5, 4751:15, 4752:13, 4753:4, 4753:11, 4753:24, 4755:3, 4757:12, 4757:22, 4758:20, 4759:2, 4759:23, 4761:1

**Glass** [23] - 4677:13, 4680:5, 4681:9, 4683:14, 4700:12, 4732:12, 4733:13, 4734:3, 4734:8, 4734:23, 4736:3, 4737:2, 4739:10, 4741:21, 4742:2, 4742:4, 4745:24, 4746:14, 4748:20, 4751:22, 4752:8, 4755:6, 4760:19

**Glass's** [1] - 4733:5

**Government** [2] - 4720:18, 4731:19

**government** [6] - 4733:9, 4734:1, 4740:8, 4744:1, 4755:12, 4759:20

**Government's** [2] - 4720:13, 4720:15

**government's** [1] - 4733:20

**granularly** [1] - 4722:8

**Gray** [1] - 4678:20

**great** [2] - 4716:2, 4752:6

**green** [2] - 4722:21, 4725:24

**group** [3] - 4686:2, 4686:4, 4719:24

**grow** [3] - 4734:20, 4743:10, 4745:22

**growing** [1] - 4736:22

**grown** [2] - 4691:9, 4719:5

**growth** [2] - 4681:20, 4720:21

**growth's** [1] - 4721:15

**guess** [5] - 4753:7, 4755:22, 4755:23, 4756:16, 4756:20

**guidance** [2] - 4736:12, 4736:15

**guidelines** [13] - 4691:22, 4713:10, 4715:7, 4715:10, 4715:16, 4715:20, 4736:12, 4736:15, 4736:16, 4736:20, 4738:10, 4744:19

# H

**Haier** [2] - 4707:1, 4747:23

**Hale** [1] - 4677:17

**half** [1] - 4758:15

**Hamer** [2] - 4753:4

**HAMER** [1] - 4753:7

**hand** [2] - 4713:14, 4742:17

**hard** [1] - 4756:20

**harm** [3] - 4690:16, 4691:10, 4742:11

**head** [2] - 4735:6, 4740:1

**heading** [3] - 4693:6, 4693:12, 4694:2

**hear** [2] - 4751:16, 4755:24

**heard** [6] - 4695:9, 4699:12, 4710:15, 4735:9, 4754:6, 4760:2

**hearsay** [4] - 4752:16, 4757:24, 4758:1

**held** [1] - 4745:5

**hello** [2] - 4681:8, 4681:9

**help** [5] - 4696:15, 4718:1, 4718:3, 4745:5, 4755:14

**helpful** [3] - 4755:25, 4756:6, 4756:9

**Henderson** [1] - 4677:20

**herself** [1] - 4697:10

**high** [4] - 4710:5, 4746:4, 4750:2, 4750:4

**high-cost** [1] - 4746:4

**higher** [11] - 4687:13, 4692:8, 4692:21, 4692:23, 4692:25, 4715:13, 4715:18, 4715:19, 4744:7, 4745:12, 4745:18

**higher-cost** [4] - 4692:21, 4692:23, 4692:25, 4715:18

**higher-end** [2] - 4692:8, 4745:12

**higher-priced** [1] - 4715:13

**higher-quality** [1] - 4715:19

**highlight** [1] - 4721:15

**highlighted** [1] - 4746:14

**hired** [1] - 4696:4

**historic** [1] - 4749:23

**historically** [3] - 4704:3, 4704:16, 4709:12

**hold** [2] - 4730:22, 4743:24

**Home** [6] - 4681:24, 4682:12, 4690:14, 4714:24, 4736:2, 4747:16

**Honor** [49] - 4693:13, 4693:16, 4693:19, 4693:25, 4697:24, 4698:4, 4698:5, 4716:6, 4720:9, 4720:12, 4720:17, 4731:2, 4731:10, 4731:18, 4731:23, 4738:6, 4738:9, 4750:14, 4750:17, 4750:19, 4750:21, 4751:8, 4751:12, 4751:15, 4751:22, 4752:13, 4752:20, 4752:21, 4753:11, 4754:3, 4755:3, 4755:4, 4755:11, 4755:25, 4756:8, 4756:11, 4756:19, 4757:11, 4757:12, 4757:22, 4758:10, 4758:20, 4759:2, 4759:23, 4760:6, 4760:16, 4761:1, 4761:2

**HONORABLE** [1] - 4677:10

**honored** [1] - 4756:12

**hook** [1] - 4758:21

**hope** [1] - 4716:3

**hoping** [1] - 4751:11

**Horizontal** [1] - 4689:7

**hour** [7] - 4754:4, 4754:17, 4755:1, 4756:11, 4758:15, 4759:1, 4760:25

**hours** [2] - 4694:20, 4750:9

**Housing** [1] - 4735:4

**hundreds** [1] - 4744:6

**hypothesize** [2] - 4691:22, 4744:20

**hypothetical** [7] - 4699:23, 4727:6, 4735:8, 4735:10, 4735:11, 4744:23, 4748:3

**hypotheticals** [1] - 4735:9

# I

**idea** [3] - 4726:3, 4757:8, 4760:1

**identical** [2] - 4713:6, 4739:17

**identification** [4] - 4712:19, 4720:19, 4731:11, 4731:19

**identified** [3] - 4707:10, 4709:24, 4728:19

**identifier** [1] - 4712:20

**identifies** [1] - 4730:25

**identifying** [1] - 4735:16

**ignore** [1] - 4715:1

**II** [1] - 4677:20

**III** [1] - 4693:6

**IL** [1] - 4678:14

**II** [1] - 4678:22

**ill** [1] - 4758:23

**immediately** [1] - 4740:1

**imply** [1] - 4691:10

**implying** [1] - 4742:10

**importance** [1] - 4715:22

**important** [9] - 4690:24, 4691:7, 4693:1, 4703:19, 4703:25, 4704:10, 4730:14, 4748:23, 4749:23

**imports** [1] - 4690:12

**impression** [1] - 4760:10

**improve** [1] - 4693:2

**include** [5] - 4703:10, 4718:1, 4734:5, 4738:1, 4738:13

**included** [3] - 4686:2, 4697:15, 4738:25

**includes** [4] - 4712:17, 4728:11, 4734:7, 4755:8

**including** [5] - 4695:13, 4728:13, 4750:9, 4751:10, 4752:3

**inconsistencies** [1] - 4730:22

**inconsistent** [2] - 4701:2, 4726:9

**incorporate** [1] - 4736:19

**increase** [5] - 4691:23, 4691:24, 4743:11, 4744:20, 4748:4

**increased** [1] - 4719:7

**increases** [1] - 4721:17

**indeed** [1] - 4760:11

**independent** [1] - 4692:17

**indicated** [1] - 4748:8

**indicating** [1] - 4740:2

**indication** [1] - 4709:4
**indicator** [5] - 4712:14, 4713:8, 4713:12, 4714:8, 4736:11
**indirect** [2] - 4709:9, 4709:15
**individual** [1] - 4759:7
**individuals** [1] - 4700:1
**inducing** [1] - 4693:2
**industrial** [1] - 4739:12
**industries** [3] - 4737:13
**industry** [6] - 4687:7, 4726:12, 4733:3, 4740:11, 4740:19
**industry-recognized** [4] - 4726:12
**inextricably** [4] - 4738:11, 4738:15, 4738:23, 4739:1
**influential** [1] - 4690:3
**inform** [3] - 4709:8, 4745:5, 4752:21
**informally** [1] - 4687:23
**information** [16] - 4697:5, 4698:21, 4706:2, 4729:5, 4729:7, 4732:16, 4739:22, 4739:25, 4740:5, 4748:17, 4754:21, 4754:23, 4755:6, 4758:12, 4760:9, 4760:14
**informs** [1] - 4748:19
**inframarginal** [4] - 4699:18, 4699:20, 4700:9, 4700:11
**ING** [1] - 4742:11
**initial** [1] - 4688:4
**innovative** [1] - 4715:15
**inquired** [2] - 4696:22, 4751:2
**inroads** [2] - 4692:7, 4745:11
**insignificant** [1] - 4725:5
**insinuation** [1] - 4715:4
**instead** [1] - 4716:24
**integration** [2] - 4751:19, 4752:5
**interesting** [2] - 4751:15, 4754:15
**internally** [1] - 4712:24
**interview** [1] - 4712:8
**interviews** [3] - 4758:6, 4759:6, 4760:2
**introduce** [1] - 4753:4
**introduced** [1] - 4682:3
**Introduced** [1] - 4727:20
**invested** [1] - 4756:25
**investigate** [2] - 4734:25, 4742:24
**investigated** [1] - 4745:17
**investigation** [1] - 4735:17
**invitation** [1] - 4758:11
**invoice** [6] - 4712:10, 4712:11, 4712:15, 4713:4, 4713:5, 4713:7
**involved** [5] - 4692:8, 4697:8, 4697:12, 4735:5, 4745:12
**issue** [4] - 4697:8, 4716:2, 4736:7, 4757:18
**issues** [9] - 4697:18, 4705:6, 4711:12, 4726:19, 4737:20, 4739:14, 4740:4, 4741:12, 4751:9
**IT** [1] - 4740:1

**J**

**January** [4] - 4681:16, 4682:15, 4682:19, 4756:10
**Janusz** [1] - 4684:21
**Jeremy** [1] - 4678:20
**jerry** [2] - 4736:4, 4736:9
**jerry-rigged** [2] - 4736:4, 4736:9
**jmmajoras@jonesday.com** [1] - 4678:12
**job** [2] - 4683:15, 4683:16
**John** [5] - 4678:9, 4693:20, 4743:9, 4744:8, 4751:8
**joined** [1] - 4686:1
**joint** [2] - 4695:4, 4697:4
**joke** [1] - 4739:11
**Jon** [1] - 4687:10
**Jonathan** [3] - 4680:5, 4686:22, 4740:24
**Jones** [5] - 4677:20, 4699:10, 4699:14, 4699:15, 4699:21, 4700:3, 4724:24
**JONES** [4] - 4678:9, 4678:13, 4678:17, 4678:21
**Joneses** [1] - 4699:16
**Journal** [1] - 4688:2
**JUDGE** [1] - 4677:10
**Judge** [1] - 4686:3
**judgment** [2] - 4738:1, 4758:23
**judgments** [1] - 4737:17
**July** [5] - 4681:16, 4682:12, 4683:3, 4714:20, 4743:15
**jump** [1] - 4747:4
**June** [3] - 4714:20, 4714:22, 4743:15
**jury** [1] - 4757:19
**JUSTICE** [3] - 4677:13, 4677:17, 4677:21, 4678:2, 4678:6
**Justice** [6] - 4689:22, 4690:2, 4690:9, 4690:23, 4697:15, 4739:15

**K**

**kalejnieks@jonesday.com** [1] - 4678:19
**Katz** [2] - 4684:14, 4686:7
**Kearney** [4] - 4711:24, 4751:18, 4758:4, 4760:4
**keep** [1] - 4726:5
**Kelsey** [1] - 4678:1
**kelsey.shannon@usdoj.gov** [1] - 4678:5
**Kenmore** [7] - 4717:24, 4718:6, 4718:8, 4719:6, 4719:21, 4720:14, 4730:6
**kept** [2] - 4706:5, 4708:6
**kind** [3] - 4688:5, 4738:12, 4757:21
**kinds** [1] - 4711:12
**kitchen** [2] - 4738:19
**knowledge** [4] - 4695:10, 4696:21, 4697:17, 4698:22

**Kristen** [1] - 4678:16

**L**

**Labor** [1] - 4714:24
**laid** [1] - 4716:3
**Landes** [1] - 4686:3
**large** [4] - 4690:13, 4742:19, 4749:11, 4749:13
**largely** [2] - 4692:7, 4745:12
**last** [5] - 4690:22, 4718:14, 4755:11, 4756:5, 4759:4
**late** [1] - 4734:16
**law** [5] - 4703:12, 4733:11, 4733:12, 4754:14, 4755:17
**Law** [1] - 4688:2
**lawsuit** [2] - 4696:2, 4697:6
**lawyers** [2] - 4690:4, 4695:5
**lax** [2] - 4687:14, 4689:22
**lays** [1] - 4688:12
**leading** [2] - 4691:11, 4742:12
**least** [2] - 4690:24, 4734:25
**leave** [2] - 4754:19, 4755:1
**leeway** [1] - 4698:3
**left** [1] - 4689:19
**legacy** [1] - 4719:16
**legitimate** [1] - 4759:19
**Lejnieks** [1] - 4678:16
**length** [1] - 4752:6
**letter** [2] - 4735:25, 4739:19
**level** [2] - 4735:13, 4748:14
**levels** [1] - 4735:16
**Lexecon** [26] - 4683:10, 4683:13, 4683:17, 4684:8, 4684:16, 4684:25, 4685:15, 4685:17, 4685:23, 4685:24, 4686:23, 4687:6, 4689:13, 4693:7, 4695:3, 4695:16, 4695:18, 4696:7, 4696:17, 4697:1, 4698:8, 4698:11, 4739:6, 4739:16, 4739:19
**LEXECON** [1] - 4683:13
**Lexecon's** [1] - 4685:13
**Lexecon-affiliated** [1] - 4687:6
**LG** [14] - 4681:20, 4690:11, 4691:5, 4692:7, 4707:21, 4708:25, 4709:10, 4719:16, 4734:9, 4742:6, 4742:17, 4743:10, 4743:14, 4745:12
**lieu** [1] - 4755:19
**likelihood** [1] - 4690:16
**limited** [2] - 4708:17, 4714:13
**line** [9] - 4704:13, 4721:22, 4721:24, 4722:15, 4722:18, 4722:21, 4724:10, 4725:24, 4725:25
**lines** [2] - 4701:17, 4703:2, 4704:12, 4723:11, 4745:7
**linked** [4] - 4738:12, 4738:16, 4738:23, 4739:1
**list** [1] - 4714:5
**litigation** [1] - 4752:15
**LLP** [5] - 4679:2, 4679:6, 4679:10,

4679:14, 4679:17
**loading** [4] - 4692:8, 4692:10, 4745:12, 4745:14
**logic** [1] - 4701:10
**look** [69] - 4682:14, 4682:21, 4688:6, 4688:25, 4689:18, 4691:14, 4693:5, 4693:10, 4695:20, 4697:19, 4697:23, 4700:21, 4702:21, 4703:1, 4704:12, 4705:9, 4708:20, 4709:18, 4713:13, 4713:16, 4714:2, 4714:17, 4715:4, 4715:25, 4716:9, 4716:16, 4717:2, 4718:3, 4719:1, 4719:2, 4719:14, 4719:19, 4720:22, 4721:1, 4721:10, 4721:20, 4721:21, 4722:7, 4722:10, 4722:14, 4723:2, 4723:19, 4723:25, 4727:14, 4727:19, 4728:4, 4729:8, 4729:13, 4729:14, 4729:16, 4729:23, 4730:5, 4730:23, 4739:1, 4743:22, 4744:3, 4744:9, 4744:17, 4745:1, 4747:15, 4749:15, 4749:21, 4752:14, 4752:20, 4752:23, 4754:25, 4756:25, 4757:13, 4758:9
**looked** [15] - 4681:20, 4681:23, 4682:2, 4682:5, 4682:8, 4682:11, 4682:14, 4683:2, 4712:22, 4713:23, 4714:10, 4715:6, 4737:20, 4755:7, 4759:7
**looking** [12] - 4688:10, 4692:19, 4706:5, 4709:2, 4709:9, 4710:11, 4719:11, 4719:14, 4720:6, 4721:1, 4728:12, 4759:24
**looks** [2] - 4692:4, 4733:11
**loosely** [1] - 4754:18
**losing** [2] - 4720:4, 4724:21
**lost** [10] - 4705:7, 4716:21, 4719:9, 4719:24, 4720:1, 4724:16, 4735:1, 4735:3, 4758:25
**Loughlin** [8] - 4695:1, 4695:4, 4695:13, 4695:16, 4696:7, 4696:11, 4696:23, 4698:18
**Loughlin's** [1] - 4695:21
**Louisiana** [2] - 4678:10, 4678:17
**Love** [1] - 4697:20
**love** [5] - 4693:9, 4693:12, 4694:3, 4698:7, 4725:6
**loves** [1] - 4711:3
**Lowe's** [1] - 4690:14
**lower** [10] - 4692:9, 4692:21, 4693:2, 4705:5, 4715:12, 4715:14, 4715:19, 4735:19, 4745:14, 4748:13
**lower-cost** [2] - 4692:21, 4693:2
**lower-end** [2] - 4692:9, 4745:14
**lower-price** [1] - 4715:12
**lower-priced** [2] - 4715:14, 4715:19
**lunch** [3] - 4754:8, 4754:17, 4755:1
**luxury** [1] - 4753:25

---

# M

---

**machine** [1] - 4679:25

**machines** [3] - 4690:14, 4692:8, 4745:13
**magnitude** [3] - 4691:24, 4692:16, 4732:24
**mail** [6] - 4693:22, 4695:12, 4695:16, 4697:19, 4698:8
**maintains** [3] - 4705:18, 4708:22, 4709:21
**Majoras** [2] - 4678:9, 4751:9
**MAJORAS** [13] - 4751:8, 4751:22, 4754:3, 4755:4, 4755:25, 4756:8, 4756:14, 4756:19, 4757:11, 4759:4, 4759:17, 4760:16, 4761:2
**managing** [2] - 4683:10, 4683:13
**manufacturer** [1] - 4746:5
**manufacturers** [1] - 4705:20
**manufacturing** [6] - 4710:25, 4711:13, 4711:16, 4711:17, 4737:3, 4737:12
**March** [2] - 4682:11, 4689:23
**marginal** [7] - 4699:14, 4699:15, 4699:17, 4699:20, 4699:22, 4699:24, 4700:4
**margins** [2] - 4691:25, 4692:3
**Margins** [1] - 4727:11
**Marius** [2] - 4685:9, 4685:18
**mark** [3] - 4720:9, 4720:12, 4731:10
**Mark** [1] - 4689:2
**marked** [3] - 4720:19, 4731:18, 4733:19
**market** [65] - 4687:23, 4687:25, 4688:11, 4690:11, 4691:6, 4691:7, 4691:8, 4691:9, 4691:11, 4691:12, 4692:11, 4692:25, 4700:17, 4700:20, 4701:1, 4701:4, 4701:6, 4701:14, 4701:21, 4701:25, 4702:4, 4703:16, 4703:22, 4708:11, 4713:23, 4715:19, 4716:11, 4716:20, 4726:11, 4726:21, 4727:6, 4727:8, 4728:1, 4728:6, 4728:9, 4728:13, 4728:16, 4729:6, 4729:15, 4730:16, 4730:20, 4731:15, 4734:16, 4736:4, 4736:6, 4736:9, 4736:18, 4736:20, 4736:22, 4736:24, 4736:25, 4737:1, 4742:10, 4742:12, 4742:13, 4745:15, 4745:21, 4745:22, 4747:13, 4748:5, 4748:7, 4749:20
**Market** [1] - 4731:13
**marketplace** [2] - 4706:4, 4714:6
**markets** [3] - 4690:13, 4692:18, 4715:8
**mass** [1] - 4735:11
**match** [2] - 4709:25, 4714:11
**material** [4] - 4728:22, 4729:8, 4731:21, 4760:11
**materials** [3] - 4723:7, 4728:15, 4757:16
**math** [3] - 4719:25, 4720:2, 4723:22
**matter** [5] - 4720:5, 4739:17, 4753:15, 4760:15, 4762:6
**matters** [2] - 4720:5, 4739:7
**mature** [1] - 4691:6
**maverick** [3] - 4733:14, 4733:22, 4734:2
**maximizing** [1] - 4726:10

**Maytag** [24] - 4687:10, 4687:19, 4689:10, 4689:25, 4691:18, 4692:1, 4692:9, 4692:17, 4696:11, 4696:24, 4705:7, 4732:24, 4733:10, 4733:17, 4733:21, 4739:6, 4741:7, 4741:11, 4742:21, 4744:3, 4744:11, 4745:13, 4746:3, 4746:5
**Maytag-Whirlpool** [5] - 4687:10, 4687:19, 4705:7, 4732:24, 4744:3
**McLoughlin** [8] - 4751:24, 4754:18, 4754:23, 4757:13, 4757:16, 4757:23, 4758:7, 4758:10
**McLoughlin's** [1] - 4758:3
**mean** [3] - 4713:7, 4752:14, 4757:3
**means** [1] - 4743:16
**measure** [1] - 4729:6
**measured** [3] - 4710:12, 4732:23, 4752:7
**measures** [1] - 4688:3
**measuring** [1] - 4730:15
**mechanisms** [1] - 4726:16
**meet** [3] - 4707:20, 4708:10, 4709:10
**meeting** [12] - 4705:18, 4705:22, 4706:5, 4706:13, 4706:18, 4706:21, 4706:24, 4707:2, 4707:5, 4707:14, 4708:9, 4708:12
**memorized** [1] - 4704:19
**memory** [4] - 4708:2, 4709:16, 4710:9, 4728:21
**mention** [1] - 4758:3
**mentioned** [6] - 4685:21, 4696:18, 4708:13, 4712:3, 4715:6, 4720:21
**merged** [1] - 4705:4
**merger** [47] - 4687:12, 4688:8, 4688:11, 4688:13, 4688:14, 4688:15, 4689:10, 4689:22, 4690:1, 4690:2, 4690:15, 4691:6, 4691:19, 4691:21, 4691:22, 4692:16, 4692:20, 4696:1, 4696:12, 4696:18, 4696:24, 4698:20, 4704:20, 4704:23, 4705:8, 4713:9, 4725:23, 4732:24, 4733:10, 4733:17, 4733:21, 4737:20, 4737:21, 4738:1, 4739:7, 4741:7, 4742:7, 4743:10, 4743:11, 4744:19, 4744:20, 4746:2, 4747:14, 4747:17, 4749:7, 4751:25, 4752:5
**Merger** [1] - 4689:7
**merger-specific** [5] - 4692:16, 4737:20, 4737:21, 4738:1, 4746:2
**mergers** [10] - 4687:7, 4694:6, 4694:12, 4694:13, 4696:20, 4711:11, 4711:13, 4746:20, 4748:10
**Merging** [1] - 4694:3
**merging** [6] - 4690:10, 4692:15, 4693:9, 4693:12, 4694:2, 4746:1
**message** [1] - 4740:1
**messier** [1] - 4716:25
**met** [1] - 4745:2
**metrics** [1] - 4728:14
**Michael** [2] - 4679:13, 4684:14
**microeconomist** [2] - 4710:17, 4710:23

**mid** [1] - 4735:19
**mid-2000s** [1] - 4734:17
**mid-price** [1] - 4735:19
**middle** [5] - 4705:11, 4705:12, 4708:7, 4708:21, 4713:16
**Midea** [2] - 4748:3, 4748:6
**Miele** [1] - 4707:12
**might** [2] - 4732:3, 4754:8
**mind** [2] - 4687:16, 4721:16
**minus** [1] - 4723:22
**minute** [1] - 4699:10
**minutes** [6] - 4700:13, 4732:3, 4753:7, 4753:16, 4753:24, 4758:15
**misapplied** [1] - 4727:6
**misguided** [1] - 4715:4
**misreporting** [2] - 4712:21, 4712:23
**missed** [1] - 4706:3
**missing** [2] - 4710:6, 4722:8
**mix** [6] - 4705:6, 4709:25, 4710:3, 4712:1, 4712:10, 4714:11
**mix-match** [1] - 4709:25
**mixed** [1] - 4719:8
**model** [2] - 4708:19, 4732:22
**models** [3] - 4688:3, 4688:6, 4692:1
**modest** [1] - 4724:22
**Monday** [9] - 4751:12, 4752:21, 4753:15, 4753:20, 4754:10, 4756:17, 4759:12, 4760:21, 4760:23
**monopolist** [1] - 4727:6
**month** [1] - 4758:17
**morning** [8] - 4755:14, 4756:21, 4757:3, 4757:4, 4757:6, 4757:10, 4759:22, 4760:25
**most** [3] - 4719:9, 4719:19, 4719:20
**motion** [1] - 4710:21
**move** [1] - 4756:23
**moved** [3] - 4719:15, 4725:11, 4745:19
**movements** [1] - 4722:9
**moves** [2] - 4721:20, 4721:21
**moving** [2] - 4725:9, 4752:4
**MR** [63] - 4681:7, 4693:13, 4693:16, 4693:19, 4693:25, 4694:1, 4694:20, 4694:25, 4697:24, 4698:4, 4698:5, 4698:6, 4700:15, 4716:6, 4716:8, 4720:9, 4720:12, 4720:17, 4720:20, 4731:2, 4731:5, 4731:6, 4731:10, 4731:18, 4731:23, 4732:2, 4732:9, 4738:4, 4738:5, 4738:8, 4739:3, 4750:14, 4750:17, 4750:21, 4751:1, 4751:5, 4751:6, 4751:8, 4751:15, 4751:22, 4752:13, 4753:4, 4753:7, 4753:11, 4753:24, 4754:3, 4755:3, 4755:4, 4755:25, 4756:8, 4756:14, 4756:17, 4757:11, 4757:12, 4757:22, 4758:20, 4759:2, 4759:4, 4759:17, 4759:23, 4760:16, 4761:1, 4761:2
**multiple** [10] - 4685:21, 4702:18, 4712:11, 4720:6, 4721:17, 4729:12, 4733:11, 4733:12, 4735:14, 4740:18
**multiple-page** [1] - 4729:12

**multiple-year** [1] - 4720:6
**multiples** [1] - 4709:4

## N

**name** [1] - 4712:19
**named** [1] - 4685:14
**names** [2] - 4691:7, 4724:24
**naturally** [2] - 4691:22, 4744:19
**nature** [2] - 4734:19, 4740:17
**necessarily** [1] - 4709:14
**necessary** [2] - 4714:18, 4758:22
**need** [13] - 4699:4, 4723:6, 4728:8, 4728:20, 4731:16, 4731:25, 4752:8, 4753:12, 4754:16, 4757:2, 4757:13, 4758:24, 4759:25
**needed** [1] - 4742:19
**needs** [3] - 4700:12, 4749:2, 4752:11
**never** [4] - 4695:22, 4748:15, 4758:16, 4758:25
**new** [3] - 4691:8, 4715:14
**next** [12] - 4681:23, 4682:2, 4692:19, 4693:5, 4717:20, 4727:14, 4727:23, 4744:9, 4744:17, 4745:23, 4746:2, 4747:8
**Nina** [1] - 4677:17
**nina.hale@usdoj.gov** [1] - 4677:19
**nine** [5] - 4753:15, 4759:12, 4759:15, 4759:22, 4760:24
**non** [1] - 4757:24
**non-hearsay** [1] - 4757:24
**noncooking** [2] - 4737:22, 4738:2
**none** [2] - 4714:25, 4752:19
**nonpublic** [1] - 4697:5
**normally** [2] - 4692:20, 4752:16
**Nos** [1] - 4720:18
**note** [4] - 4717:22, 4728:10, 4736:18, 4758:2
**noted** [2] - 4697:14, 4729:19
**notes** [3] - 4758:6, 4758:7, 4760:2
**nothing** [2] - 4709:1, 4751:21
**notice** [2] - 4699:8, 4759:24
**November** [1] - 4682:9
**number** [26] - 4683:17, 4689:25, 4691:11, 4695:13, 4707:18, 4708:17, 4710:10, 4711:20, 4714:5, 4714:7, 4714:9, 4714:10, 4720:7, 4729:11, 4729:16, 4729:17, 4730:8, 4730:10, 4734:3, 4735:7, 4735:12, 4736:2, 4738:5, 4738:17, 4740:25, 4755:8
**numbers** [16] - 4708:1, 4709:19, 4717:20, 4717:21, 4719:23, 4720:13, 4721:2, 4727:1, 4727:2, 4730:11, 4730:12, 4731:7, 4731:19, 4735:13, 4751:20
**NW** [12] - 4677:14, 4677:18, 4677:22, 4678:2, 4678:7, 4678:10, 4678:17, 4679:2, 4679:6, 4679:10, 4679:14, 4679:18

**NYU** [3] - 4684:23, 4685:5

## O

**o'clock** [6] - 4731:24, 4753:15, 4759:12, 4759:15, 4759:22, 4760:24
**object** [1] - 4693:15
**objection** [6] - 4738:4, 4738:7, 4751:5, 4751:23, 4754:21, 4757:15
**objections** [2] - 4750:25, 4754:19, 4757:18
**observation** [1] - 4710:8
**observe** [3] - 4714:6, 4736:14, 4738:12
**observed** [3] - 4705:7, 4724:15, 4732:23
**obtain** [1] - 4726:16
**obvious** [1] - 4749:13
**obviously** [13] - 4699:16, 4699:25, 4704:8, 4709:19, 4719:9, 4721:7, 4721:14, 4726:3, 4734:17, 4747:12, 4747:18, 4754:11, 4755:5
**occurred** [1] - 4707:11
**occurring** [1] - 4722:9
**October** [1] - 4702:24
**OF** [8] - 4677:1, 4677:3, 4677:9, 4677:13, 4677:17, 4677:21, 4678:2, 4678:6
**offer** [4] - 4702:19, 4726:10, 4757:19, 4758:15
**offered** [2] - 4760:14, 4760:16
**offering** [1] - 4726:3
**office** [1] - 4695:3
**Official** [2] - 4679:21, 4762:4
**offset** [1] - 4692:16
**often** [6] - 4690:10, 4692:23, 4694:13, 4696:20, 4701:8, 4709:25, 4739:11, 4740:22, 4746:20
**older** [2] - 4715:16, 4715:18
**once** [3] - 4688:13, 4698:11, 4743:22
**one** [67] - 4683:7, 4688:1, 4688:6, 4688:12, 4691:22, 4692:5, 4699:7, 4699:9, 4699:10, 4699:23, 4702:22, 4705:1, 4707:15, 4709:12, 4710:11, 4711:12, 4713:3, 4714:5, 4714:7, 4714:9, 4714:13, 4714:14, 4714:17, 4715:3, 4717:6, 4718:14, 4720:7, 4720:12, 4720:14, 4721:6, 4721:11, 4721:14, 4721:16, 4721:18, 4724:19, 4725:24, 4726:5, 4726:6, 4728:12, 4729:1, 4729:6, 4729:13, 4730:17, 4730:18, 4730:20, 4731:2, 4731:16, 4733:3, 4733:9, 4733:23, 4734:25, 4737:20, 4738:15, 4744:19, 4745:1, 4748:13, 4750:21, 4754:8, 4754:13, 4755:23, 4756:11, 4757:18, 4759:4, 4760:9, 4760:13
**one's** [1] - 4709:8
**one-quarter** [1] - 4721:16
**ones** [2] - 4685:11, 4735:14

**op** [2] - 4687:11, 4689:11
**op-ed** [2] - 4687:11, 4689:11
**open** [1] - 4756:19
**opinion** [4] - 4737:25, 4743:1, 4752:5, 4760:16
**opinions** [3] - 4747:2, 4749:24, 4750:10
**opportunity** [9] - 4691:16, 4694:21, 4694:22, 4747:8, 4747:11, 4754:3, 4758:9, 4758:18, 4760:6
**opposite** [1] - 4739:17
**oranges** [2] - 4730:12, 4730:15
**order** [1] - 4732:14
**ordinary** [1] - 4752:4
**Ordover** [5] - 4684:21, 4684:23, 4685:22, 4686:9, 4686:10
**organization** [2] - 4685:14, 4739:12
**original** [1] - 4686:4
**Orszag** [14] - 4680:5, 4681:8, 4699:10, 4700:16, 4732:10, 4743:22, 4750:9, 4750:22, 4752:6, 4753:13, 4759:5, 4759:9, 4760:1, 4760:17
**Orszag's** [2] - 4731:20, 4758:2
**otherwise** [3] - 4693:14, 4712:19, 4715:21
**out-of-court** [1] - 4760:14
**outlined** [1] - 4727:9
**outside** [1] - 4720:21
**ovens** [4] - 4701:9, 4701:12, 4701:20, 4702:4
**overall** [4] - 4690:20, 4692:10, 4730:16, 4745:15
**overreaching** [2] - 4694:8, 4746:17
**Overshot** [1] - 4689:2
**overstated** [3] - 4713:2, 4713:20, 4714:1
**overstatement** [1] - 4725:8
**overstates** [1] - 4736:25
**own** [2] - 4758:2, 4759:7
**owner** [1] - 4685:15

## P

**P.C** [1] - 4682:15
**p.m** [3] - 4677:6, 4732:6, 4761:4
**PAGE** [1] - 4680:3
**page** [31] - 4681:13, 4681:19, 4681:23, 4682:2, 4689:6, 4689:18, 4690:22, 4692:19, 4693:5, 4693:6, 4693:11, 4695:11, 4695:20, 4699:21, 4703:1, 4704:12, 4708:8, 4720:22, 4722:14, 4723:7, 4723:10, 4727:23, 4729:12, 4741:21, 4742:1, 4742:2, 4742:5, 4746:14
**pages** [2] - 4741:20, 4762:5
**paper** [8] - 4687:15, 4688:2, 4688:5, 4688:12, 4689:9, 4689:11, 4733:8
**paragraph** [15] - 4689:19, 4690:22, 4691:2, 4691:15, 4692:13, 4693:10, 4697:23, 4742:4, 4742:15, 4742:16,

4743:12, 4744:9, 4745:7, 4745:23
**paraphrasing** [1] - 4715:17
**part** [8] - 4685:23, 4685:25, 4686:3, 4690:20, 4704:1, 4715:2, 4734:19, 4740:18
**particular** [4] - 4722:16, 4722:18, 4722:21, 4745:3
**parties** [6] - 4692:15, 4694:4, 4733:9, 4736:25, 4746:1, 4751:9
**parts** [2] - 4726:11, 4745:22
**past** [4] - 4688:13, 4709:13, 4739:15, 4749:7
**Paul** [2] - 4679:1, 4679:5
**paul.denis@dechert.com** [1] - 4679:8
**paul.friedman@dechert.com** [1] - 4679:4
**Paula** [1] - 4678:13
**Pause** [1] - 4700:14
**peak** [4] - 4721:4, 4721:5, 4721:7, 4721:8
**peaks** [2] - 4721:6, 4721:13
**people** [10] - 4695:13, 4714:6, 4720:3, 4725:6, 4725:20, 4726:17, 4735:12, 4747:22, 4755:15
**per** [1] - 4756:11
**percent** [28] - 4691:9, 4691:11, 4691:12, 4707:22, 4707:25, 4708:4, 4708:24, 4708:25, 4710:7, 4716:14, 4716:20, 4717:5, 4718:22, 4724:18, 4725:9, 4728:6, 4728:7, 4729:10, 4729:21, 4730:2, 4730:7, 4730:25, 4731:9, 4742:12, 4742:13, 4743:15, 4743:20
**percentage** [9] - 4710:5, 4719:5, 4719:6, 4719:7, 4719:24, 4720:1, 4720:4, 4724:20
**perception** [1] - 4689:21
**perfect** [1] - 4713:11
**perhaps** [2] - 4716:24, 4724:15
**period** [5] - 4719:14, 4719:15, 4719:25, 4722:12, 4743:15
**periods** [7] - 4714:14, 4714:16, 4721:9, 4721:10, 4721:12, 4721:19, 4723:1
**permission** [3] - 4698:24, 4699:5, 4699:8
**person** [3] - 4710:11, 4726:14, 4726:18
**personal** [2] - 4696:21, 4697:17
**personally** [1] - 4699:6
**personnel** [1] - 4758:5
**Peter** [1] - 4697:20
**phase** [1] - 4688:4
**picked** [1] - 4714:2
**picture** [1] - 4715:3
**piece** [1] - 4730:11
**place** [3] - 4724:14, 4727:5, 4740:6
**places** [1] - 4716:24
**Plaintiff** [3] - 4677:4, 4677:13, 4678:1
**Plaintiff's** [2] - 4732:13, 4733:8
**plan** [1] - 4753:9
**planning** [2] - 4756:20, 4759:18
**players** [2] - 4716:1, 4718:24

**pleasure** [4] - 4753:19, 4753:21, 4756:18, 4756:23
**plus** [2] - 4692:24, 4710:7
**pocket** [1] - 4725:7
**point** [9] - 4690:6, 4715:1, 4726:5, 4726:6, 4744:6, 4748:8, 4751:21, 4754:8, 4759:4
**pointed** [2] - 4733:13, 4742:15
**points** [14] - 4690:24, 4710:6, 4714:13, 4716:3, 4719:5, 4719:6, 4719:7, 4719:8, 4719:25, 4720:1, 4720:4, 4721:7, 4724:20, 4735:20
**policy** [2] - 4689:23, 4690:2
**poor** [1] - 4732:22
**portion** [1] - 4753:23
**Posner** [1] - 4686:3
**possibility** [1] - 4744:24
**possible** [2] - 4696:14, 4743:2
**post** [7] - 4691:22, 4743:10, 4743:11, 4744:3, 4744:20, 4747:14, 4747:17
**post-merger** [5] - 4691:22, 4743:11, 4744:20, 4747:14, 4747:17
**precise** [6] - 4708:1, 4708:2, 4711:20, 4715:17, 4716:23, 4733:11
**precisely** [6] - 4699:3, 4700:22, 4704:19, 4713:6, 4729:3, 4749:17
**predict** [1] - 4736:21
**predictor** [1] - 4732:22
**preference** [1] - 4699:18
**Premier** [8] - 4706:12, 4734:9, 4734:24, 4735:1, 4735:18, 4735:19
**prender@jonesday.com** [1] - 4678:15
**preparation** [1] - 4755:15
**prepared** [1] - 4734:5
**presence** [2] - 4690:13, 4691:8
**present** [1] - 4709:14
**presentation** [3] - 4699:11, 4717:22, 4719:17
**presented** [4] - 4707:18, 4720:8, 4736:8, 4736:19
**president** [1] - 4695:3
**press** [2] - 4746:3, 4746:8
**pressure** [4] - 4692:22, 4693:1, 4724:11, 4724:22
**pretty** [2] - 4718:25, 4753:11
**price** [44] - 4691:23, 4691:24, 4691:25, 4692:3, 4699:23, 4710:9, 4715:9, 4715:12, 4722:15, 4722:18, 4722:21, 4723:2, 4723:3, 4723:13, 4723:15, 4723:17, 4723:23, 4724:10, 4724:15, 4724:18, 4724:22, 4724:23, 4724:25, 4725:3, 4725:4, 4725:11, 4725:14, 4726:5, 4726:6, 4732:23, 4733:14, 4733:22, 4735:16, 4735:19, 4736:13, 4737:15, 4738:20, 4743:11, 4744:20, 4747:23, 4747:25, 4748:3
**price-cost** [2] - 4691:25, 4692:3
**priced** [4] - 4715:13, 4715:14, 4715:19, 4735:24
**prices** [8] - 4687:13, 4708:16, 4709:5,

4710:2, 4710:3, 4723:11, 4744:5, 4744:7
**Pricewaterhouse** [2] - 4754:22, 4757:15
**pricewaterhouseCoopers** [2] - 4711:18, 4711:22
**PricewaterhouseCoopers** [3] - 4751:17, 4758:4, 4760:4
**primary** [1] - 4727:7
**printout** [1] - 4729:16
**problem** [2] - 4691:19, 4750:24
**problematic** [1] - 4727:8
**problems** [4] - 4691:6, 4742:7, 4756:15, 4757:4
**proceed** [4] - 4681:2, 4752:1, 4759:21, 4760:24
**proceedings** [1] - 4762:6
**Proceedings** [2] - 4679:25, 4761:4
**process** [1] - 4752:5
**produced** [4] - 4679:25, 4713:14, 4715:24, 4726:7
**producer** [1] - 4746:4
**produces** [2] - 4735:24, 4738:21
**producing** [2] - 4735:11, 4735:12
**product** [21] - 4700:19, 4712:18, 4712:20, 4715:8, 4715:12, 4715:13, 4715:14, 4715:16, 4715:18, 4715:20, 4715:22, 4724:23, 4725:5, 4725:17, 4725:19, 4725:22, 4726:8, 4726:16, 4738:23, 4743:17, 4745:19
**Product** [1] - 4727:14
**production** [2] - 4742:18, 4743:17
**products** [21] - 4693:3, 4702:19, 4709:25, 4710:3, 4725:2, 4725:21, 4726:7, 4733:1, 4734:16, 4734:17, 4735:17, 4735:19, 4735:21, 4736:2, 4737:21, 4737:22, 4742:18, 4742:20, 4743:19
**professional** [1] - 4740:7
**professionals** [2] - 4702:14, 4734:6
**professor** [19] - 4683:24, 4684:1, 4684:6, 4684:10, 4684:21, 4684:23, 4685:2, 4685:4, 4685:9, 4685:20, 4686:5, 4686:9, 4686:12, 4686:14, 4686:16, 4686:22, 4686:25, 4687:2
**Professor** [35] - 4684:14, 4685:21, 4685:22, 4685:24, 4686:7, 4686:10, 4686:19, 4687:4, 4687:9, 4687:20, 4687:23, 4688:9, 4688:12, 4688:15, 4688:25, 4689:12, 4689:15, 4693:7, 4701:18, 4707:17, 4707:21, 4707:24, 4708:3, 4708:18, 4708:23, 4709:20, 4710:13, 4726:20, 4730:21, 4741:13, 4753:10, 4753:22
**Professors** [3] - 4689:21, 4690:8, 4694:3
**professors** [3] - 4683:20, 4685:14, 4687:6
**proffer** [1] - 4758:11
**Profit** [1] - 4727:11
**profit** [1] - 4726:10

**profit-maximizing** [1] - 4726:10
**profitable** [2] - 4691:23, 4744:21
**project** [1] - 4735:2
**projects** [1] - 4698:13
**prone** [1] - 4722:13
**proportion** [1] - 4730:4
**proposal** [2] - 4698:9, 4756:11
**proposition** [2] - 4704:7, 4745:1
**prospect** [3] - 4694:11, 4746:18, 4747:19
**protected** [1] - 4739:23
**proud** [1] - 4739:9
**provide** [6] - 4698:12, 4712:2, 4714:20, 4729:3, 4736:15, 4752:11
**provided** [7] - 4697:5, 4714:5, 4714:12, 4714:24, 4729:4, 4730:3, 4730:18
**provider** [1] - 4714:19
**providing** [1] - 4751:17
**public** [1] - 4741:22
**pull** [4] - 4690:6, 4691:2, 4743:3, 4756:3
**pulled** [1] - 4714:14
**purchase** [2] - 4711:4, 4725:16
**purchased** [2] - 4712:18
**purchases** [3] - 4682:18, 4709:9, 4735:10
**purchasing** [3] - 4711:2, 4711:4, 4712:8
**purple** [1] - 4721:24
**purposes** [5] - 4700:21, 4700:23, 4731:11, 4731:19, 4746:7
**put** [12] - 4694:4, 4705:6, 4720:7, 4724:24, 4732:13, 4735:12, 4739:10, 4741:22, 4743:4, 4748:11, 4751:19, 4760:18
**puts** [2] - 4693:1, 4727:7
**putting** [2] - 4697:16, 4724:11
**PX** [12] - 4689:1, 4695:11, 4697:19, 4713:13, 4716:5, 4723:7, 4728:4, 4731:20, 4732:21, 4740:23, 4741:1

## Q

**qualified** [1] - 4710:15
**quality** [2] - 4715:19, 4715:23
**quantity** [1] - 4730:1
**quarter** [4] - 4682:22, 4721:14, 4721:16, 4721:17
**quarters** [1] - 4721:15
**query** [1] - 4754:22
**questions** [13] - 4731:23, 4732:13, 4733:5, 4734:3, 4734:8, 4734:23, 4737:2, 4738:5, 4742:24, 4743:23, 4750:14, 4750:15
**quick** [1] - 4707:8
**quickly** [1] - 4733:24
**quite** [4] - 4739:9, 4740:7, 4740:22, 4760:18
**quotations** [1] - 4693:14
**Quote** [4] - 4707:20, 4708:10, 4709:21, 4710:7

**quoted** [1] - 4736:7
**quotes** [1] - 4710:1

## R

**raise** [1] - 4743:25
**raised** [5] - 4691:19, 4716:4, 4743:23, 4755:6, 4757:14
**raises** [1] - 4744:1
**raising** [2] - 4741:9, 4751:23
**range** [19] - 4716:17, 4717:3, 4723:15, 4723:17, 4723:20, 4724:1, 4724:3, 4724:5, 4724:9, 4724:25, 4725:16, 4725:19, 4725:24, 4726:2, 4728:5, 4729:25, 4730:6, 4730:23, 4735:19
**ranges** [34] - 4682:5, 4682:8, 4682:14, 4700:19, 4700:21, 4700:23, 4700:25, 4701:3, 4701:4, 4701:11, 4701:15, 4701:25, 4707:25, 4708:4, 4708:23, 4714:2, 4714:11, 4716:9, 4716:10, 4717:7, 4718:6, 4718:24, 4720:13, 4720:14, 4720:15, 4726:3, 4726:5, 4726:11, 4728:17, 4735:5, 4735:10, 4735:24, 4736:1
**rapidly** [1] - 4743:10
**rather** [2] - 4710:3, 4729:16
**ratio** [2] - 4692:1, 4692:3
**rationales** [1] - 4716:3
**reach** [1] - 4751:11
**reaction** [5] - 4704:25, 4749:4, 4749:5, 4749:19
**read** [13] - 4688:7, 4693:4, 4694:15, 4694:16, 4715:11, 4730:10, 4731:1, 4733:16, 4741:3, 4742:4, 4742:9, 4742:15, 4745:24
**reading** [4] - 4691:15, 4692:6, 4693:15, 4730:8
**reads** [4] - 4690:22, 4693:6, 4742:16, 4746:15
**real** [2] - 4725:14, 4748:2
**real-world** [1] - 4748:2
**really** [5] - 4697:13, 4722:5, 4727:8, 4754:7, 4758:24
**reason** [7] - 4701:10, 4706:9, 4706:11, 4714:10, 4714:15, 4715:11, 4739:21
**reasonably** [1] - 4736:21
**reasons** [7] - 4690:1, 4707:9, 4709:24, 4727:9, 4730:20, 4733:4, 4749:3
**rebut** [3] - 4701:22, 4751:21, 4752:9
**rebuttal** [16] - 4694:22, 4751:13, 4751:20, 4752:11, 4754:10, 4754:16, 4755:22, 4756:16, 4756:17, 4757:5, 4757:9, 4759:15, 4759:21, 4759:25, 4760:20, 4760:24
**rebutting** [1] - 4753:13
**recalling** [1] - 4753:9
**receive** [1] - 4737:16
**received** [1] - 4741:23
**recent** [4] - 4690:11, 4691:4, 4719:20,

4742:6
**recently** [1] - 4719:19
**Recently** [1] - 4727:19
**recess** [2] - 4731:25, 4732:5
**Recess** [1] - 4732:6
**recognize** [2] - 4710:22, 4726:17
**recognized** [1] - 4726:12
**recollection** [1] - 4757:17
**recommendations** [1] - 4755:21
**record** [8] - 4720:10, 4751:24, 4752:10, 4752:14, 4752:20, 4753:1, 4755:9, 4756:7
**records** [2] - 4708:7, 4712:7
**red** [1] - 4721:21
**redacted** [1] - 4743:5
**redirect** [3] - 4694:21, 4694:23, 4731:25
**REDIRECT** [1] - 4732:8
**Redirect** [1] - 4680:5
**redraw** [1] - 4721:11
**reduce** [2] - 4690:15, 4704:23
**refer** [1] - 4733:20
**reference** [2] - 4733:20, 4734:1
**reflect** [4] - 4706:2, 4708:14, 4709:24, 4717:1
**reflected** [2] - 4692:10, 4745:14
**reflecting** [1] - 4706:3
**reflective** [2] - 4747:10, 4755:10
**refrigeration** [1] - 4738:20
**refrigerator** [1] - 4738:21
**refrigerators** [1] - 4738:14
**refute** [1] - 4709:1
**regard** [1] - 4701:10
**regarding** [5] - 4690:1, 4732:16, 4737:18, 4739:7, 4749:24
**regular** [2] - 4709:21, 4752:15
**regularly** [2] - 4706:5, 4708:6
**Reinvigorating** [1] - 4689:7
**related** [1] - 4737:22
**relating** [1] - 4737:21
**relative** [1] - 4713:4
**relatively** [1] - 4712:22
**relevant** [11] - 4700:16, 4700:19, 4700:25, 4701:5, 4701:13, 4701:20, 4715:19, 4724:16, 4728:13, 4729:7, 4757:17
**reliable** [1] - 4755:7
**relied** [2] - 4754:22, 4760:8
**rely** [3] - 4746:8, 4748:8, 4755:7
**relying** [4] - 4747:4, 4748:6, 4758:3, 4760:13
**remember** [6] - 4697:9, 4704:9, 4712:3, 4712:18, 4735:6
**remove** [1] - 4694:6
**Render** [1] - 4678:13
**renowned** [7] - 4684:4, 4684:12, 4684:18, 4684:20, 4684:25, 4685:7, 4687:2
**repetitive** [3] - 4682:25, 4755:19, 4756:4

**replace** [2] - 4705:3, 4715:13
**report** [13] - 4714:21, 4718:1, 4719:21, 4728:9, 4728:10, 4728:15, 4728:25, 4729:18, 4729:19, 4730:12, 4735:3, 4741:5
**reported** [12] - 4679:25, 4709:3, 4714:22, 4719:20, 4728:10, 4728:12, 4729:19, 4730:13, 4734:20, 4736:10, 4746:3
**Reporter** [3] - 4679:21, 4679:21, 4762:4
**reporting** [1] - 4729:11
**reports** [12] - 4716:10, 4716:13, 4716:20, 4717:10, 4717:23, 4728:7, 4728:15, 4728:25, 4729:9, 4729:25, 4730:5, 4730:23
**reposition** [1] - 4745:21
**repositioning** [2] - 4691:20, 4748:6
**represent** [2] - 4707:10, 4723:11
**represents** [1] - 4698:15
**reputation** [2] - 4742:19, 4743:18
**required** [1] - 4699:3
**requires** [3] - 4694:10, 4746:18, 4750:3
**reserve** [1] - 4753:14
**resources** [1] - 4757:1
**respect** [2] - 4746:13, 4757:2
**respects** [1] - 4736:24
**respond** [1] - 4752:18
**respondents** [1] - 4712:17
**responding** [1] - 4697:9
**response** [6] - 4709:5, 4710:2, 4710:8, 4733:4, 4733:5, 4749:20
**responses** [1] - 4724:15
**rest** [3] - 4738:19, 4742:15, 4742:16
**rests** [1] - 4751:12
**result** [7] - 4687:13, 4707:8, 4708:16, 4715:24, 4729:1, 4740:4, 4750:11
**resulted** [1] - 4725:9
**results** [2] - 4719:8, 4741:19
**retail** [5] - 4708:23, 4727:23, 4729:4, 4730:19, 4734:7
**Retail** [3] - 4727:11, 4727:15, 4727:20
**retailer** [1] - 4714:19
**retailers** [5] - 4681:16, 4714:12, 4714:25, 4735:21, 4735:23
**retailing** [1] - 4682:21
**retained** [2] - 4739:4, 4749:10
**Revathy** [1] - 4679:17
**revealing** [1] - 4690:1
**revenue** [9] - 4713:24, 4715:6, 4715:21, 4717:19, 4717:21, 4717:23, 4728:16, 4731:16, 4736:13
**revenues** [3] - 4715:10, 4718:2, 4736:10
**review** [3] - 4694:7, 4697:15, 4733:24
**reviewing** [1] - 4733:25
**revised** [1] - 4710:1
**revisit** [1] - 4757:18
**Richard** [2] - 4682:15, 4684:6
**richness** [1] - 4709:7
**Rick** [1] - 4696:19

**rigged** [2] - 4736:4, 4736:9
**right-hand** [1] - 4713:14
**rise** [1] - 4699:23
**rivalry** [1] - 4692:24
**rivals** [3] - 4694:10, 4746:18, 4747:13
**River** [1] - 4695:6
**Robert** [1] - 4685:20
**rocket** [1] - 4749:10
**room** [1] - 4719:4
**Room** [4] - 4677:14, 4677:18, 4677:22, 4679:22
**Rosenfield** [1] - 4686:2
**roster** [2] - 4683:17, 4739:11
**roughly** [4] - 4704:18, 4710:10, 4724:20, 4731:9
**rounding** [1] - 4716:24
**routinely** [2] - 4694:4, 4694:5
**row** [21] - 4716:10, 4716:16, 4716:22, 4717:2, 4717:8, 4717:12, 4717:25, 4718:6, 4718:15, 4728:4, 4728:5, 4729:8, 4729:23, 4729:25, 4730:5, 4730:23
**RPR** [1] - 4679:21
**Rubinfeld** [3] - 4685:2, 4685:4, 4686:12
**rule** [1] - 4757:25
**ruling** [1] - 4759:10

## S

**sale** [9] - 4682:8, 4682:14, 4702:4, 4702:8, 4702:11, 4702:15, 4703:3, 4703:12, 4734:10
**sales** [19] - 4681:15, 4681:24, 4706:2, 4707:10, 4708:14, 4709:25, 4712:7, 4716:17, 4717:3, 4729:15, 4729:25, 4730:6, 4730:24, 4734:5, 4734:7, 4737:10, 4737:11, 4743:16
**Sales** [2] - 4727:11, 4727:19
**Samsung** [36] - 4681:20, 4690:12, 4691:5, 4692:7, 4707:22, 4708:25, 4709:11, 4719:16, 4720:21, 4721:2, 4722:1, 4722:2, 4722:3, 4722:11, 4722:16, 4723:3, 4723:13, 4723:20, 4724:9, 4724:17, 4724:23, 4724:25, 4725:8, 4725:16, 4730:18, 4734:9, 4736:21, 4736:22, 4737:1, 4742:6, 4742:17, 4743:10, 4743:14, 4745:12, 4745:17
**satisfy** [1] - 4752:16
**savings** [1] - 4690:15
**saw** [5] - 4707:23, 4709:12, 4724:18, 4735:25, 4751:11
**scenario** [1] - 4753:2
**scheduled** [1] - 4756:10
**School** [1] - 4689:2
**Schwartz** [2] - 4685:9, 4686:14
**science** [1] - 4749:10
**scope** [1] - 4738:4
**screen** [4] - 4702:22, 4732:14, 4741:22,

4747:15
**screens** [1] - 4693:18
**Sears** [3] - 4690:14, 4727:22, 4747:17
**Second** [1] - 4744:10
**second** [9] - 4691:14, 4691:17, 4693:10, 4694:11, 4721:8, 4733:23, 4742:4, 4742:22, 4754:13
**section** [1] - 4733:13
**see** [52] - 4689:3, 4689:7, 4690:4, 4690:16, 4690:25, 4691:12, 4692:1, 4692:11, 4693:3, 4693:4, 4695:14, 4697:21, 4698:9, 4698:13, 4702:23, 4703:6, 4704:17, 4710:1, 4713:13, 4713:17, 4713:18, 4713:21, 4717:16, 4721:2, 4722:10, 4723:7, 4723:9, 4723:12, 4723:13, 4723:14, 4724:21, 4727:2, 4728:21, 4733:10, 4733:20, 4734:1, 4736:1, 4742:7, 4742:13, 4742:21, 4742:22, 4744:7, 4744:12, 4744:14, 4744:21, 4745:1, 4745:5, 4745:9, 4745:15, 4746:5, 4746:21, 4749:7
**seeing** [2] - 4697:14, 4721:19
**sees** [1] - 4720:7
**segment** [2] - 4692:10, 4745:14
**segments** [1] - 4745:19
**selling** [4] - 4714:6, 4722:25, 4726:2, 4728:17
**sells** [1] - 4735:24
**senior** [3] - 4683:10, 4683:13, 4695:2
**sense** [2] - 4697:17, 4700:7
**sent** [1] - 4693:22
**sentence** [8] - 4690:22, 4692:6, 4692:20, 4742:9, 4744:17, 4745:8, 4746:2, 4746:15
**separate** [1] - 4738:15
**separately** [1] - 4701:12
**September** [1] - 4681:25
**series** [3] - 4693:13, 4741:16, 4741:18
**seriously** [2] - 4739:15, 4740:4
**serve** [1] - 4745:22
**service** [1] - 4740:8
**services** [1] - 4712:1
**serving** [2] - 4726:5, 4748:7
**SESSION** [1] - 4677:9
**set** [2] - 4699:18, 4751:10
**seven** [3] - 4683:7, 4694:20
**several** [4] - 4694:4, 4734:8, 4734:23, 4737:2
**Shannon** [1] - 4678:1
**shape** [1] - 4685:19
**shaping** [1] - 4690:3
**Shapiro** [10] - 4687:11, 4689:15, 4689:21, 4690:8, 4693:7, 4694:3, 4740:24, 4741:5, 4743:23
**share** [23] - 4692:21, 4693:1, 4713:24, 4716:11, 4716:20, 4717:18, 4719:9, 4724:16, 4724:17, 4724:18, 4724:19, 4724:22, 4727:19, 4728:6, 4729:15, 4730:2, 4730:20, 4731:15, 4734:4,

4736:9, 4736:21, 4745:22
**shares** [35] - 4688:11, 4691:7, 4692:11, 4713:23, 4715:6, 4715:7, 4716:5, 4717:23, 4718:24, 4719:11, 4719:15, 4719:21, 4726:24, 4727:6, 4728:1, 4728:9, 4728:16, 4729:6, 4734:14, 4734:18, 4734:20, 4736:4, 4736:6, 4736:13, 4736:18, 4736:23, 4736:25, 4737:1, 4742:10, 4745:15, 4749:11, 4750:3, 4750:4
**Shares** [1] - 4731:13
**sharing** [1] - 4740:5
**shocked** [2] - 4732:2, 4732:3
**short** [2] - 4690:23, 4709:18
**short-circuit** [1] - 4709:18
**shorthand** [1] - 4679:25
**show** [8] - 4695:11, 4706:13, 4709:5, 4719:23, 4728:8, 4728:18, 4728:24, 4729:11
**showed** [6] - 4696:15, 4707:19, 4713:24, 4719:17, 4738:13, 4741:21
**showing** [2] - 4705:14, 4730:4
**shown** [4] - 4706:20, 4724:10, 4731:14, 4741:18
**shows** [4] - 4681:15, 4706:16, 4709:10, 4709:15
**shrift** [1] - 4690:24
**side** [3] - 4719:3, 4756:11
**side-by-side** [1] - 4719:3
**sides** [1] - 4739:17
**sign** [1] - 4698:8
**sign-off** [1] - 4698:8
**signature** [3] - 4695:21, 4695:22
**signatures** [1] - 4695:8
**signed** [2] - 4695:4, 4696:7
**significance** [5] - 4715:10, 4716:1, 4725:12, 4736:14, 4736:20
**significant** [12] - 4703:11, 4703:18, 4703:24, 4704:21, 4724:16, 4724:17, 4725:13, 4733:2, 4735:4, 4735:7, 4748:21, 4749:22
**significantly** [4] - 4690:12, 4719:16, 4725:9, 4725:11
**similar** [1] - 4722:24
**similarly** [1] - 4737:12
**simple** [1] - 4688:3
**simply** [2] - 4693:15, 4732:23
**simulation** [2] - 4688:8, 4688:11
**simulations** [1] - 4688:13
**single** [2] - 4707:15, 4732:19
**sit** [2] - 4705:2, 4709:17
**sits** [1] - 4704:10
**sitting** [3] - 4699:7, 4705:24, 4729:21
**situation** [2] - 4730:17, 4734:25
**six** [1] - 4683:7
**SKU** [5] - 4722:16, 4722:19, 4722:21, 4722:25, 4724:19
**SKUs** [5] - 4682:2, 4682:21, 4722:23, 4724:20, 4727:20
**sleep** [1] - 4754:3

**slide** [11] - 4681:15, 4699:11, 4705:10, 4723:19, 4726:24, 4727:10, 4727:14, 4743:4, 4743:7, 4751:10
**slides** [4] - 4681:12, 4683:6, 4722:14, 4758:2
**slightly** [3] - 4685:10, 4692:5, 4710:9
**slowly** [1] - 4692:25
**small** [4] - 4712:22, 4714:7, 4734:14, 4734:18
**smaller** [3] - 4713:8, 4713:10, 4713:24
**Smart** [4] - 4707:19, 4708:10, 4709:21, 4710:7
**Smith** [5] - 4699:11, 4700:6, 4725:1, 4725:25, 4735:8
**Smiths** [1] - 4725:20
**sold** [7] - 4682:6, 4701:25, 4702:4, 4702:8, 4728:19, 4735:18
**solid** [2] - 4722:18
**solve** [2] - 4691:5, 4742:6
**someone** [1] - 4695:6
**sometime** [1] - 4734:16
**somewhat** [1] - 4726:19
**soon** [2] - 4749:9, 4755:12
**sorry** [6] - 4716:21, 4716:25, 4741:21, 4747:4, 4747:7, 4751:1
**sort** [2] - 4709:18, 4730:22
**sorts** [1] - 4758:12
**sought** [1] - 4689:25
**sound** [4] - 4715:22, 4726:9, 4743:25, 4744:2
**sounds** [2] - 4700:10, 4757:12
**sources** [1] - 4739:22
**space** [3] - 4711:13, 4711:14
**specialty** [1] - 4710:18
**specific** [6] - 4688:21, 4692:16, 4737:20, 4737:21, 4738:1, 4746:2
**specifically** [1] - 4751:19
**speculative** [1] - 4744:23
**speed** [1] - 4718:5
**spends** [2] - 4685:5, 4756:3
**spent** [2] - 4710:20, 4759:8
**spikes** [3] - 4721:2, 4722:1, 4722:2
**split** [1] - 4727:23
**spot** [1] - 4716:21
**spreadsheet** [1] - 4729:12
**springs** [1] - 4685:6
**spur** [2] - 4694:13, 4746:20
**stability** [1] - 4720:4
**stable** [5] - 4691:8, 4718:25, 4719:12, 4719:13, 4719:22
**stage** [1] - 4688:5
**standard** [3] - 4691:20, 4740:19, 4744:18
**standards** [1] - 4688:1
**standpoint** [1] - 4756:21
**start** [9] - 4705:11, 4716:9, 4753:19, 4753:21, 4754:1, 4754:2, 4754:9, 4754:12, 4759:12, 4759:15
**started** [6] - 4685:23, 4685:24, 4686:2,

4732:4, 4734:14, 4734:17
**starting** [3] - 4689:6, 4723:2
**statement** [14] - 4690:23, 4691:4,
4691:17, 4692:14, 4719:10, 4722:10,
4733:16, 4734:2, 4736:5, 4742:5,
4744:10, 4745:25, 4747:9, 4750:21
**statements** [3] - 4748:24, 4757:24,
4757:25
**STATES** [3] - 4677:1, 4677:3, 4677:10
**States** [8] - 4696:2, 4700:17, 4701:25,
4702:5, 4702:8, 4703:13, 4718:24,
4734:11
**static** [1] - 4708:19
**statistical** [1] - 4725:12
**statistically** [1] - 4725:13
**stayed** [1] - 4725:18
**step** [4] - 4688:10, 4688:14, 4721:18,
4749:18
**steps** [2] - 4721:18, 4750:20
**still** [2] - 4713:11, 4757:5
**stingy** [1] - 4757:2
**stopped** [1] - 4704:21
**store** [1] - 4731:19
**stores** [2] - 4682:15, 4682:16
**Street** [10] - 4677:14, 4677:18, 4677:22,
4678:2, 4678:7, 4679:2, 4679:6,
4679:10, 4679:14, 4679:18
**strict** [1] - 4739:24
**strong** [5] - 4701:18, 4703:15, 4703:21,
4748:22, 4749:22
**structure** [2] - 4694:7, 4746:15
**studied** [2] - 4681:15, 4709:20
**subject** [1] - 4751:12
**submissions** [1] - 4697:14
**submitted** [1] - 4733:8
**substance** [1] - 4704:19
**substantial** [2] - 4692:25, 4735:7
**substantive** [3] - 4694:4, 4694:8,
4746:16
**substituting** [1] - 4724:24
**succeed** [2] - 4743:13, 4743:18
**sufficient** [3] - 4691:5, 4692:16, 4742:6
**suggest** [3] - 4701:8, 4701:23, 4759:8
**suggesting** [1] - 4687:12
**suggestion** [3] - 4726:8, 4754:9, 4756:8
**Suite** [6] - 4678:3, 4678:7, 4679:3,
4679:7, 4679:15, 4679:18
**SULLIVAN** [1] - 4677:10
**summation** [2] - 4755:5, 4756:9
**summations** [7] - 4755:19, 4756:1,
4756:22, 4757:5, 4757:10, 4759:22,
4760:25
**Summit** [4] - 4705:23, 4706:6, 4734:8,
4735:24
**Sunday** [1] - 4755:13
**supplemented** [1] - 4712:13
**supplied** [2] - 4697:12, 4730:18
**supplier** [3] - 4714:19, 4730:18, 4736:1
**suppliers** [5] - 4714:12, 4727:3,

4729:20, 4730:13, 4736:12
**support** [4] - 4701:17, 4711:9, 4727:8,
4744:4
**supported** [1] - 4690:25
**supposed** [3] - 4714:25, 4715:25,
4730:19
**supposedly** [1] - 4733:22
**surprise** [1] - 4696:19
**surprised** [1] - 4722:6
**surrounding** [1] - 4705:9
**survey** [3] - 4712:5, 4712:15, 4713:6
**switched** [1] - 4725:17
**switching** [2] - 4725:1, 4725:2

**T**

**table** [4] - 4716:5, 4727:23, 4728:11,
4733:13
**talks** [4] - 4688:2, 4688:5, 4758:4,
4759:6
**target** [1] - 4726:11
**team** [1] - 4751:19
**term** [3] - 4700:10, 4738:10, 4750:2
**terms** [18] - 4687:23, 4688:23, 4699:19,
4701:15, 4710:8, 4725:12, 4727:18,
4751:24, 4752:1, 4752:2, 4752:6,
4754:4, 4755:5, 4755:21, 4756:2,
4756:20, 4760:20
**terrific** [1] - 4684:5
**test** [2] - 4725:12, 4727:7
**testable** [1] - 4745:1
**tested** [1] - 4744:6
**testified** [7] - 4697:25, 4733:4, 4750:8,
4751:23, 4752:3, 4757:23, 4759:5
**testifying** [1] - 4751:3
**testimony** [22] - 4704:23, 4705:21,
4707:23, 4717:1, 4722:15, 4737:4,
4745:20, 4748:18, 4750:12, 4751:17,
4751:18, 4752:6, 4754:18, 4755:23,
4756:17, 4757:9, 4758:4, 4758:13,
4760:17, 4760:24
**that'll** [1] - 4757:10
**THE** [55] - 4677:1, 4677:10, 4681:2,
4681:4, 4681:5, 4693:17, 4693:20,
4693:22, 4693:24, 4694:22, 4694:24,
4698:2, 4700:12, 4716:7, 4720:11,
4720:16, 4731:4, 4731:12, 4731:13,
4731:22, 4731:24, 4732:4, 4732:7,
4738:7, 4738:10, 4750:15, 4750:18,
4750:19, 4750:24, 4751:2, 4751:7,
4751:13, 4752:12, 4752:22, 4753:6,
4753:9, 4753:14, 4753:25, 4754:12,
4754:15, 4755:16, 4755:18, 4756:5,
4756:13, 4756:15, 4756:25, 4757:14,
4758:12, 4758:21, 4759:3, 4759:13,
4759:19, 4760:7, 4760:23, 4761:3
**themselves** [1] - 4755:8
**theoretical** [6] - 4741:9, 4741:16,
4743:23, 4744:24, 4745:2, 4745:5

**theory** [2] - 4743:25, 4744:1
**they've** [4] - 4719:24, 4739:17, 4748:7,
4755:12
**thinking** [1] - 4754:20
**third** [3] - 4692:13, 4694:13, 4724:10
**Third** [1] - 4745:25
**thoughts** [2] - 4688:20, 4757:3
**thousands** [6] - 4708:12, 4708:15,
4711:18, 4711:21
**three** [21] - 4681:24, 4683:7, 4690:10,
4690:24, 4691:10, 4694:7, 4694:10,
4697:1, 4708:8, 4716:3, 4719:20,
4720:22, 4721:2, 4721:4, 4721:15,
4727:25, 4746:14, 4746:16, 4746:18,
4747:13, 4748:17
**throughout** [3] - 4699:13, 4748:18,
4756:1
**throw** [1] - 4714:8
**timing** [2] - 4698:13, 4755:21
**title** [1] - 4695:2
**titled** [3] - 4689:1, 4727:11, 4727:14
**today** [23] - 4689:16, 4694:18, 4696:4,
4697:2, 4699:7, 4703:23, 4705:24,
4710:22, 4714:3, 4729:22, 4734:9,
4734:21, 4735:18, 4741:23, 4743:14,
4744:15, 4746:11, 4748:5, 4750:12,
4752:6, 4753:18, 4754:7, 4759:5
**together** [9] - 4687:17, 4696:20,
4697:16, 4701:9, 4708:11, 4709:23,
4730:22, 4739:10, 4756:3
**took** [3] - 4736:10, 4758:7, 4760:2
**toolbox** [1] - 4711:15
**tools** [2] - 4711:10, 4737:8
**top** [6] - 4692:10, 4722:25, 4726:2,
4731:13, 4735:6, 4745:14
**top-loading** [2] - 4692:10, 4745:14
**top-selling** [2] - 4722:25, 4726:2
**topic** [1] - 4697:7
**total** [7] - 4716:10, 4716:17, 4717:3,
4729:21, 4730:12, 4731:16
**totals** [1] - 4728:13
**towards** [2] - 4699:3, 4719:16
**track** [1] - 4708:22
**tracks** [1] - 4705:19
**training** [1] - 4737:17
**transaction** [4] - 4742:24, 4749:25,
4750:10, 4752:1
**transactions** [2] - 4712:12, 4736:11
**TRANSCRIPT** [1] - 4677:9
**transcript** [5] - 4679:25, 4754:25,
4757:13, 4758:9, 4759:25
**transcription** [2] - 4679:25, 4762:5
**transcripts** [2] - 4752:23, 4756:5
**transportation** [2] - 4711:14, 4737:13
**TraQline** [14] - 4712:3, 4712:5, 4712:7,
4712:10, 4712:14, 4712:17, 4712:25,
4713:19, 4713:25, 4714:7, 4734:4,
4734:5
**traveling** [1] - 4753:18
**treat** [1] - 4727:3

**treated** [1] - 4715:18
**trend** [2] - 4720:7, 4721:6
**trending** [1] - 4713:1, 4713:19
**trial** [3] - 4699:13, 4753:18, 4758:3
**TRIAL** [1] - 4677:9
**tried** [5] - 4714:11, 4722:12, 4739:24, 4740:2, 4749:17
**trim** [1] - 4693:2
**trucks** [2] - 4738:13
**true** [2] - 4706:11, 4760:11
**truth** [1] - 4760:15
**try** [3] - 4726:11, 4752:24, 4754:24
**trying** [5] - 4703:7, 4714:15, 4720:2, 4740:3, 4753:17
**Tuesday** [10] - 4756:21, 4757:3, 4757:4, 4757:6, 4757:10, 4759:12, 4759:15, 4759:22, 4760:21, 4760:24
**tune** [1] - 4725:15
**turn** [7] - 4681:12, 4681:19, 4716:5, 4727:10, 4728:4, 4728:23, 4740:23
**two** [29] - 4682:14, 4683:7, 4690:11, 4691:9, 4691:12, 4694:10, 4697:16, 4700:1, 4703:10, 4705:25, 4714:10, 4719:14, 4719:25, 4720:6, 4721:5, 4721:8, 4721:13, 4721:19, 4724:21, 4726:6, 4743:20, 4746:18, 4747:13, 4749:11, 4750:8, 4751:13, 4759:25, 4760:25
**two-year** [4] - 4719:14, 4719:25, 4720:6
**type** [2] - 4709:7, 4755:6
**types** [1] - 4737:15
**typically** [3] - 4693:1, 4694:11, 4746:19

# U

**U.S** [9] - 4677:13, 4677:17, 4677:21, 4678:2, 4678:6, 4679:22, 4689:3, 4690:12, 4734:15
**ultimately** [1] - 4749:6
**uncritically** [1] - 4694:5
**under** [4] - 4693:11, 4694:2, 4713:16, 4757:25
**underestimated** [1] - 4714:1
**underlying** [4] - 4682:24, 4728:8, 4728:18, 4758:1
**understated** [1] - 4713:1, 4713:20
**understates** [2] - 4736:24, 4737:1
**understood** [1] - 4722:14
**undertaken** [2] - 4705:25, 4706:8
**underway** [1] - 4698:11
**unilateral** [7] - 4688:3, 4688:20, 4691:19, 4691:21, 4691:23, 4744:18, 4744:20
**unit** [10] - 4715:7, 4715:13, 4717:19, 4717:23, 4718:20, 4719:5, 4728:16, 4730:2, 4731:15
**United** [8] - 4696:2, 4700:17, 4701:25, 4702:4, 4702:8, 4703:13, 4718:24, 4734:11

**UNITED** [3] - 4677:1, 4677:3, 4677:10
**units** [7] - 4715:12, 4715:21, 4715:23, 4716:13, 4718:2, 4728:18, 4728:19
**University** [4] - 4684:1, 4684:10, 4686:25, 4693:8
**unquestionably** [1] - 4689:23
**unredacted** [1] - 4743:8
**unusual** [3] - 4740:10, 4740:14, 4740:20
**up** [30] - 4687:15, 4690:6, 4697:7, 4698:7, 4699:19, 4706:3, 4706:13, 4706:16, 4706:20, 4707:19, 4709:5, 4709:19, 4710:2, 4710:3, 4714:12, 4722:11, 4727:5, 4731:8, 4732:14, 4741:22, 4743:3, 4743:4, 4744:5, 4745:19, 4754:21, 4754:23, 4757:15, 4757:21, 4758:10, 4758:21
**UPP** [5] - 4688:4, 4688:18, 4692:4, 4732:22, 4733:3
**UPPs** [1] - 4688:10
**upward** [1] - 4721:6
**useful** [1] - 4688:4

# V

**value** [5] - 4725:18, 4735:10, 4735:11, 4735:24, 4736:1
**value-priced** [1] - 4735:24
**various** [2] - 4683:8, 4735:9
**Versus** [1] - 4727:11
**versus** [1] - 4715:6
**vice** [1] - 4695:2
**view** [2] - 4701:17, 4752:7
**views** [1] - 4688:17
**Viking** [1] - 4707:13
**virtually** [1] - 4694:6
**voice** [1] - 4698:8
**volume** [4] - 4702:22, 4735:5, 4737:14, 4737:15
**VOLUME** [1] - 4677:9

# W

**Wacker** [2] - 4678:14, 4678:21
**wall** [4] - 4701:9, 4701:12, 4701:20, 4702:4
**walled** [1] - 4696:10
**walls** [2] - 4739:24, 4740:6
**wants** [1] - 4760:20
**washers** [2] - 4691:25, 4692:18
**washing** [3] - 4690:14, 4692:8, 4745:13
**Washington** [14] - 4677:6, 4677:15, 4677:19, 4677:23, 4678:3, 4678:8, 4678:10, 4678:18, 4679:3, 4679:7, 4679:11, 4679:15, 4679:19, 4679:22
**water** [3] - 4714:9, 4743:24, 4745:6
**Wayne** [1] - 4679:21
**WAYNE** [2] - 4762:4, 4762:8

**ways** [1] - 4744:6
**Wednesday** [1] - 4756:16
**weekend** [2] - 4752:13, 4755:13
**weeks** [2] - 4681:24, 4759:1
**West** [2] - 4678:14, 4678:21
**whatsoever** [2] - 4698:23, 4750:5
**Whinston** [15] - 4688:9, 4701:18, 4707:17, 4707:21, 4707:24, 4708:3, 4708:18, 4708:23, 4709:20, 4710:13, 4726:20, 4730:21, 4741:13, 4753:10, 4753:22
**Whirlpool** [50] - 4687:10, 4687:19, 4689:10, 4689:25, 4691:18, 4691:23, 4692:1, 4692:8, 4695:6, 4696:8, 4696:9, 4696:11, 4696:24, 4697:5, 4697:11, 4697:16, 4698:15, 4698:18, 4698:22, 4698:24, 4699:5, 4705:7, 4708:3, 4708:5, 4708:24, 4718:14, 4718:19, 4719:7, 4719:21, 4720:14, 4727:17, 4727:21, 4730:24, 4732:24, 4733:10, 4733:17, 4733:21, 4739:6, 4739:7, 4739:25, 4741:7, 4741:11, 4742:21, 4744:3, 4744:11, 4745:13, 4745:18, 4746:4
**Whirlpool-Maytag** [9] - 4689:10, 4696:11, 4696:24, 4733:10, 4733:17, 4733:21, 4739:6, 4741:7, 4741:11
**white** [1] - 4733:8
**whole** [2] - 4705:1, 4708:11
**wholesale** [1] - 4690:13
**widely** [1] - 4746:3
**wife** [1] - 4711:3
**William** [1] - 4711:3
**Willig** [4] - 4685:20, 4685:21, 4685:22, 4686:16
**window** [2] - 4720:6, 4720:7
**wipe** [1] - 4726:9
**wish** [3] - 4752:25, 4758:17, 4758:22
**withdraw** [1] - 4744:23
**Witness** [1] - 4733:25
**WITNESS** [6] - 4680:3, 4681:4, 4694:24, 4731:13, 4738:10, 4750:19
**witness** [8] - 4697:24, 4750:16, 4750:20, 4751:3, 4751:23, 4752:11, 4759:25, 4760:12
**witnesses** [5] - 4751:7, 4751:13, 4755:14, 4756:20, 4756:24
**Wolf** [1] - 4707:13
**wonderful** [1] - 4739:11
**word** [1] - 4745:8
**wording** [1] - 4715:17
**words** [4] - 4693:4, 4699:12, 4700:8, 4745:6
**works** [2] - 4695:18, 4696:8
**world** [11] - 4683:17, 4684:4, 4684:12, 4684:18, 4684:20, 4684:25, 4685:7, 4687:2, 4699:25, 4739:13, 4748:2
**world-class** [1] - 4683:17
**world-renowned** [7] - 4684:4, 4684:12, 4684:18, 4684:20, 4684:25, 4685:7,

4687:2

**worried** [3] - 4743:9, 4743:12, 4744:8
**write** [7] - 4687:9, 4715:7, 4742:10, 4743:9, 4744:17, 4745:11, 4746:3
**writes** [1] - 4698:7
**written** [5] - 4687:7, 4687:10, 4689:10, 4739:17, 4740:24
**wrote** [8] - 4687:11, 4689:11, 4689:21, 4731:7, 4731:13, 4739:19, 4742:1

## Y

**year** [6] - 4687:15, 4719:14, 4719:15, 4719:25, 4720:6
**years** [6] - 4686:1, 4691:10, 4696:9, 4696:13, 4719:20, 4720:22
**yesterday** [3] - 4698:8, 4701:7, 4726:21

## Z

**zero** [2] - 4706:9, 4709:11